UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: AMARANTH NATURAL GAS COMMODITIES LITIGATION | MASTER FILE NO. 07 Civ. 6377 (SAS) **ECF Case** |
| This Document Relates To:<br><br>ALL ACTIONS | JURY TRIAL DEMANDED |

## PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs complain of defendants upon knowledge as to matters relating to plaintiffs and upon information (see ¶ 271 *infra*) and belief as to all other matters:

## SUMMARY OF ALLEGATIONS

1.    **Primary Federal Violation**. Between February 16, 2006 and September 28, 2006 ("Class Period"), the Amaranth Defendants (as defined in ¶ 33) manipulated the prices of New York Mercantile Exchange ("NYMEX") natural gas contracts (as defined in ¶ 14) in violation of Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act (the "CEA" or the "Act"), 7 U.S.C. §§ 9, 13b and 13(a)(2), as well as the common law.

2.    **Primary Means of Manipulation**. The Amaranth Defendants, among other manipulative acts, intentionally:

    a.    **dominated** trading in natural gas contracts by, among other acts, buying or selling millions of contracts and amassing increasingly large, unprecedented natural gas contract positions (¶¶ 63-70 *infra*);

b.      engaging in self-fulfilling prophecy manipulative acts whereby the increasing size of Amaranth's positions, by itself, acted as a push and a prop to cause increasing amounts of artificiality in NYMEX natural gas contract prices (¶¶ 71-93 *infra*);

c.      made large trades that caused spikes in artificial natural gas contract prices (¶¶ 94-98 *infra*);

d.      concealed their manipulative trading from regulators and market participants by, among other acts, misrepresenting facts and positions after Amaranth was ordered by NYMEX to reduce its NYMEX natural gas contract positions (¶¶ 149-50, 166-68 *infra*);

e.      intentionally "slammed the close" or depressed settlement prices (as defined in ¶ 100-04) on (among other dates) February 24, March 29 and April 26, 2006 (¶¶ 105-46 *infra*) which caused the prices of other natural gas contracts to be depressed then and on the days following each of the foregoing dates;

f.      conspired with the other Defendants and John Does ## 1 - 10 to plan the Amaranth Defendants' manipulative acts  and otherwise manipulate natural gas contract prices; and

g.      engaged in systematic as well as episodic other manipulative conduct in order to profit and unjustly enrich themselves at the expense of Class members.

3.      **Domination**. The Commodity Futures Trading Commission ("CFTC") defines a "large trader" for reporting purposes in the natural gas market as a trader who holds at least 200 contracts. All but the very largest traders regard a position of a few hundred contracts as very large. A position of 200 contracts can move prices and 200 contracts constitutes a potentially manipulative threshold.

a.    On December 1, 2005, the Amaranth Defendants held a very large

position of **long** 18,546 futures equivalent contracts (as defined in ¶ 75 *infra*) and 21,760 **short**

futures equivalent contracts for a total of 40,306 open contracts (or more than 200 times the

potentially manipulative threshold).

b.    By February 1, 2006, Amaranth held 53,556 net futures equivalent natural

gas contracts **long** (more than 260 times the manipulative threshold) and more than 69,708 net

futures equivalent natural gas contracts **short** (more than 348 times the manipulative threshold).

This constituted an extremely large, unprecedented position of more than 122,000 open contracts

(more than 600 times the manipulative threshold). See ¶ 75 *infra*.

c.    During the Class Period, Amaranth's positions steadily grew to 475,489

net futures equivalent natural gas contracts **long** on September 10, 2006 (or more than 2,350

times the manipulative threshold) and as many as 306,417 net contracts natural gas futures

equivalent contracts **short** (or more than 1500 times the manipulative threshold) on that same

day.  See ¶ 75 *infra*.  Amaranth's total open position on September 10 was an incredible 781,906

contracts (or more than 3900 times the manipulative threshold).

d.    Correspondingly, Amaranth's open holdings of individual expirations of

futures contracts greatly increased.  See ¶¶ 76-90 *infra*.

4.    Thus, the U.S. Senate Permanent Subcommittee on Investigations issued a report

on June 25, 2007.  *See* PSI Staff Report: *Excessive Speculation in the Natural Gas Markets,*

available at

http://hsgac.senate.gov/_files/REPORTExcessiveSpeculationintheNaturalGasMarket.pdf.

Although Plaintiffs disagree with some characterizations and some parts of the report and were

not participants therein, the Sub-Committee found:

"1. A single hedge fund, Amaranth Advisors LLC, dominated the U.S. natural gas market in 2006.

\*\*\*\*

"b. Amaranth accumulated such large positions and traded such large volumes of natural gas in 2006, on both NYMEX and ICE, that it had a direct effect on U.S. natural gas prices and increased price volatility in the natural gas market. The larger than usual differences between winter and summer futures prices that prevailed during the spring and summer of 2006 were largely the result of Amaranth's large-scale trades rather than the normal market interaction of many buyers and sellers.

\*\*\*\*

"3. Amaranth's actions in causing significant price movements in the natural gas market demonstrate that excessive speculation distorts prices, increases volatility, and increases costs and risks . .

*Id.*

5.    **"Slamming The Close."**  Defendants manipulated the Settling Price (as alleged in ¶ 50) of the March, April and May 2006 NYMEX natural gas futures contracts to lower levels by "slamming the close."  This depressed not only Settling Prices of these contracts but the prices of other natural gas contracts on the days following the close.  This manipulative act has resulted in formal legal proceedings against the Amaranth defendants from two separate federal agencies:

a.    On July 25, 2007, the U.S. Commodity Futures Trading Commission ("CFTC") filed a complaint for injunctive and other equitable relief, and civil monetary penalties against Defendants Amaranth Advisors, L.L.C., Amaranth Advisors (Calgary) ULC, and Brian Hunter for attempted manipulation of natural gas futures contract prices during 2006 in violation of the CEA.  The CFTC's complaint is available on the CFTC's website, http://www.cftc.gov/stellent/groups/public/@lrenforcementactions/documents/legalpleading/enf Amaranthcomplaint072507.pdf.

b.      On July 26, 2007, the Federal Energy Regulatory Commission ("FERC")

issued an Order to Show and Notice of Proposed Penalties (the "Order to Show Cause") against

Defendants Amaranth Advisors, L.L.C., Amaranth LLC, Amaranth Group Inc., Amaranth

International Limited, Amaranth Partners LLC, Amaranth Capital Partners LLC, Amaranth

Advisors (Calgary) ULC, Brian Hunter, and Matthew Donohoe for manipulation of NYMEX

natural gas futures prices during 2006. In the Order to Show Cause, the FERC seeks civil

penalties, and disgorgement of unjust profits, of nearly $300,000,000 against these Amaranth

Defendants. The FERC's Order to Show Cause is available on the FERC's website,

http://www.ferc.gov/EventCalendar/Files/20070726084235-IN07-26-000.pdf.

6.      **Primary Effects of Manipulation**.

a.      As a proximate and direct result of the Amaranth Defendants' violations

of law, Amaranth caused NYMEX natural gas contract prices to be artificial throughout the

Class Period. See ¶¶ 178-82 *infra*. For example, Amaranth's positions in natural gas contracts

steadily grew from December 1, 2005 until September 10, 2006 and acted as a push and a prop to

cause increasing artificiality in NYMEX natural gas contract prices, including "spread" prices

(as defined in ¶ 45). When Amaranth's manipulative positions were threatened, Amaranth

greatly increased its artificial price support activities. For example, Amaranth artificially inflated

the March 2007-April 2007 spread to $2.43 on August 15, 2006. (Amaranth was long the March

2007 contract and short the April 2007 contract. See ¶¶ 76-90 *infra*.)

b.      By September 5, 2006, Amaranth artificially increased the January 2007-

November 2006 spread to $2.60 (Amaranth was then long each contract) and the January 2007-

October 2006 spread to $4.64 (Amaranth was short October 2006 and long January 2007). *Id.*

c.      However, this extraordinary buying and unbalanced concentration on the long side (see ¶ 75 *infra*) eventually exhausted Amaranth's credit lines as prices fell. When Amaranth could no longer artificially retard the decline of prices, they collapsed during September 2006. The March-April 2007 spread fell to $0.55 (70-plus%), and the October 2006-January 2007 spread fell to $3.10 (33%).

d.      The Amaranth Defendants also caused unprecedented volatility in the prices of natural gas contracts. And they caused unprecedented relationships between and among natural gas futures contract prices, and between natural gas contract prices and the fundamentals, such as supplies.

e.      For example, the Amaranth Defendants managed to cause very high winter contract natural gas contract prices at the same times --- July and August 2006 --- that there was not just record high supplies of natural gas but all or virtually all commercially reasonable storage capacity for natural gas **was full**.

f.      For another example, traders interviewed by the Senate Subcommittee on Investigations said that during the Class Period the differences between winter and summer prices were "clearly out-of-whack," at "ridiculous" levels, and unjustified by supply or demand.

g.      For another example, during 1999-2004, the January-October spreads averaged less than $0.47.

7.      **Price Signature of Manipulation In The Collapse of Prices When Amaranth's Unprecedented Positions Are Threatened And Are Liquidated**. These extraordinary declines in natural gas prices and spreads indicate the extent of price artificiality that Amaranth's multi-faceted manipulation had intentionally caused. The only change in fundamentals during August-September 2006—the absence of hurricanes—indicated nothing

about the prospective coldness of the winter, nor the usage of natural gas for consumer heating during the winter, nor anything whatsoever about the March-April 2007 spreads. But the levels of these prices and relationships fell dramatically.

8.      **Floor Broker Defendants.** Defendants ALX Energy, Inc., James DeLucia, TFS Energy Futures, LLC and Gotham Energy Brokers, Inc. (collectively, the "Floor Broker Defendants"), aided and abetted the "slamming the close" parts of the Amaranth Defendants' manipulation in violation of the CEA. See ¶¶ 100-136 *infra*. They did so by, among other ways, executing Amaranth's manipulative orders and trades designed to slam the close.

9.      **J. P. Morgan.**

a.      Defendants J.P. Morgan Futures, Inc. ("JP Futures") and J.P. Morgan Chase & Co. ("JPMC"), J.P. Morgan Chase Bank, Inc. ("JPMCB") (collectively, the "JPM Defendants") participated in or aided and abetted all of Amaranth's manipulation in violation of the CEA.

b.      Defendant JP Futures was Amaranth's clearing broker at NYMEX. As Amaranth's clearing broker, JP Futures was the NYMEX's counterparty for all positions it cleared in the customer account with NYMEX, including the positions held by Amaranth. Defendant JP Futures knew Amaranth's entire natural gas portfolio, and knew that Amaranth's positions and trading strategies were designed to manipulate and were manipulating NYMEX natural gas contract prices. See ¶ 183-222 *infra*. By knowingly financing and supporting Amaranth's manipulative trading and by facilitating Amaranth's move from NYMEX to ICE, JP Futures, with the knowledge and consent of its parent, Defendant JPMC, aided and abetted the Amaranth Defendants' manipulation of NYMEX natural gas contract prices in violation of the CEA. *Id.*; see ¶¶ 262-65 *infra*.

10.    The Amaranth Defendants' manipulative acts were unlawful and unjustly enriched them. Commodity futures trading is a zero sum endeavor. The markets therefor are affected with a public interest that imposes legal responsibilities on the market participants. The J.P. Morgan Defendants, Defendants Nicholas Maounis, Brian Hunter, Matthew Donohoe, and the other Defendants unlawfully profited and unjustly enriched themselves from the above-alleged manipulation. Such unjust enrichment should be paid to plaintiffs and class members.

11.    The Amaranth Defendants caused artificial prices of NYMEX natural gas contracts throughout the Class Period. They unjustly enriched themselves, confused the natural gas markets, deprived Class members of an unmanipulated market, and caused Class members to transact at artificial prices. As a direct, proximate and foreseeable result of Defendants' violations of the CEA and common law, Plaintiffs and members of the Class have suffered cognizable injury and are entitled to recover unjust enrichment or damages.

## JURISDICTION AND VENUE

12.    Natural gas is a "commodity" and is the "commodity underlying" natural gas futures and options contracts traded on the NYMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

13.    This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, 28 U.S.C. §§ 1331 and 1337.

14.    Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b), (c) and (d). The Defendants transacted business in the Southern District of New York, the claims arose in the Southern District of New York, and a substantial part of the events or omissions giving rise to the claims occurred in the

Southern District of New York. Defendants' unlawful acts manipulated the prices of NYMEX

natural gas (sometimes, "NG") contracts which were traded in this district in which NYMEX is

located, at One North End Avenue, New York, New York. As used herein, NYMEX NG

contracts means NYMEX natural gas futures contracts (including NYMEX miNY Henry Hub

natural gas futures contracts and NYMEX natural gas-last day financial contracts), and NYMEX

options on such contracts.

15.    Defendants made use of the means and instrumentalities of transportation or

communication in, or the instrumentalities of, interstate commerce, or of the mails in connection

with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

16.    Plaintiffs purchased and sold NYMEX natural gas contracts during the Class

Period. Defendants' manipulation of the prices of NYMEX natural gas contracts proximately

caused Plaintiffs' losses, injury and damages.

17.    Plaintiff Roberto Calle Gracey is a resident of Madrid, Spain. Plaintiff Calle

Gracey was injured in that, among other things, he transacted at the artificial prices caused by the

Amaranth Defendants. He was also caused to suffer losses and injury when the manipulation

collapsed during September 2006 and he lost money on his long positions in NYMEX natural

gas futures contracts.

18.    Plaintiff Dax Partners LP is a resident of the Cayman Islands. Plaintiff Dax

Partners was injured in that, among other things, it transacted at the artificial prices caused by the

Amaranth Defendants. It was also caused to suffer losses and injury when the manipulation

collapsed during September 2006 and it lost money on its long positions in NYMEX natural gas futures contracts.

19.     Plaintiff John F. Special is a resident of Oklahoma.  Plaintiff Special was injured in that, among other things, he transacted at the artificial prices caused by the Amaranth Defendants.  He was also caused to suffer losses and injury when Amaranth slammed the close and depressed prices in April 2006.

20.     Plaintiff Gregory H. Smith is a resident of Texas.  Plaintiff Smith was injured in that, among other things, he transacted at the artificial prices caused by the Amaranth Defendants and suffered losses and injury during the Class Period.

21.     Plaintiff Alan Martin is a resident of New York.  Plaintiff Martin was injured in that, among other things, he transacted at the artificial prices caused by the Amaranth Defendants and was thereby caused to suffer losses in February 2006.

22.     Defendant Amaranth Advisors, L.L.C. ("Amaranth Advisors") is a Delaware limited liability corporation, founded in September 2000 and having its principal place of business at One American Lane, Greenwich, Connecticut.  At all times relevant hereto, Defendant Amaranth Advisors served as the investment advisor and manager of the Amaranth group of investment funds including Defendant Amaranth LLC, a multi-strategy private investment fund with substantial investments in energy.  Defendant Amaranth Advisors was the entity that directed the investments and employed the natural gas traders under the Advisory Agreement between Amaranth LLC and Amaranth Advisors, and was a broadly empowered agent of the Amaranth Defendants under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (2002).  Amaranth Advisors was also a controlling person within the meaning of CEA § 13(b), 7 U.S.C. § 13c(b).  Amaranth Advisors is also liable under Regulation 166.3, 17 C.F.R. § 166.3,

for the acts of its officials, agents or other persons, including the Amaranth Defendants, acting within the scope of their employment or office.

        a.      At the close of 2005, Amaranth had net assets of over $8 billion, natural gas futures positions valued at over $5 billion, and employed over 600 people in its Greenwich, Connecticut headquarters and seven other offices worldwide. In September 2006, Amaranth experienced significant losses from its natural gas positions that ultimately resulted in the pending dissolution of that firm. Although Amaranth's trading operations ceased in 2006, at present the assets of Amaranth exceed $600,000,000, including undistributed bonus amounts.

