UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: AMARANTH NATURAL GAS COMMODITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Oral Argument Requested<br><br>MASTER FILE NO. 07 Civ. 6377 (SAS) [rel. 07 Civ. 7592 (SAS), 07 Civ. 7181 (SAS), 07 Civ. 7943 (SAS)] |

**MEMORANDUM OF LAW IN SUPPORT OF THE JPMORGAN
<u>DEFENDANTS' AMENDED MOTION TO DISMISS</u>**

Mark F. Pomerantz
Eric S. Goldstein
Daniel J. Toal
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064

*Attorneys for Defendants JPMorgan Chase & Co., JPMorgan Chase Bank,
N.A. and J.P. Morgan Futures Inc.*
(212) 373-3000

Page

## TABLE OF CONTENTS

Preliminary Statement ...................................................................................................... 1

Statement of Facts and Allegations ................................................................................. 4

    Amaranth .................................................................................................................... 4

    The JPMorgan Defendants ......................................................................................... 4

    The Functions of an FCM ........................................................................................... 4

    Plaintiffs' Allegations Against JPMorgan .................................................................. 5

Argument ......................................................................................................................... 6

I.     PLAINTIFFS' MARKET MANIPULATION CLAIM MUST BE PLEADED
       WITH PARTICULARITY PURSUANT TO FED. R. CIV. P. 9(b) ............................ 6

II.    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST JPMORGAN FOR
      AIDING AND ABETTING UNDER THE CEA ...................................................... 8

    A.    Plaintiffs' Complaint Fails Adequately to Allege That JPMorgan *Knew*
         Amaranth Intended to Manipulate the Market for Natural Gas Futures ............... 9

        1.    *Allegations That JPMFI Had Data Concerning Amaranth's*
            *Positions Fail to Establish Knowledge That Amaranth Intended to*
            *Manipulate the Market* ................................................................................ 10

        2.    *Allegations That JPMFI Was Aware of Amaranth's Alleged*
            *Violations of Natural Gas Contract Position Limits Fail to*
            *Establish That JPMC Knew That Amaranth Intended to*
            *Manipulate the Market* ................................................................................ 12

        3.    *Allegations That JPMFI Was Aware of Regulatory Requests for*
            *Information About Amaranth's Natural Gas Trading Activity Fail*
            *to Establish That JPMFI Knew Amaranth Intended to Manipulate*
            *the Market* .................................................................................................. 13

        4.    *Allegations That JPMFI Was Aware That Amaranth Reduced Some*
            *of Its Natural Gas Positions on NYMEX and Increased Similar*
            *Positions on ICE Fail to Establish That JPMFI Knew That*
            *Amaranth Intended to Manipulate the Market* ........................................... 14

        5.    *Plaintiffs' Conclusory Allegations That JPMFI Knew Amaranth*
            *Intended to Manipulate the Market Fail as a Matter of Law* ..................... 15

    B.    Plaintiffs' Complaint Fails Adequately To Allege That JPMorgan Intended
         to Assist Amaranth's Alleged Market Manipulation .......................................... 16

i

Page

C.    Plaintiffs' Complaint Fails to Establish That the JPM Defendants
      Committed Any Act in Furtherance of Amaranth's Alleged Market
      Manipulation ...................................................................................................18

III.   PLAINTIFFS' COMPLAINT AGAINST JPMORGAN FAILS TO STATE A
       CLAIM FOR UNJUST ENRICHMENT.......................................................................22

      A.    Plaintiffs' Complaint Fails to Establish the Existence of a Quasi-
            Contractual Relationship With JPMorgan ...........................................................22

      B.    Plaintiffs' Complaint Fails to Establish That the JPM Defendants Were
            Enriched at Plaintiffs' Expense...........................................................................24

IV.    PLAINTIFFS FAIL TO PLEAD ANY ALLEGATIONS SPECIFIC TO JPMC
       OR JPMCB ...................................................................................................................25

Conclusion ....................................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbatiello* v. *Monsanto Co.*,
    522 F. Supp. 2d 524 (S.D.N.Y. 2007)..............................................................................22-23

*Armstrong* v. *Clovis McAlpin*,
    699 F.2d 79 (2d Cir. 1983)..............................................................................................21

*Bell Atl. Corp.* v. *Twombly*,
    127 S. Ct. 1955 (2007)..............................................................................................6, 7

*Benfield* v. *Mocatta Metals Corp.*,
    No. 91-Civ-8255 (LJF), 1992 WL 58879 (S.D.N.Y. Mar. 13, 1992)............................9, 16, 19

*Bosco* v. *Serhant*,
    836 F.2d271 (7th Cir. 1987) ............................................................................................21

*Compudyne Corp.* v. *Shane*,
    453 F. Supp. 2d 807 (S.D.N.Y. 2006)..............................................................................24

*Connolly* v. *Havens*,
    763 F. Supp. 6 (S.D.N.Y. 1991)......................................................................................15

*Cromer Fin. Ltd.* v. *Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001)..............................................................................21

*In re Crude Oil*,
    No. 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. Jun. 28, 2007)........................ passim

*Damato* v. *Hermanson*,
    153 F.3d 464 (7th Cir. 1998) ............................................................................................9, 16

*Dillon* v. *Militano*,
    731 F. Supp. 634 (S.D.N.Y. 1990) ....................................................................................21

*Ellison* v. *Am. Image Motor Co.*,
    36 F. Supp. 2d 628 (S.D.N.Y. 1999)..............................................................................17-18

*Eternity Global Master Fund Ltd.* v. *Morgan Guar. Trust Co.*,
    375 F.3d 168, 187 (2d Cir. 2004)....................................................................................16

*Golden Pac. Bancorp* v. *FDIC*,
    273 F.3d 509 (2d Cir. 2001)............................................................................................22

*Gristede's Foods, Inc.* v. *Unkechauge Nation*,
 532 F. Supp. 2d 439 (E.D.N.Y. 2007) ...................................................................23

*Hesse* v. *Halpert & Co. Employee Profit Sharing Trust*,
 No. 97 C. 4276, 1998 WL 111678 (N.D. Ill. Mar. 12, 1998) .....................................16

*Iqbal* v. *Hasty*,
 490 F.3d 143 (2d Cir. 2007)........................................................................................7

*Karasyk* v. *Marc Commodities Corp.*,
 770 F. Supp. 824 (S.D.N.Y. 1991) .......................................................................15, 17

*Kaye* v. *Grossman*,
 202 F.3d 611 (2d Cir. 2000)......................................................................................22

*Kearney* v. *Prudential-Bache Secs., Inc.*,
 701 F. Supp. 416 (S.D.N.Y. 1998) ...........................................................................16

*Krause* v. *Forex Exch. Mkt., Inc.*,
 356 F. Supp. 2d 332 (S.D.N.Y. 2005)..........................................................7-8, 15-16

*Martes* v. *USLife Corp.*,
 927 F. Supp. 146 (S.D.N.Y. 1996) ...........................................................................24

*Mazzaro de Abreu* v. *Bank of Am. Corp.*,
 525 F. Supp. 2d 381 (S.D.N.Y. 2007).......................................................................24

*Modica* v. *Modica*,
 15 A.D.3d 635 (N.Y. App. Div. 2005) .......................................................................25

*In re Motel 6 Sec. Litig.*,
 Nos. Civ. 2183 (JFK), 93 Civ. 2866 (JFK), 1997 U.S. Dist. LEXIS 3909
 (S.D.N.Y. Apr. 1, 1997)...........................................................................................23

