UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: AMARANTH NATURAL GAS COMMODITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Master File No. 07 civ. 6377 (SAS) |

**COMBINED MEMORANDUM OF LAW OF DEFENDANTS TFS ENERGY FUTURES, LLC, ALX ENERGY, INC., AND JAMES DELUCIA IN SUPPORT OF THEIR RESPECTIVE APRIL 28, 2008 MOTIONS TO DISMISS**

Karl Geercken (KG-5987)
Craig Carpenito (CC-1686)
Amber Wessels (AW-2322)
ALSTON & BIRD LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 210-9400
Fax: (212) 210-9444

*Attorneys for Defendant TFS Energy Futures, LLC*

Steven R. Goldberg (SG-2825)
One North End Avenue, Suite 1107
World Financial Center
New York, New York 10282
Tel: (212) 845-5100
Fax: (212) 845-5102

*Attorney for Defendants ALX and DeLucia*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................ii

PRELIMINARY STATEMENT .........................................................................1

PLAINTIFFS' ALLEGATIONS ........................................................................2

PLAINTIFFS' ALLEGATIONS AGAINST TFS...............................................4

PLAINTIFFS' ALLEGATIONS AGAINST ALX ..............................................5

ARGUMENT .....................................................................................................10

    I.    Plaintiffs' Aiding and Abetting Claim Cannot Survive Rules 12(b)(6) and 8(a) ...10

        A.    The Complaint's Allegations Are Too Non-Specific to Satisfy Lenient Pleading Requirements ...............................................................10

        B.    Even under Rule 8(a)(2) the Complaint Fails to Adequately Allege Aiding and Abetting ..........................................................11

        C.    Floor Brokers, by Law, Can Have No Aiding and Abetting Liability..........12

    II.    Plaintiffs' Aiding and Abetting Claim Against the Floor Brokers Does Not Satisfy the Heightened Pleading Standard of Rule 9(b) .......................................13

        A.    Rule 9(b) Applies to Market Manipulation Claims ......................................14

        B.    Rule 9(b) Also Applies to Aiding and Abetting of Market Manipulation .....17

        C.    The Claim Against the Floor Brokers Does Not Service Rule 9(b) .............17

            1.    The Claim Does Not Sufficiently Allege Actual Knowledge.................18

            2.    The Claim Does Not Sufficiently Allege a Strong Inference of the Floor Brokers' Knowledge ...................................................................20

    III.    Plaintiffs' Unjust Enrichment Claim Fails Because There Is No Nexus Between Punitive Class and the Floor Brokers....................................................21

CONCLUSION....................................................................................................24

## TABLE OF AUTHORITIES

**Case**                                                                                    **Page(s)**

*Armstrong v. McAlpin*,
699 F.2d 79 (2d Cir. 1983)..................................................................................12, 17

*ATSI Communications Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).............................................................................13, 14, 16

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007)......................................................................................10, 11

*CFTC v. Amaranth Advisors, LLC*,
__ F. Supp. 2d __, No. 07-cv-6682, 2008 WL 2123323 (S.D.N.Y. May 21, 2008)......................16

*Chee v. Marine Midland Bank, N.A.*,
Nos. 88-cv-0557, 88-cv-0673, 88-cv-0813, 88-cv-1808, 88-cv-1867
and 88-cv-2145, 1991 WL 15301 (E.D.N.Y. Jan. 29, 1991).......................................13

*Chill v. General Electric Co.*,
101 F.3d 263 (2d Cir. 1996)..................................................................................20

*Cumis Ins. Soc'y, Inc. v. E.F. Hutton & Co.*,
457 F. Supp. 1380 (S.D.N.Y. 1978)........................................................................13

*Decker v. Massey-Ferguson, Ltd.*,
681 F.2d 111 (2d Cir. 1982)..................................................................................14

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
822 F.2d, 1242 (2d Cir, 1987)...............................................................................18

*Dow Jones & Co. Inc. v. International Securities Exchange, Inc.*,
451 F.3d 295 (2d Cir. 2006)..................................................................................10

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976).............................................................................................14

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994)...............................................................................10, 18

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
49 F. Supp. 2d 298 (S.D.N.Y. 1999)......................................................................21

*Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*,
17 F. Supp. 2d 275 (S.D.N.Y. 1998)......................................................................23

**<u>Cases</u>**                                                                                                        **<u>Page(s)</u>**

*Gurary v. Winehouse*,
190 F.3d 37 (2d Cir. 1999)..................................................................................14

*Hutton v. Klabal*,
726 F. Supp. 67 (S.D.N.Y. 1989) ........................................................................21

*In Re Crude Oil Commodity Litig.*,
No. 06-cv-6677, 2007 WL 1946553 (S.D.N.Y. Jun. 28, 2007)........................12, 14, 15

*In re Initial Public Offering Sec. Litig.*, ("*In re IPO*")
544 F. Supp. 2d 277 (S.D.N.Y. 2008)..........................................................2, 10, 16, 18

*In re Motel 6 Sec. Litig.*,
Nos. 93-cv-2183 and 93-cv-2866, 1997 WL 154011 (S.D.N.Y. Apr. 2, 1997) ...........................23

*In re Natural Gas Commodity Litig.*, ("*In re Natural Gas II*")
358 F. Supp. 2d 336 (S.D.N.Y. 2005)..................................................................14, 15

*In re NYSE Specialists Sec. Litig.*,
503 F.3d 89 (2d Cir. 2007), *cert. denied*, 128 S. Ct. 1707 (2008)........................10, 18

*Kalnit v. Eicher*,
264 F.3d 131 (2d Cir. 2001)..................................................................................20

*Krause v. Forex Exchange Market, Inc.*,
356 F. Supp. 2d 332 (S.D.N.Y. 2005)..................................................................17, 18

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006)..................................................................................18

*Lightfoot v. Union Carbide Corp.*,
110 F.3d 898 (2d Cir. 1997)..................................................................................21

*Madonna v. United States*,
878 F.2d 62 (2d Cir. 1989)..................................................................................14

*Makor Issues & Rights, Ltd. v. Tellabs*,
437 F. 3d 588 (7th Cir. 2006), *vacated on other grounds,* 127 S. Ct. 2499 (2007)......................12

*Mazzaro de Abreu v. Bank of America Corp.*,
525 F. Supp. 2d 381 (S.D.N.Y 2007)..................................................................17, 18, 21

**Cases**                                                    **Page(s)**

*Michelle Pommier Models, Inc. v. Men Women NY Model Mgmt., Inc.*,
14 F. Supp. 2d 331 (S.D.N.Y. 1998), *aff'd*, 173 F.3d 845 (2d Cir. 1999) ....................................21

