UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: AMARANTH NATURAL GAS COMMODITIES LITIGATION | MASTER FILE NO. 07 Civ. 6377 (SAS) **ECF Case** |
| This Document Relates To: ALL ACTIONS | JURY TRIAL DEMANDED |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT**

**LOVELL STEWART HALEBIAN LLP**
Christopher Lovell (CL 2595)
Gary S. Jacobson (GJ 2481)
Ian T. Stoll (IS 3424)
500 Fifth Avenue
New York, NY 10110
(212) 608-1900
(212) 719-4677 (fax)

**LOUIS F. BURKE, P.C.**
Louis F. Burke (LB 4686)
Leslie Wybiral (LW 0629)
460 Park Avenue, 21st Floor
New York, NY 10022
(212) 682-1700
(212) 808-4280 (fax)

**LOWEY DANNENBERG BEMPORAD
SELINGER & COHEN, P.C.**
Vincent Briganti (VB 1497)
Geoffrey M. Horn (GH 4179)
White Plains Plaza
1 North Broadway, 5th Floor
White Plains, NY  10601
(914) 997-0500
(914) 997-0035 (fax)

*Co-Lead Counsel for Plaintiffs*

*Additional Counsel for Plaintiffs on Signature Page*

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ........................................................................... 1

II.   STATEMENT OF FACTS ................................................................................ 6

    A.    Background of Commodity Futures Markets ........................................... 6

    B.    NYMEX Natural Gas Contracts ............................................................. 6

    C.    During the Class Period, Amaranth's Long Term, Increasing Dominance
        Caused Long Term, Increasing NYMEX Natural Gas Price Artificiality
        Until The Removal of Amaranth's Dominance Removed  The NYMEX Price
        Artificiality ........................................................................................... 6

    1.    Amaranth's Increasing "Dominance" Over The NYMEX Market During
        The Class Period Through ..................................................................... 6

        a.    Amaranth's Increasing Aggregate Positions............................... 7

        b.    Amaranth's Slamming The Close of the March-May NYMEX
            Contracts,Selling Large Amounts of The March – October 2006
            NYMEX Contracts, And  Simultaneously Buying Large Amounts
            of The Winter 2006-2007 Contracts ........................................... 8

        c.    Amaranth's Unprecedented Trading Volumes .......................... 9

    2.    Amaranth's Increasing Dominance Caused NYMEX Prices To Be
        Artificial In Multiple Ways, Including By Artificially Inflating
        Summer-Winter Spreads To NineTimes Their Historical Average..................... 10

    3.    The Removal of Amaranth's Dominant Positions Removed
        The Artificiality That Amaranth Had Been Causing As The Inflated
        Spread Prices Plummeted By 70% ...................................................... 10

    D.    Amaranth's Other Blatant Manipulation Tactics Furthered Amaranth's
        Dominance And Self-Fulfilling Prophecy Manipulation..................................... 11

    1.    Amaranth's Rule Violations At The Start of The Class Period ........................... 11

    2.    Rather Than Decreasing Their "Unprecedented" Positions, Amaranth
        Greatly Increased Them....................................................................... 11

    3.    Amaranth's Lies To The NYMEX, And Amaranth's  Evasions Of
        The NYMEX Anti-Manipulation Directives Also Furthered Amaranth's

|  | Manipulation ................................................................................ | 12 |

|  | 4. | How Defendant Maounis Acquired $48 Billion Worth of Natural Gas Contracts ................................................................................ | 12 |

|  | D. | With Unprecedented Knowledge, JP Morgan Provided Unprecedented Assistance To The Manipulation And Reaped An Unprecedented Payoff ................................................................................ | 6 |

|  | E. | The Floor Broker Defendants Aided And Abetted The "Slamming The Close" Portion of Amaranth's Manipulation ............................ | 19 |

ARGUMENT ................................................................................ 19

I. | PLAINTIFFS PLEAD STRONG CLAIMS OF MANIPULATION AGAINST AMARANTH ................................................................................ | 19

| A. | Contrary To Amaranth's "Large Trades" Arguments, Congress Has Been Trying To Prevent Manipulation Of Commodity Futures Prices By "Big Traders" For Eighty-Six Years ................................................. | 19

| 1. | CEA Manipulation Cases Hold That Large Trading, Alone, Can Manipulate Prices ................................................................. | 20

| 2. | Plaintiffs Allege Far More Than Mere Large Trades ........................... | 20

|  | a. | Plaintiffs' Allegations of Dominance, By Themselves, State A Strong Claim For CEA Manipulation ......................... | 20

|  | b. | Plaintiffs Also Allege Many More Blatant Manipulative Tactics ........... | 21

| 3. | The Commodity Futures Market Have Very Different Purposes And Background Than The Securities Markets ........................... | 22

| 4. | Amaranth's Trading Destroyed The Socially-Beneficial Functions of The Commodity Futures Markets ................................... | 23

| 5. | Since 1922, Congress Has Been Trying To Prevent Manipulation By Big Traders ................................................................. | 23

| 6. | In The CEA, Unlike In Other Laws, Congress Unqualifiedly Prohibits Manipulation And Unqualifiedly Depends On Private Suits To Provide "Critical" Deterrence Against Manipulation ........................... | 24

| 7. | In Order To Deter And Redress Commodity Futures Price Manipulation, The CEA Provides Many "Practical" Avenues of Redress, Including Strict |

Vicarious Liability ........................................................................................ 25

8.    In Order To Deter And Redress Commodity Futures Price Manipulation, It Has Consistently Been Held To Be Improper To Catalogue Or Define CEA Manipulation In An Exclusive Fashion ........................................................ 26

9.    Subject To This Limitation, There Are Three Elements Of A CEA Manipulation Claim ................................................................................... 28

10.   In Construing The Pleading Of The Elements Of A CEA Manipulation Claim, It Must Be Remembered That Congress Considered Private Law Suits To Be "Critical" To Deterring Manipulation .................................................................. 28

B.    Although Fed.R.Civ.P. Rule 9(b) Particularity And Even *Twombly* Plausibility Are Not Required To Plead Manipulation By The Primary Means Of Big Trades, Plaintiffs Plead Their Manipulation Claim With Extraordinary Particularity ................. 29

      1.    Rule 8(a) Governs Claims In Which Large Positions Are the Primary Means of Manipulation .................................................................... 29

      2.    Rule 9(b) Explicitly Mandates That "Intent" And "Condition Of Mind" Should Be Averred Generally ...................................................... 30

      3.    The Existence of Artificial NYMEX Natural Gas Futures Contract Prices ......... 32

      4.    Plaintiffs Properly Plead Causation ....................................................... 34

            a.    Contrary To The Advisors' Pretension, Plaintiffs allege That Defendants' Slamming The Close" Maneuvers Manipulated NYMEX Natural Gas Contract Prices ...................................... 36

C.    Under the CEA, Manipulative Intent Is Inferred From Conduct And Plaintiffs Plead   Not One But Numerous Classic Indications of Manipulative Intent .................... 38

      1.    No Case Of Which Plaintiffs Are Aware Has Granted Even Summary Judgment On The Issue of Manipulative Intent .................................... 41

      2.    Neither Intent To Defraud Nor A Strong Inference of Scienter Is Required ........ 41

      3.    Amaranth LLC Had Manipulative Intent ............................................... 42

      4.    Amaranth Advisors LLC and Amaranth Advisors (Calgary) ULC Had Manipulative Intent .................................................................... 44

      5.    Maounis, Hunter And Donohoe, Who Made The Trading Decisions That Caused The Artificial Prices, Acted With Intent To Manipulate ................. 44

6.     Amaranth Group Inc. Had Manipulative Intent ................................................... 45

7.     Manipulation Works Better Or could Only Work Here If The Feeder Fund "Acted In Combination Or Concert" With The Amaranth Trading Defendants; Separately, Each Feeder Fund Possessed Defendant Maounis' Manipulative Intent .............. 46

a.    Standing vs. AIL

D.    Defendants' Citations To PSLRA and Securities Law Manipulation Cases Are Inapposite ........................................................................................................ 47

POINT II:    THE AMARANTH DEFENDANTS ARE LIABLE UNDER CEA SECTION 2(a)(1) AS PRINCIPALS FOR THE ACTS OF THE AMARANTH TRADING DEFENDANTS ................................................................................................ 48

A.    The CEA's Broad Codification Of Respondeat Superior Holds Each Amaranth Defendant Strictly And Vicariously Liable For The Acts Of Its Agents Regardless of Whether Those Acts Are Lawful Or Unlawful ........................................................... 48

B.    Knowledge, Profit or Control by the Principal Are Not Required Elements of this Strict Vicarious  Responsibility Under the CEA, Which is to be Pleaded Under Rule 8(a)(2) . 49

C.    Plaintiffs Have Adequately Alleged That Each Amaranth Defendant Was A Principal Or Control Person Of At Least One Amaranth Trading Defendant ....................................... 51

POINT III.    THE AMARANTH DEFENDANTS ARE ALL LIABLE AS A COMMON ENTERPRISE FOR ONE ANOTHER'S ACTS ................................................ 555

POINT IV    Plaintiffs Adequately Plead Aiding and Abetting Liability .................................. 56

A.    JP Morgan Aided And Abetted Amaranth's Manipulation ............................................. 56

1.    JP Morgan's Knowledge of The Manipulation ................................................... 57

2.    Intentional Assistance ........................................................................................ 61

3.    Intent to Further the Violation is Inferred From Unprecedented Knowledge and Unprecedented Assistance ........................................................................... 62

B.    The Floor Brokers Aided And Abetted Manipulation ..................................................... 62

C.    The Amaranth Defendant's Aided and Abetted Manipulation .......................................... 66

POINT  V    PLAINTIFFS ADEQUATELY PLEAD CLAIMS FOR UNJUST ENRICHMENT ................................................................................................... 66

POINT VI        THE EXERCISE OF PERSONAL JURISDICTION IS APPROPRIATE ......... 68

A.    The Court has Personal Jurisdiction Over Defendants Hunter and AIL........................... 68

    1.    Defendant Hunter's and AIL's Minimum Contacts Confer  Jurisdiction............. 69

    2.    Jurisdiction Over Hunter and AIL is Reasonable .................................................. 70

B.    Alternatively, Plaintiffs are Entitled to Jurisdictional Discovery .................................... 70

CONCLUSION........................................................................................................................ 70

# TABLE OF AUTHORITIES

## Federal Cases

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556 (1982)..........................................35

*APWU v. Potter*, 343 F.3d 619 (2d Cir. 2003)..............................................................69

*ATSI Communications v. Shaar Fund Ltd.*, 493 F.3d 87 (2nd Cir. 2007) ...................................26

*Bell Atlantic Corp. v. Twombly*, ___ U.S. ___S.Ct. 1955 (2007) ...........................................31, 45

*Billing v. Credit Suisse*; 426 F.3d 130(2d Cir. 2006)....................................................22

*Board of Trade v. Olsen*, 262 U.S. 1 (1923) ..........................................................22, 35

*Cange v. Stotler & Co.*, 826 F.2d 581 (7th Cir. Ill. 1987) ................................28, 48, 49

*Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8th Cir. 1971) ....................................... *passim*

*CEH Inc. v. F/V Seafarer*, 880 F. Supp. 940 (D.R.I. 1995)..............................................52

*CFTC  v. Amaranth Advisors, L.L.C., et al.*,
__F.Supp.2d___, 2008 WL 2123323 (S.D.N.Y. May 21, 2008)........................................ *passim*

*CFTC  v. Amaranth Advisors, L.L.C.*,
   2008 U.S.Dist. LEXIS 45638 (S.D.N.Y. June 10, 2008) ..........................................................3

*C.F.T.C. v. Baragos*, 278 F.3d 319 (4th Cir. 2002) ....................................................54

*C.F.T.C. v. Commodities Fluctuations Systems, Inc.*,
   583 F. Supp. 1382 (S.D.N.Y. 1984) ......................................................45, 48, 49, 53

*C.F.T.C. v. Enron Corp.*, 2004 WL 594752 (S.D. Tex. Mar. 10, 2004)...........................20, 29, 65

*C.F.T.C. v. Enron Corp.*, 2004 U.S. DIST. LEXIS 28794 (Mar. 9, 2004)...................................39

*C.F.T.C. v. Equity Financial Group, LLC*, 2006 WL 3359418 (D. N.J. Nov. 16, 2006) .............55

*C.F.T.C. v. Noble Wealth Data Info. Serv., Inc.*, 90 F. Supp. 2d 676 (D. Md. 2000)...................54

*C.F.T.C. v. Wall Street Underground, Inc.*, 281 F. Supp. 2d 1260 (D. Kan. 2003) ...............54, 55

*Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807 (S.D.N.Y. 2006).............................................49

*In re Coral Energy Resources*, Comm.Fut.L.Rep. (CCH) ¶ 29815 (July 28, 2004) ....................40

*In re Cox*, 1987 WL 106879 (C.F.T.C. July 15, 1987) ................................................................21

*Credit Suisse Sec. (USA) v. Billing*, __ U.S. ___, 127 S.Ct. 2383 (2007) ......................................67

*Cromer Finance, Ltd v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001) ..........................................68

*In re Crude Oil Commodity Litig.*, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ..................29, 30

*de Atucha v. Hunt*, 756 F. Supp. 829 (S.D.N.Y. 1991) ................................................................37

*DGM Investments, Inc. v. New York Futures Exchange, Inc.*,
    265 F. Supp. 2d 254 (S.D.N.Y. 2003) .........................................................................67

*In re DiPlacido*, 2004 WL 2036910 (CFTC Sept. 14, 2004) ...................................................59, 62

*E.E.O.C. v. Wal-Mart Stores, Inc.*, 11 F. Supp. 2d 1313 (D. N.M. 1998) .....................................53

*Ellison v. American Image Motor Co., Inc.*, 36 F. Supp. 2d 628 (S.D.N.Y., 1999) ......................45

*Fitzgerald v. Mountain States Tele. & Tel. Co.*, 68 F.3d 1257 (10th Cir. 1995) ..........................51

*Frey v. Commodity Futures Trading Comm'n*, 931 F.2d 1171 (7th Cir. 1991) ..........21, 26, 27, 35

*Friedman v. Salomon/Smith Barney, Inc.*, 313 F.3d 796 (2d Cir. 2002) ......................................24

*In the Matter of FSI Futures Inc.*, Comm. Fut. L. Rep. LEXIS 196 (C.F.T.C. 1997) ..................59

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) .........................................................39

*General Foods Corp. v. Brannan*, 170 F.2d 220 (7th Cir. 1948) ..................................................27

*In re Global Minerals & Metals Corp.*, 1999 WL 1023586 (C.F.T.C. Nov. 12, 1999) ....29, 38, 57

*Great Western Food Distrib., Inc. v. Brannan*, 201 F.2d 476 (7th Cir. 1953) .................32, 35, 38

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) ..........................28

*In re Hohenberg Bros.*, 1977 WL 13562 (CFTC Feb. 18, 1977) .................................................41

*In re Indiana Farm Bureau Coop.*,
    1982 WL 30249 (CFTC Dec. 17, 1982) ....................................................................... *passim*

*In re Initial Public Offering Securities Litig.*, 544 F. Supp. 2d 277 (S.D.N.Y. 2008) ....................3

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007) ...............................................................................31

*Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193 (8th Cir. 1982) ........................48

*Kohen v. Pacific Investment Management Company LLC*, 244 F.R.D. 469 (N.D. Il. 2007). *passim*

*Kolbeck v. LIT America, Inc.*, 923 F. Supp. 557 (S.D.N.Y. 1996) ................................................50

*Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972) ...............69

*Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980)...................................................................... *passim*

*In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152 (D. Mass. 2002) ................................50

*Lewis v. Walston & Co., Inc.*, 487 F.2d 617 (5th Cir. 1973) ........................................................48

*Manela v. Gottlieb*, 784 F. Supp. 84 (S.D.N.Y. 1992) ................................................................36

*Master Commodities, Inc. v. Texas Cattle Management Co.*, 586 F.2d 1352 (10th Cir. 1978) ....48

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982).........................6, 27

*Miles v. Merrill Lynch & Co., Inc.*, 471 F.3d 24 (2d Cir. 2006).....................................................26

*Miller v. N.Y. Produce Exch.*, 550 F.2d 762 (2d Cir. 1977) ........................................................47

*Minpeco S.A. v. ContiCommodity Serv.*, 673 F. Supp. 684 (S.D.N.Y. 1987).........................32, 59

*Minpeco, S.A. v. Hunt*, 81 Civ. 7619 (MEL) (S.D.N.Y. Aug. 15, 1988).........................29, 35, 57

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 655 F. Supp. 346 (S.D.N.Y. 1987) .............................65

*In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498 (S.D.N.Y. 2004) ...................... *passim*

*In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336 (S.D.N.Y. 2005)...............................29

*New York Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc.*,
    497 F.3d 109 (2d Cir. 2007).......................................................................................................37

*Ontario Ltd. v. Zurich Capital Markets Inc.*, 274 F. Supp. 2d 926 (N.D. Ill. 2003) ...............56, 61

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y., 2005).................................................50

*In re Pension Comm.*, 2006 U.S. Dist. LEXIS 11617 ..................................................................69

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    445 F.Supp.2d 163 (S.D.N.Y. 2006)...........................................................................................68

*Powers v. Dole*, 782 F.2d 689 (7th Cir. 1986) ............................................................54

*Premium Plus Partners, L.P. v. Davis*, 2005 WL 711591 (N.D. Ill. Mar. 28, 2005) ...................29

*Rosenthal & Co. v. CFTC*, 802 F.2d 963 (7th Cir. 1986) ..................................47, 48, 54

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. N.Y. 2000) ..........................................40, 44

*Russo v. Friedman*, 1992 WL 196791 (S.D.N.Y. July 31, 1992) ..................................65

*In re Saberi*, CFTC No. 01-11, 2005 WL 517453 (C.F.T.C. Mar. 2, 2005) ..........................58

*Saberi v. CFTC*, 488 F.3d 1207 (9th Cir. 2007) ........................................................58

*Santa Fe Indus. v. Green*, 430 U.S. 462, S.Ct. 1292 (1977) ....................................26

*S.E.C. v. Blackwell*, 477 F. Supp. 2d 891 (S.D. Ohio 2007) ....................................42

*S.E.C. v. Castilla*, 2001 WL 940560 (S.D.N.Y. Aug. 20, 2001) ................................68

*S.E.C. v. Credit First Fund, LP*, 2006 WL 4729240 (C.D. Cal. Feb. 13, 2006) ...................42

*S.E.C. v. Downe*, 969 F. Supp. 149 (S.D.N.Y. 1997) ............................................67

*S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9 th Cir. 1973) ....................55

*S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373 (S.D.N.Y. 2007) ..................................42

*S.E.C. v. Levine*, 689 F. Supp. 317 (S.D.N.Y. 1988) ............................................67

*S.E.C. v. Moscowitz*, 1998 WL 524903 (S.D.N.Y. Aug. 20, 1998 ) ..............................42

*SEC v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007) ......................................60, 62

*SEC v. U.S. Environmental, Inc.*, 155 F.3d 107 (2d Cir. 1998) ................................45

*Simplot v. Strobl,* 474 U.S. 1006 (1985) ............................................................35

*Sirota v. Solitron Devices, Inc.*, 673 F.2d 566 (2d Cir. 1982) ................................40

*In re Ski Train Fire Kaprun Austria on Nov. 11, 2000*, 499 F. Supp. 2d 437 (S.D.N.Y. 2007)....68

*In re Soybeans Futures Litig.*, 892 F. Supp. 1025 (N.D. Il. 1995) ....................... *passim*

*Starr v. Time Warner, Inc.*, 2007 WL 4144627 (S.D.N.Y. Nov. 21, 2007) ......................31

*Stoneridge Inv. Partners, LLC v. Scientific Atlanta*, ___ U.S. ___, 128 S.Ct. 761 (2008)............54

*Strobl v. New York Mercantile Exchange*, 582 F. Supp. 770 (S.D.N.Y. 1984) .......................27, 29

*Strobl v. New York Mercantile Exchange*, 768 F.2d 22 (2d Cir. 1985) .................................22, 46

*Strobl v. New York Mercantile Exchange*, 76 Civ. 4350 (MEL) (S.D.N.Y. Nov. 17, 1983).........35

*In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 325 (S.D.N.Y. 2000) .................................48

*In re Sumitomo Copper Litig.*, 182 F.R.D. 85 (S.D.N.Y. 1998)........................................... *passim*

*In re Sumitomo Copper Litig.*, 194 F.R.D. 480, (S.D.N.Y. 2000) ..................................................57

*In re Sumitomo Copper Litig.*, 995 F. Supp. 451 (S.D.N.Y. 1998) .........................................27, 37

*Teachers' Retirement System of Louisiana v. A.C.L.N. Ltd.*,
    2003 WL 21058090 (S.D.N.Y. May 12, 2003) ...........................................................................69

*In re Three Eight Corp, et al.,* CFTC No. 88-33, Comm. Fut. L. Rep. P 25,749,
    1993 WL 212489 (C.F.T.C. June 16, 1993).........................................................................19, 63

*In re Time Warner Inc. Securities Litig.*, 9 F.3d 259 (2d Cir. 1993) .............................................40

*Transnor (Bermuda) Ltd. v. BP North America Petroleum*,
    738 F. Supp. 1472 (S.D.N.Y. 1990) ...........................................................................................34

*Unique Industries v. Sui & Sons Int'l Trading Corp.*,
    2007 WL 3378256 (S.D.N.Y. Nov. 9, 2007) ..............................................................................67

*United States v. Brawer*, 482 F.2d 117 (2d Cir. 1973) ..........................................................43, 60

*United States v. Gurary*, 860 F.2d 521 (2d Cir.).................................................................43, 60

*United States v, Habersham Properties, Inc.*, 319 F. Supp. 2d 1366 (N.D. Ga. 2003) .................52

*U.S. v. Mulheren*, 938 F.2d 364 (2d Cir. 1991) ..........................................................................47

*United States v. Rivieccio*, 661 F. Supp. 281 (E.D.N.Y. 1987) ....................................................67

*Utesch v. Dittmer*, 947 F.2d 321 (8th Cir. 1991) ........................................................................27

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ...................................................30

*Vitanza v. Bd. of Trade of City of New York*, 2002 WL 424699 (S.D.N.Y. Mar. 18, 2002) .........37

*Volkart Bros., Inc. v. Freeman*, 311 F.2d 52 (5th Cir. 1962)....................................................22, 27

*Wardman-Justice Motors, Inc. v. Petrie*, 39 F.2d 512 (D.C. Cir. 1930).......................................53

## State Cases

*Bradkin v. Leverton*, 26 N.Y. 192 (1970) ...............................................................................66

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382 (1987) ......................................65

*In re Henner*, 30 A.D. 1151 (CEA No. 14,159, Sept. 15, 1971) .....................................39, 59, 62

*In re Kosuga,* 19 A.D. 603 (CEA 1960) ..................................................................................35

*Latham v. Father Divine*, 299 N.Y. 22 (1949)..........................................................................67

*In re McGuigan*, 5 A.D. 249 (CEA No. 37, Apr. 11, 1946) ......................................................41

*Miller v. Schloss*, 218 N.Y. 400 (1916) ..................................................................................66

*People v. Speir*, 77 N.Y. 144 (1879)......................................................................................65

*Reiner v. Reiner*, 100 A.D.2d 872 (2d Dept. 1984) .................................................................66

*Simonds v. Simonds*, 45 N.Y.2d 233 (1978) ........................................................................66, 67

## Federal Rules

Fed. R. Civ. P. 8(a)(2)............................................................................................................30

Fed. R. Civ. P. 8(a) ...................................................................................................31, 49, 50

Fed. R. Civ. P. 9(b) ..................................................................................................29, 30, 50

## Federal Statutes

42 Stat. 1003 ..........................................................................................................................23

15 U.S.C. § 78u-4 ...................................................................................................................42

15 U.S.C. § 77 (b) ...................................................................................................................22

15 U.S.C. §78a(i)(6)................................................................................................................36

7 U.S.C. § 1 *et. seq.*........................................................................................................ *passim*

## Federal Regulations

17 C.F.R. § 242.104 ...................................................................................................38

17 C.F.R. § 4.10(d)(1).................................................................................................69

## Other Authorities

Bogert, *Trusts and Trustees*, (2d ed. rev. 1978)........................................................72

Conference Report to 1974 amendments, 120 Cong. Rec. 34997 (Oct. 10, 1974).......28

Corbin, A.L., Quasi-Contractual Obligations, 21 Yale L.J. 533, 551-52 (1912)..........74

H.R. Rep. No. 565, 97th Cong., 2d Sess.....................................................................29

Jones, Historical Development of the Law of Business Competition, 35 Yale L.J. 905 (1926) ...37

Markham, J.W., *Manipulation of Commodity Futures Prices–The Unprosecutable Crime*, 8 YALE J. REG. 281 (1991) ........................................................................................26

Markham & Meltzer, Secondary Liability Under the Commodity Exchange Act Exchange Act -- Respondeat Superior, Aiding and Abetting, Supervision and Scienter, 27 Emory L. J. 1115, 1118-1134 (1978)...................................................................................................62

P. MacKendrick, *The Roman Mind at Work* 105 (1958). ...........................................24

Russo, *Regulation of Commodities Futures and Options Markets*, § [12.11] (1983) .............28, 36

*Secondary And Supervisory Liability Under The Commodity Exchange Act:  An Update*, 56 Rec. B. Ass'n of City of N.Y. 239 (Spring 2001) ................................................49

Seth Lubove and Elizabeth Stanton, *The Power of Pimco*, Bloomberg Markets, Vol. 17, No. 4, April 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aYxf.yAPdYcc...43

1982 U.S. Code Cong. & Admin. News 3871, 3905-06 ..............................................29

Restatement (First) of Restitution §160 (Constructive Trust) (1937)............................71

Restatement (Second) of Torts, § 909 (c) ...................................................................55

## I.    **PRELIMINARY STATEMENT**

Plaintiffs respectfully submit this consolidated memorandum and the accompanying

Declaration of Vincent Briganti, Esq. ("Brig. Decl.") to demonstrate that Plaintiffs state claims

under the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* ("CEA"):

- that Amaranth,[1] through unprecedented "dominance" and eight unlawful Tactics, manipulated the prices of New York Mercantile Exchange ("NYMEX") natural gas futures contract prices  in violation of Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2).  Argument Points ("Pt.") I-III *infra*;

- that JP Morgan,[2] by intentionally conferring such unprecedented dominance and assisting seven of Amaranth's Tactics, aided and abetted manipulation in violation of Section 13(c) of the CEA, 7 U.S.C. § 13c.  Pt. IVA;

- that the Floor Brokers,[3] by exercising their discretion to execute Amaranth's notoriously manipulative "slam the close" trades, are liable as aiders and abettors of **that part of** Amaranth's manipulation. Pt. IV.B.

