UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: AMARANTH NATURAL GAS COMMODITIES LITIGATION | MASTER FILE NO. 07 Civ. 6377 (SAS) **ECF Case** |
| This Document Relates To: | |
| ALL ACTIONS | JURY TRIAL DEMANDED |

## DECLARATION OF VINCENT BRIGANTI, ESQ. IN OPPOSITION TO THE AMARANTH DEFENDANTS' MOTIONS TO DISMISS THE CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT

VINCENT BRIGANTI, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am a shareholder of the law firm of Lowey Dannenberg Cohen & Hart, P.C, co-lead counsel to Plaintiffs and the putative class in this litigation.  I make this declaration in opposition to the motions to dismiss the Corrected Consolidated Class Action Complaint (the "Complaint") filed respectively (and collectively) by the defendants defined in the Complaint (at ¶ 33) as the Amaranth Defendants.

2.      Annexed hereto as Exhibit 1 are true and correct copies of excerpts from the Fourth Amended and Restated Advisory Agreement by and between Defendant Amaranth International Limited ("AIL") and Amaranth International Advisors L.L.C. ("Amaranth International") dated January 31, 2006 (hereinafter, the "Advisory Agreement").

3.      Annexed hereto as Exhibit 2 are true and correct copies of excerpts from the Second Amended and Restated Bye-laws of Defendant AIL (hereinafter, the "Bye-laws").

4.      Attached hereto as Exhibit 3 are true and correct copies of excerpts from

Defendant AIL's Confidential Offering Memorandum, dated January 2006 (hereinafter, the "Offering Memorandum").

5.    Attached hereto as Exhibit 4 is a true and correct copy of a notice of claim for exempt commodity pool status dated January 31, 2005, filed on behalf of Amaranth International by Defendant Nicholas M. Maounis ("Maounis") with the Commodity Futures Trading Commission ("CFTC") and National Futures Association ("NFA").

6.    Attached hereto as Exhibit 5 is a true and correct copy of a notice of claim for exempt commodity pool status dated June 6, 2002, filed on behalf of Defendant AIL by Defendant Maounis with the CFTC and the NFA.

7.    Annexed hereto as Exhibit 6 are true and correct copies of registration and membership status reports for Defendant Maounis and Amaranth International from the NFA's Background Affiliation Status Information Center ("BASIC") website, http://www.nfa.futures.org/basicnet.

8.    Annexed hereto as Exhibit 7 are true and correct copies of Defendant Amaranth LLC monthly investor updates, "snapshots" reflecting, *inter alia*, Defendant AIL's capital contributions to Defendant Amaranth LLC as of January 31, 2006, February 28, 2006, March 31, 2006, April 30, 2006, May 31, 2006, and June 30, 2006.

9.    Annexed hereto as Exhibit 8 is a true and correct copy of Form D, Notice of Sale of Securities Pursuant to Regulation D, Section 4(6), and/or Uniform Limited Offering Exemption ("Form D"), dated August 8, 2003, filed by Defendant AIL with the United States Securities and Exchange Commission (the "SEC").

10.    Annexed hereto as Exhibit 9 is a true and correct copy of an amended Form D,

dated September 29, 2005, filed by Defendant AIL with the SEC.

11.     Annexed hereto as Exhibit 10 is a true and correct copy of a Form D, dated September 1, 2005, filed by Defendant Amaranth Capital Partners LLC ("Amaranth Capital") with the SEC.

12.     Annexed hereto as Exhibit 11 are true and correct copies of excerpts from the Fifth Amended and Restated Limited Liability Company Agreement of Defendant Amaranth Partners LLC ("Amaranth Partners") dated January 31, 2006.

13.     Annexed hereto as Exhibit 12 is a true and correct copy of a May 10, 2008 article appearing in the Stamford Advocate referring to a letter Defendant Maounis sent out to Amaranth investors.

14.     Since January 2, 1998, and during the Class Period, Defendant AIL functioned as one of three Amaranth "feeder funds" which collected, pooled and invested monies in Defendant Amaranth LLC – which served as the "master fund" in the Amaranth "master-feeder" fund structure. Exhibit 3 (Offering Memorandum), at pp. 1, 4. Defendant AIL's U.S. counterparts, Defendants Amaranth Capital and Amaranth Partners, comprised the other Amaranth LLC feeder funds. Exhibit 3 (Offering Memorandum), at p. 4.

15.     The master fund (Amaranth LLC) along with the feeder funds (AIL, Amaranth Capital and Amaranth Partners), their respective trading advisors (Amaranth International and Amaranth Advisors), as well as other entities that serviced the Amaranth hedge funds, shared common management, ownership, and principal business addresses. In particular, during the Class period:

(a)     Amaranth International, a Delaware limited liability company headquartered at

One American Lane, Greenwich, CT, served as the trading advisor to Defendant AIL. Exhibit 1 (Advisory Agreement), at pp. 1-2; Exhibit 3 (Offering Memorandum), at pp. viii, 1, 3.

(b)    Defendant Amaranth Advisors, a Delaware limited liability company headquartered at One American Lane, Greenwich, CT, served as the trading advisor to and managing manager of Amaranth LLC (the master fund) and the U.S. based feeder funds, Defendants Amaranth Capital and Amaranth Partners, both of which are Delaware limited liability companies headquartered at One American Lane, Greenwich, CT. *See* Exhibit 3 (Offering Memorandum), at pp. viii, 3-4; Exhibit 10 (Form D filed with the SEC by Amaranth Capital), at pp. 2 and 5; Exhibit 11 (Fifth Amended and Restated Limited Liability Agreement of Amaranth Partners), at pp.1, 80.[1]

(c)    At all relevant times, Amaranth International and Defendant Amaranth Advisors (the trading advisors) were owned, managed and controlled by Defendant Maounis from Amaranth's headquarters in Greenwich, CT. In particular, Defendant Maounis served as the Chief Executive Officer and Managing Member of Defendant Amaranth Advisors and Amaranth International, and together with other entities controlled by Defendant Maounis, was a majority owner of Defendant Amaranth Advisors and Amaranth International. Exhibit 3 (Offering Memorandum), at pp. 3, 32; Exhibit 6 (Registration and membership status reports for Defendant

---

[1]    In its capacity as managing member of and trading advisor to the funds, Amaranth Advisors had full and complete charge of all the affairs, business and assets of the funds, and by agreement, any action taken on behalf of the funds by Amaranth Advisors constituted the act of and bound the funds. *See, e.g.*, Exhibit 11 (Fifth Amended and Restated Limited Liability Agreement of Amaranth Partners), at pp. 14-15.

Maounis and Amaranth International).[2]

(d)    Defendant Maounis also served as an "Executive Officer" of Defendant AIL along with other U.S. based executives. Exhibits 8 and 9 (Form D and Amended Form D filed with the SEC by AIL).

(e)    Defendant Maounis is also the founder, 100% owner and Chief Executive Officer of Defendant Amaranth Group Inc., a Delaware S Corporation, which at all relevant times provided administrative services, accounting, data processing, research, investment-related, technology and other support services to the Amaranth master fund (Defendant Amaranth LLC) and the feeder funds (Defendants Amaranth Partners, Amaranth Capital and AIL). Exhibit 3 (Offering Memorandum), at pp. viii, 32, 34.

16.    As the master fund, Defendant Amaranth LLC implemented both directly and indirectly Amaranth's investing and trading strategies which included, *inter alia*, buying and selling natural gas futures and options contracts on the New York Mercantile Exchange ("NYMEX") located at One North End Avenue, New York, NY 10282. *See, e.g.,* Exhibit 3 (Offering Memorandum), at pp. 3-4, 25.

17.    According to Defendant Amaranth LLC monthly investor updates (Exhibit 7), Defendant AIL was by far the largest investor in Amaranth LLC during the Class period. For instance:

(a)    As of January 31, 2006, Amaranth LLC had capital of approximately $7.3 billion,

---

[2]    According to NFA's BASIC website, Defendant Maounis is/was doing business as "Amaranth Advisors LLC" and "Amaranth International Advisors LLC." *See* Exhibit 6 (Registration and membership status reports for Defendant Maounis and Amaranth International). Likewise, according to BASIC, Amaranth International is also known as "Amaranth Advisors LLC." *Id.*

of which $6.16 billion, or more than 84%, was comprised of capital investments from AIL.

(b)     As of February 28, 2006, Amaranth LLC had capital of approximately $7.5 billion, of which $6.25 billion, or more than 83%, was comprised of capital investments from AIL.

(c)     As of March 31, 2006, Amaranth LLC had capital of approximately $7.6 billion, of which $6.37 billion, or more than 83%, was comprised of capital investments from AIL.

(d)     As of April 30, 2006, Amaranth LLC had capital of approximately $8.7 billion, of which $7.13 billion, or 82%, was comprised of capital investments from AIL.

(e)     As of May 31, 2006, Amaranth LLC had capital of approximately $7.5 billion, of which $6.27 billion, or more than 83%, was comprised of capital investments from AIL.

(f)     As of June 30, 2006, Amaranth LLC had capital of approximately $8.5 billion, of which $6.91 billion, or more than 81%, was comprised of capital investments from AIL.

18.     Defendant AIL's Board of Directors during the Class Period was comprised of two directors: Roderick M. Forrest and Nicholas J. Hoskins, both of whom are Bermuda based attorneys. ¶ 2 of the Declaration of Roderick M. Forrest submitted in support of Defendant AIL's Motion to Dismiss the Complaint in these proceedings. "Executive Officers" of Defendant AIL included Defendant Maounis and other U.S. based executives. Exhibits 8 and 9 (Form D and Amended Form D filed with the SEC by AIL).

19.     However, because of the specialized nature of Defendant AIL's investment strategies, AIL's Board of Directors ability to control AIL's operations was "inherently limited." *See* Exhibit 3 (Offering Memorandum), at p. 66 (describing Limited Role of the Directors and the Administrator). As a result, the Board's role was limited to merely oversight of, not active

involvement in, AIL's trading activities. *Id.*

20.    Instead, Amaranth International (controlled by Defendant Maounis) was vested with plenary authority to invest and trade[3] Defendant AIL's substantial investment assets[4] (which reached more than $7 billion in July 2006) and had express authority on behalf of and in the name of Defendant AIL to, *inter alia*:

- make all investment and trading decisions for AIL (*see* Exhibit 1 (Advisory Agreement), at p. 2);

- guarantee, support or secure AIL's obligations (*id.*);

- own, sell, assign or dispose of any of AIL's personal property and liabilities (*id.*);

- open accounts and enter into clearing arrangements on behalf of AIL (*id.*);

- raise or borrow funds, investment assets or other property on behalf of AIL (*id.*);

- negotiate and enter into all manner of derivatives and other financial instruments and arrangements for AIL (*id.*, at p. 3);

- hire agents, brokers, designated traders, and all employees and agents for AIL (*id.*);

---

[3]    Exhibit 1 (Advisory Agreement), at p. 2 ("[AIL] hereby confirms, reaffirms and continues the appointment of the [Amaranth International] as the Company's trading advisor with plenary authority (as expressly authorized in the Bye-laws) over the investing and trading of the Company's Investment Assets, and ratifies and approves all actions taken to date by any Amaranth Party in connection with [Amaranth International] acting as the trading advisor of the Company."). Exhibit 2 (Bye-laws), at p. 38 ("The Board is expressly authorized to delegate to [Amaranth International] plenary authority over the trading and investing of the [AIL's] Investment Assets, as contemplated by the these Bye-laws and by the Advisory Agreement. Each Member authorizes and approves the Board's delegation of such authority to [Amaranth International].").

[4]    AIL's Bye-Laws define investment assets as "all assets, instruments, contracts, rights, derivatives, undertakings, entitlements and other property . . . including securities . . . commodities, energy contracts . . . futures contracts, puts and calls, swaps and other derivatives." *See* Exhibit 2 (Bye-laws), at p. 5.

- delegate trading and investment authority over AIL's assets to other Amaranth Parties, including Amaranth Advisors (*id.*);

- advise AIL's Board concerning the establishment of reserves for AIL and liquidating adjustments as well as the postponing the determination and/or payment of redemption and dividend proceeds to AIL's investors (*id.*);

- consult with AIL shareholders' representatives (*id.)*;

- bind AIL's shareholders (*id.*, at p. 4); and

- value AIL's investment assets and other assets and liabilities, and allocate AIL's profits, deductions, gains, losses among AIL's shareholders (*id.*).

21.    Defendant AIL paid Amaranth International a monthly management fee and, if due, an annual performance fees for its services as AIL's trading advisor.[5]

22.    A limited group of portfolio managers or execution traders called "Designated Traders" -- as determined by Defendant Amaranth Advisors (and Maounis) – were also eligible to receive bonuses from Defendant AIL.[6] *See* Exhibit 3 (Offering Memorandum), at pp. 9-10.

