**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------ X

IN RE AMARANTH NATURAL GAS
COMMODITIES LITIGATION

------------------------------------------------------ X

**OPINION AND ORDER**

**07 Civ. 6377 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/6/08

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

> Another great evil arising from this desire to be thought
> rich; or rather, from the desire not to be thought poor, is the
> destructive thing which has been honored by the name of
> "*speculation*;" but which ought to be called gambling.
>
> — William Cobbett[1]

## I.    INTRODUCTION

Plaintiffs have filed this putative class action on behalf of a class of

all entities that purchased, sold, or held natural gas futures or options on futures

contracts between February 16, 2006 and September 28, 2006 (the "Class Period")

against the Amaranth family of companies, its brokers, its clearing house firm, and

certain of their employees.  Plaintiffs allege that during the Class Period,

---

[1]    *The Young Man's Own Book* 128 (1833).  Cobbett (March 9, 1763 –
June 18, 1835) was a British parliamentary reformist, farmer, and pamphleteer.
He was elected to parliament in 1832. *See also id.* at 129 ("In all situations of life,
avoid the *trammels of the law*.").

defendants manipulated the prices of New York Mercantile Exchange ("NYMEX") natural gas futures contracts in violation of sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act (the "CEA").  Defendants now move to dismiss the Complaint.  For the reasons discussed below, the motion is granted in part and denied in part.

## II.    BACKGROUND

### A.    Facts[2]

#### 1.    Structure of the Amaranth Entities

Hedge funds generally make use of complex structures that permit investors from within and without the United States to benefit from advantageous tax regimes without risking personal liability.  The Amaranth fund is no exception. Investors invested directly into three "feeder" funds, Amaranth International Ltd. ("Amaranth International"), Amaranth Partners LLC, and Amaranth Capital Partners LLC (together with Amaranth International, the "Feeder Funds"). Foreign and tax-exempt investors invested in Amaranth International.[3]  Domestic tax-sensitive investors invested into Amaranth Partners LLC or Amaranth Capital

---

[2]       Except where indicated, the facts summarized in this section are drawn from the Corrected Consolidated Class Action Complaint ("Compl.") and are presumed to be true for purposes of these motions.

[3]       *See* Compl. ¶ 26.

Partners LLC.[4]

The Feeder Funds in turn invested their capital in Amaranth LLC (the "Master Fund"), a Cayman Islands corporation. The Master Fund was advised by Amaranth Advisors LLC.[5] Advisors was owned in large part by Amaranth Management Limited Partnership ("AMLP"), a Delaware holding entity. Amaranth Group, Inc. ("AGI"), a Delaware corporation, was the general partner of AMLP.[6] Brian Hunter and Matthew Donohoe, natural gas traders and defendants in this action, were employed by AGI, as was Chief Executive Officer Nicholas Maounis.[7] Defendants established Amaranth Advisors (Calgary) ULC (with Amaranth Advisors LLC, "Amaranth Advisors"), a Canadian company and subsidiary of Amaranth Advisors LLC, to permit Hunter to move his trading operations to Canada.[8] Defendants allege that although the Amaranth entities

---

[4]    *See id.* ¶ 27.

[5]    *See id.* ¶ 23.

[6]    *See id.* ¶ 25.

[7]    Maounis is variously identified as "Chief Investment Officer," *id.* ¶ 25, and "Chief Executive Officer," *id.* ¶ 29. Plaintiffs' Memorandum of Law observes that he "founded and named the Amaranth entities . . . ." Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaint ("Pl. Mem.") at 13.

[8]    *See* Compl. ¶ 28.

were legally distinct, they "were in practice a tightly knit association-in-fact, which operated as a single entity under the direction of Defendant Maounis."[9] For convenience, I refer to the collection of Amaranth entities as "Amaranth."

Hunter was the head natural gas trader at Amaranth and Donohoe was the execution trader. Essentially, Hunter determined the company's investment strategy and Donohoe implemented that strategy.[10]

Defendant ALX Energy, Inc., a New York corporation, was Amaranth's primary NYMEX natural gas floor broker. Amaranth was ALX's largest customer.[11] Defendant James DeLucia was Chairman or Chief Executive Officer of ALX.[12] Defendants TFS Energy Futures, LLC and Gotham Energy Brokers, Inc. were also floor brokers for Amaranth (with ALX and DeLucia, the "Floor Brokers").[13] Defendant J.P. Morgan Futures, Inc. ("JPMFI") served as

---

[9]     *Id.* ¶ 29.

[10]     *See id.* ¶¶ 30-31.

[11]     *See id.* ¶ 34.

[12]     *See id.* ¶ 35.

[13]     By letter to the Court dated August 6, 2008, Gotham Energy Brokers indicated that it "had no knowledge of any unusual or wrongful conduct by its customer Amaranth and it faithfully executed the orders given it." It joined in the motion to dismiss and adopted the Memorandum of Law submitted by the other Floor Brokers.

Amaranth's clearing broker.  Its parent is defendant J.P. Morgan Chase & Co. ("JPMCC").  Finally, defendant J.P. Morgan Chase Bank, Inc. ("JPMCBI") is a depository of NYMEX.[14]

### 2.    Structure of NYMEX and Futures Trading

"NYMEX is the world's largest commodity exchange for the trading of futures contracts and options contracts in energy products, metals, and other commodities."[15]  Its operations are regulated by the Commodities Futures Trading Commission ("CFTC").

Contracts on the NYMEX relate to "crude oil, gasoline, heating oil, natural gas, electricity, propane, coal, uranium, environmental commodities, softs, gold, silver, copper, aluminum, platinum, and palladium."[16]  Hundreds of thousands of contracts are traded each day.

One type of contract traded on the NYMEX is a futures contract.  A future is an agreement for the sale of a commodity on a specific date (the "delivery

---

[14]    *See id.* ¶¶ 36-40.  Plaintiffs also allege that various unknown parties aided and abetted the manipulation.  *See id.* ¶ 41.

[15]    *Western Capital Design, LLC v. NYMEX*, 180 F. Supp. 2d 438, 440 (S.D.N.Y. 2001).

[16]    NYMEX, *An Introduction to the Exchange, available at* http://www.nymex.com/intro.aspx.  "Softs" include cocoa, cotton, sugar, and coffee.

date"). Futures contracts for a given commodity are standardized; the only terms

that vary are the delivery date and the price of the contract. Thus, "negotiations

can readily proceed and the agreed prices can be speedily disseminated to other

traders."[17] The seller of a futures contract is said to have the "short" side because

she hopes that the price of the commodity will drop before the delivery date. The

buyer has the "long" side.[18] The term "spread" generally refers to the difference in

price between two otherwise-identical futures with different delivery dates.

Only a small percentage of futures transactions actually result in an

exchange of money for a commodity.[19] Most investors close out of their positions

before the delivery dates. One way in which a trader can close a position is to

enter into an offsetting contract. For example, a trader who holds a long position

on one hundred tons of coal to be delivered on January 1, 2009, might enter into a

---

[17]    *Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982).

[18]    *See generally* Compl. ¶¶ 43-44.

[19]    Many futures are "cash-settled," meaning that when the contract matures, rather than an actual delivery of a commodity, the party that has lost money on the transaction will pay the other party the appropriate amount. The vast majority of traders in the commodities market are either speculators seeking to profit from price changes but having no independent interest in the underlying commodities or companies that are exposed to the prices of commodities and purchase futures to "hedge" those risks, that is, to protect against unforeseen price changes.

separate short position on one hundred tons of coal to be delivered on that date. This avoids the possibility that someone might attempt to deliver one hundred tons of coal to the trader's door. If the trader's short position costs less than the long position, the trader has profited from the transaction.[20]

All futures transactions are executed through the NYMEX clearinghouse. Both parties to a transaction trade through a clearing member firm, a company that is a member of the clearinghouse.[21] Thus, the parties do not transact directly – rather, the NYMEX clearinghouse sells to the buyer's clearing firm and simultaneously buys from the seller's clearing firm. In this way, neither party is exposed to credit risk from its counterparty.[22] Rather, the clearing firm guarantees the client's payment to NYMEX, and NYMEX guarantees payment to the counterparty's firm.

Because of this protection, before an entity can enter into futures

---

[20]    This might happen if, for example, the trader enters into the initial long contract, the price falls, and then the trader enters into the corresponding short contract.

[21]    To be precise, all traders trade through a "futures commission merchant" that may or may not be a member of the clearinghouse. If a trader's futures commission merchant is not a member of the clearinghouse, it must itself employ a member to clear its trades. *See generally Leist*, 638 F.2d at 287.

[22]    *See* Compl. ¶ 185.

7

contracts on the NYMEX, it must deposit funds, called "margin," with a clearing firm to cover potential losses.  A trader need not deposit the full amount of a potential loss on a futures contract, but only enough to cover the amount that the trader might foreseeably lose in one day.  The required margin amount is adjusted each day to reflect the day's price changes.  "This process, known as 'marking-to-market' the customer's open position, determines whether a customer must post additional margin or, instead, receives payments on margin."[23]

For example, a trader might have purchased the long position in a contract for delivery of two hundred and fifty pounds of uranium on October 31, 2008.  The contract calls for a payment of $100 on that date.  The trader is required to deposit some amount of money, say, $10.  If the price of the futures contract (*i.e.*, the price that the market will currently agree to pay on October 31, 2008 for the right to receive two hundred and fifty pounds of uranium on that date) then falls to $95, the trader is facing a $5 loss.  The clearing member firm might require the trader to make an additional deposit to insure against a further decline in the value of the contract.  If the price were to fall to $90 before the trader makes additional deposits, the clearing firm might close out the trader's contract – that is,

---

[23]     *NYMEX v. IntercontinentalExchange, Inc.*, 497 F.3d 109, 111 (2d Cir. 2007).

8

it would enter into a contract for the delivery of two hundred and fifty pounds of uranium on October 31, 2008, at the market price of $90, on behalf of the trader. The trader would thus have a contract to receive the uranium and a contract to deliver the uranium on the same day, closing out its position and incurring a $10 loss. In order to calculate the appropriate margin and to recalculate the margin after each day's trading, a clearing member firm must understand the trader's outstanding positions and their relative risk.

Just as a client must deposit margin with a clearing firm to protect the clearing firm, the clearing firms must deposit margin with the NYMEX clearinghouse.[24] At the end of each trading day, NYMEX determines the amount that each firm must deposit by calculating the firm's clients' current exposure, adjusted for the day's closing price of the contracts.[25] Thus, each day NYMEX receives additional margin from firms whose clients have lost money and remits funds to firms whose clients have gained money.

Futures are available for delivery dates months or years away. The price of futures tends to be fairly stable for delivery dates substantially in the future. "As a practical matter, the most actively traded and volatile contract

---

[24]    *See* Compl. ¶ 186.

[25]    *See id.* ¶ 187.

9

months are those that are within a few months of a contract's expiration."[26] Many

traders are reluctant to trade during the last days of a contract because of this

volatility.[27]

Besides futures, some traders enter into swaps.  A swap is similar to a

futures contract, although all swaps are financially settled.  In a standard swap, a

party agrees to pay a counterparty a fixed amount of money, and the counterparty

agrees to pay the party a variable amount of money.  Swaps can be structured to

feature economics similar to commodities futures.  For example, a trader might

enter into a swap wherein the trader agrees to pay a counterparty $100 on October

31, 2008, and the counterparty agrees to pay the trader the price of two hundred

and fifty pounds of uranium on that date.  The price of the uranium would be the

"notional principal."[28]  The trader benefits as the price of uranium rises (the long

---

[26]     NYMEX, *An Introduction to the Exchange.*

[27]     *See* Compl. ¶ 55.

