**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------- X

**IN RE AMARANTH NATURAL GAS**
**COMMODITIES LITIGATION**

---------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/27/09

**OPINION AND ORDER**

**07 Civ. 6377 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Plaintiffs have filed this putative class action on behalf of a class of all entities that purchased, sold, or held natural gas futures or options on futures contracts between February 16, 2006 and September 28, 2006 (the "Class Period") against the Amaranth family of companies, its brokers, its clearing house firm, and certain of their employees. Plaintiffs allege that during the Class Period, defendants manipulated the prices of New York Mercantile Exchange ("NYMEX") natural gas futures contracts in violation of sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act (the "CEA").

In an Opinion and Order dated October 4, 2008 ("October Opinion and Order"), this Court granted in part and denied in part defendants' motions to dismiss the Corrected Consolidated Class Action Complaint ("Complaint"). Plaintiffs have re-pled their allegations in the Corrected First Amended

1

Consolidated Class Action Complaint ("Amended Complaint"), and defendants

have again moved to dismiss all claims.  For the reasons discussed below,

defendants' motions are granted in part and denied in part.

## II.    BACKGROUND

### A.    Facts

A detailed description of the facts can be found in this Court's

October Opinion and Order.[1]  The instant Opinion and Order assumes familiarity

with the facts of this case and the parties involved.

### B.    Procedural History

This action was filed on July 12, 2007.  Plaintiffs raised the following

claims:

- Count One alleges that Nicholas Maounis, Brian Hunter, Matthew Donohoe, Amaranth Advisors LLC, Amaranth Advisors (Calgary) ULC (together with Amaranth Advisors LLC, "Amaranth Advisors"), Amaranth Group Incorporated ("AGI"), Amaranth Management Limited Partnership ("AMLP"), Amaranth LLC ("the Master Fund"), Amaranth International Limited ("AIL"), Amaranth Partners LLC ("AP"), and Amaranth Capital Partners LLC ("ACP") (together with AIL and AP, "the Feeder Funds") (collectively, "the Amaranth Defendants") are directly and vicariously liable for violations of sections 6(c), 6(d), 9(a), and 22(a) of the CEA;

---

[1]     *See In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008).

- Count Two alleges that the Amaranth Defendants are liable for aiding and abetting, failure to supervise, and as control persons in connection with Count One;

- Count Three alleges that James DeLucia, ALX Energy Inc. ("ALX"), TFS Energy Futures LLC ("TFS"), and Gotham Energy Brokers Inc. ("Gotham") (collectively, "the Floor Brokers") are liable for aiding and abetting in connection with Count One;

- Count Four alleges that J.P. Morgan Chase & Co., J.P. Morgan Chase Bank Inc., and J.P. Morgan Futures, Inc. ("JPMFI") (collectively, "the J.P. Morgan entities") are liable for aiding and abetting in connection with Count One; and

- Count Five alleges that all defendants are liable for unjust enrichment.

In the October Opinion and Order, this Court granted in part and denied in part defendants' motions to dismiss. In sum, the Court:

- Dismissed all claims against AIL for lack of personal jurisdiction;

- Dismissed all claims related to the Amaranth Defendants' acquisition and holding of large positions of natural gas futures because plaintiffs had failed to allege that the Amaranth Defendants had the requisite scienter to manipulate prices;

- Dismissed Count One with respect to AGI, AMLP, the Feeder Funds, and the Master Fund because they had not been alleged to have undertaken manipulative actions with respect to settlement prices nor were they responsible under a theory of vicarious liability;

- Dismissed Count One against Maounis and all other Amaranth entities except Amaranth Advisors, because plaintiffs had failed to allege the requisite scienter and because these defendants were

3

found not to be liable under a theory of vicarious liability;

- Denied Hunter's and Donohoe's motion to dismiss Count One with respect to the alleged manipulation of settlement prices;

- Denied Amaranth Advisors' motion to dismiss Count One with respect to the alleged manipulation of settlement prices under a theory of vicarious liability;

- Dismissed Count Two's aiding and abetting claims against AGI, AMLP, the Master Fund, and the Feeder Funds because plaintiffs had failed to allege the requisite scienter;

- Denied Maounis' motion to dismiss Count Two's aiding and abetting claim;

- Dismissed Count Two's control person liability claims against all defendants because the plain language of section 13(b) of the CEA limits its application to actions brought by the Commodities Futures Trading Commission ("CFTC");[2]

---

[2]    The Court notes that it did not specifically address plaintiffs' failure to supervise claim under Count Two in its October Opinion and Order and that it is unclear whether the Court's holding with respect to plaintiffs' control person liability claim was meant to encompass the failure to supervise claim as well. *See In re Amaranth*, 587 F. Supp. 2d at 546, n.215.  In any case, the prevailing authority suggests that there is also no private cause of action for violations of CFTC Rule 166.3. *See Fustok v. Conticommodity Servs., Inc.*, 618 F. Supp. 1069, 1072-73 (S.D.N.Y. 1985) (looking to the control person liability provision under section 13(b) of the CEA for guidance as to whether a private cause of action was contemplated under Rule 166.3 and concluding that no private cause of action exists); *Khalid Bin Alwaleed Found. v. E.F. Hutton & Co., Inc.*, 709 F. Supp. 815, 818 (N.D. Ill. 1989) ("A review of the language of the statute that authorized these regulations, its focus and legislative history, indicates that Congress did not intend that the rules promulgated by the CFTC should give rise to a private cause of action.").

- Dismissed Count Three against TFS and Gotham because plaintiffs had failed to allege the requisite scienter;

- Denied ALX's and DeLucia's motion to dismiss Count Three;

- Dismissed Count Four against defendants J.P. Morgan Chase & Co. and J.P. Morgan Chase Bank Inc. because plaintiffs had failed to allege the requisite scienter and against defendant JPMFI because plaintiffs had failed to allege that it committed an overt act in aid of the Amaranth Defendants' manipulation; and

- Dismissed Count Five as to all defendants because plaintiffs had failed to allege "the requisite contractual or quasi-contractual relationship with any [d]efendant."

Plaintiffs filed the Amended Complaint on November 26, 2008. At the pre-motion conference on December 1, 2008, this Court instructed the parties to determine in good faith which claims have been re-pled by plaintiffs or are challenged in defendants' motions to dismiss solely for purposes of appeal. By letter dated January 14, 2009, the parties informed the Court that the following claims were re-pled by plaintiffs for the purpose of appeal:

- Count Two's claim for control person liability pursuant to Section 13(b) of the CEA;

- Count Two's claim for failure to supervise under CFTC Rule 166.3;

- Count Four's claims against J.P. Morgan Chase & Co. and J.P. Morgan Chase Bank, Inc.; and

- Count Five's unjust enrichment claim.[3]

The parties also informed the Court in the same letter that defendants would be making the same arguments they made in their first motions to dismiss with respect to the following claims solely to preserve those grounds for appeal:

- Defendants Amaranth Advisors, Hunter, and Donohoe seek dismissal of Count One of the Amended Complaint alleging manipulation of settlement prices;

- Defendants Amaranth Advisors seek dismissal of the Amended Complaint to the extent it alleges they are liable under a respondeat superior theory;

- Defendant Maounis seeks dismissal of Count Two of the Amended Complaint to the extent it alleges that he aided and abetted the manipulation of settlement prices; and

- Defendants ALX and DeLucia seek dismissal of Count Three.[4]

This Court hereby adheres to the rulings it made in the October Opinion and Order with respect to the claims discussed in the parties' January 14, 2009 letter and will not address them in this Opinion and Order. Defendants now move to dismiss the rest of the claims on a variety of grounds.

