UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: AMARANTH NATURAL GAS COMMODITIES LITIGATION <br><br> This Document Relates To: <br><br> ALL ACTIONS | MASTER FILE NO. 07 Civ. 6377 (SAS) <br><br> **ECF Case** |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

### REDACTED VERSION

**LOVELL STEWART HALEBIAN LLP**
Christopher Lovell (CL 2595)
Gary S. Jacobson (GJ 2481)
Ian T. Stoll (IS 3424)
61 Broadway, Suite 501
New York, NY 10006
(212) 608-1900
(212) 719-4677 (fax)

**LOUIS F. BURKE, P.C.**
Louis F. Burke (LB 4686)
Leslie Wybiral (LW 0629)
460 Park Avenue, 21st Floor
New York, NY 10022
(212) 682-1700
(212) 808-4280 (fax)

**LOWEY DANNENBERG COHEN & HART, P.C.**
Vincent Briganti (VB 1497)
Geoffrey M. Horn (GH 4179)
White Plains Plaza
1 North Broadway, 5th Floor
White Plains, NY  10601
(914) 997-0500
(914) 997-0035 (fax)

*Co-Lead Counsel for Plaintiffs*

*Additional Counsel for Plaintiffs on Signature Page*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT…………………………...……………………………..1

STATEMENT OF FACTS…………………………………………………..…………...5

ARGUMENT…………………………………………………………….…………..5

A.   The Proposed Class Satisfies The Four Requirements of Rule 23(a)……..5

  1.   Rule 23(a)(1):  Numerosity Is Satisfied…………………………...5

  2.   Rule 23(a)(2):  Commonality Is Satisfied………………..………6

  3.   Rule 23(a)(3):  Typicality Is Satisfied………………………...……..7

  4.   Rule 23(a)(4):  Adequacy Is Satisfied…………………...…..…8

B.   The Two Requirements Of Rule 23(b)(3) Are Satisfied……………...…10

  1.   <u>Superiority</u>:  Class Litigation Is The Only, As Well As
      The Most, Fair And Efficient Means Of Resolving This
      Controversy………………………………………………………10

  2.   Common Issues Predominate………………………………………..11

    a.   <u>Pattern No. 1</u>:  Paying All-Time Record Prices To
        Continue Building Its Position……………………...…16

    b.   <u>Pattern No. 2</u>:  Admitting In Its IMs To Trading
        Intentionally In Order To Move And Manipulate
        Prices……………………………………………………16

    c.   <u>Pattern No. 3</u>:  Misrepresentations About The
        Positions And Trades Designed to Create And
        Prolong Artificial Prices…………………………………18

    d.   <u>Pattern No. 4</u>: Abusing Its Dominant Positions To
        Exceed The Limits Designed To Prevent Manipulation....18

    e.   <u>Pattern No. 5</u>:  Misleading the Regulators and The
        Market…………………………………………………...19

    f.   Plaintiffs Will Prove Whether Amaranth Caused
        Artificial Prices By Common Class-Wide Evidence……20

g.     Commodity Futures Markets Are Ideally Suited
       For Regression Analyses Isolating The Effect on
       Prices of A Given Event or Conduct…………………….…21

h.     The Particular Regression Analyses And Event Study
       Identified By Professor Gilbert Have Repeatedly Been
       Used In Comparable Situations And Will Be Very
       Workable To Determine Whether and To Isolate
       By How Much Amaranth Caused Artificial Prices…………22

i.     Even The Amount of Damages And The Daily
       Artificial Impact Suffered By Class Members
       Present Common Legal Questions…………………………24

CONCLUSION………………………………………………………………...…25

## TABLE OF AUTHORITIES

**Cases**

*Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52 (2d Cir. 2000) ........................ 10

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975)................................................................. 10, 13

*Brown v. Kelly*, 244 F.R.D. 222 (S.D.N.Y. 2007) .......................................................... 6

*Caridad v. Metro-North Commuter R.R. Co.*, 191 F.3d 283 (2d Cir. 1999) ................................ 7

*Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229 (2d Cir. 2007)................................................................................................ 7

*CFTC v. Amaranth Advisors, L.L.C.*, 554 F.Supp.2d 523 (S.D.N.Y. 2008)................................... 3

*CFTC v. Hunt*, 591 F.2d 1211 (7th Cir. 1979)................................................................. 19

*Computer Assoc. Int'l v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992)............................................. 16

*Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008)............................................ 18

*Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176 (S.D.N.Y. 2005)........................................... 7

*Forbush v. J.C. Penney Co.*, 994 F.2d 1101 (5th Cir. 1993) ................................................... 7

*Gen. Tel. Co. v. Falcon*, 457 U.S. 147 (1982) ................................................................. 7

*Great Western Food Distrib., Inc. v. Brannan,* 201 F.2d 476 (7th Cir. 1953) ............................. 21

*In re Amaranth Natural Gas Commodities Litig.*, 2009 WL 1138716 (S.D.N.Y. Apr. 27, 2009)................................................................. *passim*

*In re Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d 513 (S.D.N.Y. 2008) ...... *passim*

*In re Indiana Farm Bureau Cooperative Ass'n*, 1982 WL 30249 (CFTC Dec. 17, 1982) ........................................................... 19, 21

*In re Initial Public Offering Sec. Litig.*, 2009 WL 1649704 (S.D.N.Y. June 10, 2009) ........................................................... *passim*

*In re LTV Sec. Litig.*, 88 F.R.D. 134 (N.D. Tex. 1980) ..................................................... 10

*In re Nassau County Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006) ...................................... 11

*In re Natural Gas Commodities Litig.*, 231 F.R.D. 171 (S.D.N.Y. 2005) ............................ *passim*

*In re Soybean Futures Litig.*, No. 89 C 7009,
    1993 U.S. Dist. LEXIS 18738 (N.D. Ill. Dec. 27, 1993) ................................. *passim*

*In re Sumitomo Copper Litig.*, 194 F.R.D. 480 (S.D.N.Y. 2000) ......................................... *passim*

*In re Sumitomo Copper Litig.*, 182 F.R.D. 85 (S.D.N.Y. 1998) ........................................... passim

*Kline v. Wolf*, 702 F. 2d 400 (2d Cir. 1983) .................................................................. 9

*Kohen v. Pacific Investment Management Co. LLC,*
    244 F.R.D. 469 (N.D. Ill. 2007) ..................................................................... *passim*

*Leist v. Simplot*, 638 F.2d 283 (2nd Cir. 1980) ............................................................. 2

*Medicare Beneficiaries' Defense Fund v. Empire Blue Cross Blue Shield,*
    938 F.Supp. 1131 (E.D.N.Y. 1996) ........................................................... 18

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ............................... 2

*Miles v. Merrill Lynch & Co.*, 471 F.3d 24 (2d Cir. 2006) ........................................... 4, 5

*Minpeco, S.A. v. ContiCommodity Svcs., Inc.*, 673 F.Supp. 684 (S.D.N.Y. 1987) ...................... 20

*Minpeco, S.A. v. Hunt*, 718 F.Supp. 168 (S.D.N.Y. 1989) ............................................... 3

*Moore v. Painewebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002) ........................................... 12

*Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985) ........................................................ 2

*Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001) ................................ 7

*Sarlie v. Bruce,* 265 F.Supp. 371 (S.D.N.Y. 1967) ........................................................ 25

*Simplot v. Strobl*, 474 U.S. 1006 (1985) ..................................................................... 9

