USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/3/10

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- X
                                                    :
**IN RE AMARANTH NATURAL GAS
COMMODITIES LITIGATION**                            :
                                                    :
                                                    :
-------------------------------------------------- X

**OPINION AND ORDER**

**07 Civ. 6377 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I.   INTRODUCTION

Plaintiffs filed this putative class action on behalf of futures traders that purchased, sold, or held natural gas futures or options on futures contracts between February 16, 2006 and September 28, 2006 (the "Class Period"). Plaintiffs allege that during the Class Period, defendants – a hedge fund, its affiliates, employees, and brokers – manipulated the prices of New York Mercantile Exchange ("NYMEX") natural gas futures contracts in violation of the Commodity Exchange Act (the "CEA"). Among the remaining defendants are Amaranth LLC (the "Master Fund" or "Fund") and Amaranth Advisors, L.L.C. ("Advisors"), against whom plaintiffs assert vicarious liability claims.[1]

---

[1]   The following defendants also remain in the case:  Amaranth Advisors (Calgary) ULC, Amaranth Partners LLC, Amaranth Capital Partners LLC, Nicholas M. Maounis, Brian Hunter, Matthew Donohoe, ALX Energy, Inc., and James DeLucia.

1

The Master Fund now seeks to distribute $75 million of its remaining

$185 million in assets to investors and former employees.  Plaintiffs oppose the

transfer and seek a pre-judgment attachment pursuant to Rule 64 of the Federal

Rules of Civil Procedure and section 6201 of the New York Civil Practice Law and

Rules ("CPLR").   For the reasons stated below, plaintiffs' motion is granted.

## II.   BACKGROUND

Pursuant to the Advisory Agreements between them,[2] Advisors served

as the Fund's "Trading Advisor."[3]  As Trading Advisor, Advisors had "plenary

authority" over the Fund's trades and investments,[4] and was "expressly authorized

to . . . make all investment and trading decisions . . . ."[5]  The Advisory Agreements

also included a provision titled "Independent Contractor," which stated "[f]or the

purposes of this Agreement, the Trading Advisor shall be an independent

---

[2]     The term "Advisory Agreements" refers to the Advisory Agreement,
dated December 31, 2003 ("Advisory Agreement"), and the Amended and Restated
Advisory Agreement, dated January 31, 2006 ("Amended and Restated Advisory
Agreement").  The Advisory Agreements are attached to the 4/20/10 Letter from
Amelia Starr, the Fund's counsel, to the Court.

[3]     Advisory Agreement, Art. 1.  *Accord* Amended and Restated
Advisory Agreement, Art. 1.

[4]     *Id.*

[5]     Advisory Agreement, Art. 2(a).  *Accord* Amended and Restated
Advisory Agreement, Art. 2(a).

contractor and not an employee or dependent agent of the [Fund]."[6]  The Fund also

had the authority to terminate its relationship with Advisors.[7]

The Master Fund ceased active operations in September 2006.[8]  Since

that time, the Master Fund has distributed funds to investors as part of its effort to

unwind its positions.[9]  To date, the Master Fund has made five distributions of

between $65 million and $1 billion.[10]  Four of these were made prior to this lawsuit

being filed.[11]  Of the approximately $2.4 billion the Master Fund held in September

2006, approximately $185 million remains.[12]

On March 25, 2010, the Master Fund Board of Directors approved

---

[6]      Advisory Agreement, Art. 10.  *Accord* Amended and Restated
Advisory Agreement, Art. 11.

[7]      *See* Advisory Agreement, Art. 11.  *Accord* Amended and Restated
Advisory Agreement, Art. 12.

[8]      *See* Declaration of Derek H.L. Buntain, member of the Master Fund's
Board of Directors, in Support of Amaranth LLC's Opposition to Plaintiffs'
Motion for an Order of Attachment ("Buntain Decl.") ¶ 6.

[9]      *See id.* ¶¶ 4, 5.

[10]     *See id.* ¶ 5.

[11]     *See id.*

[12]     *See id.*; 4/5/10 Letter from Starr to Christopher Lovell, plaintiffs'
counsel, Ex. 8 to Declaration of Amelia Starr in Support of Amaranth LLC's
Opposition to Plaintiffs' Motion for an Order of Attachment ("Starr Decl."), at 2
("4/5/10 Starr Letter") (noting that following the Fund's $75 million distribution,
the Fund will have approximately $110 million in assets).

another investor payment of $75 million.[13]  Of this $75 million, $71.4 million is to

be distributed to investors and $3.6 million is to be paid to employees of

Amaranth-related entities as deferred compensation based on income earned in

2004 and 2005.[14]  Approximately one million dollars of the $3.6 million in

deferred compensation will be paid to defendant Brian Hunter.[15]

On April 5, 2010, the Master Fund notified plaintiffs of this pending

distribution.[16]  Plaintiffs immediately sought an order of attachment of the $75

million.  The Fund indicated in its opposition papers that if it was precluded from

distributing the $3.6 million in deferred compensation, the Fund faced "an

increased risk of employee lawsuits for failure to pay due-and-owing claims."[17]

On Reply, plaintiffs reduced their request for an order of attachment to $72.8

million to permit the Fund to distribute $2.2 million in deferred compensation to

non-defendant Amaranth employees.[18]  The $2.2 million does not include Hunter's

---

[13]     *See* Buntain Decl. ¶ 7.