      23.     Defendant Amaranth LLC ("Amaranth LLC"), a Cayman Islands company, is a multi-strategy trading fund advised by Defendant Amaranth Advisors L.L.C. and its affiliates. Amaranth LLC serves as a "master fund" in a "master-feeder" fund structure. As the "master" fund, Amaranth LLC held the manipulative positions in the NYMEX natural gas futures contracts at issue herein. At all times relevant hereto, Amaranth's investors invested directly into three "feeder" funds (Amaranth International Limited, Amaranth Partners LLC, and Amaranth Capital Partners LLC), which invested substantially all of their capital in Amaranth LLC. The "feeder" funds thus got the manipulation started by putting up the funds to manipulate the NYMEX natural gas futures contracts at issue herein, and shared in the financial benefits of the manipulation. Amaranth LLC then invested the funds on a global basis in a host of trading vehicles. Amaranth LLC currently possesses substantial assets related to the operation of the Amaranth entities. Amaranth LLC, Amaranth International Limited, Amaranth Partners LLC, and Amaranth Capital Partners LLC were also controlling persons within the meaning of CEA § 13(b), 7 U.S.C. § 13c(b). Amaranth LLC, Amaranth International Limited, Amaranth Partners LLC, and Amaranth Capital Partners LLC are also liable under CEA § 2(a)(1)(B) and Regulation

166.3, 17 C.F.R. § 166.3 for the acts of their officials, agents or other persons acting within the scope of their employment or office, including the Amaranth Defendants.

24.    Defendant Amaranth Management Limited Partnership ("Amaranth Management") is a limited partnership organized and existing under the laws of Delaware. Amaranth Management serves as a holding entity which owns 78 percent of Amaranth Advisors. Amaranth Management was also a controlling person within the meaning of CEA § 13(b), 7 U.S.C. § 13c(b). Amaranth Management is also liable under CEA § 2(a)(1)(B) and Regulation 166.3, 17 C.F.R. § 166.3, for the acts of its officials, agents or other persons acting within the scope of their employment or office, including the Amaranth Defendants.

25.    Defendant Amaranth Group Inc. ("Amaranth Group") is a Delaware S corporation owned 100 percent by Defendants Amaranth LLC and Nicholas Maounis. As of May 1, 2006, Amaranth Group owned one percent and served as general partner of Amaranth Management Limited Partnership, a Delaware holding entity, which entity in turn owned 78 percent of Amaranth Advisors LLC. At all times relevant hereto, Amaranth Group employed all the natural gas traders, including Defendant Brian Hunter, Defendant Matthew Donohoe, as well as the executives such as the President and Chief Investment Officer, Defendant Maounis. At all times relevant hereto, Amaranth Group Inc. was a service provider to the Amaranth group of funds, including Amaranth LLC. Amaranth Group was also a controlling person within the meaning of CEA § 13(b), 7 U.S.C. § 13c(b). Amaranth Group is also liable under CEA § 2(a)(1)(B) and Regulation 166.3, 17 C.F.R. § 166.3, for the acts of its officials, agents or other persons acting within the scope of their employment or office, including the Amaranth Defendants.

26.    Defendant Amaranth International Limited ("Amaranth International") is a Bermuda company. At all times relevant hereto, Defendant Amaranth International served as an

off-shore "feeder fund" for non-United States and tax-exempt investors, in the "master-feeder" fund structure. At all times relevant hereto, investors invested directly into Amaranth International, which invested substantially all of its capital in Amaranth LLC. As a "feeder" fund, Amaranth International got the manipulation started by putting up funds to manipulate the NYMEX natural gas futures contracts at issue herein, and shared in the financial benefits of the manipulation. Amaranth LLC then invested the funds on a global basis in a host of trading vehicles. Amaranth International was also a controlling person within the meaning of CEA § 13(b), 7 U.S.C. § 13c(b). Amaranth International is also liable under CEA § 2(a)(1)(B) and Regulation 166.3, 17 C.F.R. § 166.3 for the acts of its officials, agents or other persons acting within the scope of their employment or office, including the Amaranth Defendants.

27.     Defendants Amaranth Partners LLC and Amaranth Capital Partners LLC are Delaware Limited Liability Companies. At all times relevant hereto, they both served as a domestic "feeder fund" for United States taxable investors, in the "master-feeder" fund structure. During the Class Period, investors invested directly into these entities, which then invested substantially all of their capital in Amaranth LLC. As "feeder" funds, Amaranth Partners LLC and Amaranth Capital Partners LLC got the manipulation started by putting up funds to manipulate the NYMEX natural gas futures contracts at issue herein, and shared in the financial benefits of the manipulation. Amaranth LLC then invested the funds on a global basis in a host of trading vehicles. Amaranth Partners LLC and Amaranth Capital Partners LLC were also controlling persons within the meaning of CEA § 13(b), 7 U.S.C. § 13c(b). Amaranth Partners LLC and Amaranth Capital Partners LLC are also liable under CEA § 2(a)(1)(B) and Regulation 166.3, 17 C.F.R. § 166.3 for the acts of their officials, agents or other persons acting within the scope of their employment or office, including the Amaranth Defendants.

28.    Defendant Amaranth Advisors (Calgary) ULC ("Amaranth ULC") is a Nova

Scotia, Canada company, registered with the Alberta Securities Commission, that Amaranth

established as an energy advisor entity to allow Defendant Hunter and his team to move their

trading operation from Greenwich, Connecticut to Calgary, Alberta. Most of Amaranth ULC's

officers were based in Greenwich, as were the other Amaranth employees assigned to perform

support functions for the Calgary trading operation. At all times relevant hereto, Amaranth ULC

was an indirect subsidiary of Amaranth Advisors. Amaranth ULC was also a controlling person

within the meaning of CEA § 13(b), 7 U.S.C. § 13c(b). Amaranth ULC is also liable under CEA

§ 2(a)(1)(B) and Regulation 166.3, 17 C.F.R. § 166.3 for the acts of its officials, agents or other

persons acting within the scope of their employment or office, including the Amaranth

Defendants.

29.    Defendant Nicholas M. Maounis ("Maounis"), an individual, is the founder and,

at all times relevant hereto, served as the Chief Executive Officer and Managing Member of

Amaranth Advisors. The Amaranth Defendants were in practice a tightly knit association-in-

fact, which operated as a single entity under the direction of Defendant Maounis. Accordingly,

at all times relevant hereto, Defendant Maounis had *de jure* and *de facto* control over the

Amaranth Defendants, each of which acted under the direction, and at the behest of, Defendant

Maounis. Maounis was also a controlling person within the meaning of CEA § 13(b), 7 U.S.C. §

13c(b). Maounis is also liable under CEA § 2(a)(1)(B) and Regulation 166.3, 17 C.F.R. § 166.3

for the acts of his officials, agents or other persons acting within the scope of their employment

or office, including the Amaranth Defendants.

30.    Defendant Brian Hunter is an individual and Canadian citizen who, at all times

relevant hereto, was the head natural gas trader at Amaranth. In or around October 2005,

Defendant Hunter transferred from Amaranth's Greenwich, Connecticut office to Calgary and became head of energy trading in the Calgary office. Certain natural gas traders under Defendant Hunter's supervision continued to work at the Greenwich office, and risk management and compliance personnel in charge of overseeing the trading of the Calgary office continued to work in Greenwich. At all times relevant hereto, Defendant Hunter served as the President of Amaranth ULC. Defendant Hunter's compensation in 2005 was over $75 million. Hunter was also a controlling person within the meaning of CEA § 13(b), 7 U.S.C. § 13c(b). Hunter is also liable under CEA § 2(a)(1)(B) and Regulation 166.3, 17 C.F.R. § 166.3 for the acts of his officials, agents or other persons acting within the scope of their employment or office, including the Amaranth Defendants.

31.     Defendant Matthew Donohoe is an individual who, at all times relevant hereto, served as Defendant Hunter's "execution trader." According to Defendant Donohoe, Defendant Hunter would "direct macro strategy, and [Donohoe] would implement it via trading."[5] As such, Defendant Donohoe would place the orders with Amaranth's NYMEX floor brokers, including the Floor Broker Defendants, or execute trades with counterparties on behalf of Defendant Hunter's trading book. Thus, among other things, Defendant Donohoe acted as Defendant Hunter's agent, and as the agent of Amaranth, in making the trades because he engaged in purposeful activities for the benefit of and with the knowledge and consent of Defendant Hunter. Hunter was also a controlling person within the meaning of CEA § 13(b), 7 U.S.C. § 13c(b). Hunter is also liable under CEA § 2(a)(1)(B) and Regulation 166.3, 17 C.F.R. § 166.3 for the acts of his officials, agents or other persons acting within the scope of their employment or office, including the Amaranth Defendants.

---

[5]     FERC Order to Show Cause at ¶ 36 (citing to Donohoe Dep. 17:21-18:2 (March 14, 2007 morning session).

32.     Amaranth consists of a complex array of interrelated LLC's, LLPs, and corporations, organized for the purpose of pooling and investing funds of investors. Collectively, they comprise what is commonly referred to as a "hedge fund." All of the technically, legally distinct Amaranth organizations are in practice a tightly knit association-in-fact. When NYMEX cited Amaranth on March 13, 2006 for violating position limits, it treated the Amaranth entities as a collective unit and addressed its letter to "Amaranth LLC."

33.     Amaranth Advisors, L.L.C., Amaranth LLC, Amaranth Management LP, Amaranth Group Inc., Amaranth International Limited, Amaranth Partners LLC, Amaranth Capital Partners LLC, Amaranth Advisors (Calgary) ULC, Nicholas M. Maounis, Brian Hunter, Matthew Donohoe, are referred to herein collectively as "Amaranth" or the "Amaranth Defendants."

34.     Defendant ALX Energy, Inc. ("ALX"), a New York corporation, was, at all times relevant hereto, Amaranth's primary NYMEX natural gas floor brokerage firm. Amaranth was ALX's largest customer, and one of its key employees, Vincent Rufa, traveled to Calgary and socialized with Amaranth employees on multiple occasions. Throughout the Class Period, ALX had knowledge of, and aided and abetted, the Amaranth Defendants' manipulation of NYMEX natural gas prices in violation of the CEA.

35.     Defendant James DeLucia ("DeLucia") was, at all times relevant hereto, Chairman or Chief Executive Officer of Defendant ALX, and Amaranth's primary NYMEX natural gas floor broker. Throughout the Class Period, Defendant DeLucia had knowledge of, and aided and abetted, the Amaranth Defendants' manipulation of NYMEX natural gas prices in violation of the CEA.

16

36.     Defendant TFS Energy Futures, LLC ("TFS"), a Delaware limited liability company, was, at all times relevant hereto, one of Amaranth's NYMEX natural gas floor brokerage firms. Defendant TFS had knowledge of, and aided and abetted, the Amaranth Defendants' manipulation of NYMEX natural gas prices in violation of the CEA.

37.     Gotham Energy Brokers, Inc. ("Gotham"), a New York corporation, was, at all times relevant hereto, one of Amaranth's NYMEX natural gas floor brokerage firms. Defendant Gotham had knowledge of, and aided and abetted, the Amaranth Defendants' manipulation of NYMEX natural gas prices in violation of the CEA.

38.     Defendant J.P. Morgan Futures, Inc. ("JP Futures"), a Delaware corporation and a CFTC-registered futures commission merchant, was, at all times relevant hereto, Amaranth's clearing broker at NYMEX, and aided and abetted the Amaranth Defendants' manipulation of NYMEX natural gas prices in violation of the CEA.

39.     Defendant J. P. Morgan Chase & Co. ("JPMC") is a diversified banking, investment banking and brokerage firm headquartered at 270 Park Avenue, New York, New York. Defendant JPMC is the parent of Defendant JP Futures and, at all times relevant hereto, had *de jure* and *de facto* control over Defendant JP Futures.

40.     Defendant J.P. Morgan Chase Bank, Inc. ("JPMCB") is an approved bank margin depository of the NYMEX and a registered user of NYMEX ClearPort Clearing Network, an internet-based system which provides a market gateway to trading and clearing services.

41.     Plaintiffs allege on information and belief that at all relevant times, Defendants John Does 1-10, inclusive, were also engaged in or aided and abetted the manipulation of natural gas futures prices as alleged herein. Plaintiffs are presently unaware of the true names and identities of those Defendants sued herein as John Does 1-10. Any reference made to such

17

Defendants by specific name or otherwise, individually or plural, is also a reference to the actions of John Does 1-10, inclusive.

The acts alleged in this Complaint to have been committed by the Defendants were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of each of the Defendants' affairs.

## SUBSTANTIVE ALLEGATIONS

### I.    BACKGROUND

42.    NYMEX has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. NYMEX submits to the CFTC various rules and regulations for approval through which the NYMEX designs, creates the terms of, and conducts trading in various commodity futures and options, including futures and option contracts for natural gas.

43.    A futures contract is an agreement to buy or sell a commodity, such as natural gas, at a date in the future. Every aspect of a futures contract traded on the NYMEX, such as the contracts for natural gas, is standardized, except the price. Futures markets are specifically designed to facilitate and ease trading in one central market place for traders who are located throughout the United States.

44.    Futures contracts have two sides. The "long" side is the buyer of the contract and is obligated to take delivery and pay for the commodity if the buyer holds the contract until the delivery date. The "short" side is the seller of the contract and is obligated to make delivery of the commodity on the delivery date.

45.    "Spreads" means the price differential between any two futures contracts. Typically, "spreads" refers to the price differences between futures contracts on the same item only with different expirations. For example, if the August 2006 contract were priced at $6.00

and the November 2006 contract at $6.20, then the "spread" would be $.20; if the August

contract were $6.00 and the January were $10.00, then the spread would be $4.00.

46.    Only a small percentage of all futures contracts traded each year result in delivery

of the underlying commodities. Instead, traders generally offset their futures positions before

their contracts mature. For example, a purchaser of a futures contract can cancel or offset his

future obligation to the contract market/exchange clearing house to take delivery of natural gas

by selling an offsetting futures contract. The difference between the initial purchase or sale price

and the price of the offsetting transaction represents the realized profit or loss.

47.    There is a daily mark-to-market re-computation of the trader's so-called equity or

margin position based upon the daily closing or settling prices. If the prices move sufficiently

against the trader's position as of the close, then more "margin" deposits must be made.

However, if prices move in favor of the trader's position at the close, the so-called "margin" that

such trader has on deposit with the exchange clearing member increases. If the price increase is

sufficient, the trader is able to buy (or sell) additional futures contract(s) without any further

margin deposit.

48.    Accordingly, if the price of a position moves sufficiently in favor of the position

by the end of the day, then that price change can create additional margin to buy more of the

position, which can move the market price more in favor of the position, which can create more

margin, etc.