*In re Natural Gas Commodity Litig.*,
 358 F. Supp. 2d 336 (S.D.N.Y. 2005)......................................................................7-8

*Pension Comm. of the Univ. of Montreal Pension Plan* v. *Banc of Am. Secs.*,
 446 F. Supp. 2d 163 (S.D.N.Y. 2006).......................................................................21

*Reading Int'l, Inc.* v. *Oaktree Capital Mgmt.*,
 317 F. Supp. 2d 301 (S.D.N.Y. 2003).......................................................................23

*Redtail Leasing, Inc.* v. *Bellezza*,
 No. 95 Civ. 5191 (JFK), 1997 U.S. Dist. LEXIS 14821 (S.D.N.Y. Sept. 29, 1997)...............22

*Reed Int'l Trading Corp.* v. *Donau Bank AG*,
 866 F. Supp. 750 (S.D.N.Y. 1994) ...........................................................................24

*Republic of Rwanda* v. *Ferone*,
    No. 07 Civ. 7663 (JSR), 2007 WL 2890174 (S.D.N.Y. Oct. 2, 2007) ...................................25

*Ross* v. *Bolton*,
    639 F. Supp. 323 (S.D.N.Y. 1986) ................................................................................. 15-16

*Rothman* v. *Gregor*,
    220 F.3d 81 (2d Cir. 2000)..................................................................................................4

*Ryder Energy Distribution Corp.* v. *Merrill Lynch Commodities Inc.*,
    748 F.2d 774 (2d Cir. 1984)..........................................................................................4-5

*Sec. Investor Prot. Corp.* v. *BDO Seidman, LLP*,
    222 F.3d 63 (2d Cir. 2000).................................................................................................6

*SEC* v. *Treadway*,
    430 F. Supp. 2d 293 (S.D.N.Y. 2006)..............................................................................21

*Silva Worldwide Run Ltd.* v. *Gaming Lottery Corp.*,
    No. 96 CIV. 3231 (RPP), 1998 WL 167330 (S.D.N.Y. Apr. 8, 1998) ...................................18

*Sperry* v. *Crompton Corp.*,
    863 N.E.2d 1012 (N.Y. 2007)...........................................................................................23

*Stander* v. *Fin. Clearing & Servs. Corp.*,
    730 F. Supp. 1282 (S.D.N.Y. 1990)..................................................................................21

*State of New York* v. *Daicel Chem. Indus., Ltd.*,
    42 A.D.3d 301 (N.Y. App. Div. 2007) ..............................................................................23

*Tatum* v. *Legg Mason Wood Walker, Inc.*,
    83 F.3d 121, 123 n.3 (5th Cir. 1996) ..................................................................................8

*Tatum* v. *Smith*,
    887 F. Supp. 918 (N.D. Miss. 1995)............................................................................ 20-21

*Tellabs, Inc.* v. *Makor Issues & Rights Ltd.*,
    127 S. Ct. 2499 (2007).......................................................................................................7

*United States* v. *Peoni*,
    100 F.2d 401 (2d Cir. 1938) (L. Hand, J.) .........................................................................9

*U.S. Commodity Futures Trading Comm'n* v. *Amaranth Advisors, L.L.C.*,
    --- F. Supp. 2d ---, 2008 WL 2123323 (May 21, 2008 S.D.N.Y.) .......................................8

*Weber* v. *E.D. & F. Man Int'l, Inc.*,
    No. 97 C 7817, 1999 WL 258496 (N.D. Ill. Jan. 13, 1999) .........................................19, 21

*Weber* v. *E.D. & F. Man Int'l, Inc.*,
  No. 97 C 7518, 1999 WL 258496 (N.D. Ill. Apr. 9, 1999)................................18, 20

*Xpedior Creditor Trust* v. *Credit Suisse First Boston (USA) Inc.*,
  341 F. Supp. 2d 258 (S.D.N.Y. 2004)..........................................................22, 24

## STATUTES

7 U.S.C. § 25(a)(1) (2000) ...................................................................................13

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 9(b)............................................................. passim

Federal Rule of Civil Procedure 12(b)(6) ...............................................................4

NYMEX Exchange Rule 4.03...............................................................................19

Defendants JPMorgan Chase & Co. ("JPMC"), JPMorgan Chase Bank, N.A. ("JPMCB"), and J.P. Morgan Futures Inc. ("JPMFI") (collectively, "JPMorgan") submit this memorandum of law in support of their amended motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), all claims that plaintiffs assert against them.

## Preliminary Statement

In this action, plaintiffs—a putative class of purchasers and sellers of NYMEX natural gas futures contracts from February 16, 2006 to September 28, 2006—seek to transform JPMFI's performance of its ordinary, routine and required functions as Amaranth's clearing broker into an "aiding and abetting" claim under the Commodities Exchange Act. The effort is unavailing. As JPMFI did nothing other than perform the ordinary and routine functions of a clearing broker, the law does not permit JPMorgan to be held liable for any purported misdeeds by Amaranth.

In late September 2006, Amaranth—once a high-flying hedge fund—imploded and lost billions of dollars in a matter of weeks. Plaintiffs claim that during a seven-month period prior to its collapse, Amaranth manipulated the natural gas futures and options market and caused natural gas contract prices "to be artificial." Plaintiffs thus contend that Amaranth violated the Commodities Exchange Act ("CEA"). And based on nothing more than the fact that JPMFI served as Amaranth's clearing broker, and their desire for a deep pocket, plaintiffs also contend that JPMorgan aided and abetted Amaranth's supposed market manipulation. That claim fails as a matter of law for four distinct reasons.

First, to support an aiding and abetting claim under the CEA, plaintiffs must allege facts indicating that JPMorgan knew that Amaranth intended to manipulate the market for natural gas futures and options. Plaintiffs' factual allegations suggest nothing of the sort. Instead, plaintiffs attempt to predicate their claim on allegations that JPMFI had access to

Amaranth's natural gas positions and that Amaranth held large positions in certain futures contracts. Inasmuch as clearing brokers necessarily have access to information about their clients' trades and open positions, however, this is just another way of saying that JPMFI was Amaranth's clearing broker and provides no basis for concluding that JPMFI knew that Amaranth purportedly was bent on market manipulation. Nor can the fact that Amaranth held substantial positions in certain natural gas futures contracts be equated, as a matter of law or logic, with an intent to manipulate the market. To adequately allege that JPMFI knew that Amaranth intended to manipulate the market for natural gas futures contracts, much more is required. The absence of such allegations here requires dismissal of plaintiffs' aiding and abetting claim against JPMorgan.

Second, to state an aiding and abetting claim under the CEA, plaintiffs must allege facts indicating that JPMorgan not only knew that Amaranth intended to manipulate the market for natural gas futures, but intended to assist Amaranth in that unlawful enterprise. Plaintiffs again fall far short of the mark. With regard to this element of an aiding and abetting claim, plaintiffs observe only that JPMFI—like every other clearing broker—received commissions for clearing Amaranth's natural gas trades and interest on Amaranth's required margin balances. But this unremarkable fact does nothing to establish that JPMFI had a motive to assist Amaranth in market manipulation. In point of fact, the compensation that JPMFI received from Amaranth for clearing its trades is not alleged to have been different in any way from normal and customary clearing commissions or to have depended on the success of any purported efforts by Amaranth to manipulate the market. As a result, plaintiffs fail to allege any facts sufficient to establish that JPMorgan shared Amaranth's allegedly manipulative intent.