*Modica v. Modica*,
15 A.D.3d 635, 791 N.Y.S.2d 134 (2d Dep't 2005) ....................................................................22

*Neitzke v. Williams*,
490 U.S. 319 (1989) ...................................................................................................................11

*Papasan v. Allain*,
478 U.S. 265 (1986) ...................................................................................................................11

*Reading International, Inc. v. Oaktree Capital Mgmt. LLC*,
317 F. Supp. 2d 301 (S.D.N.Y. 2003) ..................................................................................22, 23

*Redtail Leasing, Inc. v. Belezza,*,
No. 95-cv-5191, 1997 WL 603496 (S.D.N.Y. Sept. 30, 1997) ............................................ 22-23

*Rombach  v. Chang*,
355 F.3d 164 (2d Cir. 2004) .......................................................................................................15

*Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*,
40 F.3d 247 (7th Cir. 1994) ........................................................................................................11

*Slusser v. CFTC*,
210 F.3d 783 (7th Cir. 2000) ......................................................................................................14

*Simon v. Castello*,
172 F.R.D. 103 (S.D.N.Y. 1997) ................................................................................................17

*Smith v. Local 819 I.B.T. Pension Plan*,
291 F.3d 236 (2d Cir. 2002) .................................................................................................11, 19

*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506 (2002) ...................................................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
127 S. Ct. 2499 (2007) ...............................................................................................................12

*Three Crown Ltd. P'ship v. Caxton Corp.*,
817 F. Supp. 1033 (S.D.N.Y. 1993) ...........................................................................................17

*Wexner v. First Manhattan Co.*,
902 F. 2d 169 (2d Cir. 1990) ......................................................................................................18

**Statutes**                                                                                                    **Page(s)**

7 U.S.C. § 9 (Commodity Exchange Act ("CEA") § 6(c))........................................................2, 14

7 U.S.C. § 13b (Commodity Exchange Act ("CEA") §6(d))....................................................2, 14

7 U.S.C. § 13(a)(2) (Commodity Exchange Act ("CEA") § 9(a)(2)) ......................................2, 14

Fed. R. Civ. P. 8(a) ...........................................................................................................1, 4, 10, 11

Fed. R. Civ. P. 9(b) ..................................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)...........................................................................................................1, 4, 10

**Other Authories**

5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216 (3d ed. 2004) .......................11

E. Allen Farnsworth, *Contracts* § 2.20 (2d Ed. 1990) .................................................................21

In accordance with this Court's June 2, 2008 directive, Defendants TFS Energy Futures, LLC ("TFS"),  and ALX Energy, Inc. together with ALX's principal James DeLucia (collectively, "ALX" or the "ALX Defendants") (TFS and ALX, collectively, the "Floor Brokers") hereby submit this combined brief in support of their respective April 28, 2008 motions to dismiss.[1]  Consequently, no inference should be drawn from this joint filing that TFS and ALX are affiliated with one another, acted in concert with one another or that their legal or factual situations are the same.

## PRELIMINARY STATEMENT

Despite its great length, Plaintiffs' the Complaint is fatally deficient as to the Floor Brokers.  The Complaint fails to state a claim against the Floor Brokers under even the permissive standards of Federal Rules of Civil Procedure 12(b)(6) and 8(a).  First, the Complaint is devoid of factual allegations sufficient to raise a right to relief above the speculative level. Moreover, in the absence of any well-pleaded facts regarding any specific knowledge, New York courts hold that floor brokers have no duty to monitor or question their customers regarding the customers' trading orders.

This failure to set forth facts to support Plaintiffs' conclusory allegations is all the more remarkable since all of the Complaint's claims against the Floor Brokers are grounded in fraud and therefore subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).

---

[1]  Plaintiffs' Corrected Consolidated Class Action Complaint (the "Complaint") lumps in TFS and ALX with Defendant Gotham Energy Brokers as the "floor brokers".  TFS and ALX understand that Gotham Energy Brokers is no longer in business and has submitted a letter to the Court informing the Court that it does not intend to appear in this lawsuit.  This brief is written solely on behalf of TFS and ALX, and this brief's definition of Floor Brokers is not synonymous with the Complaint's definition of floor brokers.

Finally, because unjust enrichment is a quasi-contractual claim, the Complaint must – but fails to – allege a contractual or quasi-contractual relationship between Plaintiffs and the Floor Brokers. The Complaint also fails to state a claim for unjust enrichment because it is not based on a contractual or quasi-contractual relationship between Plaintiffs and the Floor Brokers. The claim fails because it tries to detach artificially the elements of the claim from the quasi-contractual context in which the claim must be viewed.

## PLAINTIFFS' ALLEGATIONS[2]

The gravamen of the Complaint is that the Amaranth Defendants[3] purportedly manipulated the market in natural gas futures contracts ("NG Contracts") from February 16, 2006 to September 28, 2006 (the "Class Period") by dominating trading in NG Contracts on the New York Mercantile Exchange ("NYMEX") in violation of Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 9, 13b, and 13(a)(2). (Compl. ¶ 1, 2, 63, 238-40.)

Plaintiffs allege on behalf of a putative class that they purchased and sold NYMEX NG Contracts during the Class Period and, as a result, suffered losses due to the alleged manipulative conduct. (Compl. ¶¶ 16-21.)

The Complaint alleges the Amaranth Defendants manipulated NG Contract prices by intentionally "slamming the close", a term that is not defined in the Complaint and is not, to the

---

[2] Solely for the purposes of this motion, the Floor Brokers shall assume the accuracy of any well-pleaded factual allegations of the Complaint (but not any legal conclusions, deductions, or opinions couched as factual allegations). *In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277, 283-285 (S.D.N.Y. 2008) ("*In re IPO*"). The Floor Brokers reserve the right to challenge all of Plaintiffs' allegations in the event this motion is denied.

[3] The Amaranth Defendants are defined in the Complaint as: Amaranth Advisors, L.L.C.; Amaranth LLC; Amaranth Management, LP; Amaranth International Limited; Amaranth Partners LLC; Amaranth Capital Partners LLC; Amaranth Advisors (Calgary) ULC; Nicholas M. Maounis; Brian Hunter; and Matthew Donohoe. (Compl. ¶ 33.)