Plaintiffs also state a claim for unjust enrichment and constructive trust, and personal jurisdiction

exists over Defendants Hunter and AIL.  Arg. Pt. V-VI; Brig. Decl. *passim.*

Between February 16 and September 28, 2006 ("Class Period"), Amaranth manipulated

NYMEX natural gas futures contract prices through eight manipulation Tactics:

(1)    Amaranth's "unprecedented" and increasingly "dominant" natural gas positions which increased from an "unprecedented" 120,000 contracts at the start of the Class Period to 770,000 contracts during August 2006 (Corrected Consolidated Class Action Complaint ("Complaint" or "¶") ¶¶ 2, 73 and 75));

---

[1]  Amaranth is defined and illustrated in the flow chart attached as Appendix A.  In the alternative or in addition, the Amaranth Principal defendants are liable as the principals of one or more Amaranth Trading Defendants or as aiders and abettors of Amaranth's manipulation under Section 2(a)(1) and 13(c) of the CEA, 7 U.S.C. §§ 2(a)(1)(B) and 13c.  *See* Pts. II-IV *infra.*

[2]  JP Morgan consists of JP Morgan Chase & Co., JP Morgan Chase Bank, N.A. and JP Morgan Futures Inc.

[3]  The Floor Broker Defendants are ALX Energy, Inc. and James DeLucia (collectively the "ALX Defendants"); and TFS Energy Futures, LLC ("TFS").  Defendant Gotham Energy Brokers Inc., is in default.

(2)    Amaranth's self-fulfilling prophecy Tactic of paying increasingly uneconomic, historically unjustified prices for increasing amounts of NYMEX natural gas contracts in order to "prop up" and "push" NYMEX futures prices to increasingly higher amounts of artificiality (¶¶ 2(b), 6(a));

(3)    Amaranth's notoriously manipulative "slamming the close" Tactic which helped Amaranth's effort to artificially push apart NYMEX spreads and generated $128,000,000 in profits that helped finance Amaranth's increasingly expensive and dominant positions (¶¶ 5, 100-146);

(4)    Amaranth's "unprecedented" NYMEX natural gas trading volumes (¶¶ 6(d) 64, 68-69, 98);

(5)    Amaranth's repeated unlawful violations of NYMEX's anti-manipulation position limits which furthered Tactics (1) – (3) above (¶¶ 156-165);

(6)    Amaranth's lies to the NYMEX which covered-up Tactic (3) above and furthered Tactics (1) and (2) above (¶¶149-150, 166-168);

(7)    Amaranth's secret (except to JP Morgan) evasions of NYMEX anti-manipulation directives which furthered Tactics (1) and (2) above (¶¶166-168); and

(8)    Amaranth's other manipulative conduct. *E.g.*, ¶¶ 94-98.

Amaranth's Tactics (1), (4), (5) and (7) above are supported by specific findings by the Staff Report, Excessive Speculation in the Natural Gas Markets, United States Senate Permanent Subcommittee on Investigations ("Senate Report"). ¶¶ 3-4, 179-182. They, along with Tactics (2) and (3) above, were contemporaneously, blatantly and fully known to the JP Morgan Defendants on a real time basis as they were perpetrated..

Amaranth's Tactics (3) and (6) above are supported by specific charges brought against Amaranth by the CFTC and the Federal Energy Regulatory Commission ("FERC"). ¶ 5; *see also CFTC v. Amaranth Advisors, L.L.C., et al.*, ___ F. Supp.2d ___, 2008 WL 2123323 at *10 (S.D.N.Y. May 21, 2008) ("*Amaranth Advisors I*") (Amaranth lied to the NYMEX (*see* Tactic

(6) above) in violation of Section 9(a)(4) of the CEA, 7 U.S.C. § 13(a)(4), and attempted to manipulate NYMEX prices through "slamming the close trades" (*see* Tactic (3) above) in violation of Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(4); *see CFTC v. Amaranth Advisors, L.L.C., et al.,* 2008 U.S.Dist. LEXIS 45638 (S.D.N.Y. June 10, 2008) ("*Amaranth Advisors II*") (denying motion for reconsideration).

Amaranth's Tactic (2) above is not specifically the subject of any particularized government finding. However, Plaintiffs have alleged **in great detail** that the injection of Amaranth's "unprecedented," increasingly "dominant" position into the NYMEX natural gas market caused increasing artificiality in NYMEX prices that, ultimately, peaked at **nine times their historical average** in August-September 2006. ¶¶ 2, 3, 6, 73, 181; *compare*, *e.g.*, ¶ 6(b) (Amaranth distorted the October 2006 - January 2007 price spread to **$4.64 by September 2006**) *with* ¶ 6(g) (the historical average of such NYMEX spread was "less than **$0.47**" before Amaranth entered the markets).

And the removal of Amaranth's dominant position from the NYMEX market, quickly removed the artificiality from NYMEX prices. *E.g.,* ¶ 6c (October-January spread plummeted by 69%); ¶ 174 ("one of the steepest declines ever").

Further, consistent with the self-fulfilling prophecy Tactic of increasing the positions to increase the prices, Plaintiffs allege that Amaranth's increasing dominance "artificially drove up" (¶ 93) NYMEX futures contract spread prices to "unprecedented" (¶¶ 6a-6d) but increasing levels of artificiality:

| | DATE | AMARANTH'S NET LONG POSITION | AMARANTH'S NET SHORT POSITION | TOTAL OPEN | OCT 2006 – JAN 2007 SPREAD[4] |
|---|---|---|---|---|---|

---

[4] This column of prices is from "publicly available prices." *See, In re Initial Public Offering Securities Litig.*, 544 F.Supp.2d 277, 284 (S.D.N.Y. 2008) (on a Rule 12(b)(6) motion

| ¶ 75(a) | December 1, 2005 | 24,255 | 18,689 | 42,914 | 1.310 |
| ¶ 75(b) | January 3, 2006 | 37,149 | 34,990 | 72,139 | 1.455 |
| ¶ 75(c) | February 1, 2006 | 45,451 | 69,998 | 124,449 | 2.070 |
| ¶ 75(d) | March 1, 2006 | 81,470 | 93,995 | 175,425 | 2.825 |
| ¶ 75(e) | April 3, 2006 | 104,615 | 102,698 | 207,313 | 2.805 |
| ¶ 75(f) | May 1, 2006 | 125,122 | 119,967 | 245,189 | 3.620 |
| ¶ 75(g) | June 1, 2006 | 206,893 | 200,586 | 407,479 | 3.000 |
| ¶ 75(h) | July 5, 2006 | 243,824 | 233,073 | 476,897 | 3.760 |
| ¶ 75(i) | August 1, 2006 | 308,640 | 294,400 | 603,040 | 3.625 |
| ¶ 75(j) | September 1, 2006 | 308,253 | 286,202 | 594,455 | 4.685 |

In addition to the specific amounts of the aggregate positions, Plaintiffs plead various facts to provide context and perspective on their relative magnitude.[5]   As described in much greater detail below, Plaintiffs painstakingly allege that Amaranth (1) intentionally (2) caused (3) artificial NYMEX prices. *Compare In re Sumitomo Copper Litig.,* 182 F.R.D. 85 (S.D.N.Y. 1998) (Pollack, J.) ("*Sumitomo I*") (elements of CEA manipulation claim are (1) intentionally, (2) causing (3) an artificial price).

Indeed, price manipulation destroys all three of the legitimizing functions which rescue the commodity futures markets from their former status as illegal gambling.  *See* Arg. Pt. IA *infra*.  Therefore, Congress has been trying for eighty-six years to prevent and redress price manipulation, especially manipulation by "big traders".  *Id*.  The result of that effort is a legislative, regulatory and judicial assault on price manipulation that far exceeds that made under other federal statues (including the federal securities and antitrust laws).  *Id.*

For example, unlike the federal securities laws, the CEA (a) unqualifiedly prohibits manipulation, (b) unqualifiedly creates multiple rights of private actions (including strict

---

to dismiss, the complaint, as well as the materials to which it refers --- here the three government proceedings and the publicly availably prices --- will be considered).  ¶¶ 4, 5, 271.

[5] All but the largest traders consider a position of 200 natural gas contract to be a large position.  ¶ 3.  The CFTC requires traders with a 200 contract position to report to the CFTC.  *Id*.  Amaranth's December 1, 2005 futures equivalent position was more than **200 times,** and its February 1, 2006 position was more than **600 times** as large as this potentially manipulative threshold.  ¶ 75; *see* Matrix at p. 3 *supra*.  By August 1, 2006, Amaranth's aggregate position had grown to more than **3,000** times the potential manipulative threshold.  ¶ 75.

4

vicarious liability claims) in order to deter, prevent and redress price manipulation; and (c) unqualifiedly regards private party lawsuits as "critical" to deterring and redressing manipulation.  *Id*.

Plaintiffs have alleged that Amaranth's big, indeed "dominant", positions destroyed all three of the legitimizing functions of the commodity futures market (*Id.*) and intentionally caused long-term artificiality in NYMEX prices. *Id.*  Thus, denying the Amaranth Defendants' dismissal motion *in toto* not only is justified by Plaintiffs' strong allegations of manipulation but furthers the "critical" federal deterrence purposes that private suits like this one have.

One of the many ways in which the CEA is the opposite of the federal securities law is that Congress, as part of its effort to prevent manipulation by "big traders", expressly authorizes private suits against aiders and abettors of manipulation.  Arg. Pt. IA *infra*.  Unlike the brokers or bankers who have been charged with aiding and abetting in prior CEA manipulations, here JP Morgan acted as the **sole** broker, the **sole** banker, and the **sole** clearing member for the manipulator, Amaranth.  Arg. Pt. IV *infra.*

JP Morgan knew that Amaranth was (1) intentionally (2) engaging in unprecedented amounts of seven notorious manipulation Tactics, and (3) that NYMEX prices were distorting to unprecedented levels in conformity with the expected or logical manipulative impact of such manipulation Tactics.  ¶¶ 9,100,105,150,183,199-295.  *Id.*  Unlike the brokers and bankers who have been held responsible in prior CEA manipulation cases, JP Morgan had unprecedented, full knowledge of Amaranth's positions.  With such unprecedented knowledge of the unprecedented amount of manipulation, JP Morgan intentionally empowered, assisted and prolonged each such Tactic and Amaranth's overall manipulation.  This allowed JP Morgan to continue to receive unprecedented revenues for assisting the manipulator and, moreover, to profit by an additional

$725,000,000-plus from the collapse of what JP Morgan intentionally created, *i.e.,* a greatly overextended manipulation. ¶¶ 173, 217-22.

But Amaranth's tactics were not wholly visible to the NYMEX and the Commodity Futures Trading Commission ("CFTC"). They, unlike JP Morgan, did not know about Amaranth's Intercontinental Exchange ("ICE") natural gas positions and the important aspects of the manipulation arising therefrom. ¶¶ 166-68; 199-202; *see* Arg. Pt. IV *infra*.

## II.    STATEMENT OF FACTS

### A.    Background of Commodity Futures Markets And NYMEX Natural Gas Contracts

The terminology, operation and history of the NYMEX and other commodity exchanges are summarized in *Leist v. Simplot*, 638 F.2d 283, 286-323 (2d Cir. 1980) ("*Leist*"), *aff'd sub nom., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357-67, 382-95 (1982) ("*Curran*").

### B.    NYMEX Natural Gas Contracts

During the Class Period, NYMEX offered futures contracts on natural gas. NYMEX traded seventy-two natural gas contracts, one expiring each month for a period of six years into the future. ¶¶ 42-46, 51-56. Each contract represented 10,000 MMbtu of natural gas. *Id.*

### C.    During the Class Period, Amaranth's Long Term, Increasing Dominance Caused Long Term, Increasing NYMEX Natural Gas Price Artificiality Until The Removal of Amaranth's Dominance Removed  The NYMEX Price Artificiality

#### 1.    Amaranth's Increasing "Dominance" Over The NYMEX Market During The Class Period Through

"Dominance" means the ability to make prices. That is, rather than being a competitive firm that "takes" the competitive market price, a dominant firm "makes" a non-competitive price on its own. *See* Arg. Pt. IA2 *infra*.

The United States Permanent Subcommittee on Investigations found:

> "1. A single hedge fund, Amaranth Advisors LLC, dominated the U.S. natural gas market in 2006.
>
> ****
> "b. Amaranth accumulated such large positions and traded such large volumes of natural gas in 2006, on both NYMEX and ICE, that it had a direct effect on U.S. natural gas prices and increased price volatility in the natural gas market. The larger than usual differences between winter and summer futures prices that prevailed during the spring and summer of 2006 were largely the result of Amaranth's large-scale trades rather than the normal market interaction of many buyers and sellers."

¶ 4, quoting Senate Report at 6.  The long term nature (eight months) and increasing amount of Amaranth's dominance over NYMEX natural gas contracts is unprecedented.  ¶¶ 2, 3, 73, 181, 182; *see* Arg. Pt. IA *infra*.

### a.    Amaranth's Increasing Aggregate Positions

Amaranth's **continually increasing** NYMEX and ICE natural gas futures equivalent positions caused artificial NYMEX prices.  See Matrix at p. 4 *supra*.  One type of price artificiality that Amaranth caused was to widen spreads between the Summer 2006 contracts and the Winter 2006-07 contracts.  ¶ 6.  Before Amaranth entered the market, between 1999 and 2004, the "spread" (¶ 45, defining spread as the difference) between the price of a NYMEX natural gas contract expiring in a summer month and one expiring a few months later in the winter was "a matter of pennies."  Senate Report at 104.  From 1999-2004, the average spread between the October contract and the January contract expiring four months later was $0.47.  ¶ 6(g).  That is, one could on average purchase the October contract, take delivery of the natural gas, and sell such gas four months later for a 47¢ gain (absent costs of storage, insurance, etc.).

7

b.      **Amaranth's Slamming The Close of the March-May NYMEX Contracts, Selling Large Amounts of The March – October 2006 NYMEX Contracts, And Simultaneously Buying Large Amounts of The Winter 2006-2007 Contracts**

In order to widen this spread, Amaranth had to increase winter contract prices relative to summer contract prices. Within the foregoing aggregate positions, Amaranth simultaneously both (a) put selling pressure on the NYMEX March – October 2006 and April 2007 contracts (¶¶ 87-93, 179-80), and (b) put buying pressure on the NYMEX natural gas contracts expiring during Winter 2006-07.[6] As the scores of details in the Complaint specifically allege, Amaranth's purchases artificially increased NYMEX winter 2006-07 prices, Amaranth's sales artificially decreased NYMEX summer 2006 prices, and the result was to further widen NYMEX spreads.

66.     At times during the Class Period, Amaranth controlled 40% of all of the outstanding contracts on NYMEX for October 2006 through March 2007, including as much as 70% of the outstanding contracts to deliver natural gas in November 2006.

67.     On almost every day from February through July 2006, Amaranth held more than 50% of the open interest on NYMEX in the January 2007 and November 2006 NYMEX natural gas futures contracts.

¶¶ 66, 67. By August 4, 2006, Amaranth held positions in January 2007 futures contracts that constituted a volume of natural gas equal to the entire amount of natural gas used by residential

---

[6] Specifically, Amaranth increased its long positions to 75,025 net futures equivalent ("FEQ") long March 2007 contracts by August 8, 2006 (¶ 77(c)), 90,825 net FEQ long January 2007 contracts by August 4, 2006 (¶ 81(c)), and 91,040 net FEQ long November 2006 contracts by August 24, 2006. ¶ 82(c).

And Amaranth increased its short positions to 27,589 net short FEQ by March 29, 2006 in respect of April 2006 (¶ 87); 27,272 net FEQ short by April 5, 2006 in respect of May 2006 (¶ 88); 26,153 contracts net FEQ short by April 28, 2006 in respect of June 2006 (¶ 89); 55,215 net FEQ contracts short by May 19, 2006 in respect of July 2006 (¶ 90); 52,592 FEQ net short by June 16, 2006 in respect of August 2006; and 104,000 net FEQ short by August 29, 2006 in respect of September 2006 (¶ 92).

United States customers nationwide during January, the largest residential consumption month of the year.  ¶ 68.

Amaranth's aggregate positions represented an increasing amount of the open interest in all NYMEX natural gas futures contracts, increasing from, on average, approximately 15% of the open interest of all contracts at the start of the Class Period to almost, on average, 40% of the open interest in all NYMEX natural gas futures contracts by August or September 2006.  ¶¶ 69-70.

**Slamming The Close**.  On February 24, March 29, and April 26, 2006, Amaranth --- through the Floor Broker Defendants --- entered the "slamming the close" trades at the specific times and in the specific ways alleged in the Complaint.  ¶¶ 100-119 (February 24); ¶¶ 121-26 (March 29); ¶¶ 127-46 (April 26).  These manipulative trades depressed summer 2006 NYMEX prices and, thereby, furthered Amaranth's artificial widening of summer 2006 – winter 2006-2007 spread prices.  ¶¶ 100-146, 179-180; *see Amaranth Advisors* I, 2008 WL 2123323 at *8-9.

Also, in aggregate, these notoriously manipulative "slamming the close trades" generated $128,000,000 in profits.  ¶¶ 119, 125, 145.  These and other quick dominant trading profits helped finance Amaranth's growing, dominant open positions.

### c.  Amaranth's Unprecedented Trading Volumes

Conjoined with its unprecedented open positions, Amaranth conducted an unprecedented volume of trades:

> During the Class Period, Amaranth bought and sold thousands of natural gas contracts on a daily basis, tens of thousands of contracts on certain days, and accumulated hundreds of thousands of natural gas holdings, or "positions," on both NYMEX and ICE.

¶ 64.  During the Class Period, Amaranth's trading represented almost 70% of the total NYMEX trading volume in a given contract on many dates.  ¶ 69.  Amaranth used this high volume of

trades to make specific manipulative trades at various times in order to artificially impact specific prices and generate the profits necessary to finance its growing position.  ¶¶ 94-150.

> **2.    Amaranth's Increasing Dominance Caused NYMEX Prices To Be Artificial In Multiple Ways, Including By Artificially Inflating Summer-Winter Spreads To Nine Times Their Historical Average**

Amaranth's increasing dominance caused NYMEX prices to be increasingly artificial in multiple ways, including by increasingly inflating the spread between NYMEX summer 2006 and NYMEX winter 2006-2007 contract prices.  *See supra*.  Such increasingly artificial NYMEX spreads peaked, ultimately, at approximately **nine times the historical average** for such spreads. *Compare*, *e.g.*, ¶ 6(b) (Amaranth distorted the October 2006 - January 2007 price spread to **$4.64 by September 2006**) *with* ¶ 6(g) (the historical average of such NYMEX spread was "less than **$0.47**" before Amaranth entered the markets).

> **3.    The Removal of Amaranth's Dominant Positions Removed The Artificiality That Amaranth Had Been Causing As The Inflated Spread Prices Plummeted By 70%**

But when Amaranth's manipulative position was removed from the market, the artificial NYMEX spread prices quickly **plummeted** by approximately **70%** back down to (or almost to) normal levels.  *Compare* ¶ 6(c) (October-January spread fell by 69% and other spreads fell by more than 70%) *with* ¶ 6(c), 7, ¶¶ 181-82 *and Sumitomo I.,* 182 F.R.D.at 87 (price change during the removal of the artificial position indicates the fact and the extent of the price artificiality caused by such position).  ¶¶ 73, 75, 181.

The artificially wide spreads that Amaranth had (until September) caused, were, according to experts, "ridiculous" and "out of whack" compared with the contemporaneous "fundamentals of supply and demand." ¶¶ 6(f), 179-83 (making particularized allegations about high supplies and other aspects of the fundamentals).

10

But the removal of Amaranth's manipulative dominant position reverted the NYMEX spreads back to levels justified by supply and demand.  *Id.*  That is, Amaranth's unlawful conduct and "unprecedented" positions (¶ 182) had overwhelmed the market fundamentals of supply and demand (¶¶ 6(d), 181, 201) and repealed historical pricing norms.  ¶¶ 6(a)-(g).

Futures contract spread prices that are out of line compared to history and/or the contemporaneous supply and demand, are the classic badge of artificial futures contract prices. *See* Arg. Pt. I *infra*.

The natural market equilibrium responses to the price artificiality that Amaranth had created was to sell the inflated NYMEX spread, sell the inflated NYMEX winter month price, and/or buy the deflated NYMEX summer price.  Senate Report at 77, 111-114.  In order to "prop" prices up artificially as the market tried to return to normal, Amaranth increased its volume of trading and positions.  ¶¶ 4(a), 6(b), 75.  This arrested and reversed declines in artificiality and, after each equilibrium response had been absorbed, "pushed" NYMEX prices to even greater levels of artificiality.  *Id*.