23.    During the Class Period, and at other times, Defendant AIL had contacts with the United States, including:

(a)    AIL's trading advisor was Amaranth International, a Delaware limited liability company headquartered in Greenwich, CT, which was owned, managed and controlled by

---

[5]    Exhibit 3 (Offering Memorandum), at p. 7 ("The Fund pays Amaranth International a monthly Management Fee equal to 0.125% of the aggregate Gross Asset Value of each Shareholder's individual Series of Participating Shares at the beginning of each calendar month (a 1.5% annual rate). . . . As of each December 31, the Fund pays a Performance Fee (if due) to Amaranth International equal to: (I) 20% of any Net New Profit then attributable to . . . Annual Liquidity Shares; and (ii) 15% of any Net New Profit attributable to . . . Four-Year Liquidity Shares."). Exhibit 1 (Advisory Agreement), at pp. 11-12.

[6]    Defendant Maounis on behalf of Amaranth Advisors had sole authority to appoint designated traders and portfolio managers for the U.S. based feeder funds. *See, e.g.*, Exhibit 11 (Fifth Amended and Restated Limited Liability Agreement of Amaranth Partners), at p. 5.

Defendant Maounis from Greenwich, CT. *See* ¶ 15(a) above.

(b)     AIL's management included U.S. based executives. *See* ¶ 18 above.

(c)     AIL and Amaranth International filed documents with the CFTC (in Washington, D.C.) and NFA (in Chicago, IL) to qualify AIL for exempt commodity pool status. *See, e.g.,* Exhibit 4 (Notice of Claim of Exemption dated January 31, 2005 submitted by Amaranth International to the CFTC and NFA by Defendant Maounis); Exhibit 5 (Notice of Claim of Exemption dated June 6, 2002 submitted by AIL (on AIL Letterhead) to the CFTC and NFA by Defendant Maounis).

(d)     AIL filed documents with the SEC (in Washington, D.C.) to offer securities in the United States. Exhibits 8 and 9 (Form Ds filed by AIL with the SEC for the purpose of offering securities in the United States); Exhibit 3 (Offering Memorandum) covering the sale of AIL securities in, *inter alia*, the United States).

(e)     Investors/shareholders of AIL appear to include U.S. citizens. *See* Exhibit 3 (Offering Memorandum), at pp. 89-90 (describing taxation of AIL shareholders that are citizens of the United States).

24.     Annexed hereto as Exhibit 13 are true and correct copies of excerpts from a Client Agreement dated as of July 8, 2004 between Amaranth LLC (referred to therein as "Client") and JPMorgan Futures Inc. (referred to therein as "JPMFI"). The Client Agreement states in part at ¶ 9, p. 6. that:

> Without triggering an event of default hereunder, upon the occurrence of any of the following events, JPMFI may terminate this Agreement without providing thirty (30) days notice, and accelerate all obligations hereunder, and take such actions as to reduce JPMFI's exposure to Client to zero and without prejudice to

> JPMFI's ability to exercise in whole or part any of its rights under this Section if: . . . (dd) the Client [Amaranth LLC] shall cease to be controlled by its trading Manager, Amaranth Advisors, L.L.C. or an entity controlled by Mr. Nicholas M. Maounis or if Mr. Nicholas M. Maounis ceases to be actively involved in the day-to-day management of the Client [Amaranth LLC].

25.    Annexed hereto as Exhibit 14 is a Schedule 13D dated January 8, 2004 filed by

Amaranth LLC with the SEC signed by Defendant Maounis.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 2, 2008.


_____/s/ Vincent Briganti_____
VINCENT BRIGANTI

# EXHIBIT 1

# AMARANTH INTERNATIONAL LIMITED

## AMARANTH INTERNATIONAL ADVISORS L.L.C.

---

**FOURTH AMENDED AND RESTATED
ADVISORY AGREEMENT**

---

**DATED AS OF JANUARY 31, 2006**

# AMARANTH INTERNATIONAL LIMITED
## and
# AMARANTH INTERNATIONAL ADVISORS L.L.C.


### FOURTH AMENDED AND RESTATED ADVISORY AGREEMENT


This Fourth Amended and Restated Advisory Agreement (**"Agreement"**) is made as of January 31, 2006 by and between **AMARANTH INTERNATIONAL LIMITED (the "Company")**, a Bermuda company formed with limited liability whose registered office is c/o Dundee Leeds Management Services Ltd., 129 Front Street, Hamilton HM 12, Bermuda, and **AMARANTH INTERNATIONAL ADVISORS L.L.C. (the "Trading Advisor")**, a Delaware limited liability company whose principal office is One American Lane, Greenwich, Connecticut 06831.

Capitalized terms used but not otherwise defined herein shall have the meanings with which such terms are used in the Amended and Restated Bye-laws of the Company dated as of July 30, 2003 (**the "Bye-laws"**) as well as in the Company's Confidential Offering Memorandum dated January 2006 and the Subscription Agreements of the Company current as of the date hereof.

### R E C I T A L S:

WHEREAS, the Company is an open-end investment company formed under the laws of Bermuda;

WHEREAS, the Company appointed the Trading Advisor as its trading advisor pursuant to an advisory agreement dated as of September 1, 2000 (**the "Original Agreement"**), pursuant to which appointment the Trading Advisor managed the Company's portfolio of Investment Assets;

WHEREAS, the parties hereto amended the Original Agreement as of June 18, 2001 to reflect certain changes in the Management and Performance Fee arrangements,

WHEREAS, the parties hereto amended and restated the Original Agreement, as amended, in its entirety as of June 1, 2003, to reflect certain proposed amendments to the then-current Bye-laws of the Company, and further amended and restated the Original Agreement in its entirety as of December 31, 2003 to reflect the adoption of such proposed amendments to the then-current Bye-laws of the Company and as of December 31, 2004 to reflect certain other changes (**the "Existing Agreement"**); and

WHEREAS, the parties hereto wish to further amend and restate the Existing Agreement by entering into this Agreement.

**NOW THEREFORE,** in consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows:

1.    Confirmation and Continuation; Ratification and Approval.

    (a)    The Company hereby confirms, reaffirms and continues the appointment of the Trading Advisor as the Company's trading advisor with plenary authority (as expressly authorized in the Bye-laws) over the investing and trading of the Company's Investment Assets, and ratifies and approves all actions taken to date by any Amaranth Party in connection with the Trading Advisor acting as the trading advisor of the Company.    The Trading Advisor hereby accepts the continued appointment on the terms set forth herein.

    (b)    The Company may trade indirectly through Amaranth LLC and Amaranth Global Equities Master Fund Limited (**together, the "Master Funds"**), each of which has appointed Amaranth Advisors L.L.C., an Affiliate of the Trading Advisor, to manage its trading and investing.

2.    Power and Authority of the Trading Advisor.

    (a)    For the avoidance of doubt and without limiting the generality of the powers conferred upon it by **Section 1**, the Trading Advisor is expressly authorized to do the following for or on behalf and in the name of the Company (the Trading Advisor being authorized to do so directly as well as through managing the Company's investment in the Master Funds):

        (i)    make all investment and trading decisions with respect to the acquisition and disposition (including short sales) of Investment Assets, and all other manner of investments, including exercising and enforcing any right of the Company with respect to any Investment Asset;

        (ii)    incur all manner of obligations as well as stand surety for, guarantee, support or secure the obligations of any other Person;

        (iii)    own, sell, assign or otherwise dispose of any personal property and liabilities on such terms and conditions as the Trading Advisor may determine;

        (iv)    open, maintain and close one or more accounts (including bank, brokerage, margin and clearing accounts) and enter into arrangements to self-clear transactions with financial and commercial institutions (including clearing and depository institutions);

        (v)    raise or borrow funds, Investment Assets or other property and utilize any other form of financing or leverage on a secured or unsecured, as well as on a segregated or non-segregated, basis and mortgage, pledge, assign or otherwise hypothecate any one or more of the Company's properties or assets to secure any such borrowing;

-2-

(vi)     hold Investment Assets in nominee or street name;

(vii)     advance, deposit or lend monies, Investment Assets and other assets or otherwise provide any other form of financing or leverage on a secured or unsecured, as well as on a segregated or non-segregated, basis

(viii)     negotiate and enter into all manner of derivatives (including swaps) and other investment, financial and risk management instruments (whether or not exchange-traded), as well as registration rights, placement, selling and financing agreements, private placement and securities purchase agreements, shareholders' agreements, structured products, repurchase agreements, reverse repurchase agreements, securities lending and hypothecation agreements, counterparty agreements, and all other forms of investment, financial agreements, contracts and undertakings;

(ix)     place capital with Third-Party Managers;

(x)     invest in Third-Party Ventures;

(xi)     make Longer-Term Investments;

(xii)     employ or otherwise engage the services of (including through the Administrative Services Agreement by and between the Company and Amaranth Group) such agents, brokers, Designated Traders, consultants, advisors, employees, and other Service Providers as the Trading Advisor deems necessary or advisable, and cause the Company to pay such compensation, including performance-based and incentive compensation, to the foregoing as the Trading Advisor may determine, subject to **Section 3(h)** and **Section 27(b)(iv)**;

(xiii)     delegate trading and investing authority over the Company's assets to other Amaranth Parties;

(xiv)     enter into, organize, contribute assets to, participate in or otherwise deal with the organization of, and invest in, Trading Entities and other Persons (including Third-Party Ventures and any other Person in which any Amaranth Party or Amaranth Client has an economic interest as an owner, participant or Service Provider);

(xv)     advise the Board concerning the establishment of Reserves and Liquidating Adjustments as well as concerning Gross and Net Asset Values and the possibility of postponing the determination thereof and/or of the payment of Redemption and Dividend Proceeds;

(xvi)     consult with the Shareholders' Representative;

(xvii)     incur and pay or reimburse expenses of the Company and the Amaranth Parties (including the Company's *pro rata* share of the Amaranth Parties'

direct and indirect general and administrative expenses and overhead, such as compensation, bonuses, rent, depreciation, research and quotation services as well as technology costs and licensing fees);

(xviii)  prepare, execute, file and deliver any documents related to any of the foregoing; and

(xix)  generally, to act or decline to act for the Company in all matters relating to the trading and investing of the Company's Investment Assets.

(b)  Subject to the ultimate control of the Board of Directors, whenever the Trading Advisor is to determine or decide any matter as provided in this Agreement or relating to the Company, such determination or decision shall be in the sole and absolute discretion of the Trading Advisor. All determinations or decisions made by the Trading Advisor pursuant to or in connection with this Agreement shall be binding and conclusive on all Shareholders if made in a manner consistent with the standard of care set forth in **Section 6**.

(c)  Without limiting the generality of **Section 2.2(b)**, all matters concerning the valuation of Investment Assets and other assets and liabilities of the Company, the allocation of profits, deductions, gains and losses among the Shareholders, including the taxes thereon, and accounting procedures (including the accounting procedures regarding the treatment of the Memorandum Accounts) not expressly provided for by the terms of this Agreement shall be determined by the Trading Advisor, whose determination shall be final and conclusive as to all of the Shareholders. The Trading Advisor shall have authority to determine the manner of applying any such provisions that are unclear or not equitable, and it shall also have authority to determine the manner of applying any such provisions in circumstances in which more than one method of application would be consistent with Law or equitable principles.

(d)  The Designating Party's determination of which employees are classified as Designated Traders, as well as the portion (if less than all) of each Designated Trader's bonus that should be classified as a DT Bonus and the portion (if less than all) of each applicable Fiscal Year in respect of which such employees are so classified, shall be binding and conclusive if made in a manner consistent with the standard of care set forth in **Section 6** and neither the Designating Party nor any Manager Party shall have any liability for such determination made in a manner consistent with the standard of care set forth in **Section 6**.

(e)  The Trading Advisor shall only be required to devote such business time and resources to its obligations hereunder as the Trading Advisor may deem necessary or advisable for the successful discharge of such obligations.

3.  <u>Dealings with and by Amaranth Parties.</u>

(a)  Subject to the provisions of **Section 23**, nothing in this Agreement shall limit the right of any Amaranth Party to organize, engage in or possess an interest in,

-4-

transaction for the Company that the Trading Advisor would otherwise have initiated for the Company.