[28]     This amount is the "principal" because it is the value that determines
the payments under the contract and it is "notional" because there is no actual
uranium involved in the transaction.  Treasury Regulations define a "notional
principal contract" as "a financial instrument that provides for the payment of
amounts by one party to another at specified intervals calculated by reference to a
specified index upon a notional principal amount in exchange for specified
consideration or a promise to pay similar amounts."  26 C.F.R. § 1.446-3(c)(1)(i).
*See also id.* ("Notional principal contracts governed by this section include interest
rate swaps, currency swaps, basis swaps, interest rate caps, interest rate floors,

10

position) and the counterparty benefits as the price falls (the short position).[29]

Swaps can be traded on the IntercontinentalExchange ("ICE"), which unlike

NYMEX is not regulated by the CFTC.[30]  Extensive arbitrage generally keeps the

prices of ICE swaps and the corresponding NYMEX futures in lockstep.[31]  Both

swaps and futures are types of derivatives, so-called because their value derives

from the value of the underlying commodity.

### 3.    The NYMEX Market for Natural Gas

One commodity traded on the NYMEX is natural gas.  One NYMEX

futures contract for natural gas represents ten billion British thermal units of

---

commodity swaps, equity swaps, equity index swaps, and similar agreements.").

[29]     *See id.* ¶ 59(a).

[30]     *See id.* ¶ 62.  Swaps have become increasingly important to global
commerce.  The Bank of International Settlements reported that in December of
2007, the total notional principal of outstanding interest rate swaps in its members'
markets was $309 trillion.  Bank of International Settlements, *Semiannual OTC
Derivatives Statistics at End-December 2007* tbl. 19, *available at*
http://www.bis.org/statistics/derstats.htm.

[31]     *See* Compl. ¶ 61.  If the prices of ICE swaps and NYMEX futures
drifted apart, arbitrageurs could make riskless profits by taking the long position
in one instrument and the short position in another.  For example, if the price of a
December 2008 uranium future contract were $100 and the price of the
corresponding swap were $110, a trader could purchase the future, requiring her to
pay $100 to receive (the price of) 250 pounds of uranium in December of 2009,
and sell the swap, requiring her to pay the price of 250 pounds of uranium in
December of 2009 in exchange for a payment of $110.  Regardless of the closing
price of uranium at that time, the trader would have a $10 profit.

natural gas.[32]  "The price is based on delivery at the Henry Hub in Louisiana, the

nexus of 16 intra- and interstate natural gas pipeline systems that draw supplies

from the region's prolific gas deposits."[33]  The settlement price of a NYMEX

natural gas future is the volume-weighted average price of trades during the thirty-

minute settlement period, which is the last thirty minutes of trading on the

"termination day."[34]  The termination day is the third to last business day of the

month preceding the month in which the contract matures.[35]  For example,

September 2007 NYMEX natural gas futures settled from 2:00 p.m. to 2:30 p.m.

on Wednesday, August 29, 2007.[36]  A trader who holds the long position in a

natural gas futures contract at the end of the settlement period must "go to

delivery," that is, receive ten billion BTUs of natural gas at the Henry Hub in

Louisiana.  In Spring of 2006, less than two percent of natural gas futures

---

[32]     *See* NYMEX, *Natural Gas, available at*
http://www.nymex.com/ng_pre_agree.aspx.

[33]     *Id.*

[34]     *See* Compl. ¶ 51.

[35]     NYMEX, *Natural Gas, available at*
http://www.nymex.com/NG_spec.aspx.

[36]     *See* Compl. ¶ 51.

contracts went to delivery.[37]  At all relevant times, natural gas futures were

available for every month in the following six years, seventy-two contracts total.[38]

### 4.    Manipulation of the Natural Gas Markets

During the Class Period, Amaranth controlled 40% of the outstanding

NYMEX natural gas futures that matured for the months from October 2006

through March 2007.[39]  Amaranth trading represented almost 70% of total volume

in those contracts.[40]

---

[37]    *See id.* ¶ 53.

[38]    *See id.* ¶ 56.  NYMEX also offers basis swaps, which change in value
based on the difference between the settlement price of a given month's NYMEX
natural gas future and that of the monthly index at a specified location for that
month.  *See id.* ¶ 59(b).  Finally, NYMEX offers various other natural gas
contracts, including a financially settled contract for 2.5 billion BTUs designed for
investors and a cash-settled contract that mirrors the standard future.  *See id.* ¶¶
37-39.  Plaintiffs also allege that defendants manipulated the price of these
contracts.

[39]    *See id.* ¶ 66.

[40]    *See id.* ¶ 69.  Plaintiffs observe that "[b]uying up large portions of a
commodity in early European culture was punishable by banishment or death, and
a manipulator (forestaller or engrosser) 'should be baited out of the town where he
dwelt by dogs, and whipped forth with whips.'"  Pl. Mem. at 24 n.16 (quoting
Franklin D. Jones, *Historical Development of the Law of Business Competition*, 35
Yale L.J. 905, 908-09 (1926)).  To the extent that plaintiffs are suggesting that this
Court order defendants baited out of New York City by dogs, this request is
denied.

### a.   Self-Fulfilling Prophecy Manipulation

To cause prices to rise, Amaranth would purchase extraordinarily large contracts. Amaranth held positions "of unprecedented size – in excess of an astonishingly large 123,000 futures equivalent contracts. By September 10, 2006, Amaranth had more than quadrupled its already unprecedentedly large positions to approximately 545,365 natural gas contracts."[41] These large long positions signaled significant demand, causing market prices to rise.

Plaintiffs allege that Amaranth purchased in strategic ways to inflate prices. For example, with respect to November 2006 contracts, on July 12, 2006 Amaranth was short by as much as 62,960 contracts. But by August 24, 2006, Amaranth had purchased 154,000 contracts – entirely closing out their short position and establishing a substantial long position. This compressed purchasing cycle caused prices for November 2006 (and other) contracts to rise. Plaintiffs also allege that Amaranth made specific large purchases, such as an acquisition of about 14,000 January 2007 contracts in seven days in February 2006, that caused significant price increases.[42]

---

[41]   Compl. ¶¶ 73-74.

[42]   *See id.* ¶ 96.

### b.     Manipulation of Settlement Prices

Plaintiffs further allege that Amaranth, with the knowledge and assistance of J.P. Morgan and the Floor Brokers, manipulated the settlement prices of natural gas futures in order to benefit their positions in swaps and other derivatives.  During the last half-hour of trading for a given contract, and lacking any motive other than to affect the market price, Amaranth would sell a significant number of futures.  This would artificially depress the settlement price of those futures.[43]  Amaranth profited because it held a short position in swaps traded on ICE and elsewhere that was substantially larger than its long futures position.[44] Hunter and Donohoe orchestrated these trades knowing that Amaranth would lose money on the futures but would profit on the swaps.[45]  To maximize the intended effect, Hunter coordinated with the Floor Brokers, who were to consider in advance how best to structure the sales.[46]

For example, on February 24, 2006, the termination date for March 2006 natural gas futures, Amaranth's sales deflated the settlement price of those

---

[43]     *See id.* ¶ 101.

[44]     *See id.* ¶ 103.

[45]     *See id.* ¶ 105.

[46]     *See id.* ¶ 112.

futures by as much as twenty-nine cents, resulting in a profit of almost thirty million dollars.[47]  Many of the sales on that date were executed by DeLucia on behalf of ALX.[48]  Amaranth repeated these actions for the April 2006 natural gas futures market.

By April 26, 2006, the termination date for the May 2006 contracts, Amaranth was long by about three thousand contracts.  It also held a short position of about twenty-two thousand May 2006 swaps.[49]  Hunter became concerned that another hedge fund would purchase a large number of May 2006 contracts during the settlement period and thus drive up the price, reducing the value of Amaranth's swaps. To counter this anticipated purchasing, Amaranth waited until the last eight minutes of trading and then instructed the Floor Brokers to sell Amaranth's entire long position.[50]  Amaranth had no motive to delay these sales until the final minutes other than to increase their effect on the settlement price.  The sale had the effect of lowering the May 2006 contract price by three cents.[51]

---

47      *See id.* ¶ 118.

48      *See id.* ¶ 114.

49      *See id.* ¶¶ 129-130.

50      *See id.* ¶¶ 139-143.

51      *See id.* ¶ 144.

This trading pattern attracted the attention of NYMEX, which asked Amaranth to justify the last-minute sale of its long position. Amaranth responded with a letter that contained false justifications for its actions.[52]

NYMEX requires that no entity control a net long or short position in a contract that is due to expire within the month in excess of one thousand contracts.[53] Further, when a position reaches a certain size, traders must disclose that position to NYMEX at its request and must stop trading if ordered.[54] Amaranth repeatedly violated these limits and was warned several times by NYMEX, but did not heed these warnings.[55] For example, Amaranth was instructed to reduce the size of its September and October 2006 futures contract holdings. While it did so, it increased its holdings in ICE swaps, effectively permitting it to evade the NYMEX limits.[56]

### c. Collapse of the Amaranth Entities

---

[52] *See id.* ¶ 149. Among its misrepresentations, the letter stated that Amaranth did not make the decision to sell its futures contracts until 2:17 p.m. and suggested that some of its sales were not executed until after the settlement period because of an error by the floor broker.

[53] *See id.* ¶ 151.

[54] *See id.* ¶ 152.

[55] *See id.* ¶¶ 157-160.

[56] *See id.* ¶¶ 166-167.

From July to September of 2006, Amaranth had taken a net long position in November 2006 natural gas futures.[57]  Amaranth incurred substantial losses as prices declined during this period.  This decline degraded Amaranth's margin.  Natural gas prices collapsed during August and September of 2006.[58]  By mid-September, Amaranth lacked the liquidity to maintain its position and inflate prices.  It thus began a series of secret meetings with investment banks wherein it sought to reduce its exposure to natural gas.[59]  Amaranth and the banks were not able to consummate a transaction, and on September 20, 2006, the J.P. Morgan defendants took possession of Amaranth's natural gas positions.[60]

Amaranth's clearing firm throughout the Class Period for both NYMEX and ICE was JPMFI.  In accordance with industry practice, JPMFI analyzed Amaranth's positions on a daily basis to recalculate Amaranth's margin requirements.[61]  Thus, JPMFI was aware of Amaranth's trading activity and

---

[57]     *See id.* ¶ 169.

[58]     *See id.* ¶ 174.

[59]     *See id.* ¶ 171.

[60]     The Complaint here and elsewhere fails to distinguish between the J.P. Morgan defendants. *See id.* ¶ 173 ("[T]he JPM Defendants then scooped up much of Amaranth's natural gas portfolio for its [sic] own account.").

[61]     *See id.* ¶ 197.

Amaranth's violation of NYMEX's limits.[62]   The J.P. Morgan defendants were also aware of NYMEX and CFTC investigations into Amaranth during the applicable period.[63]   Further, JPMFI repeatedly raised Amaranth's credit limit to permit Amaranth to expand its trading in ICE swaps.[64]

## B.   Procedure

This action was filed on July 12, 2007.[65]   Plaintiffs raise the following claims:

- against the Amaranth defendants for violation of sections 6(c), 6(d), 9(a), and 22(a) of the CEA (count one);

- against the Amaranth defendants for aiding and abetting and control person liability in connection with count one (count two);

- against the Floor Brokers for aiding and abetting in connection with count one (count three);

- against the J.P. Morgan entities for aiding and abetting in connection with count one (count four); and

- against all defendants for unjust enrichment.

---

[62]   *See id.* ¶ 203.

[63]   *See id.* ¶ 206.

[64]   *See id.* ¶ 211.