---

[3]    *See* 1/14/09 Letter from David E. Mollon, counsel for Amaranth Advisors, AGI, AMLP, Amaranth International Advisors, L.L.C. ("AIA"), and Maounis, on behalf of the parties to the Court at 1.

[4]    *See id.* at 2.

## III.   LEGAL STANDARD

### A.   Motion to Dismiss

When deciding a motion to dismiss under Rule 12(b)(6), the court

must "accept as true all of the factual allegations contained in the complaint"[5] and

"draw inferences from those allegations in the light most favorable to plaintiff[]."[6]

Nevertheless, the court need not accord "[l]egal conclusions, deductions or

opinions couched as factual allegations . . . a presumption of truthfulness."[7]

In deciding a motion to dismiss, the court is not limited to the face of

the complaint.  The court "may [also] consider any written instrument attached to

the complaint, statements or documents incorporated into the complaint by

reference, legally required public disclosure documents filed with the SEC, and

documents possessed by or known to the plaintiff and upon which it relied in

bringing the suit."[8]

### 1.   Pleading Standard

---

[5]   *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 572 (2007).  *Accord Rescuecom Corp. v. Google Inc.*, — F.3d —, 2009 WL 875447, at *4 (2d Cir. Apr. 3, 2009).

[6]   *Rescuecom Corp.*, 2009 WL 875447, at *4.

[7]   *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation omitted).

[8]   *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[9]  To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[10]  Although the complaint need not provide "detailed factual allegations,"[11] it must "amplify a claim with some factual allegations . . . to render the claim *plausible*."[12]  The standard is no longer that a complaint can be dismissed only if there is "no set of facts" that plaintiff could prove "which would entitle him to relief."[13]  Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[14]

However, pursuant to Rule 9(b), allegations of fraud are subject to

---

[9]    *Erickson v. Pardus*, 551 U.S. 81, 127 S. Ct. 2197, 2200 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[10]    *See Bell Atl.*, 550 U.S. at 564.

[11]    *Id.* at 555. *See also ATSI*, 493 F.3d at 98 n.2 (applying the standard of plausibility outside *Bell Atlantic*'s anti-trust context).

[12]    *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original).

[13]    *Bell Atl.*, 550 U.S. at 562-63 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). *Accord id.* at 563 ("[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

[14]    *ATSI*, 493 F.3d at 98 (quoting *Bell Atl.*, 550 U.S. at 555).

heightened pleading requirements. In its October Opinion and Order, this Court

held that plaintiffs' allegations of commodities manipulation must satisfy Rule

9(b).[15] Rule 9(b) requires that "the circumstances constituting fraud . . . be stated

with particularity."[16] "This pleading constraint serves to provide a defendant with

fair notice of a plaintiff's claim, safeguard his reputation from improvident

charges of wrongdoing, and protect him against strike suits."[17] To comply with

the requirements of Rule 9(b), a plaintiff alleging manipulation must "plead with

particularity the nature, purpose, and effect of the fraudulent conduct and the roles

of the defendants."[18] "Allegations that are conclusory or unsupported by factual

assertions are insufficient."[19]

### 2.    Pleading Scienter

Scienter, in relation to commodities fraud, is "the intent to deceive,

---

[15]    *See In re Amaranth*, 587 F. Supp. 2d at 535.

[16]    Fed. R. Civ. P. 9(b). *Accord ATSI*, 493 F.3d at 99.

[17]    *ATSI*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

[18]    *Rombach*, 355 F.3d at 170 (quotation omitted). *Accord ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[19]    *ATSI*, 493 F.3d at 99.

9

manipulate, or defraud."[20]  Rule 9(b) imposes a significant burden on allegations

of scienter.  Scienter can be pled by "alleging facts (1) showing that the defendants

had both motive and opportunity to commit the fraud or (2) constituting strong

circumstantial evidence of conscious misbehavior or recklessness."[21]  "Sufficient

motive allegations entail concrete benefits that could be realized by one or more of

the false statements and wrongful nondisclosures alleged."[22]  Moreover,

"[m]otives that are generally possessed by most corporate directors and officers do

not suffice; instead, plaintiffs must assert a concrete and personal benefit to the

---

[20]     *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct.
2499, 2507 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94
(1976)).  Although the Supreme Court was discussing securities fraud, its
language is equally applicable to commodities fraud.

[21]     *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d
154, 168-69 (2d Cir. 2000)).  In *Tellabs,* the Supreme Court noted that it had
"previously reserved the question whether reckless behavior is sufficient for civil
liability under § 10(b) and Rule 10b-5," but that "[e]very Court of Appeals that
has considered the issue has held that a plaintiff may meet the scienter requirement
by showing that the defendant acted intentionally or recklessly, though the
Circuits differ on the degree of recklessness required."  127 S. Ct. 2499, 2507 n.3.
The Court declined to address the issue.  *See id.* ("The question whether and when
recklessness satisfies the scienter requirement is not presented in this case.").
Thus, Second Circuit law, which permits scienter to be shown by recklessness,
continues to bind this Court.

[22]     *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (describing
"[i]nsufficient motives" as including "(1) the desire for the corporation to appear
profitable and (2) the desire to keep stock prices high to increase officer
compensation") (quotations omitted)).

individual defendants resulting from the fraud."[23]

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[24] Under this theory of scienter, a plaintiff must allege facts showing that the defendant's conduct is "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"[25] Thus, an express allegation of deliberate misconduct can be sufficient to plead scienter.[26]

"Under certain circumstances, [courts] have found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor,

---

[23]   *Id. Accord In re Openwave Sys. Sec. Litig.*, 528  F. Supp. 2d 236, 250 (S.D.N.Y. 2007) (holding that defendants' stock options "are 'concrete and personal' because they represent a species of compensation different from the one ordinarily accumulated by corporate officers and directors").

[24]   *Kalnit*, 264 F. 3d at 142.

[25]   *Id.* (quoting *Honeyman v. Hoyt (In re Carter-Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000)).

[26]   *See Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001).

or ignored obvious signs of fraud."[27]  Recklessness can be shown by "defendants'

knowledge of facts or access to information contradicting their public statements.

Under such circumstances, defendants knew or, more importantly, should have

known that they were misrepresenting material facts related to the corporation."[28]

"The inquiry . . . is whether all of the facts alleged, taken collectively,

give rise to a *strong inference* of scienter, not whether any individual allegation,

scrutinized in isolation, meets that standard."[29]  "To prove liability against a

corporation . . . a plaintiff must prove that an agent of the corporation committed a

culpable act with the requisite scienter, and that the act (and accompanying mental

state) are attributable to the corporation."[30]

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court

determined that to plead a "strong inference of scienter" in the context of the

Private Securities Litigation Reform Act ("PSLRA"), a complaint must allege facts

---

[27]     *Novak*, 216 F.3d at 308.  *Accord In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (holding that the scienter requirement was satisfied by identification of specific facts constituting strong circumstantial evidence of recklessness and allegations that defendants knew of or recklessly ignored a series of accounting improprieties).

[28]     *Novak*, 216 F.3d at 308.

[29]     *Tellabs*, 127 S. Ct. at 2509 (emphasis added).