*Strobl v. New York Mercantile Exchange*, 582 F. Supp. 770 (S.D.N.Y. 1984) ........................ 3, 9

*Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363 (1966) ................................................... 10

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,*
    546 F.3d 196 (2d Cir. 2008) ..................................................................... 4

iv

**Rules**

Fed.R.Civ.P. 23 .................................................................................................... *passim*

**Other Authorities**

2007 Staff Report of the Permanent Subcommittee on Investigations of the United States Senate
entitled Excessive Speculation in the Natural Gas Market .......................................................... 3

ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS,
§ 4:25 (4th ed. 2005) ................................................................................................. 8, 11

Class Actions – Class Certification of Mass Torts, 110 Harv. L. Rev. 977 (1997) ........................ 2

*Manipulation May Be Hard To Prove In Sumitomo Case*, WALL STREET JOURNAL at C-1 (July
15, 1996) ............................................................................................................................. 3

Markham, *Manipulation of Commodity Futures Prices—The Unprosecutable Crime*, 8 YALE J.
ON REG. 281 (1991) ............................................................................................................. 3

Reference Manual on Scientific Evidence (Second Edition), Federal Judicial Center 2000 ........ 22

## PRELIMINARY STATEMENT

After two years and hundreds of pages of briefing, this Court has denied Defendants'

motions to dismiss Plaintiffs' claims for manipulation in primary violation of the Commodity

Exchange Act ("CEA") and aiding and abetting, principal-agent, or other CEA vicarious liability

for such manipulation.[1] *In re Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d 513

(S.D.N.Y. 2008) ("*Amaranth I*"); *In re Amaranth Natural Gas Commodities Litig.*, 2009 WL

1138716 (S.D.N.Y. Apr. 27, 2009) ("*Amaranth II*").

The foregoing lengthy briefing raised and this Court's lengthy decisions resolved

favorably to Plaintiffs literally dozens of questions of law or combined questions of law and fact.

Such questions concerned the elements of the foregoing types of CEA liability as applied to the

facts here, and the sufficiency of the facts (Plaintiffs' allegations) in support of those claims

against various Defendants.

So far in this litigation, literally every such question has been common to all class

members.  Plaintiffs now respectfully submit this memorandum, the accompanying declarations

of Charles Satterfield, Ian Stoll and Professor Christopher Gilbert, and the deposition testimony

of Professor Gilbert in support of Plaintiffs' motion to certify their foregoing CEA claims on

behalf of the following class pursuant to Fed.R.Civ.P. Rule 23(b)(3):

> All persons, corporations and other legal entities (other than Defendants, their
> employees, affiliates and co-conspirators) who purchased or sold New York Mercantile
> Exchange ("NYMEX") natural gas futures contracts (including miNY Henry Hub

---

[1]  The Defendants whose motions to dismiss have been denied are: Amaranth Advisors, L.L.C. ("Amaranth Advisors"), Amaranth Advisors (Calgary) ULC ("Amaranth Calgary"), Amaranth LLC ("Amaranth LLC" or "the Master Fund"), Amaranth Partners LLC ("Amaranth Partners"), Amaranth Capital Partners LLC ("Amaranth Capital Partners"), Nicholas M. Maounis ("Maounis"), Brian Hunter ("Hunter"), Matthew Donohoe ("Donohoe") (collectively the "Amaranth Defendants"), and ALX Energy, Inc. ("ALX"), James DeLucia ("DeLucia") (collectively the "Floor Broker Defendants").

natural gas futures contracts), between February 16, 2006 and September 28, 2006[2] ("Class Period").

To be certified for class treatment, Plaintiffs must meet the four requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy—and show that the action is "maintainable" under one of the three subsections of Rule 23(b).  *In re Initial Public Offering Sec. Litig.*, Master File No. 21 MC 92 (SAS), 2009 WL 1649704 at \*6 (S.D.N.Y. June 10, 2009) ("*IPO*") (citations omitted).  Under subsection (3) of Rule 23(b), "common" questions of law or fact must "predominate over any questions affecting only individual members," and a class action must be demonstrably "superior" to other methods of adjudication.  *Id*. at \*7.

In construing the foregoing requirements, the policy benefits of class actions require that Rule 23 be "given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility."  *Id*. at \*6 (citations omitted); *see also Phillips Petroleum v. Shutts*, 472 U.S. 797, 809 (1985); Class Actions – Class Certification of Mass Torts, 110 Harv. L. Rev. 977, 978 (1997) (a negative value claim is a claim that costs more to prosecute than may be recovered in damages).

Although *IPO* was a securities manipulation class action, class actions alleging CEA manipulation provide a valuable supplement to Commodity Futures Trading Commission ("CFTC") enforcement of the CEA.  *Leist v. Simplot*, 638 F.2d 283, 304 (2nd Cir. 1980), *aff'd, Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982).  In fact, class actions have been the only or primary deterrent to long term commodity futures manipulations of multiple expirations of a futures contract (as is alleged here).  *Compare* 2007 Staff Report of the Permanent Subcommittee on Investigations of the United States Senate entitled Excessive

---

[2] Whenever the terms "NYMEX natural gas futures contracts" or "natural gas futures contracts" are used in these moving papers, including the supporting declarations, it includes the miNY Henry Hub natural gas futures contracts.

2

Speculation in the Natural Gas Market ("Staff Report") (criticizing the CFTC's unwillingness or inability to bring long term manipulation cases as opposed to manipulation "just for contracts near expiration.")"  *Id*. at 7-8.[3] *with*

> • *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 179 (S.D.N.Y. 2005) (certifying class of **both short and long traders** in more than **sixty contracts** over a **three year** Class Period);

> • *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 87 (S.D.N.Y. 1998) ("*Sumitomo I*") (certifying a two-year class both of long traders and short traders in more than 36 contracts for a duration of over two years); and

> • *In re Sumitomo Copper Litig.*, ("*Sumitomo II*") 194 F.R.D. 480 (S.D.N.Y. 2000), *appeal denied*, 262 F.3d 134 (2d Cir. 2001) (same but 30-month class period).

Third, virtually the opposite of the relative roles of the Securities Exchange Commission ("SEC") and private parties in the enforcement of the federal securities laws, the CFTC has reportedly never won a contested case of CEA manipulation whereas private plaintiffs have repeatedly won contested trials of CEA manipulation claims.  *Compare Minpeco, S.A. v. Hunt*, 718 F.Supp. 168 (S.D.N.Y. 1989) *and Strobl v. New York Mercantile Exchange*, 582 F.Supp. 770 (S.D.N.Y. 1984), *aff'd* 768 F.2d 22 (2d Cir. 1985) *with* Markham, *Manipulation of Commodity Futures Prices—The Unprosecutable Crime*, 8 Yale J. On Reg. 281, 356 and n. 502 (1991); *see also Manipulation May Be Hard To Prove In Sumitomo Case*, Wall Street Journal at C-1 (July 15, 1996).

Therefore:

---

[3] Consistent with such criticism, the CFTC in this case has brought a very limited enforcement action for manipulation against some of the Defendants herein.  But the CFTC has limited **the manipulation claim to the final few minutes of trading in just two contracts "for expiration", and has also made a claim of misrepresenting facts to the exchange to further such manipulation.**  *Amaranth I*, 587 F.Supp.2d at 526 n. 65 (citing *CFTC v. Amaranth Advisors, L.L.C.*, 554 F.Supp.2d 523 (S.D.N.Y. 2008)).

Notably, even as to this extremely limited period, the CFTC is not seeking therein to create a fund for the compensation of investor losses caused by the manipulation.