[14]     *See id.*

[15]     *See id.* ¶ 9.

[16]     *See* 4/5/10 Starr Letter.

[17]     Amaranth LLC's Memorandum of Law in Support of Its Opposition
to Plaintiffs' Motion for an Order of Attachment ("Fund Opp.") at 23-24.

[18]     *See* Plaintiffs' Reply Memorandum in Further Support of Their
Motion for an Order of Attachment at 1; *see also* 4/19/10 Hearing Transcript

claimed entitlement.

## III. APPLICABLE LAW

### A. Order of Attachment

Rule 64 provides that attachment is available "under the

circumstances and in the manner provided by the law of the state in which the

district court is held." The grounds for attachment in New York are set out in

Section 6212 of the CPLR. To be successful on a motion for attachment, a

plaintiff must demonstrate "[1] that there is a cause of action, [2] that it is probable

that the plaintiff will succeed on the merits, [3] that one or more grounds for

attachment provided in Section 6201 exist, and [4] that the amount demanded from

the defendant exceeds all counterclaims known to the plaintiff."[19] Plaintiffs'

burden of proving the right to an attachment is "high."[20] "[T]he New York

---

("4/19/10 Hr'g Tr.") at 5:14-6:1, 7:2-14. I note that plaintiffs' request does not
appear to add up. The Fund states that it owes $3.6 million to its former
employees, including approximately one million to Hunter, meaning that the Fund
requires approximately $2.6 million for non-defendant employees. However,
plaintiffs have excluded only $2.2 million from the requested attachment for this
purpose.

[19]     C.P.L.R. § 6212(a).

[20]     *Intelligent Digital Sys., LLC v. Visual Mgmt. Sys., Inc.*,
--- F. Supp. 2d ---, No. 09 Civ. 974, 2010 WL 431472, at *7 (E.D.N.Y. Jan. 28,
2010) (noting that the standard for proving probability of success is "akin to that
required to obtain injunctive relief").

.

attachment statutes are construed strictly against those who seek to invoke the remedy."[21]

"[T]he issuance of an order of attachment is discretionary."[22] However, "[w]here a statutory ground for attachment exists and both need and likelihood of success are established, [a district court's] discretion does not permit denial of the remedy for some other reason, at least absent extraordinary circumstances and perhaps [not] even then."[23]

### 1.   Probability of Success on the Merits

"Probability of success on the merits for purposes of an order of attachment requires that the moving party demonstrate that it is more likely than not that it will succeed on its claims and must show proof stronger than that required to make a prima facie case."[24]   However, "all legitimate inferences should

---

[21]     *Buy This, Inc. v. MCI Worldcom Commc'ns, Inc.*, 178 F. Supp. 2d 380, 383 (S.D.N.Y. 2001).

[22]     *Capital Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 220 (2d Cir. 2006).

[23]     *Id.* at 222.  *But see Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F. Supp. 2d 155, 160 (S.D.N.Y. 2007) ("Satisfaction of the statutory criteria, however, does not guarantee that a court will issue such a relief. '[S]uch relief is discretionary, and since attachment is a harsh remedy, the court must exercise care in its application.'") (quoting *Signal Capital Corp. v. Frank*, 895 F. Supp. 62, 64 (S.D.N.Y. 1995)) (construing section 6212).

[24]     *Musket Corp.*, 512 F. Supp. 2d at 160.

be drawn in favor of the party seeking attachment."[25]

### 2.    Section 6201(1)

Section 6201(1) provides, in relevant part, that an order of attachment

may be granted where "the defendant is a nondomiciliary residing without the

state, or is a foreign corporation not qualified to do business in the state. . . ."[26]

Where a nondomiciliary defendant has consented to jurisdiction, an attachment

brought under section 6201(1) "should issue only upon a showing that drastic

action is required."[27]  To demonstrate that drastic action is required, "New York

courts have required an additional showing that something, whether it is a

defendant's financial position or past and present conduct, poses a real risk of the

---

[25]     *JSC Foreign Econ. Ass'n Technostroyexport v. International Dev. &
Trade Servs., Inc.*, 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004).  There is a tension
between the requirement that the attachment statutes be "construed strictly against
those who seek to invoke the remedy" and the notion that when evaluating the
probability of success on the merits, "all legitimate inferences should be drawn in
favor of the party seeking attachment."  There is no need for me to resolve this
conflict because  plaintiffs have provided evidence that is sufficient to demonstrate
a probability of success on the merits even without construing all legitimate
inferences in their favor.

[26]     C.P.L.R. § 6201(1).

[27]     *Reading & Bates Corp. v. National Iranian Oil Co.*, 478 F. Supp. 724,
727 (S.D.N.Y. 1979).  *Accord Ames v. Clifford*, 863 F. Supp. 2d 175, 177
(S.D.N.Y. 1994) (noting that where a nondomiciliary defendant has consented to
jurisdiction, to grant an attachment, "New York courts have required an additional
showing that something, whether it is a defendant's financial position or past and
present conduct, poses a real risk to the enforceability of a future judgment.").