49.    Prices of NYMEX natural gas futures contracts are quoted in 10,000 MMBtu.

The market for NYMEX natural gas futures contracts is the benchmark for forward natural gas

markets because of its liquidity and transparency.

50.    The "settlement price" of a NYMEX natural gas futures contract is the volume-weighted average price of trades made during the 30-minute "settlement period," which is the last 30 minutes of trading on the termination day for the "prompt-month" contract. The "prompt-month" is the next calendar month.

51.    The "termination day" for NYMEX natural gas futures contracts is the third-to-last business day of the month preceding the prompt month, and the settlement period occurs from 2:00 p.m. to 2:30 p.m. on the termination day (except when the NYMEX is operating on a holiday schedule). So, for example, for August 2007, the prompt-month contract is the September 2007 NYMEX natural gas futures contract. The last business day for August 2007 is Friday, August 31, so the settlement period for the September 2007 NYMEX natural gas futures contract will take place from 2:00 p.m. to 2:30 p.m. on Wednesday, August 29, 2007.[2]

52.    If a market participant holds its positions to the end of the settlement period for the prompt-month contract, the market participant is obligated to "go to delivery." That is to say, the "futures" contract for the prompt month becomes a present contractual obligation for the purchase and sale of the physical gas. Longs must take delivery and shorts must make delivery of 10,000 MMBtu per contract over the course of the contract month, at the buyer's interconnection on the Sabine Pipe Line Co.'s Henry Hub in Louisiana. See NYMEX Exchange Rulebook §§ 220.10-12, available at http://www.nymex.com/rule_main.aspx?pg=33. The price for the gas that goes to delivery is the settlement price of the NYMEX natural gas futures contract. See NYMEX Exchange Rulebook § 220.11(D), available at http://www.nymex.com/rule_main.aspx?pg=33.

---

[2] The settlement price of an expiring NG Contract is determined as a volume weighted average of the transaction prices taking place during the last thirty minutes of trading between 2:00-2:30 p.m. EST.

53.    As noted above, the vast majority of NYMEX natural gas futures contracts traded during the Class Period did not go to delivery. For instance, only approximately 1.6%, 1.5%, and 1.6%, respectively, of the open interest of the March, April, and May 2006 NYMEX natural gas futures contract were settled by delivery. ("Open Interest" is the total number of futures contracts long or short in a delivery month or market that has been entered into and not yet liquidated by an offsetting transaction or fulfilled by delivery. CFTC Glossary, http://www.cftc.gov/opa/glossary/opaglossary_o.htm.)

54.    The percentage of the trading volume that resulted in deliveries was much less, respectively, than each of the foregoing numbers.

55.    Most market participants prefer to avoid trading during the settlement period. As the time to termination is winding down, price risk and volatility may increase, while market liquidity and the remaining open interest are decreasing. Most market participants liquidate or "roll" (meaning that they transfer their position into later contract months) their open long or short positions in the prompt-month NYMEX natural gas futures contract well before the settlement period.

56.    The continuous contract. NYMEX offers natural gas futures contracts in the current year and the next five years up to 72 contracts. These contracts are related to one another in price, subject to arbitrage trading between contracts, and are sometimes viewed or regarded together as "spread" positions.

57.    In addition to the standard NYMEX NG futures contract, NYMEX also offered additional natural gas products. For example, NYMEX offered the NYMEX miNY Henry Hub Natural Gas Futures contract ("NG miNY"), a financially settled futures contract that is 1/4 the size of the NYMEX NG futures contract. As used herein, NYMEX NG contract or NYMEX

21

natural gas futures contract includes NYMEX NG miNY contracts. The settlement price of the NG miNY is based on the NYMEX NG futures contract first nearby contract settlement price on the penultimate trading day of the delivery month.

58.    NYMEX also offered the NYMEX Natural Gas - Last Day Financial Contract ("NYMEX NG Financial - Last Day"). This contract mirrors the NYMEX NG futures contract, except that it is financially settled. There is a clear relationship between NYMEX natural gas futures contract prices and the market prices that prevail for NG miNY and NYMEX NG Financial –Last Day. Whenever it is alleged herein that Defendants manipulated NYMEX natural gas contracts, they manipulated NYMEX NG miNY and NYMEX Financial –Last Day contract prices as well.

59.    There is a clear relationship between NYMEX natural gas futures contract prices and the market prices that prevail for a wide range of natural gas derivatives, including NYMEX financially-settled natural gas futures "swaps" and "basis swaps." Certain options also settle on the settlement price of a NYMEX natural gas futures contract.

a.    A natural gas futures "swap" (swap) is a purely financial instrument that operates much like the NYMEX natural gas futures contract except that, rather than becoming a physical delivery or purchase obligation, it settles financially at the termination of the NYMEX natural gas futures contract's final settlement price. Financial swaps do not entail physical delivery risk. The buyer in a swap transaction for a given contract month agrees to pay the seller a "fixed price," *i.e.*, a specific amount determined at the time when the transaction occurs. The seller pays the buyer a "floating price," which will be the actual final settlement price for the NYMEX natural gas futures contract and which is not known at the time of the swap transaction. Thus, buyers and sellers hope to profit based on the relation between the price paid at the time of

the transaction and the ultimate settlement price of the NYMEX natural gas futures contract; the

buyer of the swap profits if the floating price (*i.e.*, the actual final NYMEX natural gas futures

contract settlement price) is higher than the fixed price at which the swap is trading at the time

that the transaction takes place; the seller profits if the floating price is lower than the fixed price.

        b.     A "basis swap" is a derivative instrument whose value is based on the

difference between the settlement price of the NYMEX natural gas futures contract for a given

contract month and that of the monthly "index" at a specified location for that same month.

        c.     While NYMEX options on prompt-month futures and other derivatives

expire on the day before termination day, trading during the settlement period on termination day

continues to affect the value of options on future-month instruments. Trading during the last two

minutes on the termination day is particularly important, as options continue to trade at prices in

relation to the price of the expiring NYMEX natural gas futures contract. Options and other

derivatives are given a non-final settlement price based on trading during these two minutes,

which determines the options' marked-to-market value for that day.

      60.     The settlement prices for ICE swaps are pegged to the final settlement prices for

the corresponding NYMEX futures contract. Therefore, the two instruments are functionally

equivalent for risk management purposes, and (with minor deviations) their prices essentially

move in lockstep with one another. Traders base their trading decisions on whether to transact in

ICE swaps or NYMEX futures contracts based on factors such as which market has greater

liquidity at a given time. Many traders have positions in multiple contracts on both exchanges at

the same time.

      61.     The price curves for ICE swaps and NYMEX futures contracts indicate that the

price risks from purchasing ICE swaps are identical to the price risks from purchasing NYMEX

futures contracts.  Since both contracts are exchange-cleared, there exists no greater counterparty

credit risk from trading in one market versus the other.  There exists a substantial volume of

arbitrage trading attempting to exploit apparent minor, temporary price discrepancies between

the NYMEX and the ICE markets.  As a result of such arbitrage trading, NYMEX and ICE

prices essentially move in lockstep, and the two markets function as a single, integrated market.

Dr. James Newsome, CEO of NYMEX, testified in the proceedings before the U.S. Senate

Permanent Subcommittee regarding excessive speculation in the natural gas market that: "[A]s a

consequence of the extensive arbitrage activity between [NYMEX and ICE], the two natural gas

trading venues are now tightly linked and highly interactive.  These two trading venues serve the

same economic functions and are now functionally equivalent to each other."

      62.     However, there exists one crucial difference between the trading in ICE swaps

and NYMEX futures contracts-the degree of regulatory oversight.  CFTC Designated Contract

Markets like NYMEX are subject to a panoply of regulation, including regulations that require

and authorize them to prevent manipulative trading.  Pursuant to a provision of the Commodities

Futures Modernization Act of 2000 ("CFMA") referred to as the "Enron loophole" unregulated

markets such as ICE (unlike Direct Contract Markets like NYMEX) have no legal obligation to

monitor trading, prevent manipulation or price distortion, or ensure that trading is fair and

orderly.  Additionally, under the CFMA's "Enron loophole" the CFTC has neither the authority

nor the obligation to monitor trading on unregulated exchanges such as the ICE.


     **II.**     **AMARANTH MANIPULATED NYMEX NATURAL GAS
FUTURES CONTRACT PRICES THROUGHOUT THE CLASS
PERIOD.**


     **A.**     **Amaranth Dominated Natural Gas Contract Trading**

63.    Amaranth --- through Amaranth LLC which, nominally, held Amaranth's positions --- dominated trading in the U.S. natural gas financial markets before and during the Class Period.

64.    During the Class Period, Amaranth bought and sold thousands of natural gas contracts on a daily basis, tens of thousands of contracts on certain days, and accumulated hundreds of thousands of natural gas holdings, or "positions," on both NYMEX and ICE.

65.    All but a few of the largest energy companies and hedge funds consider trades of a few hundred NG contracts to be large trades.

66.    At times during the Class Period, Amaranth controlled 40% of all of the outstanding contracts on NYMEX for October 2006 through March 2007, including as much as 70% of the outstanding contracts to deliver natural gas in November 2006.

67.    On almost every day from February through July 2006, Amaranth held more than 50% of the open interest on NYMEX in the January 2007 and November 2006 NYMEX natural gas futures contracts.

68.    In late July 2006, Amaranth held a total of more than 80,000 NYMEX and ICE natural gas contracts for January 2007. This represented a volume of natural gas that equaled the entire amount of natural gas eventually used in that month by U.S. residential consumers nationwide. January of each year is, typically, the largest residential consumption month in the U.S.

69.    During the Class Period, Amaranth's trading represented almost 70% of the total NYMEX trading volume in a given contract on a given date.

70.    During the Class Period, Amaranth's position represented an increasing amount of the open interest in all NYMEX natural gas futures contracts. Amaranth increased from, on

average, approximately 15% of the open interest of all contracts at the start of the Class Period to almost, on average, 40% of the open interest in all NYNEX natural gas futures contracts by August or September 2006.

### 2.    Defendants' Self-Fulfilling Prophecy Manipulation

71.    In addition to dominating the trading in natural gas contracts, Amaranth engaged in the classic manipulative act of buy and leaving open increasingly large positions which, due to their extraordinary but increasing size, caused prices to move in their favor. This type of manipulative act is sometimes called self-fulfilling prophecy manipulation.

72.    Amaranth's ability to manipulate prices arose from many sources. Importantly included among these sources is Amaranth's net futures equivalent position held in respect of each month. "Net futures equivalent position" represents the net of a trader's long and short futures positions on NYMEX and ICE, plus the net futures equivalent of the trader's long and short options positions in respect of that month.

73.    Net futures equivalent position is a good indicator of the price impact a trader has on a contract. Amaranth bought and sold NYMEX and ICE futures and options contracts in a manner that created for Amaranth increasingly large open positions in futures equivalent contracts. During the Class Period, Amaranth --- per the trading decisions of Nicholas Maounis, Brian Hunter, Matthew Donohue and other Amaranth agents and control persons --- held and steadily added to massive natural gas contract positions on NYMEX and ICE. At the start of the Class Period, Amaranth had open positions of unprecedented size --- in excess of an astonishingly large 123,000 futures equivalent contracts.

74.    By September 10, 2006, Amaranth had octupled its already unprecedentedly large positions to almost 800,000 natural gas contracts.

75.    Amaranth's open net futures equivalent long position in respect of all months that it was net long, and its open net short futures equivalent position for all months that it was net short, totaled the following amounts on the following dates:

|     | DATE | NET LONG | NET SHORT | TOTAL OPEN |
|-----|------|----------|-----------|------------|
| (a) | December 1, 2005 | 18,546 | 21,760 | 40,306 |
| (b) | January 3, 2006 | 36,549 | 61,197 | 98,746 |
| (c) | February 1, 2006 | 53,556 | 69,708 | 123,264 |
| (d) | March 1, 2006 | 81,345 | 94,258 | 175,603 |
| (e) | April 3, 2006 | 104,047 | 108,518 | 212,565 |
| (f) | May 1, 2006 | 124,834 | 138,145 | 262,979 |
| (g) | June 1, 2006 | 262,289 | 231,112 | 493,401 |
| (h) | July 5, 2006 | 299,860 | 248,313 | 548,173 |
| (i) | August 1, 2006 | 346,339 | 282,778 | 629,115 |
| (j) | September 1, 2006 | 463,338 | 299,481 | 762,819 |
| (k) | September 10, 2006 | 475,489 | 306,417 | 781,906 |
| (l) | September 20, 2006 | liquidation | liquidation | liquidation |

76.    Amaranth's self-fulfilling prophecy trading also occurred within individual contracts in which it greatly increased and then liquidated its positions. See *infra*.

77.    **March 2007**. (a) By February 1, 2006, Amaranth had acquired an already very large long position for March 2007 of 3,112 net futures equivalent contracts, *i.e.*, more than fifteen times the large position reporting threshold.

(b)    Between February 1 and May 3, 2006, Amaranth proceeded to more than **triple** that futures equivalent position to an extraordinarily large long position in respect of March 2007 of 10,105 futures equivalent contracts.

27

(c)    Between May 3 and August 9, 2006, Amaranth proceeded to more than **octuple**
its already extraordinarily large long position in respect of March 2007 to an astounding 81,597
futures equivalent contracts.

78.    Directly and immediately, Amaranth's snowballing, unprecedented buying and
accumulated long position injected artificial and manipulative demand into the supply-demand
equation for natural gas contracts.  Thereby, Amaranth caused artificially inflated prices for
March 2007 and for other months to be repeatedly reported on a more than daily basis
throughout the Class Period.

79.    As Amaranth well knew, Amaranth's unprecedented orders, buying and build-up
of long positions in respect of March 2007, as well as the resulting artificial signals sent to the
market by the artificial prices of the March 2007 contract and other contracts, all foreseeably and
artificially inflated market prices.

80.    But Amaranth's extraordinarily large Natural Gas contracts positions were not
limited to the March 2007 contract.  Far from it.  Amaranth simultaneously took many other
larger positions in natural gas contracts.  For example, Amaranth's long positions in the
November 2006 contracts and January 2007 contracts were larger than Amaranth's
extraordinarily large March 2007 long position.

81.    **January 2007**.  (a) As of February 1, 2006, Amaranth held a natural gas long
position of 24256 net futures equivalent contracts in respect of January 2007.

(b)    Between February 3 and August 23, 2006, Amaranth proceeded to
purchase, on net, more than 120,000 January 2007 futures equivalent contracts.

(c)    Amaranth's unprecedented net buying dramatically increased its long
positions in respect of January 2007.  By late August 2006 and early September 2006, these

positions were almost **twice as large** as Amaranth's largest March 2007 long positions. For example, Amaranth held a long position in respect of January 2007 of 147,120 net futures equivalent contracts on August 30, 2006, and 146,277 contracts on September 6, 2006.

(d)    Directly and immediately, Amaranth's snowballing, unprecedented buying and increasing open long position in January 2007 contracts injected artificial and manipulative demand into the supply-demand equation for natural gas contracts. Thereby, Amaranth caused artificially inflated prices for January 2007 and for other months to be repeatedly reported on a more than daily basis throughout the Class Period.