Third, an aiding and abetting claim requires factual allegations that JPMorgan acted in furtherance of Amaranth's alleged efforts to manipulate the market. Plaintiffs allege only that JPMFI cleared Amaranth's natural gas futures trades on the New York Mercantile Exchange ("NYMEX") and the Intercontinental Exchange ("ICE"); "financed" Amaranth's natural gas trading by loaning it money on margin; and, with the approval of the relevant exchanges, agreed to increases of Amaranth's credit limits. None of these allegations remotely suffices to establish that JPMFI took any act in furtherance of Amaranth's supposed efforts to manipulate the market. To the contrary, it is well-established that clearing brokers commit no "overt act" to assist a primary violation when they merely act in accordance with their normal business practices, which is all that plaintiffs allege here.

Plaintiffs' unjust enrichment claim also fails as a matter of law. Plaintiffs have not pleaded any facts to establish that they directly dealt with, or otherwise had any relationship with JPMorgan. Nor have plaintiffs even attempted to allege that JPMorgan somehow was enriched at their expense. These fatal deficiencies foreclose any claim of unjust enrichment.

Plaintiffs' allegations against JPMC and JPMCB also fail because the Complaint is entirely devoid of factual allegations directed against either entity. The Complaint alleges only that JPMC "controls" JPMFI, and that JPMCB provides a "gateway" to trading and clearing services on the NYMEX. The Complaint thus does not even attempt to establish that either entity knew that Amaranth intended to manipulate the market for natural gas futures, intended to assist Amaranth in any such manipulative plan, or took any act in furtherance of Amaranth's supposed plan. Instead, plaintiffs have simply and impermissibly attempted to lump these entities together with JPMFI, the entity that served as Amaranth's clearing broker. Courts invariably have rejected such efforts at pleading by association.

Plaintiffs' claims against JPMorgan therefore should be dismissed in their entirety and with prejudice.

## Statement of Facts and Allegations

**Amaranth**

Amaranth was a multi-strategy private investment hedge fund with substantial investments in energy. (Compl. ¶ 22.) At the end of 2005, Amaranth had assets in excess of $8 billion and natural gas futures positions valued at more than $5 billion. (*Id.* ¶ 22(a).) Amaranth ultimately lost billions of dollars in August and September 2006 when the market for natural gas futures and options moved against its positions. (*Id.*; Ex. A at 1.[1]) In late September 2006, Amaranth was forced to liquidate its holdings and cease operation. (Ex. A at 1.)

**The JPMorgan Defendants**

JPMFI is a Commodity Futures Trading Commission ("CFTC") registered futures commission merchant ("FCM") and served as Amaranth's FCM and clearing broker from 2003 until 2006. (Compl. ¶ 194.) As a clearing broker, as described more fully below, JPMFI is an entity through which futures and other derivative transactions are cleared and settled. In 2005, JPMFI became Amaranth's primary clearing broker for natural gas trades. (*Id.* ¶ 196.)

**The Functions of an FCM**

Futures contracts are traded on designated futures exchanges. (*Id.* ¶ 184.) To access a futures exchange, it is necessary to retain the services of a licensed broker, such as an FCM. *Ryder Energy Distribution Corp.* v. *Merrill Lynch Commodities Inc.*, 748 F.2d 774, 776

---

[1] Ex. A refers to the report issued by the U.S. Senate Permanent Subcommittee on Investigations on June 25, 2007, entitled *Excessive Speculation in the Natural Gas Market*, attached to the Declaration of Daniel J. Toal, dated June 23, 2008, filed herewith. Since plaintiffs refer to this report in their complaint (Compl. ¶ 4), JPMorgan properly relies upon this document on a motion to dismiss. *See Rothman* v. *Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

(2d Cir. 1984). FCMs are generally registered with the CFTC and may engage in soliciting and accepting orders for the purchase or sale of a commodity. (*Id.*) A trade occurs when a buyer and seller agree to the terms of a bid or offer, but the transaction is not finalized until it is cleared. (Compl. ¶ 184.) To clear the trade, the FCM (also known as the clearing firm) submits the trade to the clearing house of the exchange on which the trade is executed. (*Id.* ¶ 185.) The clearing firm essentially guarantees the performance of its clients' contracts by assuming the risk of their nonperformance. (*Id.*)

To cover any losses that may occur, traders of commodities contracts and, in turn, their clearing firms, must post margin—in the form specified by regulation, such as cash or highly liquid securities—related to the value and risk of the positions taken in their trades. (*Id.* at ¶ 186.) At the conclusion of each trading day, the exchange collects money from the accounts that have lost value and credits those accounts that have gained value, a process that is known as "marking-to-market." (*Id.* ¶ 187.) This process guarantees that a clearing firm has sufficient funds on deposit to perform its obligations. (*Id.*) Margin requirements are set by the exchange and fluctuate based on the volatility of positions in the market. (*Id.* ¶ 190.)

**Plaintiffs' Allegations Against JPMorgan**

Plaintiffs' allegations against JPMorgan amount to little more than an accounting of routine and required acts that JPMFI performed in fulfillment of its obligations as Amaranth's FCM.[2] Plaintiffs factual allegations against JPMFI boil down to the following:

- JPMFI processed and settled Amaranth's trades through the NYMEX Clearing House (Compl. ¶ 196);

---

[2]  As noted previously, although plaintiffs also assert claims against JPMC and JPMCB, they do not plead any factual allegations against these entities beyond the facts that JPMC is the corporate parent of JPMFI and JPMCB is an approved bank margin depository of the NYMEX. *See* Section IV, *infra*.

- JPMFI acted as counterparty to NYMEX for all Amaranth positions that it cleared (*id.*);

- JPMFI "marked-to-market" Amaranth's positions on a daily basis (*id.* ¶ 197);

- JPMFI calculated the margin that exchange rules required Amaranth to maintain and held those amounts in a margin account (*id.* ¶¶ 197-98);

- JPMFI supposedly "financed" Amaranth's natural gas trading by lending it "money borrowed on margin" (*id.* ¶ 217);

- JPMFI consented to Amaranth's requests to increase its credit limit on ICE, subject to approval from ICE itself (*id.* ¶¶ 211-13);

- JPMFI cleared Amaranth's ICE trades after NYMEX instructed Amaranth to reduce its NYMEX natural gas position (*id.* ¶ 214);

- JPMFI tracked all of Amaranth's natural gas futures positions (*id.* ¶ 204); and

- JPMFI sent periodic reports to Amaranth (*id.*).

Each and every one of these actions was performed in the ordinary course of business by JPMFI as Amaranth's FCM and registered clearing firm.

<u>**Argument**</u>

**I.**

**PLAINTIFFS' MARKET MANIPULATION CLAIM MUST BE PLEADED WITH PARTICULARITY PURSUANT TO FED. R. CIV. P. 9(b)**

To survive a motion to dismiss, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 127 S. Ct. 1955, 1974 (2007). This means that a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965. Although the Court must "take [] all facts alleged in the complaint as true and draw [] all reasonable inferences in favor of the plaintiff," *Sec. Investor Prot. Corp.* v. *BDO Seidman, LLP*, 222 F.3d 63, 68 (2d Cir. 2000), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 127 S. Ct. at 1964-65.  Plaintiff therefore must allege enough facts to "nudge[] their claims across the line from conceivable to plausible" to avoid dismissal.  *Id.* at 1974; *see also Iqbal* v. *Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (holding that *Twombly* "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render a claim plausible").