2

Floor Brokers' knowledge, a term of art in the industry.  (Compl. ¶ 2(e)).  Plaintiffs allege that the Amaranth Defendants did this by selling NG Contracts on the NYMEX at the end of the contracts "settlement period,"[4] to depress the NG Contracts value. (Compl. ¶¶ 100-04.)  The Amaranth Defendants' ostensible motive was to benefit from substantially larger "short" positions that they allegedly held on an entirely different exchange, the Intercontinental Exchange ("ICE").  *(Id.)*

Indeed, while both the Commodity Futures Trading Commission ("CFTC") and the Federal Energy Regulatory Commission ("FERC") have brought actions against certain of the defendants regarding the same conduct at issue in the Complaint, neither the CFTC nor FERC has named a Floor Broker as a defendant.  It is also significant that neither the CFTC, FERC nor the United States Senate Permanent Subcommittee on Investigations (the "Senate subcommittee"), after completing comprehensive investigations including the thorough review of all relevant documents and after conducting numerous depositions, including those of the defendants herein, has filed any claim (either through a formal complaint or through its administrative authority) against the Floor Brokers.  In fact, the Senate subcommittee's report on Amaranth does not even mention the Floor Brokers.

The Floor Brokers are not alleged to have engaged in market manipulation or to have controlled anyone who engaged in market manipulation.  The Complaint only purports to assert causes of action against the Floor Brokers for "aiding and abetting violations of the Commodity Exchange Act" (Cause 3) and for unjust enrichment (Cause 5).  Because neither the aiding and abetting cause of action nor the unjust enrichment cause of action states a claim against the Floor Brokers, the Floor Brokers should be dismissed from this case.

---

[4] The Complaint defines the "settlement period" as "the last 30 minutes of trading on the termination day" of a given futures contract.  (Compl. ¶ 50.)

## PLAINTIFFS' ALLEGATIONS AGAINST TFS

In its 78 pages and 271 paragraphs, the Complaint makes reference to TFS only 3 times – each in the definition section of the Complaint – and utterly fails to set forth even the most basic allegations necessary to sustain a claim against TFS for aiding and abetting market manipulation. The Complaint does not allege that TFS acts as a floor broker on the ICE.  The only connection that the Complaint alleges that TFS had with this purportedly improper trading is that in its capacity as a floor broker on the NYMEX, TFS executed some of the Amaranth Defendants' trades.[5]  (Compl. ¶¶ 8, 36, 114, 226.)

The Complaint does not include any specific factual allegations regarding any knowledge possessed by TFS.  The closest that the Complaint gets to any substantive factual allegations regarding TFS's knowledge of Amaranth's scheme is to allege that one Amaranth employee told another that he would contact a clerk at a *different* Floor Broker, ALX, to inform the clerk of Amaranth's long position.[6]  (Compl. ¶112.)  Within the same paragraph, Plaintiffs then make an utterly unsupported leap of logic that Amaranth's employees must have similarly informed all other floor brokers of Amaranth's position.  (*Id.*)  Plaintiffs thereafter extrapolate even further to allege, without any substantiation or particularized factual allegation, that all floor brokers therefore had full knowledge of Amaranth's intent.  (*Id.*)  The sole allegation made directly against TFS is in the "Parties" section of the complaint, where TFS is conclusorily alleged to have had "knowledge of, and aided and abetted" Amaranth's manipulation.  As is discussed below, such unsupported allegations cannot even survive a motion to dismiss under Rules 12(b)(6) and 8(a).

---

[5] TFS is, indeed, merely a floor broker, and is not alleged to have provided advisory services or exercised any independent judgment with respect to any trades at issue in the complaint.

[6] This allegation is addressed below, at pages 6-9.

## PLAINTIFFS' ALLEGATIONS AGAINST ALX

The facts alleged in Plaintiffs' Complaint with respect to the ALX Defendants further re-confirm the lack of wrongdoing by the ALX Defendants. At best, Plaintiffs allege no more than that ALX complied with its legal duty as floor brokers to execute orders placed by its customers in accordance with the terms of those orders and in the best interest of its customers.[7]

The Complaint, as lengthy as it is, does not add any facts to the allegations contained in either the CFTC Complaint or FERC Order to Show Cause ("OSC"). It is bereft of any facts upon which a reasonable inference might be had supporting the Plaintiffs' bare conclusions that the ALX Defendants knowingly aided and abetted a market manipulation scheme (third cause of action) or were unjustly enriched by it (fifth cause of action). The Complaint simply parroted the CFTC Complaint and the FERC OSC and added defendants (described by the Plaintiffs as the "Floor Defendants" which includes the ALX Defendants) without asserting a factual basis to support such claims upon which relief may be granted.

Despite barely mentioning the Floor Broker in its massive complaint, Plaintiffs allege , almost as an afterthought and without adequate support, that the Floor Defendants "aided and abetted" the Amaranth Defendants and were "unjustly enriched." Specifically, of the two hundred and thirty six purportedly factual allegations contained in the complaint prior to the causes of actions, the ALX Defendants were mentioned directly or referred to as a "floor broker" in only seventeen of them.

---

[7] ALX is, as TFS above, indeed, merely a floor broker, and is not alleged to have provided advisory services or exercised any independent judgment with respect to any trades at issue in the complaint.

Aside from allegations identifying the parties and their general relationships, virtually all of the allegations contained in paragraphs 8, 34, 35, 112-114, 123, 143 and 224-227[8] are made up of conclusive speculative and conjectured statements presented as facts. The few factual or partially factual allegations contained therein merely identifies ALX, its relationship with Amaranth, describes the ALX defendants carrying out normal and legal duties, albeit in dramatic language, and can be easily summed up as follows:

ALX was Amaranth's primary NYMEX natural gas floor brokerage firm and Amaranth was ALX's largest customer (Compl. ¶¶ 34-35). One of ALX's key employees, Vincent Rufa, traveled to Calgary and socialized with Amaranth employees on multiple occasions (Compl. ¶ 34). Defendant James DeLucia ("DeLucia") was ALX's Chairman or Chief Executive Officer (Compl. ¶ 35). ALX made substantial money from Amaranth on commission (Compl. ¶ 224). One Amaranth defendant advised another Amaranth defendant that he was going to tell a person named "[V]innie" about Amaranth's long position.[9] ALX and DeLucia executed a series of orders for Amaranth on the day Plaintiffs alleged Amaranth "slammed the close" in the last half hour of a settlement day (Compl. ¶¶ 8, 113, 123, 143).

None of these "facts," presumed true for the purposes of this motion, is in any manner

---

[8] A few other paragraphs referring to floor brokers do not refer to ALX. Additionally, paragraph 114 contains a statement of another trader, closely associated with Amaranth, who was alleged to be involved in 26 % of the relevant trades, who thought that the last half hour was a "dramatic sell off. . . [that was] probably more emphatic [than a typical close because of] the speed at which it dropped, 50 cents" (114). However, this is merely another conclusion. Moreover, a "dramatic sell off . . . more emphatic than a typical close" is also not indicative of wrongdoing where a floor broker is directed to execute contracts in the last half hour of a settlement period. It merely describes the situation.