### D.    Amaranth's Other Blatant Manipulation Tactics Furthered Amaranth's Dominance And Self-Fulfilling Prophecy Manipulation

#### 1.    Amaranth's Rule Violations At The Start of The Class Period

Although it is not necessary to violate position limits in order to manipulate prices, at least as early as February 2006, portions of Amaranth's extraordinarily large natural gas contract positions began to violate NYMEX position reporting rules.  ¶¶ 153-157; *see infra* recounting other violations.

#### 2.    Rather Than Decreasing Their "Unprecedented" Positions, Amaranth Greatly Increased Them

Amaranth did not decrease its extraordinarily large positions in order to avoid such violations.  ¶ 75; *see* Matrix at p. 4.  In fact, unlike almost all traders, Amaranth did not substantially reduce let alone flatten its aggregate natural gas positions from time to time.

> . . . Amaranth --- per the trading decisions of Nicholas Maounis, Brian Hunter, Matthew Donohue and other Amaranth agents and control persons --- held and steadily added to massive natural gas contract positions on NYMEX and ICE.

¶ 73.  After February 16, 2006, Amaranth continued eerily to expand its already "unprecedented" aggregate positions (Matrix *supra*) and repeatedly violated NYMEX position rules after February 2006.  ¶¶ 156-165.

### 3.    Amaranth's Lies To The NYMEX, And Amaranth's  Evasions Of The NYMEX Anti-Manipulation Directives Also Furthered Amaranth's Manipulation

During and after its "slamming the close" trades, Amaranth continued to violate NYMEX position limits (¶¶ 156-165), and made false statements to NYMEX investigators about such "slamming the close" trades.  ¶ 149.  In the latter regard, after receiving notice that NYMEX was investigating Amaranth's trading activity (¶¶ 147-48), Amaranth provided NYMEX with a misleading response.  *Amaranth Advisors I*, 2008 WL 2123323 at *11-12.

After the "slamming the close trades," Amaranth's positions continued to grow.  They became so large that NYMEX issued an anti-manipulation directive in August and early September that Amaranth should reduce its positions.  ¶¶ 149-50, 163-65.  In response, Amaranth did reduce its NYMEX positions.  ¶¶ 166.  But it simultaneously replaced them on the unregulated ICE unbeknownst to the CFTC and NYMEX (but well known to JP Morgan) which provide invaluable assistance and increased credit to finance this manipulation we move.¶¶ 166, 168, 202-03.

### 4.    How Defendant Maounis Acquired $48 Billion Worth of Natural Gas Contracts

Defendant Nicholas Maounis founded and named the Amaranth entities, including the three so-called "feeder" funds: (Defendants) Amaranth International Limited, Amaranth Capital Partners LLC, and Amaranth Partners LLC.  ¶¶ 23, 26-27, 29.

In legal form, it was these "feeder" funds, but in substance it was Mr. Maounis, that raised monies and convinced the investors to commit to Mr. Maounis' plan.  ¶¶ 23, 26-27, 29, 250.  Brig. Decl. ¶¶ 14-16.  Indeed, to this day, Mr. Maounis remains the investor contact for the feeder funds.  *Id.* Ex. 12.

Consistent with the types of shell company set-ups that have plagued the history of commodity futures markets, these so-called "feeder" funds did not themselves hold the manipulative positions.  Rather, Defendant Maounis directed them *via* his control and ownership of the advisor entities that manage the feeder funds to invest all the monies they raised in another entity created by Mr. Maounis:  Defendant Amaranth LLC. ¶¶ 23, 22-29; Brig. Decl. ¶¶ 14-16. These feeder companies did, at Mr. Maounis' direction and control, transfer their monies to Amaranth LLC.  ¶¶ 23, 25, 26-27, 29; Brig. Decl. ¶ 17 and Ex. 7.  (As of April 30, 2006, Amaranth LLC had capital of $8.7 billion, of which $7.13 billion or 82%, was comprised of capital from AIL).

Amaranth LLC used this capital but also greatly leveraged it with buying power and borrowing from JP Morgan.  Presto-digito, Amaranth LLC acquired the $10-48 billion natural gas contract position that manipulated NYMEX natural gas prices during the Class Period.  ¶¶ 209, 214-17, 219, 222; Brig. Decl. ¶ 16.

Consistent with the shell company approach, another company that Defendant Maounis created and controlled, Defendant Amaranth Advisors LLC, was appointed by Amaranth LLC as

its agent to nominally[7] control the investment decisions of Defendant Amaranth LLC.  ¶¶ 22-23, 63.  Brig. Decl. ¶ 15.  It was Defendant Maounis, again, who was the chief executive officer and managing member of Amaranth Advisors LLC.  *Id.*  Also, Defendant Maounis owned 100% of the company (Amaranth Group Inc.) that served as general partner of the Amaranth Management Limited Partnership, which owned 78% of Defendant Amaranth Advisors LLC.  ¶¶ 24-25; *see* Appendix A Flow Chart of Companies; Brig. Decl. ¶ 15(b),(c),(e).

Defendant Maounis also hired Defendants Brian Hunter and Matthew Donohoe to work for the aforesaid (Maounis' 100% owned) Amaranth Group Inc.  Brig. Decl. n. 6 (Defendant Maounis on behalf of Amaranth Advisors and Amaranth International had sole authority to appoint traders and portfolio managers for the feeder funds).  Moreover, Mr. Maounis appointed Hunter and Donohoe to enter trades for Amaranth Advisors on behalf of Amaranth LLC.  ¶¶ 29-31.[8]  *Id.*

Defendants Hunter, Donohoe,[9] and Maounis made the decisions to purchase and sell natural gas contracts for Amaranth.  ¶ 73.  They did so for the other Amaranth defendants except that Mr. Maounis, even if the formalities are credited, was also a principal and control person at each and every level.  Each advisor company had Mr. Maounis' face on it and possessed Mr. Maounis' knowledge.  *See e.g.,* Brig. Decl. ¶¶ 15, n. 1-2, 20-23.

---

[7] Amaranth LLC continued to exercise full control over all trading matters during the Class Period including directing the termination of Brian Hunter's trading authority as of September 20, 2006.  See September 19, 2006 Agreement between Amaranth LLC and JP Morgan Chase Bank, N.A., at paragraph 10.

[8] Amaranth Advisors and Defendant Hunter created Defendant Amaranth Advisors (Calgary) ULC which acted as co-agent of each to purchase and sell natural gas contracts for the Amaranth LLC account.  ¶ 28.

[9] Donohoe was the "execution" trader who effected Hunter's manipulative trading strategies, which were devised under Maounis' supervision.  ¶¶ 31, 102, 106, 113, 116, 252.

The flow chart of Amaranth companies gives rise to multiple characterizations of what is occurring.  One characterization, which credits the legal form, is that --- in ordering, approving, expanding and maintaining --- the manipulative positions, Defendants Maounis, Hunter and Donohoe acted (1) as agents for Amaranth LLC, Maounis, Amaranth Advisors LLC, and Amaranth Group Inc., **AND** (2) as the *de facto* agents or sub-agents for all the other Amaranth Defendants and the Amaranth association in fact.  ¶ 29.

Another, more real world characterization is that all of the Amaranth entities were operating together "in combination or concert" in order to accomplish the overall function of achieving an investment return for a commodity pool or fund.  See, *e.g.,* Brig. Decl. ¶ 23(c) and Exs. 4, 5.  In order to provide any service to investors, the Amaranth companies had, at least, to work together in three vertical chains.  The only changing link of each chain was the name of the Amaranth feeder fund in each chain.  In fact, because of expense sharing and the other common links, the three Amaranth chains operated and may be regarded as one association in fact.  ¶¶ 29, 32;  Brig. Decl. ¶¶ 14-16 and Ex. 3 at p. 4 (stating that the feeder funds aggregate their investments through the Master Fund so as to concentrate credit status and negotiating leverage, while also achieving economies of scales.

       **E.**      **With Unprecedented Knowledge, JP Morgan Provided Unprecedented Assistance To The Manipulation And Reaped An Unprecedented Payoff**

Clearing brokers and members of the exchange have a duty to prevent manipulation. NYMEX Rule 8.52 ("No Member, Member Firm or any employee of the foregoing, **shall engage in any practice which results** in the manipulation of prices …").  [emphasis supplied]. Again, a trader has to trade through members of the exchange clearing house.  ¶¶ 184-93.  The members of the exchange clearing house are the true parties to the futures contracts or guarantee the performance of such contracts.  ¶ 185.

15

Here, Amaranth used JP Morgan as its **sole** broker, **sole** clearing firm and **sole** banker. ¶¶ 9(b), 194-217.  Thus, JP Morgan had actual, perfect knowledge of and actively assisted in Amaranth's manipulative Tactics (1) – (5) and (7) – (8) at p. 1-2 *supra*. ¶¶ 209-217.  JP Morgan, through JP Morgan Futures, Inc. ("JPMFI"), accepted Amaranth's orders for the purchase and sale of natural gas futures and options contracts, among other things. ¶¶ 195, 199-200.  As Amaranth's only clearing broker, JPMFI processed and settled Amaranth's trades through the NYMEX Clearing House. ¶ 196.  JPMFI was the NYMEX's counterparty for all positions it cleared in its customer account with NYMEX, including the positions held by Amaranth. *Id*. Thus, JPMFI accepted orders from Amaranth for the purchase and sale of natural gas futures on the NYMEX, and it posted margin on Amaranth's behalf in connection with the clearing of those and other transactions. ¶¶ 195, 217.  Amaranth paid substantial fees to JPMFI and deposited cash and securities with JPMFI to meet margin requirements which routinely exceeded $1 billion. ¶¶ 219-220.[10]

JPMFI also "marked to market" Amaranth's positions daily utilizing SPAN, and re-calculated Amaranth's variation each day in order to require Amaranth to deposit additional funds or collateral with JPMFI, if necessary. ¶ 197.  To perform these tasks, JPMFI analyzed and took into account each day's change in Amaranth's positions. *Id*.  In addition, the JPM Defendants had risk management procedures in place at all relevant times that provided another means by which they would be fully aware of Amaranth's positions in the market. ¶¶ 202, 264

---

[10]A clearing broker may require more margin than the NYMEX minimum, but not less. A customer's margin requirements will fluctuate daily depending on the settlement prices of the contracts traded by its customers.  It is the job of a clearing member to know both the creditworthiness of its customers and the risks of the various transactions that are open. ¶ 193. The Senate Report at pages 31-32 and the Complaint at ¶¶ 184-193 provide further background concerning the futures clearing process.

JPMFI alone had full access to *all* of Amaranth's natural gas trading positions. ¶¶ 194, 196-97, 199-200. Indeed, JP Morgan knew more about the positions than Amaranth and created a daily report that was made available to Amaranth that showed all of Amaranth's NYMEX and ICE positions and the balances thereof. ¶ 202.[11] Because of the foregoing, JPMFI was fully aware of the composition of Amaranth's natural gas positions beginning in 2005 through the final transfer of Amaranth's remaining natural gas positions to Defendant JP Morgan Chase Bank, Inc. ("JPMCB") on September 19, 2006. ¶¶ 194-202.

JP Morgan also knew that the Amaranth Defendants routinely violated NYMEX natural gas accountability levels and position limits.

- February 24, 2006: Amaranth held a long position of more than 3,000 March 2006 contracts expiring that same day. ¶ 108.

- March 29, 2006: Amaranth held a long position of 1,603 April 2006 contracts expiring that same day. ¶ 123.

- April 26, 2006: Amaranth held a long position in excess of 3,000 May 2006 contracts expiring that same day. ¶ 129.

- May 19, 2006: NYMEX informs JPMFI that JPMFI needed to have Amaranth comply with NYMEX position limits in the expiring June 2006 contract. ¶¶ 160, 205.

- August 23, 2006: JPM receives request for Amaranth position information from CFTC and NYMEX. ¶ 207.

JP Morgan's foregoing knowledge and awareness came not only from the JPM Defendants' intimate knowledge of all of Amaranth's trading positions, but also from direct contact with NYMEX authorities, the primary regulators of all conduct involving the NYMEX,

---

[11] Contrary to JP Morgan's protests, JP Morgan also knew the relative size of such positions as well as the absolute size. As a market professional, JP Morgan well-knew the CEA requires regulated markets such as NYMEX to publish daily information about settlement prices, volume, open interest, and opening and closing ranges for all actively traded contracts. 7 U.S.C. § 7(d)(8). Further, the Senate Report points out that "[b]asic daily trading data, including . . . open interest, is available for free on NYMEX's website." Senate Report at 34 and n. 37.

and CFTC authorities, the principal enforcers of the CEA and overseers of the U.S. commodity futures markets. ¶205. The JPM Defendants were also specifically informed by NYMEX that Amaranth was violating position limits and that NYMEX and the CFTC were investigating Amaranth's natural gas trading positions.[12] JP Morgan knew that Amaranth was repeatedly violating NYMEX trading standards and position limits during the Class Period consistent with manipulation of the prices of natural gas contracts through large positions. (¶¶ 203-25) and that NYMEX was investigating manipulation by Amaranth from July 2006 forward.

Similarly, the JPM Defendants were also aware that Amaranth exceeded its natural gas credit limits on ICE. ¶ 216. And JP Morgan had unique knowledge of the *modus operandi* of **each** Amaranth "slamming the close" trade, of **all** three such trades, and of the **overall pattern** they created. First, each time (in the March, April or May NYMEX 2006 natural gas futures contract), Amaranth amassed a large long NYMEX natural gas futures position. Second, each time, Amaranth uneconomically sold the whole wad of its long position during the compressed time frame of the last 30 minutes of trading (the "closing range") on the last day of trading such contracts ("expiration day"). ¶ 101. Third, Amaranth's sale of a large volume of futures contracts on the NYMEX trading floor during a compressed time frame had the intended effect of creating an artificially low settlement price for these contracts. ¶¶ 100-149. Fourth, each time, this benefited the Amaranth Defendants' substantially larger short positions held, through JP Morgan, on ICE and elsewhere. ¶ 103.

Outside of Amaranth, only the JPM Defendants were aware of all of the foregoing. ¶ 200. While knowing the full scope of Amaranth's positions and seven of Amaranth's eight

---

[12]Because NYMEX has no jurisdiction over non-member customers such as Amaranth, enforcement of position limit violations by NYMEX is directed at the non-member customer's clearing broker. NYMEX rule 9.36 allows NYMEX to fine clearing brokers for position limit violations. NYMEX cannot fine non-member customers such as Amaranth.

manipulation Tactics, the JPM Defendants continued to finance Amaranth's manipulation and

provided the other highly unusual assistance summarized in Arg. Pt. IVA.  ¶ 150.

   D. **The Floor Broker Defendants Aided And Abetted The
"Slamming The Close" Portion of Amaranth's Manipulation**

  The Floor Brokers accepted discretion from Amaranth (¶ 259) to execute, and executed,

the notoriously manipulative "slamming the close" trades.  ¶¶ 100-146.  Like JP Morgan, the

Floor Brokers had a duty to investigate the trades and prevent manipulation. ¶ 158; *In re Three

Eight Corp*., 1993 WL 212489 (CFTC 1993).

  Rather than honoring their duties, the Floor Brokers knowingly exercised their discretion

to manipulate NYMEX natural gas futures contract prices on each of the three "slamming the

close" trades.  ¶¶ 112-14; 123; 138-40, 142-44.  Presently, the Floor Brokers are alleged to be

liable as aiders and abettors only for those damages caused by the "slamming the close" aspect of

Amaranth's manipulation.  ¶ 258.

## ARGUMENT

**I. PLAINTIFFS PLEAD STRONG CLAIMS OF MANIPULATION AGAINST
AMARANTH**

   A. **Contrary To Amaranth's "Large Trades" Arguments, Congress Has
Been Trying To Prevent Manipulation Of Commodity Futures Prices By
"Big Traders" For Eighty-Six Years**

  Repeatedly relying on federal securities law substantive or pleading standards, Amaranth

Advisors and Amaranth Advisors (Calgary) (collectively "Advisors") base all of their arguments

on the core premise that intentionally acquiring large positions in order to cause price

artificiality, by itself and without more, supposedly can never constitute CEA manipulation.

Advisors Br. at 16-23.  For example, the Advisors catalogue a list of what they call "deceptive

trading practices."  *Id*. at 21.  Their catalogue does not include "large trades," positions of less

than 62% of the open interest in one contract, and "slamming the close" of settlement prices. *Id.* "Large trades" is supposedly all that Plaintiffs allege here. *Id.* at 23.

But there is a hole in the donut of the Advisors' argument. They fail to cite **any** CEA manipulation case holding or reasoning --- much less granting a Rule 12(b)(6) motion because --- large trading intended to cause artificial futures prices can **never** constitute manipulation (or can never do so unless the position is more than 62% of the open interest). Advisors Br., *passim*.

### 1. CEA Manipulation Cases Hold That Large Trading, Alone, Can Manipulate Prices

Further, there is a donut smashing machine in that numerous CEA manipulation cases have expressly **rejected** the argument that large trading intended to cause artificial prices, does not constitute manipulation. *E.g., Amaranth Advisors I,* 2008 WL 2123323 at *7; *Amaranth Advisors II,* 2008 U.S.Dist. LEXIS 45638; *CFTC v. Enron Corp.*, 2004 WL 594752 at *5 (S.D. Tex. 2004) (making large trades in order to manipulate prices, constitutes one form of manipulation).

### 2. Plaintiffs Allege Far More Than Mere Large Trades

#### a. Plaintiffs' Allegations of Dominance, By Themselves, State A Strong Claim For CEA Manipulation

Next, there is a sweeping machine that removes all the crumbs from the erstwhile donut of the Advisors' argument: Amaranth allegedly engaged in far more than merely "large trades" or "legitimate trades." *See* pp. 1-12 *supra*. First, Amaranth intentionally and actively acquired and maintained price-making "dominance" over the entire NYMEX natural gas market. *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1171 (8th Cir. 1971) ("Cargill did not sell at the market price but

set the market price by reason of its dominant long position in the closing 7 minutes".) [13] Amaranth uneconomically had to pay increasing amounts of price artificiality for increasing amounts of natural gas contracts in order to maintain its dominance and artificial prices.  See pp. pp. 2-8, *supra*; ¶¶ 6a, 78-80.

This blatantly obvious manipulation Tactic is accompanied by pleading Amaranth's increasingly dominant positions, the increasing NYMEX natural gas price artificiality, the removal of the dominance, and the removal of the artificiality.  *Id*.

Intentionally maintaining dominance over and causing artificial prices (by as much as 100%) in an entire market for eight months constitutes extraordinary CEA manipulation. *Compare Cargill*, 452 F.2d at 1171 *with* sub-Points 9 and 10 and B-D *infra* (explaining the elements of CEA manipulation and that Plaintiffs plead same).

> **b.  Plaintiffs Also Allege Many More Blatant Manipulative Tactics**

In addition, with or without the dominance, Plaintiffs separately state a claim for CEA manipulation through Amaranth's self-fulfilling prophecy manipulation, its notorious "slamming the close" manipulative acts which financed and furthered its overall manipulation, its lies, its position limit violations, and its other unlawful acts.  *Id*. Through these Tactics, as well, Amaranth (1) intentionally (2) caused (3) artificial NYMEX prices.  *Sumitomo I supra.*

---

[13] The cases relied upon by Defendants are very different.  They involve an alleged manipulator who passively inherited, near the expiration of all trading in the futures contract when the open interest had declined to almost zero, a dominant position in the futures contract. In these cases, the alleged manipulator happened to be holding the last open contracts.  *Compare, In re Cox*, 1987 WL 106879 (CFTC July 15, 1987)*; Frey v. CFTC*, 931 F.2d 1171 (7th Cir. 1991)*; In re Indiana Farm Bureau Coop. Ass'n*, 1982 WL 30249 (CFTC Dec. 17, 1982).

In contrast, Amaranth, through JP Morgan, actively acquired its unprecedented positions and increasing dominance for ten months (rather than a few days).  ¶ 75.

3.    **The Commodity Futures Market Have Very Different Purposes
And Background Than The Securities Markets**

Most important, there is a deodorizer that removes any lingering trace of Amaranth's

"large trades" argument, and creates the proper atmosphere for the consideration of the

remainder of the Defendants' arguments.  That is, the history of commodity futures markets, the

CEA's anti-manipulation efforts, and the elements of a CEA manipulation claim.

"Trading for the difference" between the buy and sell prices of commodity futures

contracts, without making actual delivery, was long considered to be unlawful gambling or an

unenforceable aleatory contract under multiple States' common law.  *See Volkart Bros., Inc. v.

Freeman*, 311 F.2d 52, 56 (5th Cir. 1962) ("a commodity exchange which did not require a short

to deliver at maturity would be a gambling institution") (quoting amicus brief of N.Y. Cotton

Exchange).  However, it was ultimately determined that commodity futures trading can have

socially beneficial effects which rescue them from the status of unlawful gambling.

Specifically, the legitimizing functions of the futures markets are "the stabilization of

commodity prices, the provision of reliable pricing information, and the insurance against loss

from price fluctuation." *Cargill*, 452 F.2d at 1173.[14]  The futures market's foregoing price

discovery, risk transfer and price stability functions "can be fulfilled **only** if both longs and

shorts can be assured that they can [transact]…at **non-manipulated** prices." *Id.*[15]  [emphasis

---

[14]In stark contrast, the purposes and historical function of the securities markets have
been to facilitate the raising of capital --- hundreds of billions of dollars of equity and debt
capital raised each year.  *See* Section 2(b) of the Securities Act of 1933, 15 U.S.C. § 77b(b) (SEC
required in rulemaking to consider "public interest," including promotion of "capital
formation").

[15] In contrast, price manipulation in the securities markets---such as price stabilization or
price maintenance --- sometimes helps such securities markets perform their unique function to
raise capital.  *Strobl v. New York Mercantile Exchange*, 768 F.2d 22, 28 (2d Cir. 1985) ("a little
manipulation" is permitted under the federal securities laws but all manipulation is prohibited

supplied]. But the "futures market lends itself to such manipulation much more readily than a cash market." *Board of Trade v. Olsen*, 262 U.S. 1, 39 (1923).

Because price manipulation destroys the legitimizing functions of futures markets and such markets are vulnerable to such manipulation, Congress' *raison d'être* for the CEA has been to prevent, and provide ample avenues of redress for, manipulation of commodity futures contract prices by "big traders". *Leist v. Simplot*, 638 F.2d at 304-306 fn. 24; *see* CEA Section 3, 7 U.S.C. § 5 (core purpose of the CEA is "to deter and prevent price manipulation or any other disruptions to market integrity").

### 4. Amaranth's Trading Destroyed The Socially-Beneficial Functions of The Commodity Futures Markets

In this case, the United States Senate Permanent Subcommittee on Investigations explicitly found that, consistent with the evils of manipulation, Amaranth's "dominant" positions and trades impaired each of three above-quoted legitimizing functions of futures markets: "Amaranth's actions in causing significant price movements in the natural gas market demonstrate that excessive speculation distorts prices, increases volatility, and increases costs and risks. . . ." ¶ 175 quoting Senate Report, Finding # (3).