(e)     Notwithstanding that the Company may pay (either directly or as a reimbursement) for the personal property and fixed assets utilized by an Amaranth Party in connection with providing services to the Company and/or other Amaranth Clients (such as general operating assets including leasehold improvements, data transmission lines and communications equipment, furniture and fixtures), that the book value of such personal property and fixed assets may be included in the calculation of the Gross Asset Value and the Net Asset Value of the Company and that depreciation on such property and assets may reduce the Gross Asset Value and the Net Asset Value of the Company, the Company shall not, and the Trading Advisor or another Amaranth Party shall, have the legal title and the right to use and retain such personal property and fixed assets.

8.    Brokerage, Dealing and Other Counterparty Contracts; Custody.

(a)     The Trading Advisor may cause the Company to enter into brokerage and dealing arrangements pursuant to which the Company pays transaction costs in an amount greater than would be incurred if another broker or dealer were used.  The Trading Advisor may also receive products and other services from the brokers and/or dealers through which the Company executes transactions.  In certain cases, such arrangements may fall outside of the safe harbor for fiduciaries' use of "soft dollar" services established by Section 28(e) of the U.S. Securities Exchange Act of 1934; provided, in each case, that the Trading Advisor believes that these arrangements are reasonable and consistent with the Company's objective.

(b)     The Trading Advisor shall not itself have custody, or any responsibility for the safekeeping, of the Company's Investment Assets or other property.

(c)     The Trading Advisor shall use reasonable efforts to allocate or rotate investment opportunities among the different Amaranth Clients in a manner that the Trading Advisor deems equitable (giving due consideration to the differences among the various accounts directed by the Trading Advisor).

(d)     Other Amaranth Clients may invest in certain investments and strategies in which the Company does not or is unable to participate.

(e)     The Trading Advisor shall be permitted to aggregate orders for the Company with orders for other Amaranth Clients, notwithstanding that the effect of such aggregation may operate to the disadvantage of the Company.

9.    Compensation; Expenses.

(a)     As compensation for its services hereunder, the Trading Advisor shall receive: (i) a monthly management fee (the "Management Fee") based on the Gross Asset Value of each Shareholder's individual Series of Shares at the beginning of each calendar month; and (ii) depending upon the performance of each

Shareholder's Annual Liquidity Shares, on the one hand, and Four-Year Liquidity Shares, on the other hand, an annual Performance Fee, in each case as set forth in **"Schedule I — Management and Performance Fee Calculation Schedule."** Management Fees and Performance Fees shall be calculated separately in respect of each Shareholder's individual Series of Annual Liquidity Shares and Four-Year Liquidity Shares, irrespective of the overall performance of such Shareholder's aggregate investment in the Company.

(b)     The payment of Management Fees and Performance Fees is as provided in **"Schedule II — Management and Performance Fee Payment Schedule for Fiscal Years Beginning Prior to January 1, 2005"** and **"Schedule III — Management and Performance Fee Payment Schedule for Fiscal Years Beginning on or After January 1, 2005,"** as applicable.

(c)     The Trading Advisor shall also receive Management Fees and Performance Fees in respect of any Designated Investment Series Shares held by a Shareholder as provided in **Schedule I**.

(d)     (i)     The Designating Party's determination of which Amaranth Party individuals are classified as Designated Traders, as well as of the portion (if less than all) of each Designated Trader's bonus that should be classified as a DT Bonus and the portion (if less than all) of each applicable Fiscal Year in respect of which such individuals are so classified, shall be binding and conclusive, and neither the Designated Party nor any Amaranth Party shall have any liability for such determination if made in a manner consistent with the standard of care set forth in **Section 6**.

(ii)     DT Bonuses payable to Designated Traders managing capital in respect of more than one Amaranth Client shall be allocated among such Amaranth Clients as the Designating Party may determine.

(iii)     If, as a result of Law, tax or other considerations, amounts are payable to any Person (including Amaranth Parties associated with Designated Traders) rather than to a Designated Trader, under circumstances in which the Trading Advisor determines such payment to be equivalent to paying bonus compensation to one or more Designated Traders, the amounts so payable shall be deemed to constitute DT Bonuses.

(e)     The Amaranth Parties shall be entitled to retain any and all ancillary fees — *e.g.,* directors', financial advisory, origination and placement fees — which may be received by them in the course of the Company's trading and investing activities, without reduction for any amounts payable to the Trading Advisor under this **Section 9** or otherwise due to the Amaranth Parties from the Company.

(f)     The Company will bear, directly and indirectly (including, in particular, through its investment in the Master Funds), its allocable share of the Allocable Expenses.

IN WITNESS WHEREOF, this Agreement has been executed by the Company and the Trading Advisor as the date first written above.

**AMARANTH INTERNATIONAL LIMITED**

By: _____

Name: Roderick Forrest
Title: Director

Accepted:

**AMARANTH INTERNATIONAL ADVISORS L.L.C.**

By: _____

Name: Nicholas M. Maounis
Title: President

-26-

# EXHIBIT 2

# Second Amended and Restated Bye-Laws

## of

## AMARANTH INTERNATIONAL LIMITED

# SECOND AMENDED AND RESTATED
# B Y E - L A W S

## of

## AMARANTH INTERNATIONAL LIMITED

### DEFINITIONS AND INTERPRETATION

1.     **Definitions and interpretation**

1.1     In these Bye-laws:

"**Accounting Date**" means: (a) the last day of a month; (b) an Effective Date; (c) the day immediately preceding the issuance of any Participating Shares; (d) the day on which the Company is wound-up; (e) the day as of which the Company's final liquidating distribution is made following the Company's winding-up; and (f) any other day which the Board may designate;

"**Accounting Period**" means the period beginning immediately after an Accounting Date and ending as of the next Accounting Date;

"**Act**" means the Companies Act 1981;

"**Administrative Services Agreement**" means the agreement pursuant to which Amaranth Group provides administrative and investment-related services to the Company, as the same may from time to time be amended by resolution of the Board and agreement of the other parties thereto. The Administrative Services Agreement shall be available for inspection during regular business hours at the Office, and all Shareholders shall be conclusively deemed to have notice of, and to have approved, the terms thereof;

"**Administrator**" means the Person for the time being appointed as administrator by the Directors of the Company;

"**Adoption Date**" means July 30, 2003 or, if the special general meeting called for the purpose of adopting these Bye-laws is adjourned, the date of such adjourned meeting if these Bye-laws are then adopted;

"**Advisory Agreement**" means the Amended and Restated Advisory Agreement whereby the Company has delegated to Amaranth plenary authority over the investment and trading activities of the Company. The Advisory Agreement shall be available for inspection during regular business hours at the Office, and all Shareholders shall be conclusively presumed to have notice of, and to have approved, the terms thereof;

"**Affiliate**" of a Person means a Person controlling, controlled by or under common control with, that Person, either directly or indirectly through one or more intermediaries (for purposes of this definition, the direct or indirect ownership of 20% or more of the voting or equity interests of a Person shall be conclusively presumed to constitute control);

"**Alternate Director**" means an alternate Director appointed in accordance with these Bye-laws;

"**Amaranth**" means Amaranth International Advisors L.L.C.;

"**Amaranth Client**" means the Company and each other Person whose investments or trading activities are directed by Amaranth or of any Affiliate of Amaranth;

"**Amaranth Group**" means Amaranth Group Inc. and any Affiliate thereof that provides administrative and accounting services to the Company comparable to those provided pursuant to the Administrative Services Agreement;

"**Amaranth Intellectual Property**" means the Amaranth Proprietary Information and the Amaranth Software;

"**Amaranth Party**" means (a) Amaranth, (b) Amaranth Group and (c) any Affiliate, officer, director, manager or employee of any of the foregoing; provided that none of Paloma Partners Management Company, its Affiliates or any owner, principal, director, officer or employee of any of the foregoing shall constitute an Amaranth Party in their capacity as such (although any such owner, principal, director, officer or employee may otherwise constitute an Amaranth Party due to such Person's relationship with Amaranth, Amaranth Group or one or more of its Affiliates);

"**Amaranth Proprietary Information**" means all trading and investment systems, methods, inventions, techniques, strategies, data, algorithms, applications, concepts, designs, discoveries, ideas, improvements, formulae, financial products or services, know-how, models, modifications, processes, trade secrets, or other information and data that are: (A) utilized in the current, or as the basis for future, investment or trading activities used or to be used by any Amaranth Party or any Amaranth Client; or (B) embodied in or are the ideas upon which the Amaranth Software is based;

"**Amaranth Software**" means, without limitation, the proprietary computer programs, data files, databases, and other material related thereto, and all adaptations, modifications, enhancements, improvements, additions, derivative works, and developments thereto or therein that presently exist or that are subsequently created or developed by or on behalf of any of Amaranth Parties that: (A) embody the Amaranth Proprietary Information; or (B) are used in connection with the Amaranth Proprietary Information and either are proprietary to Amaranth Parties or as to which Amaranth Parties have the right to sublicense;

"**Anniversary Date**" means any date in which a Shareholder may make an Anniversary Redemption, as provided in such Shareholder's Shareholders' Agreement or Subscription Agreement;

"**Anniversary Redemption**" means the Redemption of Participating Shares permitted on any Anniversary Date, as provided in a Shareholder's Shareholders' Agreement or Subscription Agreement;

"**Auditor**" means the Person for the time being appointed as auditor of the Company;

"**Bankruptcy**" means, with respect to any Person, an adjudication that such Person is bankrupt or insolvent, such Person's admission of its inability to pay its debts as they mature, such Person's making a general assignment for the benefit of creditors, such Person's filing a petition in bankruptcy or a petition for relief under any section of any bankruptcy or insolvency Law (including the United States Bankruptcy Code), or the filing against such Person of any such petition which is not discharged within 60 days thereafter;

"**Bermuda**" means the Islands of Bermuda;

"**Board**" means the Board of Directors of the Company or any committee thereof appointed or elected pursuant to these Bye-laws and acting by resolution in accordance with the Act and these Bye-laws or the Directors present at a meeting of Directors at which there is a quorum; the Board is sometimes referred to herein as the Directors;

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for business in Bermuda and New York City;

"**Bye-laws**" means these Bye-laws as the same may, from time to time, be amended or supplemented;

CONFIDENTIAL TREATMENT REQUESTED

AMARANTH_REG049028

"**Finally Determined**" means found by a court or arbitral tribunal upon entry of a final, non-appealable judgment;

"**Fiscal Year**" means the calendar year, unless the Board elects a different Fiscal Year;

"**General Meeting.**" See Bye-laws 31 to 48;

"**Gross Asset Value**" means Net Asset Value prior to reduction for any accrued Performance Fees, Management Fees or any other expenses accrued but not yet due or credited;

"**Impermissible Event**" means any event which would: (A) cause the Company not to qualify for an exclusion from the definition of "investment company" provided by the U.S. Investment Company Act of 1940 (if the Company is then relying on such exemption); (B) cause the Company not to qualify for an exemption from regulation under the U.S. Commodity Exchange Act (if the Company is then relying on such exemption); or (C) cause the Company to be considered to hold "plan assets" within the meaning of ERISA;

"**Investment Assets**" means all assets, instruments, contracts, rights, derivatives, undertakings, entitlements and other property (real or personal) which may be acquired, traded, held, borrowed, lent, invested in or sold (including short sales), including securities, loans, loan participations, trade claims, commodities, energy contracts, power, currencies, futures contracts, puts and calls, swaps and other derivatives;

"**Law**" means any law, regulation (proposed, temporary or final), administrative rule or procedure, self-regulatory organization rule or interpretation, or exchange rule or procedure binding upon, or which the Board determines reasonably may be binding upon (in each case, as applicable in light of the context), any Member, the Company, any Amaranth Party or any Affiliate of any of the foregoing or to which any of their property is subject;

"**LIBOR**" means the U.S. Dollar London Interbank Offered Rate for deposits of the specified duration as published in such recognized newspapers or quotation services as may be selected by the Board at the time of determination. Interest calculated at LIBOR shall be compounded each time LIBOR is determined in respect to the underlying debt;

"**Liquidating Adjustment**" means a charge or credit allocable to a Shareholder holding Participating Shares all or part of which are to be Redeemed and is based upon that Shareholder's Proportionate Share of costs and expenses incurred or anticipated to be incurred in liquidating Investment Assets (including expenses incurred or anticipated to be incurred by the Trading Entities to liquidate Investment Assets) in order to fund such Redemption, as well as such reserves or contingencies as the Board may determine to be associated with such Redemption;

"**Liquidator**" See Bye-law 90.1;

"**Management Fees**" means the "percentage of assets under management" fee payable to Amaranth by the Company under the Advisory Agreement (Management Fees shall be separately assessed on each Shareholder's Series of Participating Shares as well as on each Designated Investment Series held by such Shareholder);

"**Master Fund**" means Amaranth L.L.C., a Delaware, U.S. limited liability company;

"**Material Contracts**" means those agreements and instruments identified as such from time to time in the Memorandum;

"**Member**" or "**Shareholder**" means a holder of Participating Shares and/or Designated Investment Series Shares and, when two or more Persons are registered as joint holders of Shares, means the Person whose

CONFIDENTIAL TREATMENT REQUESTED

AMARANTH_REG049031

54.2    A Director who is directly or indirectly interested in a contract or proposed contract or arrangement with the Company shall declare the nature of his interest at the first opportunity at a meeting of the Board or by writing to the Directors as required by the Act.