[65]   Certain defendants are also defendants in an action brought by the CFTC that relate to the same underlying facts.  The court in that case recently denied defendants' motion to dismiss. *See CFTC v. Amaranth Advisors, L.L.C.* ("*Amaranth I*"), 554 F. Supp. 2d 523 (S.D.N.Y. 2008).

Defendants now move to dismiss all of the claims on a variety of grounds.

## III.  LEGAL STANDARD

### A.    Personal Jurisdiction

At the motion to dismiss stage, the plaintiff bears the burden of demonstrating that a court has jurisdiction over each defendant.[66]  Where, as in this case, plaintiffs have had minimal opportunity for discovery, the plaintiff need make only a prima facie showing of jurisdiction "'by pleading in good faith legally sufficient allegations of jurisdiction.'"[67]

"In a federal question case where a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules 'if the federal statute does not specifically provide for national service of process.'"[68] However, section 22 of the CEA provides for service of process "wherever the defendant may be found . . . ."[69]  This language indicates a congressional intention

---

[66]    *See In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 452 (S.D.N.Y. 2005).

[67]    *Id.* (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998)) (citation omitted).

[68]    *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (quoting *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990)).

[69]    7 U.S.C. § 25(c).  Prior to 1992, the CEA did not provide for nationwide service of process, so personal jurisdiction was evaluated pursuant to

to extend personal jurisdiction to the limit permitted by the Due Process Clause of the Fifth Amendment.[70]

      To determine whether a proposed exercise of jurisdiction comports with due process, the court must conduct "an analysis consisting of two components: the 'minimum contacts' test and the 'reasonableness' inquiry."[71]  The first component asks "'whether the defendant has certain minimum contacts [with the forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"[72]  The second component "'asks . . .

---

the laws of the forum state. *See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 105-06 (1987) (concluding that the CEA does not contain an "implied provision for nationwide service of process in a private cause of action," so state service rules apply); *Futures Trading Practices Act of 1992* § 211, Pub. L. No. 102-546 (1992) (amending the CEA to include nationwide service of process). *See also* Amaranth International Limited's Separate Memorandum of Law in Support of Its Motion to Dismiss Corrected Consolidated Class Action Complaint, at 3 (asserting that "[t]he scope of this Court's personal jurisdiction is governed by New York's long-arm statute.").

[70]    *See Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1339 (2d Cir. 1972) (holding that the Securities Exchange Act, whose service clause mirrors that of the CEA, allows personal jurisdiction to the extent permitted by the Fifth Amendment).

[71]    *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (citing *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)).

[72]    *Id.* (quoting *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 (2d Cir. 2001)).

whether it is reasonable under the circumstances of the particular case'" to assert personal jurisdiction.[73]

The Supreme Court has explained that purposeful availment is the cornerstone of personal jurisdiction – if a defendant has not purposefully availed himself of the "benefits and protections" of the forum's laws, the defendant has little warning that they can be used against him.[74]  Further, a court "'has the power to exercise judicial jurisdiction over an individual who causes effects in the [forum] by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of the effects and of the individual's relationship to the [forum] makes the exercise of such jurisdiction unreasonable.'"[75]  The Second Circuit has noted that "this is a principle that must be applied with caution, particularly in an international context."[76]  To establish minimum contacts jurisdiction, "[t]he person sought to be charged must know, or have good reason to know, that his conduct will have effects in the [forum] seeking to assert

---

[73]     *Id.* at 129 (quoting *Metropolitan Life Ins. Co.*, 84 F.3d at 568).

[74]     *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

[75]     *Leasco Data Processing*, 468 F.2d at 1341 (quoting Restatement (Second) of Conflict of Laws § 37 (1969)).

[76]     *Id.*

jurisdiction over him."[77]  This is to ensure "that a defendant will not be haled into

a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts,

or of the unilateral activity of another party or a third person."[78]  "In determining

whether personal jurisdiction exists over a foreign defendant who . . . has been

served under a federal service of process provision, a court should consider the

defendant's contacts throughout the United States and not just those contacts with

the forum."[79]

      In addition to meeting the minimum contacts test, any exercise of

personal jurisdiction must also be reasonable.  This requires analysis of

> (1) the burden that the exercise of jurisdiction will impose
> on the defendant; (2) the interests of the forum state in
> adjudicating the case; (3) the plaintiff's interest in
> obtaining convenient and effective relief; (4) the interstate
> judicial system's interest in obtaining the most efficient
> resolution of the controversy; and (5) the shared interest of
> the states in furthering substantive social policies.[80]

"Where a plaintiff makes the threshold showing of the minimum contacts required

by the first test, a defendant must present 'a compelling case that the presence of

---

[77]    *Id.*

[78]    *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984)) (quotation omitted).

[79]    *U.S. Titan*, 241 F.3d at 152 n.12 (citations omitted).

[80]    *Metropolitan Life Ins. Co.,* 84 F.3d at 568.

some other considerations would render jurisdiction unreasonable.'"[81]

### B.    Motion to Dismiss

When deciding a motion to dismiss under Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[82] and "draw all inferences in the light most favorable to the non-moving party[]."[83] Nevertheless, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[84]

In deciding a motion to dismiss, the court is not limited to the face of the complaint. The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[85]

---

[81]    *Bank Brussels Lambert*, 305 F.3d at 129 (quoting *Metropolitan Life Ins. Co.*, 84 F.3d at 568).

[82]    *Bell Atl. Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1964 (2007). *Accord In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

[83]    *In re NYSE Specialists*, 503 F.3d at 95.

[84]    *Id.* (quotation omitted).

[85]    *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## 1.   Pleading Standard

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[86]  To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[87]  Although the complaint need not provide "detailed factual allegations,"[88] it must "amplify a claim with some factual allegations . . . to render the claim *plausible*."[89]  The standard is no longer that a complaint can be dismissed only if there us "no set of facts" that plaintiff could prove "which would entitle him to relief."[90]  Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[91]

---

[86]   *Erickson v. Pardus*, — U.S. —, 127 S. Ct. 2197, 2200 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[87]   *See Bell Atl.*, 127 S. Ct. at 1970.

[88]   *Id.* at 1964. *See also ATSI*, 493 F.3d at 98 n.2 (applying the standard of plausibility outside *Bell Atlantic*'s anti-trust context).

[89]   *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original).

[90]   *Bell Atl.*, 127 S. Ct. at 1969 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). *Accord id.* ("[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

[91]   *ATSI*, 493 F.3d at 98 (quoting *Bell Atl.*, 127 S. Ct. at 1965).

However, allegations of fraud are subject to heightened pleading requirements. Rule 9(b) requires that "the circumstances constituting fraud . . . be stated with particularity."[92] "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."[93] To comply with the requirements of Rule 9(b), a plaintiff alleging manipulation must "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants."[94] "Allegations that are conclusory or unsupported by factual assertions are insufficient."[95]

### 2.    Pleading Scienter

Scienter, in relation to commodities fraud, is "the intent to deceive, manipulate, or defraud."[96] Rule 9(b) imposes a significant burden on allegations

---

[92]    Fed. R. Civ. P. 9(b). *Accord ATSI*, 493 F.3d at 99.

[93]    *ATSI*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

[94]    *Rombach*, 355 F.3d at 170 (quotation omitted). *Accord ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[95]    *ATSI*, 493 F.3d at 99.

[96]    *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976). Although the Supreme Court was discussing securities fraud, its language is equally applicable to commodities fraud.

of scienter.  Scienter can be pled by "alleging facts (1) showing that the defendants

had both motive and opportunity to commit the fraud or (2) constituting strong

circumstantial evidence of conscious misbehavior or recklessness."[97]  "Where

motive is not apparent, it is still possible to plead scienter by identifying

circumstances indicating conscious behavior by the defendant, though the strength

of the circumstantial allegations must be correspondingly greater."[98]  Under this

theory of scienter, a plaintiff must allege facts showing that the defendant's

conduct is "'at the least, conduct which is highly unreasonable and which

represents an extreme departure from the standards of ordinary care to the extent

that the danger was either known to the defendant or so obvious that the defendant

---

[97]     *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)).  The Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* noted that it had "previously reserved the question whether reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5," but that "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required." — U.S. —, 127 S. Ct. 2499, 2507 n.3 (2007).  The Court declined to address the issue.  *See id.* ("The question whether and when recklessness satisfies the scienter requirement is not presented in this case.").  Thus, Second Circuit law, which permits scienter to be shown by recklessness, continues to bind this Court.

[98]     *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

must have been aware of it.'"[99]  Thus, an express allegation of deliberate

misconduct can be sufficient to plead scienter.[100]  "The inquiry . . . is whether all

of the facts alleged, taken collectively, give rise to a *strong inference* of scienter,

not whether any individual allegation, scrutinized in isolation, meets that

standard."[101]  "To prove liability against a corporation . . . a plaintiff must prove

that an agent of the corporation committed a culpable act with the requisite

scienter, and that the act (and accompanying mental state) are attributable to the

corporation."[102]

   In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court

determined that to plead a "strong inference of scienter" in the context of the

Private Securities Litigation Reform Act ("PSLRA"), a complaint must allege facts

that give rise to an inference of scienter at least as strong as any competing

inference.[103]  The Circuit has not yet clarified whether district courts must now

---

  [99] *Id.* (quoting *Honeyman v. Hoyt (In re Carter-Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000)).

  [100] *See Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001).

  [101] *Tellabs*, 127 S. Ct. at 2509 (emphasis added).

  [102] *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

  [103] *Tellabs*, 127 S. Ct. at 2509.

28

find that the inference of scienter raised in actions governed by Rule 9(b) but not

the PSLRA be at least as compelling as any other inference.

### C.   CEA Violations

#### 1.   Manipulation

"The elements of a market manipulation claim under section 9(a) of

the CEA are as follows: (1) the defendant possessed an ability to influence market

prices; (2) an artificial price existed; (3) the defendant caused the artificial price;[104]

and (4) the defendant specifically intended to cause the artificial price."[105]  The

specific intent to cause a market distortion, scienter, can be pled by "alleging facts

(1) showing that the defendants had both motive and opportunity to commit the

fraud or (2) constituting strong circumstantial evidence of conscious misbehavior

or recklessness."[106]  "Sufficient motive allegations entail concrete benefits that

---

[104]    There is a real question as to whether a defendant can satisfy the third element and yet not satisfy the first.  Indeed, plaintiffs cite cases that disregard the first element. *See* Pl. Mem. at 28.  I do not address this issue, however, because it is not dispositive in the case of any defendant.  Further, a person who violates the CEA is liable to a private plaintiff only for "actual damages resulting from" the violation.  7 U.S.C. § 25(a)(1).  Thus, a plaintiff who failed to allege damages or causation would have failed to state a claim.

[105]    *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *3 (S.D.N.Y. June 28, 2007).

[106]    *ATSI*, 493 F.3d at 99 (citing *Ganino*, 228 F.3d at 168-69). *Accord In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007)

29

could be realized by one or more of the false statements and wrongful

nondisclosures alleged."[107]  "[A]dmissions of misrepresentations, coupled with

defendants' continuous intimate knowledge of company affairs is enough to

adequately infer scienter."[108]  Moreover, "[m]otives that are generally possessed by

most corporate directors and officers do not suffice; instead, plaintiffs must assert

a concrete and personal benefit to the individual defendants resulting from the

fraud."[109]

　　　　"Where motive is not apparent, it is still possible to plead scienter by

identifying circumstances indicating conscious behavior by the defendant, though

---

(holding that plaintiffs adequately pleaded scienter because the allegations
supported the inference that the company and the officers were at least reckless in
not knowing that the financial statements were false and in failing to disclose
internal control weaknesses); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266,
292 (S.D.N.Y. 2006) (holding that plaintiffs must "specifically allege defendants'
knowledge of facts or access to information contradicting their public
statements").