[30]     *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

12

that give rise to an inference of scienter at least as strong as any competing inference.[31] The Circuit has not yet clarified whether district courts must now find that the inference of scienter raised in actions governed by Rule 9(b) but not the PSLRA is at least as compelling as any other inference.[32]

## B.   Piercing the Corporate Veil

"In some instances, the corporate relationship between a parent and its subsidiary [is] sufficiently close as to justify piercing the corporate veil and holding one corporation legally accountable for the actions of the other."[33] Courts pierce the corporate veil "'to prevent fraud or other wrong, *or* where a parent dominates and controls a subsidiary.'"[34] Veil piercing determinations are fact-specific and are highly sensitive to "the circumstances of each case."[35] "[A] parent corporation and its subsidiary lose their distinct corporate identities when

---

[31]   127 S. Ct. at 2509.

[32]   At least one court in this district has expressly declined to require it. *See S.E.C. v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008) (declining to extend PSLRA "'strong inference' formulation beyond the limits of the PSLRA").

[33]   *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995).

[34]   *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 96 (2d Cir. 1997) (quoting *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l*, 2 F.3d 24, 26 (2d Cir. 1993)).

[35]   *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988).

13

their conduct demonstrates a virtual abandonment of separateness."[36]

Factors that are relevant to determining whether a corporation's form

should be respected include:

> "(1) disregard of corporate formalities; (2) inadequate
> capitalization; (3) intermingling of funds; (4) overlap in
> ownership, officers, directors, and personnel; (5) common
> office space, address and telephone numbers of corporate
> entities; (6) the degree of discretion shown by the allegedly
> dominated corporation; (7) whether the dealings between
> the entities are at arms length; (8) whether the corporations
> are treated as independent profit centers; (9) payment or
> guarantee of the corporation's debts by the dominating
> entity, and (10) intermingling of property between the
> entities."[37]

### C.   CEA Violations

#### 1.   Manipulation

"The elements of a market manipulation claim under section 9(a) of

the CEA are as follows: (1) the defendant possessed an ability to influence market

prices; (2) an artificial price existed; (3) the defendant caused the artificial price;

---

[36]   *Thomson-CSF*, 64 F.3d at 778 (citing *Carte Blanche*, 2 F.3d at 29).

[37]   *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC*,
268 F.3d 58, 63 (2d Cir. 2001) (quoting *Freeman v. Complex Computing Co.*, 119
F.3d 1044, 1053 (2d Cir. 1997)).

and (4) the defendant specifically intended to cause the artificial price."[38] "Section 22(a) of the CEA provides plaintiffs with a private cause of action to pursue claims of market manipulation."[39]

### 2.    Aiding and Abetting Liability

Section 22(a)(1) of the CEA creates liability for "[a]ny person . . . who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter . . . ."[40] "Generally stated, to recover on an aiding and abetting claim under the CEA, a plaintiff must prove that the defendant (1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective."[41]

### 3.    Vicarious Liability

---

[38]    *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *3 (S.D.N.Y. June 28, 2007).

[39]    *See id.* (citing 7 U.S.C. § 25(a)).

[40]    7 U.S.C. § 25(a)(1). *Cf. Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182, 191 (1994) (observing that unlike the CEA, the Securities Exchange Act does not provide an explicit cause of action for aiding and abetting that is available to private plaintiffs, and concluding that no implied cause of action is available under the Securities Exchange Act).

[41]    *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 511 (S.D.N.Y. 2004).

The CEA also creates liability for an individual or corporate entity for "[t]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office . . . ."[42] "Courts have described subsection 2(a)(1)(B) as codifying 'a variant of the common law principle of respondeat superior' and thus 'mak[ing] an employer strictly liable – that is to say, regardless of the presence or absence of fault on the employer's part – for torts committed by his employees in the furtherance of his business.'"[43] Alleging a principal-agent relationship requires allegations of "(1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent."[44] "In addition, the principal must maintain control over key aspects of the undertaking."[45]

## IV.   DISCUSSION

### A.   Common Enterprise Liability and the Corporate Veil

In the October Opinion and Order, this Court held that there was "no

---

[42]    7 U.S.C. § 2(a)(1)(B).

[43]    *Natural Gas Commodity Litig.*, 337 F. Supp. 2d at 515 (quoting *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986)).

[44]    *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (citations omitted).

[45]    *Id.* (citations omitted).

basis for finding that the corporate forms of the Amaranth entities should be disregarded" such that they would be liable under a theory of common enterprise liability.[46]  The Court ruled that although plaintiffs had alleged "common ownership and overlapping directors," the Complaint lacked allegations of

> the disregard of corporate formalities, inadequate capitalization, intermingling of funds or property, reduced discretion by any entity, failure to deal at arms' length, or payment of the debts of one entity by another.[47]

The Amended Complaint still fails to sufficiently allege a theory of common enterprise liability.  The allegations highlighted by plaintiffs include nothing more than conclusory allegations that the Amaranth Defendants are "a tightly knit association-in-fact"[48] and allegations that they shared common ownership and offices.[49]  Without more, this Court cannot – and will not – impose

---

[46]   *In re Amaranth*, 587 F. Supp. 2d at 539.

[47]   *Id.* at 538.

[48]   Amended Complaint ("Am. Compl.") ¶¶ 30, 268.

[49]   *See id.* ¶ 25 (alleging that Maounis owned one hundred percent of AGI, which owned one percent and was the general partner of AMLP, which in turn owned seventy-eight percent of Amaranth Advisors LLP), ¶ 254 (alleging that AIL was owned, managed, and controlled by Maounis), ¶ 257 (alleging the sharing of offices, telephone numbers, and email addresses).

liability under the common enterprise doctrine.[50]

### B.    Acquisition of Large Positions

In the October Opinion and Order, this Court held that allegations that Amaranth acquired large positions were insufficient to demonstrate manipulation, without additional allegations that the defendants intended these acquisitions to manipulate the market.[51] The Court ruled that although plaintiffs had alleged that defendants "well knew" that Amaranth's acquisition of large positions would send artificial signals to the market, knowledge was not sufficient – "only intent [] can transform a legitimate transaction into manipulation."[52] The Court held additionally that claims of manipulation must be dismissed unless the allegations "give rise to a strong inference that manipulation was the dominant

---

[50]    In the October Opinion and Order, the Court noted that the only cases referenced by plaintiffs based on common enterprise liability were brought by public regulatory entities rather than private individuals. *See In re Amaranth*, 587 F. Supp. 2d at 539 n.162. Plaintiffs now point to one case from the Eastern District of Texas to show that the common enterprise doctrine is applicable in actions filed by private plaintiffs. *See* Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motions to Dismiss Plaintiffs' Corrected First Amended Consolidated Class Action Complaint ("Pl. Mem.") at 79 (citing *Nichols v. Pabtex, Inc.*, 151 F. Supp. 2d 772, 782-83 (E.D. Tex. 2001)). This holding is not binding on this Court.

[51]    *See In re Amaranth*, 587 F. Supp. 2d at 539.

[52]    *Id.*

purpose of the transaction."[53]

Plaintiffs have now included numerous additional allegations in the Amended Complaint that they contend give rise to a strong inference that the Amaranth defendants intended Amaranth's positions to manipulate spread prices.[54] I will discuss the allegations with respect to each defendant or group of defendants in turn.