> Federal courts have long recognized the suitability of class actions for securities and commodities fraud cases. In cases involving securities or commodities fraud, there are frequently large numbers of investors who have relatively small stakes in the outcomes and who would be deterred from proceeding with lawsuits absent the availability of the class action.

*Sumitomo I.*, 182 F.R.D. at 89 (citation omitted).

Thus, the extensive remedial and deterrence benefits of certifying classes of CEA manipulation claims such as this one warrant the same "liberal construction" of Rule 23's requirements as was described by this Court in *IPO*.

Under such construction, Plaintiffs' evidence demonstrates that the proposed class satisfies, by a preponderance of the evidence, *IPO*, 2009 WL 1649704 at *6 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008)), each Rule 23 requirement in the same ways that previous CEA manipulation claim classes have satisfied Rule 23(b)(3) certification and been left undisturbed on petition for review. *E.g., Kohen v. Pacific Investment Management Co. LLC*, 244 F.R.D. 469 (N.D. Ill. 2007), *aff'd*, 571 F.3d 672 (7th Cir. July 7, 2009) (Posner, J.) ("*PIMCO*"); *Natural Gas*, 231 F.R.D. at 179; *Sumitomo I*, 182 at F.R.D. 85; *Sumitomo II*, 194 F.R.D. 480 (S.D.N.Y. 2000), *appeal denied*, 262 F.3d 134 (2d Cir. 2001) ("*Sumitomo II*"); *In re Soybean Futures Litig.*, No. 89 C 7009, 1993 U.S. Dist. LEXIS 18738 (N.D. Ill. Dec. 27, 1993) (Report and Recommendation certifying a five-week class of both longs and shorts in two separate futures contracts, adopted by Court on January 26, 1994, as reflected at 892 F. Supp. 1025, 1031 n. 1 (N.D. Ill. 1995) ("*Soybeans*").

To be sure, the standards set forth in *Miles v. Merrill Lynch & Co*., 471 F.3d 24 (2d Cir. 2006) ("*Miles I*"), *reh'g denied*, 483 F.3d 70 (2d Cir. 2007) ("*Miles II*"), now require Plaintiffs to submit evidence establishing, and this Court to determine that Plaintiffs have established, each of those Rule 23 requirements. *Miles I*, 471 F.3d at 41. (In making such determinations, however,

the Court "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *Id*.; *see also IPO*, 2009 WL 1649704 at *6.)

Plaintiffs' accompanying declarations and evidence establish, under *Miles I*, that the proposed class satisfies the four requirements of Rule 23(a) and the two pertinent requirements of Rule 23(b)(3).

## STATEMENT OF FACTS

The facts have been set forth in the context of Argument below.

## ARGUMENT

### A.   The Proposed Class Satisfies The Four Requirements of Rule 23(a)

#### 1.   Rule 23(a)(1): Numerosity Is Satisfied

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, Plaintiffs submit evidence of the CFTC "commitment of traders" reports and NYMEX floor traders showing that there are approximately 1,000 such large and floor traders. Stoll Decl. at ¶¶4-6. Large traders and floor traders are, relatively, only a small number of the total futures traders in a given market. Satterfield Decl.¶10.

From the foregoing evidence it may reasonably be inferred that there are well in excess of 1,000 class members. Stoll Decl. at ¶6. Prior CEA cases have found the numerosity requirement to be satisfied on similar facts and methodology. *Natural Gas*, 231 F.R.D. at 179 (certifying claims of traders of NYMEX natural gas futures contracts); *see also PIMCO*, 244 F.R.D. at 476; *Sumitomo I*, 182 F.R.D. at 89. Indeed, any more than forty class members would likely satisfy the Rule 23(a)(1) numerosity requirement. *See IPO*, 2009 WL 1649704 at *6. Based on the foregoing evidence, Plaintiffs have established that joinder of all members is clearly impracticable.

### 2.      Rule 23(a)(2):  Commonality Is Satisfied

Rule 23(a)(2) requires that common questions of law or fact affect all class members. Courts have held that even one common question of law satisfies this (relatively low) standard. *Brown v. Kelly*, 244 F.R.D. 222, 230 n. 57 (S.D.N.Y. 2007).

Here, all Plaintiffs and class members make the exact same legal claim for manipulation, the exact same legal claim for aiding and abetting liability therefor, and the exact same legal claim for principal-agency and other vicarious CEA responsibility for CEA manipulation.  ¶¶ 486-518; *see Amaranth II*, 2009 WL 1138716 at *1-3.

As more than one hundred pages of prior opinions by this Court in this very case demonstrate, the elements of the CEA manipulation claims and of each of the foregoing other CEA claims present literally dozens of extensive, complex and sharply contested legal questions that are common to the claims of all class members in this case.  *Compare Amaranth I*, 587 F.Supp.2d at 530 n. 104, *with Sumitomo I*, 182 F.R.D. at 89-90.

Prior CEA cases have found the commonality requirement to be satisfied on far less extensive common questions of law.  *PIMCO,* 244 F.R.D. at 477; *Natural Gas,* 231 F.R.D. at 181-82; *Sumitomo II,* 194 F.R.D. at 482; *Sumitomo I,* 182 F.R.D. at 89-90; *Soybeans,* 1993 U.S.Dist.LEXIS at *34-35.

Indeed, there is a relative lack of U.S. assets of the Defendants responsible for primary CEA manipulation in this case.  There are many times greater U.S. and other assets held by Defendants who remain in the case only for CEA aiding and abetting, CEA principal-agent or other CEA vicarious liability for the manipulation here.  *See* n. 1.

This means that the CEA vicarious liability and aiding and abetting claims---the legal and factual questions in which are 100% common to all Class members---are critical, overarching

common issues to any recovery of damages in this case. Such overarching common questions did not exist in *Sumitomo I, Sumitomo II, Natural Gas, PIMCO* or *Soybeans*. The application of these extensive common questions of law to the evidence will likely continue to permeate this case through the remainder of this litigation including at the summary judgment stage, in post-trial motions and appeals.

### 3.    Rule 23(a)(3):  Typicality Is Satisfied

The claims of the representative parties must be typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). This requirement is "not demanding." *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005) (citing *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993)). A named plaintiff's claims are typical where "each class member's claims arise from the same course of conduct or events and each class member makes similar legal arguments to prove the defendant's liability." *IPO*, 2009 WL 1649704 at * 6 (quoting *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244-45 (2d Cir. 2007) (quoting *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).[4]

The latter requirement is satisfied because all class members "make similar legal arguments." *See* sub-point 2 *supra* regarding the literally dozens of common legal questions within each Class member's exact same legal claim. All Plaintiffs and all class members have made and will for the remainder of the litigation make not just similar but the **same** legal claims and arguments under the CEA. Therefore, Plaintiffs' claims are extremely typical here. *See* sub-point 2 *supra*.

---

[4] Accordingly, the commonality and typicality requirements "'tend to merge' because 'both serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately represented in their absence.'" *Caridad v. Metro-North Commuter R.R. Co.*, 191 F.3d 283, 291 (2d Cir. 1999) (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n. 13 (1982)).

Finally, each class member's claim arises from the same course of events.  *IPO*, 2009 WL 1649704 at *6.  That is, all members of the sculpted class transacted in the same standardized and fungible NYMEX natural gas futures contracts (the only difference being the date of expiration and the price), in the same centralized marketplace, allegedly polluted by the same common course of manipulative conduct for which the same course of hedge fund conduct is alleged to be legally responsible in damages.