7

enforcement of a future judgment."[28]

## B.   Vicarious Liability Under the CEA

"The elements of a market manipulation claim under section 9(a) of the CEA are as follows: (1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price."[29]  "Section 22(a) of the CEA provides plaintiffs with a private cause of action to pursue claims of market manipulation."[30]

The CEA also creates liability for an individual or corporate entity for "[t]he act, omission, or failure of any official, *agent, or other person acting for* any individual, association, partnership, corporation, or trust within the scope of his

---

[28]   *Ames*, 863 F. Supp. at 177.  *Accord See ITC Entm't, Ltd. v. Nelson Film Partners*, 714 F.2d 217, 221 (2d Cir. 1983) (holding that where attachment is sought for security of a future judgment, section 6201(1) "serves to protect the plaintiff against defendant's ability to pack his bags, abandon his place of convenience within the state, and remain at his permanent residence outside the reach of New York enforcement procedures . . . [T]he courts focus . . . on whether there is a likelihood that the defendant will have adequate assets within the state to respond to a judgment against him.").

[29]   *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *3 (S.D.N.Y. June 28, 2007).

[30]   *See id.* (citing 7 U.S.C. § 25(a)).

8

employment or office . . . ."[31]  "Courts have described subsection 2(a)(1)(B) as

codifying 'a variant of the common law principle of respondeat superior' and thus

'mak[ing] an employer strictly liable – that is to say, regardless of the presence or

absence of fault on the employer's part – for torts committed by his employees in

the furtherance of his business.'"[32]

      Courts most often consider subsection 2(a)(1)(B) in the context of

whether the wrongdoer was an "agent" of the defendant.  Demonstrating a

common law principal-agent relationship typically requires allegations of "(1) the

principal's manifestation of intent to grant authority to the agent, and (2)

agreement by the agent."[33]  "In addition, the principal must maintain control over

key aspects of the undertaking."[34]  However, under the CEA, "[t]he ascription of

agency is a purposive, policy-oriented act rather than an exercise in semantics."[35]

Not surprisingly, there is some debate as to whether common law agency is the

---

[31]     7 U.S.C. § 2(a)(1)(B) (emphasis added).

[32]     *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 515
(S.D.N.Y. 2004) (quoting *Rosenthal & Co. v. Commodity Futures Trading
Commission ("C.F.T.C.")*, 802 F.2d 963, 966 (7th Cir. 1986)).

[33]     *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448,
462 (2d Cir. 2003) (citations omitted).

[34]     *Id.* (citations omitted).

[35]     *Rosenthal*, 802 F.2d at 969.

proper test to apply for vicarious liability under the CEA. Specifically, courts

disagree as to whether evidence of control is required.[36]

For example, some courts apply common law agency principles and

require plaintiffs to demonstrate control in order to find an agency relationship

exists.[37] Other courts require evidence of a common law agency relationship – *i.e.*,

consent, acceptance, and conduct within the scope of the agency – but do not

require evidence of control.[38] Still other courts do not apply common law agency

---

[36]     In denying the Master Fund's second motion to dismiss the vicarious liability claims, I noted that plaintiffs argued that demonstrating that the principal retained control over the agent was not a requirement for vicarious liability under the CEA. *See In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d 376, 393 n.117 (S.D.N.Y. 2009) (citing Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motions to Dismiss Plaintiffs' Corrected First Amended Consolidated Class Action Complaint at 61 (citing *Guttman v. C.F.T.C.*, 197 F.3d 33, 39 (2d Cir. 1999))). This Court was not required to decide the matter because "the issue of control [wa]s not dispositive of the determinations made with respect to the vicarious liability claims against any of the defendants" and found plaintiffs' argument to be inconsequential. *Id.*

[37]     *See C.F.T.C. v. Gibraltar Monetary Corp., Inc.*, 575 F.3d 1180, 1188-89 (11th Cir. 2009) (per curiam) (holding that "[i]t appears clear to [the court] that the vicarious liability statute and regulation codify common law principal agent liability" and requires evidence of control); *Asa-Brandt, Inc. v. ADM Investor Servs., Inc.*, 344 F.3d 738, 743 (8th Cir. 2003) (finding that "[d]etermining whether an agency relationship exists hinges on the principal's right to exercise control over the activities of the agent").

[38]     *See Dohmen-Rameriz v. C.F.T.C.*, 837 F.2d 847, 858 (9th Cir. 1988) ("The Commission properly rejected the petitioners' contention that an agency relationship was lacking because Dohmen-Ramirez did not control Handy and Handy may have acted without the consent or knowledge of Dohmen-Ramirez. *It*

principles and, instead, apply a broader totality of the circumstances test.[39]  Finally,

at least two C.F.T.C. decisions have found that the inclusion of "other person

acting for" in section 2(a)(1)(B) permits vicarious liability even where the actor is

not the defendant's "agent."[40]

In what appears to be the Second Circuit's only substantive discussion

of vicarious liability under the CEA, the Second Circuit denied a trader's petition

for review of a C.F.T.C. order finding him vicariously liable for noncompetitive

---

is not necessary to show control to establish agency under the CEA . . . . [A]gency
under the CEA is premised on respondeat superior liability, and it is not necessary
that the principal direct the act or have knowledge of the agent's actions.")
(emphasis added).