(e)    As Amaranth well knew, Amaranth's unprecedented orders, buying and build-up of long positions in respect of January 2007, as well as the resulting artificial signals sent to the market by the artificial prices of the January 2007 contract and other contracts, all foreseeably and artificially inflated market prices.

82.    **November 2006**. With respect to November 2006 contracts,

(a)    Between February 1 and July 28, 2006, Amaranth was short in respect of November 2006 including by as much as 73,108 futures equivalent contracts on July 12, 2006.

(b)    Between July 12 and August 24, 2006, however, Amaranth turned around and purchased more than 400,000 (!) futures equivalent November 2006 contracts in a compressed span of thirty-one trading days.

(c)    This entirely liquidated Amaranth's short position and built up a net futures equivalent long position in respect of November 2006 of more than 119,600 contracts by August 24, 2006.

(d)    The artificial and manipulative demand that this compressed buying of November 2006 contracts injected into the supply-demand equation for natural gas contract

prices directly and immediately caused artificial increases in the prices of November 2006 contracts as well as the prices of the other contracts.

83.    Also during this time, Amaranth held significantly larger open long positions in natural gas contracts than it held open short positions. See ¶ 75 *supra*.

84.    Through Amaranth's buying, its open long positions and other conduct, and the repeated, more than daily reporting of artificial prices for the November 2006 and other natural gas contracts, Amaranth caused artificially high prices in the November 2006 contracts, and other contracts from on or about August 1, 2006 forward.

85.    As large as Amaranth's November 2006 and January and March 2007 long positions were, they were only one part of Amaranth's overall positions.

86.    **March 2006**. During February 2006, Amaranth's net futures equivalent positions in respect of March 2006 was **short** and declined from in excess of 35,000 net futures equivalent contracts on February to less than 5,000 contracts entering the last day of trading.

87.    **April 2006**. Between February 1 and March 29, 2006, Amaranth's net futures equivalent positions in respect of April 2006 declined from 5,000 contracts **long** on February 1st to virtually flat within one week. Amaranth then built up a short position in respect of April 2006 that grew to 27,000 net futures equivalent contracts by early March 2006 and then declined until the end of trading.

88.    **May 2006**. Between February 1 and March 30, 2007, Amaranth held large net futures equivalent positions in respect of May 2006 that began at 1175 contracts **long** on February 1. The position then decreased to 0 and grew to 32, 471 net futures equivalent contracts **short** by April 5, 2006. The positions then decreased to 3079 contracts short on April 20, 2006 when Amaranth again reversed the position and went long in order to "slam the close."

89.    **June 2006**. Between February 1 and March 30, 2006, when Amaranth's position in respect of June 2006 fluctuated from 503 contracts **long** on February 1 to 1835 net futures equivalent contracts long on March 17 and, on certain dates, was short as much as 472 futures equivalent contracts. On April 3, 2006, Amaranth began to amass a short position in respect of June 2007 that grew to 37,028 contracts on April 28, 2006, and then declined until three days before the close. Amaranth then again went long in order to slam the close.

90.    **July 2006**. Amaranth's short position in respect of July 2006 was 1631 futures equivalent contracts on February 1, 2006, and grew to 55,487 futures equivalent contracts short by May 19, 2006. The short position then declined to less than 6,000 contracts at the end of trading in respect of July 2006.

91.    **August 2006**. From February 1, 2006 forward, Amaranth maintained a large **short** position in respect of August 2006 that grew to 51,248 futures equivalent contracts by July 23, 2006. The short position then declined until July 21, 2006 when Amaranth reversed itself and went long.

92.    **September 2006**. From February 1, 2006 forward, Amaranth's position in respect of September 2006 grew from a net futures equivalents on February 1st of 933 contracts short to more than 99,000 contracts **short** on August 29, 2006.

93.    Amaranth's large positions and trades caused significant price movements in natural gas futures prices and price relationships. Without limitation, Amaranth's purchases of contracts to deliver natural gas in the winter months of 2006 (including November 2006, January 2007 and March 2007), in conjunction with Amaranth's sales of natural gas contracts for delivery in the summer months of 2006 (including May-September 2006), artificially drove

winter prices far above summer prices. These differences between winter and summer prices, "price spreads," were artificially high in 2006 — until the collapse of Amaranth.

### 3.    Amaranth Made Specific Large Trades That Caused Specific Spikes In Price Artificiality

94.    Plaintiffs have had no discovery, and it is the extraordinarily large open positions, not specific trades, through which Amaranth caused artificial prices.

95.    Nonetheless, on several specific occasions, Amaranth's massive short-term trading was responsible for large changes in price artificiality.

96.    Between February 15, 2006 and February 22, 2006, Amaranth increased its January 2007 NYMEX natural gas futures contract position from 7,110 contracts (comprising 27.20% of the open interest) to 21,475 contracts (comprising 55.70% of the open interest). This caused the price of the January 2007 to increase from $10.089 to $10.808 during the same period. The value of the 7,110 January 2007 NYMEX natural gas contracts Amaranth owned on February 15, 2006 increased in value by $51,120,900 during the same period.

97.    Similarly, between July 28, 2006 and August 11, 2006, Amaranth increased its January 2007 NYMEX natural gas futures contract position from 22,188 contracts (comprising 43.05% of the open interest) to 38,434 contracts (comprising 60.81% of the open interest). This caused the price of the January 2007 NYMEX natural gas futures contract to rise from $10.764 to $11.20 during the same period. The value of the 22,188 January 2007 NYMEX natural gas futures contracts Amaranth owned on July 28, 2006 increased in value by $96,739,680 during the same period.

98.    For another example, on July 31, 2007, Amaranth increased its March 2007 NYMEX natural gas futures long position from 29,879 contracts to 40,549 contracts. Amaranth's increase in its March 2007 NYMEX natural gas futures position contributed 68.42%

of that day's trading volume and increased Amaranth's percentage of the March 2007 open

interest from 46.68% to 58.01%. More importantly, the value of the 29,879 March 2007

contracts Amaranth owned at the end of trading on Friday, July 28, 2007 increased in value by

$276,978,330 as the price of the March 2007 contract jumped from $10.534 to $11.461 due to

Amaranth's large buying.

99.    Other examples include Amaranth's "slamming the close" trades alleged

below.

### 4.    Defendants' Slamming The Close Orders And Other Conduct Specifically Caused Artificially Low Settlement Prices of Natural Gas Contracts On And After The April, May and June Contract Closes

100.    During the Class Period, Amaranth, with the knowledge and substantial assistance

of the JPM Defendants and Floor Broker Defendants, intentionally manipulated the settlement

prices of NYMEX NG Contracts, including, *inter alia,* the settlement prices of the March, April

and May 2006 NYMEX NG Contract, in order to benefit their positions in financially settled

natural gas derivatives, including swaps and options contracts, traded on ICE and other

electronic energy exchanges.[9]

101.    Amaranth's scheme to manipulate NYMEX NG Contract settlement prices

included the purchase and maintenance of substantial positions in the expiring NYMEX NG

Contract which Amaranth sold during the last half hour on the final day of trading such

contracts. (As previously alleged, in accordance with NYMEX Rules, the settlement price of the

NYMEX natural gas futures contracts is determined by the volume weighted average of trades

executed from 2:00-2:30 p.m. ("closing range") on the last day of trading of such contracts

---

[9]    For instance, the ICE natural gas swap is a look-alike swap that is financially settled, meaning that upon expiration of the swap the holder will either pay or be paid the difference in the price paid for the swap and the final settlement price of the swap. In calculating the settlement price for its natural gas swaps, ICE uses the NYMEX settlement price.

("expiration day").) Amaranth's trading scheme of waiting until the closing range of the expiration day of the prompt-month NYMEX NG Contract to liquidate its position therein lacked any legitimate commercial basis and was done with the specific intent to manipulate the final settlement price of the expiring prompt-month NYMEX NG Contract.

102.    Amaranth's head natural gas trader, Defendant Hunter, along with his executing broker, Defendant Donohoe, were primary actors in the manipulation of the settlement prices of NYMEX NG Contracts for the March 2006, April 2006 and May 2006 contracts. Specifically, Defendants Hunter and Donohoe held Amaranth's natural gas futures contract positions open until the beginning of the settlement periods, then liquidated the positions during the settlement period.

103.    Amaranth's manipulation of the prices of the NYMEX NG Contracts during settlement was intended to benefit Amaranth's substantially larger short natural gas swaps positions on ICE and elsewhere.

104.    Amaranth's manipulation of the settlement prices of NYMEX NG Contracts caused artificial prices in NYMEX NG Contracts during the Class Period.

a.    **Amaranth's Manipulation of the March 2006 Contract NYMEX Natural Gas Futures Contract Settlement Price And Other Prices**

105.    Amaranth's manipulation of the settlement price of NYMEX natural gas futures prices began, as Defendant Hunter stated in an instant message, as "a bit of an expiriment" [*sic*] devised on or before February 23, 2006. This "experiment" was repeated and refined throughout the Class Period and was carried out by Amaranth, with the knowledge and substantial assistance of the JPM Defendants and Floor Broker Defendants, by entering into long futures positions in the prompt-month NYMEX NG Contract which Amaranth sold during the closing range on

34

expiration day in order to artificially drive down the settlement price of the expiring prompt-month NYMEX NG Contract. While Amaranth lost money on its positions in the expiring prompt-month NYMEX NG Contract, these losses were offset by profits Amaranth realized in its positions held on ICE and elsewhere which benefited from a lower NYMEX NG Contract settlement price.

106.    On February 23, 2006, the day prior to the expiration of the March 2006 NYMEX natural gas futures contract (the "March 2006 contract"), Defendant Hunter told Defendant Donohoe in an instant message[11] "make sure we have lots of futures to sell MoC [market on close] tomorrow."[12] Defendant Hunter thus instructed Defendant Donohoe to buy a large number of March 2006 contracts before the close the next day so that Amaranth would have "lots" of contracts to sell "MoC," that is, during the close.

107.    At that time, Amaranth operations personnel in Greenwich informed Defendant Hunter and his natural gas traders that they were "short – 1729 Nat Gas Mar 06" futures contracts and to "[p]lease make sure we are flat by the end of the day today."[13] Therefore, Amaranth would have had to buy only 1,729 March 2006 NYMEX natural gas contracts if its objective was merely to go "flat by the end of the day today." But, if it wanted to have "lots" of

---

[11]    Defendant Donohoe was based in Greenwich, CT as of February 23, 2006, whereas Defendant Hunter was trading from Calgary, Alberta. Thus, during this time frame Donohoe and Hunter engaged in many communications via instant messaging. Donohoe subsequently relocated to Calgary prior to the expiration of the April 2006 NYMEX natural gas futures contract on March 29, 2006 (the next period during which Amaranth engaged in a manipulative scheme to artificially lower the settlement price during the closing range).

[12]    See instant message attached as Exhibit A (document number AALLC_REG0684056) to the CFTC Complaint which is available on the CFTC's website, http://www.cftc.gov/stellent/groups/public/@lrenforcementactions/documents/legalpleading/enf Amaranthcomplaint072507.pdf.

[13]    See e-mail attached as Exhibit A (document number AALLC_REG0672597) to the CFTC's Complaint.

futures to sell MoC, it would have to buy additional contracts to build a long position. That is

what it did. In fact, Amaranth bought in excess of 4,800 March 2006 contracts the next day,

taking its position from short, past "flat" and then to long sometime around noon.

108.    Thus, as part of the manipulative scheme, on February 24, 2006 before the start of

the closing range, Amaranth reversed its natural gas futures positions from being short to being

long over 3000 March 2006 contracts. Defendant Donohoe advised Defendant Hunter via an

instant message at 12:22 P.M. that Amaranth was now long 3,111 contracts and asked whether

he should buy more. Defendant Hunter responded in the negative, stating "that should be

enough."

109.    On February 24, 2006, prior to the closing range, Defendant Hunter stated to

another Amaranth natural gas trader that he would "just need H [the March 2006 contract] to get

smashed on settle then day is done."[14]

110.    Defendant Hunter has testified that the term "smashed" in the context of futures

prices means "if something fell really, really quickly, if the prices fell really, really quickly, you

say those prices got smashed."

111.    Less than half an hour before the closing range on February 24, 2006, Defendant

Hunter disclosed part of the manipulation to a natural gas trader at another firm who utilized the

instant messaging "handle" "gloverb", Bart Glover of National Trading LLC:

| | |
|---|---|
| 1:31:25 PM EST Brian Hunter: | We have 4000 to sell MoC |
| 1:31:28 PM EST Brian Hunter: | shhhh |
| 1:31:36 PM EST gloverb: | come on |
| 1:31:39 PM EST Brian Hunter: | y |
| 1:31:43 PM EST gloverb: | unless you are huge bearish |
| 1:31:49 PM EST gloverb: | position |
| 1:31:54 PM EST gloverb: | why the f would yo do that |

---

[14]    *See* instant message attached as Exhibit A (document number
ALLC_REG0684186) to the CFTC's Complaint.

| 1:32:16 PM EST Brian Hunter: | all from options yestrday |
| 1:32:25 PM EST Brian Hunter: | so we ll see what the floor has |
| 1:32:33 PM EST Brian Hunter: | bit of an expiriment [sic] mainly |
| 1:32:43 PM EST gloverb: | what the f |
| 1:32:46 PM EST gloverb: | that is huge |
| 1:35:34 PM EST Brian Hunter: | I think John [Arnold] and Sempra [Energy] are sellers too.[15] |

112.    In the meantime, Defendant Hunter let Defendant Donohoe know he would be contacting Amaranth's primary NYMEX floor brokerage firm, Defendant ALX, to advise it of Amaranth's long position and intentions. Defendant Hunter told Defendant Donohoe via an instant message that he was "telling vinnie" about Amaranth's long position, referring specifically to Vincent Rufa, one of ALX's phone clerks who had a long-running relationship with Amaranth's traders. The purpose of contacting Defendant ALX (and other Floor Broker Defendants) was to make sure that such brokers knew exactly of Amaranth's intentions so that when it came time to execute the trades, the brokers would have considered, in advance, how to execute the order so as to maximize the intended effect. The Floor Broker Defendants – including Defendant ALX – therefore had knowledge of Amaranth's intent to artificially drive down prices on the close on February 24.

113.    On February 24, 2006, Defendant Donohoe carried out Defendant Hunter's instructions to "smash" the settlement price of the March contract by placing a series of six orders to Defendant ALX from 2:00 p.m. to 2:28 p.m., in which Defendant ALX was directed to sell a total of 3,111 March 2006 natural gas futures contracts.