   Plaintiffs' aiding and abetting claim against JPMorgan is also subject to the heightened pleading standard of Rule 9(b).  Courts apply Rule 9(b) to manipulation claims under the CEA that, as here, allege schemes "classically associated with fraud." [3]  *See In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007) (applying Rule 9(b) to market manipulation claims notwithstanding that plaintiffs never used the word "fraud"); *see also Krause* v. *Forex Exch. Mkt., Inc.*, 356 F. Supp. 2d 332, 338 (S.D.N.Y. 2005) (applying Rule 9(b) to aiding and abetting claims under the CEA).  Rule 9(b) requires fraud claims to be pleaded with particularity.  In the context of a market manipulation claim, the plaintiff must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."  *In re Crude Oil*, 2007 WL 1946553, at *6 (citation omitted).

   Plaintiffs' allegations here are indistinguishable from the "fraud-like" claims to which courts routinely apply the heightened pleading requirements of Rule 9(b).  *See In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 344 (S.D.N.Y. 2005) ("*Natural Gas II*") (applying Rule 9(b) to market manipulation and aiding and abetting claims that alleged schemes

---

[3]   As a court in this District recently observed, the application of this heightened pleading standard to CEA claims comports with the U.S. Supreme Court's decisions in *Tellabs, Inc.* v. *Makor Issues & Rights Ltd.*, 127 S. Ct. 2499 (2007) and *Twombly*, 127 S. Ct. 1955.  This is because CEA claims, like private securities fraud claims, "if not adequately contained, can be

"classically associated with fraud"); *see also U.S. Commodity Futures Trading Comm'n* v. *Amaranth Advisors, L.L.C.*, --- F. Supp. 2d ----, 2008 WL 2123323, at *7 (May 21, 2008 S.D.N.Y.) (reiterating that courts in this District have applied Rule 9(b) to manipulation claims involving false statements or concealment of information). Indeed, plaintiffs devoted an entire section of their Complaint to allegations of "Fraudulent Concealment," in which they maintained that the "unlawful activity . . . was self-concealing" (Compl. ¶ 234), that the Amaranth Defendants "engaged in secret and surreptitious trading" (*id.*), and that these acts "were calculated to wrongfully conceal" Amaranth's allegedly manipulative trading (*Id.* ¶ 235). Plaintiffs further allege that JPMorgan "concealed [Amaranth's] manipulative trading from regulators and market participants" (*id.* ¶ 150) and were aware that "Amaranth moved its positions from NYMEX to ICE via a series of secret, orchestrated trades . . . to evade CFTC and NYMEX scrutiny and to further its manipulative scheme (*Id.* ¶ 214)." Such fraud-like allegations warrant application of the Rule 9(b) pleading standard to plaintiffs' aiding and abetting claim against JPMorgan.

## II.
## PLAINTIFFS FAIL TO STATE A CLAIM AGAINST JPMORGAN FOR AIDING AND ABETTING UNDER THE CEA

Plaintiffs fail to state a claim against JPMorgan for aiding and abetting Amaranth in its purported manipulation of the market for natural gas futures.[4] To state an aiding and abetting claim under the CEA, plaintiffs must allege that JPMorgan: (1) knew that Amaranth

---

employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *In re Crude Oil*, 2007 WL 1946553, at *7 n.5.

[4] JPMorgan joins in the arguments of the other defendants that plaintiffs have failed adequately to allege a predicate market manipulation violation. Plaintiffs' failure adequately to allege a predicate violation of the CEA thus forecloses the aiding and abetting claim against JPMorgan. *See Krause*, 156 F. Supp. 2d at 338; *see also Tatum* v. *Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 n.3 (5th Cir. 1996).

intended to manipulate the market for natural gas options and futures; (2) intended to assist Amaranth in its attempted market manipulation; and (3) committed some act in furtherance of Amaranth's manipulative scheme. *Damato* v. *Hermanson*, 153 F.3d 464, 473 (7th Cir. 1998); *Benfield* v. *Mocatta Metals Corp.*, No. 91-Civ-8255 (LJF), 1992 WL 58879, at *6 (S.D.N.Y. Mar. 13, 1992). This is a particularly high bar, requiring "not only knowledge of the principal's objective, but a desire to help him attain it." *Damato*, 153 F.3d at 473 (citation omitted); *see also United States* v. *Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.) (stating that an individual cannot be held liable under the federal criminal aiding and abetting statute, which courts and the CFTC consider coterminous with the CEA, unless "he in some sort associate[s] himself with the venture, . . . participate[s] in it as something that he wishes to bring about, [and] seek[s] by his action to make it succeed").

As plaintiffs are unable to establish any of these three elements, their CEA claim against JPMorgan should be dismissed.

## A.    Plaintiffs' Complaint Fails Adequately to Allege That JPMorgan *Knew* Amaranth Intended to Manipulate the Market for Natural Gas Futures

The CEA provides a cause of action against a person "who *willfully* aids, abets, counsels, induces, or procures the commission of a violation of this chapter." 7 U.S.C. § 25(a)(1) (2000) (emphasis added). Plaintiffs thus must allege facts sufficient to establish "that the aider and abettor acted knowingly." *Damato*, 153 F.3d at 472. In other words, plaintiffs here must allege facts showing that JPMorgan "had knowledge of [Amaranth's] intent to commit a violation of the Act." *See id*. at 473; *Benfield*, 1992 WL 58879, at *6.

In their effort to satisfy this exacting standard, plaintiffs allege only that JPMorgan: (1) "had knowledge of Amaranth's natural gas positions, trading activity and trading strategies" (Compl. part III(C) at 62); (2) "were aware of Amaranth's natural gas contract

9

position limit violations" (*id.* part III(D) at 63); (3) "were aware of government investigations into Amaranth's natural gas trading activity" (*id.* part III(E) at 63); and (4) "knew" that Amaranth moved positions to ICE after NYMEX instructed Amaranth to reduce its NYMEX positions (*id.* ¶¶ 150, 211-13). None of these allegations—either individually or collectively—is sufficient to establish that JPMorgan knew that Amaranth intended to manipulate the market for natural gas futures.

<p style="padding-left: 2em;">1.     *Allegations That JPMFI Had Data Concerning Amaranth's Positions Fail to Establish Knowledge That Amaranth Intended to Manipulate the Market*</p>

The fact that JPMFI had information concerning Amaranth's trading positions reveals nothing more than that JPMFI served as Amaranth's clearing broker. To this, plaintiffs add the observation that Amaranth held substantial positions in certain natural gas futures contracts, as if the combination of these points somehow indicated that JPMFI knew that Amaranth planned to manipulate the market. But the fact that Amaranth had large positions in certain futures contracts says nothing about its supposed intent to manipulate the relevant markets, let alone JPMFI's knowledge of any such intent. *See In re Crude Oil*, 2007 WL 1946553, at *8 (holding that allegations concerning defendants' large positions in the markets for crude oil and oil futures, and the large profits that therefore would have been available from market manipulation, failed to adequately allege manipulative intent). In point of fact, NYMEX officials—who are responsible for oversight of the exchange, ensuring orderly trading, and preventing fraud—do not consider the size of a trader's position in isolation when discharging these duties, but only in relation to the overall open interest in the relevant contract and similar financial instruments. (Ex. A at 88-89.) Plaintiffs do not allege that JPMFI had access to information on the overall open interest in any of the futures contracts in which Amaranth traded. And even if they had, any such information would establish, at most, reason for concern about

"excessive market concentration," (*id.* at 90), but would not establish that Amaranth intended to manipulate the market for any futures contract in which it traded.