[9] ALX does not concede Plaintiffs' completely unsupported conclusion that the Vinnie of the e-mail and Vincent Rufa are one or same person, but includes it here for completeness sake, and states unequivocally that were it so, it would be meaningless information.

indicative of any participation by ALX or DeLucia in the alleged Amaranth scheme.   None state

a situation indicative of ALX'S knowledge or intent or of any wrongdoing by the ALX

defendants.  None of these "facts" state that ALX acted as a floor broker on ICE.

      The elongated tenuousness of Plaintiffs' argument against ALX and DeLucia is most

easily seen in the Plaintiffs' insertion of Vincent Rufa into the complaint.  Plaintiff alleges that

"one of [ALX's] key employees, Vincent Rufa, traveled to Calgary and socialized with

Amaranth employees on multiple occasions" (34).

      There is no attempt to base the asserted relationship on any fact, or to state when this

occurred or how often, or to explain why it merited discussion in the Complaint or is indicative

of malfeasance for an ALX employee. Plaintiffs do not allege that Rufa socialized with or even

knew any of the Amaranth employees who are defendants herein (Hunter, Donohoe and

Maounis).  No extended discussion is needed to assert the proposition that personal relationships

between firms that do business with each other is commonplace and desirable for them.

However, plaintiffs insert at paragraph 112 what they apparently believe the key connecting

paragraph:

> In the meantime, Defendant Hunter let Defendant Donohoe know he would be
> contacting Amaranth's primary NYMEX floor brokerage firm, Defendant ALX,
> to advise it of Amaranth's long position and intentions. Defendant Hunter told
> Defendant Donohoe via an instant message that he was "telling vinnie" about
> Amaranth's long position, referring specifically to Vincent Rufa, one of ALX's
> phone clerks who had a long-running relationship with Amaranth's traders. The
> purpose of contacting Defendant ALX (and other Floor Broker Defendants) was
> to make sure that such brokers knew exactly of Amaranth's intentions so that
> when it came time to execute the trades, the brokers would have considered, in
> advance, how to execute the order so as to maximize the intended effect. The
> Floor Broker Defendants – including Defendant ALX – therefore had knowledge
> of Amaranth's intent to artificially drive down prices on the close on February 24.

      Although dramatically written to sound like facts, the paragraph contains only one actual

alleged fact – that defendant Hunter told defendant Donohoe he intended to tell someone named

Vinnie about Amaranth's long position. Yet, again, this allegation is not supported by the actual fact which plaintiffs chose not to put directly in their complaint. *See* below, fn. 10.

Vinnie is, of course, a relatively common name. However, even making the same leap that Plaintiff does in associating it with Vincent Rufa, and had there actually been a good faith allegation that defendant Hunter contacted him, there would be nothing ominous or wrong about a customer advising a floor broker on "expiration" about the size of any pending or soon to be placed orders. The overall position of the customer does not concern the floor broker nor is there any duty for the floor broker to inquire into such position. The floor broker's duty is to follow the customer's instructions. In particular, trading during the half-hour close in an expiring contract month, the floor broker's only concern is to complete the customer's order as quickly as possible in accordance with the instructions provided. Thus, this conjecture and speculation is neither pertinent nor probative at all as to whether ALX or DeLucia had knowledge of or intent to aid in any CEA violation.

It is the purest speculation to ascribe any meaning to "telling vinnie" in the IM string contained in the FERC OSC (which Plaintiffs here merely incorporate by reference to the OSC). See, FERC'S OSC, p. 38 para. 67, fn. 102.[10] Plaintiffs' own conclusions that Hunter intended to advise Vincent Rufa of Amaranth's "long position and intentions" is a giant leap unsupported in any dimension. The actual facts referred to in the complaint show only that Hunter intended to

---

[10] The entire series of instant messages presented in the order to show cause reads:
"Donohoe: 12:22:03 3111 fut
Hunter: 12:26:17 that should be enough
Hunter: 12:26:23 getting them easy?
Donohoe: 12:26:35 yeah … last 1500 on h/j roll
Donohoe: 12:26:42 vitol gave me 2000
Hunter : 12:32:20 telling Vinnie
Donohoe: 12:32:52 ok no more futures will be traded"

tell someone named Vinnie that Donohoe told him that "vitol gave me 2000". All of the rest is mere rhetoric.

More important, there is nothing alleged that would in any way indicate to Vincent Rufa, were he the intended person and assuming that a message was actually communicated to him, that a manipulative scheme was underway. In the end, reading paragraph 112 fairly, there are, in fact, no allegations at all which would:

- connect "vinnie" (a common name) of the email with Vincent Rufa of ALX;

- allow an inference that Hunter ever actually contacted anyone named "Vinnie" at all;

- allow an inference that Hunter ever contacted Vincent Rufa, or, did so specifically to tell him about Amaranth's "long position and intentions";

- show why it would be probative of ALX's knowledge or intent, were it actually Vincent Rufa to whom Hunter referred and if an actual communication was made.

- show how knowing of the long position or "intentions" would in any manner alert ALX as to any malfeasance or violation;

- show how it would benefit Amaranth in any manner to tell a floor broker of its overall strategy, particularly were it doing something improper, when the floor broker had a duty to execute the orders to the best of his ability in any event;

- allow an inference that ALX knew how many other traders were actively trading for Amaranth on the settlement day, what the total size of Amaranth's positions were, whether Amaranth had any positions on at ICE or an electronic exchange or on an ETF, or what Amaranth's strategy was at all.

By not presenting the actual series of messages to the court, which can only be seen as purposeful in such a lengthy and detailed complaint, and by draping pure conjecture in factual

clothes, Plaintiffs' paragraph 112 is used to assert facts which simply do not exist.  Indeed, based

upon the same information, and despite an in-depth investigation of this matter, neither ALX,

DeLucia nor Rufa were the subject of the FERC's OSC.

## ARGUMENT

The Floor Brokers incorporate by reference any grounds for dismissal asserted by their co-

Defendants to the extent those grounds are applicable to the Floor Brokers.

## I.    Plaintiffs' Aiding and Abetting Claim Cannot Survive Rules 12(b)(6) and 8(a)

### A.    The Complaint's Allegations Are Too Non-Specific to Satisfy Lenient Pleading Requirements

The Complaint fails to state an aiding and abetting claim against the Floor Brokers under

the more liberal Rule 12(b)(6) and Rule 8(a) standards.  The Complaint does not provide "factual

allegations 'sufficient to raise a right to relief above the speculative level.'"  *In re IPO*, 544 F.