### 5. Since 1922, Congress Has Been Trying To Prevent Manipulation By Big Traders

In 1922, Congress, in order to end manipulation by "big traders" of the prices of grain futures contracts, enacted the original federal legislation regulating the futures markets. The Grain Futures Act, 42 Stat. 1003 (Sept. 21, 1922); *Leist,* 638 F.2d, at 304-306 fn. 24. Preventing

---

under the CEA); *see* Section 9(a)(6) of Securities Exchange Act,15 U.S.C. §78a(i)(6); *Billing v. Credit Suisse*; 426 F.3d 130, 139 (2d Cir. 2006), *rev'd on other grounds sub nom. Credit Suisse Sec. (USA) v. Billing*, __ U.S. ___, 127 S.Ct. 2383 (2007).

big purchases of a community's necessities by one individual had been an aspect of many European cultures or laws.[16]

> ### 6. In The CEA, Unlike In Other Laws, Congress Unqualifiedly Prohibits Manipulation And Unqualifiedly Depends On Private Suits To Provide "Critical" Deterrence Against Manipulation

In 1936, in order to improve the prevention of commodity price manipulation by "big traders," Congress amended and expanded the Grain Futures Act by enacting the CEA. *Leist, supra,* 638 F.2d at 304-305 and fn. 24. Part of the 1936 amendments, Section 9(a)(2) of the CEA, **unqualifiedly** prohibited and made it a felony to "manipulate"[17] (as well as to "corner" or to make "false reports"). *See* Statutory Appendix.

This helped satisfy the demonstrated "need for some limiting power over the speculative trading of **large operators** who *by force of their own trading* have been able to take advantage of technical conditions in the market to the disadvantage of hedgers and others using those markets." Sen. Rep. No. 1431, at 3 (1935) (emphasis supplied).

---

[16] Buying up large portions of a commodity in early European culture was punishable by banishment or death, and a manipulator (forestaller or engrosser) "should be baited out of the town where he dwelt by dogs, and whipped forth with whips." Jones, *Historical Development of the Law of Business Competition*, 35 Yale L.J. 905, 907-909 (1926). Earlier, Apollonius warned Roman grain merchants who were withholding grain from a market that, "If you do not stop, I will not let you exist upon [earth]." P. MacKendrick, *The Roman Mind at Work* 105 (1958).

In contrast, historically, buying all the stock or large amounts of shares of stock of a venture provided the capital that permitted new business projects and other progress. Also, it allowed the owner of a business to retire or otherwise served the public good.

[17] Unlike Congress' blanket prohibition of price manipulation in the commodity futures markets, Congress permits or expressly empowers the Securities and Exchange Commission ("SEC") to permit some price manipulation and exempt additional transactions from the prohibitions of manipulation. *Compare Friedman v. Salomon/Smith Barney, Inc.*, 313 F.3d 796, 802 (2d Cir. 2002) (the Exchange Act "allows price stabilization practices that the SEC does not prohibit") *and* 17 C.F.R. § 242.104 (establishing guidelines for stabilization).

In other words, Section 9(a)(2) and the CEA were amended in 1936 to ensure that intentionally causing artificial prices by making large trades, constitutes manipulation in violation of the CEA.

> **7.    In Order To Deter And Redress Commodity Futures Price Manipulation, The CEA Provides Many "Practical" Avenues of Redress, Including Strict Vicarious Liability**

In 1974, Congress amended the CEA in order to improve the prevention of manipulation by big traders and "to protect any individual who desires to participate in futures market trading." *Leist*, 638 F.2d at 306-307, *citing* Cong. Rec.-Senate 30466 (1974) (remarks of Sen. Dole).

In 1982, Congress again amended the CEA to improve the prevention of price manipulation, this time by creating an express private right of action for manipulation.  CEA § 22(a), 7 U.S.C. § 25(a); *Cange v. Stotler & Co.,* 826 F.2d 581, 594-595 (7th Cir. Ill. 1987) ("Congress viewed private lawsuits as "**critical** to protecting the public and fundamental to maintaining the credibility of the futures market"). [emphasis supplied.]

Also in 1982, Congress created an express private right of action for aiding and abetting price manipulation in violation of the CEA.  7 U.S.C. § 25(a).[18]  A related part of Congress' effort to prevent and redress futures market price manipulation arose from such market's checkered history of shady operators.  In order to deter registrants, principals, and others from failing to prevent manipulation, Congress imposed strict vicarious liability on the principal for

---

[18] *Compare,* CEA § 22(a), 7 U.S.C. § 25(a) *with Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994) (reasoning, in part, that private claims for aiding and abetting **are not available under the federal securities laws** because Congress expressly authorized such claims in the CEA but did not expressly authorize them in the federal securities laws).

violations of the CEA by the agent.  Section 2(a)(1) of the CEA, 7 U.S.C. § 4.[19]

> **8.    In Order To Deter And Redress Commodity Futures Price Manipulation, It Has Consistently Been Held To Be Improper To Catalogue Or Define CEA Manipulation In An Exclusive Fashion**

Consistent with Congress' overarching concern to prevent so-called "market power" manipulations by big traders, every court to consider the elements of a CEA manipulation claim has omitted deception as well as reliance upon deception from such elements.[20]  *See* fn. 22 *infra*.

However, while manipulation by big traders has been Congress' primary concern, the methods of manipulation are "limited only by the ingenuity" of men and women. *Cargill*, *Inc. v. Hardin*, 452 F.2d at 1163; Jerry W. Markham, *Manipulation of Commodity Futures Prices–The Unprosecutable Crime* ("*Markham*"), 8 Yale J. Reg. 281, 461 n. 526 (1991) (quoting a CFTC memorandum rejecting efforts to catalog manipulative practices because this would merely enable "crafty" traders to then "evade prohibitions").

Accordingly, "in enacting the CEA, Congress did not define manipulation by statute; similarly, the [CFTC] and its many predecessor agencies which have had the authority to

---

[19] *Compare*, *Rosenthal & Co., v. CFTC*, 802 F.2d 963, 966-967, 969 (7th Cir. 1986) (Posner, J.) (such sections "impose[s] strict liability, under a theory of respondeat superior, for acts within" the scope of the agency "by agents who are not necessarily employees"); (**"[T]here is no counterpart in the securities laws to section 2(a)(1) of the Commodity Exchange Act, that is, no provision creating liability on the basis of respondeat superior).** [emphasis supplied.]

[20] Unlike the CEA manipulation claim, the elements of a securities manipulation claim first "go through the door" of requiring (1) deception and (2) reliance upon deception.  Thus, in *ATSI Communications v. Shaar Fund Ltd.,* 493 F.3d 87, 101 (2nd Cir. 2007) the elements of securities manipulation were stated as follows: "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Compare*, *Miles v. Merrill Lynch & Co., Inc.*, 471 F.3d 24, 43 (2d Cir. 2006) (knowledge of manipulative practice could negate the necessary elements of reliance).

promulgate regulations under the CEA, have refrained from defining in an exclusive or other limiting fashion what constitutes manipulation." *Sumitomo I*, *supra*, 182 F.R.D. at 90.

Following this Congressional and regulatory methodology of preventing manipulation, every Circuit court that has considered the issue has likewise avoided **cataloguing** what is or is not a sufficient means of manipulation.[21] *E.g.*, *Frey*, 931 F.2d at 1175 (manipulation "is an intentional exaction of a price determined by forces other than supply and demand"; the **"know it when you see it" test** may be the "most useful" test and any other criteria may be employed only while recognizing their "limitations") [emphasis supplied]; *Utesch v. Dittmer*, 947 F.2d 321 (8th Cir. 1991) ("*Utesch*"), *cert. denied*, 503 U.S. 1006, 112 S. Ct. 1764 (1992) ("**no fixed standards or tests** is to apply in determining whether there has been 'manipulation'") [emphasis supplied].[22]

Thus, precisely the opposite of the "term of art" into which securities law "manipulation" has calcified (*see* fn. 21-22 *supra*), CEA manipulation is "practical," "*ad hoc*" and "case-specific." *In re Soybeans Future Litig.*, 892 F.Supp. 1025, 1044 (N.D. Il. 1995). This required

---

[21]In stark contrast, in the federal securities laws, Congress, the SEC and the Courts have construed "manipulation" in such a formalistic manner that it is virtually a "term of art." *See Santa Fe Indus. v. Green*, 430 U.S. 462, 476-77, 97 S.Ct. 1292 (1977).

[22] **Seventh Circuit**. *See Frey, supra*; *General Foods Corp. v. Brannan*, 170 F.2d 220, 231 (7th Cir. 1948) ("the creation of an artificial price by planned action, whether by one man or a group of men").

**Eighth Circuit**. *See Utesch, supra*; *Cargill*, 452 F.2d at 1163 ("test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished . . . . The aim [is] to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand").

**Fifth Circuit**. *Volkart Bros.,* 311 F.2d at 58 ("'**any and every operation or transaction or practice . . . calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets**. . . .'" ) (emphasis supplied).

**Second Circuit**. *See In re Sumitomo Copper Litig.*, 995 F.Supp. 451, 458 (S.D.N.Y. 1998); *Strobl v. New York Mercantile Exchange*, 582 F. Supp. 770 (S.D.N.Y. 1984). The Second Circuit has not yet addressed the issue.

"practical, *ad hoc*, case specific" approach to CEA manipulation makes it very difficult to dismiss a CEA manipulation claim at the outset of a case.[23]

> **9.    Subject To This Limitation, There Are Three Elements Of A CEA Manipulation Claim**

The elements of CEA manipulation are: "(1) the existence of an artificial price, (2) an intent to cause an artificial price, and (3) causation of the artificial price by the defendants." *Sumitomo I*, 182 F.R.D. at 89-90; *In re Natural Gas Commodity Litig.*, 337 F.Supp.2d 498, 507 (S.D.N.Y. 2004) (same) (Marrero, J.) ("*Natural Gas I*"); *accord,* Russo, *Regulation of Commodities Futures and Options Markets*, § [12.11] (1983).

> **10.    In Construing The Pleading Of The Elements Of A CEA Manipulation Claim, It Must Be Remembered That Congress Considered Private Law Suits To Be "Critical" To Deterring Manipulation**

In applying the foregoing elements of a CEA manipulation claim to the pleading here, it is important to remember that the CEA is unqualifiedly remedial legislation. *See, Leist*, 638 F.2d at 315 n. 37, *citing* Conference Report to 1974 amendments, 120 Cong. Rec. 34997 (Oct. 10, 1974) (Sen. Talmadge). Moreover, part of Congress' efforts to prevent manipulation is to promote private law suits such as this one:

---

[23] In 1995, Congress found that abusive securities law class actions chilled capital raising and, therefore, enacted the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. This made so-called strike suits and all other securities law class actions more difficult to plead and easier to dismiss.

Unlike under the federal securities laws, the rarely-asserted private rights of action for CEA manipulation are an unqualifiedly valuable supplement to the criminalization of manipulation, the prophylactic exchange rules, and the other deterrents of manipulation that Congress created in the CEA. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982); *Sumitomo*, 182 F.R.D. at 89.

But class actions for CEA manipulation are very rare, averaging less than one per year for the last two decades. *Contrast*, PSLRA (discourages certain securities laws class action). The CEA has no history of class action abuse. *Id*.

> Congress viewed private lawsuits as "**critical** to protecting the public and fundamental to maintaining the credibility of the futures market.

*Cange v. Stotler & Co.,* 826 F.2d 581, 594-595 (7th Cir. 1987) (*citing* to H.R. Rep. No. 565, 97th Cong., 2d Sess., pt. 1 at 56-57, *reprinted* in 1982 U.S. Code Cong. & Admin. News 3871, 3905-06). [emphasis supplied.][24]

### B. Although Fed.R.Civ.P. Rule 9(b) Particularity And Even *Twombly* Plausibility Are Not Required To Plead Manipulation By The Primary Means Of Big Trades, Plaintiffs Plead Their Manipulation Claim With Extraordinary Particularity

#### 1. Rule 8(a) Governs Claims In Which Large Positions Are the Primary Means of Manipulation

Defendants argue that Fed. R. Civ. P. 9(b) governs the pleading of manipulation claims. Advisors Br. 12-14. Contrary to their argument, numerous courts have held that such claims need **not** be pleaded with Rule 9(b) particularity to the extent that large positions are the primary means of the CEA manipulation. *Amaranth Advisors I,* 2008 WL 2123323 at *7 (where large positions rather than fraudulent statements are the primary means of manipulation, Rule 8(a) applies); *Amaranth Advisors II*, 2008 U.S.Dist. LEXIS 45638 at *5 (securities law pleading standards do not supersede CEA pleading standards); *Premium Plus Partners, L.P. v. Davis*, 2005 WL 711591 at *15 (N.D. Ill. Mar. 28, 2005) (Rule 8(a) governs where false statements are

---

[24] Contrary to Defendants' arguments, the fact that the government may so far have brought different charges against different defendants is without significance. *E.g.*, *In Re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664-65 (7th Cir. 2002) (Posner, J.) (it does not follow that "because the Justice Department has not moved against the alleged HFCS price-fixing conspiracy, there must not have been one. The Justice Department has limited resources. . . . It may also have felt that the antitrust class action bar had both the desire and the resources to prosecute such a suit vigorously, as indeed it has done."). Indeed, if claims may only be brought after the government has asserted them, private enforcement becomes not "critical" but merely redundant. Also, the CFTC has reportedly never won a contested CEA manipulation claim whereas this Court has seen successful trials. *Strobl, supra, and Minpeco, supra,with* Markham, 8 Yale J. On Reg. at 356 and n. 502.

not the basis for the claim); *Enron*, 2004 WL 594752 at *3 (manipulating natural gas market by large trades was governed by Rule 8(a)). *See also, In re Global Minerals & Metals Corp.*, 1999 WL 1023586 at *4 & nn. 50-52 (CFTC Nov. 12, 1999).[25]

### 2. Rule 9(b) Explicitly Mandates That "Intent" And "Condition Of Mind" Should Be Averred Generally

Because Rule 9(b) provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," Plaintiffs have no burden to plead the manipulative intent element of manipulation (or the "knowledge" or "intent" element of aiding and abetting, *see* Point IVA *infra*) with the particularity which would be required for fraud or mistake.

However, the Advisors argue that Plaintiffs' claims "sound in fraud," Advisors Br. at 13, because an artificial price is a misrepresentation of a true price. *Id*. The Advisors fail to cite any cases or other support for their assertion. And, in the CEA, an "artificial price is one that does not reflect the market or economic forces of supply and demand." *Sumitomo I*, 182 F.R.D. at 90 n. 6; *Natural Gas I*, 337 F.Supp.2d at 502. There is nothing, definitionally, in the CEA that

---

[25] Defendants rely on two CEA manipulation cases. *In re Natural Gas Commodity Litig.*, 358 F. Supp.2d 336, 343 (S.D.N.Y. 2005) ("*Natural Gas II*") and *In re Crude Oil Commodity Litig.*, 2007 WL 1946553 at *5 (S.D.N.Y. 2007) ("*Crude Oil*"). *Amaranth Advisors I* distinguished *Natural Gas II* on the grounds that the, unlike here, false statements were the primary means of manipulation (and no positions whatsoever were taken by the Defendants in the market).

Similarly, in *Crude Oil*, the plaintiffs failed to identify a single trade or position but did allege a conspiracy "'to *conceal* the availability, release and/or sale' of defendants' supplies of crude oil ... and also used proxies to sell their crude oil inventories 'so as to *not appear* to the market as a seller of crude oil'" (quoting amended complaint) (emphasis in original)).

The specific allegations of the amounts of Amaranth's unprecedented positions (*e.g.*, ¶¶ 75, 78-93), specific trades (*e.g.*, ¶¶ 104-40), and the resulting market power and "dominance" were not present in *Crude Oil*. Their correlation with specific price behaviors was also not present. This moves the facts here to the opposite end of the continuum from *Natural Gas II* and *Crude Oil* for purposes of both whether Rule 9(b) should apply and, if so, whether Plaintiffs comply with Rule 9(b).

requires or superimposes any misrepresentation or fraud on an artificial price. *See supra* (collecting cases holding that CEA manipulation claims are subject to Rule 8(a)(2) pleading). Defendants' "artificial price equals fraud" argument could be used to transform even antitrust cases into Rule 9(b) subjects.

Assuming but not accepting that the plain language Rule 9(b) can be expanded from "averments of fraud" to anything "sounding" in fraud,[26] then whether a claim "sounds in fraud" should be determined by the legal elements of the claim, Congress' purposes for the claim, the specific fact allegations in the complaint, and the purposes of Rule 9(b). Here:

(a) the elements of CEA manipulation do **not** involve deception nor reliance upon deception. *See* fn. 18-22 *supra*. and associated text;

(b) unlike with the federal securities laws, Congress unqualifiedly endorses rare CEA private actions (such as this one) as "critical" to accomplishing the prevention and remedying of manipulation, which are the *raison d'être* of the CEA) (*see* fn. 18-22 *supra*);

(c) the Complaint focuses on large trades and contains no fact allegations of lies to the market (Complaint, *passim*);

(d) albeit there is an allegation of internal lies to the NYMEX which has been pled with the same particularity as was recently held sufficient to state a false reporting claim in *Amaranth Advisors* I, 2008 WL 2123323 at *11-12 (applying F.R.C.P. Rule 8(a)(2) pleading standards to the charge that large positions could manipulate prices; and applying F.R.C.P. Rule 9(b) standards to the charge of making false statements); and

(e) the reputational preservation purposes of Rule 9(b) have no or very little incremental applicability to Amaranth because it has already been criticized in three government proceedings and has ample notice of the claim against it.

Finally, the plausibility standard required by *Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S.Ct. 1955 (2007) did not announce a new heightened pleading standard, but obligates

---

[26] *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) ("in a case where fraud is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b). Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a).").

the pleader to include factual allegations where needed to render the claim plausible.  *See Iqbal*

*v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007); *Starr v. Time Warner, Inc.*, 2007 WL 4144627 at

*2 (S.D.N.Y. Nov. 21, 2007).

### 3.  The Existence of Artificial NYMEX Natural Gas Futures Contract Prices

Contrary to Defendants' arguments, Plaintiffs have alleged not just one but six, mutually

reinforcing and legally-accepted badges of NYMEX natural gas price artificiality during the

Class Period.[27]  For example, the presence of abnormal futures spread prices is the classic (blood

pressure) symptom of futures contract price artificiality.  *See, Cargill*, 452 F.2d at 1167;

*Sumitomo I,* 182 F.R.D. at 89 (same); *Minpeco,* 673 F.Supp. 693, n. 9 (same).  Again, a spread is

the difference between the price of one futures contract and the price of another.  ¶¶ 45-46.

---

[27] These six indicators are (1) "unprecedented" volatility.  *See Minpeco, S.A. v. ContiCommodity Svcs., Inc.*, 673 F.Supp. 684, 689-90 (S.D.N.Y. 1987) ("objective economic indicators" of artificial silver prices included greater than normal price volatility and unusual futures contract spread prices); *Cargill Inc.*, 452 F.2d at 1167 (same).

(2) prices are out of line compared to historical norms.  *Compare, ¶ 6(f) with In re Sumitomo I*, 182 F.R.D. at 90 n. 6 (courts look to factors such as "historical price comparisons . . . comparison of spreads . . . ."); *Cargill*, 452 F.2d at 1167 (that the record price increase in the last two trading days was not comparable to the previous nine years was an indicator of artificiality).

(3) abnormal spread relationships are a very strong indication that prices are artificial. *Compare* ¶¶ 5, 6(a)-(c), 6(g) *with Great Western*, 201 F.2d  at *Sumitomo I*, 182 F.R.D. at 90 n. 6; *Minpeco*, 673 F.Supp. at 689-90.

(4) prices that are out of line compared to contemporaneous supply and demand. *Compare* ¶¶ 6(c)-(a), 180-81 *with Cargill*, 452 F.2d at 1169; *Sumitomo I*, 182 F.R.D. at 90 n. 6.

(5) a substantial change in prices when the manipulator's positions are eliminated from the market.  *Compare,* ¶¶ 6(c) (70% drop), 7; 174 ("Electric Power Research Institute" characterized price decline as "stunning . . . one of the steepest declines ever"); ¶ 175A(1)(b) *with  Sumitomo I,* 182 F.R.D. at 87 ("when Sumitomo, under intense government scrutiny, liquidated forward contracts for thousands of tons of unneeded copper . . . . the prices of copper futures contracts traded on the Comex declined dramatically").

(6)  prices resulting from an illegitimate factor in supply or demand.  *Compare* ¶¶ 100-119, 121-126, 127-146 *with Indiana Farm,* 1982 WL 30249 at *4 n. 2; *Sumitomo I*, 182 F.R.D. at 91.

Plaintiffs explicitly allege that Amaranth artificially inflated the spread between the prices of summer 2006 NYMEX contracts and winter 2006-2007 NYMEX contracts.  ¶¶ 77-82. Amaranth caused these artificial prices by its overall positions (*see* Matrix at 4 *supra*) as well as by simultaneously building large **short** positions in respect of March – October 2006 contracts, and large **long** positions in respect of March 2007 (¶¶ 77-80), January 2007 (¶ 81), and (much later) November 2006 contracts.  ¶ 82.

Amaranth's foregoing **short** positions in the summer months, its high volume of trading, and its specific "slamming the close" trades, intentionally caused **artificially low** prices of NYMEX March (¶ 118), April (¶¶ 119, 125), May (¶¶ 125,144), June (¶ 145), July, August (¶ 170), September and October 2006 natural gas futures contracts.  *Id.; see* ¶¶ 6a, 75, 88-91, 93. Amaranth's foregoing "dominant" long positions "directly and immediately" injected artificial and manipulative demand into the supply-demand equation for winter natural gas futures contracts, and caused **artificially inflated** prices of NYMEX winter natural gas contracts.  ¶¶ 78, 93.  By artificially reducing the summer and artificially increasing the winter prices, Defendants artificially widened the spreads between the prices to unprecedented levels.

Separately, another legally recognized symptom of artificial prices is unusual price volatility.  *See* fn. 27 *supra.*  Plaintiffs have alleged that Amaranth engaged in unprecedented volumes of trading, constituting more than 70% of the entire NYMEX volume on certain days in certain contracts.  ¶¶ 66, 69.  This unprecedented volume of trading coupled with Amaranth's unprecedented and "dominant" positions allowed Amaranth to cause "unprecedented" NYMEX natural gas price volatility that was unjustified by the fundamentals of supply and demand.  ¶¶ 3, 4, 6(d), 63-70, 98, 175.

Finally, another approach to price artificiality is to

> search for those factors which . . . are not a legitimate part of the economic pricing of the commodity . . . . [W]hen a price is affected by a factor which is not legitimate, the resulting price is necessarily artificial.

*Indiana Farm Bureau,* 1982 WL 30249 at *4 n. 2; *Sumitomo I,* 182 F.R.D. at 91.  Plaintiffs contend and allege Amaranth's positions were not a legitimate part of the supply-demand equation because they were (a) dominant, (b), uneconomic (c) unlawful, (d) one way positions that grew intentionally in order to cause artificial prices, and/or (e) "charter destroying," that is, they destroyed not one but all three of the charter functions that legitimized futures market trading.  *Cargill,* 452 F.2d at 1156-58.  ¶¶ 78, 81(d), 82(d), 93, 144, 159.  Non-competitive market dominance is an illegitimate factor in the market if it is acquired or maintained (1) in order to cause artificial prices, and/or (2) by means of unlawful conduct.  *Indiana Farm Bureau,* 1982 WL 30249 at *4 n. 2 (at a minimum, illegality confers illegitimacy on a position but other factors indicating a lack of economic function also confer illegitimacy).  Amaranth did both.  Statement of Facts *supra*.