54.3    Following a declaration being made pursuant to **Bye-law 54.2**, and unless disqualified by the chairman of the relevant Board meeting, a Director may vote in respect of any contract or proposed contract or arrangement in which such Director is interested and may be counted in the quorum at such meeting.

## POWERS AND DUTIES OF THE BOARD

### 55.    Management of the Company; delegation of plenary trading and investing authority to Amaranth

55.1    In managing the business of the Company, the Board may exercise all such powers of the Company as are not by statute or by these Bye-laws required to be exercised by the Company in general meeting subject to the Act, these Bye-laws and to any directions given by the Company by Resolution.

55.2    No direction or alteration of these Bye-laws made by the Company in general meeting shall invalidate any prior act of the Board which would have been valid but for that direction or alteration.

55.3    The powers given by this Bye-law shall not be limited by any special power given to the Board by these Bye-laws and a meeting of the Board at which a quorum is present shall be competent to exercise all the powers, authorities and discretions for the time being vested in or exercisable by the Board.

55.4    The Board may procure that the Company pays all expenses incurred in promoting and incorporating the Company.

55.5    The Board may establish the Registered Office and other Offices of the Company in such locations as the Board may from time to time determine.  The Board may change the name and/or Registered Office and/or any other Office of the Company from time to time, promptly notifying the Members of any such change.

55.6    The Board is expressly authorized to delegate to Amaranth plenary authority over the trading and investing of the Company's Investment Assets, as contemplated by these Bye-laws and by the Advisory Agreement. Each Member authorizes and approves the Board's delegation of such authority to Amaranth.

### 56.    Power to borrow and charge property

The Board may exercise all the powers of the Company to borrow money and to mortgage or charge all or any part of the undertaking, property and assets (present and future) and uncalled capital of the Company and to issue debentures and other securities, whether outright or as collateral security for any debt, liability or obligation of the Company or of any other Persons.

### 57.    Power to provide benefits

The Board on behalf of the Company may provide benefits for any individual including any Director or former Director who has held any executive office or employment with the Company or with any body corporate which is or has been a subsidiary or affiliate of the Company or a predecessor in the business of the Company or of any such subsidiary or affiliate, and to any member of his family or any individual who is or was dependent on him, and may contribute to any fund and pay premiums for the purchase or provision of any such benefit, or for the insurance of any such individual.

### 58.    Power to appoint managing director or chief executive officer

The Board may from time to time appoint one or more of the Directors to be managing director or chief executive officer of the Company who shall, subject to control of the Board, supervise and administer all of

38

# EXHIBIT 3

## CONFIDENTIAL OFFERING MEMORANDUM

# /α/Amaranth

## AMARANTH INTERNATIONAL LIMITED
### (A Bermuda Company)

Minimum Investment:
U.S.$5,000,000 for Annual Liquidity Shares
U.S.$10,000,000 for Four-Year Liquidity Shares

_____

#### THESE ARE SPECULATIVE SECURITIES

_____

## AMARANTH INTERNATIONAL ADVISORS L.L.C.
### Trading Advisor

**January 2006**

For the Exclusive Use of (Name of Subscriber): Wakefield Quin - Roderick M. Forrest
Memorandum Number: 0133

# AMARANTH INTERNATIONAL LIMITED

## DIRECTORY

| | |
|---|---|
| Registered Office: | c/o Dundee Leeds Management Services Ltd.<br>129 Front Street<br>Hamilton HM 12<br>Bermuda |
| Administrator: | Dundee Leeds Management Services Ltd.<br>129 Front Street<br>Hamilton HM 12<br>Bermuda |
| Directors: | Roderick Forrest<br>Nicholas Hoskins |
| Trading Advisor to the Fund: | Amaranth International Advisors L.L.C.<br>One American Lane<br>Greenwich, Connecticut  06831<br>U.S.A. |
| Master Fund: | Amaranth LLC<br>c/o Dundee Leeds Management Services<br>(Cayman) Ltd.<br>2nd Floor, Waterfront Centre<br>28 North Church Street<br>George Town, Grand Cayman<br>Cayman Islands, British West Indies |
| Trading Advisor to the Master Fund: | Amaranth Advisors L.L.C.<br>One American Lane<br>Greenwich, Connecticut  06831<br>U.S.A. |
| Administrative and Accounting Services Provider: | Amaranth Group Inc.<br>One American Lane<br>Greenwich, Connecticut  06831<br>U.S.A. |
| Auditors: | Ernst & Young LLP<br>5 Times Square<br>New York, New York  10036-6530<br>U.S.A. |

# AMARANTH INTERNATIONAL LIMITED

## SUMMARY

---

*The following summary is qualified in its entirety by reference to the more detailed information included elsewhere in this Confidential Offering Memorandum ("Memorandum"), the Second Amended and Restated Bye-laws of the Fund (the "Bye-laws") and in the other Material Contracts (see "General — Material Contracts"), each of which is available upon the request of any existing or prospective investor and is incorporated by reference herein.*

*Capitalized terms used but not otherwise defined herein have the meanings assigned to them in the Material Contracts.*

---

### The Fund

| | |
|---|---|
| **The Fund** | Amaranth International Limited (the "Fund") is a private investment fund organized as a Bermuda company on January 2, 1998. Since September 2000, Amaranth International Advisors L.L.C., a Delaware, U.S.A. limited liability company ("Amaranth International" or the "Trading Advisor"), has been the trading advisor of the Fund *(see " — The Trading Advisor," below)*. As of December 1, 2005, the capitalization of the Fund was approximately $5.4 billion. From September 2000 to November 30, 2005, the Fund's compound annual return to Shareholders, net of all costs including Management Fees and Performance Fees, has been approximately 14.01%. *See Appendix — Amaranth International Limited — Performance Summary for Annual Liquidity Shares. Past results are not necessarily indicative of future performance; an investment in the Fund is speculative and involves a high degree of risk.* |
| **The Fund's Investment Objective and Strategies** | The investment objective of the Fund is superior risk-adjusted returns. In managing the portfolio of the Master Fund *(see " — The Master Fund," below)*, in which the Fund invests a substantial portion of its capital, Amaranth Advisors L.L.C., a Delaware, U.S.A. limited liability company ("Amaranth Advisors"; and, collectively with its Affiliates, "Amaranth," unless the context otherwise requires), opportunistically employs a wide range of relative value, event-driven, directional, hybrid and other strategies on a global basis. There are no material limitations on the instruments, strategies, markets or countries in which the Fund may invest. |

### SUMMARY
### (cont.)

**The Fund's Investment Objective and Strategies (cont.)**

In executing its investment strategies, the Fund may enter into joint venture or co-investment arrangements, participate in pooled investment vehicles, invest capital with unaffiliated advisors or managers ("Third-Party Managers"), as well as make direct investments in (as opposed to investments in the public securities or bank loans of) operating entities as to which the Fund is limited in its ability to exercise day-to-day management control (such joint ventures, co-investments, pooled investments, real estate ventures and other investments, collectively, "Third-Party Ventures") where Amaranth determines that such arrangements complement Amaranth's expertise and/or enhance the Fund's ability to access specific investment opportunities. In making such investments on behalf of the Fund, Amaranth may, where it deems appropriate, negotiate for specific rights — for example, position transparency rights, risk management rights (which may include the right to veto or pre-approve investments made by a Third-Party Manager or investment partner), liquidity rights, special fees or profit-sharing arrangements and other negotiated terms. However, Third-Party Ventures may not include any such rights. Amaranth's investments in certain Third-Party Ventures may be made on the same basis as by any other passive investor.

In addition, the Fund may make investments that are long-term in nature and/or less liquid than an investment in readily-marketable securities ("Longer-Term Investments"). Amaranth's determination to make Longer-Term Investments, as well as its decision to participate in Third-Party Ventures, will be based on Amaranth's assessment of the potential risk and return of each such investment. *For a description of the risks associated with Third-Party Managers, Third-Party Ventures, Longer-Term Investments and other less liquid investments, see "Risk Factors": " — Strategy Risks — Third-Party Managers and Third-Party Ventures," " — Strategy Risks — Longer Term Investments," " — Certain Instruments Traded — Private Investments; Illiquid Investments; Designated Investments; Estimated Values" and " — Certain Trading and Investing Techniques — Duration of Investment Positions."*

As of the date of this Memorandum, the Fund's commitment to Third-Party Managers, Third-Party Ventures and Longer-Term Investments do not represent a material portion of the Fund's overall portfolio; however, the amount of capital invested in this manner may increase, possibly materially, over time as market conditions and opportunities merit.

-2-

**SUMMARY**
**(cont.)**

| | |
|---|---|
| **The Fund's Investment Objective and Strategies (cont.)** | The Fund may invest in countries that are considered to be "emerging markets." These investments present special risks, including: political instability; changes in governmental administration, policy and regulation; the possible imposition of currency and exchange controls; ineffective legal systems; inadequate accounting and disclosure rules; unequal market access; inability to hedge market risk; confiscatory taxation; and/or outright expropriation. *For a description of the risks associated with investing in "emerging markets," see "Risk Factors — Certain Instruments Traded — Non-U.S. Securities and Emerging Markets."* |
| | *There can be no assurance that the investment objective of the Fund will be achieved or that its strategies will be successful. Past results are not necessarily indicative of future performance, and investors must be prepared to lose all or substantially all of their investment in the Fund. The increasing emphasis of the Fund on Third-Party Ventures and Longer-Term Investments may result in its performance to date not being representative of how it will perform in the future.* |

**The Amaranth Structure**

| | |
|---|---|
| **The Trading Advisor** | Amaranth International is the Trading Advisor of the Fund, and its Affiliate, Amaranth Advisors, is the trading advisor of the Master Fund. Amaranth International and Amaranth Advisors have the same ownership and management. |
| | As of December 1, 2005, Amaranth was managing capital of approximately $7.4 billion. |
| | Affiliates of Amaranth are registered in the category of Investment Counsel and Portfolio Manager and Limited Market Dealer with the Ontario Securities Commission ("OSC") and with the United Kingdom ("U.K.") Financial Services Authority ("FSA") under Part IV of the U.K. Financial Services and Markets Act 2000. |

-3-

## SUMMARY
### (cont.)

| | |
|---|---|
| **The Trading Advisor (cont.)** | A recently-adopted rule (the "Hedge Fund Advisers Registration Rule") promulgated by the U.S. Securities and Exchange Commission (the "SEC") requires, with certain exceptions, that substantially all "hedge fund" advisers register as "investment advisers" under the U.S. Investment Advisers Act of 1940 (the "Advisers Act"). Amaranth has notified the Fund that it does not currently intend to register as an "investment adviser," although it may do so at a later date. Amaranth is not required to register with the SEC due to the twenty-five (25) month minimum investment period (the "Lock-Up Period") imposed on all investments made (by new or existing investors in the Fund and/or in other Amaranth "feeder funds") on or after February 1, 2006. *See "— Redemptions — The Lock-Up Period — Lock-Up Period for Participating Shares Issued on or after February 1, 2006," below. Prospective investors must not rely on Amaranth becoming an SEC-registered "investment adviser" in determining whether to invest in the Participating Shares.* |

The "Master Fund"

Amaranth LLC, a Cayman Islands exempted company, is the "Master Fund" in which the Fund invests a substantial portion of its capital. The Fund's U.S. counterparts, Amaranth Partners LLC and Amaranth Capital Partners LLC, each a Delaware, U.S.A. limited liability company (the "U.S. Funds"), are the other principal investors in the Master Fund. The Fund and the U.S. Funds aggregate their investments through the Master Fund so as to concentrate credit status and negotiating leverage, while also achieving administrative economies of scale, eliminating the need for trade allocations and simplifying ongoing operations.

As of December 1, 2005, the capitalization of the Master Fund was approximately $6.8 billion.

The Master Fund implements Amaranth's investing and trading strategies both directly and through a variety of trading subsidiaries ("Trading Entities"). References to the Fund include the Master Fund and the Trading Entities (or the Fund's interests therein, as the case may be), unless the context otherwise requires.