[107]　　*Kalnit*, 264 F.3d at 139 (describing "[i]nsufficient motives" as
including "(1) the desire for the corporation to appear profitable and (2) the desire
to keep stock prices high to increase officer compensation") (quotations omitted)).

[108]　　*Stevelman v. Alias Res. Inc.*, 174 F.3d 79, 84-85 (2d Cir. 1999).

[109]　　*Kalnit*, 264 F.3d at 139. *Accord In re Openwave Sys. Sec. Litig.*, 528
F. Supp. 2d 236, 250 (S.D.N.Y. 2007) (holding that defendants' stock options "are
'concrete and personal' because they represent a species of compensation different
from the one ordinarily accumulated by corporate officers and directors");
*Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir. 1984)
(holding that "a pledge is a sale and purchase of a security under §10(b)").

the strength of the circumstantial allegations must be correspondingly greater."[110]

Under this theory of scienter, a plaintiff must show that the defendant's conduct is

"at the least, conduct which is highly unreasonable and which represents an

extreme departure from the standards of ordinary care to the extent that the danger

was either known to the defendant or so obvious that the defendant must have

been aware of it."[111]  "Under certain circumstances, [courts] have found allegations

of recklessness to be sufficient where plaintiffs alleged facts demonstrating that

defendants failed to review or check information that they had a duty to monitor,

or ignored obvious signs of fraud."[112]  Recklessness can be shown by "defendants'

knowledge of facts or access to information contradicting their public statements.

Under such circumstances, defendants knew or, more importantly, should have

known that they were misrepresenting material facts related to the corporation."[113]

---

[110]   *Kalnit*, 264 F.3d at 142.

[111]   *Id.* (quotation omitted).

[112]   *Novak*, 216 F.3d at 308. *Accord In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (holding that the scienter requirement was satisfied by identification of specific facts constituting strong circumstantial evidence of recklessness and allegations that defendants knew of or recklessly ignored a series of accounting improprieties).

[113]   *Novak*, 216 F.3d at 308.

### 2.      Private Right of Action

The CEA provides that "[a]ny person . . . who violates this chapter or

who willfully aids, abets, counsels, induces, or procures the commission of a

violation of this chapter shall be liable for actual damages" that result from certain

transactions, including if the violator was counterparty to the plaintiff in a futures

transaction or if the violation consisted of market manipulation and the plaintiff

purchased or sold a futures contract.[114]  With certain limited exceptions that do not

apply here, no other remedies are available under the CEA.[115]

### 3.      Aiding and Abetting Liability

Section 22(a)(1) of the CEA creates liability for "[a]ny person . . .

who willfully aids, abets, counsels, induces, or procures the commission of a

violation of this chapter . . . ."[116]  "Generally stated, to recover on an aiding and

abetting claim under the CEA, a plaintiff must prove that the defendant (1) had

---

[114]      7 U.S.C. § 25(a)(1).

[115]      *See id.* § 25(a)(2).

[116]      *Id.* § 25(a)(1).  *Cf. Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182, 191 (1994) (observing that unlike the Commodities Exchange Act, the Securities Exchange Act does not provide an explicit cause of action for aiding and abetting that is available to private plaintiffs, and concluding that no implied cause of action is available under the Securities Exchange Act).

knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective."[117]

### 4.    Agency Liability

The CEA also creates liability for an individual or corporate entity for "[t]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office . . . ."[118]  "Courts have described subsection 2(a)(1)(B) as codifying 'a variant of the common law principle of respondeat superior' and thus 'mak[ing] an employer strictly liable – that is to say, regardless of the presence or absence of fault on the employer's part – for torts committed by his employees in the furtherance of his business.'"[119]  Alleging a principal-agent relationship requires allegations of "(1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent."[120]  "In addition, the

---

[117]    *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 511 (S.D.N.Y. 2004).

[118]    7 U.S.C. § 2(a)(1)(B).

[119]    *Natural Gas Commodity Litig.*, 337 F. Supp. 2d at 515 (quoting *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986)).

[120]    *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (citations omitted).

principal must maintain control over key aspects of the undertaking."[121]

## D.   Unjust Enrichment

"The basic elements of an unjust enrichment claim in New York [are] that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."[122]  In addition, to state a claim for unjust enrichment, there must be some relationship between the parties, though it need not be as close as privity of contract.[123]

## E.   Piercing the Corporate Veil

"In some instances, the corporate relationship between a parent and

---

[121]   *Id.* (citations omitted).

[122]   *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (citing *Clark v. Daby*, 751 N.Y.S.2d 622, 623 (2002)).

[123]   *See Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215-16 (2007) ("While we agree . . . that a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment, we nevertheless conclude that such a claim does not lie under the circumstances of this case.  Here, the connection between the purchaser . . . and the producers . . . is simply too attenuated to support such a claim.").  *See also State ex rel. Spitzer v. Daicel Chemical Indus.*, 840 N.Y.S.2d 8, 12 (1st Dep't 2007) (citing *Sperry*, 8 N.Y.3d at 215-16); *Benedict v. Whitman Breed Abbott & Morgan*, 722 N.Y.S.2d 586 (2d Dep't 2001) (affirming denial of a motion to dismiss where "the appellants were not in contractual privity with the individual plaintiffs, [but] under the circumstances of this case, their relationship can be said to be so close as to approach that of privity") (quotation omitted).

its subsidiary [is] sufficiently close as to justify piercing the corporate veil and

holding one corporation legally accountable for the actions of the other."[124]

Courts pierce the corporate veil "to prevent fraud or other wrong, or where a

parent dominates and controls a subsidiary."[125]  Veil piercing determinations are

fact-specific and are highly sensitive to "the circumstances of each case."[126]  "[A]

parent corporation and its subsidiary lose their distinct corporate identities when

their conduct demonstrates a virtual abandonment of separateness."[127]

Factors that are relevant to determining whether a corporation's form

should be respected include:

> "(1) disregard of corporate formalities; (2) inadequate
> capitalization; (3) intermingling of funds; (4) overlap in
> ownership, officers, directors, and personnel; (5) common
> office space, address and telephone numbers of corporate
> entities; (6) the degree of discretion shown by the allegedly
> dominated corporation; (7) whether the dealings between
> the entities are at arms length; (8) whether the corporations
> are treated as independent profit centers; (9) payment or
> guarantee of the corporation's debts by the dominating
> entity, and (10) intermingling of property between the

---

[124]    *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995).

[125]    *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l*, 2 F.3d 24, 26 (2d Cir. 1993).

[126]    *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988).

[127]    *Thomson-CSF*, 64 F.3d at 778 (citing *Carte Blanche*, 2 F.3d at 29).

entities."[128]

## IV.   DISCUSSION

### A.   What Is Manipulation?

A fundamental disagreement between the parties is the extent to

which certain conduct can constitute manipulation.  Defendants argue that the

simple purchase and sale of futures contracts, even in large quantities, cannot

constitute market manipulation.[129]  Plaintiffs disagree.[130]

---

[128]   *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC*,
268 F.3d 58, 63 (2d Cir. 2001) (quoting *Freeman v. Complex Computing Co.*, 119
F.3d 1044, 1053 (2d Cir. 1997)).

[129]   *See* Memorandum of Law in Support of Motion to Dismiss the
Corrected Consolidated Class Action Complaint by Defendants Amaranth
Advisors L.L.C., Amaranth Advisors (Calgary) ULC, Amaranth Group Inc.,
Amaranth Management Limited Partnership, and Nicholas M. Maounis ("Advisors
Mem.") at 20.

[130]   Plaintiffs use the rhetorical trope of metaphor to illustrate their
argument:

> But there is a hole in the donut of the Advisors' argument.
> . . . Further, there is a donut smashing machine in that
> numerous CEA manipulation cases have expressly *rejected*
> the argument . . . . Next, there is a sweeping machine that
> removes all the crumbs from the erstwhile donut of the
> Advisors' argument . . . .   Most important, there is a
> deodorizer that removes any lingering trace of Amaranth's
> 'large trades' argument . . . .

Pl. Mem. at 20-22.  The question has been asked: "do metaphors give us truth or

In *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, the Second Circuit

explained that "short selling [of securities] – even in high volumes – is not, by

itself, manipulative. . . . To be actionable as a manipulative act, short selling must

be willfully combined with something more to create a false impression of how

market participants value a security."[131]  The Circuit explained that short selling,

far from being inherently manipulative, is important to the proper functioning of

the market, providing liquidity and moving prices towards their intrinsic values.[132]

Defendants contend that this language indicates that legitimate transactions cannot

violate the CEA notwithstanding the intent of the traders.[133]

---

obscure it – or is the issue of truth simply irrelevant?"  David S. Miall, *Metaphor as a Thought-Process*, 38 J. Aesthetics & Art Crit. 21, 21 (1979).  Assuming, as I must, that a court is occupied with the search for truth, I do not find that plaintiffs' metaphor has illuminated the path toward that goal.

[131]  *ATSI*, 493 F.3d at 101.

[132]  *See id.*

[133]  In *Amaranth I*, the court held that "there is no doubt that marking the close or any other trading practices, without an allegation of fraudulent conduct, can also constitute manipulation in contravention of the CEA, so long as they are pursued with a manipulative intent."  554 F. Supp. 2d at 534.  The court distinguished *ATSI* by observing that while the securities laws prohibit both fraud and market manipulation in one section, the CEA distinguishes commodities fraud from market manipulation.  *See id.* (citing *Three Crown Ltd. v. Caxton Corp.*, 817 F. Supp. 1033, 1043 n. 19 (S.D.N.Y. 1993)).  Thus, "it would be redundant to construe manipulation to require a fraud element."  *Id.*  That court also observed that other courts have reached a similar conclusion.  *See id.* at 534-35 (citing *Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58 (5th Cir. 1962); *CFTC v. Enron*

Whether *ATSI*'s conclusion should be extended to commodities

trading depends on the underlying rationale for that conclusion. Discussing

securities, *ATSI* determined that "manipulation 'connotes intentional or willful

conduct designed to deceive or defraud investors by controlling or artificially

affecting the price of securities.'"[134] Specifically, the deception "arises from the

fact that investors are misled to believe 'that prices at which they purchase and sell

securities are determined by the natural interplay of supply and demand, not rigged

by manipulators.'"[135] Manipulation may deceive investors by suggesting that the

market has discovered new information that is affecting the price of the

securities.[136]

This logic applies equally to the commodities markets. Just as with

securities, commodities manipulation deceives traders as to the market's true

---

*Corp.*, No. H-03-909, 2004 WL 594752 (S.D. Tex. Mar. 10, 2004)). *But see CFTC v. Delay*, No. 05 Civ. 5026, 2006 WL 3359076, at *3 (D. Neb. Nov. 17, 2006) ("[I]t is not a violation of the statute to report feeder cattle sales to the USDA with the intention of moving the CME index up or down – rather, to be unlawful, the reported sales must be sham or nonexistent transactions, or the reports must be knowingly false or misleading."). The *Amaranth I* court subsequently listed various factors other than manipulative intent that supported the allegations. *See Amaranth I*, 554 F. Supp. 2d at 537 (denying reconsideration).

[134] *ATSI*, 493 F.3d at 100 (quoting *Ernst & Ernst*, 425 U.S. at 199).

[135] *Id.* (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)).

[136] *See id.* at 100-01.

judgment of the worth of the commodities. Similarly, for the same reasons that *ATSI* concluded that short selling, without more, cannot constitute securities manipulation, entering into futures contracts or swaps, without more, cannot constitute commodities manipulation. If a trading pattern is supported by a legitimate economic rationale, it cannot be the basis for liability under the CEA because it does not send a false signal. There must be "something more," some additional factor that causes the dissemination of false or misleading information.