### 1.    Hunter and Donohoe

Plaintiffs have made sufficient and plausible allegations that Hunter and Donohoe not only knew, but intended Amaranth's trades to manipulate the market.  For instance, plaintiffs allege that on April 1, 2006, Hunter told Donohoe that "[w]e need to put upward pressure on q1 07" and gave him detailed instructions on the trades that should be made in order to achieve this goal.[55] Plaintiffs also allege that Amaranth's positions were then changed according to Hunter's instructions.[56]  Plaintiffs contend that this exchange shows that Hunter and Donohoe knew and intended that Amaranth's dominant position would help

---

[53]    *Id.* at 536.

[54]    *See* Am. Compl. ¶¶ 314-475.

[55]    *Id.* ¶ 378.

[56]    *See id.* ¶ 379.

them increase the prices of winter gas contracts.[57]

Hunter and Donohoe argue that "when viewed in context, [this exchange] more plausibly refers to Amaranth's own book and how trading in certain contracts might impact other contracts in Amaranth's book along the curve."[58] Their explanation, however, is unpersuasive. Furthermore, Hunter and Donohoe do not provide any explanation as to what in the first quarter of 2007 Amaranth needs to "put upward pressure on" if not prices. While it is unclear whether the inference of scienter in a non-PSLRA case needs to be at least as strong as a competing inference, here the inference is at least as strong as defendants' competing inference.[59]

Another example that gives rise to a strong inference of scienter with respect to both Hunter and Donohoe is plaintiffs' allegation that on July 18, 2006, Hunter instructed Donohoe and an Amaranth trader who is not named in this action, Shane Lee, to execute Amaranth's positions in order to "drive up" the

---

[57]     See Am. Compl. ¶ 378; Pl. Mem. at 23.

[58]     See Memorandum of Law in Support of Brian Hunter's and Matthew Donohoe's Motions to Dismiss the Corrected First Amended Consolidated Class Action Complaint ("Hunter and Donohoe Mem.") at 9.

[59]     See In re Amaranth, 587 F. Supp. 2d at 530.

October/November contract spread price.[60]  In one instant message ("IM")

exchange, Lee reports to Hunter that the "v/x is at 5."[61]  As explained by plaintiffs,

each natural gas futures contract month has a letter code.[62]  The letter "V" stands

for October and "X" stands for November.[63]  Plaintiffs thus interpret Lee's IM to

report that the October/November spread is at $1.45.[64]  The IM continues with

Hunter instructing Lee to execute Amaranth's positions.[65]  Lee then asks "to

where," and Hunter replies "6."[66]  Plaintiffs interpret the "6" to mean $1.46.[67]

Plaintiffs allege that Hunter then ordered Lee to continue to "drive out" the spread

to $1.47 and later to "take v/x to 49 [$1.49]."[68]  A half an hour later, Hunter begins

focusing on "pushing the v/f," in other words, pushing the October/January

---

[60]   See Am. Compl. ¶¶ 438-446.

[61]   *Id.* ¶ 440.

[62]   *See id.* ¶ 340.

[63]   *See id.*

[64]   *See id.* ¶ 440.

[65]   *See id.*

[66]   *Id.*

[67]   *See id.*

[68]   *Id.* ¶¶ 441, 443.

spread.[69]  Donohoe responds that he can get 4,000 October/January contracts "no problem."[70]

Although it is admittedly difficult to decipher the meanings of the IMs because of the various abbreviations and jargon used by the participants, plaintiffs' interpretation of these exchanges strongly suggest that Hunter and Donohoe intended to manipulate spread prices.  Defendants attempt to explain away these IMs, arguing that they "reflect real-time observations of the market and discussions of how many contracts to purchase and at what prices to purchase them."[71]  However, it would be incredible to believe that Hunter is merely directing Lee and Donohoe regarding the prices at which trades should be executed when he instructs them to "drive out"  and "push" the spread as well as "take [the spread] to" certain prices.[72]  The use of these terms more plausibly imply that Hunter and Donohoe not only knew that Amaranth could execute its positions to manipulate prices but that they intended to make particular trades in order to do so.

---

[69]     *Id.* ¶ 446.

[70]     *Id.*

[71]     Hunter and Donohoe Mem. at 12.

[72]     Am. Compl. ¶¶ 441, 443, 446.

While plaintiffs have provided other examples to show that Hunter and Donohoe intended to trade Amaranth's positions for the dominant purpose of manipulating spread prices, the two examples discussed above suffice. Hunter's and Donohoe's motion to dismiss Count One with respect to the claim that Amaranth acquired large positions for the purpose of manipulating spread prices is therefore denied.

### 2.    Maounis

This Court previously dismissed plaintiffs' primary claims against Maounis, finding that plaintiffs had "allege[d] no facts that would support an inference that he acted with scienter" and that "the Complaint does not even allege facts that suggest that he was connected with any particular trade."[73] The Amended Complaint alleges nothing new that would change the Court's prior decision.

Plaintiffs make the following arguments: (1) that by virtue of Maounis' position as CEO, he had "access to all relevant facts and information" regarding the alleged manipulation;[74] and (2) that Maounis had "direct knowledge of Amaranth's gas positions, trading strategies, and risk profile," "actively

---

[73]    *In re Amaranth*, 587 F. Supp. 2d at 541.

[74]    Pl. Mem. at 28.

23

discussed the performance of Amaranth's natural gas positions and trades," and

"ratified and ultimately approved [these] positions and trades."[75]  I previously

found plaintiffs' first argument to be unavailing when it was made in response to

Maounis' first motion to dismiss and again find this argument unpersuasive.

Plaintiffs' second argument is equally unavailing.  *First*, plaintiffs

contend that Maounis had "direct and sophisticated knowledge of Amaranth's

natural gas positions, trading strategies, and risk-profile."[76]  The principal support

for this argument is that Maounis was involved in managing investor

relationships.[77]

*Second*, plaintiffs contend that Maounis "actively monitored,

reviewed, and commented on the performance of Amaranth's natural gas positions

and trades . . . ."[78]  Plaintiffs cite to IMs between Amaranth traders discussing

Maounis' request for the "daily profit & loss statement" and "recap[s] of the day"

and an email from Maounis to these traders asking "whether yesterday's profit &

---

[75]     *Id.* at 29.

[76]     *Id.* at 30.

[77]     *See id.*; Am. Compl. ¶ 263 (alleging that Maounis met with asset
management companies and research analysts to "discuss the energy book" and
"Amaranth's current views on risk management.")).

[78]     Pl. Mem. at 31.

loss statement came in."[79]

*Third*, plaintiffs assert that Maounis was "in constant communication with [] Hunter concerning specific strategies, positions taken and trades executed in Amaranth's natural gas book . . . ." and that he "routinely met and was in constant communication with [] high ranking Amaranth personnel concerning risk-management . . . ."[80] Plaintiffs point specifically to emails in which Maounis and Hunter confer about Amaranth's performance, an email reporting to the members of the executive committee that Amaranth was "much more defensively postured today" and that Hunter was "inclined to reduce risk," and an email between two "high-ranking" officials discussing how Maounis and Hunter were going to attempt to increase liquidity.[81]

*Finally*, plaintiffs argue that Maounis "expressly ratified and approved [Amaranth's] gas positions and trading strategies."[82] For this, they cite to an email in which an Amaranth official named Robert Jones is asking Maounis to decide how to instruct Hunter with regards to risk reduction and another in

---

[79]   *See id.*; Am. Compl. ¶ 264.

[80]   Pl. Mem. at 31-33; *see* Am. Compl. ¶¶ 264-265.

[81]   *Id.*; Am. Compl. ¶¶ 264-265.