Prior CEA cases have found the typicality requirement to be satisfied on much lesser facts that did not involve the second common course of conduct present here involving the hedge fund members and managers and whether a damages recovery could be had against them for the common course of manipulative conduct.  Such cases have noted that Rule 23(a)(3) is "liberally construed," and "typical" does not mean "identical."  *PIMCO,* 244 F.R.D. at 477; *Natural Gas,* 231 F.R.D. at 184; *Sumitomo II,* 194 F.R.D. at 482; *Sumitomo I*, 182 F.R.D. at 94-95; *Soybeans*, 1993 U.S.Dist.LEXIS at *34-35.[5]

### 4.      Rule 23(a)(4):  Adequacy Is Satisfied

Plaintiffs must show that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).

---

[5] To be typical, the named Plaintiffs need not have invested in all NYMEX natural gas futures contracts traded during the Class Period, nor need they have invested throughout the Class Period.  *Prudential*, 163 F.R.D. at 208 (typicality "does not require" plaintiffs to "invest in all related partnerships that are the subject of the action"); *Sumitomo I*, 182 F.R.D. at 94.  *See also* 1 NEWBERG ON CLASS ACTIONS § 3.13 at 2-76 (the typicality requirement is usually met "when it is alleged that the same unlawful conduct was directed at or affected both the named plaintiffs and the class sought to be represented").  For this reason, inevitable differences among the proposed class representatives and other members of the class do not defeat typicality.  Rather, "when inquiring into the typicality requirement under Rule 23(a)(3), the focus must be on the defendants' behavior and not that of plaintiffs."  *Sumitomo II*, 194 F.R.D. at 482.

Rule 23(a)(4) "adequacy" is satisfied by adequate counsel and an absence of unmanageable and irreconcilable conflicts between the named Plaintiffs and the Class. *IPO*, 2009 WL 1649704 at *6.

Counsel here are adequate. Their experience is set out in the firm biographies of interim Class Counsel appointed by this Court, attached as Exhibits A1-3 to the Stoll Decl. Various of such counsel have successfully conducted antitrust, securities and commodity futures class actions, and successfully tried commodity futures manipulation claims.[6] Plaintiffs and interim Class counsel have, they respectfully submit, vigorously investigated, developed and prosecuted Plaintiffs' claims to date.

Rule 23(a)(4)'s remaining prong, absence of unmanageable conflicts between the representative parties and other class members, is also satisfied. A "court must be wary of a defendant's efforts to defeat representation of a class on grounds of inadequacy when the effect may be [and defendants' obvious desire is] to eliminate any class representation." *See Kline v. Wolf*, 702 F. 2d 400, 402 (2d Cir. 1983).

Here, each and every class member and Plaintiff wants (a) to prove the existence of the Defendants' intent to manipulate, misleading of the regulators, and other manipulative conduct, (b) to develop the database of "objective historical facts" necessary to engage in the "largely mathematical enterprise"[7] of demonstrating that such conduct had an artificial impact on prices in violation of the CEA, (c) to demonstrate the amount of such artificial impact, and (d) to prove

---

[6] *E.g., In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 395 (S.D.N.Y. 1999) ("The recovery is the largest class action recovery in the 75 plus year history of the Commodity Exchange Act."). *See Strobl v. New York Mercantile Exchange*, 582 F. Supp. 770 (S.D.N.Y. 1984) (denying defendant's motion for JNOV), *aff'd*, 768 F.2d 22 (2d Cir.), *cert. denied sub nom. Simplot v. Strobl*, 474 U.S. 1006 (1985).

[7] *Sumitomo I*, 182 F.R.D. at 92; *In re LTV Sec. Litig.*, 88 F.R.D. 134, 141, 149 (N.D. Tex. 1980); *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975).

the overarching issues of CEA aiding and abetting, CEA principal-agent and other vicarious CEA liability.

Finally, differences (or lack of sameness) among class members who purchased, sold or held futures contracts do not equal a conflict much less an unmanageable one.  Indeed, prior CEA cases have found the adequacy requirement to be satisfied on much lesser facts.  *Compare* Plaintiffs' Proposed Trial Plan *with Natural Gas,* 231 F.R.D. at 183 (buyers and sellers); *Sumitomo II,* 194 F.R.D. at 483 (buyers and sellers); and *Sumitomo I,* 182 F.R.D. at 95-96.[8]

**B.     The Two Requirements Of Rule 23(b)(3) Are Satisfied**

**1.     <u>Superiority</u>:  Class Litigation Is The Only, As Well As The Most, Fair And Efficient Means Of Resolving This Controversy**

Rule 23(b)(3) has two prongs, both of which are easily satisfied here.  The second prong requires Plaintiffs to demonstrate that the class action mechanism is the most "fair and efficient" method of resolving the case.  Here, Plaintiffs are aware of no other civil lawsuits filed to date to seek redress for this manipulation.  This is unsurprising given the high costs of litigation and "negative value" of the claims.  They render a class action the only means of adjudicating this controversy.

Thus, this is the only action by which the claims of the victims of the alleged long term manipulation, which have been upheld in two earlier decisions of this Court, may be vindicated. *Amaranth II*, 2009 WL 1138716; *Amaranth I*, 587 F.Supp2d 513.  Therefore, it is very fair that this case proceed as a class action.  *See* policy, deterrence and remedial benefits of CEA manipulation claims recounted in Argument Point I *supra*.  Plaintiffs foresee no problems in the

_____

[8] The Supreme Court has "expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance."  *IPO*, 2009 WL 1649704 at *6 & n. 87 (quoting *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp*., 222 F.3d 52, 61 (2d Cir. 2000), citing *Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, 370-74 (1966)).

management of this lawsuit.  *See Sumitomo I,* 182 F.R.D. at 97 (noting legal requirement that daily trading records be preserved).

### 2.      Common Issues Predominate

The remaining prong of Rule 23(b)(3) requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." *See* Rule 23(b)(3); *see also IPO*, 2009 WL 1649704 at *6.  "The very definition of the requirement of the predominance of common questions contemplates that individual issues will remain after the common issues are adjudicated."  1 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS, § 4:25 at 4-82 (4th ed. 2005).

In assessing "predominance," the Second Circuit has articulated possibly different reference points.  In *In re Nassau County Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006), the court ruled that "all factual or legal issues that are common to the class inform the analysis." This language seems to include an analysis of all common questions throughout the course of the case: the pleadings, motion to dismiss, discovery, summary judgment, motions *in limine*, trial, post-trial and appeal stages.

The Second Circuit also may have articulated the predominance inquiry as focusing only on the proof portions (summary judgment, trial, post-trial) of the overall litigation:  "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. Painewebber, Inc.*, 306 F.3d 1247, 1252-53 (2d Cir. 2002).  But this latter statement does **not** purport to be exclusive.  Also, this "trial" reference point has been reduced to only the trial of liability issues:

> The requirement of predominance is met where, as here, there is a showing of predominance of common questions at the liability stage of the litigation, rather than at the damages stage.  *See Sumitomo I*, 182 F.R.D. at 91 (citation omitted).

*Natural Gas,* 231 F.R.D. at 180-81 (certifying a three-year class of both long and short sellers).

Whatever reference point is used to assess the predominance of common questions on this motion, Plaintiffs have demonstrated that common questions will predominate over individual ones.