[39]     See Stotler & Co. v. C.F.T.C., 855 F.2d 1288, 1292 (7th Cir. 1988)
(applying a totality of the circumstances test without mentioning control); see also
Rosenthal, 802 F.2d at 966 (explaining that vicarious liability invokes a variant of
common law respondeat superior and applying a totality of the circumstances test).

[40]     See Bian v. MG Fin., LLC, No. R 08-17, 2009 WL 3863292, at *9
(C.F.T.C. Oct. 28, 2009) (Initial Decision) ("The reference to 'other person acting
for' another person or entity [in section 2(a)(1)(B)] [ ] implies that respondeat
superior under the Act applies to persons who act for others, but who do not fall
within the usual definition of 'agent.'"); Lobb v. J.T. McKerr & Co., No. R85-185,
1989 WL 242384, at *12 n.13 (C.F.T.C. Dec. 14, 1989) ("The category of
relationships covered by Section [2(a)(1)(B)] not only includes agents but also any
'official . . . or other person acting for any individual, association, partnership,
corporation or trust.' Our reference in this opinion to the term 'agent' should be
understood as a short-hand reference to the complete statutory category rather than
an implicit limitation of the category to common-law agents.").

11

options transactions effected by his partner.[41]  The Second Circuit made the

following pronouncement regarding vicarious liability under the CEA:

> Liability may be imposed under section [2(a)(1)(B)] if the
> CFTC shows that (1) [the partner] was acting as [the
> trader's] agent when he executed the unlawful trades, and
> (2) [the partner's] actions were within the scope of his
> employment or office.  [The trader] need not actually have
> participated in [his partner's] wrongful conduct *or have
> controlled* [his partner's] behavior; for the purpose of
> imposing liability under section [2(a)(1)(B)], it is enough
> if [the partner] was 'acting for' [the trader] in executing the
> illegal trades.[42]

## IV.   DISCUSSION

There is no dispute that two of the four elements necessary for an

attachment under section 6212 are present:  a cause of action has been filed and the

Fund has not filed any counterclaims.  Accordingly, I need only address plaintiffs'

probability of success on the merits and whether plaintiffs meet the requirements of

6201(1).

### A.   Probability of Success on the Merits

To be successful on their motion for an order of attachment, plaintiffs

must demonstrate both a probability of success on the underlying merits of the case

---

[41]   *See Guttman*, 197 F.3d at 39-40 (citing *Rosenthal*, 802 F.2d at 966).

[42]   *Id.* at 39 (citations omitted).

against Advisors[43] and a probability of success in demonstrating that Advisors was an "official, agent, or other person" acting for the Master Fund. I conclude that plaintiffs have submitted evidence sufficient to demonstrate a probability of success on the merits as to both.

*First*, it is probable that plaintiffs will succeed on the merits against Advisors. After ten days of testimony, the Federal Energy Regulatory Commission ("FERC") recently found that Hunter – the lead natural gas trader for Advisors – manipulated three NYMEX natural gas futures contracts.[44] Plaintiffs' claims in the instant action are based upon Hunter's alleged manipulation of these same three futures contracts.[45] FERC's conclusions support a probability of success on the merits of plaintiffs' claims for manipulation against Hunter. Because Hunter is an employee of Advisors, it is equally likely that Advisors will be vicariously liable for Hunter's conduct. The Fund does not argue here that plaintiffs are unlikely to

---

[43]     Plaintiffs only assert that the Fund is vicariously liable for Advisors's actions. *See generally* Pl. Mem.

[44]     *See In the Matter of Brian Hunter*, No. IN07-26-004, 130 FERC ¶ 63,004 (Jan. 22, 2010) (Initial Decision), Ex. 1 to Declaration of Ian T. Stoll, plaintiffs' counsel, in Support of an Order of Attachment Against Amaranth LLC ("Stoll Decl."), ¶¶ 165, 167, 172, 173, 176, 185, 187, 189, 191, 212 (concluding that "[t]he preponderance of the evidence demonstrates that Hunter intended to and did manipulate the prices in the three at-issue months").

[45]     *See* Plaintiffs' Corrected First Amended Consolidated Class Action Complaint ¶¶ 102-148.

succeed on their claims against Hunter or Advisors.

      *Second*, it is also probable that plaintiffs will succeed on proving that

Advisors was an "agent, or other person acting for" the Fund.  The principal piece

of evidence supporting this conclusion is the Client Agreement between the Fund

and its NYMEX clearing broker, J.P. Morgan Futures Inc. ("JPMFI").[46]  Article 18

of the Client Agreement expressly authorized Advisors – and therefore Hunter – to

trade on the Fund's behalf and as its agent.[47]  In fact, Advisors signed the

Agreement on behalf of the Fund.[48]  At oral argument, the Fund argued that Article

18 of the Client Agreement appoints Advisors as the Fund's agent for the sole

purpose of receiving "communications" and "requests for instructions" – not for

---

[46]     *See* Client Agreement, Ex. 5 to Stoll Aff., Art. 1.