114.    The Floor Broker Defendants' resulting selling activity on behalf of Amaranth, in one manner or another, disseminated to the pit on behalf of Amaranth that Amaranth would be a large seller. During the settlement period, Defendant James DeLucia, a Defendant ALX floor

---

[15]    *See* instant message attached as Exhibit A (document number AALLC_REG0684227) to the CFTC's Complaint.

broker, known in the pit as Jim X, traded on Amaranth's behalf. Another trader, Eric T. Bolling, stood only five feet away from Defendant DeLucia in the pit. Of the trades that Defendant DeLucia executed on behalf of Amaranth during the close, approximately 26 percent went to Bolling, more than any other trader associated with Amaranth. Bolling was thus an eyewitness to the Amaranth selling and recalled in vivid detail the events of that settlement. He later testified that the March contract close on February 24 involved a "dramatic sell off. . . [that was] probably more emphatic [than a typical close because of] the speed at which it dropped, 50 cents."[16]

115.    A few minutes after the start of the closing range on February 24, 2006, Bart Glover, the same natural gas trader who corresponded with Defendant Hunter earlier that day, asked Defendant Hunter "arent you done" selling your futures. Defendant Hunter, knowing that the manipulation was not yet concluded, replied "no . . . have a lot more to sell . . . waiting until 2:20."[17]

116.    Defendants Hunter and Donohoe congratulated themselves about halfway through the closing range on February 24, 2006, when Defendant Hunter stated to Defendant Donohoe, "today came together quite nicely," and Defendant Donohoe later replied:

| | |
|---|---|
| 2:30:41 PM EST Matthew Donohoe: | h [March contract] will settle lower |
| 2:30:47 PM EST Matthew Donohoe: | and h/j wider |
| 2:31:30 PM EST Matthew Donohoe: | nice |
| 2:31:37 PM EST Brian Hunter: | I am flexing here |
| 2:31:40 PM EST Matthew Donohoe: | looking preety [sic] bang on |
| 2:30:50 PM EST Matthew Donohoe: | we already mimiced |
| 2:31:53 PM EST Matthew Donohoe: | lol |
| 2:31:58 PM EST Matthew Donohoe: | rrrrrrrrrrrrrrrrrrrrrrrrrr |
| 2:32:04 PM EST Brian Hunter: | hahahahaha |

[16]    See FERC Order to Show Cause, p. 37, para. 68.

[17]    See instant message attached as Exhibit A (document number AALLC_REG0684264) to the CFTC's Complaint.

| 2:32:23 PM EST Matthew Donohoe: | 2nd best...sept/oct last year still the best |
| 2:32:27 PM EST Matthew Donohoe: | oh yeag [sic][18] |

This exchange reflected Hunter and Donohoe's expectation that (as eventually proved to be true) Amaranth's trading in natural gas on February 24, 2006 would be the second most profitable in its history.

117.    Amaranth's net short position in the March 2006 contract and March swaps of (10,056.5) contracts would have benefited by slightly more than $1 million per penny decrease in the settlement price of the March 2006 contract.

118.    By reason of Amaranth's manipulation, the settlement price of the March 2006 contract was artificially deflated by as much as $0.29, resulting in a realized gain of $29,000,000 to Amaranth. Specifically, prior to the beginning of the settlement period on February 24, 2006, the March 2006 contract had been trading at around $7.40, but the prices declined sharply in the first five minutes of the settlement period due to Defendants' manipulative acts, and the March 2006 contract ultimately settled at $7.11 (representing a decline of $0.29).

119.    In addition, Amaranth had a net short position of (16,613.25) April 2006 NYMEX natural gas futures contracts (the "April 2006 contract") and swaps, which would have benefited by roughly $1.661 million per penny decrease in the April 2006 contract settlement price for the day. Amaranth's trading on February 24, 2006 caused the April 2006 contract to be manipulated lower as much as $0.36, representing a marked-to-market gain for Amaranth of roughly $60,000,000. Moreover, according to Amaranth's contemporaneous records, the total one-day net trading profits for Defendant Hunter's group on February 24, 2006 was $45,350,447.141.[19]

---

[18]    *See* instant message attached as Exhibit A (document number AALLC_REG0704931) to the CFTC's Complaint.

[19]    *See* n. 141, p. 47 of the FERC's Order to Show Cause, which is available on the FERC's website, http://www.ferc.gov/EventCalendar/Files/20070726084235-IN07-26-000.pdf.

120.    As a result of Amaranth's manipulative trading, described in ¶¶ 105-119 above, the FERC found Amaranth manipulated the settlement price of the March 2006 contract. Amaranth's manipulation of the March 2006 contract settlement price also had the effect of manipulating the price of the April 2006 contract and subsequent NYMEX NG Contracts.

b.    **Amaranth's Manipulation of the April 2006
NYMEX Natural Gas Futures Contract Settlement Price**

121.    After the success of the "experiment" in the February 24 trading for the March 2006 contract, Amaranth decided to repeat this strategy for the April 2006 contract on March 29, 2006.

122.    As on February 24, 2006, Amaranth held a large long position in the April 2006 contract prior to the settlement period, and proceeded to sell it "MoC" during the close, employing a nearly identical trading strategy as that used for manipulating the price of the March 2006 contract.

123.    On March 29, 2006, Amaranth entered the day with a long position of 1,603 April 2006 contracts. In three separate orders, Amaranth directed Defendant ALX to sell 303 April 2006 contracts prior to the close between 12:41 p.m. and 1:50 p.m. At 2:00 p.m. and 2:03 p.m., Amaranth placed further orders with Defendant ALX to sell 100 April 2006 contracts and 1,200 April 2006 contracts "MOC." Once again, Jim DeLucia ("Jim X" of ALX) was the selling broker in the trading ring.

124.    During the week prior, Amaranth built its aggregate April swap position from being short roughly (9,500) futures contract equivalents at the end of the day on March 21 to short (17,884) futures contract equivalents at the end of the day on March 29. Thus, although Amaranth's amount of April 2006 contract selling was less than its selling in the March 2006

contract, the amount of short swap contracts that Amaranth stood to benefit from a lowered

natural gas futures contract prices was much greater.

125.    Amaranth profited by at least $11,200,000 from the manipulation of the April

2006 contract on March 29. Specifically, on March 29, 2006, the April 2006 contract was

trading between about $7.26 and $7.32 in the half hour before and at $7.34 at 2:00 p.m., and then

prices dropped right at the beginning of the settlement to about $7.15. From 2:00 p.m. to 2:30

p.m., the April 2006 contract traded in the range of $7.15 to $7.37 and settled at $7.233.

Accordingly, the Amaranth Defendants' manipulative trading caused the settlement price of the

April 2006 contract to decrease by as much as $.09 from where it would have settled without

such manipulation. Based on the foregoing, Amaranth's April 2006 contracts and April swap

positions realized gains of $1.788 million per penny decrease in the settlement price of the April

2006 contract prices, for a total profit of $16,000,000. In addition, Amaranth had a net short

position of (19,639.5) contracts in the May 2006 contract and swaps, whose value increased by

about $1.964 million per penny decrease in the May 2006 contract settlement price for that day.

Defendants' manipulative trading caused the May 2006 contract to settle lower by as much as

$.13 for a marked-to-market gain of approximately $25,500,000 to Amaranth.

126.    As a result of Amaranth's manipulative trading, described in ¶¶ 121-25 above, the

FERC found that Amaranth manipulated the settlement price of the April 2006 contract.

Amaranth's manipulation of the April 2006 contract settlement price also had the effect of

manipulating the price of the May 2006 contract and subsequent NYMEX NG Contracts.

        c.     **Amaranth's Manipulation of the May 2006
              NYMEX Natural Gas Futures Contract Settlement Price**

127.    On or about April 26, 2006, the expiration date of the May 2006 NYMEX natural

gas futures contract (the "May 2006 contract"), Amaranth manipulated NYMEX natural gas

futures contract prices by obtaining a large long futures May 2006 position in order to sell a large number of offsetting contracts using three large orders that were placed near the end of the closing range.

128.    On or about April 21, 2006, Amaranth reversed its May 2006 contract futures position by purchasing futures contracts, such that for the first time in the month they were long May 2006 contracts.

129.    From then until April 26, 2006, Amaranth continued to build its long futures position, such that by the time of the closing range, it was long in excess of 3,000 May 2006 contracts.

130.    Going into the closing range on April 26, 2006, Amaranth also had a short May swap position of over 19,000 contracts (futures equivalents).

131.    Defendant Hunter was concerned that Centaurus Advisors LLC ("Centaurus"), an energy hedge fund managed by John Arnold ("Arnold"), was going to be a large buyer of natural gas futures in the closing range and potentially affect the settlement price of the May 2006 contract, which in turn would adversely affect Amaranth's short swaps positions.

132.    Beginning at 12:45 pm on April 26, 2006, Defendant Hunter had an instant message conversation with David Chasman ("Chasman"), the energy risk manager at Amaranth, where he discussed what he thought Centaurus planned to do and why:

| 12:48:48 pm Brian Hunter: | FYI Arnold is getting scary short into the [Energy Information Agency gas storage] number tomorrow |
|---|---|

*    *    *

| 12:50:26 pm David Chasman: | what u think arnold has? |
|---|---|
| 12:50:28 PM Brian Hunter: | we are rolling size into may |
| 12:50:42 pm Brian Hunter: | and I am worrie[d] that Anold [sic] has taken the other side of everything |

| 12:51:00 pm Brian Hunter: | so either he runs it up on the close today and gets short tomorrow |
| 12:51:08 pm Brian Hunter: | or has a HUGE view on the number tomorrow |

*   *   *

| 12:53:03 pm David Chasman: | other side of everything meaning buying from everyone else selling – or buying from [you] |
| 12:53:17 pm Brian Hunter: | no buying may and selling June ... with me |
| 12:54:37 pm David Chasman: | does he know what [you are] up [to] [with respect to] rolling off length? ... sorry rolling off short |
| 12:55:16 pm Brian Hunter: | probably |

*   *   *

| 12:55:29 pm Brian Hunter: | I think its more that he thinks its going to get [f...d] tomorrow |

*   *   *

| 12:55:47 pm Brian Hunter: | me may try to help it by running the market up on the close |

*   *   *

| 12:56:10 pm David Chasman: | kinda hard to do when [you are] selling – no? |
| 12:56:39 pm Brian Hunter: | Arnold is the master of moving the close?[20] |

133.    Defendant Hunter expressed a similar sentiment to an outside trader in an instant message wherein Defendant Hunter wrote, "I think John [Arnold] wants to bid it on close."[21]

134.    To affect the settlement price for the May 2006 contract, Amaranth intentionally waited to sell its May 2006 contracts.

135.    At the beginning of the closing range on April 26, 2006, Defendant Hunter stated to an Amaranth risk manager that he is seeing many buyers but he (Defendant Hunter) has "yet to sell."[22]

---

[20]    *See* instant message attached as Ex. A (document number A_CFTC032874) to the CFTC's Complaint.

[21]    *See* instant message attached as Ex. A (document number AALLC_REG0593127) to the CFTC's Complaint.

136.    Also early in the closing range on April 26, 2006, Defendant Hunter stated to an Amaranth trader, Matthew Calhoun, "we are wa[i]ting to sell."[23]

137.    Defendant Hunter knew that his selling would mute the effect of the buyers, whose purchases would tend to exert upward price pressure.

138.    At about the middle of the close on April 26, 2006, Amaranth, via Defendant Hunter, placed an order to sell 500 May 2006 NYMEX natural gas futures contracts with instructions to hold execution of the order until the last eight minutes of the closing range, as part of the manipulation.

139.    The order ticket for that order indicates the instruction to wait to execute the order until the last eight minutes of the closing range.[24]  There was no legitimate commercial basis for such an instruction by Amaranth.

140.    Around the same time on April 26, 2006, Amaranth placed another order to sell 544 May 2006 contracts with instructions to hold execution of the order until the last eight minutes of the closing range, as part of the manipulation.  Once again, there was no legitimate commercial basis for such an instruction by Amaranth.

141.    In instant messages between Defendant Hunter and Chasman, which took place seven minutes into the start of the settlement period, Defendant Hunter explained that he was still "waiting to sell" his May 2006 natural gas futures contracts.  Also, a taped telephone line at Gotham, a broker for Amaranth, captured Defendant Donohoe and brokers at Gotham as follows:

---

[22]     *See* instant message attached as Ex. A (document number A_CFTC032878) to the CFTC's Complaint.

[23]     *See* instant message attached as Ex. A (document number A_CFTC032910) to the CFTC's Complaint.

[24]     *See* copy of order ticket appearing on p.12, para. 56 of the CFTC's Complaint.

| Barry: | Gotham. Dave. |
|---|---|
| Donohoe: | T.J. |
| | [pit noise in background] |
| T.J.: | Gotham T. |
| Donohoe: | Hey. |
| | [pit noise in background] |
| T.J.: | Hey, Matty, what's up? |
| Donohoe: | In the last eight minutes . . . |
| T.J.: | Yes? |
| Donohoe: | . . . I need you to sell five hundred and forty Mays. |
| T.J.: | In the last eight minutes, sell 544 Mays. |
| Donohoe: | Yes. |
| T.J.: | You got it, my friend. |

142.    The order ticket for that order also includes an instruction to wait to execute the order until the last eight minutes of the closing range.[25]  Again, there is no legitimate explanation or business justification for this trading behavior.  Amaranth's strategy, according to FERC, was "calculated to maximize the downward effect on prices owing to vanishing liquidity toward the end of the settlement period."  FERC Order to Show Cause at ¶ 8.

143.    At about 2:22 p.m. on April 26, 2006, with only eight minutes left in the closing range, Amaranth placed a third order with Defendant ALX to sell 2,000 May 2006 contracts. This final order represents two-thirds of the position Amaranth held going into the closing range. The order ticket for the 2,000-lot order, with an indication that 1,675 of those lots were executed during the close.[26]  The 2,000-lot order was so large, and came so late in the closing range, that Defendant ALX was not able to execute the entire order during the closing range.

144.    Unlike in the previous two expirations for the March and April 2006 contracts, Amaranth not only engaged in orchestrated selling during the closing range, but also

---

[25]    *See* copy of order ticket appearing on p.13, para. 58 of the CFTC's Complaint.

[26]    *See* copy of order ticket appearing on p.14, para. 60 of the CFTC's Complaint.

concentrated its sales in the final minutes of the closing range to maximize their effect in a market with a rapidly dwindling open interest. By reason of Defendants' manipulative acts, the settlement price of the May 2006 contract was artificially deflated by approximately $.03.

145.    Amaranth's manipulation of the settlement of the May 2006 contract also had the effect of manipulating the prices of other NYMEX natural gas futures and options contracts such as the June and July 2006 contracts. For example, Amaranth reported its resulting June 2006 option position profit as approximately $20,600,000, and Amaranth's June 2006 swap positions profited by approximately $6,700,000. These profits were derived from the artificial decline in prices of the June and July 2006 contracts that resulted from Amaranth's manipulative trading of the May 2006 contracts.

146.    As a result of Amaranth's trading behavior described in ¶¶ 127-45 above, the FERC found that Amaranth manipulated the settlement price of the May 2006 contract. FERC Order to Show Cause at ¶ 106. Amaranth's manipulation of the settlement price also manipulated the price of other NYMEX NG Contracts, including, *inter alia*, the prices of the June and July 2006 contracts and subsequent NYMEX NG Contracts.

### d.    NYMEX Investigates Amaranth's Natural Gas Trading Activity for Trade Date April 26, 2006

147.    By letter dated August 2, 2006, NYMEX advised Amaranth that it had "commenced Investigation Number MS-04-06 to review Amaranth LLC's ("Amaranth") NYMEX Natural Gas futures trading activity for trade date April 26, 2006" because "Exchange records indicated a heavy concentration of Amaranth's May 2006 Natural Gas ("NG") futures trading activity occurred in the final minutes prior to the termination of trading in the contract."[27]

---

[27]    The August 2 Letter is attached as Exhibit B to the CFTC's Complaint.