Plaintiffs further allege that JPMorgan specifically knew as of May 2006 that Amaranth's energy trading strategies "drove a disconnect" between the prices of futures contracts in which Amaranth invested and the prices dictated by market fundamentals. (Compl. ¶ 201.) As purported support for this allegation, plaintiffs point to a May 2006 monthly newsletter that Amaranth sent its investors. That newsletter states:

> Historically, the market has provided sufficient liquidity and opportunity for [Amaranth] to tailor the portfolio as desired despite rapidly changing market dynamics. This "expansion/contraction" approach has enabled us to generate more profits than if we had required the team to unwind trades aggressively whenever markets moved in our favor . . . [W]e believe certain spread relationships remained disconnected from their fundamental value drivers.

(*Id.*) Even setting aside the improbity of plaintiffs' suggestion that Amaranth essentially confessed in a letter to its investors that it had been engaged in market manipulation, the letter simply does not say—as plaintiffs would have this Court believe—that Amaranth's trading strategies caused any disconnect between futures prices and market fundamentals. To the contrary, the letter explains, in a sentence that plaintiffs replace with an ellipsis, that Amaranth believed the suspected disconnect had been caused by "liquidity in the market seiz[ing] up due to high volumes of producer hedging that oversaturated market demand for forward natural gas." (Ex. A at 73.) Moreover, far from evidence of market manipulation, the newsletter to which plaintiffs point actually represents Amaranth's attempt to explain to its investors why losses in its natural gas positions had made May 2006 "the worst month since inception" of the fund. *Id.* The newsletter thus lends no weight to plaintiffs' deficient allegations that JPMFI somehow knew that Amaranth intended to manipulate the market for natural gas futures.

2.    *Allegations That JPMFI Was Aware of Amaranth's Alleged*
      *Violations of Natural Gas Contract Position Limits Fail to Establish*
      *That JPMC Knew That Amaranth Intended to Manipulate the Market*

Plaintiffs next allege that JPMFI knew that Amaranth "was violating NYMEX position limits," (Compl. ¶ 203), which it evidently urges as the equivalent of knowledge that Amaranth was intent on market manipulation. As explained in the Senate Subcommittee Report, however, NYMEX has established position limits only for the last three days of trading prior to expiration of a futures contract. (Ex. A at 88-89.) As the Complaint alleges, and the Senate Subcommittee Report details, "[i]n 2006, Amaranth exceeded the NYMEX position limit for natural gas contracts on several occasions." (*Id.* at 90.) The Complaint further alleges that in May 2006, as the end of expiration month for the June futures contract approached, "NYMEX contacted [JPMFI] to inform it that Amaranth needed to comply with its expiration position limits." (Compl. ¶ 205.) After receiving this directive, on May 19, 2006, one JPMFI official directed another to advise Amaranth that it needed to comply with its position limit by the close of business on May 23, 2006, precisely as NYMEX had requested. (*Id.*) This reminder from NYMEX and JPMFI notwithstanding, Amaranth failed to do so. (Compl. ¶ 161; Ex. A at 92.)

The mere fact that JPMFI would have known that Amaranth failed to comply with its position limits on particular trading days in May 2006, however, does not tend to establish that it knew Amaranth intended to manipulate the market for natural gas futures. Far from it. Indeed, NYMEX itself knew that Amaranth had violated these position limits and yet clearly did not consider this violation to be suggestive of market manipulation. To the contrary, NYMEX determined that this infraction warranted no more than a warning letter to Amaranth, but never suggested in that letter or anywhere else that the violation of these position limits somehow established that Amaranth had attempted—or intended—to engage in market manipulation. (Ex. A at 92 (citing May 31, 2006 letter in which NYMEX advised Amaranth: "Owing to your firm's

12

violations of the spot month NG position limit, and in accordance with the provisions of Exchange Rule 9.36, this letter shall constitute a warning to your firm.").)  This allegation therefore also fails to support plaintiffs' conclusory allegation that JPMFI knew Amaranth intended to manipulate the market for natural gas.

3. *Allegations That JPMFI Was Aware of Regulatory Requests for Information About Amaranth's Natural Gas Trading Activity Fail to Establish That JPMFI Knew Amaranth Intended to Manipulate the Market*

Plaintiffs' allegations that JPMFI knew that NYMEX and CFTC had requested information about Amaranth's trading positions likewise provides no basis for concluding that JPMFI knew that Amaranth purportedly intended to manipulate the market.  As support for this allegation, the Complaint points to a JPMorgan chronology of events concerning Amaranth. That chronology reflects that on August 23, 2006, NYMEX sought information about Amaranth's trading positions on NYMEX and ICE, and the CFTC also sent a request for information.  The Complaint also notes that the same memorandum indicated that NYMEX visited JPMorgan's offices on September 15, 2006, to discuss JPMorgan's "hedge fund credit risk management process and [its] views on Amaranth."  (Compl. ¶ 208.)  None of these allegations suggests, however, that any regulatory discussion or request for information related to even a suspicion by NYMEX or the CFTC that Amaranth had engaged in market manipulation. Indeed, the Complaint says nothing about whether suspected market manipulation actually motivated these regulatory requests and, if so, whether that was communicated to JPMFI. Plaintiffs instead evidently invite the illogical inference that JPMFI must have understood the requests to mean that Amaranth intended to manipulate the market for natural gas futures contracts.  That simply does not follow.  The fact that regulators charged with ensuring the efficient functioning of commodities markets would seek position information on a hedge fund known to have substantial positions bespeaks nothing more than responsible oversight.  It

13

certainly provides no basis for concluding that the regulators believed—much less that JPMFI understood—Amaranth was intent on market manipulation.  Had the regulators held this view, they presumably would have done more after JPMFI provided them with the requested information.  As a result, this allegation also fails to establish that JPMFI knew Amaranth intended to manipulate the market for natural gas futures.

4.   *Allegations That JPMFI Was Aware That Amaranth Reduced Some of Its Natural Gas Positions on NYMEX and Increased Similar Positions on ICE Fail to Establish That JPMFI Knew That Amaranth Intended to Manipulate the Market*

In its final effort to allege that JPMFI knew that Amaranth intended to manipulate the market for natural gas futures, plaintiffs allege that JPMFI knew that Amaranth reduced certain of its positions on NYMEX and simultaneously increased similar positions on ICE. (Compl. ¶ 214.)  In particular, the Complaint alleges that, on or around August 10, 2006, Amaranth "reduced its positions on NYMEX in the September and October [2006] futures contracts," but also "increased its positions in the corresponding September and October swaps on ICE." (*Id.* ¶ 166.)  The Complaint further suggests that Amaranth did so because ICE, unlike NYMEX, had no expiration position limits. (*Id.* ¶ 167.)

These allegations also fail to suggest that JPMFI knew Amaranth purportedly intended to manipulate the market for natural gas futures.  The ICE positions establish—at most—that Amaranth may have had the ability in August 2006 to trade positions with fewer restrictions than that imposed by NYMEX.  (Ex. A at 98.)  But that can hardly be equated with JPMFI's knowledge that Amaranth intended to engage in market manipulation and, indeed, the Complaint provides no specific factual allegations as to how Amaranth's positions on ICE would have permitted it to manipulate market prices, let alone whether it actually did so.  What is clear is that on August 29, 2006, the last day of trading in the September 2006 contract, Amaranth complied with a NYMEX request and refrained from executing any large orders on NYMEX or

14

ICE during the last half hour of trading. (*Id.* at 110.) As a result of heavy trading by other market participants, however, prices turned dramatically against Amaranth and its positions lost approximately $600 million on that day alone. (*Id.* at 111.) Plaintiffs' allegations thus provide no support for any suggestion that Amaranth's trades on NYMEX and ICE in mid-to-late August provided JPMFI with knowledge that Amaranth intended to manipulate the market for natural gas.