Supp. 2d 277, 283-285 (S.D.N.Y. 2008).  Under the Supreme Court's recent decision in *Bell

Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-1965 (2007), Plaintiffs must allege sufficient

"facts to state a claim to relief that is plausible on its face."  Where Plaintiffs "have not nudged

their claims across the line from conceivable to plausible, their complaint must be dismissed."

Plaintiff's complaint, far from stating a plausible claim to relief, instead "consists of conclusory

allegations unsupported by factual assertions" and therefore . . . 'fails even the liberal standard of

Rule 12(b)(6)'"  *Dow Jones & Co., Inc. v. International Securities Exchange, Inc.*, 451 F.3d 295,

307 (2d Cir. 2006).

The court "need not accord '[l]egal conclusions, deductions or opinions couched as

factual allegations . . . a presumption of truthfulness.'"  *In re IPO,* 544 F. Supp. 2d 277 (quoting

*In re NYSE Specialists Sec. Litig.*, 503, F.3d 89, 95 (2d Cir. 2007), *cert. denied*, 128 S. Ct. 1707

(2008).  *See also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994)

("In the absence of a factual basis underlying [plaintiff's] causation claim, we cannot accept its allegation as fact.")  Except as detailed above, the remainder of the allegations against the Floor Brokers in general consists of formulaic general legal conclusions that all floor brokers aided and abetted with "knowledge and substantial assistance", (Compl. ¶¶ 100, 105) and "knowingly executed" Amaranth's strategy (Compl. ¶ 225).  Such "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002).

### B.    Even under Rule 8(a)(2) the Complaint fails to adequately allege aiding and abetting

Even if Rule 8 were to apply to the instant action, Plaintiffs' allegations are still insufficient to state a cause of action as the allegations are almost pure speculation and conclusions couched, improperly, as facts. In *Twombly*, 127 S. Ct. at 1964-1965, the Supreme Court dismissed the action on Rule 8 grounds holding, in part:

> ". . . While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see *Papasan v. Allain,* 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed.2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"),[FN3] on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, *e.g.*, *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) . . . . (footnote omitted).

The entire Complaint is alleged on information and belief except as to matters relating to Plaintiffs.  The introduction of the Complaint refers to Paragraph 271 for the "information" that forms the basis of the complaint, and Paragraph 271, in turn, reveals that the Plaintiffs rely

primarily and substantially on the CFTC Complaint, the FERC OSC and the Senate report, none of which contains allegation of wrongdoing against the Floor Brokers.

To base a claim merely on the fact that floor brokers and customers exchange information important to them in securing the best trade possible for the customer, is to imply that the ordinary business of NYMEX, a federally regulated exchange, is entirely fraudulent. Communication between futures companies (e.g., floor brokerage entities) and off-floor traders is part and parcel of the business.

As to TFS, the Complaint contains no specific factual allegations whatsoever regarding any knowledge possessed by TFS.  As to ALX, a claim based upon speculations of the identity of a person identified only by a common first name, and who is referenced only in a vague sentence fragment as "telling vinnie" concerning one innocuous line in an email string cannot stand under any pleading requirement.  Accepting all of Plaintiffs well-pleaded factual allegations as true, no reasonable inference can be raised that either Floor Broker had any knowledge or intent to participate in a violation of the CEA.  Plaintiffs fail to state a claim that is plausible on its face, and the Complaint therefore fails against both of the Floor Brokers under even the lenient standards of Rule 8.[11]

### C.    Floor Brokers, by Law, Can Have No Aiding and Abetting Liability

Moreover, without any well-pleaded facts regarding any knowledge, there can be no aiding and abetting liability for Floor Brokers with no duty to monitor or question their customers regarding their trading orders.  *See Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.

---

[11] *See Makor Issues & Rights, Ltd. v. Tellabs*, 437 F. 3d 588 (7th Cir. 2006), *vacated on other grounds*, 127 S. Ct. 2499 (2007), which held allegations of scienter made against one defendant cannot be imputed to all other individual defendants and to proceed beyond the pleading stage, the plaintiff must allege as to each defendant facts sufficient to demonstrate a culpable state of mind." *Twombly* did not disturb that ruling.  *See Tellabs*, 127 S. Ct., 2499, 2511, fn 7.  *See also In Re Crude Oil Commodity Litig.*, No. 06-cv-6677, 2007 WL 1946553, at *6 (S.D.N.Y. Jun. 28, 2007).

1983) ("we are not prepared to hold that a broker who merely executes an investment manager's orders for improper purchases or sales can be held liable as an aider and abettor"); s*ee also Cumis Ins. Soc'y, Inc. v. E.F. Hutton & Co.*, 457 F.Supp. 1380, 1386-87 (S.D.N.Y. 1978) (no aiding and abetting liability where brokerage firm lacked knowledge of investment advisor's wrongdoing).

Indeed, the Complaint does not allege that the Floor Brokers provided any advice or exercised any judgment on behalf of the Amaranth Defendants. The Floor Brokers' function is, instead, similar to that of a discount brokerage that merely executes orders, rather than an advisor that provides any advice or exercises judgment on behalf of its clients. In *Chee v. Marine Midland Bank, N.A.*, Nos. 88-cv-0557, 88-cv-0673, 88-cv-0813, 88-cv-1808, 88-cv-1867 and 88-cv-2145, 1991 WL 15301 (E.D.N.Y. Jan. 29, 1991), the court analyzed the role of such a discount brokerage and dismissed aiding and abetting claims against the brokerage. The court noted that the brokerage did not make any recommendations regarding trading strategies or markets and instead "simply executed buy and sell orders" when instructed to do so by the alleged primary wrongdoer. *Id.* at*2. Following *Armstrong* and *Cumis*, the court therefore held that – even though the discount brokerage may have provided technical advice to the person who was alleged to have wrongly placed the trades at issue – the broker could not be held liable without knowledge of the wrongdoer's improprieties. *Id.*

## II.    Plaintiffs' Aiding and Abetting Claim Against the Floor Brokers Does Not Satisfy the Heightened Pleading Standard of Rule 9(b)

Plaintiffs' market manipulation claims, and, consequently, their claims against the Floor Brokers for aiding and abetting the market manipulation, are subject to the stringent pleading requirements of Fed. R. Civ. P. 9(b). *ATSI Communications Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). The Complaint, however, utterly fails to allege the requisite well-pleaded

facts demonstrating that the Floor Brokers had *knowledge* of the Amaranth Defendants' alleged scheme. Moreover, Plaintiffs do not even allege facts supporting a strong *inference* of the Floor Brokers' knowledge. The Complaint's claims against the Floor Brokers must accordingly be dismissed.