### 4.  Plaintiffs Properly Plead Causation

With regard to the "causation of artificial prices" element of CEA manipulation, Plaintiffs have specifically alleged that it was Amaranth that caused **each and every one** of the foregoing six strong indications of price artificiality.[28]  ¶¶6, 73-75, 76-90, 179-182 and (as to "slamming the close") 100-146 generally; *see* Statement of Facts *supra*;  *see Transnor*

---

[28]  Issues relating to causation in commodity manipulation cases require discovery followed by expert analysis and testimony and are therefore inappropriate for resolution on a motion to dismiss or even summary judgment.  *See Natural Gas I*, 231 F.R.D. at 181-82; *Transnor (Bermuda) Ltd. v. BP North America Petroleum*, 738 F. Supp. 1472, 1488 (S.D.N.Y. 1990)(denying summary judgment and holding that it is the jury's task to weigh competing inferences of causation); Markham, 8 Yale J. Reg. on 281, 284 ("[T]he determination of the "true" economic price will turn on an after-the-fact economic analysis of the price a willing buyer and a willing seller would have paid in the absence of the manipulation.").

*(Bermuda) Ltd. v. BP North America Petroleum*, 738 F.Supp. 1472 (S.D.N.Y. 1990) (denying summary judgment on defendants' argument that multiple causes of oil price movements were present).

Each of these allegations satisfies Plaintiffs' burden to plead the causation element for Plaintiffs' CEA manipulation claims. *See Cargill*, 452 F.2d at 1171-72 (causation of artificial prices established when it is shown that artificial prices resulted from the conduct of a trader rather than from legitimate forces of supply and demand); *Kosuga*, 19 A.D. at 624 (defendants' conduct need not be the sole cause of the artificial price).

Defendants' arguments to the contrary are legally unfounded and should be rejected. Thus, despite Defendants' arguments, (a) a manipulator need not have substantial involvement in the market for the underlying cash commodity;[29] a manipulator need have no minimum percentage of the open interest in the manipulated futures contract;[30] and the elements of CEA

---

[29] Courts have repeatedly rejected the Amaranth Defendants' argument that significant cash supplies are needed to manipulate. *Olsen*, 262 U.S. 39 ("Manipulations of grain futures for speculative profit, though not carried to the extent of a corner or complete monopoly, exert a vicious influence and produce abnormal and disturbing temporary fluctuations of prices that are not responsive to actual supply and demand and discourage, not only justifiable hedging, but disturb the normal flow of consignments."); *Frey*, 931 F.2d 1177 ("[t]he Commission's investigation of Cox and Frey proceeded on the theory that control of the cash crop was *not* essential for a squeeze," which the court adopted as "a plausible proposition") (emphasis in original); *Great Western*, 201 F.2d 478-79 (although purchases of some deliverable supplies by the long manipulator are not a required element of manipulation, such purchases can constitute extremely manipulative acts).

[30] Courts have rejected the Amaranth Defendants' argument that ownership of at least 62% of the open interest is needed to manipulate futures contracts. *Soybean Futures Litig.*, 892 F.Supp. at 1052 ("neither the courts, Congress, nor the CFTC has ever defined a minimum percentage of the open interest that is necessary to establish control of the futures market"; jury question whether ownership of 18% of open interest, together with other manipulative activity, including misleading regulators, constituted manipulation).

manipulation do not include the "ability to manipulate."[31]  The Advisors Defendants dedicate barely half of a page to arguing that an inapposite case, *Manela v. Gottlieb*, 784 F. Supp. 84 (S.D.N.Y. 1992), which applies the heightened PSLRA pleading standard to causation should govern pleading causation here.  Advisors Br. at 25.  This, clearly, is incorrect because the PSLRA does not apply to the CEA.  Also, pleading causation is governed under Rule 8(a).  *See Amaranth Advisors I*, 2008 WL 2123323 at *7 (allegations of manipulation caused by slamming the close not premised on fraud).

Finally, the U.S. Senate Permanent Subcommittee on Investigations **also** found that Amaranth caused these indicators") of price artificiality (other than "slamming the close ¶¶ 162,164,170.

> a,    **Contrary To The Advisors' Pretension, Plaintiffs allege That Defendants' "Slamming The Close" Maneuvers Manipulated NYMEX Natural Gas Contract Prices**

The Advisors pretend that Plaintiffs allege that Amaranth's "slamming the close" maneuvers manipulated only the mathematical calculation of "final settlement prices" and otherwise did not cause artificial NYMEX futures contract prices.  Advisors Br. at 8-9.

---

[31]  Courts have rejected Defendants' proposed fourth element—"ability to manipulate"— as subsumed under the causation element.  *Natural Gas I*, 337 F.Supp.2d at 507; *Sumitomo I,* 182 F.R.D. at 89-90 (the three elements are "(1) the existence of an artificial price, (2) an intent to cause an artificial price, and (3) causation of the artificial price by the defendants.").  *See also* Jury Charge, *Minpeco, S.A. v. Hunt*, 81 Civ. 7619 (MEL) (S.D.N.Y. Aug. 15, 1988), Tr. at 16718 (implicit in existence of artificial price is defendants' "ability to influence market price"); Jury Charge, *Strobl v. New York Mercantile Exchange*, 76 Civ. 4350 (MEL) (S.D.N.Y. Nov. 17, 1983), Tr. at 1220 (charging the three elements).  The Second Circuit affirmed a judgment of manipulation based on the jury's verdict at *Strobl v. New York Mercantile Exchange*, 768 F.2d 22 (2d Cir.), *cert. denied sub nom. Simplot v. Strobl*, 474 U.S. 1006 (1985).  *Accord*, Russo, *Regulation of Commodities Futures and Options Markets*, § [12.11] (1983).

But, the short answer to Defendants' pretension is Plaintiffs expressly allege that "Amaranth's manipulation of the settlement prices of NYMEX NG Contracts caused artificial prices in NYMEX NG Contracts during the Class Period." *See* ¶ 2(e) (same), ¶ 58 (same) and ¶¶ 105-46, ¶ 104; "By reason of Amaranth's manipulation, the settlement price of the March 2006 contract was artificially deflated by as much as $0.29, resulting in a realized gain of $29,000,000 to Amaranth." ¶ 118; *see* ¶ 6 of the FERC's Order to Show Cause, citing a Letter from Amaranth to NYMEX dated August 30, 2006.  The FERC's Order to show cause is available on the FERC's website: http://www.ferc.gov/EventCalendar/Files/20070726084235-IN07-26-000.pdf. (Amaranth itself argues that manipulation of the final settlement price can harm "all natural gas market participants, including consumers whose cost of natural gas most certainly [is] tied" to the settlement price).

This clearly constitutes manipulation in violation of the CEA.  *E.g.*, *Amaranth Advisors I*, 2008 WL 2123323, at * 10-11 (denying Amaranth Advisors' and Hunter's motions to dismiss CFTC's complaint based on defendants' attempted manipulation of final settlement prices of NYMEX NG contracts via "slamming" or "marking" the close – the identical manipulative conduct alleged in the Complaint).

The scope of causation of artificial prices is much less than has been upheld in prior cases.[32]  The Advisors argue that Plaintiffs fail to state a claim in respect of post April 2007

---

[32] *Natural Gas I*, 337 F.Supp.2d  503-04 (defendant manipulated natural gas indices, which in turn manipulated NYMEX natural gas futures prices); *In re Sumitomo Copper Litig*., 995 F.Supp. 451, 453 (S.D.N.Y. 1998) (denying motion to dismiss where defendants manipulated the London Metal Exchange ("LME") price of copper, which manipulated NYMEX copper futures contract prices); *de Atucha v. Hunt*, 756 F.Supp. 829, 830-31 (S.D.N.Y. 1991) (denying summary judgment to defendant's who manipulated NY COMEX silver futures prices, which manipulated the LME prices where plaintiffs transacted).

Defendants' authority, *Vitanza v. Bd. of Trade of City of New York*, 2002 WL 424699 (S.D.N.Y. Mar. 18, 2002), is wholly distinguishable.  The "settlement price" allegedly

NYMEX futures contracts because Plaintiffs do not specifically allege Amaranth's positions post April 2007 nor specifically allege the direction of the artificiality in such post April 2007 contracts. See ¶ 66. Plaintiffs need not do so in order to state a violation of the CEA. The "continuous" contract transmitted artificiality from expiration to expiration. ¶ 56. Earlier commodity futures manipulation cases have sustained claims where the specific trades and specific manipulative acts were not alleged. For example, in *Natural Gas*, all that was alleged was that the defendants artificially impacted the NYMEX natural gas futures market through false reposts to cash market indexes. The artificial effect alleged was transferred from the cash indexes to the NYMEX natural gas futures markets. That was held sufficient to state a manipulation claim as to all 72 NYMEX contracts trading at the time of receipt of the false reports.

### C. Under the CEA, Manipulative Intent Is Inferred From Conduct And Plaintiffs Plead Not One But Numerous Classic Indications of Manipulative Intent

CEA manipulation law infers manipulative intent from conduct. "Intent is a subjective inquiry and 'must of necessity be inferred from the objective facts and may, of course, be inferred by a person's actions and the totality of the circumstances." *See Kohen* 244 F.R.D. 9, 482 (N.D. Il. 2007) ("*Kohen*"), *quoting Indiana Farm*, 1982 WL 30249 at *5. "Because 'proof

---

manipulated in that case involved not expiring contracts, as here, but open contracts where "settlement price" was used "only [as] an accounting mechanism to determine margin, not the price at which a contract actually trades the next day." *Id.* at *1 & n. 5; *New York Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc.* 497 F.3d 109, 111 (2d Cir. 2007) (distinguishing between discretion employed by NYMEX settlement committee in determining *daily* (not final) settlement prices of *open* (not expiring) NYMEX natural gas contracts for purposes of marking-to-market customers' open positions with final settlement prices of expiring NYMEX natural gas contracts which are determined by a purely mathematical formula).
     Also, the *Vitanza* plaintiffs failed to plead bad faith under Section 22(b) of the CEA against defendants, which unlike here, were "contract markets, clearing organizations and their officers." *Id.* at *3, *6-7.

of intent will most often be circumstantial in nature, manipulative intent must normally be shown inferentially from the conduct of the accused." (citation omitted). *See Amaranth Advisors I*, 2008 WL 2123323 at *8.

First, dominance, alone, is conclusive evidence of manipulative intent. *See In re Global Minerals & Metals Corp.*, 1999 WL 1023586 at *1 n. 7 (CFTC No. 99-11, Nov. 12, 1999), citing *Great Western*, 201 F.2d at 483. The Senate Report found and Plaintiffs allege that Defendants did what they had to do maintain long term dominance over the NYMEX natural gas market. ¶ 175. For this reason alone, Plaintiffs sufficiently allege manipulative intent.

Second, uneconomic conduct is evidence of manipulative intent. *See Cargill,* 452 F.2d at 1163 (uneconomic act is not necessary condition for a manipulation but is a sufficient one). Plaintiffs plead facts showing uneconomic conduct by Amaranth (1) to slam the close, and (2) to continue to buy the spreads at levels unjustified by supply and demand, history, etc.

Amaranth repeatedly engaged in the uneconomic conduct of driving down prices by selling net natural gas contracts in a compressed time frame for less than Amaranth could have received through gradual selling. ¶ 82. Uneconomic conduct is strong evidence of intent to manipulate because it is contrary to self-interest absent the benefits of moving (and intending to move) the price. *In re Henner*, 30 A.D. 1151 (CEA No. 14,159, Sept. 15, 1971); *Soybean Futures Litig.*, 892 F.Supp. 1025.

Third, Plaintiffs contend that Amaranth's conduct in intentionally caused not just one but multiple types of artificial prices, ¶¶ 11, 78, 176. If Amaranth caused so many symptoms of an artificial price, then its intent may be inferred at the pleading stage to have been to intend to cause an artificial price.

Fourth, another classic indicator of manipulative intent is that Amaranth has extensively

39

caused prices to move in a direction that would profit Amaranth and, if Amaranth could not maintain the artificiality, then Amaranth faced large losses and liquidation. *Compare Amaranth Advisors I*, 2008 WL 2123323 at *9 (alleged benefits from artificially lower prices to Amaranth's short swaps positions "render the inference of intent even more plausible") *with Cargill,* 452 F.2d at 1172 (rise in wheat futures price caused by Cargill's dominant futures position creating self-fulfilling prophecy manipulation); *CFTC v. Enron Corp.*, 2004 U.S. Dist. Lexis 28794 (March 9, 2004) (intent adequately alleged where buying spree of large position and unwinding of positions sufficed); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 169 (2d Cir. 2000)(pleading motive and opportunity to commit fraud even for purposes of PSLRA *scienter*, can suffice).[33]

Fifth, Amaranth made misleading statements to the NYMEX in order to prolong Amaranth's market dominance, which constitutes classic evidence of manipulative intent. *See In re Soybean Futures Litig.*, 892 F. Supp. at 1046 (concluding that false reports can influence prices and constitute part of a **manipulation** claim); *In re Coral Energy Resources*, Comm.Fut.L.Rep. (CCH) ¶ 29815 (July 28, 2004)(same "CER specifically intended to affect the price of natural gas in interstate commerce or for future delivery. The provision of reports to *Inside FERC* and *NGI []* constitute overt acts in furtherance of attempts to manipulate the price

---

[33] *Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. N.Y. 2000)(acquisition using inflated company stock creates a strong inference that company and its officers had motive, and allegations of scienter adequately pled); *In re Time Warner Inc. Securities Litig.*, 9 F.3d 259, 270 (2d Cir. 1993) (sufficient pleading of motive that company allowed prior statements to  become misleading by material nondisclosure of company's active consideration of rights offering in order to maintain high stock price before announcing new rights offering in order to lessen dilutive effect of that announcement on stock price); *cf. Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 & n.2 (2d Cir. 1982) (sufficient evidence to support jury finding of defendants' fraudulent intent to overstate inventory, including, among other evidence, that company benefitted from overstated inventory because stock price followed rising reported earnings, "enabling [the company] to make numerous acquisitions after a five-for-one split").

of natural gas in interstate commerce, which, if successful, could have affected the price of natural gas in interstate commerce or prices of NYMEX natural gas futures contracts. Accordingly, Respondent violated Section 9(a)(2) of the Act."). (¶¶ 2(d), 149-150, 166-168). Plaintiffs plead these allegations with the same level of detail as was held to suffice under Rule 9(b) for purposes of pleading a false report violation in *Amaranth Advisors I,* 2008 WL 2123323 at *12. *See id.* at *7 (9(b) only applies to the part of the claim that involved lies to regulators).

Sixth, the Amaranth Defendants' repeated acts of "slamming the close" in a compressed time frame are recognized as circumstantial evidence of intent to manipulate. *Amaranth Advisors I*, 2008 WL 2123323, at * 10-11.

Seventh, while Defendants protest that their switch of position on ICE is not necessarily illegal, they do not confront Plaintiffs' allegation that they were maintaining positions on ICE to disguise Amaranth's holdings from NYMEX, after NYMEX had instructed it to liquidate. ¶¶ 150, 154-155, 163-168. Such efforts to disguise actual positions have long been held to give rise to an inference of the trader's knowledge that those positions were manipulative.[34]

### 5. No Case Of Which Plaintiffs Are Aware Has Granted Even Summary Judgment On The Issue of Manipulative Intent

Even summary judgment is generally inappropriate on questions of manipulative intent. *E.g.*, *In re Soybean Futures, 892 F. Supp.* at 1045; *Transnor (Bermuda) Ltd. v. BP North America Petroleum*, 738 F.Supp. 1472 (S.D.N.Y. 1990).

### 6. Neither Intent To Defraud Nor A Strong Inference of Scienter Is Required

Contrary to the Amaranth Trading Defendants' arguments, Plaintiffs' CEA claims do not require pleadings or proof of *scienter*, let alone a "strong inference" of *scienter*. *Compare*

---

[34] *In re McGuigan*, 5 A.D. 249 (CEA No. 37, Apr. 11, 1946) (trader disguised his transactions from regulators by trading in an account in his wife's maiden name).

PSLRA (statutorily requiring "strong inference" in certain federal securities fraud cases) *with Indiana Farm Bureau*, 1982 WL 30249, at *5 (all that is required is an intent to create prices that do not reflect legitimate forces of supply and demand). Indeed, Plaintiffs are not even required to aver a profit motive to establish a *prima facie* case of CEA market manipulation. *In re Hohenberg Bros.*, 1977 WL 13562, at *8 ("'profit motive' or a 'demonstrated capability of realizing a manipulation' are [not] necessary elements of a manipulation'" claim); *Cargill*, 452 F.2d at 1163 ("the question of whether an alleged manipulator has made a profit is largely irrelevant, for the economic harm done by manipulation is just as great whether there has been a profit or a loss in the operation.").

### 7.  Amaranth LLC Had Manipulative Intent

The foregoing manipulative intent logic applies with great force to Amaranth LLC.  It held all of Amaranth's natural gas contracts positions that manipulated the market.  It stood, in the first instance, to register the profits or suffer the losses from the trades.  ¶ 23; Brig. Decl. ¶¶ 14, 16.

Conspicuously failing to cite *Kohen* 244 F.R.D. 482 and numerous other important decisions,[35]  Amaranth LLC argues that it is a headless bomb ketch of money that can sail where and destroy what it may without liability because "the statute and case law reject[] liability on the part of investment funds."  Amaranth LLC Br. at 1-2.

Amaranth LLCs' failure to cite *Kohen* is particularly surprising.  First, as here, *Kohen* involves a CEA manipulation claim.  Second, *Kohen* holds that CEA manipulation claims have

---

[35] *E.g.*, *S.E.C. v. Haligiannis*, 470 F.Supp.2d 373 (S.D.N.Y. 2007) (summary judgment imputing investment manager's *scienter* to hedge fund); *S.E.C. v. Credit First Fund, LP*, 2006 WL 4729240 at *10 n. 19 (C.D. Cal. 2006) (imputing *scienter* to fund defendants for securities laws violations); *S.E.C. v. Blackwell*, 477 F.Supp.2d 891 (S.D. Ohio 2007) (imputing fiduciary's knowledge to trust); *S.E.C. v. Moscowitz*, 1998 WL 524903 (S.D.N.Y. 1998) (same).

been adequately pled against "a legitimate fund," Pimco Funds, which was (and is) the largest

bond fund on earth. Compare *Kohen*, 244 F.R.D. at 482 *with* Seth Lubove and Elizabeth

Stanton, *The Power of Pimco*, Bloomberg Markets, Vol. 17, No. 4, April 2008, at 95, at

http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aYxf.yAPdYcc.

     *Kohen* held that Pimco Funds' manipulative intent was adequately pled because:

> it can be reasonably inferred from the facts alleged that PIMCO
> Funds intended to cause artificial prices or otherwise manipulate
> the futures market.

244 F.R.D. at 482. The facts were that PIMCO Funds held very large positions which were used

for six weeks to manipulate prices. *Id*. Plaintiffs plead much more against Amaranth LLC. It

purchased and increased "dominant" manipulative positions (no "dominance" in *Kohen*) for

eight months (versus six weeks in *Kohen*) and such position grew to $48 billion (versus $16

billion in *Kohen*) in value and represented a "life or death" struggle for Amaranth LLC (versus a

minuscule percentage of the overall assets at issue in Kohen). *Compare* ¶¶ 63-70 *with Kohen,*

244 F.R.D at 482. Therefore, far more than under *Kohen*, Amaranth LLC knowingly "acted as

the purchaser" of the manipulative positions and had manipulative intent.

     Also contrary to Amaranth LLC's arguments, funds have also been held liable, on

summary judgment and otherwise, based on imputing the manager's intent to the fund. *See* cases

collected in prior fn. Either because of its own knowledge or the intent imputed to it from its

Advisors, Amaranth LLC had manipulative intent. In this regard, Amaranth LLC's implication

that it lacked knowledge of its unprecedented and dominant positions is flawed as a matter of

policy, practice and law. Amaranth LLC must be held to have developed an antecedent and

ongoing intent to manipulate even if it did not keep track of its positions and conduct. *See*

*United States v. Brawer*, 482 F.2d 117, 128 n.14 (2d Cir. 1973) (jury charge "…knowledge may

be satisfied …proof that a defendant deliberately closed his eyes to what otherwise would have been obvious to him. No person can disclaim knowledge merely by closing his eyes …"); *United States v. Gurary*, 860 F.2d 521, 526 n.5 (2d Cir.), *cert. denied*, 490 U.S. 1035 (1989)(same).

> 4.    **Amaranth Advisors LLC and Amaranth Advisors (Calgary) ULC Had Manipulative Intent**

The foregoing manipulative intent principles apply with even greater force to Amaranth Advisors.  It was the investment advisor and manager that directed the natural gas trading for the entities referred to in the Complaint as the "Amaranth Defendants." ¶ 33.  Brig. Decl. ¶¶ 15(b), n. 1, 3, 4, 6.  It employed the individual defendants pursuant to an agreement with Amaranth LLC.  ¶ 22.  Amaranth Advisors (Calgary) was an indirect subsidiary of Amaranth Advisors, from which Hunter worked before moving outside of Maounis' office from June 2006 forward.  ¶¶ 28, 30; *see also* FERC OSC ¶¶ 39, 90.  The manipulative intent principles developed above also apply to Amaranth Advisors (Calgary) because it carried out its natural gas trading in close contact with Amaranth Advisors.

> 4.    **Maounis, Hunter And Donohoe, Who Made The Trading Decisions That Caused The Artificial Prices, Acted With Intent To Manipulate**

The manipulative intent principles developed *supra*, apply with greatest force to Defendants Maounis, Hunter and Donohoe.  They made the decisions to make the trades and hold the positions (a) that intentionally caused artificial prices in six different ways (*see supra*), and (b) that acquired the dominance that caused prices to become artificial.  It should be inferred from their conduct that they did so with manipulative intent.  *Kohen,*  244 F.R.D. at 481-82; *In re Indiana Farm*, 1982 WL 30249 at *32.  Similarly, the sheer magnitude of Amaranth's manipulation (¶¶ 181-82) and the "bet the company" nature of the outcome compel an inference that the individuals both knew and intended the results of their activities.  *Rothman v. Gregor*, 220

F.3d 81, 92 (2d Cir. 2000) (magnitude of fraud supports even the strong inference of scienter required by the PSLRA).

In this regard, Plaintiffs plead the roles played by each of the individual Defendants:

> (a)    Maounis founded Amaranth Advisors, hired Hunter and Donohoe, and supervised and controlled the activities of the Amaranth Defendants, including the trading and allocation of capital for natural gas position trading.  ¶¶ 25, 29, 73.  Brig. Decl. ¶ 15(c)(e), 20, n. 1, 6.

> (b)    Hunter was the head natural gas trader and devised the manipulative trading strategies under Maounis' supervision, which included accumulating and holding the unprecedented large positions and repeatedly slamming the close.  ¶¶ 31, 102, 106, 109, 115-16, 251. Brig. Decl. n 1.

> (c)    Donohoe was the "execution" trader who effected Hunter's trading strategies which were devised under Maounis' supervision.  ¶¶ 31, 102, 106, 113, 116, 252.

Maounis denies that he made the trading decisions.  But the fact allegations are required to be accepted as true.  *Twombly,* 127 S.Ct. at 1965.  Donohue says he exercised only limited discretion while working with Hunter. That, also, denies the complaint but, given the extraordinary manipulation here, even that would be more than enough[36] at the pleading stage. Maounis' denial presents an issue for another day.  ¶¶ 2d, 149.

## 8.  Amaranth Group Inc. Had Manipulative Intent

The foregoing manipulative intent principles also apply with considerable force to Maounis' 100% owned company, Amaranth Group, Inc.  It employed the three persons who traded the positions, one of whom was also the 100% owner and CEO of Amaranth Group, Inc.