Direct Trading;
Investment Restrictions

In situations in which the Master Fund is restricted from investing in a particular investment or strategy but the Fund itself is not, the Fund may trade directly for its own account or invest in a Trading Entity that engages in such investment activity or strategy. Similarly, in situations in which the Fund and/or the Master Fund is restricted from investing in a particular investment or strategy, but the U.S. Funds are not, one or more of the U.S. Funds may make investments and engage in strategies in which the Fund does not participate.

-4-

## SUMMARY
### (cont.)

| | |
|---|---|
| **Individual Series of Participating Shares of Each Class** | Each Shareholder will acquire its own Series of Annual Liquidity Shares and/or Four-Year Liquidity Shares, each with a Net Asset Value determined separately based on such Shareholder's individual investment experience. All Annual Liquidity Shares held by the same Shareholder will have the same Net Asset Value (irrespective of such Participating Shares' issuance dates), as will all Four-Year Liquidity Shares held by the same Shareholder. The Participating Shares of each Class will be initially issued to their Shareholder at $1,000 per Participating Share and thereafter at Net Asset Value. Issuing separate Series of Participating Shares of each Class to each Shareholder makes possible the equitable allocation of Performance Fees, Special Allocations and other expenses among different Shareholders. |

Because each Shareholder will hold an individual Series of Participating Shares of each Class with its own Net Asset Value per Participating Share, the number of Participating Shares held by a Shareholder has no effect on the Net Asset Value of such Shareholder's overall investment in such Class. The aggregate Net Asset Value of a Shareholder's Participating Shares of each Class, not the number of Participating Shares held, determines each Shareholder's participation in the profits and losses of such Class.

### Financial Terms

| | |
|---|---|
| **Monthly Management Fee** | The Fund pays Amaranth International a monthly Management Fee equal to 0.125% of the aggregate Gross Asset Value of each Shareholder's individual Series of Participating Shares at the beginning of each calendar month (a 1.5% annual rate). |

Annual Liquidity Shares and Four-Year Liquidity Shares are subject to the same Management Fees.

| | |
|---|---|
| **Annual Performance Fee** | As of each December 31, the Fund pays a Performance Fee (if due) to Amaranth International equal to: (i) 20% of any Net New Profit then attributable to each Shareholder's individual Series of Annual Liquidity Shares; and (ii) 15% of any Net New Profit attributable to each Shareholder's individual Series of Four-Year Liquidity Shares. |

Performance Fees are calculated separately with respect to each Shareholder's individual Series of each Class (not separately with respect to each Subscription made by such Shareholder to such Class). However, Performance Fees are calculated separately with respect to the Annual Liquidity Shares and the Four-Year Liquidity Shares held by a Shareholder which has invested in both Classes.

*In the event that a Shareholder holds both Annual Liquidity Shares and Four-Year Liquidity Shares, it is possible that such Shareholder will be subject to a Performance Fee with respect to one Class even though the other Class, and such Shareholder's overall investment in the Fund, has incurred losses.*

**SUMMARY**
**(cont.)**

DT Bonuses

Certain bonuses ("DT Bonuses") payable by the Fund to "Designated Traders" reduce the Performance Fees (if any) otherwise payable, but not below $0, so that (in the case where Performance Fees exceed DT Bonuses) *the sum of* the Performance Fees and DT Bonuses payable with respect to a Fiscal Year and, in each case, attributable to a Shareholder's individual Series of Participating Shares of each Class, *equals* the Performance Fees that would have been payable had Amaranth itself paid the DT Bonuses without reimbursement from the Fund. For further clarification, in the case where DT Bonuses exceed Performance Fees, such excess is allocated to the Fund in the same manner as the other Allocable Expenses of the Fund. *See " — Operating Expenses and Transaction Costs," below.*

DT Bonuses reduce the Performance Fees themselves, but not (to the extent that DT Bonuses are credited against Performance Fees) the Net New Profit on which the Performance Fees are calculated.

Designated Traders are a strictly limited group of investment professionals, as determined from time to time by Amaranth, who either: (i) are the portfolio managers having overall investment management responsibility — not only trading authority — for each portfolio or sub-portfolio implemented on behalf of the Fund or of the Master Fund, as the case may be; or (ii) devote substantially all of their business time to trade execution, as opposed to performing research (fundamental or quantitative), securities lending or borrowing, treasury, risk management, investor relations or other services.

For purposes of determining whether an investment professional devotes substantially all of his or her business time to trade execution, Amaranth considers, among other things, whether such person is listed with Amaranth's execution brokers as an authorized trader and the frequency of such person's (i) communications with sales desks of the execution brokers for execution-related purposes and (ii) trade execution with the execution brokers. The extent to which an investment professional's compensation is based on the performance of one or more specific portfolios, sub-portfolios or positions, and the amount and/or form of such investment professional's compensation, are not determinative of such investment professional's status as a Designated Trader. In fact, certain Amaranth personnel (including persons who are not investment professionals) may receive a higher level of compensation than certain Designated Traders. Not all highly compensated investment professionals and members of Amaranth's senior management are Designated Traders.

## SUMMARY
### (cont.)

| | |
|---|---|
| **DT Bonuses (cont.)** | For purposes of determining whether an investment professional is a portfolio manager of a sub-portfolio, the Designating Party considers, among other things, (i) the investment professional's level of discretion over trading decisions without input from the portfolio manager for the overall portfolio and level of input in setting investment strategy for the overall portfolio or sectors of the overall portfolio and (ii) the existence of any trading limits imposed on such investment professional by the portfolio manager. An investment professional may be the portfolio manager of a portfolio, and of any one or more of the sub-portfolios of such portfolio even if another investment professional has significant investment responsibility for a portion of the capital committed to such portfolio and/or sub-portfolios. However, it is highly likely that an investment professional who is the portfolio manager for a sub-portfolio will be the portfolio manager for the portfolio of which such sub-portfolio is a constituent part. |

Notwithstanding the number of portfolio managers employed by Amaranth, there is only one investment professional designated as the portfolio manager for each portfolio or sub-portfolio, and the same investment professional may be designated as being the portfolio manager for more than one portfolio or sub-portfolio.

The determination of which Amaranth Party employees constitute Designated Traders, as well as the portion of such individuals' activities and/or the portion of the applicable Fiscal Year with respect to which such individuals were so classified, involves a subjective determination by Amaranth.

Amaranth's determination of which of its personnel constitute Designated Traders (certain of such personnel may be so designated in respect of a portion of their bonuses or for only a portion of a Fiscal Year) is binding if made in a manner consistent with the standard of care set forth in the Material Contracts. *See "Management — Standard of Liability; Indemnification."*

Amaranth may, but is under no obligation to, pay DT Bonuses from its own assets, in which case such DT Bonuses will not reduce Performance Fees.

*See "Fees and Expenses — Performance Fees — DT Bonuses."*

## THE FUND'S INVESTMENT OBJECTIVE AND STRATEGIES

**Investment Objective**

The investment objective of the Fund is superior risk-adjusted returns. The Fund employs a diverse group of trading strategies, trading a broad range of equity and debt securities, commodities, derivatives and other financial instruments on a global basis. In managing the Fund's portfolio, Amaranth opportunistically employs a wide range of relative value, event-driven, directional, hybrid and other strategies. There are no material limitations on the instruments, strategies, markets or countries in which the Fund may invest. *The Fund's investments and strategies involve significant risks. There can be no assurance that the Fund will meet its objective or avoid substantial losses. See "Risk Factors."*

**Investment Strategies**

The Fund currently invests a substantial portion of its capital in the Master Fund. However, the Fund retains the discretion to invest directly in Trading Entities, in Third-Party Ventures and/or with Third-Party Managers, as well as to acquire Investment Assets directly, and may in the future commit a material portion of its portfolio to Longer-Term Investments.

The following are summary descriptions of certain of the strategies employed by Amaranth in directing the Master Fund's trading and investing.

*General*

Among the principal strategies implemented by the Fund are: convertible arbitrage, merger arbitrage, equity long/short investing, statistical arbitrage, energy trading, commodities trading, options arbitrage and credit arbitrage.

The Fund trades globally in a broad range of equity and debt securities, derivatives and other financial instruments. These instruments may include, for example, common and preferred stocks, bonds, commodities, loans, trade claims, bank deposits and currencies, as well as futures, forwards, swaps (including commodity swaps, interest rate swaps, credit default swaps and asset swaps) and options (including options on stocks, bonds, commodities, credit default swaps and interest rate swaps).

Asset allocations among strategies are based on Amaranth's ongoing analysis of prevailing market conditions. The Fund does not focus on, nor is its trading limited to, any geographic area, industry sector, issuer credit rating or issuer market capitalization level. The Fund is not subject to any formal diversification requirements, and the Fund's portfolio may, from time to time, be concentrated in a limited number of positions or strategies.

The Fund's strategies can, generally, be separated into three categories: relative value, event-driven and directional. There are no clear dividing lines among these categories, and any strategy employed by the Fund may be cross-categorized to the extent its guiding logic is multidisciplinary. There is no material limitation on the strategies which the Fund may implement (either directly or through investments in Third-Party Ventures and allocations to Third-Party Managers).

*Relative Value Strategies*

Relative value strategies seek to profit from the relative mispricing of related assets: for example, convertible bonds and the common stock underlying the conversion option, other options and futures and their underlying reference assets, debt instruments of the same issuer or of different issuers (including

**Amaranth International and Amaranth Advisors**

The Chief Executive Officer of Amaranth Group, Amaranth International and Amaranth Advisors is Nicholas Maounis. Mr. Maounis is the sole shareholder of Amaranth Group and, together with entities controlled by Mr. Maounis, is the majority owner of Amaranth International and Amaranth Advisors.

Mr. Maounis is the President and Chief Investment Officer of Amaranth, responsible for all investment functions as well as managing the firm. From 1990 until August 2000, Mr. Maounis was a Portfolio Manager for Paloma Partners Management Company and affiliated entities ("PPMC"). In this role, Mr. Maounis was responsible for trading a large convertible arbitrage portfolio and for managing up to 25 traders and assistants employing a variety of investment strategies similar to those utilized by Amaranth. Previously, Mr. Maounis managed U.S. convertible arbitrage portfolios for PPMC (1990-1992), Angelo Gordon & Co. (1989-1990) and LF Rothschild, Unterberg, Towbin (1985-1989), where he was a senior vice-president in charge of all convertible-arbitrage trading. Mr. Maounis graduated from the University of Connecticut in 1985 with a Bachelor of Science degree in Finance.

Other principal Amaranth personnel include:

Gregg Felton — Gregg Felton is the Portfolio Manager for the credit trading portfolio and the Senior Credit Manager for the convertible portfolio at Amaranth. Prior to his present position, he served in similar roles for PPMC. Before joining PPMC, Mr. Felton was a Vice President at The Chase Manhattan Bank; from 1997 to March 2000, he co-managed its Special Situations Fund (a distressed investment vehicle). Prior to that, Mr. Felton worked in the High Yield Finance Department of Chase's Global Investment Bank. Mr. Felton received a joint Juris Doctor/Master in Business Administration from Georgetown University Law Center/School of Business as well as a Bachelor of Arts in Economics from Tufts University.

Robert Jones — Robert Jones serves as Amaranth's Chief Risk Officer. After graduating from Harvard College (1984 *cum laude* in Economics), Mr. Jones joined Fischer Black's group at Goldman, Sachs & Co. to develop proprietary arbitrage strategies and risk-limited portfolio management techniques. After co-authoring two papers with Dr. Black, Mr. Jones joined Goldman's equity arbitrage trading unit to run a listed and OTC derivatives book. In 1988, NYSE Chairman John Phelan invited Mr. Jones to assist him in evaluating and addressing operational risks exposed during the 1987 crash. In 1989, Mr. Jones joined PPMC where he managed an international derivative arbitrage portfolio. He and Mr. Maounis worked together for four years managing arbitrage portfolios for the private investment funds associated with PPMC. Prior to joining Amaranth in September 2001, Mr. Jones led Stradivarius Capital, a firm he founded to help quantitatively-oriented hedge funds to identify and manage sources of performance uncertainty.

Rick Solomon — Rick Solomon is the Portfolio Manager for the global convertibles (excluding Canada) portfolio at Amaranth. From 1998 to August 2000, he managed a U.S. convertible portfolio and a long/short technology portfolio for PPMC. Mr. Solomon began his investment career in 1983 with Wechsler and Co. There he was a Director and Executive Vice President and managed the convertible trading and arbitrage portfolios until 1998. Mr. Solomon graduated from Emory University in 1983 with a Bachelor of Science in Business Administration.