But the additional factor need not be a misstatement or omission. The "something more" is anything that distinguishes a transaction made for legitimate economic purposes from an attempted manipulation. Because every transaction signals that the buyer and seller have legitimate economic motives for the transaction, if either party lacks that motivation, the signal is inaccurate.[137] Thus, a legitimate transaction combined with an improper motive is commodities manipulation.[138]

---

[137]    *See SEC v. Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007) (concluding that "if an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and not for any legitimate economic reason, it can constitute market manipulation").

[138]    Defendants vehemently contest this point. As evidence to the contrary, they cite *Nanopierce Technologies, Inc. v. Southridge Capital Management*, No. 02 Civ. 767, 2008 WL 1882702, at *2 (S.D.N.Y. Apr. 21, 2008), which denied reconsideration of No. 02 Civ. 767, 2008 WL 250553

Permitting intent to be the "something more" causes difficulty in distinguishing between legitimate trading strategies and deliberate attempts at market manipulation. In close cases, there should be no liability. The laws that forbid market manipulation should not encroach on legitimate economic decisions lest they discourage the very activity that underlies the integrity of the markets they seek to protect. Because as discussed below, Rule 9(b) applies to such allegations, plaintiffs face a substantial hurdle in alleging that a legitimate transaction plus scienter constitutes commodities fraud.

There are two types of transactions alleged here: Amaranth's manipulation by buying and holding large positions and by selling large quantities of futures during the settlement period. Under the principles explained above, the former transactions – the mere acts of buying and holding large positions – are not manipulation unless plaintiffs have alleged facts that give rise to a strong inference of scienter. If they have done so, the combination of wrongful intent (or, more

_____

(S.D.N.Y. Jan. 29, 2008). But a close reading of *Nanopierce* indicates that it is not to the contrary. The court first determined that the factual allegations at issue failed to raise a strong inference of scienter. *See* 2008 WL 250553, at \*3 ("The Second Circuit has spoken clearly about the principle that '[a] strong inference of scienter [sufficient to defeat a motion to dismiss] is not raised by alleging that a legitimate investment vehicle . . . creates an opportunity for profit through manipulation.'") (quoting *ATSI*, 493 F.3d at 104). The court then held that without this inference of scienter, the otherwise-legitimate transactions were not manipulative. *See id.* at \*4.

40

accurately, the lack of a legitimate economic motive) and a legitimate transaction

would constitute manipulation. As to the latter transactions, the timing of the sales

are suspicious in themselves. While the sale of a large number of futures is not

inherently manipulative, allegations that a defendant repeatedly sold large

numbers of futures just before the close of settlement periods are sufficient to

allege commodities manipulation.

## B.    Applicable Pleading Standard

The parties disagree over whether Rule 8(a) or Rule 9(b) applies.[139]

In *ATSI*, the Second Circuit explained that "a claim for market manipulation is a

claim for fraud, [so] it must be pled with particularity under Rule 9(b)."[140]

Plaintiffs argue that this does not apply because *ATSI* dealt with securities, not

commodities. However, there is no principled reason to distinguish between

commodities manipulation and securities manipulation in selecting the applicable

pleading standard. As discussed above, market manipulation is inherently

deceptive. Thus, a complaint that alleges manipulation of commodities prices

---

[139]    *Compare* Memorandum of Law in Support of Brian Hunter's and
Matthew Donohoe's Motions to Dismiss the Corrected Consolidated Class Action
Complaint at 20 ("Rule 8's more liberal pleading standard . . . does not apply . . .
.") *with* Pl. Mem. at 29 ("[N]umerous courts have held that such claims need *not*
be pleaded with Rule 9(b) particularity . . . .").

[140]    *ATSI*, 493 F.3d at 101.

must satisfy Rule 9(b)'s requirement that "the circumstances constituting fraud . . . be stated with particularity."[141]

As *ATSI* noted, however, "[a] claim of manipulation . . . can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim."[142] "This test will be satisfied if the complaint sets forth, to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."[143]

Further, as discussed above, an otherwise legitimate trade can violate the CEA if performed with scienter. But Rule 9(b) serves as a gatekeeper, requiring a plaintiff to do more than merely allege that a transaction that appears legitimate was intended to manipulate the market. Under Rule 9(b), the factual allegations in the complaint must give rise to a "strong inference" of scienter. As the Supreme Court explained, "[t]he strength of an inference cannot be decided in

---

[141]   Fed. R. Civ. P. 9(b). *Accord ATSI*, 493 F.3d at 99.

[142]   *ATSI*, 493 F.3d at 102.

[143]   *Id.* (quotation omitted).

a vacuum."[144]  The inference must be "at least as compelling as any opposing

inference one could draw from the facts alleged."[145]  Thus, applying this reasoning

to the Rule 9(b) standard, a claim for manipulation that alleges that a defendant

engaged in an otherwise legitimate transaction with the goal of manipulating the

market must be dismissed unless the facts alleged, taken as true, give rise to a

strong inference that manipulation was the dominant purpose of the transaction.

### C.    Personal Jurisdiction

#### 1.    Brian Hunter

Hunter argues that the Court lacks personal jurisdiction over him

because he does not have the requisite minimum contacts with the forum.  I

disagree.  Hunter's alleged transactions presented unmistakably foreseeable effects

within the United States.  For example, on April 26, 2006, Hunter allegedly placed

an order to sell five hundred May 2006 natural gas futures with instructions to

hold execution of the order until the last eight minutes of the settlement period in

order to manipulate the price of those contracts.[146]  On a different occasion, Hunter

allegedly instructed another defendant to "smash" the settlement price of the

---

[144]    *Tellabs*, 127 S. Ct. at 2510.

[145]    *Id.*

[146]    *See* Compl. ¶ 138.

43

March 2006 natural gas futures contract.[147] These trades constitute purposeful availment of the United States, and if the allegations are correct, Hunter knew that his trades would affect the price of natural gas futures within the United States.[148]

This forum has a substantial interest in ensuring that American citizens receive any relief to which they are entitled as a result of Hunter's alleged violations of American law. Moreover, the Court's exercise of jurisdiction over Hunter is entirely reasonable. Exercising jurisdiction over Hunter will impose a minimal burden given his business contacts with the United States. The United States has a substantial interest in the enforcement of its commodities laws, and plaintiffs have a similarly substantial interest in obtaining relief for Hunter's alleged violation of those laws. Social policies and the interest in efficient dispute resolution further favor the exercise of jurisdiction. Thus, this Court will exercise

---

[147]    *Id.* ¶ 111. According to the Complaint, Hunter stated that "if something fell really, really quickly, if the prices fell really, really quickly, you say those prices got smashed." *Id.* ¶ 110.

[148]    *Cf. SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (upholding personal jurisdiction where "Unifund's transactions are alleged to have had a rather direct and an unmistakably foreseeable effect within the United States. . . . [Its] activity created the near certainty that United States shareholders . . . would be adversely affected"); *SEC v. Euro Sec. Fund*, No. 98 Civ. 7347, 1999 WL 76801, at *3-4 (S.D.N.Y. Feb. 17, 1999) (finding that if allegations of insider trading are accepted as true for purposes of a motion to dismiss, "there is little question that it is proper for this Court to exercise personal jurisdiction over [the defendants] for claims arising out of those trades.").

personal jurisdiction over Hunter.

## 2. Amaranth International

Amaranth International, however, lacks the requisite minimum

contacts with the United States to support personal jurisdiction. There is no

indication that Amaranth International purposefully availed itself of this forum.

The only connection between Amaranth International and the forum is that the

company invested in a foreign hedge fund located in the Cayman Islands but

managed by plaintiffs. Defendant never allegedly directed any activity toward the

United States. Within the United States, the defendant has never commenced any

suit, registered an office, been qualified or licensed to do business, paid or been

required to pay taxes, employed any officers or agents, leased or purchased any

property, acquired a telephone number, or engaged in any other activity reasonably

expected of a business venture under the protection and permission of domestic

laws. Further, the Supreme Court has emphasized that the actions of a third party

connected to defendant and the forum will not render the defendant subject to

jurisdiction if the standard of purposeful availment is not met.[149] Thus, the Court's

exercise of personal jurisdiction over other Amaranth defendants does not justify a

finding of personal jurisdiction over Amaranth International. As such, all claims

---

[149]    *See Hanson*, 357 U.S. at 253.

against Amaranth International are dismissed for want of personal jurisdiction.[150]

A plaintiff must allege facts that would permit the exercise of personal jurisdiction in order to warrant jurisdictional discovery.[151]  Here, plaintiff has failed to allege facts that, if true, would permit the exercise of jurisdiction over Amaranth International.  As such, jurisdictional discovery is denied.

### D.    Private Right of Action as to Settlement Prices

Section 22(a) of the CEA provides a private right of action only in limited circumstances.  As discussed above, buyers and sellers of commodities can sue a trader who was not their counterparty only under section 22(a)(1)(D), which requires that the violation of the CEA "constitute[] a manipulation of the price of any such contract or the price of the commodity underlying such contract."  Defendants argue that the manipulation of settlement prices is not the manipulation of the price of any contract that plaintiffs bought or sold.[152]

A related question arose in *Vitanza v. Board of Trade of the City of*

---

[150]    Plaintiffs also argue that jurisdiction exists because Amaranth International is the alter ego of an entity over which the Court has jurisdiction.  As discussed below, plaintiffs have not alleged sufficient facts to justify such a finding.

[151]    *See Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 255 (2d Cir. 2007).

[152]    *See* Advisors Mem. at 8.

46

*New York.*[153]  At issue were the daily settlement prices for a certain option, which

were calculated pursuant to a formula.  Plaintiffs alleged that the committee

charged with this calculation "grossly miscalculated" those prices, leading to

inaccurate margin calculations.[154]  One defendant argued that section 22(a)(1)(D)

did not provide a cause of action for manipulation of settlement prices.  The court

agreed:

> the settlement price is not the value of the contract itself or
> the value of the commodity underlying the contract.  In
> their papers, Plaintiffs argue that settlement prices are an
> essential element in the operation of a commodities market
> and their manipulation is just as corrupting to the integrity
> of the market as an attempt to manipulate contract prices.
> While Plaintiffs claims may be true, courts are extremely
> reluctant to imply a private right of action where the statute
> explicitly provides a different remedy.[155]

As a result, the court dismissed the claims that relied on this theory.

Although defendants assert that the situation here is indistinguishable,

the Complaint alleges not only that defendants manipulated settlement prices, *but

also* that that manipulation *altered the prices* of NYMEX natural gas futures.[156]

---

[153]   No. 00 Civ. 7393, 2002 WL 424699 (S.D.N.Y. Mar. 18, 2002).

[154]   *Id.* at *1.

[155]   *Id.* at *5.

[156]   *See, e.g.,* Compl. ¶ 118.

*Vitanza* involved the unusual circumstance where the defendants were alleged to have manipulated only the calculation of settlement prices, not the prices of the underlying contracts. The plaintiffs in that case argued that "as a result of the inaccurate settlement prices, the margin calculations for their accounts were incorrect, which prevented Plaintiffs from effectively trading their accounts."[157] Here, defendants' manipulations allegedly altered not only settlement prices, but also the prices of futures contracts.[158] Thus, plaintiffs allege that they were harmed through the manipulation of the futures contract prices, not simply by the altering of settlement prices. Therefore, the allegations fall squarely within the scope of section 22(a)(1)(D).

## E.   Violation of the CEA

### 1.   Common Enterprise Liability and the Corporate Veil

As discussed above, to state a claim for primary manipulation under the CEA, plaintiffs must allege that the defendant manipulated a price. Most of the Amaranth defendants are not alleged to have taken any manipulative actions. Thus, plaintiffs have failed to state a claim for primary violations of the CEA

---

[157]   *Vitanza*, 2002 WL 424699, at *1 (citation omitted).