[82]   Pl. Mem. at 33.

which Maounis is asking Hunter whether there is "upside" on Amaranth's positions.[83]

At best, these allegations show that Maounis was actively involved in investor relations, kept track of Amaranth's positions and strategies, and monitored and possibly made some decisions with respect to Amaranth's risk exposure. These are tasks that a CEO of a hedge fund investment advisory company would normally be expected to undertake. Importantly, there is no allegation that Maounis was involved in any of the alleged manipulative trades. Count One is therefore dismissed with respect to Maounis.

### 3.    The Other Amaranth Entities

Similar to the first Complaint, AGI, AMLP, the Master Fund, and the Feeder Funds are not alleged in the Amended Complaint to have undertaken any manipulative actions. Plaintiffs appear to concede this in their opposition papers by asserting that they have included adequate allegations only with respect to the "Amaranth Trading Defendants," which they identify as Hunter, Donohoe, Maounis, and Amaranth Advisors.[84] And, although plaintiffs include a new defendant, AIA, in their Amended Complaint, there are similarly no allegations

---

[83]    *See id.*; Am. Compl. ¶¶ 265, 465.

[84]    *See* Pl. Mem. at 2.

that AIA undertook any manipulative actions. Thus, plaintiffs have failed to state a claim for primary violations of the CEA with respect to these defendants.

## C.    Aiding and Abetting Liability

There are two elements that plaintiffs must demonstrate to succeed on a claim for aiding and abetting a violation of the CEA. At the motion to dismiss stage, plaintiffs must allege that a defendant (1) had knowledge of a principal's intent to manipulate the market and intended to assist to further that manipulation; and (2) performed an act in furtherance of that manipulation.[85]

### 1.    Maounis

In the October Opinion and Order, this Court ruled that Maounis was liable on plaintiffs' aiding and abetting claim with respect to the alleged manipulation of settlement prices.[86] On the issue of Maounis' scienter, the Court held that it "strains credulity to suggest that Maounis was unaware of the manipulation" when he was CEO of Amaranth Advisors and the alleged settlement price manipulation happened not once, but three times.[87] The same must be said with respect to the alleged manipulation of spread prices.

---

[85]    *See In re Amaranth*, 587 F. Supp. 2d at 541.

[86]    *See id.* at 544-45.

[87]    *Id.* at 543.

Although plaintiffs failed to sufficiently plead that Maounis was directly involved in manipulating spread prices, plaintiffs have adequately shown that Maounis aided and abetted Hunter. Plaintiffs' additional allegations show that Maounis closely monitored Amaranth's trades and positions and made occasional reports to the executive committee. It is plausible to believe that Maounis was familiar with Amaranth's ability to move prices. His failure to stop Hunter and other traders from continuing to execute trades that affected prices artificially is reckless, if not intentional. And, his frequent communications with Hunter and failure to advise him to act otherwise with respect to Amaranth's trading constitute tacit approval. Indeed, Maounis concedes that "[a]t best, [p]laintiffs' new allegations relate to their aiding and abetting claim . . . ."[88] As such, the aiding and abetting claim against Maounis based on the manipulation of spread prices may proceed.[89]

---

[88] Memorandum of Law in Support of Motion to Dismiss the Corrected First Amended Consolidated Class Action Complaint by Defendants Amaranth Advisors, AGI, AIA, AMLP, and Maounis ("Amaranth Advisors, AGI, AIA, AMLP and Maounis Mem.") at 11.

[89] In his opposition papers, Maounis focused principally on arguments that he cannot be held primarily liable for alleged manipulations of spread prices. *See generally id.* He did not address whether he could be liable for aiding and abetting. *See id.* In any case, I find that had he moved to dismiss this aiding and abetting claim, he would not have succeeded.

## 2. The Other Amaranth Entities

The aiding and abetting claims against the other Amaranth entities,
however, must fail. There are simply no allegations that any of these entities had
any knowledge of or intention to assist in the furtherance of any manipulation.
Nor is there any allegation that these entities acted in furtherance of such
manipulation.[90]

The only allegations in the Amended Complaint that relate directly to
plaintiffs' claims for aiding and abetting against these entities are conclusory and
insufficient. In each of these allegations, plaintiffs have pleaded that the
Amaranth entity "willfully aided, abetted, counseled, induced, or procured the
commission of violations of the [CEA] by the Amaranth Defendants."[91] Most
notably, plaintiffs failed, in their opposition papers, to point to any other

---

[90]     Plaintiffs appear to base their aiding and abetting claims against the
Master and Feeder Funds on the Master Fund's holding of allegedly manipulative
positions and on the Feeder Funds' investment of funds in the Master Fund. *See*
Am. Compl. ¶¶ 493-494. In addition, plaintiffs wish to impose aiding and abetting
liability on AIA because it was the investment advisor to AIL. *See id.* ¶ 492.
However, these broad allegations are inadequate without any allegations that any
of these entities knew about the manipulative scheme, intended that the
manipulation would occur, and substantially assisted in the furtherance of the
scheme.

[91]     Am. Compl. ¶¶ 492-496.

allegations in the Amended Complaint that might help them.[92]   The aiding and

abetting claims against these Amaranth entities are therefore dismissed.

### 3.   TFS

In the October Opinion and Order, this Court dismissed the aiding

and abetting claim against TFS because plaintiffs had failed to state a claim

against TFS under Rule 9(b) and had even failed to do so under the more liberal

pleading standard of Rule 8(a).[93]   Although the Court found that plaintiffs had

sufficiently alleged the knowledge of and intent of ALX, another floor broker, to

further the manipulative scheme by Amaranth, it also noted that "[f]loor brokers

are not expected to weigh the implications of every order they receive."[94]   The

Court therefore found that TFS, which had been involved in only one "slamming

the close" transaction could not, without more, be held liable under an aiding and

abetting theory.[95]

The only new allegations in the Amended Complaint relate to three

---

[92]    *See generally* Pl. Mem.

[93]    *See In re Amaranth*, 587 F. Supp. 2d at 543 & n.196.

[94]    *Id.* at 542.

[95]    *See id.* at 543.

30

IMs between two alleged employees of TFS and Donohoe.[96]  In the first, plaintiffs allege that on April 21, 2006, Donohoe "bragged to an employee at Defendant TFS with the IM handle, 'scottbtfs,' that he "put some hurt on that h/j," which meant that Donohoe had been "successful in widening March/April contract spread prices."[97]  Importantly, however, plaintiffs do not allege that "scottbtfs" ever responded to Donohoe's remarks.  This IM therefore does not suggest any complicity on the part of TFS.

The second and third IMs took place on April 24, 2006 and April 26, 2006, respectively, and were allegedly between another employee of TFS with IM handle, "gkurzertfs," and Donohoe.  The only substantive portion of the first of the two messages appears to include a question from gkurzertfs, saying "how many should i work?," followed by a reply by Donohoe, "1000."[98]  The import of this exchange is unclear, and plaintiffs do not venture to guess what Donohoe and his acquaintance at TFS are discussing.[99]  In the third IM, Donohoe says "I should be

---

[96]     The rest of the allegations highlighted by plaintiffs either repeat the allegations made in the first Complaint, which I found to be insufficient to allege scienter, or are conclusory allegations without factual support.  *See* Am. Compl. ¶¶ 287, 289-291, 294-295.

[97]     *Id.* ¶ 308.

[98]     *Id.* ¶ 309.