**Entire Litigation**.  Again, in all of the joint and individual motions to dismiss filed against the two consolidated complaints, no argument was directed at fewer than all Plaintiffs; no Defendant distinguished among the Plaintiffs in arguing against the sufficiency of the complaints.  The experience of the motions to dismiss in this case was that all questions of the elements of manipulation and elements of agency, aiding and abetting and other liability therefor were common to all class members.  *See* analysis of FRCP Rule 23(a)(2) supra.  This suggests that the motion for summary judgment, post-trial motions and even discovery issues and *in limine* motions concerning the scope of the allowable legal claim will all also present questions that are 100% common to all class members.

Further, the overarching Amaranth-centric questions of CEA aiding and abetting and CEA vicarious responsibility that are critical to this CEA manipulation case through discovery as well as at trial, but were absent in prior CEA cases, greatly adds to the common questions here.

**Trial or Proof of Case Alone.**  Although not required for Rule 23(b)(3), here the same common class-wide proof may establish all elements of each class member's claim.

**Maounis.**  All Class members will need, in order to recover damages, to prove Maounis'

CEA liability for aiding and abetting the manipulation.[9]  Proof of this conduct will be common to

the Class.  This class-wide proof includes Maounis' close monitoring of (a) trading activity as CEO of the Amaranth entities, including Defendants' correspondence with each other and to other market participants concerning their trading and trading plans, (b) the volume and timing of their trades, (c) the repetition of their trading methods, (d) Defendants' serial violations of position limits, (e) their shifting of positions to ICE, and (f) their misrepresentations to and stonewalling of the regulators.  *See Amaranth I*, 587 F.Supp.2d at 543; *Amaranth II*, 2009 WL 1138716 at *9.  Any countervailing arguments by Maounis will raise additional common issues as to his liability, which common issues will predominate.

**Amaranth Advisors LLC and Amaranth Advisors (Calgary) ULC ("Amaranth Advisors").**  All Class members will need, in order to recover damages, to prove Amaranth Advisors' CEA vicarious liability (under the doctrine of respondeat superior) for the conduct of its agents Hunter and Donohoe.  They will do so by proof common to the Class.  *See Amaranth I*, 587 F.Supp.2d at 541; *Amaranth II*, 2009 WL 1138716 at *6-8, 12.

**Amaranth LLC (the "Master Fund").**  All Class members will need, in order to recover damages, to prove the Master Fund's CEA liability under the doctrine of respondeat superior for the conduct of its agent Amaranth Advisors, by proof common to the Class.  Such common proof will include statements made by Amaranth LLC in litigation also arising from Defendants' trading in natural gas futures contracts in 2006.  *Amaranth II*, 2009 WL 1138716 at *12.

---

[9]  "The amount of damages is invariably an individual question and does not defeat class action treatment . . . should the class prevail the amount of the price inflation during the period can be charted and the process of computing individual damages will be virtually a **mechanical** task."  *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) (citations omitted) (emphasis added).

**Amaranth Partners and Amaranth Capital Partners (the "Feeder Funds").**  All Class members will need, in order to recover damages, to prove the Feeder Funds' CEA liability under the doctrine of respondeat superior for the conduct of their agents Maounis and Amaranth Advisors, by proof common to the Class.  Such common proof will include the terms of the Advisory Agreements between Amaranth Advisors and the Feeder Funds, such as those conferring on Amaranth Advisors authority to make all investment and trading decisions, and authorizing Maounis to appoint traders and portfolio managers, for the Feeder Funds' investments.  *Amaranth II*, 2009 WL 1138716 at *13.

**Hunter, Donohoe and all Defendants**.  Finally, all class members also need to prove a claim for manipulation against at least Defendants Hunter, Donohoe, or others.

This Court identified four elements of each class member's claim for manipulation: Defendants (1) intended (2) to cause, and (3) did have the ability to cause (4) artificial prices. This Court held that the Plaintiffs' allegations of each of these four elements have been well-pleaded.  *Amaranth I*, 587 F.Supp.2d at 530; *Amaranth II*, 2009 WL 1138716 at *5.  Plaintiffs now intend to prove for each class member each such element of manipulation through the same common class-wide proof.

Common to all class members is Plaintiffs' following set of assertions:

(A) Amaranth held "dominant positions" in natural gas which caused artificial NYMEX natural gas prices during the Class Period (¶ 235);

(B) Indeed, as Amaranth's positions continually increased, they caused a gradually increasing distortion in NYMEX prices; when Amaranth's positions were rapidly reduced and removed from the market, the price distortion was rapidly eliminated.  Regarding the alleged

gradual increase in Amaranth's positions and corresponding gradual increases in distortions of prices, Plaintiffs have contended:

|  | DATE | AMARANTH'S NET LONG POSITION | AMARANTH'S NET SHORT POSITION | TOTAL OPEN | OCT 2006 – JAN 2007 SPREAD |
|---|---|---|---|---|---|
| ¶ 75(a) | December 1,2005 | 24,255 | 18,689 | 42,914 | 1.310 |
| ¶ 75(b) | January 3, 2006 | 37,149 | 34,990 | 72,139 | 1.455 |
| ¶ 75(c) | February 1, 2006 | 45,451 | 69,998 | 124,449 | 2.070 |
| ¶ 75(d) | March 1, 2006 | 81,470 | 93,995 | 175,425 | 2.825 |
| ¶ 75(e) | April 3, 2006 | 104,615 | 102,698 | 207,313 | 2.805 |
| ¶ 75(f) | May 1, 2006 | 125,122 | 119,967 | 245,189 | 3.620 |
| ¶ 75(g) | June 1, 2006 | 206,893 | 200,586 | 407,479 | 3.000 |
| ¶ 75(h) | July 5, 2006 | 243,824 | 233,073 | 476,897 | 3.760 |
| ¶ 75(i) | August 1, 2006 | 308,640 | 294,400 | 603,040 | 3.625 |
| ¶ 75(j) | September 1,2006 | 308,253 | 286,202 | 594,455 | 4.685 |

As and after Amaranth's positions were eliminated, such spreads rapidly collapsed back to near normal levels.  For example, the October 2006 – January 2007 spread fell by 69% to $1.45. ¶ 6c.

(C)     Amaranth intended to and did use its positions to manipulate and move prices as much as possible in favor of its positions.

Defendants have denied the foregoing allegations.  *See*, *e.g.*, Defendant Amaranth Advisors' Answer; Docket No. 209 at ¶¶ 2-7.  Although Defendants have created numerous excuses, they generally argue that their large positions and conduct were motivated by normal trading fundamentals, including the weather.

Regarding Amaranth's possible explanations for its dominant positions and conduct, manipulative intent is the *sine qua non* of manipulation.  *Amaranth II,* 2009 WL 1138716 at *6.

Intent is inferred from circumstances.  *PIMCO*, 244 F.R.D. at 482.  In this case, there are at least four different patterns of circumstances which each Plaintiff may prove on behalf of all Class members to establish Amaranth's manipulative intent.

15

In this regard, the Plaintiff is the "master of his own case," *Computer Assoc. Int'l v. Altai, Inc.*, 982 F.2d 693, 715 (2d Cir. 1992), and Plaintiffs here intend to prove their claims through common class-wide evidence.

Plaintiffs plan to submit voluminous evidence and proof of each of the following five patterns of Amaranth's behavior.  Individually or collectively, each pattern demonstrates that Amaranth specifically intended its course of conduct to manipulate and move prices rather than trade normally or profit from normal trading on the fundamentals.