[47]     *See* Client Agreement Art. 1; *id.* Art. 18 ("Client hereby appoints
[Advisors] as Client's *agent* for the purpose of receiving all communications,
notices and requests for *instructions* related to this Agreement and the transactions
effected pursuant to this Agreement, including, without limitation, trading
recommendations or market information.") (emphasis added); *see also* Deposition
of Derek H.L. Buntain, Ex. 5 to Reply Affidavit of Ian T. Stoll in Support of an
Order of Attachment Against Amaranth LLC ("Stoll Reply Aff."), at 110:14-22
("Q. Who made that decision . . . the decision to maintain the relationship with
Brian Hunter?  A.  He was recommended to us and the board approved it.  Q.  Who
recommended it?  A.  Amaranth Advisors."); *id.* at 135:6-10 ("Q.  [T]he
investments that [Advisors] made on behalf of [the Fund], were they made in [the
Fund's] name, when those investments were made?  A.  Yes.").

[48]     *See* Client Agreement at 10.

trading.[49] When Article 18 is read in isolation, the Fund's interpretation has merit. However, when Article 18 is read in conjunction with the entire Client Agreement – particularly Article 8, which defines trading in terms of "giv[ing]*instructions*"[50] and Article 16, which authorizes Advisors to "give JPMFI oral or written *instructions* concerning any transaction or proposed transaction,"[51] the Fund's position is less compelling. Indeed, based on these provisions in the Client Agreement, the stronger inference is that the Fund authorized Advisors to give JPMFI "instructions" to trade on behalf of the Fund.

The Fund also advocated that policy concerns favored its interpretation of the Client Agreement – namely that "passive" investors should not be subject to liability for the conduct of those "over which they had no control."[52]

---

[49]   *See* 4/19/10 Hr'g Tr. at 27-29.

[50]   Client Agreement Art. 8 ("[The Fund] shall give *instructions* regarding maturing futures contracts and expiring options, give *instructions* with respect to the exercise of options, and make appropriate arrangements to take or make delivery of any underlying commodity within such commercially reasonable deadlines as JPMFI and [the Fund] may agree upon from time to time) (emphasis added).

[51]   *Id.* Art. 16 ("[The Fund], or any person notified to JPMFI as being authorized by [the Fund] [*i.e.*, Advisors], may give JPMFI oral or written *instructions* concerning any transaction or proposed transaction under this Agreement.") (emphasis added).

[52]   4/19/10 Hr'g Tr. at 28.

15

Plaintiffs, through the declarations of named plaintiff Alan Martin and plaintiffs'

commodities trading expert Charles Robinson, refute this policy justification.

Martin and Robinson declare that the market looked to the account holders – here,

the Fund – rather than the trader – here, Advisors – as those with ultimate

responsibility for trades.[53]  I conclude that policy concerns favor plaintiffs'

position.  Not only does the market appear to expect the "passive" investor to be

responsible for all trades, but to adopt the Fund's policy rationale would permit

account holders to reap all the benefits of their traders' wrongful conduct without

shouldering any of the responsibility when such conduct is discovered.

        In addition, FERC brought a vicarious liability claim against the Fund

for Hunter and Advisors's alleged manipulation and twice denied the Fund's

motions for summary disposition (*i.e.*, summary judgment) on that claim.[54]   The

Fund ultimately settled the vicarious liability charges in the FERC proceeding –

---

[53]        *See* Reply Affidavit of Charles Robinson ¶ 9 ("Based upon the course of dealings in the markets generally and on the [NYMEX] particularly, [the Fund] was liable as principal for the trades entered for it by its agent [Advisors]."); *id.* ¶¶ 10, 15; Reply Declaration of Alan Martin ¶ 4 ("Morgan Stanley and I looked to the *account holder* as the responsible financial principal for each account.") (emphasis added).

[54]        *See* Stoll Reply Aff. ¶¶ 4-5; Order Denying Rehearing, Motions for Stay, and Motions for Summary Disposition, and Establishing Hearing Procedures, *Amaranth Advisors LLC,* No. 07-26-004, 124 FERC ¶ 61,050 (July 17, 2008) ¶¶ 13-14, Ex. 3 to Stoll Reply Aff.; 10/24/08 Hearing Transcript, *Amaranth Advisors LLC,* No. 07-26-004, Ex. 4 to Stoll Reply Aff., at 101:21-25.

albeit without an admission of liability.[55]  Pursuant to that settlement, the Fund

"stipulate[d] that [the Master Fund]'s NYMEX NG Contract position exceeded

NYMEX position limits and applicable hedge exemptions from such limits on

February 23 and May 23, 2006."[56] [57]  Such evidence indicates that Advisors was

acting for the Fund within the scope of its employment when it made the allegedly

manipulative trades.[58]

        This evidence also supports the conclusion that Advisors was an

---

[55]    *See* Order Approving Uncontested Settlement, *Amaranth Advisors LLC*, No. 07-26-004, 128 FERC ¶ 61,154 (Aug. 12, 2009), Ex. 7 to Stoll Reply Aff., ¶ 12.

[56]    *Id.*

[57]    The Fund's Memorandum in Opposition to Defendants' Motion to Dismiss, *Amaranth LLC & Amaranth Advisors LLC v. J.P. Morgan Chase & Co., et al.*, 603756/07 (Sup. Ct. N.Y. Co. Nov. 13, 2007), Ex. 9 to Stoll Reply Aff., at 14, 17.