148.    NYMEX asked Amaranth to review its May 2006 NYMEX natural gas futures trading activity for April 26, 2006 and provide a written explanation of the commercial need and justification for its trading.

149.    Afraid that the NYMEX investigation would start to unravel its manipulative scheme, Amaranth submitted a letter to NYMEX, dated August 15, 2006, designed to cover-up what had actually occurred.[28]  Amaranth's letter contained a number of false and misleading statements in describing its April 26, 2006 trading including:  (i) the manner in which Amaranth described its positions and trading strategy; (ii) deliberately concealing from NYMEX that Amaranth had given specific instructions to its floor brokers on April 26, 2006 as to when Amaranth's sales orders should be executed; (iii) claiming that it did not decide to sell its May natural gas futures contracts outright until 2:17 p.m. or later; and (iv) claiming that to the extent any part of Amaranth's order was executed in the post-close trading session it was not due to Amaranth's instructions, but perhaps occurred because a floor broker erroneously failed to comply with Amaranth's directive to complete the execution of its orders during the closing range.

## 5.    After Warnings from NYMEX, Amaranth Violated Speculative Limits and Continued Their Market Manipulation via Secret Trading in Natural Gas Swaps on Ice

150.    In support of their manipulative acts, the Amaranth Defendants, with the assistance and knowledge of the JPM Defendants: (a) repeatedly violated NYMEX exchange rules by amassing substantial NYMEX natural gas futures contract positions that exceeded applicable position limits; and (b) concealed their manipulative trading from regulators and market participants by restructuring and eventually increasing the size of Amaranth's natural gas

---

[28]    The August 15 Letter is attached as Exhibit C to the CFTC's Complaint.

positions on ICE after it was ordered by NYMEX to reduce its natural gas positions which were so large that they were distorting natural gas market prices.

     a.    **To Comply with CFTC Directives, NYMEX Has Established Position Limits and Accountability Levels for Various Energy Contracts Including Natural Gas**

    151.    With respect to energy commodities, NYMEX has established a fixed position limit that applies during the last three days of trading of a futures contract. The NYMEX rule states: "No person may own or control a net long position or a net short position in the expiration or current delivery month in excess of [1,000 contracts]."

    152.    Additionally, for energy commodities, the CFTC has directed approved exchanges to establish "accountability levels." Once a trader reaches a preset accountability level, however, she must provide information about her positions upon request by the exchange. Depending on the size of the market and type of commodity, any trader over the accountability level must also consent to stop increasing her position if so ordered by the exchange. The accountability levels consider the capitalization of each clearing firm.

    153.    Evaluating a trader's positions in relation to the NYMEX accountability levels may entail a detailed analysis of the trader's positions and the size of the market in a variety of related contracts. CFTC and NYMEX rules provide, for example, that, in addition to reviewing a trader's long and short futures contracts, NYMEX may consider the trader's positions in related NYMEX options and swaps.[34] One factor in the NYMEX analysis is the trader's position relative to the open interest in a contract for delivery in a particular month.

-----

[34] NYMEX Exchange Rulebook § 9.20(D)(5), *available at* http://www.nymex.com/rule_main.aspx?pg=8.

154. In contrast to NYMEX, ICE has established no position limits or accountability levels for its traders. That means a trader can speculate without limit by trading on ICE, where no such restrictions apply.

155. NYMEX personnel have no routine access to trading data on ICE, the other leading U.S. commodities market whose swaps and options have a direct impact on NYMEX prices. This lack of access means that NYMEX personnel have no information on the trader's positions on ICE and no information on how those positions relate to the rest of the natural gas financial market.

      **b.**    **Amaranth Repeatedly Violated NYMEX Exchange Rules by Amassing Substantial NYMEX NG Contract Positions that Exceeded Applicable Position Limits**

156. In 2006, Amaranth exceeded the NYMEX position limit for natural gas contracts on several occasions and repeatedly exceeded its natural gas accountability levels.

157. Amaranth's first position limit violation occurred at the end of February 2006. On March 13, NYMEX cited Amaranth for violating the expiration position limit on trading near the expiration of the March contract. In a letter of violation sent to Amaranth, NYMEX wrote: "At the close of business on February 23, 2006, Amaranth maintained an open commitment of 3,646 short contracts, 1,146 contracts over its spot month hedge except position limit . . . Owing to your firm's violation of the spot month NG position limit, and in accordance with the provisions of Exchange Rule 9.36, this letter shall constitute a warning to your firm." SENATE REPORT at 91 (citing Letter from Nancy M. Minett, Vice President, Compliance Division, NYMEX, to Mike Carrieri, Chief Compliance Officer, Amaranth LLC, March 13, 2006.)

158. Several weeks later, on April 7, 2006, NYMEX personnel reviewed Amaranth's short position of about 32,000 May contracts, which exceeded the elevated accountability level

of 25,000 contracts that NYMEX had previously granted to Amaranth. The NYMEX

compliance officer determined that Amaranth should not be allowed to increase its position in

the expiring May contract. "I do not think that Amaranth ANY month level should be increased

any further in this case because May06 is the front month contract," the NYMEX compliance

officer wrote. SENATE REPORT at 91 (citing Memo from Corey Traub to Anthony Densieski,

April 7, 2006.)

159.   On April 26, the last day of trading on the May futures contract, Amaranth sold

more than 3,000 contracts in the final minutes of trading. This last-minute sale eventually

triggered not only a NYMEX letter asking Amaranth to explain its trading, but also an

investigation by the CFTC. SENATE REPORT at 91.

160.   In May, NYMEX sought to limit Amaranth's trading at the expiration of the June

contract. In this instance, after reviewing Amaranth's positions in the June contract, NYMEX

contacted Amaranth's clearing firm, JPMorgan Chase, to remind it that Amaranth needed to

comply with its expiration position limits. After receiving this message from NYMEX, one

JPMorgan Chase official wrote to another, "Would you please remind Amaranth that they need

to be at/below their NYMEX Nat Gas exempt level COB May 23." SENATE REPORT at 92 (citing

e-mail from Vincent J. Leale to Aldo J. Solares, May 19, 2006.)

161.   Amaranth did not heed these instructions. On May 31, following the expiration of

the June contract, NYMEX sent a second warning letter to Amaranth. NYMEX wrote:

> The records of the Exchange show that Amaranth, LLC
> ("Amaranth") exceeded its current delivery month ("spot month")
> hedge exempt position limit of 2,500 contracts on two trade dates.
> At the close of business of May 23 and May 26, 2006, Amaranth
> maintained open commitments of 8,488 short and 3,363 long
> contracts, respectively. These open commitments exceeded your
> firm's spot month hedge exempt position limit by 5,988 and 863
> contracts, respectively.

> Owing to your firm's violations of the spot month NG position
> limit, and in accordance with the provisions of Exchange Rule
> 9.36, this letter shall constitute a warning to your firm. Please note
> that a previous violation of the rule was addressed in a warning
> letter issued to your firm on March 13, 2006. Any further violation
> of the Exchange's position limit rules will be handled pursuant to
> Rule 9.36 and may ultimately result in extraordinary sanctions as
> specified by this rule.

SENATE REPORT at 92 (citing Letter from Nancy M. Minett, Vice President,

Compliance Division, NYMEX, to Mike Carrieri, Chief Compliance Officer,

Amaranth LLC, May 31, 2006.) On July 11, 2006, NYMEX rescinded the

violation pertaining to trading on May 23, but retained the violation and warning

regarding Amaranth's positions on May 26.

162.    The next day, June 1, Amaranth again appeared on the list of traders exceeding

NYMEX accountability levels. On this occasion, the reviewing official recommended increasing

Amaranth's All Month Accountability levels and its Any Month Accountability levels.

Although the official recommended a temporary increase for Amaranth in the accountability

levels, he also noted: "***This customer holds a very large percentage of open interest in floor

traded NG futures (Not FEQ) in outer months. *** Please let me know if you want more (Non-

FEQ) figures." SENATE REPORT at 92-93 (citing memo from Corey Traub to Anthony Densieski,

June 1, 2006.) FEQ is an abbreviation for "Futures Equivalent." Positions in options and swaps

can be represented by an "equivalent" number of futures positions, so these positions can be

measured against each other.

163.    In mid-July, Amaranth's increasing size triggered still another NYMEX review.

NYMEX compliance officials conducted another analysis of Amaranth's share of the open

interest in several NYMEX futures contracts and another analysis of Amaranth's share of the

total open interest in all NYMEX futures, options, and swaps for that contract month. When

NYMEX performed its market analysis of Amaranth's positions in June and July, however, it did

not have a complete view of Amaranth's positions in the natural gas financial market. NYMEX

officials reviewed and addressed only Amaranth's positions on NYMEX. Unknown to NYMEX

at the time, Amaranth also had extensive positions on ICE, which were significant components

of Amaranth's total positions in the contract months addressed by NYMEX, but NYMEX

officials did not have access to this data. SENATE REPORT at 94.

164.    About ten days later, on August 4, NYMEX examined Amaranth's positions once

again, and calculated that Amaranth then held about 51% of the open interest in the September

natural gas futures contract, which would expire at the end of the month. NYMEX determined

that this level of open interest in an expiring contract was too large and decided to tell Amaranth

to reduce its positions. SENATE REPORT at 95.

165.    During a call on August 9, NYMEX cautioned Amaranth that it should not reduce

its September position simply by shifting those positions into October contracts. It told

Amaranth that their October position "represented 51.87% of open interest in that natural gas

futures, was too large, and we were concerned that as he brought down the September position,

Amaranth would further increase the October position."

        c.    **Amaranth Concealed Its Manipulative Trading from
Regulators and Market Participants by Restructuring and
Eventually Increasing the Size of Its Natural Gas Positions on
ICE After NYMEX Ordered It to Reduce its Natural Gas
Positions**

166.    Amaranth reduced its positions on NYMEX in the September and October futures

contracts. At the same time, however, Amaranth increased its positions in the corresponding

September and October swaps on ICE. Although NYMEX succeeded in reducing Amaranth's

positions in the expiring natural gas futures contract, Amaranth maintained a comparable number

of positions in the expiring ICE swaps. Soon afterwards, Amaranth even increased those positions on ICE.

167.  It is clear from Amaranth's records that Mr. Hunter viewed the absence of position limits as a major reason to trade on ICE rather that on NYMEX. In an instant message conversation on April 25, 2006 – the day prior to the expiration of the May contract – another trader wrote to Mr. Hunter, "everyone is high on ICE these days. You think its had its day or more to go?" Mr. Hunter replied: "one thing that's nice is there are no expiration limits like Nymex clearing." SENATE REPORT at 98.

168.  Amaranth deliberately exploited the opacity of the ICE swap market to effectively flout regulators' attempts to curtail its excessive speculative trading on NYMEX.

**B.    AMARANTH'S MANIPULATION COLLAPSES**

169.  Until May 2006, Amaranth's net futures equivalent short positions were larger than Amaranth's net future equivalent long positions. By May and June 2006, Amaranth's total net futures equivalent long positions exceeded its total net futures equivalent short positions. From June 1 until September 10, 2006, Amaranth conspicuously changed its behavior. It greatly increased its net futures equivalent **long** positions by 213,000 contracts and increased its comparable short positions by approximately one-third as much, that is, by "only" 75,000 contracts. See ¶ 75 *supra*.

170.  Although these extraordinary purchases and unbalanced positions allowed Amaranth to maintain NYMEX futures contracts at artificially high levels during July – early September, they also caused Amaranth losses because prices were generally declining by August and September. As a result, Amaranth's margin cushion and its credit lines reserves with JP Morgan were being used up by early September 2006. Also, by this time, the Amaranth

Defendants had drawn increasing scrutiny on themselves from the NYMEX, taken evasive steps, and faced the threat of exposure of their evasive steps or compulsory reductions in its positions.

171.    By mid-September 2006, Amaranth's positions had grown so large but prices had still sufficiently declined that Amaranth ran out of money and capital to add to its positions. Because it could no longer artificially counteract the natural price declines so as to continue to support its manipulation, Amaranth conducted secret meetings with major investment firms including Goldman Sachs, Morgan Stanley and Merrill Lynch, beginning on or about September 15, 2006. Amaranth attempted to arrange private transactions in which Amaranth would reduce its exposure to natural gas in a privately negotiated transaction or transactions.

172.    Amaranth claims to have managed to strike a deal with Goldman Sachs that would have enabled it to substantially lower its risk exposure to natural gas. However, the supposed deal fell through on September 18, 2006, when the JPM Defendants refused to deliver Amaranth's cash collateral held by JP Futures to Goldman Sachs as part of a deal that Amaranth had negotiated with Goldman Sachs. The JPM Defendants claimed that the deal between Goldman Sachs and Amaranth did not adequately protect the JPM Defendants from exposure to losses as a result of additional trading losses by Amaranth.

173.    Just two days later, on September 20, 2006, the JPM Defendants then scooped up much of Amaranth's natural gas portfolio for its own account. Shortly thereafter, the JPM Defendants earned $725 million from the takeover of Amaranth's natural gas portfolio.

174.    As alleged *supra*, the prices of the NYMEX futures contracts collapsed during August and September 2006. The Electric Power Research Institute characterized this collapse as "stunning . . . one of the steepest declines ever."

175.    On June 25, 2007, the U.S. Senate Permanent Subcommittee on Investigations

issued a report summarizing the conclusions of its investigation into Amaranth and excessive

speculation in the natural gas market.  The Committee reached the following conclusions, among

others:

A.    FINDINGS
(1)    A single hedge fund, Amaranth Advisors LLC, dominated the U.S. natural gas
       market in 2006.
       (a)    Amaranth accumulated massive natural gas holdings on NYMEX and ICE
              spanning five years, from 2006-2010.

       (b)    Amaranth accumulated such large positions and traded such large volumes
              of natural gas in 2006, on both NYMEX and ICE, that it had a direct effect
              on U.S. natural gas prices and increased price volatility in the natural gas
              market. The larger than usual differences between winter and summer
              futures prices that prevailed during the spring and summer of 2006 were
              largely the result of Amaranth's large-scale trades rather than the normal
              market interaction of many buyers and sellers.

       (c)    Amaranth's 2006 positions in the natural gas market constituted excessive
              speculation.

(2)    In August 2006, Amaranth traded natural gas contracts on ICE rather than on
       NYMEX so that it could trade without any restrictions on the size of its positions.

       (a)    When NYMEX directed Amaranth to reduce its positions in September
              2006 and October 2006 natural gas futures contracts, Amaranth simply
              transferred those      positions to ICE, an unregulated market, thereby
              maintaining its overall speculative position in the natural gas market.
       (b)    NYMEX's attempt to limit speculative trading during the last day of
              trading on the September 2006 natural gas futures contract failed, because
              neither NYMEX nor the CFTC had any authority, mandate, or ability to
              limit trading on ICE that affected the pricing of the NYMEX futures
              contract.

(3)    Amaranth's actions in causing significant price movements in the natural gas
       market demonstrate that excessive speculation distorts prices, increases volatility,
       and increases costs and risks . . . .

*See* SENATE REPORT.


## C. **MOTIVE AND INTENT**

176.    The Amaranth Defendants had an extraordinary financial motive to manipulate NYMEX natural gas futures and options contract prices.

a.    First, Amaranth was the largest participant in the natural gas market and dominated trading in the U.S. natural gas financial markets during the Class Period.

b.    Also, Amaranth not only conducted substantial trading in the NYMEX natural gas futures and options market, but also held massive trading positions in the OTC natural gas financial markets.

c.    Amaranth profited handsomely from their manipulation of NYMEX natural gas futures and options contract prices, recording profits exceeding hundreds of millions of dollars.