   5.   *Plaintiffs' Conclusory Allegations That JPMFI Knew Amaranth*
        *Intended to Manipulate the Market Fail as a Matter of Law*

        Aside from these unavailing efforts to plead facts, plaintiffs offer nothing other than (i) conclusory assertions that JPMFI knew that Amaranth intended to manipulate the market, and (ii) suggestions that JPMFI's status as Amaranth's clearing broker should permit the inference that JPMFI knew of Amaranth's purported manipulative plans. Courts have rejected both strategies as a matter of law. *See, e.g., Krause*, 356 F. Supp. 2d at 339 (holding allegation that FCM "participated with actual knowledge that the purpose of the transactions [was] to manipulate Plaintiffs' assets" fell "far short of the requirements under Rule 9(b)"); *Karasyk v. Marc Commodities Corp.*, 770 F. Supp. 824, 829-31 (S.D.N.Y. 1991) (dismissing CEA claims against an FCM because conclusory allegations of knowledge and scienter failed to satisfy Rule 9(b)).

        Courts also routinely reject the suggestion that clearing brokers should be deemed to know the purpose of their clients' transactions. *See, e.g., Connolly v. Havens*, 763 F. Supp. 6, 11 (S.D.N.Y. 1991) (dismissing aiding and abetting claim against a clearing broker under the Exchange Act because providing normal clearing services to a primary broker acting in violation of the law does not make out an aiding and abetting case against the clearing broker); *Ross v. Bolton*, 639 F. Supp. 323, 326-27 (S.D.N.Y. 1986) (dismissing aiding and abetting claim against

clearing firm under the Exchange Act because allegations that (i) the broker cleared a large number of transactions, (ii) the price of the securities rose dramatically, (iii) the broker loaned money to the allegedly fraudulent actor and (iv) the broker selectively executed trades, did not individually or collectively state a claim under Rule 9(b)).[5]

**B.      Plaintiffs' Complaint Fails Adequately To Allege That JPMorgan Intended to Assist Amaranth's Alleged Market Manipulation**

To establish the second element of an aiding and abetting claim under the CEA, plaintiffs must allege not merely that JPMorgan knew of Amaranth's intent to manipulate the market for natural gas futures, but that JPMorgan actually shared this unlawful objective. *See Benfield* v. *Mocatta Metals*, No. 91 Civ. 8255 (LJF), 1992 WL 58879, at *6 (S.D.N.Y. Mar. 13, 1992). Rule 9(b) further requires plaintiffs to state, with particularity, facts that give rise to a strong inference of fraudulent or manipulative intent. *Krause*, 356 F. Supp. 2d at 338 (citing *Eternity Global Master Fund Ltd.* v. *Morgan Guar. Trust Co.*, 375 F.3d 168, 187 (2d Cir. 2004)). Plaintiffs may satisfy this burden by pleading facts demonstrating that JPMorgan had both motive and opportunity to assist Amaranth in its purported efforts to manipulate the market. *Id.*

Plaintiffs *necessarily* fail to adequately allege scienter given the fatal deficiencies in their allegations that JPMorgan knew that Amaranth intended to engage in market manipulation. It is well-settled that absent a showing of actual knowledge of an unlawful objective, there can be no intent to further that plan. *See Damato*, 153 F.3d at 473 (holding that plaintiffs could not establish intent to perpetuate a fraudulent scheme where they were unable to

---

[5]    Cases interpreting the Exchange Act are instructive here because the requirements for aiding and abetting under that statute are similar to those under the CEA. *See, e.g., Hesse* v. *Halpert & Co. Employee Profit Sharing Trust*, No. 97 C. 4276, 1998 WL 111678, at *9 (N.D. Ill. Mar. 12, 1998); *see also Kearney* v. *Prudential-Bache Secs., Inc.*, 701 F. Supp. 416, 424 (S.D.N.Y. 1998) (citations omitted) (noting the CEA and the Exchange Act "whenever possible, should be read to provide similar coverage").

allege knowledge); *see also Connolly*, 763 F. Supp. at 11 (holding that inability to plead actual knowledge precluded adequate scienter allegations).

Here, even if—contrary to law and fact—plaintiffs had been able to plead that JPMFI had *actual* knowledge of Amaranth's purportedly manipulative intent, they nonetheless failed to plead facts tending to show that JPMorgan had motive and opportunity to aid and abet the alleged manipulation. In this regard, plaintiffs allege only the conclusions that JPMorgan "had a financial incentive to knowingly aid and abet Amaranth's manipulation of NYMEX natural gas prices" (Compl. ¶¶ 218-21), and that JPMorgan "substantially profited from their aiding and abetting of Amaranth's unlawful conduct" (*Id.* part III(G) at 67). Plaintiffs similarly allege that "Amaranth's natural gas trading generated enormous revenues for JPMorgan in the form of commissions and interest on margin balances" and that, "[b]ecause of the magnitude and quantity of the orders typically placed by Amaranth, [JPMFI] earned substantial brokerage and commission fees for executing orders for Amaranth." (*Id.* ¶¶ 195, 219.)

As a matter of law, however, allegations that Amaranth compensated JPMFI for clearing its trades merely state the obvious and certainly do not suffice to establish that JPMFI therefore had a motive to assist Amaranth in any attempted market manipulation. As courts have recognized repeatedly, the fact that businesses receive fees for rendering professional services, including the provision of clearing services, does not remotely establish a motive to commit fraud or to engage in market manipulation. *See Karasyk*, 770 F. Supp. at 830-31 (dismissing CEA claim premised on allegations that FCM was motivated to collude to "generat[e] commissions" because defendant presumably "generate[d] commissions through licit as well as illicit trades"); *see also Ellison* v. *Am. Image Motor Co.*, 36 F. Supp. 2d 628, 639-40 (S.D.N.Y. 1999) (dismissing Exchange Act claim because the receipt of professional fees does not provide

any basis for drawing a strong inference of fraudulent intent); *Silva Worldwide Run Ltd.* v. *Gaming Lottery Corp.*, No. 96 CIV. 3231 (RPP), 1998 WL 167330, at *21 (S.D.N.Y. Apr. 8, 1998) (same).

Plaintiffs here plead nothing more than that JPMFI received commissions for clearing Amaranth's natural gas trades and interest on Amaranth's margin balances. The mere fact that JPMFI had the ability to earn fees or interest in return for rendering professional services, however, provides no motive for JPMFI to assist in fraudulent or manipulative conduct. As a matter of fact, the Complaint is entirely devoid of allegations indicating that JPMFI's compensation depended in any way on the success of Amaranth's alleged scheme to manipulate the market for natural gas futures, let alone the magnitude of any such financial incentive to participate in unlawful conduct. As the receipt of professional fees "is not a badge of fraud," plaintiffs' allegations of manipulative or fraudulent intent fail as a matter of law. *See Karasyk*, 770 F. Supp. at 831.

**C.    Plaintiffs' Complaint Fails to Establish That the JPM Defendants Committed Any Act in Furtherance of Amaranth's Alleged Market Manipulation**

The Complaint also fails adequately to allege the third element of an aiding and abetting claim under the CEA, that "[the] defendant committed an overt act designed to aid in the success of the venture." *Weber* v. *E.D. & F. Man Int'l, Inc.*, No. 97 C 7518, 1999 WL 258496, at *3 (N.D. Ill. Apr. 9, 1999) ( "*Weber II*"). Plaintiffs advance three principal allegations in support of their assertion that JPMorgan acted in furtherance of Amaranth's alleged market manipulation. (Compl. ¶¶ 209-17.) None of these allegations, however, suffices to demonstrate that JPMorgan committed any overt act designed to further Amaranth's purported manipulative scheme.