"Rule 9(b) [fails] in its purpose if conclusory allegations such as these will permit a plaintiff to set off on a long and expensive discovery process in the hopes of uncovering some wrongdoing." *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 116 (2d Cir. 1982). *See also*, *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989).

A.     **Rule 9(b) Applies to Market Manipulation Claims**

Plaintiffs' primary claim is against the Amaranth Defendants for market manipulation under Sections 6(c), 6(d) and 9(a)(2) of the CEA, 7 U.S.C. §§ 9, 13b, and 13(a)(2). As such, the Complaint is subject to the heightened pleading requirements of Rule 9(b). The Second Circuit recently held that, "[b]ecause a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b)." *ATSI Communications*, 493 F.3d at 101. "The deception arises from the fact that investors are misled to believe 'that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators'". *Id.* at 100 (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999).[12] Rule 9(b)'s heightened pleading standard must be satisfied to sustain a market manipulation claim under the CEA where, as here, the conduct alleged to underpin the manipulation is of the type "classically associated with fraud." *See In re Crude Oil*, 2007 WL

---

[12] Other courts similarly hold that a claim of manipulation is, in fact, a claim of fraud. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (stating manipulation "connotes intentional or willful conduct designed to deceive or defraud"); *Slusser v. CFTC*, 210 F.3d 783, 786 (7th Cir. 2000) (stating "manipulation is a species of fraud").

1946553, at *4; *see also In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005) ("*In re Natural Gas II*").

In re Natural Gas II applied the Second Circuit rule of *Rombach  v. Chang*, 355 F.3d 164, 167 (2d Cir. 2004), mandating that when a complaint "sounds in fraud," it must fulfill the prerequisites of Rule 9(b), even where the complaint "does not allege a cause of action requiring proof of fraud." *In re Natural Gas II*, 358 F. Supp. 2d at 343.  Specifically, the court held that Rule 9(b) applied to a market manipulation claim under the CEA where the alleged goal of the scheme was to create the perception of increased liquidity and demand for natural gas, thereby manipulating supply and demand. *Id.*

Similarly, the *In re Crude Oil* court dismissed a class action complaint alleging manipulation of the market in crude oil futures for failure to plead with particularity under Rule 9(b).  The court held that because the "crux of plaintiffs' allegations is that defendants misled the market with regard to supply and demand," Rule 9(b)'s heightened pleading requirements applied to plaintiffs' manipulation claim.  *Crude Oil*, 2007 WL 1946553, at *5.

The same reasoning applies here.  Plaintiffs allege that the Amaranth Defendants manipulated the NG Contracts market by placing large orders to sell NG Contracts in the settlement period of the contract.  (Compl. ¶¶ 2(e), 5, 101, 113, 122, 127.)  Plaintiffs further allege that the Amaranth Defendants artificially drove down prices by placing these sale orders at the close of the NG Contracts settlement periods, thereby flooding the market and creating *misleading supply and demand information for the NG Contracts*.  (Compl. ¶¶ 6(f), 78, 81(d), 82(d), 112-115, 181.)  This alleged manipulation of *misleading* the market with regard to "supply and demand" fits squarely with the reasoning of *Crude Oil* and *In re Natural Gas II*, and

pursuant to these cases and *ATSI Communications*, Rule 9(b) applies to Plaintiffs' market manipulation claims.[13]

In the recent *CFTC v. Amaranth Advisors, LLC* decision based upon the same underlying facts, the court "split the baby" with respect to its determination of whether Rule 9(b) applied, holding that Rule 9(b) did apply as far as the alleged "cover up" was concerned, but not where the manipulation scheme was involved. *CFTC v. Amaranth Advisors, LLC*, No. 07-cv-6682, __ F. Supp. 2d __, 2008 WL 2123323, at **4, 7, 10 (S.D.N.Y. May 21, 2008) (Chin, J.). The court determined that since the claim was based on Amaranth's "trading strategy" of manipulating the NYMEX closing price to benefit Amaranth's short positions on non-NYMEX natural gas swaps, the manipulation did not sound in fraud. *Id.*

Although the CFTC action against the Amaranth defendants did not name any floor brokers as defendants, Judge Chin's decision and rationale places a Sword of Damocles over Plaintiffs' claim with respect to their reliance on that decision. If Plaintiffs argue that the rationale of Judge Chin applies here, then they must also argue that their claims herein are based on Amaranth's manipulative trading strategy to benefit its non-NYMEX natural gas swap positions.[14] This argument is paramount to acknowledging that no claim exists against the Floor Brokers, as there are no allegations asserting any knowledge (or need to know) by the Floor

---

[13] The parties exchanged pre-motion letters in accordance with Rule III.B of This Court's Individual Rules and Procedures. Plaintiffs' letter argued that this Court's recent *In re IPO* opinion holds that "Section 11 claims against issuer defendants were not subject to . . . Rule 9(b)'s heightened pleading requirements because plaintiffs' claims against issuer defendants rested on market manipulation, not false statements." Plaintiffs' reliance on *In re IPO* is misplaced, as the *In re IPO* decision applied Rule 9(b) to plaintiff's market manipulation case brought pursuant to Section 10(b) of the Securities and Exchange Act of 1934, and specified that Rule 9(b) did not apply to the Section 11 claims because those claims "sound[ed] in negligence," not in fraud. 544 F. Supp. 2d at 285 & 298.

[14] This is not to suggest that the Floor Brokers are arguing that Judge Chin's assessment is binding on this court; on the contrary, the Floor Brookers believe that Plaintiffs' allegations of "misleading" conduct sound in fraud, requiring the application of Rule 9(b) standards.

Brokers with respect to Amaranth's trading strategy, and the Complaint must be dismissed as to the Floor Brokers.

### B.    Rule 9(b) Also Applies to Aiding and Abetting of Market Manipulation

Similarly, because the primary violations upon which Plaintiffs' aiding and abetting claim are based "sound in fraud," the aiding and abetting claims are also subject to the heightened pleading requirements of Rule 9(b) and must be pleaded with the requisite particularity. *Krause v. Forex Exchange Market, Inc.,* 356 F. Supp. 2d 332, 338 (S.D.N.Y. 2005) (applying Rule 9(b) to aiding and abetting in the context of the CEA); *see also Mazzaro de Abreu v. Bank of America Corp.*, 525 F. Supp. 2d 381, 388 (S.D.N.Y 2007) (applying Rule 9(b) to aider and abettor liability with respect to a fraud claim).