---

[36]    The Second Circuit has held that an actor's liability for securities manipulation turns on the nature of his acts, rather than his state of mind when he performed them.  *Ellison v. American Image Motor Co., Inc.,* 36 F. Supp. 2d 628, 643 (S.D.N.Y. 1999) ("Indeed, if the trader who executes manipulative buy and sell orders is not a primary violator, it is difficult to imagine who would remain liable after *Central Bank*."), *citing SEC v. U.S. Environmental, Inc.*, 155 F.3d 107, 111 (2d Cir. 1998).

The manipulative intent of these three individuals is also that of Amaranth Group, Inc. *See CFTC v. Commodities Fluctuations Systems, Inc.*, 583 F. Supp. 1382, 1384 (S.D.N.Y. 1984) (a company may act or intend only through its employees or other representatives).

> **9. Manipulation Works Better Or Could Only Work Here If The Feeder Fund "Acted In Combination Or Concert" With The Amaranth Trading Defendants; Separately, Each Feeder Fund Possessed Defendant Maounis' Manipulative Intent**

Finally, the foregoing manipulative intent logic also applies to any Amaranth Defendant who "acts in combination or concert with any other person in any such violation." CEA § 13(a), 7 U.S.C. § 13c.[37]  At the pleading stage, the Amaranth Defendants all acted in concert with Amaranth Advisors in the violation.  ¶¶ 238-239.  This includes the Feeder funds who developed the critical mass of capital (¶ 246) that gave Amaranth the ability to manipulate.  Only by acting together, could the Feeder funds "share in the financial benefits from the manipulation" (*Id.*) that none of them would be able to afford if they were only using their own capital.  This allegation is supported by the allegations of overlapping control, the contribution that each made to the manipulation (¶¶ 22-33,73,245-252,255) and the basic CEA manipulation law premise that manipulation of an entire market can be better carried out by acting in concert.  *Strobl,* 768 F.2d at 23.  **In particular**, the Amaranth's "increasing dominance" form of manipulation required more trading capital.  At the pleading stage, CEA manipulation law trumps the protestation that each Amaranth card (each with Mr. Maounis' face on it) acted separately.  Statement of Facts *supra*.

---

[37] This statutory standard is exceedingly low.  "Conspiracy" is not used.  "Willfully" is used in the other parts of this section.  But it does not modify "acts in combination."  Rather, Congress re-inserts the subject "who" before "acts in combination," and drops "willfully" as a modifier.  The only modifier is that they act "in combination in the violation."

Relatedly, any Amaranth Defendant to whom the manipulative intent of Defendant Maounis or any other Amaranth Trading Defendant is properly imputed, also has manipulative intent for purposes of committing manipulation in violation of the CEA.  Defendant Maounis was the CEO of, and dominated, each of the Amaranth feeder funds and still is their contact with their investors through today.  *See* Statement of Facts *supra*.  Therefore, Defendants Amaranth International Limited, Amaranth Capital Partners LLC, and Amaranth Partners LLC are sufficiently alleged to be liable for the manipulation.

> ### a.    Standing vs. AIL

Contrary to Defendant's AIL analysis of Section 22 of the CEA, Plaintiffs have standing, under the allegations of the complaint, because AIL worked in concert and is a common enterprise with and a principal of Defendants who satisfy the pre-conditions of Section 22.  7 U.S.C. §5(a)(1); *D'Amato v. Hermanson,* 153 F.3d 464, 470 (7th Cir. 1998) (CEA creates private right of action against one who aids and abets principal in undertaking one of the specifically enumerated transactions of Section 22, even if the aider and abettor does not independently satisfy those subsections).

> ### D.    Defendants' Citations To PSLRA and Securities Law Manipulation Cases  Are Inapposite

Defendants' citation to securities law cases do not help Defendants for many reasons, including the profound differences between the two with respect to manipulation.  See *supra*.  [38]

---

38  Defendants err in asserting that *Mulheren* holds that even market domination does not establish securities law manipulation without "something more."  Amaranth Advisors Br. at 21 n. 15.  Reversing a jury verdict of securities manipulation for insufficient evidence of fraudulent intent, the court "agree[d], as a general proposition, that market domination is a factor that supports a manipulation charge, [but] the extent to which an investor controls or dominates the market at any given period of time cannot be viewed in a vacuum." 938 F.2d at 371. The court then stated in full (with Defendants' omitted language in bold):

**POINT II:    THE AMARANTH DEFENDANTS ARE LIABLE UNDER CEA SECTION 2(a)(1) AS PRINCIPALS FOR THE ACTS OF THE AMARANTH TRADING DEFENDANTS**

**A.    The CEA's Broad Codification Of Respondeat Superior Holds Each Amaranth Defendant Strictly And Vicariously Liable For The Acts Of Its Agents Regardless of Whether Those Acts Are Lawful Or Unlawful**

Section 2(a)(1)(B) of the CEA (*see* Statutory Appendix) has been described as "a variant of the common law principle of respondeat superior," but which broadens the common law in two respects: it also operates as a "quasi-criminal statute," and "it applies to torts committed by agents who are not necessarily employees." *Rosenthal, 80*2 F.2d at 963, 966 (Posner, J.). Obviously, the intent of the agent is imputed to the principal. *See Cange, 8*26 F.2d at 589; *Rosenthal, supra*, 802 F.3d at 966.

But Defendants repeatedly argue that Section 2(a)(1) liability requires a determination that the  wrongdoing itself must be "within the scope of [the agent's] employment or office." *E.g*., Amaranth Advisors Br. at 36.  Such an interpretation would nullify the provision, and finds no support in law or policy.  On the contrary, in *Commodities Fluctuations Systems*, 583 F.Supp. at 1384, liability was imputed because the wrongdoing was committed in the solicitation of

---

**Thus, in the absence of other indicia of manipulation–and here there are none–**the fact that Mulheren dominated the market between 9:30 a.m. and 11:10 a.m. **on October 17, 1985 (noting that Mulheren's purchasers represented a small fraction of the total October 17th activity in G&W stock)** carries little weight.

*Compare* Amaranth Advisors Br. at 21 n. 15 *with* 938 F.2d at 372 (emphasis supplied to highlight Defendants' omissions from quote).  *Mulheren*  involved accidental dominance acquired for 100 minutes that moved prices by 1/75th.

    In sharp contrast, the Amaranth Defendants actively worked to dominate natural gas trading for months and moved prices by over 100%.  ¶¶ 2a, 63-70.

    Defendants' reliance on *Miller v. N.Y. Produce Exch*., 550 F.2d 762 (2d Cir. 1977) as supporting the use of securities law reasoning in CEA cases is unavailing.  *Miller* was a bankruptcy trustee's action against an exchange, and the case foundered on the lack of a "scintilla" of requisite bad faith on the exchange's part. *Id*. at 767.  *Miller* has no applicability here.

investors, which was the subject of the salespersons' employment. Similarly, in *Rosenthal*, the wrongdoing occurred in the solicitation of investors as "indirect customers" of the defendant. 802 F.2d at 968. The Amaranth Trading Defendants engaged in manipulative acts while performing their respective duties on behalf of the other Defendants and the master fund, which was within the "scope of their employment" for purposes of the CEA.[39]

Defendants' self-serving argument that any wrongdoer, *ipso facto*, ceases to be an agent, also runs counter to the enforcement policy of Section 2(a)(1)(B).

> [I]n general, the CFTC and courts have continued to interpret this vicarious liability provision broadly and aggressively. Indeed, in recent years, intentionally or not, the CFTC and the courts appear to have expanded the application of Section 2(a)(1) vicarious liability to futures industry participants who might not be liable under traditional agency principles.

*Secondary And Supervisory Liability Under The Commodity Exchange Act: An Update*, 56 Rec. B. Ass'n of City of N.Y. 239, 240-241 (Spring 2001). *See In re Sumitomo Copper Litig.,* 104 F. Supp. 2d 314, 325 (S.D.N.Y. 2000.

### B. Knowledge, Profit or Control by the Principal Are Not Required Elements of this Strict Vicarious Responsibility Under the CEA, Which is to be Pleaded Under Rule 8(a)(2)

Under Congress' design for Section 2(a)(1), the principal, like many of the Amaranth Defendants here, is liable **without regard** as to whether it had prior knowledge of the illegal acts and did not take commissions from the defrauded customer or otherwise benefit financially from the illegal acts" of its agent. *Cange*, 826 F.2d at 589. Contrary to Defendants' arguments,

---

[39] *See also, Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193, 1198 (8th Cir. 1982)("The plaintiffs had no reason to know that Margulies was acting beyond the scope of his authority. Accordingly, Friedman is bound by the acts and omissions of its agent."); *see, e.g*., *Master Commodities, Inc. v. Texas Cattle Mgmt. Co.,* 586 F.2d 1352, 1357-1361 (10th Cir. 1978); *Lewis v. Walston & Co., Inc*., 487 F.2d 617, 623-624 (5th Cir. 1973); Markham & Meltzer, Secondary Liability Under the Commodity Exchange Act -- Respondeat Superior, Aiding and Abetting, Supervision and Scienter, 27 Emory L.J. 1115, 1118-34 (1978).

neither knowledge of the agent's activities nor the derivation of profit therefrom, nor "control" of

the agent by the principal, is required for a principal to be vicariously liable.[40] Moreover Section

2(a)(1) applies even where the agent acts without express direction of the principal, and even

where the principal would have countermanded the agent if informed of the conduct.

*See* Restatement (Second) of Agency § 230 at 511, cmt. b (employee may be said to act within

the scope of employment even if the employee engages in acts "specifically forbidden" by the

employer).

Also contrary to Defendants' arguments, the sufficiency of allegations supporting Section

2(a)(1)(B) liability are analyzed pursuant to Rule 8(a)(2) and not Rule 9(b).[41]

---

[40] Once again, in *Commodities Fluctuations Systems, Inc.*, 583 F. Supp.at 1384, the Court held that Jones, a defendant who "carried the accounts" and cleared trades for which certain associated persons ("AP's") solicited investments was liable for the fraudulent acts of those salespersons, even though the salespersons were hired by an independent entity ("CFS") which also developed and marketed the investment program.

The salespersons identified themselves to investors as representatives of CFS, and CFS also developed and packaged the sales materials, "retain[ed] control over [the salespersons'] activities, arrange[d] for compensation, and retaine[d] the right to terminate the relationship at any time." *Id.* The Court nonetheless imputed liability under Section 2(a)(1), concluding that "the CFS salesperson/Jones AP's solicited accounts in part at least for Jones's benefit and were, therefore, agents of Jones." *Id.*

[41] Even in the securities fraud context, an agency relationship need only be pleaded with the detail required by the notice pleading provisions of Fed. R. Civ. P. 8(a). *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807 (S.D.N.Y. 2006); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 290-91 (S.D.N.Y., 2005) (allegations concerning agency relationship were subject to Fed. R. Civ. P. 8(a), not Fed. R. Civ. P. 9(b)).

*In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152 (D. Mass. 2002), relied upon by defendants is inappropriate. *Id.* at 171 (refusing to hold one entity that was part of a worldwide accounting firm liable for acts of another as agent where, *inter alia*, there was an express disclaimer of agency in the agreement between the entities). Here, there are express agreements of agency between the Amaranth Defendants. See, *e.g.,* Brig. Decl. Ex. 11 (Advisory Agreement between Amaranth Advisors and Amaranth Partners LLC) at pp. 14-15, stating that "any action taken [by Amaranth Advisors] on behalf of [Amaranth Partners] . . . shall constitute the act of a and bind the Company." The defendants misstate the law when they argue that an agency relationship must be pleaded according to the standards of Fed. R. Civ. P. 9(b).

In fact, the case upon which Defendants rely, *Kolbeck v. LIT America, Inc.*, makes it clear that this is so only "when the agency relationship itself allegedly is part of the fraud." 923 F.

### C. Plaintiffs Have Adequately Alleged That Each Amaranth Defendant Was A Principal Or Control Person Of At Least One Amaranth Trading Defendant

Plaintiffs have adequately alleged that Amaranth Advisors was a "broadly empowered agent" of the Amaranth Defendants under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and that each of the Amaranth Defendants is liable for the acts of its agents. ¶ 22. *See also* ¶¶ 23-31.

**Amaranth Advisors.** Plaintiffs have satisfied this burden by pleading that Defendant Amaranth Advisors served as the investment advisor and manager of the Amaranth group of investment funds, including Defendant Amaranth LLC. ¶ 22. Defendant Amaranth Advisors was the entity that directed the investments under the Advisory Agreement between Defendants Amaranth LLC and Amaranth Advisors. ¶ 22. And, that Defendant Amaranth Advisors was the broadly empowered agent of the master funds and the feeder funds, Defendants Amaranth LLC, Amaranth Partners LLC, Amaranth Capital Partners LLC and Amaranth International Ltd. ¶ 22.

**Amaranth LLC (the "master fund"), Amaranth International Limited, Amaranth Capital Partners LLC, and Amaranth Partners LLC ("the feeder funds").** The Amaranth master fund and the feeder funds rest much of their argument on the notion that Defendant Amaranth Advisors was not their agent because they allegedly did not exercise "control" over Defendant Amaranth Advisors. For now, it is a complete answer to this argument to say that it denies the well pleaded allegations of the complaint: Defendant Amaranth Advisors L.L.C. "was a broadly empowered agent of the Amaranth Defendants under Section 2(a)(1)(B) of the CEA, 7 U.S.C. 2(a)(1)(B) (2002)." ¶ 22.

---

Supp. 557, 569 (S.D.N.Y. 1996). Indeed, in *Kolbeck*, the agency relationship was itself alleged to be a fraud. *Id*. Here, by contrast, (1) there is **NO** fraud with regard to the agency relationship alleged whatsoever, and (2) the entire enterprise **engaged** in manipulation **BUT** the agency relationship itself was not manipulation.

Contrary to the funds' arguments, their delegation of a greater degree of control over their investing to Amaranth Advisors is a factor that militates **in favor of the imposition** of vicarious liability, not against.  See Brig. Decl. ¶ 15(b), n.1, 3, 4.  Generally "managing agents" (like Defendant Amaranth Advisors here) who have authority "to… exercise control, discretion, and independent judgment..." create greater vicarious liability for their principals.  *See Fitzgerald v. Mountain States Tele. & Tel. Co.,* 68 F.3d 1257,1263 (10th Cir. 1995) (no vicarious liability could be imposed on principal employer where "training director" at telephone company did not have stature and authority  to exercise control, discretion and independent judgment over certain area of a business with some power to set policy for the company).  Indeed, as demonstrated by *Fitzgerald*, if the agent does not have sufficient independent discretion, the principal cannot be bound by the agent.

> [the principal] could avoid liability by ensuring that it remained ignorant of its agents' conduct. and the . . . laws would therefore encourage [the principal] to do as little as possible to oversee its agents... Only [the principal]  can take systematic steps to make improper conduct on the part of all its agents unlikely, and the possibility of civil liability will inevitably be a powerful incentive for [the principal] to take those steps.

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.,* 456 U.S. 556, 572-73 (1982).

A broadly empowered agent need not have its day-to-day affairs such as individual trading decisions subject to any "control" by the principal so long as the principal retains some bit of control.  Common sense and the cases make clear that the fact that the principal has delegated wide discretion to the agent does not annul the agency or absolve the principal from vicarious liability.[42]  As the Restatement confirms:

---

[42] *See CEH Inc. v. F/V Seafarer*, 880 F. Supp. 940, 956 (D .R.I. 1995), *aff'd* 70 F.3d 694, 705 (1st Cir. 1995) (holding a shipowner liable for both compensatory and punitive damages for tortious act of ship captain who had "carte blanche" authority over fishing vessel and rejecting

> [A] person may be an agent although the principal lacks the right
> to control the full range of the agent's activities, how the agent
> uses time, or the agent's exercise of professional judgment. A
> principal's failure to exercise the right of control does not eliminate
> it, nor is it eliminated by physical distance between the agent and
> principal.

Restatement (Third) of Agency § 1.01, cmt. c. The Restatement defines the concept of an

agency relationship as follows:

> §1.01 Agency Defined
>
> Agency is the fiduciary relationship that arises when one person (a
> "principal") manifests assent to another person (an "agent") that
> the agent shall act on the principal's behalf and subject to the
> principal's control, and the agent manifests assent or otherwise
> consents so to act.

Thus, even if the Funds retained no operational control, the cases recognize that one of the bases

for holding a principal vicariously liable for punitive damages is that the agent was a

"managerial agent" who had discretion and control over the business of the principal. *See*

*Wardman-Justice Motors, Inc. v. Petrie*, 39 F.2d 512 (D.C. Cir. 1930); *EEOC v. Wal-Mart*

*Stores*, *Inc.*, 11 F. Supp. 2d 1313, 1322-23 (D. N.M. 1998); *see also* Restatement (Second) of

Torts, § 909 ( c) (stating punitive damages can properly be awarded against a master or other

principal because of an act by an agent if, but only if, the agent was employed in a managerial

capacity and was acting in the scope of employment).

Amaranth LLC cites no authority in support of its argument that, as the master fund,

Section 2(a)(1)(B) requires that it "control" Amaranth Advisors or any of the other Amaranth

---

the argument of the shipowner that its "delegation of nearly absolute management authority" to
the captain absolved it of liability); *U.S. v, Habersham Properties, Inc*., 319 F. Supp. 2d 1366.
1375 (holding that it was appropriate to sanction owner of property management company
because the property management company managed the property for the corporate owner and
thus "submits to the control of [the owner] even if the [owner] did not often exercise this
control").

Defendants.  Amaranth LLC Br. at 16.  This Court has held squarely to the contrary.

*Commodities Fluctuations Systems,* 583 F.Supp. at 1384-85.

**Maounis.**  Allowing a master or feeder fund to claim absolution from the unlawful activities of its trading advisor would be especially inequitable where, as here, the master fund, feeder funds, and trading advisor are all entities created by a single hedge fund manager, Nicholas Maounis, as a unitary group that created the single pool of capital needed to engage in the manipulative conduct charged in the complaint.  *Id.*  See Brig. Decl. ¶¶ 15(c)-(e), 20, 23, n.1, 6. Further, all of the organizations were formed and linked together by Maounis to pool and invest the assets of U.S.-based and offshore investors without being subject to the regulation under the Investment Company Act of 1940.  *See supra*.  In substance, Amaranth acted as a single organization under the direction of Defendant Maounis, whose capital was deployed to manipulate NYMEX natural gas futures prices. *Id.*

**Hunter**.  Hunter was the head natural gas trader and devised the manipulative trading strategies under Maounis' supervision, which included accumulating and holding the unprecedented large positions and repeatedly slamming the close.  ¶¶ 31, 102, 106, 109, 115-16, 251.

**Donohoe.**  Donohoe was the "execution" trader who effected Hunter's trading strategies which were devised under Maounis' supervision.  ¶¶ 31, 102, 106, 113, 116, 252.43

---

[43]  Defendants argue as a matter of first impression that there can "no longer" be a private right of action for vicarious liability under the CEA by reason of the Rule 10b-5 decision in *Stoneridge Inv. Partners, LLC v. Scientific Atlanta*, ___ U.S. ___, 128 S.Ct. 761 (2008).  Defendants cite no authority applying *Stoneridge* to the CEA.

Generally, the CEA is very different from the securities law.  *See supra*.  Specifically, Judge Posner emphasized  that Section 2(a)(1)(B)'s express provisions have "no counterpart in the securities laws . . . creating liability on the basis of respondeat superior."  *Rosenthal*, 802 F.2d at 966, 967, 969.

**III.        THE AMARANTH DEFENDANTS ARE ALL LIABLE AS A COMMON ENTERPRISE FOR ONE ANOTHER'S ACTS**

The Amaranth shell of companies is claimed to be a license to alleviate assets from responsibility and harm, in this case, NYMEX natural gas traders while the individual miscreants go on their next machination. However, Section 13(c)(a) of the CEA provides that those who act in combination with a violator are also liable as primary violators. Where one or more corporate entities operate in a common enterprise, each may be held liable for the manipulative acts and practices of the other. *CFTC v. Wall Street Underground, Inc.*, 281 F.Supp.2d 1260, 1271 (D. Kan. 2003). Individuals may also be held to be participants in a common enterprise where the individual and the other members of the enterprise operate as a single economic entity. *Id.* Common enterprises may be held to exist where common control exists, business is transacted through a maze of interrelated companies, or the entities commingle funds. *Id.* (sharing of office space and officers and unified advertising are factors of common enterprise); *CFTC v. Noble Wealth Data Info. Serv., Inc.*, 90 F. Supp. 2d 676, 690 (D. Md. 2000), *aff'd in part, vacated in part sub. nom. CFTC v. Baragos*, 278 F.3d 319 (4th Cir. 2002) (two firms formed as successors to prior firm, both funded through prior firm, and both operated by the same individuals utilizing the same traders and scheme as prior firm were liable along with prior firm as a common enterprise).

That is, the Amaranth entities are not like, for example, Price Waterhouse U.S. and Price Waterhouse Overseas. The former, without dependence on anyone else, provides self-contained accounting services here in the U.S. The latter does likewise overseas. Courts have long considered common control to be indicative of a common enterprise for the purpose of

---

*Stoneridge* emphasized the unique history of securities regulation and it was not addressing Congress' words but "[t]he § 10(b) private cause of action is a judicial construct that Congress did not enact in the text of the relevant statutes." 128 S.Ct. at 772.

attributing joint and several liability. *Wall Street Underground, Inc.*, 281 F. Supp. 2d at 1271. As established in the Complaint and herein, Defendant Maounis had *de jure* and *de facto* control over the funds, advisors, and other entities that comprise the Amaranth hedge fund. *See supra*. Also consistent with its structure as a single entity commodity pool, the Amaranth entities had common addresses. Brig. Decl. ¶ 15.

The Amaranth entities operated as one commodity pool, with at most sub-accounts, and constitute a common enterprise. *See, e.g.*, *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482, fn. 7 (9th Cir. 1973) ("A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.") [44]

## IV. Plaintiffs Adequately Plead Aiding and Abetting Liability

### A.     JP Morgan Aided And Abetted Amaranth's Manipulation

---

[44] Under the CEA, a commodity "[p]ool means any investment trust, syndicate *or similar form of enterprise* operated for the purpose of trading commodity interests." 17 C.F.R. § 4.10(d)(1) (2007) (Emphasis supplied.) "A commodity pool is distinguished from other investment entities by the aggregation of investors' funds into a single account. Funds from the account are then invested without regard to the source of specific funds, and the profits and losses are distributed pro rata among the investors." *CFTC v. Equity Financial Group, LLC*, 2006 WL 3359418, *2 (D. N.J. Nov. 16, 2006)("A commodity pool operator is one who manages an investment fund, similar to a mutual fund, in which assets of several investors are invested together with gains and losses shared pro rata by the participants."). The fact that a feeder fund does not directly invest in commodity futures, but instead transferred funds to a master fund for investment, does not affect its status as a commodity pool. *Id*. at *3.

   Here, Defendant Maounis established Amaranth as a single unitary commodity pool subject to common enterprise liability. ¶¶ 25, 29, 32. *See, e.g.,* Brig. Decl.¶ 23. Consistent with its structure as a single entity commodity pool, Amaranth, per Defendant Maounis, consistently issued a single monthly report summarizing the performance and investment strategy of each of its funds. *See* Brig. Decl. Ex. 7. Moreover, other than defining the individual feeder funds as the "Funds", such "common enterprise" reports made no mention of the feeder funds individually). *Id*. Nor did the reports otherwise distinguish among the funds other than reporting their individual performance expressed as a percentage return to equity. *Id*. Finally, the reported financial results of the feeder funds indicate that the returns of each of them were closely correlated to those of the others.