Manos Vourkoutiotis — Manos Vourkoutiotis is the Portfolio Manager for the Canadian products and mandatory convertible securities portfolios at Amaranth. He managed similar portfolios for PPMC from 1998 until August 2000. Mr. Vourkoutiotis began his career in 1991 at RBC Dominion Securities, where he traded convertible securities for their equity derivatives group until 1993. He was a market maker in convertible securities for Nesbitt Burns from 1993 to 1997. He spent the following year at

the Shareholders, regardless of the number of Shareholders in attendance, in person or by proxy, at the general meeting at which such termination is considered.

**Advisory Agreements and Regulatory Status of Amaranth Parties and Amaranth**

The Master Fund and certain other Amaranth Clients also have entered into an Amended and Restated Advisory Agreement dated March 23, 2005 (the "Canadian Advisory Agreement") with Amaranth Advisors (Canada) ULC ("Amaranth Advisors Canada") and also have entered into sub-advisory agreements with each of Amaranth Advisors (UK) LLP ("Amaranth Advisors London") and Amaranth Advisors (Singapore) Pte. Ltd. ("Amaranth Advisors Singapore"), as the same may from time to time be amended and/or restated. The aggregate amount of Management Fees and Performance Fees payable, directly or indirectly, by Shareholders of the Fund is not increased by virtue of the advisory arrangements between the Master Fund and Amaranth Advisors Canada, Amaranth Advisors London and Amaranth Advisors Singapore.

Amaranth Advisors Canada is registered in the category of Investment Counsel and Portfolio Manager and Limited Market Dealer with the OSC. Amaranth Advisors London is authorized with the FSA under Part IV of the U.K. Financial Services and Markets Act 2000. Amaranth Advisors Singapore engages in management and financial advisory activities and securities dealing activities that are incidental to its fund management and financial advisory activities pursuant to an exemption that is based on the nature of its client base.

Amaranth has notified the Fund that it does not intend to register with the SEC as an investment adviser by February 2006, although it reserves the right to register at a later date. Amaranth intends to avail itself of certain exceptions to registration under the Hedge Fund Advisers Registration Rule, including an exception for advisers that impose a twenty-five (25) month minimum investment period on new investments, which is referred to in this Memorandum as the "Lock-Up Period." *Prospective investors must not rely on Amaranth becoming an SEC-registered "investment adviser" in determining whether to invest in the Participating Shares.*

**Amaranth Group Inc.**

Amaranth Group, an Affiliate of Amaranth, was organized in November 2002 by Mr. Maounis to provide administrative services to the Amaranth Clients that formerly were supplied by PPMC. Amaranth Group provides administrative, accounting, data processing, research, investment-related, technology and other support services to the Fund.

The Administrative Services Agreement between the Fund and Amaranth Group provides for the indemnification of Amaranth, Amaranth Group, their respective Affiliates, and the respective officers, directors, managers and employees of each of the foregoing.

The Administrative Services Agreement may be terminated (i) at any time by Amaranth Group upon one hundred and twenty (120) days' notice and (ii) by the Fund, only if Amaranth ceases to serve as the Trading Advisor of the Fund.

The Master Fund has entered into a substantially similar administrative services agreement with Amaranth Group.

adverse impact on the profit potential of the Fund, as well as require increased transparency as to the identity of the Shareholders.

**The Fund May be Subject to Net Income Tax in Certain Jurisdictions**

Amaranth may determine that it is in the best interests of the Fund for the Fund or the Master Fund to be subject to net income tax in certain jurisdictions due to the perceived profit potential of certain transactions justifying the Fund or the Master Fund participating even on an after-tax basis.

**Tax Determinations by Third-Party Managers**

In placing capital with a Third-Party Manager, the Fund will become subject to such Third-Party Manager's tax determinations regarding the proper tax treatment of its strategies. Such determinations could be incorrect or improper, perhaps indirectly subjecting the Fund to substantial costs. Conversely, such determinations could be overly conservative, causing the Fund to pay unnecessary taxes.

**Accounting Changes Could Make Certain Strategies Obsolete**

In response to the *Enron* bankruptcy and other highly publicized losses resulting at least in part from improper accounting methods, a number of accounting initiatives have been launched by the auditing professional standards board. Certain of these proposed initiatives could render obsolete trading strategies which have been used routinely for many years. For example, one proposal would have required the issuers of convertible bonds to mark-to-market the option component embedded in these securities. Had this proposal been adopted, convertible bond issuance would likely have declined materially, as the volatility of the option value would directly impact the issuer's income statement. Other changes affecting consolidation, the valuation of over-the-counter, out-of-the-money options and other matters could adversely affect the viability of certain aspects of the Fund's strategies.

**Revised Regulatory Interpretations Could Make Certain Strategies Obsolete**

In addition to proposed and actual accounting changes, there have recently been certain well-publicized incidents of regulators unexpectedly taking positions which prohibited strategies which had been implemented in a variety of formats for many years. In the current unsettled regulatory environment, it is impossible to predict if future regulatory developments might adversely affect the Fund.

**Limited Role of the Directors and the Administrator**

The Directors have ultimate authority over all of the Fund's operations. However, as substantially all of the Fund's operations consist (indirectly) of implementing highly specialized, alternative investment strategies, the ability of the Directors to control these operations is inherently limited. The Directors' role is the oversight of, not active involvement in, the Fund's trading activities.

The Administrator has strictly limited administrative and corporate secretarial responsibilities and does not provide any independent verification of the Fund's accounting or valuation procedures.

and its real property. The Fund and the Master Fund do not intend to invest in U.S. real property and will not generally invest in USRPHCs.

Section 881(a) of the Code provides that a foreign corporation also is subject to a non-recoverable 30% U.S. federal withholding tax imposed on the gross amount of certain types of U.S. source income that are not effectively connected with a U.S. business (for example, certain interest or dividends). The Master Fund may invest in certain U.S. source income producing assets that could be subject to the 30% U.S. withholding tax if allocated to a foreign person.  For example, dividends received from U.S. corporations generally would be subject to U.S. withholding, whereas interest constituting "portfolio interest" would not be subject to U.S. withholding.

As noted, "portfolio interest" is exempt from U.S. withholding tax.  Portfolio interest generally is non-contingent interest, including original issue discount, on obligations issued after July 18, 1984 that are in registered form or, if in bearer form, that satisfy the following requirements: there are arrangements reasonably designed to ensure that it will be sold (or resold in connection with original issuance) only to a non-U.S. person; interest is payable only outside the United States and its possessions; and the face of the obligations bears a legend stating that any U.S. Person that holds the obligations will be subject to limitations under U.S. income tax laws.  Portfolio interest generally does not include interest paid to persons who own directly or indirectly 10% or more of the voting stock of the borrower.

A number of trading strategies employed in the energy markets involve physical energy trading (*e.g.*, transmitting actual electrical power or natural gas through power grids and pipelines) or investing in operating businesses (*e.g.*, oil and gas exploration companies).  Certain of these strategies may be deemed to constitute a "trade or business" which could subject the Fund to tax in the United States and other jurisdictions on the same basis as any other business.  In the case of certain U.S.-based energy strategies, non-U.S. capital can efficiently participate in such strategies only as a lender rather than as an equity owner.  Consequently, in certain of the Fund's energy strategies, the Fund itself will lend capital to one or more of the U.S. Funds.  In such cases, the U.S. Funds' exposure will be leveraged and their risk increased, and they will incur interest expense.  Furthermore, in certain cases Amaranth may deem the tax issues to be such that it is prudent to exclude the Fund from participating in certain energy strategies altogether.

**Taxation of Shareholders**

As used herein, references to a "U.S. Tax Person" are to a Shareholder that is (i) a citizen or resident of the United States; (ii) a corporation organized under the laws of the United States or any political subdivision thereof; or (iii) a person or entity otherwise subject to United States federal income taxation on a net income basis with respect to such person's or entity's ownership of Participating Shares (including a non-resident alien or foreign corporation that holds, or is deemed to hold, Participating Shares or Designated Investment Series Shares in connection with the conduct of a U.S. trade or business).

**Shareholders that are not U.S. Tax Persons**

Gain realized by Shareholders that are not U.S. Tax Persons upon the sale or exchange or complete Redemption of Participating Shares or Designated Investment Series Shares held as a capital asset should generally not be subject to U.S. federal income tax provided that the gain is not effectively connected with the conduct of a trade or business in the U.S.  However, in the case of nonresident alien individuals, such gain will be subject to a 30% (or lower tax treaty rate) U.S. tax if (i) such person is present in the U.S. for 183 days or more during the taxable year (on a calendar year basis unless the

nonresident alien individual has previously established a different taxable year) and (ii) such gain is derived from U.S. sources.

Generally, the source of gain upon sale or exchange or complete Redemption of Participating Shares is determined by the place of residence of the Shareholder. For purposes of determining the source of gain, the Code defines residency in a manner that may result in an individual who is otherwise a nonresident alien with respect to the United States being treated as a U.S. resident for purposes of determining the source of income only. Each individual Shareholder who anticipates being present in the U.S. for 183 days or more (in any taxable year) should consult his tax adviser with respect to the possible application of this rule.

Gain realized by a non-U.S. Shareholder engaged in the conduct of a U.S. trade or business will be subject to U.S. federal income tax upon the sale or exchange or complete Redemption of Participating Shares if such gain is effectively connected with its U.S. trade or business.

**Shareholders that are U.S. Tax Persons**

In the event any Shareholder, or any other person who directly or indirectly owns an interest in a Shareholder, is or is deemed to be a U.S. Tax Person, that Shareholder or other person should generally be subject to the Passive Foreign Investment Company ("PFIC") provisions of the Code.

Under the PFIC provisions, gain from the direct or indirect sale or exchange of, and certain direct or indirect distributions in respect of, stock of a PFIC is allocated ratably over the U.S. Tax Person's holding period in respect of the stock and is subject to the highest rate of tax (without allowance for deductions) applicable to ordinary income, plus an interest charge. Alternatively, a U.S. Tax Person may be able to elect to treat the PFIC as a qualified electing fund ("QEF") if the Fund provides certain required information, in which case the U.S. Tax Person would be required to report currently a *pro rata* share of the PFIC's ordinary earnings and net capital gains (but not losses) for a taxable year. The Fund does not intend to provide the Shareholders with the necessary information to make a QEF election.

A direct or indirect U.S. Tax Person of a foreign corporation that is more than 50% controlled by certain U.S. Tax Persons can also be subject to the controlled foreign corporation provisions of the Code. The Fund does not believe that it will be a controlled foreign corporation.

The PFIC and other provisions of the Code applicable in respect of direct or indirect ownership of foreign corporations by U.S. Tax Persons are extremely complicated. Any investor which is or which may be deemed, directly or indirectly, to be a U.S. Tax Person, or in which a U.S. Tax Person has a direct or indirect interest, should consult a tax adviser prior to acquiring Participating Shares or Designated Investment Series Shares.

Shareholders that are U.S. tax-exempt entities, including but not limited to charities, private foundations, pension trusts, Keogh Plans and Individual Retirement Accounts, are subject to U.S. federal income tax on unrelated business taxable income ("UBTI"). Amaranth believes that, under current U.S. tax law, income from the Fund will not result in UBTI, except to the extent that U.S. tax-exempt Shareholders incur "acquisition indebtedness" as defined under Section 514 of the Code in connection with their acquisition of Participating Shares or Designated Investment Series Shares.

**Bermuda Taxation**

At the date of this Memorandum, there is no Bermuda income, corporation or profits tax, withholding tax, capital gains tax, capital transfer tax, estate duty or inheritance tax payable by the Master

# EXHIBIT 4

# /α/Amaranth

One American Lane
Greenwich CT 06831
T 203 422 3300
F 203 422 3500

January 31, 2005

**VIA FEDERAL EXPRESS**

National Futures Association
Attn: Director of Compliance
200 West Madison Street
Suite 1600
Chicago, Illinois 60606



Re:  **NOTICE OF CLAIM PURSUANT TO COMMODITY
FUTURES TRADING COMMISSION RULE 4.13(a) (4)
UNDER THE COMMODITY EXCHANGE ACT**

Dear Madame/Sir:

The undersigned, Amaranth International Advisors, L.L.C. (the "Claimant")
hereby files this NOTICE OF CLAIM PURSUANT TO COMMODITY FUTURES
TRADING COMMISSION ("CFTC") Rule 4.13(a) (4) for the following pool:

**Amaranth International Limited** – P5941

The claimant seeks relief on behalf of the above-named pool pursuant to CFTC Rule
4.13(a)(4). The Claimant will comply, and above named pool will be offered and
operated in compliance with the requirements of CFTC Rule 4.13(a)(4). Contact
information is as follows:

Amaranth International Advisors L.L.C. – 303073 (net Reg)
One American Lane
Greenwich, CT 06831
Telephone:    (203) 422-3300

Amaranth International
Adivsors L.L.C.