[158]   *See, e.g.,* Compl. ¶ 5 (alleging that defendants' actions "depressed not only Settling Prices of these contracts but the prices of other natural gas contracts on the days following the close").

48

against AGI, AMLP, the Feeder Funds, and the Master Fund.

Plaintiffs allege that the Amaranth entities "are all liable as a common enterprise for one another's acts."[159]  They argue that the entities shared a common address, were subject to the "*de jure* and *de facto* control" of one individual (Maounis), and functioned as a single entity commodity pool.[160]  However, plaintiffs have failed to allege sufficient facts to support piercing the corporate veil.  There are no allegations of the disregard of corporate formalities, inadequate capitalization, intermingling of funds or property, reduced discretion by any entity, failure to deal at arms' length, or payment of the debts of one entity by another.  While plaintiffs have alleged common ownership and overlapping directors, these factors alone are insufficient to support an extension of liability.

Plaintiffs assert that "[w]here one or more corporate entities operate in a common enterprise, each may be held liable for the manipulative acts and practices of the other. . . .  Common enterprises may be held to exist where

---

[159]    Pl. Mem. at 55.

[160]    *Id.* at 56.  Plaintiffs suggest that the Amaranth entities' status as a commodity pool as defined in the regulations is relevant to a finding of common enterprise status.  *See id.* at 56 n.44 (citing 17 C.F.R. § 4.10(d)(1)).  Plaintiffs misunderstand the applicable law.  Whether any individual Amaranth entity functioned as a commodity pool has no bearing on whether the actions of that entity should be attributed to other Amaranth entities.

common control exists, business is transacted through a maze of interrelated companies, or the entities commingle funds."[161]  Even assuming that a private plaintiff could make use of the common enterprise doctrine, and plaintiffs have cited no case on this point,[162] plaintiffs have failed to plead commingling of funds or any shared use of resources that would permit the application of the doctrine.

Because there is no basis for finding that the corporate forms of the Amaranth entities should be disregarded, plaintiffs have failed to state a claim for primary violation of the CEA except against those defendants that are alleged to have directly manipulated the commodities market.  Thus, all primary claims against AGI, AMLP, the Feeder Funds, and the Master Fund are dismissed.

### 2.    Scienter

As discussed above, to state a claim for commodities manipulation or for aiding and abetting manipulation, the Complaint must allege facts that give rise to an inference of scienter that is at least as strong as any competing inference that

---

[161]    Pl. Mem. at 55.

[162]    All cases cited by plaintiffs as to common enterprise status were brought by public regulatory entities. *See id.* at 55-56 (citing *SEC v. Glenn W. Turner Enters.*, 474 F.2d 476 (9th Cir. 1973); *CFTC v. Equity Fin. Grp.*, No. 04 Civ. 1512, 2006 WL 3359418 (D.N.J. Nov. 16, 2006); *CFTC v. Wall Street Underground, Inc.*, 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003); *CFTC v. Noble Wealth Data Info. Serv.*, 90 F. Supp. 2d 676, 690 (D. Md. 2000)).

can be drawn from those facts.  The allegations as to each manipulative act are

discussed separately.

### a.    Acquisition of a Large Position

The Complaint alleges that "Amaranth engaged in the classic

manipulative act of buying and leaving open increasingly large positions which,

due to their extraordinary but increasing size, caused prices to move in their

favor."[163]  As discussed above, taking a position is a legitimate transaction unless

there is some additional factor that converts the transaction into manipulation.  In

this case, the Complaint alleges that Amaranth took these positions knowing that

they would artificially inflate market prices.[164]

But although the Complaint contains a detailed description of the

many trades in which Amaranth *acquired* a substantial position in natural gas

futures,[165] it fails to allege facts that give rise to a strong inference that Amaranth

intended to manipulate the market through these transactions.  Plaintiffs allege that

Amaranth "well knew" that the acquisition of a large position would send an

---

[163]    Compl. ¶ 71.

[164]    *See id.* ¶ 79 ("As Amaranth well knew, Amaranth's unprecedented
orders, buying and build-up of long positions . . . all foreseeably and artificially
inflated market prices.").

[165]    *See id.* ¶¶ 71-93.

artificial signal to the market.[166]  But entering into a legitimate transaction

knowing that it will distort the market is not manipulation – only intent, not

knowledge, can transform a legitimate transaction into manipulation.[167]

Allegations of this type are exactly those that Rule 9(b) seeks to

prevent.  Trading, in and of itself, does not constitute market manipulation.

Further, the details of the trade do not give rise to a strong inference of scienter on

behalf of any defendant.  Without such an inference, there is nothing to distinguish

these transactions from legitimate trading.  Therefore, all claims related to these

transactions are dismissed.

Similarly, plaintiffs' allegations that Amaranth caused artificial price

changes through "massive short-term trading" are well-documented,[168] but are not

---

[166]    *Id.* ¶ 81(e).

[167]    The distinction is crucial.  Consider a successful, renowned fund
manager whose investments are carefully scrutinized by the financial press.  The
manager might know that when she invests in a commodity, the mere news that
she has purchased the commodity will cause others to purchase, causing the price
to rise.  The manager would rationally incorporate this effect into her investment
decisions.  Despite the knowledge that the commodity's price will rise, she would
not have intended to manipulate this price.  But if she were to purchase a
commodity for no reason other than the hope that her purchase would cause the
price to rise, permitting her to sell at a profit, she would have intended to
manipulate the price.

[168]    *Id.* ¶ 95.  *See id.* ¶¶ 94-98 (discussing individual trades).

supported by factual allegations that give rise to a strong inference of scienter. All claims related to these trades are dismissed as well.[169]

### b.   Manipulation of Settlement Prices

Plaintiffs have clearly pled manipulative acts with respect to their allegations of manipulation of settlement prices. While large transactions are not inherently manipulative, the alleged timing of the transactions provides the "something more" that is required to convert a legitimate transaction into market manipulation.

But plaintiffs must still plead facts that give rise to a strong inference of scienter. The factual allegations that plaintiffs contend support an inference of scienter are discussed separately for each group of defendants.

### i.   Hunter and Donohoe

The day prior to the expiration of the March 2006 futures, Hunter allegedly told Donohoe to "'make sure we have lots of futures to sell MoC [market on close] tomorrow.'"[170] Hunter instructed Donohoe to purchase more futures so

---

[169]   Plaintiffs observe that they "have had no discovery" as to these trades. *Id.* ¶ 94. They are correct. However, one of the purposes of Rule 9(b) is to prevent accusations of fraud from reaching the discovery stage. Without factual allegations that support a strong inference of scienter, these claims cannot go forward.

[170]   *Id.* ¶ 106 (quoting an instant message conversation).

that they could be sold the next day.[171]  The next day, Donohoe asked Hunter if

3,111 contracts would be sufficient; Hunter responded that it would.[172]  Hunter

then told another Amaranth trader that he would "'just need [the March 2006

contract price] to get smashed on settle then day is done.'"[173]

Half an hour before the settlement period began for the March 2006

contracts, Hunter allegedly told another trader that he was selling 4,000 contracts

"'MoC.'"[174]  The trader responded, "'unless you are huge bearish position why the

f would yo do that'" [sic].  Hunter explained: "'all from options yesterday / so we

ll see what the floor has / bit of an expiriment mainly'" [sic].[175]

During the thirty minute settlement period, Donohoe instructed ALX

to place six sales orders that comprised Amaranth's entire March 2006 futures

holding.[176]  After some of the trades were complete, the trader with whom Hunter

had previously corresponded asked Hunter if he had finished.  Hunter responded,

---

[171]   *See id.*

[172]   *See id.* ¶ 108.

[173]   *Id.* ¶ 109 (quoting an instant message conversation).

[174]   *Id.* ¶ 111 (quoting an instant message conversation).

[175]   *Id.* (quoting an instant message conversation).

[176]   *See id.* ¶ 113.

"'no / have a lot more to sell / waiting until 2:20,'" ten minutes before the close of

the settlement period.[177]  Amidst the settlement period, Hunter allegedly told

Donohoe that "'today came together quite nicely,'" and Donohoe replied, "'h

[March contract] will settle lower / and h/j wider / nice'" [sic].[178]

Although the Complaint alleges attempts by Donohoe and Hunter to

manipulate settlement prices for two other contracts, there is no need to discuss

them here.  The allegations as to the March futures alone are sufficient to raise a

strong inference of scienter.  The timing of the orders, the conduct of the traders,

and Amaranth's ICE swap holdings strongly suggest an improper motive.

Therefore, the motions of these defendants to dismiss the claims for failure to

plead scienter are denied.

### ii.    Maounis

Maounis argues that the Complaint fails to raise a strong inference

that he intended to manipulate the commodities market or aid any other person in

---

[177]    *Id.* ¶ 115 (quoting an instant message conversation).

[178]    *Id.* ¶ 116 (quoting an instant message conversation) (explanatory
bracketed phrase in Complaint).  Presumably "i" refers to the April 2006 contract
and "j" refers to the May 2006 contract, and thus "h/j" refers to the spread between
the March and May 2006 contracts.  Plaintiffs allege that the spreads were
artificially inflated due to Amaranth's trading activities.  *See id.* ¶¶ 45, 93.

doing so.[179]  Plaintiffs allege that the manipulation was partly the result of "trading

decisions" of Maounis.[180]  However, they allege no facts that would support an

inference that he acted with scienter; the Complaint does not even allege facts that

suggest that he was connected with any particular trade.  Therefore, the primary

claims against Maounis are dismissed.

### iii.    The Other Amaranth Entities

As discussed above, to plead that a corporation acted with scienter,

"the pleaded facts must create a strong inference that someone whose intent could

be imputed to the corporation acted with the requisite scienter."[181]  The Complaint

alleges scienter only as to Hunter and Donohoe.  Hunter and Donohoe are alleged

to have been employed by Amaranth Advisors.[182]  Therefore, the primary claims

---

[179]    *See* Advisors Mem. at 27.

[180]    Compl. ¶ 73.

[181]    *Teamsters Local 445*, 531 F.3d at 195.

[182]    The Complaint is not entirely clear as to the traders' alleged
employer.  *Compare* Compl. ¶ 22 ("Amaranth Advisors was the entity that
directed the investments and employed the natural gas traders under the Advisory
Agreement between Amaranth LLC and Amaranth Advisors . . . .") *with id.* ¶ 25
("At all times relevant hereto, Amaranth Group employed all the natural gas
traders, including defendant Brian Hunter, defendant Matthew Donohoe . . . .").
However, because Amaranth Advisors are allegedly the entities that managed
Amaranth's assets, the activity in which Hunter and Donohoe were engaged when
they performed the manipulative acts, their scienter is properly imputed to
Amaranth Advisors, not AGI.

against all Amaranth entities except Amaranth Advisors are dismissed.

### 3.    Aiding and Abetting Liability

As discussed above, to state a claim for aiding and abetting a

violation of the CEA, plaintiffs must allege that a defendant, knowing of a

principal's intent to manipulate the market and intending to further that

manipulation, performed an act in furtherance of the manipulation.  These

elements are discussed separately.

### a.    Knowledge of and Intent to Further the Manipulation

### i.    DeLucia and ALX

Amaranth was allegedly not only one of the largest natural gas traders

but also ALX's largest customer.[183]  Amaranth's trades "generated substantial

revenue" for ALX in the form of commissions.[184]  One of ALX's employees,

Vincent Rufa, a telephone clerk, socialized with Amaranth personnel.[185]  Just

before the manipulation of the March futures, Hunter told Donohoe that he

planned to inform "vinnie," presumably Rufa, of the manipulation.[186]  During the

---

[183]    *See id.* ¶ 259.

[184]    *Id.* ¶ 224.