[99]     *See id.*

getting k/m," in which "k/m" refers to May/June.[100]  gkurzertfs responds, "pushing

so hard" and "still working you 1.985 in h/j right," in which "h/j" refers to

March/April.[101]  Donohoe responds "500" and gkurzertfs says "h/j spread 1.97

bid."[102]  Again, plaintiffs provide no explanation as to the meaning of this

conversation and how it demonstrates TFS' knowledge of and intent to further the

alleged manipulation.[103]  In fact, it is plausible that the second and third IMs are

merely exchanges between Donohoe and gkurzertfs in which gkurzertfs is asking

for instructions on certain trades and Donohoe is giving them.  Plaintiffs have

therefore failed to plead allegations that give rise to a strong inference of scienter

with respect to TFS, and therefore, Count Three is dismissed.

### 4.    Gotham

---

[100]    *Id.* ¶ 310.

[101]    *Id.*

[102]    *Id.*

[103]    TFS also notes that the individuals with which Donohoe is
communicating, "scottbtfs" and "gkurzertfs," are not employees of the company,
but are employed by TFS Energy LLC, "a different enterprise" involved in over-
the-counter trading that is "not named in this complaint." *See* Memorandum of
Law of Defendant TFS Energy Futures LLC in Support of its Motion to Dismiss
Plaintiffs' Corrected First Amended Consolidated Class Action Complaint at 5, 6
n.6. Although this lends further support to my skepticism that the IMs will
uncover any involvement by TFS in the manipulation, I cannot consider this
information on a motion to dismiss. In any event, the content of the IMs
themselves are ambiguous.

This Court previously dismissed the aiding and abetting claim against Gotham on the same grounds that it dismissed the claim against TFS.[104]  Plaintiffs have provided no additional allegations to show that Gotham possessed the intent to further the alleged manipulation of settlement prices.[105]

With respect to the alleged manipulation of spread prices, plaintiffs' only new allegation is that Gotham was involved in placing one order on behalf of Amaranth allegedly in the last twelve minutes of trading on July 12, 2006.[106] Plaintiffs include references to an IM exchange between Lee and Hunter that allegedly shows that they had intended to trade in the last twelve minutes of trading for the purposes of manipulating spread prices.[107]  Plaintiffs allege that

---

[104]     *See In re Amaranth*, 587 F. Supp. 2d at 543 & n.196.

[105]     Plaintiffs allege that with regard to the May 2006 contracts, Gotham had placed an order for Amaranth in the last eight minutes of trading and that there was no legitimate economic purpose for doing so. *See* Am. Compl. ¶¶ 142, 143, 292.  This allegation was made in the prior Complaint, *see* Compl. ¶¶ 140-141, but the Court had nevertheless decided that involvement in one "slamming the close" transaction was insufficient to give rise to a strong inference of intent on the part of a floor broker. *See In re Amaranth*, 587 F. Supp. 2d at 542 (finding that "no inference of scienter [would have been] drawn" had Amaranth executed its trades just before the close of the settlement period once); *id.* at 543 (holding that the allegations in the Complaint were insufficient to give rise to a strong inference of intent on the part of Gotham).

[106]     *See* Am. Compl. ¶¶ 298-303.

[107]     *See id.* ¶¶ 299-301.

33

Gotham then executed the order at 2:31 p.m., one minute after the close of

trading.[108]  However, there is no indication that Gotham knew or intended to assist

Lee and Hunter in this transaction.[109]  Count Three is therefore dismissed with

respect to Gotham.

### 5.    JPMFI

Although this Court held that plaintiffs had included allegations

"sufficient to permit a strong inference that JPMFI had knowledge of the

manipulations and intended their success," it found that JPMFI had not

"committed an overt act in aid of the Amaranth entities' manipulation."[110]  I held

that plaintiffs' allegations that JPMFI had "clear[ed] Amaranth's transactions and

[extended] credit" was not enough because "'a clearing broker cannot be held

---

[108]     *See id.* ¶ 302.

[109]     Plaintiffs also allege that the original order ticket appears to have
been manually altered by "someone at Gotham" to conceal the fact that
Amaranth's order was received after 2 p.m.  *Id.* ¶ 303.  Plaintiffs speculate that
Gotham wished to conceal the time the order was placed because placing orders in
the last thirty minutes of trading is a violation of NYMEX rules and practices.  *See
id.*  Gotham vehemently disagrees that executing trades in the last thirty minutes is
a violation.  *See* 2/6/09 Letter to the Court from Gotham Energy Brokers at 2.  In
addition, the NYMEX web page indicates that trading on the exchange is
conducted from 9 a.m. until 2:30 p.m.  *See* NYMEX, *Natural Gas*, *available at*
http://www.nymex.com/NG_spec.aspx.  This allegation is therefore baseless.

[110]     *In re Amaranth*, 587 F. Supp. 2d at 544-45.

liable as an aider and abettor simply because it performed its contracted-for services.'"[111]

A review of the Amended Complaint indicates that plaintiffs have once again failed to adequately support their contention that JPMFI had committed an overt act in furtherance of the Amaranth entities' alleged manipulation. Although plaintiffs have included additional allegations, none of them suggest that JPMFI was involved with anything more than providing clearing services and extending credit to the Amaranth entities.[112]

Plaintiffs allege again that JPMFI helped the Amaranth entities to move their positions to the InterContinentalExchange from NYMEX.[113]  But this allegation was made in the earlier Complaint,[114] and I found it to be insufficient and conclusory.  Plaintiffs also now specifically allege the amount of commissions

---

[111]     *Id.* at 545 (quoting *Stander v. Financial Clearing and Servs. Corp.*, 730 F. Supp. 1282, 1288 (S.D.N.Y. 1990)). *Accord Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 29 (2d Cir. 2000) ("The simple providing of normal clearing services to a primary broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker.").

[112]     *See, e.g.*, Am. Compl. ¶¶ 230-233.

[113]     *See id.* ¶ 234.  The InterContinentalExchange is a futures exchange that is not regulated by the CFTC. *See In re Amaranth*, 587 F. Supp. 2d at 522.

[114]     *See* Complaint ¶ 214.

JPMFI was awarded for its services.[115]  While these figures appear generous, there are no allegations by plaintiffs that they are extraordinary or at least not customary.

Instead of providing additional substantive allegations of JPMFI's involvement in non-routine services besides acting as a clearing broker and extending credit, plaintiffs attempt to argue that routine services can be considered by a Court to constitute substantial assistance when considered "*in toto*," when the "circumstances in which the acts were performed" are considered, and "in light of the Court's [previous] finding that the elements of *scienter* and intent have been satisfied."[116]  I directed the parties not to reargue issues that were decided by the October Opinion and Order.  Notwithstanding this instruction, plaintiffs have attempted to do so here.  The Court declines to consider plaintiffs' re-argument and therefore dismisses Count Four against JPMFI.

---

[115]     *See* Am. Compl. ¶ 197 (alleging that JPMFI earned "$32,674,815 in commission fees from Amaranth's trading from 2005 through September 2006"), ¶ 243 (providing a table of monthly commissions totaling $32,674,815).

[116]     Pl. Mem. at 54 (emphasis in original).

## C.    Respondeat Superior

This Court previously decided that in order to state a claim for
vicarious liability, "plaintiffs must allege that the principal manifested an intent to
grant the agent authority, the agent agreed, and the principal 'maintain[ed] control
over key aspects of the undertaking.'"[117]

### 1.    Amaranth Advisors

Plaintiffs have alleged facts that indicate that Hunter and Donohoe
were acting within the scope of their employment with Amaranth Advisors when
they executed manipulative trades.[118]  This is sufficient to state a claim against
Amaranth Advisors for vicarious liability.  Amaranth Advisors' motion to dismiss
Count One is therefore denied.