    **a.  <u>Pattern No. 1</u>:  Paying All-Time Record Prices To Continue Building Its Position**

Amaranth repeatedly paid increasing all-time record prices in order to build up dominant positions.  One can profit from the fundamentals without dominant positions, much less a dominant position that is contrary to one's own commercial interests.  Satterfield Decl.¶ 36.  But a dominant position is very helpful to manipulation and was once regarded as a prerequisite to the ability to cause any very significant artificial prices.

    **b.  <u>Pattern No. 2</u>:  Admitting In Its IMs To Trading Intentionally In Order To Move And Manipulate Prices**

Consistent with its dominant position, Amaranth repeatedly admitted in its instant messages that Amaranth was trading explicitly in order to move prices the most.

This is the opposite of the normal trading procedure which is undertaken in order to lose as little or make as much as possible from hoped for changes in the fundamentals.  Satterfield Decl.¶36.  That procedure is to purchase as cheaply as possible so as to be able to profit (or avoid loss) when the hoped for reports on the fundamentals move the market.

Amaranth traders tried to keep their manipulative conversations out of writing.  ¶306.  However, in 61 separate conversations on 25 separate days, Amaranth traders wrote that they were making specific trades to do exactly what the overall correlations (¶ 346) and pattern show

that they did: move prices and increase the artificiality in prices and spreads.  ¶¶ 81, 83, 316, 318, 338, 345, 352, 373; see "A2" *supra*.

In Amaranth's traders' and managers' own written words, Amaranth traded explicitly in order to:

Redacted

Again, this trading in order to move prices is the exact opposite of normal trading procedure.  Such procedure is to establish and liquidate positions at the **cheapest** prices possible and move prices the least possible.  Satterfield Decl.¶¶ 23, 36.

Not only did Amaranth trade in the opposite manner of normal procedure, but Amaranth, per its head trader, Defendant Brian Hunter, intentionally sought and looked to trade in

Redacted                    ¶ 424 (Defendant Hunter).

This Court has previously held that even one IM could show intent for the entire positions.  *Amaranth I*, 587 F.Supp.2d at 540-41; *Amaranth II*, 2009 WL 1138716 at *7. Therefore, each IM is common proof for all class members of Amaranth's manipulative intent. And every class member will want to establish each IM, the pattern of IMs and the manipulative intent they betray.

And Defendants have of course disputed Plaintiffs' interpretations of all of the IMs.  *See* Defendants' Answers; Docket Nos. 207-213 at ¶¶ 105-46, 300, 315-476.  The Court acknowledged that deciphering the meanings of some of the IMs "because of the various

17

abbreviations and jargon used by the participants. . . ." was not free from difficulty.  *Amaranth II*, 2009 WL 1138716 at *7.[10]

### c. **Pattern No. 3:**   **Misrepresentations About The Positions And Trades Designed to Create And Prolong Artificial Prices**

Consistent with manipulation rather than legitimate positions, Amaranth further illegitimized its dominant position by also making (a) oral misleading statements about such positions in a manner designed to move prices (¶¶ 149, 151, 416); and (b) written misrepresentations to the NYMEX about the reasons for Amaranth's trades.  Although this latter lie to the NYMEX was designed to prolong the manipulation, it ultimately caused an additional charge for fraud to be brought against Amaranth by the CFTC.  *See CFTC v. Amaranth Advisors*, 554 F. Supp. 2d at 535-36.

### d. **Pattern No. 4:**   **Abusing Its Dominant Positions To Exceed The Limits Designed To Prevent Manipulation**

Amaranth also abused its dominant position by repeatedly exceeding the NYMEX position limits that were intended to prevent a single trader from moving prices.  ¶159 (alleging, for example, violations on February 23, 2006); ¶ 160 (April 7, 2006); ¶ 161 (April 26, 2006); ¶ 162 (May 23, 2006); ¶ 163 (May 26, 2006); ¶ 210 (summarizing position limit and accountability level violations).

Indeed, Amaranth acquired as much as 450% of the maximum position limit designed to avoid manipulation.  ¶¶ 108-10, 123-25, 129-31, 153-67, 208, 220, 227.   Exceeding limits has

---

[10] This raises scores of questions common to all Class members.  *See, e.g., Damassia v. Duane Reade, Inc*., 250 F.R.D. 152, 156-57 (S.D.N.Y. 2008) (interpretation of contested documents describing job descriptions was a question common to all members of class of assistant managers seeking overtime pay under New York Labor law); *Medicare Beneficiaries' Defense Fund v. Empire Blue Cross Blue Shield*, 938 F.Supp. 1131, 1146-47 (E.D.N.Y. 1996) (required interpretation of several health insurance plan documents expected to be substantially similar, notwithstanding some differences in language, created predominant common questions in action alleging that insurer failed to pay health claims fully).

been held to be a main basis for some manipulation claims. *E.g.*, *CFTC v. Hunt*, 591 F.2d 1211, 1218 (7th Cir. 1979). This further illegitimizes Amaranth's position. *See In re Indiana Farm Bureau Cooperative Ass'n,* 1982 WL 30249 at *17-18 (CFTC Dec. 17, 1982) (Johnson, Ch., concurring) (illegitimate trading includes, at the very minimum, trading that violates contract market rules or laws).

   e. <u>Pattern No. 5</u>: **Misleading the Regulators and The Market**

   Consistent with its patterns of violating position limits in order to exert artificial pressure on spreads and of deceptive conduct to prolong its manipulation (all as described above), Amaranth deceptively (and without disclosure) evaded NYMEX directives that Amaranth reduce its dominant positions. ¶¶ 152-57, 165-70, 468-71. These directions would have reduced Amaranth's artificial effect on prices. But Amaranth ostensibly reduced its position on NYMEX, only to immediately and greatly increase its positions on the InterContinental Exchange ("ICE"). *Id.*

   However, Amaranth had to post higher margins on its ICE positions. ¶ 236. Amaranth had to pay higher commissions to JP Morgan Futures on its ICE positions. *Id.* This was very costly. It would have hurt Amaranth's results if Amaranth was trading expecting a change in prices in the market. But Amaranth was not a trader. Rather, it was a systematic manipulator of prices. As such, Amaranth had an immediate "return" on all these higher margin and transaction costs that it laid out to increase the ICE position. This return was that Amaranth thereby maintained its artificial pressure on spreads contrary to the intent of direction of the NYMEX.

   Thus, Amaranth's creation of its large position on ICE was not a legitimate least–cost trading strategy. Rather, it was illegitimately paying more in order, however uneconomically, to maintain artificial pressure on spread prices. This further illegitimized Amaranth's positions.

**f.      Plaintiffs Will Prove Whether Amaranth Caused Artificial Prices By Common Class-Wide Evidence**

Although not required in order to establish predominance, here Plaintiffs have proposed as yet another common question of law and fact the question whether Defendants caused artificial prices in NYMEX natural gas futures contracts.  This common question will be answered for all Class members by the same common class-wide methodology and proof.

**Qualitative Evidence**.  Plaintiffs have alleged six indicia of artificial prices.[11]  One type of artificial price is a price resulting from an illegitimate or manipulative position.  *See Indiana Farm*, 1982 WL 30249 at *24 (Stone, concurring).  Plaintiffs will present qualitative expert opinions addressing whether Amaranth intended to manipulate and its dominant position constituted a manipulative and illegitimate position. Gilbert Aff¶¶8-9, 15; Satterfield Decl.¶¶14-43.  Underlying such opinions will be expert consideration of factors such as the correspondence

---

[11] These six indicia are:

(1) "unprecedented" volatility. *See Minpeco, S.A. v. ContiCommodity Svcs., Inc*., 673 F.Supp. 684, 689-90 (S.D.N.Y. 1987) ("objective economic indicators" of artificial silver prices included greater than normal price volatility and unusual futures contract spread prices); *Cargill Inc. v. Hardin*, 452 F.2d 1154, 1167 (8th Cir. 1971) (same).