[58]    Furthermore, the Fund's statements in other court documents filed in actions unrelated to this one identify Advisors as the "agent" of the Master Fund and explain that Advisors's business is "intertwined" with that of the Master Fund. The Fund points out that, upon denying the Fund's motion to dismiss the vicarious liability claim against it, this Court expressly noted that the Fund's use of the word "agent" in the context of a legal brief in an unrelated action would be insufficient evidence of an agency relationship. *See* Fund Opp. at 13 (citing *In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d at 395 n.130 ("Of course, plaintiffs' mere allegation that the Master Fund used the word 'agent' to refer to [Advisors] will not be enough to withstand summary judgment.")).  Had this brief been plaintiffs' *only* piece of evidence, plaintiffs would not have successfully demonstrated a probability of success on the merits.

17

"agent or other person" when doing so. As stated by the Second Circuit, this Court

need not determine whether the Fund exercised control over Advisors when the

trades were executed in order to find that Advisors was the Fund's agent within the

meaning of the CEA.[59] "[I]t is enough if [Advisors] was 'acting for' [the Fund] in

executing the illegal trades."[60] Here, regardless of whether common law agency

principles – albeit without requiring control – or a totality of the circumstances test

is applied, the evidence shows that it is highly probable that the Fund expressly

authorized Advisors to trade on its behalf and Advisors did so when it traded the

futures contracts in question. As a result, plaintiffs have demonstrated a

probability of success on the merits for vicarious liability.

      The Master Fund contends that Advisors could not be an "agent"

because it expressly contracted to be only an independent contractor.[61] This

---

[59]     *See Guttman*, 197 F.3d at 39-40; *see also Dohmen-Rameriz*, 837 F.2d
at 858; *Stotler*, 855 F.2d at 1292; *Rosenthal*, 802 F.2d at 966; *Lobb*, 1989 WL
242384, at \*12 n.13.

[60]     *Guttman*, 197 F.3d at 39 (citations omitted).

[61]     *See* Fund Opp. at 8-11 (citing Deposition of Derek H.L. Buntain, Ex.
4 to Starr Decl., at 159:13-17 ("[Advisors] and [the Fund] had a contract and [ ]
Advisors, basically, what I recall, is a third party contractor. They weren't agents.
It specifically says in the contract that they are not agents."); *id.* at 38:14-15
("[Advisors] had complete authority to do whatever trading they saw fit to do.");
*id.* at 42:17-18 ("Advisors were given the authority to invest the money."); *id.* at
77:4-6 ("[Advisors] had, I believe the term was plenary authority, total authority
for actually all documents necessary for the trading function."); *id.* at 108:25-109:2

18

argument holds little weight. Advisors's title as an independent contractor is not

dispositive for purposes of establishing that Advisors was the Fund's agent under

the CEA, particularly in light of the evidence discussed above.[62] Moreover, even if

Advisors's title as an independent contractor – or the Fund's lack of control over

Advisors, for that matter – were enough to defeat the conclusion that Advisors was

the Fund's agent, Advisors is an "other person" within the meaning of the statute.[63]

Thus, although plaintiffs' burden is high, I conclude that plaintiffs have

demonstrated a probability of success on the merits.

## B.   Grounds for Attachment Under Section 6201

The Master Fund admits in its Answer "that it is a Cayman Islands

---

("[Advisors] had total control over what they invested in. We saw annual
statements at the end of the year. That was the extent of it."); *id.* at 109:24-110:1
("Generally speaking, we didn't give them strategic direction in terms of their
trading and investment policy.")).

[62]    *See Cleveland v. Caplaw Enter.*, 448 F.3d 518, 523 (2d Cir. 2006)
("Slavish deference to contractual language is inappropriate in the highly-factual
and often nuanced agency analysis."); *In re Shulman Transp. Enter., Inc.*, 744 F.2d
293, 295 (2d Cir. 1984) ("An employee does not become an independent contractor
simply because a contract describes him as such.").

[63]    *See, e.g., Bogard v. Abraham-Reitz & Co. West, Inc.*, No. R 77-315,
1984 WL 48236, at *4 (C.F.T.C. July 5, 1984) (stating that "even if Abraham were
an independent contractor whose conduct in the performance of the services
undertaken was not controlled by Shearson, that status would not itself preclude his
being Shearson's agent" and concluding that "[w]e find, on this record, that
Abraham . . . was acting for Shearson within the scope of an agreed-upon
employment or office") (quotation marks omitted).

exempted company."[64]  In addition, a search of the New York State Department of

State, Division of Corporations database reveals no entries for Amaranth LLC.[65]

Accordingly, the Master Fund is a foreign corporation not qualified to do business

in New York and, thus, section 6201(1) is satisfied provided that plaintiffs can

establish that "drastic action" is required.

        Plaintiffs seek six billion dollars in damages in this lawsuit.[66]  The

Fund – which once had at least $2.4 billion – currently holds a mere $185 million.

Now, the Fund seeks to transfer nearly forty percent of its remaining assets to

entities from whom plaintiffs will not be able to recover.  Thus, there appears to be

a strong need for security for the enforcement of any judgment plaintiffs may

obtain. Because the Fund's financial position and proposed distribution poses a

significant risk that plaintiffs will not be able to enforce a future judgment against

----

[64]     Answer ¶ 23.