177.    The Amaranth Defendants therefore had the ability, as well as a motive, to manipulate NYMEX natural gas and futures contract prices.


## D.  EFFECTS

178.    Amaranth intentionally caused artificial prices for all NYMEX natural gas contracts and artificial spreads throughout the Class Period.  See ¶ 6 *supra*.

179.    Among other things, Amaranth's manipulative conduct artificially depressed prices of the March-November 2006 and the April 2007 NYMEX natural gas futures contract, for the time that each was still trading, between the start of the Class Period and in or about mid-July 2006.

180.    Further, despite all-time record high inventories of physical natural gas during summer 2006, Amaranth caused artificial prices throughout the Class Period of NYMEX natural gas futures contracts expiring in January-March 2007, and artificially high winter-summer

spreads throughout the Class Period. Amaranth's trading strategies were calculated to cause (and capitalize on) wide price "spreads" between summer 2006 and winter 2006-2007 NYMEX NG Contracts.

181.    The high winter month prices during July-August 2006 were wholly contrary to (a) the all-time record high supplies and glut of storage of natural gas during August and September 2006, (b) the developing low immediate demand for natural gas due to the relative absence of hurricane-related problems, (c) the U.S. Energy Information Administration's projections that natural gas prices would decline substantially, and (d) other fundamental factors.

182.    The cumulative net effect of Amaranth's unprecedented buying of each of the November 2006, January 2007, and March 2007 contracts, its increasingly large net long position, and all of Amaranth's other conduct artificially maintained prices of all NYMEX natural gas futures contracts at artificially inflated levels from in or about mid-July 2006 until late September 2006.

III.    **THE JPM DEFENDANTS UNLAWFULLY AIDED AND ABETTED AMARANTH IN ITS MANIPULATION OF THE NATURAL GAS FUTURES AND OPTIONS MARKET**

183.    The JPM Defendants knew that Amaranth's unprecedented positions in NYMEX NG Contracts during the Class Period, including those which were established to manipulate the prices of natural gas for delivery in the summer months of 2006 and the winter months of 2006/2007, had the purpose and effect of creating artificial prices. Despite this knowledge, the JP Morgan defendants continued to materially assist Amaranth notwithstanding Amaranth's violations of NYMEX positions limits.

A.    **The Clearing Function in General**

184.    As previously alleged, a futures contract is a legally binding agreement to buy or sell a commodity or financial instrument at a later date. Futures contracts are normally standardized according to the quality, quantity, delivery time and location for each commodity, with price as the only variable. There is a buyer and a seller to every futures contract. Futures contracts are traded on designated futures exchanges. When the terms of an offer to sell are accepted by the buyer (or vice versa) in a trading pit or on a computerized screen, a trade occurs. However, a trade cannot be finalized until the exchange's clearing house clears the trade.

185.    To clear a trade, the clearing firms first submit the trade to the exchange's clearing house. A clearing firm or clearing member is a member of an exchange clearing house responsible for the financial commitments of its customers. All trades of a non-clearing member must be registered and eventually settled through a clearing member. The exchange's clearing house then substitutes itself as the buyer to the seller's clearing firm and the seller to the buyer's clearing firm. This part of the process removes the risk that the underlying buyer and seller to the futures contract will not perform. The clearing house assumes the credit risk of the underlying buyer and seller by guaranteeing the buyer's performance obligations to the seller's clearing firm and the seller's performance obligations to the buyer's clearing firm. The exchange's clearing house then deals only with the clearing firms on a principal to principal basis and has no contact with the underlying buyer or seller.

186.    The clearing house still needs protection against the risk that the clearing firms will not perform. Clearing firms are required to guarantee their ability to pay the aggregate losses on the contracts they carry on behalf of their customers by maintaining margin accounts at the exchange's clearing house. The first deposit into these accounts is made at the time an order is placed to buy or sell a futures contract and is determined by the exchange on which the

58

contract is traded. This initial margin is not a down payment but rather, a deposit of good faith money that can be drawn on by the buyer or seller's clearing firm to cover its customer's potential losses.

187. After the initial margin, the amount of money the clearing firms must deposit into these accounts, called the variation margin, is made at the end of each trading day. A futures exchange determines, through a formula, the settlement price for each commodity futures contract being traded on it. The exchange's clearing house then takes the settlement price and applies it to the open customer positions in each of the clearing firms' accounts and makes adjustments to those accounts accordingly. The clearing house's adjustments consist of debiting losses from the accounts or crediting gains to them. This process is called marking-to-market. Through this daily process the clearing firms are able to guarantee their obligations to the exchange's clearing house even if there are adverse movements in futures prices.

188. In order to ensure that market participants have sufficient funds to handle losses, the NYMEX establishes specific margin requirements for clearing members and separate minimum margin requirements for customers of clearing members, which are calculated to be at least 110% greater for member accounts and 135% greater for all other customers.

189. Accordingly, the NYMEX requires that clearing members obtain initial margins from their customers. In addition to initial margin deposits, daily variation margin payments are made in cash to the NYMEX by clearing members who have sustained losses on their futures positions. In turn, gains on futures positions are remitted to the appropriate clearing member. For customers, variation margin is required by clearing members if an adverse price movement erodes margin on deposit below the maintenance margin levels established by the NYMEX.

190.    Margins are set by the NYMEX and are subject to change as conditions warrant. NYMEX requires higher margins for any NYMEX Division spot-month position open on the day prior to expiration of the futures contract.

191.    NYMEX employs a margining system known as Standard Portfolio Analysis of Risk (SPAN ) in order to calculate margin requirements. The margin requirements are based on the overall risk of positions held by a clearing member in both customer and house accounts. SPAN will determine the overall risk of entire portfolios as calculated through option pricing models. This calculation takes into account the factors that affect option values in option pricing models, including futures price, volatility, and time to expiration. As factors change, futures and options either gain or lose value.

192.    SPAN uses option pricing factors to calculate the worst possible scenario and margins an entire portfolio on this basis. NYMEX rules require member firms to collect from their customers margins for open positions based on SPAN.

193.    Additionally, clearing firms protect themselves against the credit risk of their customers. It is the job of a clearing firm to look into both the credit-worthiness of its customers and the risks of the various transactions that are open, and then demand more than the minimum margin if necessary.

**B.    The Relationship Between the JPM Defendants and Amaranth**

194.    Defendant JP Futures was Amaranth's futures commission merchant ("FCM")[50] and clearing firm throughout the Class Period, pursuant to a contract between Amaranth and JP Futures. Amaranth first opened clearing accounts at JPM, and at JP Futures for financial futures

---

[50]    An FCM solicits or accepts orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any exchange and accepts payment from or extends credit to those whose orders are accepted.

trading, in 2003. In 2004, following the merger of JPM and BankOne, all of Amaranth's

accounts were consolidated into JP Futures.

195.    As Amaranth's FCM, JP Futures accepted Amaranth's orders for the purchase or

sale of natural gas futures and options contracts, among other things. Because of the magnitude

and quantity of the orders typically placed by Amaranth, JP Futures earned substantial brokerage

and commission fees for executing orders for Amaranth.

196.    JP Futures became Amaranth's primary clearing broker of natural gas with the

transfer of ICE positions from UBS to JPM in 2005. As Amaranth's clearing broker, JP Futures

processed and settled Amaranth's trades through the NYMEX Clearing House, a division of the

NYMEX. JP Futures was the NYMEX's counterparty for all positions it cleared in the customer

account with NYMEX, including the positions held by Amaranth.

197.    JP Futures "marked to market" Amaranth's positions every day utilizing SPAN,

and re-calculated Amaranth's variation margin each day in order to require Amaranth to deposit

additional funds or collateral with JP Futures, if necessary. To perform these tasks, JP Futures

was required to analyze and take into account each day's change in Amaranth's positions.

198.    JP Futures held substantial collateral from Amaranth to protect against the risk

that Amaranth would default on its natural gas futures and options contracts. This collateral

comprised mostly cash, treasury bills and short-term government securities.

**C.      The JPM Defendants Had Knowledge of Amaranth's Natural
Gas Positions, Trading Activity and Trading Strategies**

199.    In early 2006, JP Futures became Amaranth's only FCM for the purchase and sale

of natural gas derivatives. According to a complaint filed by Amaranth against JPM in a

separate case, Amaranth alleged: "[f]rom that point forward, JP Futures could 'see' all natural

gas derivatives transactions by [Amaranth], excluding bilateral swaps transactions . . . which collectively amounted to less than 5% of [Amaranth's] natural gas derivative trades."

200.    As Amaranth alleged in that same complaint, "[b]ecause of the nature of the relationship between [Amaranth] and JP Futures, the latter was fully aware of the makeup of [Amaranth's] natural gas derivatives portfolio during 2006." JP Futures had full access to Amaranth's trading positions. JP Futures accepted orders from Amaranth for the purchase and sale of natural gas futures on the NYMEX, and posted margin on Amaranth's behalf in connection with the clearing of those and other transactions. Because JP Futures cleared all of Amaranth's natural gas trades on NYMEX and ICE, it had intimate and substantial knowledge of all of Amaranth's positions and trading activity.

201.    The JPM Defendants specifically knew in and around May 2006 that Amaranth's energy trading strategies drove a disconnect between the spread relationships and market fundamentals. In its May 2006 monthly letter to investors, Amaranth explained, among other things, that:

> Historically, the market has provided sufficient liquidity and opportunity for us to tailor the portfolio as desired despite rapidly changing market dynamics. This "expansion/contraction" approach has enabled us to generate more profits than if we had required the team to unwind trades aggressively whenever markets moved in our favor . . . [W]e believe certain spread relationships remained disconnected from their fundamental value drivers.[51]

202.    In addition, the JPM Defendants had risk management procedures in place at all relevant times that caused it to be fully aware of Amaranth's positions in the market. JP Futures created a daily report that was made available to Amaranth that showed all of Amaranth's NYMEX and ICE positions.

---

[51]    SENATE REPORT at 73.

### D.    The JPM Defendants Were Aware of Amaranth's Natural Gas Contract Position Limit Violations

203.    Being fully aware of all of Amaranth's natural gas futures positions on the NYMEX and ICE, and being responsible for executing Amaranth's orders, JP Futures knew that Amaranth was violating NYMEX position limits. Position limits bar a trader from buying or selling more than a certain number of contracts on NYMEX during the final hours of trading. The purpose of position limits is to reduce the threat of market manipulation.

204.    JP Futures kept track of all of Amaranth's natural gas futures positions on NYMEX and ICE and regularly sent Amaranth periodic reports on its positions. For example, according to a May 24, 2006 email from Michael Malach ("Malach") at Amaranth to Amaranth's Compliance Group, copied to Defendants Hunter and Donohoe among others, entitled "RE: Position Limit Nat Gas June 06," Malach states: "According to the below from JPMU and our delta report, we no NOT appear to be in compliance with the NYMEX. We needed to be under 2,500 contracts by COB yesterday and we are showing in excess of over 8,500." In Malach's email there is a chart showing futures position limits and Amaranth's actual positions. At all times during the Class Period, JP Futures was well aware of Amaranth's position limit violations.

205.    Not only did JP Futures know of Amaranth's position limit violations from its own records, but it also learned of them from the NYMEX and CFTC. For example, in May, 2006, NYMEX sought to limit Amaranth's trading at the expiration of the June contract. After reviewing Amaranth's positions in the June contract, NYMEX contacted JP Futures to inform it that Amaranth needed to comply with its expiration position limits. After receiving this message from NYMEX, on May 19, 2006, one JP Futures official, Vincent Leale, wrote to another, Aldo Solares: "Would you please remind Amaranth that they need to be at/below their NYMEX Nat Gas exempt level COB May 23."

63

**E.     The JPM Defendants Were Aware of Government Investigations
Into Amaranth's Natural Gas Trading Activity**

206.    The JPM Defendants were also aware that NYMEX and the CFTC were

investigating Amaranth's natural gas trading activity during the Class Period.

207.    For example, according to an internal JPM memorandum produced during the

Senate's investigation of Amaranth's natural gas trading activities, which summarized JPM's

interactions with Amaranth through September 21, 2006, on August 23, 2006, JPM stated:

"NYMEX requests position information for Amaranth of NYMEX and ICE.  CFTC sends

request for information."

208.    According to the same internal memorandum, on September 15, 2006, JPM

stated: "NYMEX visits JPM's offices to discuss JPM's hedge fund credit risk management

process and our views on Amaranth."

**F.     The JPM Defendants Willfully Provided Substantial and
Extraordinary Assistance to Amaranth to Further Amaranth's
Unlawful Commodity Manipulations**

209.    Aware that Amaranth's positions and trading strategies were designed to

manipulate NYMEX natural gas futures and options contract prices, the JPM Defendants

knowingly participated in furthering the illegal venture by providing substantial assistance in the

aforesaid manipulations.  The JPM Defendants' assistance to Amaranth was non-routine and

went beyond those regular and usual services typically provided by an FCM and clearing firm to

its customer.  JP Futures knew that Amaranth's natural gas spread positions had the effect of

creating artificial prices and, despite this knowledge, continued to finance such positions despite

violations of NYMEX position limits.  By knowingly financing and supporting Amaranth's

manipulative trading, JP Futures, with the knowledge and consent of its parent, JPMC, aided and

abetted the Amaranth Defendants' manipulation of NYMEX natural gas futures prices in

violation of the CEA. Amaranth could not have engaged in its unlawful trading activity without the knowledge, consent and substantial assistance provided by JP Futures.

210.    JP Futures substantially assisted in the aforesaid manipulations by executing Amaranth's trades on the NYMEX and ICE and providing credit to Amaranth, while simultaneously being aware and informed of the nature of the manipulative pattern of trading engaged in by Amaranth.

211.    For example, in the summer of 2006, Hunter kept pushing for credit limit increases, particularly involving ICE swaps for natural gas at the Henry Hub. This required Amaranth to request more and more ICE credit limit increases from JP Futures. As long as both counterparties agreed upon a credit limit increase, in this case between Amaranth and JP Futures, then ICE did not object.

212.    By August 2006, Amaranth was contacting JP Futures several times a week regarding credit limits increases. Approval by JP Futures for credit limit increases came from the very top – John Hogan, head of credit for JP Futures. Michael Christ at JP Futures was also routinely involved in increasing credit limits for Amaranth. Meetings between Amaranth and JP Futures regarding credit limit increases occurred more frequently during this time as well.

213.    JP Futures agreed to and accommodated every one of Amaranth's requests for a credit limit increase. These requests continued into early September, 2006. By September 2006, JP Futures agreed to increase its ICE limits to Amaranth to the hundreds of millions of dollars. In order to assist in the manipulative scheme, it still regularly agreed to increase credit limits for Amaranth, while at the same time knowing the negative impact Amaranth's natural gas trades were having on the market.