*First*, plaintiffs allege that during the summer of 2006, JPMFI repeatedly acceded to requests by Amaranth to increase its ICE credit limits governing natural gas swaps, the result of which was to increase Amaranth's ICE limits by hundreds of millions of dollars by September 2006. (Compl. ¶¶ 211-13.) Plaintiffs do not offer any explanation, however, for how any increase in credit limits—done with the knowledge and consent of the ICE—furthered or otherwise related to the alleged market manipulation that is the subject of the Complaint. In particular, plaintiffs are silent as to how increases in Amaranth's credit limits for commodities traded on ICE in the summer of 2006 somehow allowed Amaranth to manipulate natural gas futures trading on NYMEX, which is the subject of their Complaint. Plaintiffs thus have not pleaded any facts showing that the alleged increases in credit limits were done in furtherance of the alleged primary violation by Amaranth. *See Weber* v. *E.D. & F Man Int'l, Inc.*, No. 97 C 7817, 1999 WL 258496, at *3 (N.D. Ill. Jan. 13, 1999) ("*Weber I*") (explaining that the overt act must be "designed to aid" in the success of the venture or, in other words, "to make the principal wrongdoing succeed") (citations omitted); *Benfield*, 1992 WL 58879, at *6 (holding that the defendants' actions in allowing a primary violator to market the options at issue did not constitute "substantial assistance" because that conduct did not show defendants' involvement "with the fraud itself").

*Second*, plaintiffs make assertions to the effect that JPMFI "finance[d] Amaranth's natural gas trading" and enabled Amaranth to continue its manipulation using "money borrowed on margin from JPMorgan at a time when the JPMorgan knew of and facilitated such manipulative scheme." (Compl. ¶ 217.) The Complaint, however, is devoid of factual allegations supporting the existence of any loans that JPMFI supposedly extended to Amaranth, much less any information about when the loans purportedly were made, what entity

allegedly extended the loan, to whom the loan was extended, the amount of any such loan, and how the supposed loan furthered Amaranth's alleged market manipulations.[6]  Such barren assertions fail to satisfy the particularity requirements of Rule 9(b).  *See In re Crude Oil,* 2007 WL 1946553, at \*6 (requiring plaintiff to specify what manipulative acts were performed, which defendants performed them, when they were performed, and their effect on the market).[7]

*Third,* plaintiffs assert that JPMFI facilitated Amaranth's "secret" increase in trading on ICE after NYMEX directed Amaranth to reduce its NYMEX holdings.  (Compl. ¶ 214.)  As explained previously (*see* Section II.A.4, *supra*), this allegation does not withstand scrutiny because there is no indication that JPMFI did anything other than clear trades that Amaranth presented to it and, as a matter of law, such routine professional services do not qualify as "overt acts" sufficient to sustain an aiding and abetting claim.  Courts consistently have held that an FCM has not committed an "overt act" in furtherance of the primary violation where it simply acts in accordance with its normal business practices, regardless of the fraudulent activities of its client.  *See, e.g., Weber II,* 1999 WL 258496, at \*3-5 (finding no "affirmative act" even though FCM allowed trade advisor to open account without investigating his background; permitted individual to operate as trading advisor; provided account forms; neglected to inspect trading advisor's operations; failed to disclose certain facts regarding trading advisor's previous sanctions and his current trading record; refused to accept wire transfer and allowed advisor to maintain accounts despite expulsion by National Futures Association); *Tatum*

---

[6]    It also bears noting that the NYMEX Rulebook does not permit clearing members to make unsecured loans to customers for the purpose of securing margins, which further calls into question the plausibility of this vague and conclusory allegation.  *See* NYMEX Exchange Rulebook, Rule 4.03, *available at* http://www.nymex.com/rule_main.aspx?pg=3.

[7]    To the extent that this allegation is meant to refer to the margin accounts that are "marked to market" each day pursuant to NYMEX rules (Compl. ¶¶ 187-192), such funds are amounts that Amaranth was required to maintain by regulation, not loans from JPMFI to Amaranth.

v. *Smith*, 887 F. Supp. 918, 920-21, 923 (N.D. Miss. 1995) (holding that the FCM defendants did not aid in a commodity broker's scheme merely by such routine activities as allowing him to place orders, providing new account forms and brochures to assist in the solicitation of business, and allowing broker to use toll-free number); *see also Bosco* v. *Serhant*, 836 F.2d 271, 280 (7th Cir. 1987) ("The clearing member's job is to make sure that trades go through rather than to prevent misrepresentations by the member whose trades it is guaranteeing."). Moreover, the failure to investigate or to perform due diligence does not constitute an affirmative or overt act under the CEA. *See, e.g., Weber I*, 1999 WL 35326, at *4. As Congress has made clear, oversight is the obligation and responsibility of the exchange, not the FCM. (Ex. A at 40-41.)[8] Nor do plaintiffs even allege that, let alone explain how, JPMFI's clearance of Amaranth's ICE trades in August 2006 furthered Amaranth's allegedly manipulative plans. These allegations are all the more suspect since, as the Senate Subcommittee Report makes clear, Amaranth voluntarily refrained from trading on NYMEX and ICE at the end of August 2006, with the result that its positions declined by $600 million in a single day. (Ex. A at 107.) Such huge losses hardly bespeak market manipulation.

---

[8]  This requirement that an aiding and abetting defendant carry out an affirmative act that is above and apart from its routine services has been strictly construed by courts applying federal securities laws and New York common law as well. To that end, courts have dismissed aiding and abetting claims for failure to establish an overt act where the broker, among other things, continued to execute trades despite defendant's failure to meet margin calls, *see Stander* v. *Fin. Clearing & Servs. Corp.*, 730 F. Supp. 1282, 1287 (S.D.N.Y. 1990); failed to enforce margin requirements, *Cromer Fin. Ltd.* v. *Berger*, 137 F. Supp. 2d 452, 470-71 (S.D.N.Y. 2001); and provided computer network access to a fund manager that allowed the manager to generate false position statements, *Pension Comm. of the Univ. of Montreal Pension Plan* v. *Banc of Am. Secs.*, 446 F. Supp. 2d 163, 202-04 (S.D.N.Y. 2006). Courts interpreting aiding and abetting under the Exchange Act also have held that, in the absence of a duty to act, inaction is insufficient to satisfy the substantial assistance element, unless it was designed intentionally to aid the primary fraud. *Armstrong* v. *Clovis McAlpin*, 699 F.2d 79, 92 (2d Cir. 1983); *SEC* v. *Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006); *Dillon* v. *Militano*, 731 F. Supp. 634, 639 (S.D.N.Y. 1990).

Absent specific allegations of affirmative acts taken in furtherance of Amaranth's fraud, plaintiffs are left with conclusory assertions that JPMorgan "substantially assisted in the [ ] manipulations by executing Amaranth's trades on the NYMEX and ICE." (Compl. ¶ 210.) Plaintiffs, however, cannot plead an overt act merely by asserting—as they do repeatedly in the Complaint—that JPMFI acted in furtherance of the manipulative scheme simply by performing its routine functions as FCM and clearing broker.

Plaintiffs thus have failed to plead that JPMorgan performed an overt act in furtherance of Amaranth's alleged market manipulation, and the Complaint must be dismissed.