### C.    The Claim Against the Floor Brokers Does Not Survive Rule 9(b)

To state a claim for aiding and abetting under the CEA, Plaintiffs must allege: (1) the existence of an underlying fraud; (2) that the Floor Brokers actually knew of the fraud; and (3) that the Floor Brokers provided substantial assistance in the achievement of the underlying fraud. *See Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983); *see also Mazzaro de Abreu*, 525 F. Supp. 2d at 387; *Krause*, 356 F. Supp. 2d at 338. "Constructive knowledge is insufficient to create aiding and abetting liability." *Mazzaro de Abreu*, 525 F. Supp. 2d at 387. Actual knowledge of the aider and abettor is required to sustain a claim. *Id.*

Although 9(b) allows "intent, knowledge, and other condition of mind of a person [to] be averred generally," this relaxation of 9(b)'s requirement is not a "license to base claims of fraud on speculation and conclusory allegations." *Crude Oil*, 2007 WL 1946553, at *8 (quoting *Simon v. Castello*, 172 F.R.D. 103, 106 (S.D.N.Y. 1997)). "Rather, the complaint must 'adduce specific facts supporting a <u>strong inference</u> of fraud'".) *Id.,* (quoting *Three Crown Ltd. P'ship v. Caxton Corp.,* 817 F. Supp. 1033, 1040 (S.D.N.Y. 1993))(emphasis in original). The necessary strong

inference must be established by either "(a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Crude Oil*, 2007 WL 1946553, at *8 (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)); *see also Mazzarode Abreu*, 525 F. Supp. 2d at 387; *Krause*, 356 F. Supp. 2d at 339. The fraud allegations "cannot be based on information and belief" unless the facts are "peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based," *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d, 1242, 1247 (2d Cir, 1987) and even "this exception to the general rule must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Wexner v. First Manhattan Co.,* 902 F. 2d 169, 172 (2d Cir. 1990).

In this instance, Plaintiffs have alleged neither actual knowledge of the purported fraud, nor facts supporting a strong inference of the Floor Brokers' knowledge. Their aiding and abetting claim against the Floor Brokers therefore fails to satisfy Rule 9(b)'s requirements for aiding and abetting under the CEA, and the claim must be dismissed.

### 1. The Claim Does Not Sufficiently Allege Actual Knowledge

The court "need not accord '[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness.'" *In re IPO*, 544 F. Supp. 2d 277 (quoting *In re NYSE Specialists Sec. Litig.*, 503, F.3d 89, 95 (2d Cir. 2007). *See also First Nationwide Bank v. Gelt Funding Corp*, 27 F.3d 763, 771 (2d Cir. 1994) ("In the absence of a factual basis underlying [plaintiff's] causation claim, we cannot accept its allegation as fact.")

The remainder of the allegations against the Floor Broker Defendants in general consists of formulaic general legal conclusions that all floor brokers aided and abetted with "knowledge and substantial assistance", (Compl. ¶¶ 100, 105) and "knowingly executed" Amaranth's strategy

(Compl. ¶ 225).  The placing of an order (which by definition requires disclosing the quantity to be either purchased or sold) with a floor brokerage operation is a prerequisite to having any trade executed and without more, does not cause the floor broker to "have knowledge of manipulative behavior."  The Complaint is devoid of any allegation that the Floor Brokers knew of Amaranth's positions with ICE or other OTC markets (which is critical to the alleged scheme), or even knew of orders Amaranth placed with other NYMEX floor brokers, OTC trading desks, or on other exchanges.  Since it is the crux of Plaintiffs' case that a large number of trades were placed in order to "slam the close" and to benefit Amaranth through these non-NYMEX short positions, the Floor Brokers simply cannot be held liable for aiding and abetting unless they had knowledge of these essential elements.

The sole allegation made directly against TFS is in the "Parties" section of the complaint, where TFS is groundlessly alleged to have had "knowledge of, and aided and abetted" Amaranth's manipulation.  Such "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."  *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002).

Similarly, no factual allegations concerning ALX's purported knowledge were made.  In fact, during the alleged Class Period, which covers six months, there are only two distinct references to the ALX defendants; February 24, 2006 and April 26, 2006.  In each instance, the ALX defendants, as one of several floor brokers to have received orders from Amaranth, executed the customer order in accordance with the customer instructions.[15]  Plaintiffs' Complaint contains an allegation that defendant Hunter told another defendant that defendant

---

[15] This Court is respectfully referred to the CFTC Complaint which describes in detail the transactions on February 24 and April 26.  The CFTC Complaint makes it clear that the ALX Defendants' role was limited to executing customer orders on NYMEX placed, in what appeared to the ALX Defendants, in the ordinary course of business.

Hunter intended to advise someone named "[V]innie" of Amaranth's "long positions and intentions" (Compl. Para 112).  This allegation, even if it had been based upon an actual fact, (*see* above, fn. 10 and related argument), cannot even be fairly described as *constructive* knowledge of manipulative behavior.[16]

Further, it is not alleged that the information was actually conveyed to any Vinnie, or that anyone even intended to tell DeLucia, who was the executing broker on the trading floor; and, more important, why telling him that "Vitol gave me 2000" would have advised ALX of a manipulative trading scheme.  The order would have had to been filled by the Floor Brokers with or without additional information.

> **2.      The Claim Does Not Sufficiently Allege a Strong Inference of the Floor Brokers' Knowledge**

The Complaint also does not allege any facts regarding misbehavior or recklessness by the Floor Brokers, and Plaintiffs' boilerplate allegations of motive are wholly insufficient to establish a strong inference of intent on behalf of the Floor Brokers.  Plaintiffs' only attempt to allege that the Floor Brokers had any motive to aid and abet the alleged fraud is a blanket assertion that they had a generalized "financial motive to aid and abet Amaranth" because Amaranth is a large trader who "generated substantial revenue for the Floor Broker Defendants in the form of commissions."  (Compl. ¶ 223, 224.)

A generalized motive "which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter".  *Chill v. General Electric Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (affirming dismissal without leave to replead for failure to state fraud under 9(b)).  *See also Kalnit v. Eicher*, 264 F.3d 131, 140 (2d Cir. 2001)

---

[16] Again, as previously stated, the actual facts referred to in the complaint show only that Hunter intended to tell someone named Vinnie that Donohoe told him that "vitol gave me 2000".  All of the rest is mere rhetoric.