In order to state a claim for aiding and abetting liability under the CEA, Plaintiffs must allege that JP Morgan (1) had knowledge of Amaranth's intent to manipulate in violation of the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the "principal's objective". *Natural Gas I*, 337 F. Supp.2d at 511, *citing 766347 Ontario Ltd. v. Zurich Capital Markets*, 274 F. Supp.2d 926, 934-35 (N.D. Ill. 2003); *see also Kohen,* 244 F.R.D.at 482.

Plaintiffs have done so:  (1) JP Morgan knew of Amaranth's manipulation (*see, e.g.*, ¶¶199-208, 22); (2) JP Morgan intended to further the manipulation (*see, e.g.*, ¶¶209, 217-218, 222); and (3) JP Morgan provided substantial assistance in furtherance of the manipulation (*see, e.g.*, ¶¶210-217, 222).  *See Kohen, surpa*, 244 F.R.C. 469, 482 (N.D. Ill. 2007).45

1. **JP Morgan's Knowledge of The Manipulation**.

The violation here is that Amaranth was (1) intentionally, (2) causing (3) artificial NYMEX prices.  *Sumitomo I supra* (describing elements of a CEA violation).

JP Morgan knew that Amaranth was (1) intentionally (2) engaging in blatant manipulation Tactics, and (3) that NYMEX prices were distorting in conformity with the expected or logical impact of such Tactics.

In other words, JP Morgan knew of manipulation Tactics and manipulation effects.  As is set forth below, JP Morgan also knew of an investigation of manipulation and multiple other inculpatory facts.

By using multiple brokers, prior manipulators have tried to disguise their methods, their movements, and their finances. [46]  Here, Amaranth disguised its acts by using multiple

---

45 JP Morgan's contention (at p. 6) that Plaintiff's CEA manipulation by dominant position claim is subject to Rule 9(b)'s heightened pleading standard is without merit.  *See supra*.
46 *In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 87 (S.D.N.Y. 1998) (Pollack, J.) ("*Sumitomo*

exchanges and trading venues.  ¶¶150, 166-168, 200.  However, Amaranth used only **one**

financier, only **one** broker and only **one** clearing member in all such exchanges and trading

venues:  JP Morgan.  ¶¶199-200.  Amaranth did **everything** through JP Morgan.  Amaranth

perpetrated its blatant manipulation exclusively through JP Morgan and exclusively through

Tactics of which JP Morgan was aware (except for Amaranth's misleading statements to the

NYMEX).  ¶¶100, 105, 150, 183, 199-202.

Therefore, in contrast to the aiders and abettors in prior CEA manipulation cases, JP

Morgan had **unprecedented** knowledge of Amaranth's manipulation.  For example, JP Morgan:

- ▪    knew **all** of Amaranth's unprecedented, eerily increasing positions, and **all** of
       Amaranths' unprecedented trading volume (¶¶199-202);

- ▪    knew of the highly unusual and continuing increases in NYMEX spread prices to
       unprecedented levels (¶¶150, 121, 209);

- ▪    knew of the unprecedented volatility of prices on the NYMEX market (¶¶4, 175);

---

*I*")(two brokers); *In re Sumitomo Copper Litig.*, 194 F.R.D. 480, (S.D.N.Y. 2000) (a third and
fourth broker including JP Morgan) ("*Sumitomo II*"); *Minpeco, S.A. v. Conticommodity Services,
Inc.*, 673 F. Supp. 684, 692-693 (S.D.N.Y. 1987) (brokers' summary judgment motions denied
where allegations that silver futures traders and the brokerage houses who handled their silver
futures accounts participated in a conspiracy to manipulate upward the price of silver and silver
futures.)

    Also, the CFTC has found primary brokers liable for aiding and abetting commodity
price manipulation.  For example, the Sumitomo Corporation established and maintained large
and dominating futures positions in corner on the London Metal Exchange ("LME") in 1994-95
with the intent of manipulating the price of copper traded on the New York Commodities
Exchange ("COMEX").  *In the Matter of Global Minerals & Metals Corp., et al.*, CFTC No. 99-
11, 1999 WL 440439.

    One of Sumitomo's primary brokers, Merrill Lynch, provided significant financing and
trading support for Sumitomo's manipulative position.  In finding Merrill Lynch liable for aiding
and abetting under the CEA, the Court determined "Merrill (B&D) and Merrill International
provided the financial wherewithal and trading assistance with which the manipulators
manipulated the market . . .  In addition, Merrill Lynch provided trading facilities and credit
through which the manipulator maintained a dominant position in maturing LME contracts and
warrants."  *Id.* at *4.

    *Leist, supra* 638 F.2d at 289-290 (manipulators stayed in the background and used
multiple brokers).

- knew of Amaranth's dominance (¶¶190-202);

- knew all aspects of Amaranth's notoriously manipulative "slamming the close" transactions, including that they benefited Amaranth's natural gas positions held on ICE by $128,000,000 (¶¶119, 125, 145, 200, 204);

- knew and willfully assisted in Amaranth's movement of manipulative natural gas positions from NYMEX to ICE to avoid regulatory scrutiny and continue Amaranth's manipulation (¶¶210-211, 214);

- knew fare more than the CFTC or NYMEX knew about Amaranth's positions on the ICE including the critical ICE facts recounted in the two bullets above (*Id*);

- knew that the Amaranth Defendants were repeatedly violating NYMEX position and accountability limits during the Class Period[47], and

- even knew that Amaranth was being investigated for manipulation and other infractions. ¶¶206-208.

In addition to its duty under NYMEX rules (*see* Statement of Facts *supra*) to prevent manipulation, JP Morgan, as a sophisticated market participant holding a sensitive position of social and economic responsibility, had to be aware of the inculpatory nature and the deleterious effects of each of the notoriously manipulative Tactics.   *In the Matter of FSI Futures Inc.,* Comm. Fut. L. Rep. (CCH) P27,150; 1997 CFTC LEXIS 196, 17-18 (CFTC 1997)("As with primary wrongdoers, ignorance of the law is not a defense, especially where the person charged

---

[47] The purpose of these limits, as all market participants know, is to reduce the threat of market manipulation.  The Commodity Futures Modernization Act of 2000 ("CFMA") addressed the importance and purpose of position limits: "To reduce the potential threat of market manipulation or congestion, especially during trading in the delivery month, the board of trade shall adopt position limitations or position accountability for speculators, where necessary and appropriate."  7 U.S.C. § 7(d)(5).  Violation of exchange position limits is a serious violation of the CEA and the CFTC brings actions against traders that violate futures exchange position limits.  7 U.S.C. §6a(e); *see also In re Saberi, CFTC No. 01-11, 2005 WL 517453,* aff'd *Saberi v. CFTC*, 488 F.3d 1207 (9th Cir. 2007) (CFTC fines pork belly futures trader $110,000 for violating Chicago Mercantile Exchange ("CME") position limits even though CME sent trader a warning letter for the same single violation).

Each position and accountability limit violation by Amaranth was a "red flag" to the JPM Defendants indicating the intent by the Amaranth Defendants to manipulate the prices of natural gas contracts.

with aiding and abetting is an industry professional in a highly regulated field.").  Each such

Tactic was well known in the law as manipulative:

(a) acquiring and maintaining dominance over the market, *see Minpeco, S.A. v. Conticommodity Services, Inc.*, 673 F. Supp. 684, 693 (S.D.N.Y. 1987)("… [broker] Bache had information strongly suggesting that the Hunts were in the process of establishing a dominant position in the silver futures market, an important indicator of manipulative intent. *See Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1164 (8th Cir. 1971), cert. denied, 406 U.S. 932, 92 S. Ct. 1770, 32 L. Ed. 2d 135 (1972).");

(b) slamming the close" trades, *see Black v. Finantra Capital, Inc.*, 418 F.3d 203, 206 (2d Cir. 2005)("Lowry also testified that the broker executing Finantra's buybacks was "marking the close" by making those purchases at the end of the day, a manipulative device that maintained Finantra's reported closing share price at an artificially high level."); *T.H.C., Inc. v. Fortune Petroleum Corp.*, 1999 U.S. Dist. LEXIS 4039, 13-14 (S.D.N.Y. Mar. 31, 1999)(fraud, and in particular scienter adequately pled against a broker where complaint stated that broker "**knowingly executed, and even directed, stock transactions during the restricted periods at a time of the day deliberately calculated to mark the closing price at a lower level than it otherwise would have had."**)(emphasis added);

(c) steadily increasing positions to push prices, *see In re Henner*, 30 A.D. 1151, 1227 (Agric. Dec. 1971).("Buying or selling in a manner calculated to produce the maximum effect upon prices, frequently in a concentrated fashion and in relatively large lots" is one form of manipulation, among others.);

(d) violating speculative limits; (*see* fn *supra*); and

(e) defeating the NYMEX's anti-manipulation directive.[48]

From the unambiguous, notoriously manipulative nature of such a high quantity of acts,

JP Morgan had ample knowledge of Amaranth's on-going large-scale manipulation.  *See United States v. Gurary*, 860 F.2d 521, 526 n.5 (2d Cir.), *cert. denied*, 490 U.S. 1035 (1989)( jury

---

[48]    *See In re DiPlacido*, CFTC No. 01-23, 2004 WL 2036910 (NYMEX floor broker manipulated, and aided and abetted manipulation of, the settlement price of NYMEX electricity futures contracts through execution of uneconomic orders on the floor at the close on behalf of a customer that had the purpose and effect of driving down prices.) Slamming or marking the close conveys false information to the market as to the value and demand for the commodity free of manipulative influences. *CFTC v. Amaranth Advisors* I 2008 WL 2123323 at *3 citing *Sec. & Exch. Comm'n v. Masri,* 523 F.Supp.2d 361, 369-70; (S.D.N.Y.2007).

charge of "conscious avoidance" and "deliberate disregard with a conscious purpose to avoid learning the truth" was sufficient for knowledge in aiding and abetting) ; *United States v. Brawer*, 482 F.2d 117, 128 n.14 (2d Cir. 1973)(upholding jury charge that "the element of knowledge may be satisfied by … proof that a defendant deliberately closed his eyes to what otherwise would have been obvious to him…Defendant's knowledge of a fact may be inferred from willful blindness....").

## 2.    Intentional Assistance

JP Morgan used its unprecedented knowledge **not** to stop the manipulation, but to make tens of millions of dollars in fees for assisting and prolong the manipulation and $725 million in trading profits when the manipulation collapsed.

Contrary to the JPM Defendants' contention, the unprecedented scale of Amaranth's foregoing Tactics required an extraordinary and an unprecedented of assistance from JP Morgan. That is, JP Morgan provided **unprecedented** assistance to Amaranth precisely because the scale of what Amaranth did was unprecedented.  In this sense, as the **sole** futures broker, the **sole** clearing exchange member, and **the** sole financier, JP Morgan, effectively conferred dominance on Amaranth by allowing Amaranth to continue to **increase** its positions, slam the close, evade NYMEX anti-manipulation directives, violate position limits, and continue to distort prices. ¶¶183, 194-217.

JP Morgan did so, first, by continuing to carry, clear and finance JP Morgan's positions, trading volume, slam the close trades, etc.

Second, JP Morgan:

·        secretly executed and carried a substantial portion of Amaranth's ICE natural gas positions *in order to evade CFTC and NYMEX scrutiny*.  (¶214)

- continuously increased Amaranth's credit limits, particularly for ICE swaps.  ¶¶ 210, 2113

- allowed Amaranth to exceed its own trading limits on ICE after NYMEX directed Amaranth to reduce its positions.  ¶216

Plaintiffs' allegations showing how the JPM Defendants assisted Amaranth go far beyond the allegations in *The Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 446 F. Supp.2d 163 (S.D.N.Y. 2006).[49]

This assistance enabled Amaranth's manipulation violation here to go on for eight extraordinary months as its positions continued to grow and cause increasing amounts of artificiality.  Corroborating that JP Morgan knew that the distorted prices were due to Amaranth, JP Morgan made $725,000,000 when Amaranth's position was removed and prices snapped back to normal.  ¶173.

### 3.    Intent to Further the Violation Is Inferred From Unprecedented Knowledge and Unprecedented Assistance

Just as the state of mind or intent is inferred from conduct for purposes of CEA manipulation (*see* Pt.I *supra*), so it should be inferred from conduct for purposes of CEA aiding and abetting.  JP Morgan clearly intended to further and profit from the manipulation and to profit even more from its demise.

### B.    The Floor Broker Aided And Abetted Amaranth's Slamming The Close Manipulation

---

49 The JPM Defendants contend that such specific allegations fail because plaintiffs "impermissibly attempt to 'lump together'" the three JPMorgan defendants.  *But see Ontario Ltd. v. Zurich Capital Markets Inc.*, 274 F.Supp.2d 926, 934-35 (N.D. Ill. 2003) (finding plaintiffs sufficiently alleged an aiding and abetting claim under the CEA based on fraud in compliance with Rule 9(b) where specific allegations were made against all defendants grouped together).  Here, Plaintiffs' manipulation and aiding and abetting claims are based on the unlawful exertion of market power, not fraud, and are thus governed by Rule 8's simplified notice pleading standard.

The Floor Broker Defendants knowingly executed the Amaranth Defendants' "slamming the close" scheme, which had the deliberate effect of causing artificially low prices for NYMEX natural gas futures on and after the close of the March, April and May natural gas futures contracts. ¶¶ 31, 34-36, 100-104, 112-114, 123, 138-139, 143, 259; Federal Energy Regulatory Commission Order to Show Cause and Notice of Proposed Penalties, No. IN07-26-000 ("FERC OSC") at ¶¶ 12, 57-106.

"Slamming the close," also known as "marking the close," is a notorious manipulation tactic that has been used NYMEX floor brokers and other commodities traders, in the past.[50] The "timing of such transactions is not only suspicious, but also more capable of artificially affecting the price" of commodities. *Amaranth Advisors I,* 2008 WL 2123323, at *10, citing *Masri*, 523 F. Supp. 2d at 370.

The Complaint alleges that each of the Floor Broker Defendants "had knowledge of, and aided and abetted, the Amaranth Defendants' manipulation of NYMEX natural gas prices in violation of the CEA." ¶¶ 34-36. The Amaranth Defendants gave the Floor Broker Defendants extraordinarily large sale orders to execute during the winding down of trading in the nearby NYMEX natural gas contract.[51] One of the orders was so large and given at such a late point during the closing range that the Floor Broker Defendant could not even fully execute the

---

[50] *In re DiPlacido,50* CFTC No. 01-23, 2004 WL 2036910 at *4-5 (NYMEX floor broker manipulated, and aided and abetted manipulation of, the settlement price of NYMEX electricity futures contracts through execution of uneconomic orders at the close that had the purpose and effect of driving down prices); *In re Henner*, 30 A.D. 1151 (1971) (Henner, a trader on the Chicago Mercantile Exchange, manipulated shell egg futures by his large volume of purchases at the close of trading).

[51] NYMEX floor brokers have a duty to investigate suspicious orders before executing them. "[A] floor broker is responsible for evaluating the orders he receives for indications that his participation in the transaction is legally prohibited . . . Floor brokers who fail to make such inquiries act at their own peril." *In the Matter of Three Eight Corp, et al.,* CFTC No. 88-33, Comm. Fut. L. Rep. P 25,749, 1993 WL 212489 (C.F.T.C.).

contract.[52]  ¶ 143.  The impact of the size and timing of these orders was obvious to anyone trading in the NYMEX natural gas futures pit.  ¶ 114.

In addition to the knowledge of the obvious impact the Amaranth orders would have on the market, the Complaint identifies additional specific instances where Floor Broker Defendants were made aware of Amaranth Defendants' intentions.  For example, Defendant Hunter advised ALX and other Floor Broker Defendants of Amaranth's long position and manipulative intentions so that the floor brokers would know how to execute the trades in order to maximize Amaranth's ability to manipulate the market. ¶ 112.  The constant large volume of selling by the ALX Defendants at progressively lower prices as the closing range progressed, signaled to the floor traders and other market participants that they could "position themselves to respond to [the ALX Defendants] in such a way that could have benefited them . . . as well as maximize the intended effect of [the ALX Defendants'] trades."  *Id.* at ¶ 74.

In sum, the ALX Defendants, as the largest seller during the closing range, sold 3,111 contracts during the closing range in such a manner that they were able to drive down the prices of the March contract by $0.29.  Compl ¶ 118.

After the "success" of the "experiment" for the March 2006 natural gas contract, the scheme was repeated during the April 2006 close.  ¶ 121.  Again, Amaranth Defendants held "a large long position in the April 2006 contract prior to the settlement period, and proceeded to sell

---

[52]  The manner in which the ALX Defendants executed the sale of the 3,111 contracts "disseminated to the pit that Amaranth would be a large seller" during the closing range.52  ¶ 114.  Market participants testified that Defendant DeLucia, an ALX floor broker, was executing Amaranth's order in such a way that it was clear DeLucia was "more concerned with executing trades than with obtaining good prices."  FERC OSC at ¶ 69.  Further testimony and facts developed during the FERC investigation supports the inference that the ALX Defendants knew of the Amaranth Defendants' scheme and actively worked to achieve that goal.  *Id.* at ¶ 71; *see also* FERC OSC at ¶¶ 72-73 for testimony describing ALX Defendants' selling as a "freight train" signaling to the market that they are selling a "big piece of March on the close."

it [market on close] during the close, employing a nearly identical trading strategy as that used for manipulating the price of the March 2006 contract." ¶ 122.  On March 29, the termination day for the April 2006 contract, Floor Broker Defendants received three separate orders to sell April natural gas contracts, both immediately prior to and at the closing range.  ¶ 123.  If the size and timing of the trades during the March 2006 close were not red flags for Floor Broker Defendants, the repetition of the same trading scheme used just a month earlier surely demonstrates that Floor Broker Defendants had knowledge of Amaranth Defendants' objective to manipulate prices of NYMEX natural gas futures contracts.

For the third consecutive month, Amaranth Defendants directed Floor Broker Defendants to sell natural gas futures contracts at the end of the closing range for the May 2006 contracts.  ¶ 127.  Defendant "Donohoe placed orders with three separate [Floor Broker Defendants] (TFS, Gotham, and ALX) to sell these 3,044 contracts, in a highly orchestrated fashion starting at 2:22 p.m."  FERC OSC at ¶ 94.  According to order tickets and audio recordings, Amaranth Defendants instructed Floor Broker Defendants to wait until the last eight minutes to sell.  ¶¶ 138-143; FERC OSC at ¶ 94.  There was no other purpose to wait until the last eight minutes of the closing range to execute the trades other than to manipulate the NYMEX natural gas futures prices.  ¶ 139.  As a result, Floor Broker Defendants' knowledge of Amaranth's intent can be inferred from the orders to wait until the very last minutes of the closing range to sell.

Not only did the last minute trades create an inference of knowledge, such trades by the Floor Broker Defendants also created an inference of intent to assist Amaranth with violating the CEA because the trades were highly unusual and there was no legitimate commercial basis (¶¶ 101, 139-140) for this trading behavior.  *See Enron Corp.*, 2004 WL 594752, at *7.  The Floor Broker Defendants were also motivated to aid and abet Amaranth in their manipulative trading

by substantial revenue they generated executing Amaranth's trades, allowing Floor Broker Defendants to personally profit from the commissions. ¶¶ 223-227.

### C.   The Amaranth Defendants Aided and Abetted Manipulation

Each Amaranth Defendant allegedly knew about, worked to further, and intended to further Amaranth's manipulation. ¶¶ 22-33,73,245-252,255. Therefore, Plaintiffs have also plead a claim for aiding and abetting against each Amaranth Defendant.

### V   PLAINTIFFS ADEQUATELY PLEAD CLAIMS FOR UNJUST ENRICHMENT

Defendants formulaic constraints upon the doctrine of unjust enrichment are antithetical to the broad equitable purpose of the doctrine, clearly expressed by the New York Court of Appeals almost 130 years ago: "if one man has obtained money from another, through the medium of oppression, imposition, extortion, or deceit, or by the commission of a trespass, such money may be recovered back, for the law implies a promise from the wrong-doer to restore it to the rightful owner." *People v. Speir*, 77 N.Y. 144, 150 (1879).[53] Plaintiffs must only plead that: 1) Defendants were enriched; 2) the enrichment was at plaintiffs' expense; and 3) the circumstances were such that equity and good conscience require defendants to make restitution. *See Russo v. Friedman*, 91 Civ. 6913 (LBS), 1992 WL 196791 (S.D.N.Y. July 31, 1992); *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 655 F.Supp. 346, 353 (S.D.N.Y. 1987). Plaintiffs have more than satisfied each of these requirements under Rule 8(a).

Defendants also misapprehend the nature of quasi-contractual remedies, attempting to impose artificial requirements of pleading a substantial relationship between the parties and the

---

[53] *See also Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89 (1987) ("legal obligation imposed in order to prevent a party's unjust enrichment").

existence of some form of contract.[54]  In so doing, the Defendants also ignore that the very contractual nature of futures and options is inextricably intertwined with the alleged manipulative practices, and that they are fundamentally different financial instruments than equity securities.  Plaintiffs have pled in detail the nature of futures and options contracts, and how they are standardized and regulated.  *See, e.g.,* ¶¶ 42-43, 52 and 184.  Plaintiffs expressly allege that "[c]ommodity futures is a zero sum endeavor," ¶ 10, so that defendants' unlawful price manipulation unjustly enriched defendants in inverse proportion to plaintiffs' losses, ¶¶ 10 -11.  None of the cases relied upon by Defendants involve a similar type of "zero sum" contract market, and rather reflect examples of faulty pleading wholly distinguishable from the well-pled and causally connected allegations of the Complaint.

Plaintiffs seek the imposition of a constructive trust not as a stand alone claim but because it is the proper remedy to prevent unjust enrichment. *See Simonds v. Simonds*, 45 N.Y.2d 233, 242 (1978); *see also* Restatement (First) of Restitution §160 (Constructive Trust) (1937). While New York courts sometimes recite four factors for the imposition of a constructive trust, these factors are guidelines only.[55]  As the New York Court of Appeals explained in *Latham v. Father Divine*, 299 N.Y. 22, 27 (1949): "its applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to

---

[54] This is contrary to the equitable principles underlying quasi-contractual theory.  *See, e.g., Bradkin v. Leverton*, 26 N.Y. 2d 192, 197 (1970) ("a quasi-contractual obligation is one imposed by law ... The law creates it, regardless of the intention of the parties, to assure a just and equitable result"); *Miller v. Schloss*, 218 N.Y. 400, 407 (1916) ("It is an obligation which the law creates, in the absence of any agreement…"); Corbin, A.L., Quasi-Contractual Obligations, 21 Yale L.J. 533, 551-52 (1912) ("[a] quasi- contractual right is any right *in personam* that arises by act of the law independently of agreement, and is either specifically enforcible [sic] or measured by the amount of the defendant's enrichment.").

[55] *See Simonds*, 45 N.Y.2d at 241 ("[a]lthough the factors are useful in many cases constructive trust doctrine is not rigidly limited"); *Reiner v. Reiner*, 100 A.D.2d 872, 874 (2d Dept. 1984) ("these factors are merely useful guides and are not talismanic").

them." *See also Simonds*, 45 N.Y.2d at 241 (quoting Bogert, Trusts and Trustees § 471 p. 27 (2d ed. rev. 1978) for proposition that the court "reserves the freedom to apply this remedy to whatever knavery human ingenuity can invent"). Courts have applied this flexible approach when confronted with marketplace fraud.[56]

Defendants claim that it would be "inequitable" to order disgorgement against the Fund, because the Fund is not a "wrongdoer", citing to *S.E.C. v. Downe*, 969 F.Supp. 149, 157 (S.D.N.Y. 1997) (SAS). Yet the application of the unjust enrichment doctrine has never required the performance of any wrongful act by the one enriched. *See Simonds*, 45 N.Y.2d at 242. In fact, the very case cited by defendants undercuts any such requirement, as this Court found that the proper inquiry was the degree of control that the wrongdoer exercised over the accounts in question, and then required further disgorgement from those accounts. *See Downe*, 969 F.Supp. at 158.[57] Insofar as Defendants have represented that they are liquidating funds notwithstanding their obligations to Plaintiffs and the Class, imposition of the constructive trust remedy is all the more appropriate.