By: _____
Name: Nicholas M. Maounis
Title:  Managing Member

**EXHIBIT 5**

Chancery Hall, 52 Reid Street
Hamilton HM12, Bermuda
Tel: (441) 295-9294
Fax: (441) 292-8899

## AMARANTH INTERNATIONAL LIMITED

June 6, 2002

Commodity Futures Trading Commission
Attn: Managed Funds Branch
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

National Futures Association
Attn: Director of Compliance, Compliance Department
200 West Madison Street, Suite 1600
Chicago, Illinois 60606

RE:     Notice of Claim for Exemption under
        Section 4.7 (a) (3) of the Commodity Exchange Act

Gentlemen:

    This constitutes a Notice of Claim for Exemption under Section 4.7 (a)(3) of the Commodity Exchange Act for the undersigned, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓, a registered commodity pool operator (the "Operator"). In this connection, please be advised as follows:

    (i) the Operator's main business address is Two American Lane, Greenwich, CT 06836; its main business telephone number is (203) 625-8300; and its National Futures Association commodity pool operator identification number is 303073;

    (ii) the name of the pool for which this request is made is Amaranth International Limited, a Bermuda corporation (the "Exempt Pool");

    (iii) the Operator hereby represents that (1) it is not subject to any statutory disqualification under Section 8a(2) or 8a(3) of the Commodity Exchange Act unless such disqualification arises from a matter that was previously disclosed in connection with a previous application for which registration was granted or which was disclosed more than thirty days prior to the filing of this notice; (2) it will comply with the applicable requirements of Section 4.7 of the Commodity Exchange Act; and (3) the

Exempt Pool will be offered and operated in compliance with the applicable requirements of said Section 4.7;

        (iv) the Operator claims the relief set forth in Sections 4.7(a)(2)(i), (ii), (iii), and (iv) of the Commodity Exchange Act; and

        (v) the offering for the exempt pool will be continuous.

Sincerely yours,

Amaranth International Advisors L.L.C.,
Commodity Pool Operator of
Amaranth International Limited
By:   Nicholas Maounis,
      Managing Member

# EXHIBIT 6



# Details

**MAOUNIS NICHOLAS MATTHEW**                                    **NFA ID: 0289575**

## Current Status

• ALSO SEE NFA ID 0289576

## Regulatory Actions

| Agency | Number |
|--------|--------|
| NFA | 0 |
| CFTC | 0 |
| Exchanges | 0 |

details...

## NFA Arbitration Awards

| Role | Number |
|------|--------|
| Claimant | 0 |
| Respondent | 0 |
| Representative | 0 |

details...

## CFTC Reparations Cases

| | |
|--|--|
| Total | 0 |

details...

## Also Known As

No other names

## Business Address

ONE AMERICAN LANE
GREENWICH, CT  06831
UNITED STATES
(203) 625-8300

## Doing Business As

• AMARANTH ADVISORS LLC          • AMARANTH INTERNATIONAL ADVISORS LLC

## Listed Principals

No principals currently listed

## History

| Status | Effective Date |
|--------|----------------|
| • ALSO SEE NFA ID 0289576 | |
| • NFA MEMBER WITHDRAWN | 07/17/2004 |
| • COMMODITY TRADING ADVISOR WITHDRAWN | 07/17/2004 |
| • NFA MEMBER APPROVED | 09/10/1998 |
| • COMMODITY TRADING ADVISOR REGISTERED | 09/10/1998 |
| • COMMODITY TRADING ADVISOR PENDING | 08/19/1998 |
| • NFA MEMBER PENDING | 08/19/1998 |

©2003-2008 National Futures Association



# Details

**AMARANTH INTERNATIONAL ADVISORS LLC**                    **NFA ID: 0303073**

### Current Status

• EXEMPT COMMODITY POOL OPERATOR

### Exemptions

Click the link below to view exemptions for this firm
View Exemptions

| Regulatory Actions | | | NFA Arbitration Awards | | | CFTC Reparations Cases | |
|---|---|---|---|---|---|---|---|
| **Agency** | **Number** | | **Role** | **Number** | | Total | 0 |
| NFA | 0 | | Claimant | 0 | | | details... |
| CFTC | 0 | | Respondent | 0 | | | |
| Exchanges | 0 | | Representative | 0 | | | |
| | details... | | | details... | | | |

### Also Known As

• AMARANTH ADVISORS LLC

### Business Address

ONE AMERICAN LANE
GREENWICH, CT  06831
UNITED STATES
203-625-8300

### Doing Business As

No other names

### Listed Principals

No principals currently listed

### History

| Status | Effective Date |
|---|---|
| • NFA MEMBER WITHDRAWN | 02/05/2005 |
| • COMMODITY POOL OPERATOR WITHDRAWN | 02/05/2005 |
| • NFA MEMBER APPROVED | 06/29/2000 |
| • COMMODITY POOL OPERATOR REGISTERED | 06/29/2000 |
| • COMMODITY POOL OPERATOR PENDING | 06/23/2000 |
| • NFA MEMBER PENDING | 06/23/2000 |

©2003-2008 National Futures Association

# EXHIBIT 7

/α/Amaranth

| Strategy (1) | Capital at 1/31/06 (2) | Leverage (4) | Total # of Trading Positions | 2006 Performance Attribution Year to Date January 31, 2006 |
|---|---|---|---|---|
| US Convertibles | 4% | 7.17 | 141 | 2% |
| International Convertibles / Volatility | 15% | 4.28 | 2,121 | 9% |
| Statistical Arbitrage | 7% | 2.46 | 4,179 | 2% |
| Energy / Commodities | 34% | 6.49 | 5,989 | 55% |
| Merger Arbitrage | 4% | 1.98 | 118 | 4% |
| Long/Short Equity | 13% | 1.99 | 452 | 11% |
| Credit Products | 23% | 4.15 | 2,985 | 13% |
| TOTAL | 100% | 4.62 | 15,985 | 100% |

Snapshot at January 31, 2006

(1) The information detailed above pertains to Amaranth LLC. The Capital Allocation Grid below depicts the allocation of capital from each feeder fund listed below to the master funds, Amaranth LLC ("AM LLC") and Amaranth Global Equities Master Fund Limited ("AGE"), and capital allocated directly (e.g., Credit Products strategy) ("Direct"):

Capital Allocation Grid

| Feeder | AM LLC | AGE | Direct | Total |
|---|---|---|---|---|
| Amaranth International Limited | 93% | 4% | 3% | 100% |
| Amaranth Partners L.L.C. | 85% | 4% | 11% | 100% |
| Amaranth Capital Partners LLC | 93% | 4% | 3% | 100% |

(2) The strategy description above is not necessarily indicative of all the positions in that category. Certain strategies may contain positions that have characteristics that would normally have it categorized within another strategy, but are included within the predominant strategy of the portfolio manager or group of portfolio managers responsible for managing such positions. For example, Credit Products consists of various strategies including, but not limited to, distressed and high-yield trading, capital structure arbitrage, collateralized debt obligation trading and participation in primary and secondary debt and equity markets (including PIPES and other private convertibles). Notwithstanding the foregoing, effective December 2005, Volatility strategies managed by the European Convertibles desk have been re-classified to the International Convertibles / Volatility strategy (formerly known as the International Convertibles strategy).

(3) As of January 31st, AM LLC had capital of approximately $7.3 billion and AGE had capital of approximately $0.4 billion. The capital of the feeder funds was as follows:

Amaranth International Limited        $6.16 billion
Amaranth Partners L.L.C.             $1.40 billion
Amaranth Capital Partners LLC        $ .30 billion

(4) Leverage represents long markets value divided by capital. Notional values for any notional principal contracts are included in long market value except those utilized to hedge specific portfolio risks (e.g., interest rate exposure).

**CONFIDENTIAL**

The information contained herein is being provided solely for the use of current and potential investors in funds managed by Amaranth Advisors L.L.C. or its affiliates ("Amaranth") for the specific purpose of evaluating investments in Amaranth's funds. This information is CONFIDENTIAL and should not be re-distributed without the express written consent of Amaranth. Past results are not necessarily indicative of future results.

AMARANTH_REG001910

# α/Amaranth

## AMARANTH Group

### Snapshot at February 28, 2006

| Strategy[2] | Capital at 2/28/06[1] | Leverage[4] | Total # of Trading Positions | 2006 Performance Attribution Year to Date February 28, 2006 |
|---|---|---|---|---|
| US Convertibles | 4% | 7.32 | 151 | 1% |
| International Convertibles / Volatility | 13% | 4.18 | 2,356 | 3% |
| Statistical Arbitrage | 7% | 2.37 | 4,589 | 3% |
| Energy | 37% | 6.43 | 5,470 | 66% |
| Commodities | 2% | 6.16 | 1,294 | 4% |
| Merger Arbitrage | 3% | 1.95 | 119 | 2% |
| Long/Short Equity | 10% | 2.39 | 647 | 2% |
| Credit Products | 24% | 4.64 | 2,609 | 9% |
| TOTAL | 100% | 4.95 | 17,235 | 100% |

(1) The information detailed above pertains to Amaranth LLC. The Capital Allocation Grid below depicts the allocation of capital from each feeder fund listed below to the master funds, Amaranth LLC ("AM LLC") and Amaranth Global Equities Master Fund Limited ("AGE"), and capital allocated directly (e.g., Credit Products strategy) ("Direct");

(2) The strategy description above is not necessarily indicative of all the positions in that category. Certain strategies may contain positions that have characteristics that would normally have it categorized within another strategy, but are included within the predominant strategy of the portfolio manager or group of portfolio managers responsible for managing such positions. For example, Credit Products consists of various strategies including, but not limited to, distressed and high-yield trading, capital structure arbitrage, collateralized debt obligation trading and participation in primary and secondary debt and equity markets (including RMBS and other private convertibles). Effective February 2006, the strategies previously included in the Energy/Commodities strategy will be presented in the following manner: non-energy related commodities strategies (i.e. metals and agricultural commodities) will be presented as a separate Commodities strategy, long/short trading of energy-sector equity securities is included in the Long/Short Equity strategy and energy-related commodity strategies are presented as the Energy strategy.

(3) As of February 28th, AM LLC had capital of approximately $7.5 billion and AGE had capital of approximately $0.5 billion. The capital of the feeder funds was as follows:

Amaranth International Limited $6.25 billion
Amaranth Partners L.L.C. $1.42 billion
Amaranth Capital Partners LLC $ .11 billion

#### Capital Allocation Grid

| Feeder | AM LLC | AGE | Direct | Total |
|---|---|---|---|---|
| Amaranth International Limited | 93% | 5% | 2% | 100% |
| Amaranth Partners L.L.C. | 85% | 4% | 11% | 100% |
| Amaranth Capital Partners LLC | 93% | 4% | 3% | 100% |

(4) Leverage represents long market value divided by capital. Notional values for any notional principal contracts are included in long market value except those utilized to hedge specific portfolio risks (e.g., interest rate exposure).

## CONFIDENTIAL

The information contained herein is being provided solely for the use of current and potential investors in funds managed by Amaranth Advisors L.L.C. or its affiliates ("Amaranth") for the specific purpose of evaluating investments in Amaranth's funds. This information is CONFIDENTIAL and should not be re-distributed without the express written consent of Amaranth. Past results are not necessarily indicative of future results.

# /α/Amaranth

## 2006 Performance Attribution

| | Year to Date | March 31, 2006 |
|---|---|---|
| | 1% | 1% |
| | 2% | 2% |
| | 3% | 3% |
| | 60% | 60% |
| | 6% | 6% |
| | 2% | 2% |
| | 2% | 2% |
| | 5% | 5% |
| | 9% | 9% |
| | 17% | 17% |
| | 100% | 100% |

## Snapshot at March 31, 2006

| Strategy [2] | Capital at 3/31/06 [3] | Leverage [4] | Total # of Trading Positions |
|---|---|---|---|
| US Convertibles | 5% | 7.28 | 161 |
| International Convertibles / Volatility | 13% | 4.26 | 2,846 |
| Statistical Arbitrage | 8% | 2.26 | 4,409 |
| Energy | 34% | 5.58 | 5,782 |
| Commodities | 6% | 6.05 | 1,442 |
| Merger Arbitrage | 2% | 1.92 | 96 |
| Long/Short Equity | 9% | 2.43 | 537 |
| Credit Products | 25% | 4.55 | 3,051 |
| TOTAL | 100% | 4.63 | 18,324 |

(1) The information detailed above pertains to Amaranth LLC. The Capital Allocation Grid set forth below depicts each feeder fund's allocation of capital. While the three feeder funds allocate capital to the master funds, Amaranth Global Equities Master Fund Limited ("AGE"), and Amaranth LLC ("AM LLC") and Amaranth International Limited and Designated Investments, Amaranth Partners LLC also allocates capital directly to investments that may be inappropriate for Amaranth International Limited and Amaranth Partners LLC (e.g. certain Credit Products). Designated Investments and other direct investments of the feeder funds are included below in "Direct".