[185]    *See id.* ¶ 259.

[186]    *Id.* ¶ 112.  Defendants correctly observe that there is no explicit
allegation that Rufa was actually informed.  However, that paragraph of the

settlement period for March futures, DeLucia allegedly "traded on Amaranth's behalf."[187]

Similarly, on March 29, 2006, the settlement day for April futures, Amaranth sold 303 April futures between 12:41 p.m. and 1:50 p.m.  Between 2:00 p.m. and 2:03 p.m., Amaranth instructed ALX to sell 1,303 futures "MOC."[188] DeLucia was again the selling broker.[189]  On April 26, 2006, the settlement day for May 2006 futures, eight minutes before the close of the settlement period, Amaranth instructed ALX to sell 2,000 futures.[190]  The order was so large and was placed so late that ALX was not able to execute the entire order before the expiration of the settlement period.[191]

These facts raise a strong inference that DeLucia (and thus ALX) knew of and intended to aid the manipulation.  The Complaint alleges that

---

Complaint concludes that "The Floor Broker[s] . . . therefore had knowledge of Amaranth's intent to artificially drive down prices on the close on February 24." *Id.*  Although the paragraph is inartfully drafted, it appears to be alleging that Amaranth did in fact contact ALX and the other Floor Brokers.

[187]   *Id.* ¶ 114.

[188]   *Id.* ¶ 123.

[189]   *See id.*

[190]   *See id.* ¶ 143.

[191]   *See id.*

Amaranth engaged in a highly suspicious trading pattern that had the effect of driving down the settlement price for natural gas futures. Had Amaranth only followed this pattern once, no inference of scienter could be drawn. Presumably floor brokers receive orders in quick succession and execute those orders as rapidly as possible, taking little time to consider the meaning behind those orders. Perhaps only in retrospect, after the settlement period for the March 2006 futures, did the full effects of Amaranth's trading become apparent. Floor brokers are not expected to weigh the implications of every order they receive.

Nonetheless, accepting plaintiffs' factual allegations as true, the March 2006 orders must have been suspicious to DeLucia. In a market where several hundred contracts is a sizeable holding,[192] Amaranth sold 3,111 contracts in a single day. In retrospect, it is reasonable to infer that DeLucia may have suspected that manipulation was occurring. It is further reasonable to infer that DeLucia may have become more suspicious when the next month Amaranth contacted DeLucia and instructed him to sell 1,600 futures contracts on the settlement day, 1,300 of which were to be sold within the settlement period. By the third settlement period, when ALX was instructed to sell 2,000 futures within

---

[192]     See id. ¶ 3 ("All but the very largest traders regard a position of a few hundred contracts as very large.")

the last eight minutes of the settlement period, the strongest inference is that

DeLucia proceeded despite the knowledge that he was aiding Amaranth's market

manipulation.[193]   Indeed, "'a floor broker is responsible for evaluating the orders

he receives for indications that his participation in the transaction is legally

prohibited.'"[194]   When such indications are as strong as they are alleged to have

been here, the floor broker cannot plead ignorance.   Thus, plaintiffs have

adequately alleged that DeLucia intended to assist Amaranth's manipulation.

### ii.   TFS Energy and Gotham

The Complaint contains minimal specific factual allegations as to

TFS Energy or Gotham.   Instead, these defendants and ALX are lumped together

as the "Floor Broker Defendants," and plaintiffs raise various generalized

---

[193]   The Complaint does not specify that DeLucia was involved in the third transaction, but this is a reasonable inference given his alleged involvement in the other two transactions.

[194]   *Wilson v. CFTC*, 322 F.3d 555, 560 (8th Cir. 2003) (quoting *In re Three Eight Corp.*, CFTC No. 88-33, Comm. Fut. L. Rep. (CCH) ¶ 25,749, 1993 WL 212489 (CFTC June 16, 1993)).   In *Armstrong v. McAlpin*, the Second Circuit remarked in dicta that "we are not prepared to hold that a broker who merely executes an investment manager's orders for improper purchases or sales can be held liable as an aider and abettor of the investment manager . . . ."   699 F.2d 79, 92 (1983).   However, the Circuit was not addressing a situation such as this one, where the facts alleged support a strong inference of scienter on behalf of the broker.

allegations against them.[195]  These allegations are plainly insufficient to state a

claim under Rule 9(b).[196]  There is virtually nothing to support any inference of

intent to further the manipulation on behalf of TFS Energy or Gotham.  Therefore,

all claims against these defendants are dismissed.

### iii.    Maounis

The Complaint alleges that Maounis "had *de jure* and *de facto*

control" of the Amaranth entities and that they acted at his direction.[197]  It further

alleges that he "willfully aided, abetted, counseled, induced, or procured the

commission of violations" of the CEA by the Amaranth entities.[198]

Disregarding plaintiffs' conclusory language, their strongest

argument is that Maounis, as CEO of the Amaranth entities, must have known

about these transactions.  Plaintiffs have alleged that Amaranth controlled a

majority of the national market for natural gas futures, having taken positions

---

[195]    *See, e.g., id.* ¶ 225 ("Rather than refuse Amaranth's request to effectuate multiple manipulative natural gas transactions and thereby forego substantial commission revenue from same, the Floor Broker Defendants knowingly executed Amaranth's manipulative trading strategy.").

[196]    These allegations would not survive even were they evaluated in accordance with the liberal pleading standard of Rule 8(a).

[197]    Compl. ¶ 29.

[198]    *Id.* ¶ 250.

whose size was unprecedented, and earned large sums of money from those positions. Further, those positions allegedly led to the collapse of the Amaranth entities when the price of natural gas collapsed. It is reasonable to infer from these facts that Maounis knew of the positions. But as discussed above, plaintiffs have failed to state a claim for market manipulation based only on Amaranth's holding large positions. Plaintiffs have pled manipulation under the CEA only as to their claims that relate to Amaranth's alleged manipulation of settlement prices.

The facts alleged in the Complaint support a strong inference of Maounis's knowledge and scienter as to the settlement price manipulation. As with ALX, had the alleged manipulation occurred only once, it would be reasonable to conclude that Maounis may have been unaware of the "expiriment." But after two repetitions, when Amaranth had allegedly earned tens of millions of dollars through these trades, it strains credulity to suggest that Maounis was unaware of the manipulation. On the contrary, the Complaint adequately alleges that Maounis knew of the manipulation and intended its success.[199]

---

[199]     This is a close question, and I am not prepared to hold that the inference of scienter is the strongest inference that can be drawn from these facts. However, as the Supreme Court explained in *Tellabs*, "A complaint will survive . . . only if a reasonable person would deem the inference of scienter . . . *at least as compelling* as any opposing inference . . . ." 127 S. Ct. at 2510 (emphasis added). *Cf. id.* at 2513 ("In my view, the test should be whether the inference of scienter (if any) is *more plausible* than the inference of innocence.") (Scalia, J.,

### iv.    The J.P. Morgan Defendants

The Complaint alleges that JPMFI became one of Amaranth's futures commission merchants in 2003 and became its primary clearing broker for natural gas in 2005.[200] In accordance with industry practice, JPMFI recalculated Amaranth's margin requirements each day. This calculation involved analysis of Amaranth's trading positions.[201] By early 2006, JPMFI was the only futures commission merchant used by Amaranth.[202] Thus, JPMFI had access to information on virtually all of Amaranth's trades. From this information, JPMFI knew that Amaranth was violating NYMEX position limits. On May 24, 2006, a JPMFI employee emailed several individuals at Amaranth, including Hunter and Donohoe, to inform them that Amaranth had violated these limits.[203]

In the summer of 2006, Amaranth requested several ICE credit limit increases from JPMFI.[204] On August 15, 2006, an employee at Amaranth told an

---

concurring) (emphasis added).  In other words, in close cases, ties go to the plaintiff.

[200]    *See* Compl. ¶¶ 194, 196.

[201]    *See id.* ¶ 197.

[202]    *See id.* ¶ 199.

[203]    *See id.* ¶ 204.

[204]    *See id.* ¶ 211.

employee at "JPM" that Amaranth was "'taking down risk in the energy book by trading OTC and clearing these trades via ICE and NYMEX ClearPort so as to keep their activity out of view of the floor/broker mkt.'"[205]

These allegations are sufficient to permit a strong inference that JPMFI had knowledge of the manipulations and intended their success.  However, because there are no allegations that would support an inference of scienter as to the other JPM entities, plaintiffs' aiding and abetting claims against those defendants are dismissed.

### b.    Act in Furtherance

### i.    ALX and DeLucia

ALX and DeLucia move to dismiss on the ground that they are not alleged to have exercised any independent judgment or have provided any advisory services to the Amaranth entities, but only fulfilled their legal obligation to execute the orders placed by those entities.[206]  To the extent that their response is accurate, it is irrelevant to whether plaintiffs have stated a claim.  Plaintiffs have

---

[205]     *Id.* ¶ 215 (quoting an internal "JPM" memorandum).  There is no indication as to which J.P. Morgan entity is meant by "JPM."

[206]     *See* Combined Memorandum of Defendants TFS Energy Futures, LLC, ALX Energy, Inc., and James DeLucia in Support of Their Respective April 28, 2008 Motions to Dismiss ("Floor Brokers Mem.") at 5.

alleged that DeLucia, on behalf of ALX, rendered substantial assistance to the Amaranth entities.  Their motion to dismiss on this ground is therefore denied.

### ii.    Maounis

The Complaint alleges that Maounis was CEO of the Amaranth entities and that he played a personal role in directing the operation of those entities.[207]  There can be little question that this is adequate to allege sufficient actions to justify a determination that plaintiffs have stated a claim for aiding and abetting.

### iii.    JPMFI

JPMFI argues that there is no allegation that it committed an overt act in aid of the Amaranth entities' manipulation.[208]  The question raised is whether the ordinary services of a clearing broker can qualify as "overt acts."

The Second Circuit has explained that "'the simple providing of normal clearing services to a primary broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker.'"[209]  A

---

[207]    *See, e.g.*, Compl. ¶¶ 29, 250.

[208]    *See* Memorandum of Law in Support of the JPMorgan Defendants' Amended Motion to Dismiss at 18.

[209]    *Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 29 (2d Cir. 2000) (quoting *Stander v. Financial Clearing & Servs. Corp.*, 730 F. Supp. 1282, 1286

broker owes no fiduciary duty to its clients' counterparties; in the absence of such a duty, the broker has no affirmative duty to disclose known manipulation. "A simple allegation of inaction can make out a claim of aider and abettor liability 'only where there is a conscious or reckless violation of an independent duty to act.'"[210]

Plaintiffs try to avoid this conclusion by alleging that JPMFI took affirmative steps to aid the manipulation – the clearing of Amaranth's transactions and the extension of credit. But "a clearing broker cannot be held liable as an aider and abettor simply because it performed its contracted-for services."[211] The Complaint states that "[t]he JPM Defendants' assistance to Amaranth was non-routine and went beyond those regular and usual services typically provided by an [futures commission merchant] and clearing firm to its customer."[212] But there is no indication of any services provided by JPMFI that were not typical of the

---

(S.D.N.Y. 1990)). *Accord Connolly v. Havens*, 763 F. Supp. 6, 11 (S.D.N.Y. 1991) (citing *Stander*, 730 F. Supp. at 1286); *Baum v. Phillips, Appel & Walden, Inc.*, 648 F. Supp. 1518 (S.D.N.Y.), *aff'd*, 867 F.2d 776 (2d Cir. 1986)).

[210]    *Stander*, 730 F. Supp. at 1287 (quoting *IIT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir. 1980)).

[211]    *Id.* at 1288 (citation omitted).