### 2.    Maounis

In the October Opinion and Order, this Court declined to impose

---

[117]    *In re Amaranth*, 587 F. Supp. 2d at 546 (quoting *Commercial Union
Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.2d 448, 462 (2d Cir. 2003) (citations
omitted)).  Plaintiffs now argue that demonstrating that the principal retained
control over the agent is not a requirement for vicarious liability.  *See* Pl. Mem. at
61 (citing *Guttman v. CFTC*, 197 F. 3d 33, 39 (2d Cir. 1999)).  Because I find that
the issue of control is not dispositive of the determinations made with respect to
the vicarious liability claims against any of the defendants, plaintiffs' argument is
inconsequential.

[118]    *See, e.g.*, Am. Compl. ¶¶ 22, 29, 31, 32.

vicarious liability on Maounis for the acts of Hunter.[119]  It held that Hunter was an

employee of Amaranth Advisors and therefore was not Maounis' employee.[120]

Plaintiffs have provided no reason for the Court to revisit its decision.  Therefore,

this claim is dismissed with respect to Maounis.

### 3.    AGI

Similar to the prior Complaint, plaintiffs allege that Hunter and

Donohoe were employed by AGI.[121]  There are, however, no allegations describing

the relationship between Hunter, Donohoe, and AGI.  Indeed, AGI points out that

plaintiffs seem to contradict themselves because they also allege also that Hunter

and Donohoe were employed by Amaranth Advisors.[122]  Because plaintiffs have

failed to allege that Hunter and Donohoe were acting within the scope of their

employment by AGI, this claim must be dismissed with respect to AGI.

### 4.    AMLP

---

[119]    *See In re Amaranth*, 587 F. Supp. 2d at 546.

[120]    *See id.*

[121]    *See* Am. Compl. ¶¶ 25, 496.

[122]    *See* Amaranth Advisors, AGI, AIA, AMLP, and Maounis Mem. at 10
(citing Am. Compl. ¶ 31).  In the October Opinion and Order, this Court noted that
the scienter of Hunter and Donohoe is properly imputed to Amaranth Advisors and
not to AGI because Amaranth Advisors is alleged to have managed Amaranth's
assets. *See In re Amaranth*, 587 F. Supp. 2d at 541 n.182.

Plaintiffs make no specific allegations with respect to AMLP.[123]
Plaintiffs allege only that AMLP is a holding company that owns 78 percent of
Amaranth Advisors.[124] Vicarious liability cannot be imposed on AMLP in the
absence of any allegations that AMLP granted Amaranth Advisors the authority to
act on its behalf, Amaranth Advisors agreed, and AMLP controlled Amaranth
Advisors. Therefore, plaintiffs' claim against AMLP on a respondeat superior
theory must be dismissed.

### 5.    The Master Fund

This Court had previously dismissed the vicarious liability claim
against the Master Fund because plaintiffs had failed to sufficiently allege a
principal-agent relationship between the Master Fund and Amaranth Advisors.[125]
Plaintiffs have now included new allegations. Because one of these allegations
gives rise to the inference that a principal-agent relationship existed between the
Master Fund and Amaranth Advisors, I will not discuss the remainder.

Plaintiffs claim that the Master Fund admitted that Amaranth

---

[123]    Plaintiffs do not even attempt to make any arguments with respect to
AMLP in their opposition papers. *See generally* Pl. Mem.

[124]    *See* Am. Compl. ¶ 24.

[125]    *See In re Amaranth*, 587 F. Supp. 2d at 546-47.

39

Advisors was its "agent" and also argued that its business was "intertwined" with that of Amaranth Advisors in a brief filed in *Amaranth LLC v. J.P. Morgan Chase & Co.*, 603756/07.[126]  This allegation renders the existence of an agency relationship "plausible."

The Master Fund argues that these statements do not amount to judicial admissions that are binding on it in this proceeding.[127]  In addition, it contends that because there are many colloquial uses to the word "agent," this Court should not rely on this statement to support the existence of a principal-agent relationship between the two parties.[128]  Whether the Master Fund's statement is a judicial admission that is *binding* on this Court is inconsequential. This Court need only determine whether plaintiffs have pled sufficient factual

---

[126]     Am. Compl. ¶ 271 (alleging that ". . . Defendant Amaranth LLC stated that defendants 'exploited the financial difficulties of their customer Plaintiff Amaranth LLC . . . to reap handsome but illegal profits, while causing billions of dollars of losses to the Fund and its agent, Plaintiff Amaranth Advisors L.L.C." and "Advisors' business was so intertwined with the Fund's that J.P. Morgan's misconduct directly interfered with Advisors' business."); *see* Pl. Mem. at 63-64.

[127]     *See* Reply Memorandum of Law of Defendants Amaranth LLC, AIL, AP, and ACP in Further Support of Their Motions to Dismiss Plaintiffs' Corrected First Consolidated Class Action Complaint at 4-5.

[128]     *See* Memorandum of Law of Defendants Amaranth LLC, AIL, AP and ACP in Support of Their Motions to Dismiss Plaintiffs' Corrected First Amended Consolidated Class Action Complaint at 9-10.

allegations to render their claim "plausible."[129]  And while it is certainly possible

that the Master Fund was not referring in the brief to Amaranth Advisors L.L.C. as

its "agent" in the legal sense, this is an issue of fact that cannot be determined on a

motion to dismiss.[130]  Because I find that plaintiffs have pled adequate allegations

that an agency relationship existed between the Master Fund and Amaranth

Advisors, the Master Fund's motion to dismiss Count One is denied.[131]

### 6.    AP and ACP

Plaintiffs had failed to plead the existence of a principal-agent

relationship between AP and ACP and Amaranth Advisors sufficient to impose

---

[129]    *See Iqbal*, 490 F.3d at 157-58.

[130]    Of course, plaintiffs' mere allegation that the Master Fund used the
word "agent" to refer to Amaranth Advisors L.L.C. will not be enough to
withstand summary judgment.

[131]    While there are also allegations referring to the advisory relationship
between Amaranth Advisors and the Master Fund, the allegations are conclusory.
*See* Am. Compl. ¶¶ 270, 272 ("Amaranth LLC, per its agents Amaranth Advisors
and the employees of Amaranth Advisors, including Defendants Hunter and
Donohoe, engaged in the manipulative transactions that are the subject of this
action with the capital provided by the Feeder Funds . . . ." and "Although
Amaranth Advisors was 'authorized' to make investment decisions on behalf of
Amaranth LLC, Amaranth LLC continued to exercise full control over all trading
matters during the Class Period and maintained knowledge, influence and input
over all decisions, including the termination of Hunter's trading authority as of
September 20, 2006.").

vicarious liability on AP and ACP.[132]  Nevertheless, plaintiffs argue that the

allegations in their Amended Complaint now sufficiently demonstrate that

Maounis and Amaranth Advisors were the agents of AP and ACP.[133]  I agree.