(2) prices are out of line compared to historical norms. *Compare*, ¶ 6(f) *with In re Sumitomo I*, 182 F.R.D. at 90 n. 6 (courts look to factors such as "historical price comparisons . .. comparison of spreads . . . ."); *Cargill*, 452 F.2d at 1167 (that the record price increase in the last two trading days was not comparable to the previous nine years was an indicator of artificiality).

(3) abnormal spread relationships are a very strong indication that prices are artificial. *Compare* ¶¶ 5, 6(a)-(c), 6(g) *with Great Western Food Distrib., Inc. v. Brannan,* 201 F.2d 476, 484 (7th Cir. 1953); *Sumitomo I*, 182 F.R.D. at 90 n. 6; *Minpeco*, 673 F.Supp. at 689-90.

(4) prices that are out of line compared to contemporaneous supply and demand. *Compare* ¶¶ 6(c)-(a), 180-81 *with Cargill*, 452 F.2d at 1169; *Sumitomo I*, 182 F.R.D. at 90 n. 6.

(5) a substantial change in prices when the manipulator's positions are eliminated from the market. *Compare,* ¶¶ 6(c) (70% drop), 7; 174 ("Electric Power Research Institute" characterized price decline as "stunning . . . one of the steepest declines ever"); ¶ 175A(1)(b) *with Sumitomo I,* 182 F.R.D. at 87 ("when Sumitomo, under intense government scrutiny, liquidated forward contracts for thousands of tons of unneeded copper . . . . the prices of copper futures contracts traded on the Comex declined dramatically").

(6) prices resulting from an illegitimate factor in supply or demand. *Compare* ¶¶ 100-119, 121-126, 127-146 *with Indiana Farm,* 1982 WL 30249 at *4 n. 2; *Sumitomo I*, 182 F.R.D. at 91.

of NYMEX prices to the perceived supply and demand and contemporary market reports of analysts and commentators as well as changes in the value of the U.S. Dollar.  Deposition of Christopher Gilbert ("Gilbert Dep.") 181:3 – 184:10.  This evidence will be common to all Class members.  It tends to show that Amaranth's dominant positions and associated conduct were illegitimate and intentionally manipulative; therefore their price effect was an artificial one.  *Id.*  For this reason alone, the effect on prices of Amaranth's dominant positions was "necessarily" and artificial one.  *Indiana Farm,* 1982 WL 30249 at *4 n.2.

**Quantitative Analysis**.  Plaintiffs will also present economic expert analysis in the form of a model that will have multiple parts customized to fit the facts here.  See Gilbert Declaration and Deposition pages.

### g.    Commodity Futures Markets Are Ideally Suited For Regression Analyses Isolating The Effect on Prices of A Given Event or Conduct

Presenting common class-wide proof that isolates the effect on prices of Amaranth's positions and conduct may be accomplished by the well-accepted tool of regression analyses.  *See* Reference Manual on Scientific Evidence (Second Edition), Federal Judicial Center 2000, available at http://air.fjc.gov/public/f jcweb.nsf/pages/16, at 181 (describing regression analyses as useful forms of evidence for purposes of solving problems similar to that of determining the change in prices caused by a given course of conduct).

Commodity futures are standardized fungible contracts.  Gilbert Aff.¶¶6, 12.  They are traded in centralized uniform market place subject to the exact same rule set.  *Id.*  They have years or decades of publicly available price series that can be employed in regression analyses.  *Id.*  In contrast, the typical antitrust price fixing fact pattern involves disparate manufacturers, disparate locations, disparate types of contracts of sale, non-public prices and many other differences for performing regression analyses.  Therefore, it is much easier to employ regression

analyses to determine the effect upon prices of a given event or course of conduct in commodity futures than in typical antitrust price fixing fact patterns.[12]  Gilbert Aff.¶22.

Due to the above factors, regression analyses have repeatedly been used successfully to isolate the alleged degree of impact upon commodity futures prices of a given course of conduct or alleged manipulation.  Gilbert Aff.¶21; see *Natural Gas*, 231 F.R.D. at 182.[13]

The same factors that have made regression analyses workable in prior cases to determine the amount of price impact, are present in this case.  NYMEX natural gas futures contracts are standardized and fungible (the only variable being the date of expiration and the price therefor).  Gilbert Aff.¶¶6, 22.  All class members transacted in the standardized NYMEX natural gas contract in the same centralized marketplace subject to the same rule set.  *Id*.¶22.  There are many years of price data before and after the alleged manipulation here that can be used to develop statistically significant correlations or otherwise employ an event study form of regression analysis.  Gilbert Aff.¶22.

### h.   The Particular Regression Analyses And Event Study Identified By Professor Gilbert Have Repeatedly Been Used In Comparable Situations And Will Be Very Workable To Determine Whether and To Isolate By How Much Amaranth Caused Artificial Prices

Here, Plaintiffs' economic expert has identified the particularized types of regression

---

[12] Moreover, there is extensive public news reporting about a commodity futures market.  Gilbert Aff.¶22; Gilbert Dep. 181:3 – 182:14.  This reporting, along with the above described standardization of contracts and other aspects of commonality of futures markets, makes the use of the event study form of regression analysis very workable in commodity futures fact patterns for the purpose of determining the effect on prices of a given circumstance or event.  *Compare* Gilbert Aff.¶ 13 *with IPO*, 2009 WL 1649704 at *15 (event study methodology demonstrated that share prices moved in a statistically significant manner when unexpected information was released to the public).

[13] Indeed, in the most recent commodity futures manipulation class certification decision, *PIMCO,* 244 F.R.D. at 480, *aff'd*, 2009 WL1919013 (7th Cir. July 7, 2009), the defendants did not even contest that the plaintiffs could perform a combination of regression analyses in order to isolate the effect on prices of the alleged manipulative conduct.  *See* Gilbert Aff.¶ 21.

analyses that comprise his model.  Gilbert Aff.¶16.  First, the conspicuous build up in Amaranth's positions corresponds to an increase in spreads to all-time record levels; the conspicuous restriction and elimination of Amaranth's positions, corresponds with the collapse of the spreads and prices.   Accordingly, Professor Gilbert has determined that the appropriate regression analysis technique must begin with the event study analysis of the impact of Amaranth's activities on the range of spread prices.  (He noted that the model will also include a residual component which will permit inference from the estimated artificiality in the spreads to the implied artificiality in price levels.).  Gilbert Aff. ¶ 12; Gilbert Dep. 228:6 – 229:15.  Such analysis will include the impact on spread prices (the dependent variable) of factors (the independent variables) including prices of other energy products, dollar exchange rates, and Amaranth's positions and trades.  *Id*. 221:18 – 225:21.