[65]     *See* Stoll Decl. ¶ 2.

[66]     *See* Plaintiffs' Memorandum in Support of an Order of Attachment
("Pl. Mem.") at 1 (citing Declaration of Professor Craig Pirrong, plaintiffs'
damages expert, ¶¶ 17-19, 28). The Fund disputes whether six billion dollars is an
accurate assessment of damages. *See generally* Declaration of Atanu Saha, the
Fund's damages expert. I need not decide the accuracy of plaintiffs' six billion
dollar assessment at this time. Even if plaintiffs are ultimately entitled to only a
fraction of that figure – for example, ten percent (equaling $600 million) – that
fraction is still substantially greater than the amount of assets the Fund currently
holds.

it, drastic action is required.[67]

## C.    Discretion to Deny

Should the Court find that plaintiffs are statutorily entitled to an

attachment, the Fund requests that the Court deny the attachment in its discretion.

The Fund contends that prohibiting it from transferring the $75 million harms only

---

[67]     *See ITC Entm't, Ltd.* 714 F.2d at 221 (upholding order of attachment where defendant did not have sufficient assets in New York to satisfy a potential $ 2.7 million judgment against him); *Thornapple Assoc., Inc. v. Sahagen*, No. 06 Civ. 6412, 2007 WL 747861, at *8 (S.D.N.Y. Mar. 12, 2007) ("Although it is true . . . that an order of attachment should not be granted solely in order to permit a plaintiff to obtain priority over other creditors, a defendant's financial instability may justify a plaintiff's fear that a potential judgment will not be satisfied and thus provide a ground for an attachment."); *County of Oswego Indus. Dev. Agency v. Fulton Cogeneration Assocs.,* No. 05 Civ. 926, 2006 WL 752772, at *1-*2 (N.D.N.Y. Mar. 22, 2006) (ordering attachment where defendant owed significant sums to other creditors and had insufficient assets in New York to satisfy potential judgment); *Pena v. Morgan*, 149 F. Supp. 2d 91, 93-95 (S.D.N.Y. 2001) (ordering attachment in aid of security where most of defendant's assets were outside of New York); *Graubard Mollen Dannett & Horowitz v. Kostantinides*, 709 F. Supp. 428, 432 (S.D.N.Y. 1989) (finding attachment under CPLR 6201(1) appropriate where plaintiff sought to attach defendant's bank account, because "[t]hese accounts, by nature, are liquid and can be easily transferred from the jurisdiction by a simple telephone call" and "if plaintiff were then to recover a judgment against the defendants, plaintiff would be in the inauspicious position of having to chase defendants" to other venues).

Plaintiffs also assert that they have grounds for an attachment under section 6201(3). *See* Pl. Mem. at 16-18.  Because 6201(1) is satisfied, there is no need to address whether plaintiffs have sufficiently met the requirements of section 6201(3).

innocent investors who have already lost millions of dollars.[68]  The Fund also

points out that it has not made any distributions in over a year.[69]  These

circumstances are not so extraordinary that they justify exercising discretion to

deny plaintiffs' motion where plaintiffs have shown that they are statutorily

entitled to an attachment and there is a demonstrated need for it.[70]

### D.    Amount of Undertaking

Section 6212(b) of the CPLR requires on a motion for an order of

attachment for the plaintiff to post an undertaking of no less than $500 to provide

surety for any damages suffered by virtue of the attachment.  The Fund requests an

undertaking of $3.6 million, which is intended to cover the potential that the Fund

would be subject to employee lawsuits for failure to pay due-and-owing claims.

However, plaintiffs no longer seek to attach the $2.6 million that is earmarked for

non-defendants.  As a result, there is no reason to require such a large undertaking

by plaintiffs.  Instead, plaintiffs suggest an undertaking of $100,000 – or 0.13

---

[68]     *See* Fund Opp. at 22-23.

[69]     *See id.*

[70]     *See Capital Ventures Int'l*, 443 F.3d at 223 (suggesting that exercising
discretion to deny attachment where the statutory criteria are otherwise met may be
limited to those circumstances "in which an order of attachment might be against
the public interest for some reason not addressed in the CPLR").

22

percent of the attachment.[71]  Although there is case law supporting ordering an

undertaking that represents such a small percentage of the attachment,[72] I find such

an undertaking lower than appropriate in this case.[73]  Accordingly, plaintiffs are

ordered to post an undertaking of $250,000 – or approximately 0.35 percent of the

attachment.[74]

## V.   CONCLUSION

For the foregoing reasons, plaintiffs' motion for an order of

attachment is granted, but for $72.4 million instead of the $72.8 million

---

[71]     *See* Pl. Mem. at 18-19.

[72]     *See Osrecovery, Inc. v. One Groupe Int'l, Inc.*, 305 F. Supp. 2d 340,
348 (S.D.N.Y. 2004) (setting an undertaking of $100,000 for an attachment of
$250,000,000 of assets without providing a rationale for the bond amount – 0.04
percent).