214.    The JPM Defendants also knew that Amaranth moved its positions from NYMEX to ICE via a series of secret, orchestrated trades, and then placed even more trades on ICE to increase its overall positions in natural gas. Amaranth did so in order to evade CFTC and NYMEX scrutiny and to further its manipulative scheme. Nonetheless, JP Futures knowingly carried and facilitated these trades and provided financing for them while it was contemporaneously aware of Amaranth's positions in natural gas futures and swaps (including the fact that Amaranth had moved its NYMEX positions to ICE after NYMEX had specifically directed Amaranth to reduce its holdings).

215.    According to the internal memorandum by JPM produced during the Senate investigation of Amaranth's natural gas trading activities, on August 15, 2006, JPM stated that Artie DiRocca (Amaranth) told Mike Christ (JPM) that Amaranth was "taking down risk in the energy book by trading OTC and clearing these trades via ICE and NYMEX ClearPort so as to keep their activity out of view of the floor/broker mkt."

216.    According to the same JPM internal memorandum, on August 29, 2006, JPM stated: "Mike Schneider [of JPM] alerts HF Credit that Amaranth exceeded their intraday ICE limit."

217.    Despite the JPM Defendants' knowledge of Amaranth's manipulative trading activities, the JPM Defendants chose to continue to finance Amaranth's natural gas trading even though such financing had the effect of furthering and continuing Amaranth's manipulation. Amaranth's unlawful natural gas trading had been heavily financed by money borrowed on margin from the JPM Defendants at a time when the JPM Defendants knew of and facilitated such manipulative scheme.

G.    **The JPM Defendants Substantially Profited From Their
       Aiding and Abetting of Amaranth's Unlawful Conduct**

218.    The JPM Defendants had a financial incentive to knowingly aid and abet

Amaranth's manipulation of NYMEX natural gas prices.

219.    Amaranth's natural gas trading generated enormous revenues for the JPM

Defendants in the form of commissions and interest on margin balances. Amaranth's trading had

been heavily financed by money borrowed on margin from the JPM Defendants. Thus, the JPM

Defendants had a financial incentive to aid and abet Amaranth's manipulation of NYMEX

natural gas prices.

220.    The JPM Defendants had a financial incentive to aid and abet Amaranth's

manipulation of NYMEX natural gas prices.

221.    Amaranth's natural gas trading generated enormous revenues for the JPM

Defendants in the form of commissions and interest on margin balances.

222.    Despite the JPM Defendants' knowledge of Amaranth's manipulative trading

activities, the JPM Defendants chose to continue to finance Amaranth's natural gas trading even

though such financing had the effect of continuing Amaranth's manipulation.

## IV.    **FLOOR BROKER DEFENDANTS**

223.    The Floor Broker Defendants had a financial motive to aid and abet Amaranth's

manipulative trading.

224.    Amaranth, as one of the largest traders on NYMEX, generated substantial revenue

for the Floor Broker Defendants in the form of commissions.

225.    Rather than refuse Amaranth's request to effectuate multiple manipulative natural

gas transactions and thereby forego substantial commission revenue from same, the Floor Broker

Defendants knowingly executed Amaranth's manipulative trading strategy.

226.    The Floor Broker Defendants' execution of Amaranth's trading strategy caused manipulated natural gas futures and options prices.

227.    The Floor Broker Defendants therefore had the ability, as well as the motive, to aid and abet Amaranth's manipulation.


## V.    CLASS ACTION ALLEGATIONS

228.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP") on their own behalf and as representatives of a class ("Class") defined as all persons, corporations and other legal entities (other than Defendants, their employees, affiliates and co-conspirators) that purchased, sold and/or held NYMEX natural gas futures and/or options on futures contracts between February 16, 2006 and September 28, 2006 ("Class Period").

229.    FRCP Rule 23(a)(1).  Class members number in the thousands and are geographically dispersed such that joinder is impractical.

230.    FRCP Rule 23(a)(2).  Common issues of fact and law include but are not limited to:

a.    Whether the Amaranth Defendants manipulated NYMEX natural gas contract prices in violation of the CEA;

b.    Whether the Other Defendants aided and abetted manipulation in violation of the CEA;

c.    Whether such manipulation caused prices of NYMEX natural gas contracts to be artificial;

d.    Whether such manipulation caused cognizable legal injury under the CEA;

e.      Whether such injury or the extent of such artificiality may be established by common, Class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests;

f.      Whether Defendants unjustly enriched themselves or otherwise violated the common law;  and

g.      Whether damages, restitution, equitable, compulsory, or other relief is warranted.

231.   Rule 23(a)(3).  Plaintiffs' interests are typical of, and not antagonistic to the interests of, the Class.

232.   Rule 23(a)(4).  Plaintiffs are adequate class representatives and have retained adequate counsel.

233.   Rule 23(b)(3).  Common issues predominate over individual issues (if any).  A class action is superior to other methods (if any) for a fair and efficient adjudication of this case. Indeed, a class action is the only method by which plaintiffs and the Class can efficiently seek redress from Defendants' complex manipulation because the high cost of prosecution render an individual plaintiff's claim a "negative value" claim.  That is, the size of the individual damages of Plaintiffs and other Class members is less than the costs of prosecuting the complex claims against defendants.  Plaintiffs do not anticipate any difficulties in the management of this action as a class action.

## VI.    FRAUDULENT CONCEALMENT

234.   By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing. Defendants, *inter alia*, engaged in secret and surreptitious

trading on the ICE in order to manipulate and make artificial prices for natural gas futures and options on the NYMEX.

235.    Because the Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiffs and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in or about June 25, 2007 by the U.S. Senate Subcommittee on Investigations. See ¶ 4 *supra*.

236.    Due to the fraudulent concealment, or other principles, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class has been tolled during the period of such fraudulent concealment.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST THE AMARANTH DEFENDANTS FOR MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. SECTION 1

237.    Plaintiffs repeat and re-allege the previous allegations as if fully set forth herein.

238.    Amaranth Advisors, and the remaining Amaranth Defendants, undertook the activities alleged herein individually, in concert, and as one another's control persons or agents .

239.    Each Amaranth Defendant or its control person or agent specifically intended their activities alleged herein to move or support the prices of NYMEX natural gas contracts to or at artificial levels. Each Amaranth Defendant intentionally engaged in conduct which caused NYMEX natural gas contracts prices and price spreads to be artificial throughout the Class Period.

240.    During the Class Period the Amaranth Defendants manipulated natural gas contract prices in  violation of Sections 6( c), 6(d),  9(a) and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a) and 25(a).

241. Plaintiffs and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

### AS AND FOR A SECOND CAUSE OF ACTION AGAINST THE AMARANTH DEFENDANTS FOR AIDING AND ABETTING AND CONTROL PERSON LIABILITY FOR MANIPULATION

242. Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

243. To any extent that any Amaranth Defendant is not liable for manipulation or conspiracy to manipulate under the first cause of action, then that Defendant is liable under this cause of action.

244. Defendant Amaranth Advisors was the investment advisor and manager of the Amaranth Defendants and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the Amaranth Defendants.

245. Defendant Amaranth LLC held the manipulative positions for the Amaranth Defendants and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the Amaranth Defendants.

246. Defendants Amaranth International Limited, Amaranth Partners LLC and Amaranth Capital Partners LLC got the manipulation started by putting up funds for investment in Amaranth LLC, shared in the financial benefits from the manipulation, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the Amaranth Defendants.

247. Defendant Amaranth Management controlled and substantially owned Amaranth Advisors and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the Amaranth Defendants.

248.    Defendant Amaranth Group was general partner of Amaranth Management, controlled Amaranth Advisors, employed the natural gas traders, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the Amaranth Defendants.

249.    Defendant Amaranth ULC was an indirect subsidiary of Amaranth Advisors, allowed the natural gas traders to be based in Calgary, Alberta, rather than in Greenwich, Connecticut, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the Amaranth Defendants.

250.    Defendant Maounis was the principal of the Amaranth Defendants and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by defendant Amaranth.

251.    Defendant Hunter was the head natural gas trader for the Amaranth Defendants, supervised trading operations in Calgary and Greenwich, served as president of Amaranth ULC, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the Amaranth Defendants.

252.    Defendant Donohoe served as "execution trader" for Defendant Hunter, placed manipulative orders with Amaranth's NYMEX floor brokers, and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodities Exchange Act by the Amaranth Defendants.

253.    The Amaranth Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.

254.    The Amaranth Defendants willfully intended to assist the manipulation in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

255.    Additionally or alternatively, Defendants Amaranth Advisors, Amaranth LLC,

Amaranth Management, Amaranth Group, Amaranth International, Amaranth Partners,

Amaranth Capital Partners, Amaranth ULC, Maounis, Hunter and Donohoe controlled the

Amaranth Defendants.  As a controlling person, each of the aforementioned Defendants is liable

under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B),  Section 4(b) of the Commodities

Exchange Act, 7 U.S.C. § 6(b) pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), and 17

C.F.R. § 166.3.

256.    Plaintiffs and members of the Class are each entitled to damages for the violations

alleged herein.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST
## THE FLOOR BROKER DEFENDANTS FOR AIDING AND
## ABETTING VIOLATIONS OF THE COMMODITY EXCHANGE ACT

257.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as

though fully set forth herein.

258.    The Floor Broker Defendants knowingly aided, abetted, counseled, induced,

and/or procured the violations of the CEA alleged herein.  The Floor Broker Defendants did so

knowing of Amaranth's manipulations of NYMEX natural gas futures prices, and willfully

intended to assist these manipulations to cause the price of NYMEX natural gas contracts to be

artificial during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

259.    The Floor Broker Defendants were at all relevant times Amaranth's primary

NYMEX floor brokerage firms and floor brokers.  Defendant Amaranth was ALX's largest

customer, and one of its key employees, Vincent Rufa, traveled to Calgary and socialized with

Amaranth employees on multiple occasions.  Throughout the Class Period, the Floor Broker

Defendants substantially assisted in the aforesaid manipulations by executing the trades for

Amaranth, while simultaneously being informed of the nature of the manipulative intent of the

trading engaged in by Amaranth.

260.    Other persons willfully intended to assist these manipulations to cause the price of

NYMEX natural gas futures contracts to reach artificial levels during the Class period, in

violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).  They are John Does 1-10.

261.    Plaintiffs and the Class are each entitled to actual damages for the violation of the

CEA alleged herein.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST THE JPM DEFENDANTS FOR AIDING AND ABETTING VIOLATIONS OF THE COMMODITY EXCHANGE ACT

262.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as

though fully set forth herein.

263.    Defendant JPMC, through its wholly-owned subsidiary Defendant JP Futures,

knowingly and willfully aided, abetted, counseled, induced, and/or procured the violations of the

CEA alleged herein.  The JPM Defendants did so knowing of Amaranth's unlawful manipulation

of NYMEX natural gas contracts prices, and willfully intended to assist and further these illegal

manipulations to cause the price of NYMEX natural gas contracts and options contracts to be

artificial during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

264.    The JPM Defendants substantially assisted in the aforesaid manipulations by

executing the trades and providing credit to Amaranth, while simultaneously being aware of the

nature of the manipulative pattern of trading engaged in by Amaranth.  The JPM Defendants had

risk management procedures in place at relevant times that caused it to be fully aware of

Amaranth's positions and the effects of same on the market.

265.    Plaintiffs and the Class are each entitled to actual damages for the violation of the CEA alleged herein.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST
## DEFENDANTS FOR UNJUST ENRICHMENT

266.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

267.    Defendants financially benefited from their unlawful acts.  These unlawful acts caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact natural gas contracts at artificial prices.

268.    As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

269.    Each Defendant should pay its own unjust enrichment to Plaintiffs and members of the class.

270.    Plaintiffs and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

271.    Plaintiffs have brought this Amended and Consolidated Complaint based upon the investigation of Class Counsel including without limitation (1) the U.S. Senate Permanent Subcommittee Staff Report on Excessive Speculation in the Natural Gas Markets, and its records, (2) the Federal Energy Regulatory Commission's Order to Show Cause against Amaranth, (3) the complaint filed by Amaranth against J.P. Morgan, (4) the complaint filed against Amaranth by the Commodity Futures Trading Commission, and publicly available prices, volume and open interest information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A)    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representatives and their counsel as Class counsel;

(B)    For a judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)    For a judgment awarding Plaintiffs and the Class any and all sums of Defendants' unjust enrichment;

(D)    For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiffs and the Class;

(E)    For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(F)    For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury.

Dated: New York, New York
      December 17, 2007

LOVELL STEWART HALEBIAN LLP

By: _____
Christopher Lovell (CL 2595)
Gary S. Jacobson (GJ 2481)
Ian T. Stoll (IS 3424)
500 Fifth Avenue
New York, NY 10110
(212) 608-1900
(212) 719-4677 (fax)

LOUIS F. BURKE, P.C.

By: _____
Louis F. Burke (LB 4686)
Leslie Wybiral (LW 0629)
460 Park Avenue, 21ST Floor
New York, NY 10022
(212) 682-1700
(212) 808-4280 (fax)

LOWEY DANNENBERG BEMPORAD
SELINGER & COHEN, P.C.

By: _____
Vincent Briganti (VB 1497)
Geoffrey M. Horn (GH 4179)
White Plains Plaza
1 North Broadway, 5th Floor
White Plains, NY 10601

(914) 997-0500
(914) 997-0035 (fax)

*Co-Lead Counsel for Plaintiffs*

Christopher Gray (CG 0334)
CHRISTOPHER J. GRAY PC
460 Park Avenue, 21st Floor
New York, NY 10022
(212) 838-3221
(212) 508-3695 (fax)

Samuel Rudman
Robert Rothman
Fainna Kagan
COUGHLIN, STOIA, GELLER,
RUDMAN & ROBBINS, LLP
58 South Service Rd., Suite 200
Melville, NY 11747
(631) 367-7100
(631) 367-1173 (fax)

Bernard Persky (BP 1072)
Gregory S. Asciolla
LABATON SUCHAROW, LLP
140 Broadway
New York, NY 10005
(212) 907-0868
(212) 883-7068 (fax)

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Christopher M. McGrath, an attorney, hereby certify that I have served *Plaintiffs' Consolidated Class Action Complaint* upon the following individuals by Electronic Means on December 18th, 2007 at 1:30 a.m.:

Amelia T.R. Starr
**Davis Polk & Wardwell**
amelia.starr@dpw.com
*Attorneys for Defendant Amaranth LLC*

Geoffrey F. Aronow
**Heller Ehrman LLP**
geoffrey.aronow@hellerehrman.com
*Attorneys for Defendant Nicholas Maounis*

Michael S. Kim
**Kobre & Kim LLP**
michael.kim@kobrekim.com
*Attorneys for Defendant Brian Hunter*

Eric. S. Goldstein
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
egoldstein@paulweiss.com
*Attorneys for Defendants J.P. Morgan Chase & Co. and J.P. Morgan Futures, Inc.*

Mark J. Stein
**Simpson Thatcher & Bartlett LLP**
mstein@stblaw.com
*Attorneys for Defendant Mathew Donohoe*

Steven M. Schwartz
**Winston & Strawn LLP**
Sschwart@winston.com
*Attorneys for Defendants Amaranth Advisors LLC, Amaranth Group, Inc., Amaranth Partners LLC, Amaranth Capital Partners LLC, and Amaranth Advisors (Calgary) ULC*

Adam Hakki
**Sherman & Sterling LLP**
ahakki@shearman.com
*Attorneys for Defendant Amaranth International Limited*

/s/ Christopher M. McGrath
Christopher M. McGrath