### III.
### PLAINTIFFS' COMPLAINT AGAINST JPMORGAN FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT

To prevail on a claim for unjust enrichment, plaintiffs must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiffs' expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff. *Golden Pac. Bancorp* v. *FDIC*, 273 F.3d 509, 519 (2d Cir. 2001); *Xpedior Creditor Trust* v. *Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 273 (S.D.N.Y. 2004). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" *Kaye* v. *Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).

**A.    Plaintiffs' Complaint Fails to Establish the Existence of a Quasi-Contractual Relationship With JPMorgan**

An unjust enrichment claim is quasi-contractual and therefore requires a plaintiff to have "some type of direct dealing or actual, substantive relationship with a defendant." *Redtail Leasing, Inc.* v. *Bellezza*, No. 95 Civ. 5191 (JFK), 1997 U.S. Dist. LEXIS 14821, at *22 (S.D.N.Y. Sept. 29, 1997). Courts thus have consistently dismissed unjust enrichment claims where plaintiff and defendant have no such relationship. *See, e.g.*, *Abbatiello* v. *Monsanto Co.*,

522 F. Supp. 2d 524, 542 (S.D.N.Y. 2007) (dismissing unjust enrichment claim where plaintiff landowner had no direct dealing, actual relationship, or substantive connection with defendant chemical company); *Redtail Leasing,* 1997 U.S. Dist. LEXIS 14821, at *23 (dismissing unjust enrichment claim by plaintiff shareholders against corporate insiders who allegedly traded on inside information); *In re Motel 6 Sec. Litig.,* Nos. Civ. 2183 (JFK), 93 Civ. 2866 (JFK), 1997 U.S. Dist. LEXIS 3909, at *21-22 (S.D.N.Y. Apr. 1, 1997) (same); *State of New York* v. *Daicel Chem. Indus., Ltd.,* 42 A.D.3d 301, 304 (N.Y. App. Div. 2007) (dismissing unjust enrichment claim because the relationship between manufacturers and end-users of food additives was too attenuated).

Similarly, courts consistently have dismissed unjust enrichment claims predicated on the effect that a defendant's actions allegedly had on a market in which a plaintiff participated. *See, e.g., Gristede's Foods, Inc.* v. *Unkechauge Nation,* 532 F. Supp. 2d 439, 454-55 (E.D.N.Y. 2007) (dismissing unjust enrichment claim of plaintiff supermarket against defendants for engaging in sale of untaxed cigarettes, which allegedly diverted sales from plaintiff); *Reading Int'l, Inc.* v. *Oaktree Capital Mgmt.,* 317 F. Supp. 2d 301, 333 (S.D.N.Y. 2003) (dismissing unjust enrichment claim against defendant theater chains who were alleged to have abused their market power to the detriment of a competitor); *Sperry* v. *Crompton Corp.,* 863 N.E.2d 1012, 1018 (N.Y. 2007) (dismissing unjust enrichment claim because the connection between the purchaser of tires and the producers of chemicals used in the tires was too attenuated).

Plaintiffs here have failed to identify any relationship they had with JPMorgan, quasi-contractual or otherwise. Indeed, plaintiffs have failed to identify any business dealings between the parties whatsoever. In view of the absence of any factual allegations demonstrating

that plaintiffs dealt with JPMorgan or otherwise had a quasi-contractual relationship with the firm, plaintiffs' unjust enrichment claim must be dismissed.

**B.      Plaintiffs' Complaint Fails to Establish That the JPM Defendants Were Enriched at Plaintiffs' Expense**

To succeed on their claim, plaintiffs also would have to plead that JPMorgan was enriched at plaintiffs' expense. *Xpedior Creditor Trust*, 341 F. Supp. 2d at 273. Where, as here, a plaintiff cannot allege a possessory interest in the "property" that defendant allegedly received unjustly, a claim for unjust enrichment will not lie. *See Martes* v. *USLife Corp.*, 927 F. Supp. 146 (S.D.N.Y. 1996) (dismissing unjust enrichment claim where there was no allegation that defendants received or possessed anything that belonged to the plaintiffs); *Reed Int'l Trading Corp.* v. *Donau Bank AG*, 866 F. Supp. 750, 757 (S.D.N.Y. 1994) (dismissing unjust enrichment claim where plaintiffs could not assert a possessory interest in the disputed funds); *see also Mazzaro de Abreu* v. *Bank of Am. Corp.*, 525 F. Supp. 2d 381, 397 (S.D.N.Y. 2007) (dismissing unjust enrichment claim concerning fees defendants had received from a third-party for transferring funds); *Compudyne Corp.* v. *Shane*, 453 F. Supp. 2d 807, 833 (S.D.N.Y. 2006) (dismissing unjust enrichment claim where any proceeds that defendant allegedly received came from counterparties to the transactions, not the plaintiffs); *Xpedior Creditor Trust*, 341 F. Supp. 2d at 273 (dismissing unjust enrichment claim because defendant received any excess compensation, not from plaintiffs, but from its own customers).

Plaintiffs make the general assertion that Defendants' allegedly unlawful acts "caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact natural gas contracts at artificial prices" (Compl. ¶ 267), but such allegations do not salvage their unjust enrichment claim. Even assuming *arguendo* that plaintiffs paid more for natural gas contracts as a result of Amaranth's alleged market manipulation, any such amounts are not

alleged to have flowed to JPMorgan and therefore would not be recoverable from JPMorgan in an unjust enrichment action. Moreover, any compensation that JPMorgan received for clearing Amaranth's trades came from Amaranth, not plaintiffs, and so would not be recoverable by plaintiffs in an unjust enrichment action.[9]

## IV.
## PLAINTIFFS FAIL TO PLEAD ANY
## ALLEGATIONS SPECIFIC TO JPMC OR JPMCB

Plaintiffs' claims also fail because they impermissibly attempt to "lump together" the three JPMorgan defendants. *See In re Crude Oil*, 2007 WL 1946553, at *6. Plaintiffs advance no factual allegations against defendants JPMC and JPMCB. Instead, plaintiffs allege only that JPMC, as the corporate parent of JPMFI, had "*de jure* and *de facto* control" over JPMFI (*see* Compl. ¶ 39), and that JPMCB is "an approved bank margin depository of the NYMEX and a registered user of NYMEX ClearPort Clearing Network, an internet-based system which provides a market gateway to trading and clearing services (*See id.* ¶ 40)." These allegations are not remotely sufficient to state an aiding and abetting or an unjust enrichment claim against either entity. Plaintiffs' claims against JPMC and JPMCB therefore should be dismissed for this reason as well.

## Conclusion

For the foregoing reasons, we respectfully submit that the Court should dismiss plaintiffs' claims against JPMorgan in their entirety and with prejudice.

---

[9] Inasmuch as plaintiffs cannot establish that the JPM Defendants were unjustly enriched, the imposition of a constructive trust is unwarranted. *See Republic of Rwanda* v. *Ferone*, No. 07 Civ. 7663 (JSR), 2007 WL 2890174, at *3 (S.D.N.Y. Oct. 2, 2007) (finding constructive trust not appropriate where no unjust enrichment); *Modica* v. *Modica*, 15 A.D.3d 635, 635-36 (N.Y. App. Div. 2005) (same).

Dated: New York, New York
       June 23, 2008

                          PAUL, WEISS, RIFKIND, WHARTON &
                          GARRISON LLP


By: /s/ Mark F. Pomerantz
        Mark F. Pomerantz
        Eric S. Goldstein
        Daniel J. Toal

        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212) 373-3000
        (212) 757-3990

*Attorneys for Defendants JPMorgan Chase & Co.*
*JPMorgan Chase Bank, N.A. and J.P. Morgan*
*Futures, Inc.*