(finding allegation that a company acted to obtain a more favorable business agreement too generalized to be sufficient under Rule 9(b)); *Crude Oil*, 2007 WL 1946553, at *8.  Indeed, in *Mazzaro de Abreu*, 525 F. Supp. 2d at 388, allegations of "substantial fees" and "unusually large volume" of business were held to be insufficient to create a reasonable inference of intent sufficient to salvage the complaint at issue from dismissal.

As to TFS, the Complaint in the instant case does not even allege any facts regarding the volume of business or commissions received by TFS; indeed, Plaintiffs admit that TFS is not Amaranth's primary floor broker.  (Compl. ¶112.)  As to TFS and ALX, there are no allegations that either Floor Broker charged Amaranth anything other than its standard fixed commission rate for executing trades on behalf of any customer, in accordance with its ordinary manner of earning income.  As a result, these conclusory, blanket assertions of motive and intent are insufficient to sustain Plaintiffs' claims against the Floor Brokers under Rule 9(b).

## III.    Plaintiffs' Unjust Enrichment Claim Fails Because There Is No Nexus Between the Putative Class and the Floor Brokers

In addition, Plaintiffs fail to state a claim against the Floor Brokers for unjust enrichment because Plaintiffs try to artificially detach the elements of the claim from the quasi-contractual context in which the claim must be viewed.[17]  "Unjust enrichment under New York Law falls under the umbrella of quasi-contract."  *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 49 F. Supp. 2d 298, 300 (S.D.N.Y. 1999) (citing E. Allen Farnsworth, Contracts § 2.20, at 103-104 (2d Ed. 1990) and *Lightfoot v. Union Carbide Corp.* 110 F.3d 898, 905 (2d Cir. 1997); *see also Michelle Pommier Models, Inc. v. Men Women NY Model Mgmt., Inc.*, 14 F. Supp. 2d 331, 338 (S.D.N.Y.

---

[17] The elements of an unjust enrichment claim are "that (1) defendant was enriched, (2) the enrichment was at plaintiff's expense and (3) the circumstances were such that equity and good conscience require defendant to make restitution.  *Hutton v. Klabal*, 726 F. Supp. 67 (S.D.N.Y. 1989) (upholding unjust enrichment claim in a case arising out of an agreement between plaintiff and defendant to purchase and resell etchings).

1998) ("there must be some legally cognizable relationship between the parties"), *aff'd*, 173 F.3d 845 (2d Cir. 1999).

New York courts therefore dismiss unjust enrichment cases for failure to state a claim where the complaint does not allege a contractual or quasi-contractual relationship between plaintiffs and defendants. For example, in *Reading International, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301 (S.D.N.Y. 2003), an antitrust plaintiff who owned a movie theater argued that he had stated an unjust enrichment claim because he had alleged that, by virtue of defendant theater chains' anticompetitive behaviors, the defendants had been enriched at his expense, and that equity and good conscience required them to make restitution. The court held that this argument "would remove the elements of unjust enrichment from the context in which they must be viewed: as an alternative to contract, where a contractual relationship has legally failed." 317 F. Supp. 2d at 333-34. Despite the fact that plaintiff had recited the elements of unjust enrichment, the claim was dismissed based on plaintiff's failure to allege that he had a contractual or quasi-contractual relationship – or even any prior business dealings – with defendants. *Id.*

The putative class action representatives in this case were all traders on the natural gas futures market who allege that their losses, injuries and damages were "proximately caused" by Defendants' manipulation of the market. The attenuated relationship between these Plaintiffs and the Floor Brokers will not support an unjust enrichment claim.[18]

New York courts have, for example, dismissed for lack of privity unjust enrichment claims in class action securities cases alleging fraud on the market. In *Redtail Leasing, Inc. v.*

---

[18] Even if this Court finds there are grounds for an unjust enrichment claim, Plaintiffs fail to allege any of the remaining elements for a constructive trust. *Modica v. Modica*, 15 A.D.3d 635, 635, 71 N.Y.S.2d 134, 135 (2d Dep't 2005).

*Belezza,* No. 95-cv-5191, 1997 WL 603496, at *8 (S.D.N.Y. Sept. 30, 1997), a case arising out of insider trading allegations against defendants who allegedly profited at the expense of shareholders of Motel 6, the court dismissed unjust enrichment causes of action because "an unjust enrichment claim, which is a quasi-contract claim, requires some type of direct dealing or actual, substantive relationship with a defendant", and because plaintiff only alleged a "contemporaneous trading relationship" with defendants. The court also dismissed additional cases arising out of similar insider trading allegations against different defendants for the same reason: "[w]ithout factual allegations that Plaintiffs had a more substantive connection to the Defendants beyond a contemporaneous trading relationship, Plaintiffs have not alleged facts to support a claim." *In re Motel 6 Sec. Litig.*, Nos. 93-cv-2183 and 93-cv-2866, 1997 WL 154011, at *7 (S.D.N.Y. April 2, 1997).

"Plaintiffs have also failed to demonstrate that defendants have 'received a benefit of money or property belonging to the plaintiff.'" *Reading International,* 317 F. Supp. 2d at 334 (quoting *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,* 17 F.Supp.2d 275, 313 (S.D.N.Y.1998)). Plaintiffs allege that the Floor Brokers received commissions for executing trades. (Compl. ¶ 224-225). Thus, any payment to the Floor Brokers was made by Amaranth regardless of whether the customer profited or lost on the transaction and regardless of whether it was successful in its strategy or not. No payment is or can be alleged to have been received by the Floor Brokers at the expense of the Plaintiffs or any member of the class. Indeed, the Complaint does not even mention the Floor Brokers in the paragraphs constituting the basis of the unjust enrichment claim (266-271), but lumps them in with all defendants for the first time, in order to avoid applying the elements of the claim to them.

**<u>CONCLUSION</u>**

Accordingly, the Plaintiffs' claims against the Floor Brokers should be dismissed.  Further, because the problems with the Complaint are substantive, as demonstrated above, any additional pleading would be futile.  Therefore, the Complaint should be dismissed without leave to replead.

Dated: June 23, 2008
        New York, New York

Respectfully submitted,
ALSTON & BIRD, LLP


By:  /s/ Craig Carpenito
Karl Geercken (KG-5987)
Craig Carpenito (CC-1686)
Amber Wessels (AW-2322)
90 Park Avenue
New York, NY 10016
(212) 210-9400
(212) 210-9444 (fax)

*Attorneys for Defendant TFS Energy Futures, LLC*



/s/  Steven R. Goldberg
Steven R. Goldberg (SG-2825)
One North End Avenue, Suite 1107
World Financial Center
New York, New York  10282
 (212) 845-5100

*Attorney for Defendants ALX and DeLucia*


LEGAL02/30845501v1

24