**VI    THE EXERCISE OF PERSONAL JURISDICTION IS APPROPRIATE**

**A.    The Court has Personal Jurisdiction Over Defendants Hunter and AIL**

---

[56] *See S.E.C. v. Levine*, 689 F.Supp. 317 (S.D.N.Y. 1988) (not requiring all four factors because constructive trust doctrine was not "rigidly limited"); *United States v. Rivieccio*, 661 F.Supp. 281, 292 (E.D.N.Y. 1987) (four factors not "talismanic" and "[i]nnocent parties may frequently be unjustly enriched").

[57] Defendants argue, as a matter of first impression, that the unjust enrichment claim is preempted by reason of the decision in *Credit Suisse Sec. (USA) LLC v. Billing*, 127 S.Ct. 2383 (2007) implying antitrust immunity to certain securities underwriting activity. Defendants again cite no authority applying *Credit Suisse* or antitrust immunity principles to the CEA. *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, 265 F.Supp.2d 254 (S.D.N.Y. 2003), which held that gross negligence and bad faith claims *against futures exchanges* were preempted by the CEA as "directly affect[ing] trading in futures markets" is no authority for preemption here.

Personal jurisdiction can be established by showing (1) defendants' minimum contacts with the forum and (2) the reasonableness of the forum.[58] *See, e.g., Pension Comm. of the Univ. of Montreal Pension Plan,* 2006 WL 708470, at *3. Plaintiffs have sufficiently established each of these elements over Defendant Hunter and AIL.

### 1. Defendant Hunter's and AIL's Minimum Contacts Confer Jurisdiction

Defendant Hunter contests jurisdiction on the basis that he is "unaware of any case finding jurisdiction in such circumstances." Hunter Mem. p. 23. Hunter, however, blatantly fails to cite Judge Chin's decision finding personal jurisdiction over him on the ground that "he personally placed orders to trade natural gas futures on NYMEX." *Amaranth Advisors I,* 2008 WL 2123323, at *6. The Complaint details similar allegations amply supporting jurisdiction over Defendant Hunter. *E.g.* ¶¶30, 105-146. Defendant Hunter should therefore be estopped from contesting personal jurisdiction here. *See In re Ski Train Fire in Kaprun Austria,* 499 F. Supp. 2d 437, 440-441 (S.D.N.Y. 2007).

This Court also has jurisdiction over Defendant AIL because: (1) AIL financed a wrongful scheme in the U.S. (Brig. Decl. ¶ 23), (2) AIL was controlled by Defendant Maounis from the U.S. as part of a common enterprise with other Maounis controlled U.S. based Amaranth entities (Brig. Decl. ¶¶14-20); and (3) Plaintiffs' claims arise from AIL's financing activities and other contacts with the U.S. (Brig. Decl. ¶¶ 21-23). *See Cromer Finance, Ltd v. Berger,* 137 F. Supp. 2d 452, 476 (S.D.N.Y. 2001) (personal jurisdiction established where offshore-fund's assets were invested in securities traded on U.S. exchanges); *Leasco Data*

---

[58]The relevant forum here is the U.S. *SEC v. Gonzalez de Castilla,* 2001 WL 940560, at *3 n.2 (S.D.N.Y. Aug. 20, 2001) (where jurisdiction is premised on federal statute, the forum applicable for contacts is the U.S. rather than forum state).

*Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1341 (2d Cir. 1972) (minimum contacts established where defendant knows, or has good reason to know, that his conduct will have effects in the forum seeking to assert jurisdiction). Defendant AIL with other Maounis U.S. based controlled entities derived substantial profits from U.S. markets. ¶¶16, 26, 246, 267; *Pension Comm.,* 2006 WL 708470 at *5 ("revenue derived from the forum can be a persuasive factor in establishing [ ] minimum contacts").

### 2. Jurisdiction Over Hunter and AIL is Reasonable

Asserting personal jurisdiction over Defendants Hunter and AIL is reasonable. *Teachers' Retirement System,* 2003 WL 21058090, at *9. Neither Defendant Hunter nor AIL contend that they would suffer any burden litigating this case in the U.S. or in this Court. To the contrary, the interests of the U.S., New York, and Plaintiffs are great and weigh heavily in favor of jurisdiction. *Id.*

### B. Alternatively, Plaintiffs are Entitled to Jurisdictional Discovery

Plaintiffs have had no jurisdictional discovery. Should the Court determine that the facts alleged in the Complaint and Brig. Decl. are insufficient to establish personal jurisdiction, Plaintiffs request leave to conduct jurisdictional discovery on Defendants Hunter and AIL. *APWU v. Potter,* 343 F.3d 619, 627 (2d Cir. 2003) ("A plaintiff should be provided with ample opportunity to secure and present evidence relevant to the existence of jurisdiction through jurisdictional discovery."); *Unique Industries v. Sui & Sons Int'l Trading Corp.,* 2007 WL 3378256, at *6 (S.D.N.Y. Nov. 9, 2007).

### CONCLUSION

All arguments raised by Defendants are disputed. Their motions should be denied in all respects.

Dated:      July 2, 2008
           New York, New York

LOVELL STEWART HALEBIAN LLP

By:  /s/ *Christopher Lovell*
Christopher Lovell (CL 2595)
Victor E. Stewart (VS 4309)
Gary S. Jacobson (GJ 2481)
Ian T. Stoll (IS 3424)
500 Fifth Avenue
New York, NY 10110
(212) 608-1900
(212) 719-4677 (fax)

LOUIS F. BURKE, P.C.

By:  /s/ *Louis F. Burke*
Louis F. Burke (LB 4686)
460 Park Avenue, 21ST Floor
New York, NY 10022
(212) 682-1700
(212) 808-4280 (fax)

LOWEY DANNENBERG COHEN
& HART, P.C.

By: /s/ *Vincent Briganti*
Vincent Briganti (VB 1497)
Geoffrey M. Horn (GH 4179)
White Plains Plaza
1 North Broadway, 5th Floor
White Plains, NY  10601
(914) 997-0500
(914) 997-0035 (fax)

*Co-Lead Counsel for Plaintiffs*

Christopher Gray (CG 0334)
CHRISTOPHER J. GRAY PC
460 Park Avenue, 21st Floor
New York, NY 10022
(212) 838-3221
(212) 508-3695 (fax)

Samuel Rudman
Robert Rothman
COUGHLIN, STOIA, GELLER,
RUDMAN & ROBBINS, LLP
58 South Service Rd., Suite 200
Melville, NY 11747
(631) 367-7100
(631) 367-1173 (fax)

Bernard Persky (BP 1072)
Gregory S. Asciolla
LABATON SUCHAROW, LLP
140 Broadway
New York, NY 10005
(212) 907-0868
(212) 883-7068 (fax)

*Additional Counsel for Plaintiffs*

## STATUTORY APPENDIX

**Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2)**

**§ 13. Violations generally; punishment; costs of prosecution**

(a) Felonies generally

It shall be a felony punishable by a fine of not more than $1,000,000 (or $500,000 in the case of a person who is an individual) or imprisonment for not more than five years, or both, together with the costs of prosecution, for:

(2) Any person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to corner or attempt to corner any such commodity or knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, or knowingly to violate the provisions of section 6, section 6b, subsections (a) through (e) of subsection 6c, section 6h, section 6(1), or section 23 of this title.

**CEA § 22(a), 7 U.S.C. § 25(a)**

**§ 25. Private rights of action**

(a) Actual damages; actionable transactions; exclusive remedy

(1) Any person (other than a registered entity or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person–

1. (A) who received trading advice from such person for a fee;

(B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract;

(C)  who purchased from or sold to such person or placed through such person an order for the purchase or sale of–

(i) an option subject to section 6 of this title (other than an option purchased or sold on a registered entity or other board of trade);

(ii) a contract subject to section 23 of this title; or

(iii) an interest or participation in a commodity pool; or

(D) who purchased or sold a contract referred to in subparagraph (B) hereof if the violation constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract.

(2) Except as provided in subsection (b) of this section, the rights of action authorized by this subsection and by section 7(d)(13), 7a-1 (b)(1)(E), and 21(b)(10) of this title shall be the exclusive remedies under this chapter available to any person who sustains loss as a result of any alleged violation of this chapter. Nothing in this subsection shall limit or abridge the rights of the parties to agree in advance of a dispute upon any forum for resolving claims under this section, including arbitration.

(3) In any action arising from a violation in the execution of an order on the floor of a registered entity, the person referred to in paragraph (1) shall be liable for–

(A) actual damages proximately caused by such violation. If an award of actual damages is made against a floor broker in connection with the execution of a customer order, and the futures commission merchant which selected the floor broker for the execution of the customer order is held to be responsible under section 2(a)(1) of this title for the floor broker's violation, such futures commission merchant may be required to satisfy such award; and

(B) where the violation is willful and intentional, punitive or exemplary damages equal to no more than two times the amount of such actual damages. If an award of punitive or exemplary damages is made against a floor broker in connection with the execution of a customer order, and the futures commission merchant which selected the floor broker for the execution of the customer order is held to be responsible under section 2(a)(1) of this title for the floor broker's violation, such futures commission merchant may be required to satisfy such award if the floor broker fails to do so, except that such requirement shall apply to the futures commission merchant only if it willfully and intentionally selected the floor broker with the intent to assist or facilitate the floor broker's violation.

(4) Contract enforcement between eligible counterparties

No agreement, contract, or transaction between eligible contract participants or persons reasonably believed to be eligible contract participants, and no hybrid instrument sold to any investor, shall be void, voidable, or unenforceable, and no such party shall be entitled to rescind, or recover any payment made with respect to, such an agreement, contract, transaction, or instrument under this section or any other provision of Federal or State law, based solely on the failure of the agreement, contract, transaction, or instrument to comply with the terms or conditions of an exemption or exclusion from any provision of this chapter or regulations of the Commission.

**Section 2(a)(1) of the CEA, 7 U.S.C. § 4**
**§ 4. Liability of principal for act of agent**

For the purpose of this chapter the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

**Section 13(c) of the CEA, 7 U.S.C. § 13c**
**§ 13c. Responsibility as principal; minor violations**


(a) Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

(b) Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

(c) Nothing in this chapter shall be construed as requiring the Commission or the Commission.

# Exhibit 1

16681

CORRECTED TRANSCRIPT

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   --------------------------------x

4   MINPECO S.A.,

5              Plaintiff,

6         v.                          81 Civil 7619

7   NELSON BUNKER HUNT, et al.,

8              Defendants.

9   --------------------------------x

10                                    August 15, 1988
11                                    10:00 a.m.

12

13  Before:

14              HON. MORRIS E. LASKER,

15                         District Judge

16                 APPEARANCES

17  COLE, CORETTE & ABRUTYN
         Attorneys for Plaintiff
18       1110 Vermont Avenue, N.W.
         Washington, D.C.
19  MARK A. CYMROT, ESQ.,
    THOMAS O. GORMAN, ESQ.,
20            and
    WILKES, ARTIS, HEDRICK & LANE
21       1666 K Street, N.W.
         Washington, D.C.
22  ROBERT X. PERRY, JR., ESQ.,

23

24

25

16682

CORRECTED TRANSCRIPT

APPEARANCES (Continued)

KAYE, SCHOLER, FIERMAN, HAYS & HANDLER
    Attorneys for Hunt Defendants
    425 Park Avenue
    New York, New York
PAUL CURRAN, ESQ.
AARON RUBINSTEIN, ESQ.,
STANLEY ROBINSON, ESQ.,
PHILLIP A. GERACI, ESQ.,
        and
GARDERE & WYNNE
ROBERT WOLIN, ESQ.,

CURTIS, MALLET-PREVOST, COLT & MOSLE
Attorneys for Defendant Mahmoud Fustok
    101 Park Avenue
    New York, New York
PETER FLEMING, ESQ.,
HERBERT STOLLER, ESQ.,
TURNER P. SMITH, ESQ.,
MICHAEL T. ZIMMERMAN, ESQ.,

LAXALT, WASHINGTON, PERITO & DUBUC
    Attorneys for Defendant International Metals
    Investment Co., Ltd.,
    1120 Connecticut Avenue, N.W.
    Washington, D.C.
PAUL L. PERITO, ESQ.,
ROBERT POKUSA, ESQ.,


           O   O  O



    (Trial continued)

    (In open court; jury present.)

    THE COURT:  Good morning, ladies and gentlemen.

    Well, ladies and gentlemen, it is a red letter

day.  First of all, it is VJ Day, and 43 years ago today I

was involved in defending a soldier in France on a murder

trial when I got a telegram that my second son was born and

16715

CORRECTED TRANSCRIPT

fact, intended to participate in the alleged conspiracy.

Ladies and gentlemen, I don't know about you, but I am a little tired so we will take a short recess.

Would you please leave your copies at your seats and maybe in about ten minutes we will resume.

(Recess)

(In open court; jury present.)

THE COURT: I come now, ladies and gentlemen, to the discussion of the four either Congessional acts or state law, provisions of state law which the plaintiff claimS that the conspiracy violated.  I will start with commodities manipulation.

The first law that Minpeco claims the alleged conspirators violated is the Commodities Exchange Act.  That statute, or act of Congress, makes it unlawful for any person to manipulate the price of any commodity in interstate commerce.  It is undisputed, of course, that silver futures contracts are a commodity in interstate commerce.  Therefore, the ultimate question for you to decide on this claim is whether defendants manipulated the market price of silver futures contracts.

I will now define for you what constitutes manipulation as a matter of law.

In order to determine whether the alleged conspirators manipulate the market, you must find that the

16716

CORRECTED TRANSCRIPT

plaintiff has proven each of the following facts by a
preponderance of the credible evidence.

First, that the alleged conspirators specifically
intended to produce an artificial market price of silver
futures.

Second, that an artificial market price in fact
occurred as a proximate result of the alleged conspirators'
intentional conduct.

And third, that the alleged conspirators' conduct
was a proximate cause of injury to the plaintiff.

Of course, to find that the conspirators
manipulated the market you must initially find that the
conspiracy existed.

As I have just said, the first proposition you
must decide is whether defendants specifically intended to
create an artificial market price of silver futures
contracts.

"Intent" here means that the conspirators knew
what they were doing and that they did it with a purpose or
conscious object of creating an inflated and artificial
price. An artificial price, as I will discuss in a few
minutes, is one that does not reflect the legitimate forces
of supply and demand.

Whether a person acted intentionally depends on
his state of mind, and you can determine that state of mind

16717

CORRECTED TRANSCRIPT

1    from circumstantial evidence surrounding these

2    transactions.  In other words, you can decide whether

3    defendants acted with knowledge and intent by looking at

4    their conduct and from the way the evidence established that

5    they acted.  Do their actions reveal an innocent state of

6    mind, or do they show a state of mind with the purpose to

7    affect the price of silver futures contracts?

8              While intent to manipulate may be inferred from a

9    person's actions and the totality of circumstances, such

10   intent may not be inferred from legitimate activity of the

11   market alone.  For instance, it is lawful to seek to make

12   money in silver trading, to hold substantial long positions

13   in silver futures, to take delivery of silver and to ship

14   silver bullion to Europe.  Thus, you may not draw any

15   inference to manipulate from the mere fact, and those words

16   are underlined in my charge, that the defendants may have

17   engaged in one or more of these trading activities.

18             However, you should not view each piece of

19   evidence in a vacuum.  If, when viewed in conjunction with

20   other evidence, you conclude that these trading activities

21   were undertaken for an unlawful purpose, you may consider

22   them as evidence of improper intent.

23             The second element of the claim of commodity

24   manipulation which you must consider is whether an

25   artificial market price in fact occurred as a proximate

16718

CORRECTED TRANSCRIPT

result of defendants' intentional conduct.

Implicit in this second element is a finding that the conspirators had the ability to influence market price.

An artificial market price is a price that does not reflect or that distorts the basic forces of the laws of supply and demand. Prices reflecting basic supply and demand occur only in a marketplace that is free of artificial stimulus or distortions.

However, high prices, even unusually high prices, are not necessarily artificial.

Of course, when the aggregate forces of supply and demand bearing on the market are all legitimate, the price is not artificial. Thus, in determining whether plaintiff has proved that the price of silver was artificial, you should focus not only on the price itself, but on the factors causing it. However, you should note that the creation of a price that is to any degree artificial, whether great or small, is prohibited.

If you determine that the price of silver and silver futures contracts became artificial during the period in question, you must decide whether the defendants' intentional conduct was the proximate cause of this artificial price.

To establish what we call proximate cause, plaintiff must prove by a preponderance of the evidence that

16719

CORRECTED TRANSCRIPT

defendants' conduct played a substantial part in bringing

about or actually causing the artificial price.  It is not

necessary, however, that plaintiff prove to you that the

defendants' conduct was the sole cause of an artificial

price.

Third, you must determine whether the plaintiff

has proven by a preponderance the evidence that the alleged

conspirators' conduct was a proximate cause of injury to the

plaintiff.

The concept of proximate cause has just been

explained to you, and injury and damages will be discussed

at the end of the charge.

I come now to what is called the Sherman Act.

The Sherman Act is also known to most people as the

antitrust act.  It is a federal law.  There are various

sections of it.  I will deal first with what is called

Section 1.

Section 1 of the Sherman Act makes unlawful all

agreements that constitute unreasonable restraints of

trade.  It reads as follows:

"Every contract, combination. . . or conspiracy

in restraint of trade or commerce among the several states

or with foreign nations is declared to be illegal."

In this case, plaintiff allegation that the

defendants conspired to restrain trade in silver by

# Exhibit 2

STROBL

vs.

NEW YORK MERCANTILE EXCHANGE

```
 1   NEIL LEIST, PHILIP SMITH, and

 2   INCOMCO                          76 Civ. 4350

 3       -against-                    79 Civ. 1834

 4   JOHN RICHARD SIMPLOT, et al.

 5                                    New York, New York

 6                                    November 17, 1983

 7                                    10:00 a.m.

 8                            -    -    -

 9              (Robing room)

10              (Discussion off the record)

11              THE COURT:  Now I want to go on the record for a

12   minute.

13              Let the record note that we spent about four

14   hours yesterday conferring with counsel on the proposed

15   charge, the Court submitted a draft and that we together,

16   working together, revised the draft.

17              The rules require, as you're aware I'm sure,

18   that I rule on your requests.  I thought in this case what

19   we did was probably a more effective way of ruling on your

20   requests than writing in the margin or anything else.  And

21   what I wanted was your consent to that procedure, rather

22   than my sitting down and ruling specifically on each one of

23   your requests.

24              MR. FLEMING:  I agree to that, your Honor.

25              MR. LOVELL:  I agree to that.
```

1220

1    antitrust laws should be in favor of the defendants.

2            The second federal law which plaintiff claims

3    defendants violated is the Commodity Exchange Act.  That

4    law makes it unlawful for any person to manipulate or

5    attempt to manipulate the price of any commodity in

6    interstate commerce.

7            It is undisputed that Maine potato futures

8    contracts are a commodity in interstate commerce.

9    Therefore, the ultimate question for you to decide on this

10   claim is whether defendants manipulated the market price of

11   April and May 1976 Maine potato futures contracts, as I

12   will define what constitutes manipulation.

13           In order to determine whether defendants

14   manipulated the market, you must first find that plaintiff

15   has proved each of the following facts by a preponderance

16   of the credible evidence:  one, that defendants intended to

17   produce an artificial market price of Maine potato futures;

18   two, that defendants engaged in conduct to produce an

19   artificial market price; three, that an artificial market

20   price, in fact, occurred as a proximate result of

21   defendants intentional conduct; and four, that the

22   defendants' conduct was the proximate cause of the injury

23   which plaintiff claims.

24           The first element, as I've just told you in this

25   claim, and for you to decide, is whether the defendants

1   intended to create an artificial market price for April or

2   May 1976 Maine potato futures contracts.  "Intent" here

3   simply means that the defendant knew what he was doing and

4   that he did it with a purpose of creating a depressed and

5   artificial price.

6          Whether a defendant acted intentionally depends

7   on his state of mind.  And you can determine that state of

8   mind from circumstantial evidence surrounding these

9   transactions.  In other words, you can decide whether

10  defendants acted with knowledge and intent by looking at

11  their conduct and from the way they acted, in light of all

12  the evidence.  Do their actions reveal an innocent state of

13  mind or do they show a state of mind with a purpose to fix

14  the price of these futures contracts?

15         As to the second element, that defendants

16  engaged in conduct to produce an artificial market price.

17  An artificial price is a price which does not reflect or

18  which distorts the basic forces of the laws of supply and

19  demand.  Prices reflecting basic supply and demand occur

20  only in a marketplace that is free of artificial stimulus

21  or distortions.

22         The third and fourth elements, that an

23  artificial market was, in fact, produced, and that the

24  defendants' conduct caused injury to plaintiff, are

25  questions for you to decide, based on all of the evidence

1222

1    and on my earlier instructions as to what conduct is

2    prohibited and as to what constitutes proximate cause.

3           If you find that plaintiff has proved each of

4    these elements by a preponderance of the evidence, then you

5    must return a verdict for plaintiff on his second claim.

6    The second claim: "For whom do you find on plaintiff's

7    claim under the Commodities Exchange Act?"  On the other

8    hand, if you find that plaintiff has not proved these

9    elements, then you must return a verdict for defendants on

10    the second claim.

11           Plaintiff also claims that defendants violated

12    the Commodities Exchange Act by engaging in excessive

13    speculation without being bona fide hedgers.  The Commodity

14    Exchange Act and Rules provide in pertinent part that "No

15    person may hold or control a net short position in any

16    Maine potato futures contracts in excess of 150 car lots in

17    the Maine potato futures."  This law, however, does not

18    apply to defendants, if you find that they were bona fide

19    hedgers.

20           Each defendant has stipulated or agreed that he,

21    in fact, held a net short position in the May potato

22    futures contract in excess of 150 car lots or contracts.

23    Therefore, you must only consider whether or not plaintiff

24    has proved, by a preponderance of the evidence, that

25    defendants were not bona fide hedgers.  The burden of

1223

1   proving that they were not bona fide hedgers is on the

2   plaintiff.

3           Now, a "hedge" is a transaction in the potato

4   futures market for the purpose of reducing the risk of loss

5   in the cash market.  A bona fide hedger is a person who, in

6   good faith, engages in a futures transaction for that

7   purpose.

8           If you find that plaintiff has failed to prove

9   that defendants were not bona fide hedgers, return a

10  verdict for defendants on this claim.  If you find that

11  plaintiff has proved that defendants were not bona fide

12  hedgers, then you must determine whether their trades in

13  excess of 150 Maine contracts proximately caused injury to

14  plaintiff.  If you find that plaintiff has failed to prove

15  such damage, then you must return a verdict for defendants

15  on this claim.

17          Plaintiff's final claim is based on New York

13  State law prohibiting fraud.  He claims that defendants

19  committed a fraud against the Maine potato futures market

20  in 1976 and that he, as a speculator in that market,

21  suffered damages as a result.

22          In order to recover on this claim, plaintiff

23  must prove the following elements: one, that defendants

24  manipulated the price of Maine potato futures market in

25  1976; two, that this manipulation created a false