(2) The strategy description above is not necessarily indicative of all the positions in that category. Certain strategies may contain positions that have characteristics that would normally have it categorized within another strategy, but are included within the predominant strategy of the portfolio manager or group of portfolio managers responsible for managing such positions. For example, Credit Products consists of various strategies including, but not limited to, distressed and high-yield trading, capital structure arbitrage, collateralized debt obligation trading and participation in primary and secondary debt and equity markets (including PIPES and other private convertibles). Effective February 2006, the strategies previously included in the Energy/Commodities strategy will be presented in the following manner: non-energy related commodities strategies (i.e. metals and agricultural commodities) will be presented as a separate Commodities strategy, long/short trading of energy-sector equity securities is included in the Long/Short Equity strategy and energy-related commodity strategies are presented as the Energy strategy.

(3) As of March 31st, AM LLC had capital of approximately $7.6 billion and AGE had capital of approximately $0.5 billion. The capital of the feeder funds was as follows:

Amaranth International Limited        $6.37 billion
Amaranth Partners LLC                 $1.42 billion
Amaranth Capital Partners LLC         $ .30 billion

### Capital Allocation Grid

| Feeder | AM LLC | AGE | Direct | Total |
|---|---|---|---|---|
| Amaranth International Limited | 93% | 4% | 3% | 100% |
| Amaranth Partners LLC | 83% | 4% | 13% | 100% |
| Amaranth Capital Partners LLC | 93% | 4% | 3% | 100% |

(4) Leverage represents long market value divided by capital. Notional values for any notional principal contracts are included in long market value except those utilized to hedge specific portfolio risks (e.g., interest rate exposure).

**CONFIDENTIAL**

The information contained herein is being provided solely for the use of current and potential investors in funds managed by Amaranth Advisors L.L.C. or its affiliates ("Amaranth") for the specific purpose of evaluating investments in Amaranth's funds. This information is CONFIDENTIAL and should not be re-distributed without the express written consent of Amaranth. Past results are not necessarily indicative of future results.

# /α/Amaranth

## Snapshot at April 30, 2006

| Strategy [2] | Capital at 4/30/06 [1] | Leverage [4] | Total # of Trading Positions | 2006 Performance Attribution Year to Date April 30, 2006 |
|---|---|---|---|---|
| US Convertibles | 1% | 7.26 | 178 | 1% |
| International Convertibles / Volatility | 12% | 4.34 | 2,840 | 1% |
| Statistical Arbitrage | 9% | 2.24 | 4,657 | 2% |
| Energy | 38% | 5.02 | 5,699 | 74% |
| Commodities | 6% | 4.99 | 1,564 | -5% |
| Merger Arbitrage | 1% | 1.63 | 113 | 1% |
| Long/Short Equity | 8% | 2.65 | 573 | -5% |
| Credit Products | 23% | 4.77 | 3,139 | 11% |
| TOTAL | 100% | 4.47 | 19,353 | 100% |

### Capital Allocation Grid

| Feeder | AH LLC | AGE | Direct | Total |
|---|---|---|---|---|
| Amaranth International Limited | 83% | 4% | 3% | 100% |
| Amaranth Partners L.L.C. | 83% | 4% | 13% | 100% |
| Amaranth Capital Partners LLC | 93% | 4% | 3% | 100% |

(1) The information detailed above pertains to Amaranth LLC. The Capital Allocation Grid set forth below depicts each feeder fund's allocation of capital. While the three feeder funds allocate capital to the master funds, Amaranth LLC ("AH LLC") and Amaranth Global Equities Master Fund Limited ("AGE"), and Designated Investments, Amaranth Partners LLC also allocates capital directly to investments that may be inappropriate for Amaranth International Limited and Amaranth Capital Partners LLC (e.g. certain Credit Products). Designated Investments and other direct investments of the feeder funds are included below in "Direct".

(2) The strategy description above is not necessarily indicative of all the positions in that category. Certain strategies may contain positions that have characteristics that would normally have it categorized within another strategy, but are included within the predominant strategy of the portfolio manager or group of portfolio managers responsible for managing such positions. For example, Credit Products consist of various strategies including, but not limited to, distressed and high-yield trading, capital structure arbitrage, collateralized debt obligation trading and participation in primary and secondary debt and equity markets (including PIPES and other private convertibles). Effective February 2006, the strategy previously included in the Energy/Commodities strategy will be presented in the following manner: non-energy related commodities strategies (i.e. metals and agricultural commodities) will be presented as a separate Commodities strategy; long/short trading of energy-sector equity securities is included in the Long/Short Equity strategy and energy-related commodity strategies are presented as the Energy strategy.

(3) As of April 30th, AH LLC had capital of approximately $6.7 billion and AGE had capital of approximately $0.5 billion. The capital of the feeder funds was as follows:

Amaranth International Limited        $7.13 billion
Amaranth Partners L.L.C.             $1.60 billion
Amaranth Capital Partners LLC        $ .33 billion

(4) Leverage represents long market value divided by capital. Notional values for any notional principal contracts are included in long market value except those utilized to hedge specific portfolio risks (e.g., interest rate exposure).

**CONFIDENTIAL**

The information contained herein is being provided solely for the use of current and potential investors in funds managed by Amaranth Advisors L.L.C., or its affiliates ("Amaranth") for the specific purpose of evaluating investments in Amaranth's funds. This information is CONFIDENTIAL and should not be re-distributed without the express written consent of Amaranth. Past results are not necessarily indicative of future results.

AMARANTH_REG001913

# /α/Amaranth

**AMARANTH LLC [1][2]**

Snapshot at May 31, 2006

| Strategy [2] | Capital at 5/31/06 [3] | Leverage [4] | Total # of Trading Positions (May 31, 2006) | 2006 Performance Attribution Year to Date (May 31, 2006) |
|---|---|---|---|---|
| US Convertibles | 3% | 9.45 | 156 | 3% |
| International Convertibles / Volatility | 8% | 5.64 | 2,871 | -9% |
| Statistical Arbitrage | 6% | 3.43 | 4,944 | 3% |
| Energy | 50% | 5.21 | 6,641 | 55% |
| Commodities | 6% | 6.56 | 1,700 | 14% |
| Merger Arbitrage | 3% | 2.12 | 98 | 2% |
| Long/Short Equity | 7% | 2.80 | 532 | 10% |
| Credit Products | 19% | 5.19 | 3,107 | 12% |
| **TOTAL** | **100%** | **5.35** | **20,049** | **100%** |

(1) The information detailed above pertains to Amaranth LLC. The Capital Allocation Grid set forth below depicts each feeder fund's allocation of capital. While the three Amaranth feeder funds allocate capital to the master funds, Amaranth LLC ("AM LLC") and Amaranth Global Equities Master Fund Limited ("AGE"), and Designated Investments, Amaranth Partners LLC also allocates capital directly to investments that may be inappropriate for Amaranth International Limited and Amaranth Capital Partners LLC (e.g. certain Credit Products). Designated Investments and other direct investments of the feeder funds are included below in "Direct".

(2) The strategy description above is not necessarily indicative of all the positions in that category. Certain strategies may contain positions that have characteristics that would normally have it categorized within another strategy, but are included within the predominant strategy of the portfolio manager or group of portfolio managers responsible for managing such positions. For example, Credit Products consists of various strategies including, but not limited to, distressed and high-yield trading, capital structure arbitrage, collateralized debt obligation trading and participation in primary and secondary debt and equity markets (including PIPEs and other private convertibles). Effective February 2006, the strategies previously included in the Energy/Commodities strategy will be presented in the following manner: non-energy related commodities strategies (i.e. metals and agricultural commodities) will be presented as a separate Commodities strategy, long/short trading of energy-sector related equity securities is included in the Long/Short Equity strategy and energy-related commodity strategies are presented as the Energy strategy.

(3) As of May 31st, AM LLC had capital of approximately $7.5 billion and AGE had capital of approximately $0.5 billion. The capital of the feeder funds was as follows:

| Capital Allocation Grid | | | | |
|---|---|---|---|---|
| Feeder | AM LLC | AGE | Direct | Total |
| Amaranth International Limited | 93% | 4% | 3% | 100% |
| Amaranth Partners L.L.C. | 83% | 4% | 13% | 100% |
| Amaranth Capital Partners LLC | 93% | 4% | 3% | 100% |

Amaranth International Limited   $6.27 billion
Amaranth Partners L.L.C.   $1.50 billion
Amaranth Capital Partners LLC   $ .31 billion

(4) Leverage represents long market value divided by capital. Notional values for any notional principal contracts are included in long market value except those utilized to hedge specific portfolio risks (e.g., interest rate exposure).

**CONFIDENTIAL**

The information contained herein is being provided solely for the use of current and potential investors in funds managed by Amaranth Advisors L.L.C. or its affiliates ("Amaranth") for the specific purpose of evaluating investments in Amaranth's funds. This information is CONFIDENTIAL and should not be re-distributed without the express written consent of Amaranth. Past results are not necessarily indicative of future results.

# /α/Amaranth

## AMARANTH LLC

### Snapshot at June 30, 2006

| Strategy[1] | Capital at 6/30/06 [2] | Leverage [4] | Total # of Trading Positions | 2006 Performance Attribution Year to Date June 30, 2006 |
|---|---|---|---|---|
| US Convertibles | 7% | 7.26 | 449 | 2% |
| International Convertibles / Volatility | 17% | 4.53 | 2,178 | -8% |
| Statistical Arbitrage | 4% | 2.84 | 4,456 | 3% |
| Energy | 56% | 4.52 | 6,671 | 78% |
| Commodities | 6% | 5.05 | 1,685 | 8% |
| Merger Arbitrage | 1% | 1.26 | 72 | 1% |
| Long/Short Equity | 7% | 2.39 | 499 | 4% |
| Credit Products | 1% | 4.20 | 1,217 | 12% |
| TOTAL | 100% | 4.33 | 16,924 | 100% |

### Capital Allocation Grid

| Feeder | AM LLC | AGE | Direct | Total |
|---|---|---|---|---|
| Amaranth International Limited | 95% | 3% | 2% | 100% |
| Amaranth Partners L.L.C. | 83% | 3% | 14% | 100% |
| Amaranth Capital Partners LLC | 95% | 3% | 2% | 100% |

(1) The information detailed above pertains to Amaranth LLC. The Capital Allocation Grid set forth below depicts each feeder fund's allocation of capital. While the three feeder funds allocate capital to the master fund (Amaranth LLC ("AM LLC") and Amaranth Global Equities Master Fund Limited ("AGE"), and Designated Investments, Amaranth Partners LLC also allocates capital directly to investments that may be inappropriate for Amaranth International Limited and Amaranth Capital Partners LLC (e.g. certain Credit Products). Designated Investments and other direct investments of the feeder funds are included below in "Direct".

(2) The strategy description above is not necessarily indicative of all the positions in that category. Certain strategies may contain positions that have characteristics that would normally have it categorized within another strategy, but are included within the predominant strategy of the portfolio manager or group of portfolio managers responsible for managing such positions. For example, Credit Products consists of various strategies including, but not limited to, distressed and high-yield trading, capital structure arbitrage, collateralized debt obligation trading and participation in primary and secondary debt and equity markets (including PIPES and other convertibles). Effective February 2005, the strategies previously included in the Energy/Commodities strategy will be presented in the following manner: non-energy related commodities strategies (i.e. metals and agricultural commodities) will be presented as a separate Commodities strategy, long/short trading of energy-sector equity securities is included in the Long/Short Equity strategy and energy-related commodity strategies are presented as the Energy strategy.

(3) As of June 30th, AM LLC and capital of approximately $9.5 billion and AGE had capital of approximately $0.3 billion. The capital of the feeder funds was as follows:

Amaranth International Limited $6.91 billion
Amaranth Partners L.L.C. $1.59 billion
Amaranth Capital Partners LLC $.34 billion

(4) Leverage represents long market value divided by capital. Notional values for any notional principal contracts are included in long market value except those utilized to hedge specific portfolio risks (e.g., interest rate exposures).

**CONFIDENTIAL**

The information contained herein is being provided solely for the use of current and potential investors in funds managed by Amaranth Advisors L.L.C. or its affiliates ("Amaranth") for the specific purpose of evaluating investment in Amaranth's funds. This information is CONFIDENTIAL and should not be re-distributed without the express written consent of Amaranth. Past results are not necessarily indicative of future results.

AMARANTH_REG001915