[212]    Compl. ¶ 209.

relationship between a futures clearing merchant and its client.[213]

"[W]here a clearing firm moves beyond performing mere ministerial or routine clearing functions and becomes actively and directly involved in the introductory broker's actions, it may expose itself to liability with respect to the introductory broker's misdeeds."[214] There are no allegations of such behavior here. JPMFI's alleged activities were limited to the provision of clearing services and the extension of credit, activities that are typical of the relationship between a clearing broker and its client. The aiding and abetting claim against JPMFI is therefore dismissed.

### 4.    Respondeat Superior

The CEA creates liability for those employers whose agents

---

[213]    *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 471 (S.D.N.Y. 2001) ("A failure to enforce margin requirements, or continuing to execute trades despite margin violations, however, does not constitute substantial assistance.") (citing *Dillon v. Militano*, 731 F. Supp. 634, 637, 639 (S.D.N.Y. 1990); *Stander*, 730 F. Supp. at 1287).

[214]    *McDaniel v. Bear Stearns & Co., Inc.*, 196 F. Supp. 2d 343, 353 (S.D.N.Y. 2002). *Accord Lesavoy v. Lane*, No. 02 Civ. 10162, 2008 WL 2704393, at *11 (S.D.N.Y. July 10, 2008) (rejecting the plaintiff's argument that "'[e]nabling Lane to continue trading in commodities [was] precisely the substantial assistance that is required to sustain the claim'") (quoting the plaintiff's brief). *Cf. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 373 (S.D.N.Y. 2007) (declining to dismiss where clearing broker's "alleged activity . . . was anything but routine").

committed manipulative acts while functioning within the scope of the relationship.[215] As discussed above, to state a claim for vicarious liability, plaintiffs must allege that the principal manifested an intent to grant the agent authority, the agent agreed, and the principal "maintain[ed] control over key aspects of the undertaking."[216]

### a. Amaranth Advisors

Plaintiffs have alleged facts that indicate that Hunter and Donohoe were acting within the scope of their employment with Amaranth Advisors. This suffices to state a claim for vicarious liability.[217]

---

[215] The Complaint also alleges that certain defendants are liable as "control persons." Section 13(b) of the CEA provides that "[a]ny person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person." 7 U.S.C. § 13c(b). The plain language of this provision limits its application to actions brought by the CFTC. Plaintiffs did not address this issue in their memorandum of law.

[216] *Commercial Union Ins. Co.*, 347 F.3d at 462 (citations omitted).

[217] Amaranth Advisors contend that because Hunter had a duty not to "knowingly violate any law or NYMEX trading rule," if he violated any such rule, he could not have been authorized to do so. Advisors Mem. at 37. The Court cannot consider evidence as to the scope of Hunter's employment on a motion to dismiss.

### b.    Maounis

Maounis argues that the Complaint fails to allege that Hunter was his agent.[218] Specifically, he contends that there are no allegations that he authorized Hunter to trade natural gas futures on his behalf or that he had substantial control of the attempts to manipulate settlement prices.[219] Maounis is correct. Although he was allegedly the CEO of the Amaranth entities, it was those entities, not Maounis personally, who employed the traders. Therefore, this claim is dismissed as to Maounis.

### c.    AGI

Plaintiffs have also alleged that Hunter and Donohoe were employed by AGI. However, except in conclusory language they have pled no facts as to the nature or extent of that relationship. Having failed to allege that the traders were operating within the scope of any employment by AGI, this claim is dismissed as to AGI.

### d.    The Other Amaranth Entities

The other Amaranth entities argue that the Complaint fails to allege that they had the requisite control over Hunter, Donohoe, or Amaranth Advisors.

---

[218]    *See* Advisors Mem. at 32.

[219]    *See id.*

69

Plaintiffs respond that "[f]or now, it is a complete answer to this argument to say that it denies the well pleaded allegations of the complaint: Amaranth Advisors 'was a broadly empowered agent of the Amaranth Defendants under Section 2(a)(1)(B) of the [Act].'"[220]  Plaintiffs are incorrect.  Whether Amaranth Advisors are agents of any other defendant is a mixed question of law and fact.  To meet their pleading burden, plaintiffs must allege facts that, if true, would support the legal conclusion that an agency relationship exists.

Plaintiffs have alleged that Amaranth LLC "held the manipulative positions . . . ."[221]  The Feeder Funds allegedly "got the manipulation started by putting up funds for investment . . . ."[222]  AMLP "controlled and substantially owned Amaranth Advisors . . . ."[223]  AGI "controlled Amaranth Advisors [and] employed the natural gas traders . . . ."[224]  Maounis "was the principal of the

---

[220]    Pl. Mem. at 51 (quoting Compl. ¶ 22).

[221]    Compl. ¶ 245.

[222]    *Id.* ¶ 246.

[223]    *Id.* ¶ 247.

[224]    *Id.* ¶ 248.  Ordinarily, an allegation that a wrongdoer was "employed" by an entity would be sufficient to plead an agency relationship.  However, in this instance the traders were alleged to be operating in the scope of their employment with Amaranth Advisors at the time of the allegedly manipulative trades.  The Complaint provides no details as to the nature of their employment with AGI or their responsibilities as employees of AGI.  Without such information, I cannot

Amaranth Defendants . . . ."[225]  In addition, all of the Amaranth entities allegedly "willfully aided, abetted, counseled, induced, or procured the commission of violations . . . ."[226]  Plaintiffs also allege that "Amaranth Advisors, and the remaining Amaranth Defendants, undertook the activities alleged herein individually, in concert, and as one another's control persons or agents."[227]

In no sense are any of these allegations sufficient to allege a principal-agent relationship.  The only language that would justify such a relationship is general, vague, and conclusory.  Therefore, plaintiffs' vicarious liability claims are dismissed as to these defendants.

### E.    Unjust Enrichment

Defendants argue that plaintiffs have failed to allege "the requisite contractual or quasi-contractual relationship with any Defendant."[228]  To state a

---

infer that the traders were operating in the course of this employment.

[225]    *Id.* ¶ 250.

[226]    *E.g., id.* ¶ 245.  *See also id.* ¶ 253 ("The Amaranth Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.").

[227]    *Id.* ¶ 238.

[228]    Advisors Mem. at 38.  *See also* Floor Brokers Mem. at 21 ("Plaintiffs try to artificially detach the elements of the claim from the quasi-contractual context in which the claim must be viewed.").

claim for unjust enrichment, plaintiffs need not allege that they had a contract or were otherwise in privity with defendants. But the alleged relationship between plaintiffs and defendants must not be excessively attenuated.

Plaintiffs have alleged that their losses were caused by defendants' market manipulations performed on behalf of Amaranth Advisors. But they have not alleged any direct relationship, trading or otherwise, between themselves and any Amaranth entity or trader. The alleged link between plaintiffs and defendants – from defendants' manipulations to the general natural gas futures market to plaintiffs' trades – is too attenuated to support an unjust enrichment claim.[229] Therefore, this claim is dismissed as to all defendants.[230]

---

[229]    Plaintiffs have defined their proposed class as those entities that "purchased and sold NYMEX natural gas contracts during the Class Period." Compl. ¶ 16. By definition, some members of this class were counterparties to Amaranth in the trades described herein. Because plaintiffs appear not to rely on this relationship, I have not considered whether it would suffice for an unjust enrichment claim. If plaintiffs do seek to rely on this relationship, possibly in view of a future subclass, they may add such allegations by amending the Complaint.

[230]    Further, plaintiffs do not allege that JPMFI, the Floor Brokers, Hunter, Donohoe, or Maounis were enriched at plaintiffs' expense. Without such allegations, plaintiffs cannot state a claim for unjust enrichment against these defendants.

**F.     Leave to Replead**

Whether to permit a plaintiff to amend its pleadings is a matter committed to the Court's "sound discretion."[231]  Rule 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires." Moreover, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."[232]  Leave to replead is therefore granted.

**V.     CONCLUSION**

For the reasons discussed above, defendants' motions to dismiss are granted in part and denied in part.[233]  The Clerk of the Court is directed to close these motions [nos. 60, 63, 66, 69, 72, 75, 78, 85, 87, 93, 96, 99, 102, 103, 109, 110, and 114 on the docket sheet].  If plaintiffs choose to file an amended complaint, they must do so within thirty days of the date of this Opinion and Order.  A conference is scheduled for December 1, 2008, at 4:30 p.m.

---

[231]     *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

[232]     *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

[233]     Because I now dismiss all claims that do not relate to the alleged manipulation of settlement prices, those plaintiffs who have failed to allege that they were injured by this manipulation have not stated claims.  Similarly, as the Complaint currently stands, the Class Period cannot begin earlier than February 23, 2006.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              October 4, 2008

## - Appearances -

**For Plaintiffs:**

Bernard Persky, Esq.
Gregory Scott Asciolla, Esq.
Labaton Sucharow, LLP
140 Broadway
New York, NY 10005
(212) 907-0868

Christopher Lovell, Esq.
Ian Trevor Stoll, Esq.
Lovell Stewart Halebian LLP
500 Fifth Avenue
New York, NY 10110
(212) 608-1900

Vincent Briganti, Esq.
Geoffrey Milbank Horn, Esq.
Lowey Dannenberg Cohen & Hart, P.C.
White Plains Plaza
One North Broadway, Suite 509
White Plains, NY 10601
(914) 997-0500

Robert M. Rothman, Esq.
Samuel Howard Rudman, Esq.
Coughlin, Stoia, Geller, Rudman &
Robbins, LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Louis Fox Burke, Esq.
460 Park Avenue, 21st Floor
New York, NY 10022
(212) 682-1700

Christopher J. Gray, Esq.
460 Park Avenue, 21st Floor
New York, NY 10022
(212) 838-3221

**For Defendant Amaranth Advisors, LLC:**

David Emilio Mollon, Esq.
Steven Michael Schwartz, Esq.
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
(212) 294-4748

Kristen Victoria Grisius, Esq.
Stephen J. Senderowitz, Esq.
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-6062

**For Defendant Nicholas M. Maounis:**

Andrew Levine, Esq.
Richard Scott Goldstein, Esq.
Heller Ehrman, LLP
7 Times Square
New York, NY 10036-6524
(212) 847-8667

Thomas Samuel Kimbrell, Esq.
Heller Ehrman LLP
1717 Rhode Island Avenue, NW
Washington, DC 20036
(202) 912-2604

Geoffrey Aronow, Esq.
Bingham McCutchen, LLP
2020 K Street, NW
Washington, DC 20006-1806
(202) 912 2000

**For Defendant ALX Energy, Inc.:**

Steven R. Goldberg, Esq.
One North End Avenue, Suite 1107
New York, NY 10282
(212) 845-5100

**For Defendant Brian Hunter:**

Michael Sangyun Kim, Esq.
Kobre & Kim LLP
800 Third Avenue
New York, NY 10022
(212) 586-9151

**For Defendant Amaranth LLC:**

Amelia Temple Redwood Starr, Esq.
Dharma Betancourt Frederick, Esq.
Sheldon Leo Pollock, III, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
(212) 450-4516

**For Defendant Amaranth
International Ltd.:**

Adam Selim Hakki, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-4924

**For Defendant TFS Energy Futures LLC:**

Karl Geercken, Esq.
Alan Mark Kanzer, Esq.
Amber C. Wessels, Esq.
Craig Carpenito, Esq.
Alston & Bird, LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

**For Defendant Matthew Donohoe:**

Brijesh Pradyuman Dave, Esq.
Joshua Adam Levine, Esq.
Mark J. Stein, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-3315

**For the J.P. Morgan Defendants:**

Daniel John Toal, Esq.
Eric S. Goldstein, Esq.
Marguerite Sophia Dougherty, Esq.
Mark Floyd Pomerantz, Esq.
Jason Harold Wilson, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3869