Plaintiffs rely on the Advisory Agreements between Amaranth

Advisors and AP and ACP to demonstrate that Amaranth Advisors were agents of

AP and ACP.[134]  In particular, plaintiffs allege that under the Advisory

Agreements, Amaranth Advisors "had the authority to, *inter alia*, make all

investment and trading decisions on behalf of [AP] and [ACP]."[135]  In addition, the

Advisory Agreement expressly authorized Maounis to "appoint the portfolio

managers and traders for each portfolio or sub-portfolio of [AP's] and [ACP's]

investments, at [] Maounis'[] discretion."[136]  Finally, plaintiffs allege that AP and

ACP retained the authority to approve certain transactions proposed by Amaranth

Advisors "that would otherwise potentially present an impermissible conflict of

---

[132]    *See In re Amaranth*, 587 F. Supp. 2d at 546-47.

[133]    *See* Pl. Mem. at 67-69.

[134]    *See* Am. Compl. ¶¶ 276; 279-281.

[135]    *Id.* ¶ 279.

[136]    *Id.* ¶ 280.

interest under the Investment Advisers Act of 1940."[137]  These allegations are
sufficiently specific, making it plausible to believe that AP and ACP had
authorized Amaranth Advisors to act on their behalf and that Amaranth Advisors
agreed to this grant of authority.  In addition, plaintiffs allege that AP and ACP
retained control by maintaining the authority to approve certain transactions.  AP's
and ACP's motion to dismiss Count One against them is therefore denied.

### 7.    AIL

I previously held that plaintiffs' allegations were "general, vague, and
conclusory" and therefore insufficient to support a conclusion that AIL would be
vicariously liable for the acts of Amaranth Advisors.[138]  Plaintiffs now argue that
they have corrected these deficiencies by adding allegations to show instead that
AIA and Maounis were the "broadly empowered agents" of AIL.[139]

Plaintiffs allege that pursuant to an Advisory Agreement between
AIA and AIL, AIA "was vested with plenary authority to invest and trade AIL's

---

[137]    *Id.* ¶ 281.

[138]    *In re Amaranth*, 587 F. Supp. 2d at 547.

[139]    *See* Pl. Mem. at 64-67.  It is worth noting that there are no allegations
in the Amended Complaint that AIA was a principal, and plaintiffs have not
attempted to make this argument in their opposition papers.

substantial investment assets."[140]  In addition, AIA is alleged to have had "express authority on behalf of and in the name of AIL" to execute a number of tasks, including guaranteeing AIL's obligations, selling or disposing of AIL's property and liabilities, and negotiating and entering into derivative and other financial instruments for AIL.[141]  However, while these allegations may be sufficient to plead the existence of an agency relationship between AIL and AIA, plaintiffs have not pled that AIA was in any way involved in the manipulation complained of in this action.  Thus, no vicarious liability can be imposed on AIL because AIA is not alleged to have engaged in misconduct.

Plaintiffs also allege in conclusory terms that AIA was "controlled by [] Maounis."[142]  At best, however, this allegation indicates that AIA was an agent of Maounis.  To the extent that plaintiffs are suggesting that Maounis' control of AIA somehow made him an agent of AIL, their argument must fail.  The acts for which Maounis may be liable – aiding and abetting Hunter's and Donohoe's manipulation of spread and settlement prices – were undertaken on behalf of Amaranth Advisors, not AIA.  Plaintiffs do not allege that Maounis engaged in

---

[140]    Am. Compl. ¶ 255.

[141]    *Id.*

[142]    *Id.* ¶ 274.

any wrongdoing in his role as "controller" of AIA. Count One must therefore be dismissed with respect to AIL.[143]

## V.    CONCLUSION

For the reasons discussed above, defendants' motions to dismiss are granted in part and denied in part. Because plaintiffs have already had limited discovery in the case and an opportunity to correct the deficiencies of their Complaint after extensive briefing by all parties on the first motion to dismiss, the claims that are dismissed by this Opinion and Order are done so *with prejudice*.

The Clerk of the Court is directed to close these motions [for case no. 07 Civ. 6377, document nos. 163, 166, 169, 174, 177, 178, 181; for case no. 07 Civ. 7181, document nos. 74, 80, 82; for case no. 07 Civ. 7592, document nos. 73, 79, 81; and for case no. 07 Civ. 7943, document nos. 59, 65, 67]. A conference is scheduled for May 11, 2009, at 5:30 p.m.

---

[143]    Because I find that plaintiffs have failed to state a claim for relief against AIL, there is no need to consider whether this Court has personal jurisdiction over AIL.

45

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 27, 2009

**- Appearances -**

## For Plaintiffs:

Bernard Persky, Esq.
Gregory Scott Asciolla, Esq.
Labaton Sucharow, LLP
140 Broadway
New York, NY 10005
(212) 907-0868

Christopher Lovell, Esq.
Ian Trevor Stoll, Esq.
Lovell Stewart Halebian LLP
500 Fifth Avenue
New York, NY 10110
(212) 608-1900

Vincent Briganti, Esq.
Geoffrey Milbank Horn, Esq.
Lowey Dannenberg Cohen & Hart, P.C.
White Plains Plaza
One North Broadway, Suite 509
White Plains, NY 10601
(914) 997-0500

Robert M. Rothman, Esq.
Samuel Howard Rudman, Esq.
Fainna Kagan, Esq.
Coughlin, Stoia, Geller, Rudman &
Robbins, LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Louis Fox Burke, Esq.
Leslie Wybiral, Esq.
Louis F. Burke, P.C.
460 Park Avenue, 21st Floor
New York, NY 10022
(212) 682-1700

Christopher J. Gray, Esq.
Christopher J. Gray PC
460 Park Avenue, 21st Floor
New York, NY 10022
(212) 838-3221

**For Defendants Amaranth Advisors L.L.C., Amaranth Advisors (Calgary) ULC, Amaranth Group Inc., Amaranth Management Limited Partnership, Amaranth International Advisors, L.L.C.:**

David Emilio Mollon, Esq.
Steven Michael Schwartz, Esq.
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
(212) 294-4748

Kristen Victoria Grisius, Esq.
Stephen J. Senderowitz, Esq.
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-6062

**For Defendant Nicholas M. Maounis:**

Geoffrey Aronow, Esq.
Catherine Risdon Murphy, Esq.
Bingham McCutchen LLP
2020 K Street, NW
Washington, DC 20006-1806
(202) 912-2000

Peter Curtis Neger, Esq.
Theo J. Robins, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022
(212) 705-7961

**For Defendant ALX Energy, Inc.:**

Steven R. Goldberg, Esq.
One North End Avenue, Suite 1107
New York, NY 10282
(212) 845-5100

**For Defendant Brian Hunter:**

Michael Sangyun Kim, Esq.
Zaharah Rachel Markoe, Esq.
Kobre & Kim LLP
800 Third Avenue
New York, NY 10022
(212) 586-9151

**For Defendant Amaranth LLC:**

Amelia Temple Redwood Starr, Esq.
Sheldon Leo Pollock, III, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
(212) 450-4516

**For Defendant Amaranth International Ltd.:**

Adam Selim Hakki, Esq.
Herbert S. Washer, Esq.
Kirsten N. Cunha, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-4924

**For Defendant TFS Energy Futures LLC:**

Karl Geercken, Esq.
Alan Mark Kanzer, Esq.
Amber C. Wessels, Esq.
Craig Carpenito, Esq.
Alston & Bird, LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

**For Defendant Matthew Donohoe:**

Brijesh Pradyuman Dave, Esq.
Joshua Adam Levine, Esq.
Mark J. Stein, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-3315

**For the J.P. Morgan Defendants:**

Daniel John Toal, Esq.
Eric S. Goldstein, Esq.
Marguerite Sophia Dougherty, Esq.
Mark Floyd Pomerantz, Esq.
Jason Harold Wilson, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3869