Specifically, Professor Gilbert opines that, if Amaranth's large positions were changing the level of NYMEX prices, then an event study of the restriction, transfer and eventual elimination of such positions will provide a reasonable estimate of the amount of change in NYMEX prices that Amaranth had been causing.  Gilbert Aff¶ 13.   Also, Professor Gilbert opines that, if his qualitative analysis concludes that Amaranth's positions were illegitimate or manipulative positions, then the amount of the effect on NYMEX prices that such positions were causing was an artificial effect.  *Id*.  Finally, Professor Gilbert opines that, until discovery is completed—including discovery on the restriction, transfer and eventual elimination of Amaranth's dominant positions and whether and to what extent Amaranth reduced its NYMEX positions or offset them on another exchange, such as ICE—Professor Gilbert cannot specify the precise parameters of this event study analysis.  Gilbert Aff. ¶ 16; Gilbert Dep. 204:4 –

209:10.[14]

Fourth, Professor Gilbert opines that a similar profile of an event study analysis may also be used on specific trades, including the so-called "slam the close" trades by Amaranth. Gilbert Aff.¶¶15-16. The repeated "slam the close" trades were episodic but occurred within the context of Amaranth's overall alleged manipulation. The days on which those trades allegedly occurred will specifically be examined within the model in order to incorporate their price impact into the overall model. Gilbert Dep. 219:7 – 220:10. That is: (a) an event study may be constructed to determine the change in price caused by a specific trade, (b) until discovery is obtained Professor Gilbert cannot specify the exact parameters of such event study and (c) however, if his qualitative analysis of the trades reveal them to be illegitimate, manipulative trades, then the amount of effect that such trades had on prices will be an artificial one.[15]

### i. Even The Amount of Damages And The Daily Artificial Impact Suffered By Class Members Present Common Legal Questions

Although also not required in order to establish predominance of common questions, Plaintiffs have further proposed that the amount of damages caused by Defendants' unlawful conduct is yet another common class-wide issue. First, there are the legal questions of how to compute damages. Defendants invariably argue that this computation is impossible or very

---

[14] Additional information which must be obtained in discovery for this analysis includes reliable position data from Defendants, data from ICE (particularly on NYMEX contract expiration days where trading activity was unusual), and data regarding the September 2006 takeover of Defendants' positions by JP Morgan and Citadel. Gilbert Dep. 143:24 – 146:9.

[15] Defendants may disagree, on the merits, with Professor Gilbert's foregoing opinions, or the bases therefor. However, the proof of the merits is not at issue now. What is at issue is the foregoing class-wide methodology. Event studies have repeatedly been used to isolate the amount of impact that a specific occurrence or conduct had. Gilbert Aff.¶¶14, 21; *see IPO*, 2009 WL 1649704 at *16. Professor Gilbert has opined that multiple regression analyses may be performed through the event study methodology to provide common class-wide evidence of the amount of impact that Amaranth's manipulative positions or trades was having on NYMEX natural gas futures contract prices. Gilbert Aff.¶19; Gilbert Dep. 213:7 – 214:10.

24

difficult.  Here, Plaintiffs will argue that Amaranth's domination of the market and extensive manipulative conduct to abuse that dominance, along with other factors, makes it appropriate that anyone who suffered a net loss on their trading of NYMEX natural gas futures contracts during the Class period, sustained net economic harm due to Amaranth and is entitled to damages.  Satterfield Decl.¶ 21.  *Sarlie v. Bruce,* 265 F.Supp. 371, 376 (S.D.N.Y. 1967).  This presents a common class-wide mixed question of law and fact.

Second, another measure of damages involves the amount of artificiality paid by each Class member on their transactions minus any artificiality received on such transactions.  This method of establishing the amount of damages has repeatedly been approved in CEA manipulation cases.  *See also PIMCO*, 244 F.R.D. at 475-76; *Sumitomo I*, 182 F.R.D. at 92.

Professor Gilbert has specifically identified co-integration and error adjustment regression analyses that may be performed, after the event study analysis, to isolate on a daily basis, the amount of artificial impact on NYMEX futures prices by Amaranth. Gilbert Aff.¶ 16. Because these analyses must build on the event study analyses, Professor Gilbert has not specified the precise parameters and control variables.  *Id* at ¶28.  However, these and similar methods have been used in prior CEA manipulation cases in order to isolate, on a daily basis, the amount of artificial impact on futures prices that the alleged manipulator caused.  Gilbert Aff.¶21.  Those same methods will be very workable here to isolate how much artificiality, on a daily basis, that Amaranth caused. Gilbert Aff.¶¶13,18.By comparing how much price artificiality a Class member purchased and how much artificiality a Class member sold, the net economic harm or damages of each Class member may be determined. Gilbert Aff. ¶28.

## **CONCLUSION**

The proposed class should be certified under Fed.R.Civ.P. Rule 23(b)(3).

Dated:  New York, New York
        October 15, 2009

Respectfully submitted,

**LOVELL STEWART HALEBIAN LLP**

By: */s/ Christopher Lovell*
Christopher Lovell (CL 2595)
Gary S. Jacobson (GJ 2481)
Ian T. Stoll (IS 3424)
Christopher M. McGrath (CM 4983)
61 Broadway, Suite 501
New York, NY 10006
(212) 608-1900
(212) 719-4677 (fax)
LOUIS F. BURKE, P.C.

Louis F. Burke (LB 4686)
460 Park Avenue, 21st Floor
New York, NY 10022
(212) 682-1700
(212) 808-4280 (fax)

LOWEY DANNENBERG COHEN
& HART, P.C.

Vincent Briganti (VB 1497)
Geoffrey M. Horn (GH 4179)
White Plains Plaza
1 North Broadway, 5th Floor
White Plains, NY  10601
(914) 997-0500
(914) 997-0035 (fax)

*Co-Lead Counsel for Plaintiffs*

Christopher Gray (CG 0334)
CHRISTOPHER J. GRAY PC
460 Park Avenue, 21st Floor
New York, NY 10022
(212) 838-3221
(212) 508-3695 (fax)

Samuel Rudman
Robert Rothman
Fainna Kagan
COUGHLIN, STOIA, GELLER,
RUDMAN & ROBBINS, LLP
58 South Service Rd., Suite 200
Melville, NY 11747
(631) 367-7100
(631) 367-1173 (fax)

Bernard Persky (BP 1072)
Gregory S. Asciolla
LABATON SUCHAROW, LLP
140 Broadway
New York, NY 10005
(212) 907-0868
(212) 883-7068 (fax)
*Additional Counsel for Plaintiffs*

# EXHIBIT A

09-09-11 FINAL Gilbert Depo Transcript

1

1 –HIGHLY CONFIDENTIAL: CHRISTOPHER L. GILBERT–

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   MASTER FILE NO. 07 CV 6377 (SAS)
    ECF Case
4
    ------------------------------- X
5   IN RE:  AMARANTH NATURAL GAS
    COMMODITIES LITIGATION
6
    This document relates to:
7
    ALL ACTIONS.
8   ------------------------------- X

9

10     TRANSCRIPT DEEMED HIGHLY CONFIDENTIAL

11

12           DEPOSITION TRANSCRIPT OF

13           CHRISTOPHER L. GILBERT

14

15   DATE:     September 11, 2009

16   TIME:     9:50 a.m.

17

18       The deposition of CHRISTOPHER L.

19   GILBERT, was held at the offices of

20   Winston & Strawn, 200 Park Avenue,

21   New York, New York, pursuant to

22   Subpoena, before Hope Menaker, a

23   Shorthand Reporter and Notary Public of

24   the State of New York.

25

2

1 –HIGHLY CONFIDENTIAL: CHRISTOPHER L. GILBERT–

2   A P P E A R A N C E S

3   LOVELL STEWART HALEBIAN LLP

Page 1

**FILED UNDER SEAL**