[73]     *Cf. New York Dist. Council of Carpenters Pension Fund v. KW
Constr.*, No. 07 Civ. 8008, 2008 WL 2115225, at *6 (S.D.N.Y. May 16, 2008)
(requiring a $50,000 undertaking for an attachment of $1,114,185.18 –
approximately 4.5 percent); *S.M. Pires v. Frota Oceanica Brasileria, S.A.*, 800
N.Y.S.2d 354 (table), 2005 WL 579500, at *5 (Sup. Ct. N.Y. Co. Jan. 14, 2005)
(directing the plaintiffs to post an undertaking of $100,000 where they sought to
attach the defendants' assets up to the amount of $4,176,539.54 – approximately
2.4 percent).

[74]     *See Garden City Irrigation, Inc. v. Salamanca*, 801 N.Y.S.2d 234
(table), 2005 WL 927001, at *4 (Sup. Ct. N.Y. Co. Apr. 18, 2005) (directing the
plaintiff to post an undertaking of $500 where it sought to recover $150,000 – 0.33
percent).

requested.[75]  Plaintiffs are ordered to post an undertaking of $250,000.  The parties

are directed to submit a proposed order of attachment to the Court within three (3)

business days of the date of this Order.

        The Clerk of the Court is directed to close this motion (document no.

257).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      April 30, 2010
            New York, New York

---

[75]      As noted above, *see supra* n.18, plaintiffs' request to attach $72.8
million assumed that $1.4 million was intended for Hunter, instead of $1 million as
stated by the Fund.  Therefore, plaintiffs' requested attachment has been reduced
by the $400,000 difference.  If, in fact, the Fund intends to distribute an amount
greater than $1 million to Hunter, the parties are instructed to notify the Court and
the order of attachment will be adjusted accordingly.

24

## - Appearances -

**For Plaintiffs:**

Bernard Persky, Esq.
Gregory Scott Asciolla, Esq.
Labaton Sucharow, LLP
140 Broadway
New York, New York 10005
(212) 907-0868

Christopher Lovell, Esq.
Ian Trevor Stoll, Esq.
Lovell Stewart Halebian LLP
500 Fifth Avenue
New York, New York 10110
(212) 608-1900

Vincent Briganti, Esq.
Geoffrey Milbank Horn, Esq.
Lowey Dannenberg Cohen & Hart, P.C.
White Plains Plaza
One North Broadway, Suite 509
White Plains, New York 10601
(914) 997-0500

Robert M. Rothman, Esq.
Samuel Howard Rudman, Esq.
Fainna Kagan, Esq.
Coughlin, Stoia, Geller, Rudman &
Robbins, LLP
58 South Service Road, Suite 200
Melville, New York 11747
(631) 367-7100

Louis Fox Burke, Esq.
Leslie Wybiral, Esq.
Louis F. Burke, P.C.
460 Park Avenue, 21st Floor
New York, New York 10022
(212) 682-1700

Christopher J. Gray, Esq.
Christopher J. Gray PC
460 Park Avenue, 21st Floor
New York, New York 10022
(212) 838-3221

**For Defendants Amaranth Advisors L.L.C., Amaranth Advisors (Calgary) ULC, Amaranth Group Inc., Amaranth Management Limited Partnership, Amaranth International Advisors, L.L.C.:**

David Emilio Mollon, Esq.
Steven Michael Schwartz, Esq.
Winston & Strawn LLP
200 Park Avenue
New York, New York 10166
(212) 294-4748

Kristen Victoria Grisius, Esq.
Stephen J. Senderowitz, Esq.
Winston & Strawn LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-6062

**For Defendant Nicholas M. Maounis:**

Geoffrey Aronow, Esq.
Catherine Risdon Murphy, Esq.
Bingham McCutchen LLP
2020 K Street, NW
Washington, DC 20006-1806
(202) 912-2000

Peter Curtis Neger, Esq.
Theo J. Robins, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
(212) 705-7961

**For Defendant ALX Energy, Inc.:**

Steven R. Goldberg, Esq.
One North End Avenue, Suite 1107
New York, New York 10282
(212) 845-5100

**For Defendant Brian Hunter:**

Michael Sangyun Kim, Esq.
Zaharah Rachel Markoe, Esq.
Kobre & Kim LLP
800 Third Avenue
New York, New York 10022
(212) 586-9151

26

**For Defendant Amaranth LLC:**

Amelia Temple Redwood Starr, Esq.
Sheldon Leo Pollock, III, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
(212) 450-4516

**For Defendant Amaranth International Ltd.:**

Adam Selim Hakki, Esq.
Herbert S. Washer, Esq.
Kirsten N. Cunha, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4924

**For Defendant TFS Energy Futures LLC:**

Karl Geercken, Esq.
Alan Mark Kanzer, Esq.
Amber C. Wessels, Esq.
Craig Carpenito, Esq.
Alston & Bird, LLP
90 Park Avenue
New York, New York 10016
(212) 210-9400

**For Defendant Matthew Donohoe:**

Brijesh Pradyuman Dave, Esq.
Joshua Adam Levine, Esq.
Mark J. Stein, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-3315

**For the J.P. Morgan Defendants:**

Daniel John Toal, Esq.
Eric S. Goldstein, Esq.
Marguerite Sophia Dougherty, Esq.
Mark Floyd Pomerantz, Esq.
Jason Harold Wilson, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3869