**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------- X

IN RE AMARANTH NATURAL GAS
COMMODITIES LITIGATION

------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9 30 10

**OPINION AND ORDER**

**07 Civ. 6377 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Plaintiffs filed this putative class action on behalf of futures traders

that purchased, sold, or held natural gas futures or options on futures contracts

between February 16, 2006 and September 28, 2006 (the "Class Period").

Plaintiffs allege that during the Class Period, the Amaranth Defendants

manipulated the prices of New York Mercantile Exchange ("NYMEX") natural gas

futures contracts in violation of sections 6(c), 6(d), and 9(a)(2) of the Commodity

Exchange Act (the "CEA") and the remaining defendants were secondarily liable

for such manipulation.[1]  On April 27, 2009, I held that plaintiffs sufficiently

---

[1]       Defendants who remain in the case are:  Amaranth Advisors, L.L.C.,
Amaranth Advisors (Calgary) ULC, Amaranth LLC, Amaranth Partners LLC,
Amaranth Capital Partners LLC, Nicholas M. Maounis, Brian Hunter, Matthew
Donohoe, (collectively, the "Amaranth Defendants" or "Amaranth"), and ALX
Energy, Inc. and James DeLucia (together, with the Amaranth Defendants,
"defendants").

pleaded these claims to survive a motion to dismiss.[2]  Plaintiffs now move for class

certification.  For the reasons discussed herein, plaintiffs' motion is granted.

        In granting plaintiffs' motion, I find persuasive, indeed controlling,

the reasoning of previous decisions in this District – particularly *In re Sumitomo*

*Copper Litigation*[3] and *In re Natural Gas Commodities Litigation.*[4]  In both cases,

the court certified similar classes based on allegations that defendants manipulated

futures contracts prices in violation of the CEA.[5]  The Second Circuit denied

defendants' petitions for leave to appeal and expressly endorsed the rationale of

*Sumitomo.*[6]

---

[2]        *See In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d
376, 387-98 (S.D.N.Y. 2009).

[3]        *See* ("*Sumitomo I*"), 182 F.R.D. 85 (S.D.N.Y. 1998); ("*Sumitomo II*"),
194 F.R.D. 480 (S.D.N.Y. 2000).

[4]        *See* 231 F.R.D. 171, 177 (S.D.N.Y. 2005) (finding the rationales of
*Sumitomo I* and *Sumitomo II* "persuasive, indeed controlling").

[5]        *See id.* ("[Class action plaintiffs] allege that Defendants reported false
gas prices to several industry publications in an effort to manipulate the prices of
natural gas futures contracts traded on [NYMEX]."); *Sumitomo II*, 194 F.R.D. at
481 ("This action arises out of the alleged manipulation of prices of copper futures
contracts traded on the Commodity Exchange Inc. and the Comex division of
[NYMEX] . . . .").

[6]        *See In re Natural Gas*, No. 05 Civ. 5732, slip op. at *1 (2d Cir. Aug.
1, 2006) (order denying defendants' petition for leave to file an interlocutory
appeal of the *In re Natural Gas* decision "[b]ecause [defendants] have failed to
satisfy the criteria for immediate interlocutory review of the class certification
order, and have failed to show any special circumstances" existed warranting

Decisions in another case, *Kohen v. Pacific Investment Management Co.* (*"PIMCO"*), lend further weight to the conclusions reached in these two decisions.[7] In *PIMCO II*, Judge Richard Posner, writing for the Seventh Circuit, affirmed the district court's certification of a class of futures contracts purchasers who alleged that the defendant manipulated the contract prices in violation of the CEA.[8] Indeed, the district court in *PIMCO I* relied in part on *Sumitomo* and *In re Natural Gas.*[9]

Defendants in the instant matter raise objections similar to those rejected by the courts in these three cases. However, defendants make no effort to

---

immediate review) (citing *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 76 (2d Cir. 2004)); *Sumitomo III*, 262 F.3d 134 (2d Cir. 2001) (explicitly endorsing the rationale of *Sumitomo I and II* and denying leave to appeal the grant of class certification).

[7]    *See "PIMCO I,"* 244 F.R.D. 469 (N.D. Ill. 2007), *aff'd, "PIMCO II,"* 571 F.3d 672 (7th Cir. 2009), *cert. denied*, 130 S.Ct. 1504 (2010).

[8]    *See* 571 F.3d at 680.

[9]    *See generally* 244 F.R.D. 469 (rejecting defendants arguments against class certification based on the fact that the proposed representatives (1) did not trade through the entire class period; (2) may have received a net benefit as a result of the alleged manipulation; (3) had an interest in demonstrating that the price was artificially high on the dates they purchased the contracts while other class members that sold on those dates would have an interest in demonstrating the price was not artificially high; and (4) that injury and causation could not be proven on a class-wide basis because issues regarding whether individual class members suffered economic losses would predominate over issues common to the class).

distinguish *PIMCO* at all, and claim that *Sumitomo* and *In re Natural Gas* should

be ignored merely because they were decided before the Second Circuit placed

heightened burdens on plaintiffs seeking class certification.[10] The *Sumitomo* and *In*

*re Natural Gas* courts did not determine that each Rule 23 requirement was met by

a preponderance of the evidence as I am now required to do. However, the theories

underlying certification adopted in these cases as well as in *PIMCO* remain

compelling.[11]

## II.    BACKGROUND[12]

### A.    NYMEX Futures Contracts

"NYMEX is the world's largest commodity exchange for the trading

of futures contracts and options contracts in energy products, metals, and other

---

[10]    *See* Defendants' Memorandum of Law in Opposition to Plaintiffs'
Motion for Class Certification ("Def. Opp.") at 9-10 (citing *In re IPO Sec. Litig.*
("*Miles I*"), 471 F.3d 24, 41-42 (2d Cir. 2006) (holding that plaintiffs must meet
each element of class certification); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29, 34-35 (2d Cir. 2009) (holding that plaintiffs must satisfy each class
certification element by a preponderance of the evidence).

[11]    *See PIMCO I*, 244 F.R.D. at 478 & n.2 (considering *In re Natural Gas*
and *Sumitomo* despite noting that the "some showing" standard had been overruled
by *Miles I* and *In re IPO* ("*Miles II*"), 483 F.3d 70 (2d Cir. 2006)).

[12]    A detailed description of the facts and procedural history can be found
in this Court's prior opinions and orders in this action. *See In re Amaranth*, 612 F.
Supp. 2d at 379-81; *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp.
2d 513, 519-26 (S.D.N.Y. 2008). The instant Opinion and Order assumes
familiarity with this case and the parties involved.

commodities."[13] Its operations are regulated by the Commodities Futures Trading Commission ("CFTC").  Hundreds of thousands of contracts are traded each day.

One type of contract traded on the NYMEX is a futures contract.  A futures contract is an agreement for the sale of a commodity on a specific date (the "delivery date").  Futures contracts for a given commodity are standardized; the only terms that vary are the delivery date and contract price.  Thus, "negotiations can readily proceed and the agreed prices can be speedily disseminated to other traders."[14]  The seller of a futures contract is said to have the "short" side because he or she hopes that the price of the commodity will drop before the delivery date.  The buyer has the "long" side.[15]

Only a small percentage of futures transactions actually result in an

---

[13]     *Western Capital Design, LLC v. NYMEX*, 180 F. Supp. 2d 438, 440 (S.D.N.Y. 2001).

[14]     *Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980), *aff'd sub nom.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982).

[15]     *See* Plaintiffs' Corrected First Amended Consolidated Class Action Complaint ("Am. Compl.") ¶¶ 44-57; *see also PIMCO II*, 571 F.3d at 675 ("Changes in the demand for or the supply of the underlying commodity will make the price of a futures contract change over the period in which the contract is in force.  If the price rises, the 'long' (the buyer) benefits . . . and if it falls the 'short' (the seller) benefits.").

exchange of money for a commodity.[16]  Most investors close out of their positions

before the delivery dates.  One way in which a trader can close a position is to

enter into an offsetting contract.[17]  For example, a trader who holds a long position

on one hundred tons of coal to be delivered on January 1, 2009, might enter into a

separate short position on one hundred tons of coal to be delivered on that date.

This avoids the possibility that someone might attempt to deliver one hundred tons

of coal to the trader's door.  If the trader's short position costs less than the long

position, the trader will profit from the transaction.[18]

　　　　　One commodity traded on the NYMEX is natural gas.  The settlement

price of a NYMEX natural gas future is the volume-weighted average price

("VWAP") of trades during the thirty-minute settlement period, which is the last

thirty minutes of trading on the "termination day."[19]  The termination day is the

third to last business day of the month preceding the month in which the contract

---

[16]　　　Many futures are "cash-settled," meaning that when the contract
matures, rather than an actual delivery of a commodity, the party that has lost
money on the transaction will pay the other party the appropriate amount.

[17]　　　*See* Am. Compl. ¶ 48.

[18]　　　This might happen if, for example, the trader enters into the initial
long contract, the price falls, and then the trader enters into the corresponding short
contract.

[19]　　　*See id.* ¶ 53.

6

matures.[20]  For example, September 2007 NYMEX natural gas futures are settled from 2:00 p.m. to 2:30 p.m. on Wednesday, August 29, 2007.[21]

The majority of traders in commodities markets are either speculators seeking to profit from price changes or companies that are exposed to the prices of commodities seeking to hedge against the risk of unforeseen price changes.  An important speculative trading strategy is spread trading in which the trader seeks to profit based on the relative price movements between two contracts for the same underlying commodity.[22]  For example, if an investor holds a January natural gas contract long and an October natural gas contract short, the investor profits so long as the January contract's price increases more than the October contract's price.  Thus, when entering a spread, the trader's aim is not to predict whether a market will rise or fall in absolute terms, but to predict how the relationship between

---

[20]     *See id.*

[21]     *See id.*

[22]     The term spread refers to the price differential between any two futures contracts. *See id.* ¶ 47.  However, it generally refers to the price difference between two futures contracts for the same underlying commodity with different expiration dates. *See id.*  For example, the spread between an August 2006 contract priced at $6.00 and a November 2006 contract priced at $6.20 is $.20. *See id.*

prices will change.[23]

### B.   Alleged Manipulation

Plaintiffs allege that Amaranth used its market power to manipulate

the prices of natural gas futures contracts.  According to plaintiffs' expert,

Christopher Gilbert, Amaranth held a dominant or potentially dominant position in

fifteen of the thirty-four natural gas contracts extending from March 2006 to

December 2008 at some point over the Class Period.[24]  Amaranth acquired that

market power by holding a large percentage – exceeding seventy-five percent in

some instances – of the open interest in those contracts.[25]

### 1.   Spread Trading Claims

Plaintiffs allege that Amaranth used this dominant position to

---

[23]      *See* Futures Market: A Primer, Appendix B to Response Affidavit of
Atanu Saha, Ph.D., at 9 (citing George Kleinman, Trading Commodities and
Financial Futures: A Step-by-Step Guide to Mastering the Markets 38 (Upper
Saddle River: Pearson Education 2005)).

[24]      *See* Supplemental Affirmation of Professor Christopher Gilbert in
Further Support of Plaintiffs' Motion For Class Certification ("Gilbert Supp. Aff.")
¶ 12.

[25]      *See id.* ¶¶ 11-15; Am. Compl. ¶¶ 65-72.  "Open interest is the total
number of futures contracts long or short in a delivery month or market that has
been entered into and not yet liquidated by an offsetting transaction or fulfilled by
delivery."  Declaration of Charles Satterfield, plaintiffs' expert, in Support of
Plaintiffs' Motion for Class Certification ("Satterfield Decl.") ¶ 13 (citing CFTC
Glossary, available at www.cftc.gov/opa/glossary/opaglossary_o.htm).

manipulate spreads among natural gas futures contracts.  While natural gas

consumption is seasonal, peaking in the winter months,[26] gas production is more or

less constant over the course of the year.[27]  Accordingly, prices of winter contracts

tend to exceed that of summer contracts.[28]  Plaintiffs assert that defendants profited

by artificially inflating the spread between summer 2006 contracts and winter

2006-2007 contracts by making large volume purchases of winter 2006-2007

contracts (thus inflating those prices) and large volume sales of summer 2007

contracts (thus deflating those prices).[29]  Amaranth's trading positions are complex.

However, if it were net long on the winter contracts and net short on the summer

contracts, as alleged, Amaranth would profit by inflating the spread between these

contracts.

## 2.    Slam the Close Claims

Plaintiffs also allege that Amaranth manipulated natural gas contract

prices by engaging in so-called "slam the close" trades.  As noted, the settlement

price for expiring NYMEX natural gas futures is determined by the volume

---

[26]    *See* Gilbert Supp. Aff. ¶ 9.

[27]    *See id.*

[28]    *See id.*

[29]    *See id.* ¶ 10.

weighted average of the transaction prices taking place during the last thirty minutes of trading on the third to last day of the month before the contract comes due. The resulting price, the VWAP, also determines the price at which a number of related non-exchange instruments settle.[30]  Accordingly, a trader with a large long exposure to the VWAP through *off-exchange* instruments can theoretically benefit from pushing up the VWAP (by purchasing contracts at higher than average prices) even if it will subsequently need to sell its costly *exchange* position at a loss.[31]  Similarly, a trader with a large short non-exchange exposure to the VWAP can benefit from pushing down the VWAP (by selling contracts at below average prices).  Amaranth, according to plaintiffs, was in just such a position – having a large short exposure to various instruments traded off of NYMEX.  It allegedly took advantage of its market power to exploit this position by engaging in a large volume of slam the close trades in order to artificially depress settlement prices for the March, April and May 2006 contracts.[32]

---

[30]     *See id.* ¶ 85.

[31]     *See id.*

[32]     *See id.* ¶¶ 85-89; Am. Compl. ¶¶ 102-106. Because contract prices are interrelated, slamming the close for the March, April, and May 2006 contracts also allegedly had an artificial effect on the prices of the contracts set to expire in the following months as well as the spreads between the summer 2006 and winter 2006/2007 contracts.  *See* Am. Compl. ¶¶ 5, 65-184.

### C.   Proposed Class Definition and Representatives

Plaintiffs have altered their proposed class definition several times during the course of this litigation. They now seek certification of the following class:

> All persons (other than Defendants, their employees, affiliates and co-conspirators) who satisfy any one of the following conditions and were damaged
>
> (1)   purchased, [during the Class Period] . . . , [NYMEX] . . . natural gas futures contracts expiring in December 2006 . . . , January 2007, February 2007, or March 2007 . . . either (i) to liquidate prior to September 1, 2006, a short position in such contract, or (ii) as a long position in such contract which was not liquidated until after May 10, 2006.
>
> (2)   purchased, during the Class Period, a NYMEX natural gas futures contract expiring in March 2006, April 2006, May 2006, June 2006, July 2006, August 2006, September 2006, October 2006 or November 2006 . . . or in April 2007 . . . as a long position in such contract, and liquidated such position after May 10, 2006.
>
> (3)   purchased a 2006 Contract as a long position in such contract, held such contract as of the start of any of the following time periods, and sold such contract after the end of such time period and on or prior to September 28, 2006. Time Periods: (i) 2:00 p.m. - 2:30 p.m. on February 24; (ii) 2:00 p.m. - 2:30 p.m. on March 29; or (iii) 2:00 p.m. - 2:30 p.m. on April 26, 2006 PROVIDED that no person shall satisfy this provision if they held a net short position in March 2006 Contracts at the start of Time Period

("i"), a net short position in April 2006 Contracts at the start of Time Period ("ii"), or a net short position in May 2006 Contracts at the start of Time Period ("iii").[33]

Plaintiffs define "persons" to include "natural persons, corporations and other legal entities."[34] The terms "'NYMEX natural gas futures contracts' or 'natural gas futures contracts' include the miNY Henry Hub natural gas futures contracts."[35] "[A] short position in a given contract expiration (*e.g.*, March 2006) means a position in which the class member's open sales of that expiration exceed the class member's open purchases of that expiration.[36] This is so regardless of whether the short position is a standalone position or is part of a spread with a long position in a different contract expiration (*e.g.*, May 2006)."[37] Finally,

a long position in a given expiration (*e.g.*, April 2006) means a position in which the class member's open purchases in that expiration exceed the class member's open sales in that contract expiration. This is so regardless of whether the long position is a standalone position or is part of a spread with a short position in

---

[33]    Appendix A to Plaintiffs' Supplemental Reply Memorandum of Law in Further Support of Their Motion for Class Certification.

[34]    *Id.*

[35]    *Id.*

[36]    *Id.*

[37]    *Id.*

a different contract expiration (*e.g.*, March 2006).[38]

There are four proposed class representatives – Roberto Calle Gracey, Alan Martin, Gregory H. Smith, and John F. Special (the "Proposed Representatives").[39]  Each claims to have suffered a net loss during the Class Period as a result of the Amaranth defendants' manipulative conduct.  Gracey bought one September 2006 contract on August 10, 2006 for $7.690 as an opening transaction and closed out that position on August 24, 2006 for $7.115 for a net loss of $5,750.[40] Martin engaged in only two trades during the Class Period and both were intra-day trades in which he bought and sold the same quantity of the same contract on the same day.[41]  However, plaintiffs allege that because Amaranth traded between Martin's purchase and sale he may have suffered a loss on his trade as a result of defendants' alleged misconduct.[42]  Smith sold four January 2007

---

[38]     *Id.*

[39]     *See* Am. Compl. ¶¶ 17-21.  Dax Partners LP was originally named as a proposed class representative but dismissed its claims pursuant to a stipulation of the parties that was ordered by the Court.

[40]     *See* Reply Declaration of Charles Satterfield in Support of Plaintiffs' Motion for Class Certification ("Satterfield Reply Decl.") ¶ 6.a.

[41]     *See* Deposition of Alan Martin, Ex. D to the Affidavit of Steven Schwartz in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, at 89-90.

[42]     *See* 2/23/10 Hearing Transcript at 17-19.

contracts in January 2006 and covered the positions on April 24, 2006 for a net loss of $29,440.[43] Special, trading on behalf of the entity Special Exploration, bought fifteen May 2006 contracts and sold those positions on March 30, 2006 for a net loss of $6,000.[44]

## III.    APPLICABLE LAW

### A.    Standing

In articulating the doctrine of Article III standing, the Supreme Court has identified an "irreducible constitutional minimum" that must be shown by a party seeking redress.[45] This minimum is comprised of three distinct elements: (1) the party must have suffered an injury-in-fact, that is, the invasion of a "legally protected interest" in a manner that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical;" (2) the injury must be "fairly traceable" to the alleged conduct; and (3) it must be likely that the injury will be redressed by a favorable decision.[46]

### B.    Class Certification

---

[43]    *See* Satterfield Reply Decl. ¶ 6.b.

[44]    *See id.* ¶ 6.c.

[45]    *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

[46]    *Id.* (quotation marks and citations omitted).

14

### 1.    Requirements of Rule 23(a)

Rule 23 of the Federal Rules of Civil Procedure governs class certification. "'Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility.'"[47] To be certified, a putative class must first meet all four prerequisites set forth in Rule 23(a), commonly referred to as numerosity, commonality, typicality, and adequacy.[48]

The numerosity requirement mandates that the class be "so numerous that joinder of all members is impracticable."[49] Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims.[50] Sufficient numerosity can be presumed at a level of forty members or more.[51]

---

[47]    *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (quoting *Sharif ex rel. Salahuddin v. New York State Educ. Dep't*, 127 F.R.D. 84, 87 (S.D.N.Y. 1989)).

[48]    *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008).

[49]    Fed. R. Civ. P. 23(a)(1).

[50]    *See Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244-45 (2d Cir. 2007); *see also Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) ("'[I]mpracticality' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class.").

[51]    *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (citing 1 Newberg on Class Actions § 3.05 (2d ed. 1985)).

Commonality requires a showing that common issues of fact or law affect all class members.[52] "[C]ommonality does not mandate that all class members make identical claims and arguments . . . ."[53] When "common questions do predominate, differences among the questions raised by individual members will not defeat commonality."[54]

"Typicality 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events[] and each class member makes similar legal arguments to prove the defendant's liability.'"[55] Rather than focusing on the precise nature of plaintiffs' injuries, the typicality requirement may be satisfied

---

[52]    *See* Fed. R. Civ. P. 23(a)(2).

[53]    *Attenborough v. Construction & Gen. Bld'g Laborers' Local 79*, 238 F.R.D. 82, 94 (S.D.N.Y. 2006) (citing *Open Hous. Ctr., Inc. v. Samson Mgmt. Corp.,* 152 F.R.D. 472, 476 (S.D.N.Y. 1993)). *Accord Port Auth. Police Benevolent Ass'n v. Port Auth.*, 698 F.2d 150, 153-54 (2d Cir. 1983)).

[54]    *Civic Ass'n of the Deaf v. Giuliani*, 915 F. Supp. 622, 633 (S.D.N.Y. 1996). *Accord Daniels v. City of New York*, 198 F.R.D. 409, 417 (S.D.N.Y. 2001) (citing *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)); 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1764 (3d ed. 2008) ("To the extent that 'co-extensive' suggests that the representatives' claims must be substantially identical to those of the absent class members, it is too demanding a standard.").

[55]    *Central States*, 504 F.3d at 245 (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).

where "injuries derive from a unitary course of conduct by a single system."[56]
"Although 'the mere existence of individualized factual questions with respect to
the class representative's claim will not bar class certification, class certification is
inappropriate where a putative class representative is subject to unique defenses
which threaten to become the focus of the litigation.'"[57]

Adequacy demands that "the representative parties will fairly and
adequately protect the interests of the class."[58] "Generally, adequacy of
representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic
to the interest of other members of the class and 2) plaintiff's attorneys are
qualified, experienced and able to conduct the litigation."[59] "[C]lass representative
status may properly be denied 'where the class representatives have so little
knowledge of and involvement in the class action that they would be unable or
unwilling to protect the interests of the class against the possibly competing

---

[56]     *Marisol A.*, 126 F.3d at 377.

[57]     *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009)
(quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d
Cir. 2000)).

[58]     Fed. R. Civ. P. 23(a)(4).

[59]     *Baffa*, 222 F.3d at 60 (citing *In re Drexel Burnham Lambert Grp.,
Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

17

interests of the attorneys.'"[60]   However, the Supreme Court has "expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance."[61]

Finally, the courts have added an "implied requirement of ascertainability" to the express requirements of Rule 23(a).[62]   "[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."[63]   "'An identifiable class exists if its members can be ascertained by reference to objective criteria.'"[64]

---

[60]     *Id.* at 61 (quoting *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995)).

[61]     *Id.* (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370-74 (1966)). *Accord Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 344 (S.D.N.Y. 2004) (holding that inflexible application of the adequacy requirement "runs counter to a principal objective of the class action mechanism – to facilitate recovery for those least able to pursue an individual action").

[62]     *Miles I*, 471 F.3d at 30.

[63]     7A Wright, Miller, & Kane, *supra*, § 1760.   *Accord In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008) (quoting *Rios v. Marshall*, 100 F.R.D. 395, 403 (S.D.N.Y. 1983)).

[64]     *In re Fosamax*, 248 F.R.D. at 395 (quoting *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002)). *Accord id.* at 396 ("The Court also must be able to determine the class' membership "'without having to answer numerous fact-intensive inquiries.'" (quoting *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y. 2001))).

18

## 2.    Requirements of Rule 23(b)

In addition to showing that the proposed class satisfies the four prerequisites of Rule 23(a), plaintiffs must show that the class is "maintainable" under Rule 23(b).  A class satisfies this requirement if it fits into one of the three alternative categories delineated by Rule 23(b), subdivisions (1), (2), and (3).  In the case at bar, plaintiffs move for class certification pursuant to subdivision (b)(3).

Under Rule 23(b)(3), certification is appropriate where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and the court finds that class litigation "is superior to other available methods for the fair and efficient adjudication of the controversy."[65]  Generally, the "'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"[66]  The Second Circuit has observed that this subdivision

> encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.[67]

---

[65]    Fed. R. Civ. P. 23(b)(3).

[66]    *In re Nassau County Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001)).

[67]    *Id.* (quotations and citation omitted).

"Regardless of whether [an action] as a whole satisfies Rule 23(b)(3)'s predominance requirement," courts may employ Rule 23(c)(4) to certify a class on a particular issue.[68]

Under Rule 23(b)(3), a court must also determine whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."[69]  In determining whether the class action mechanism is the most "fair and efficient" method of resolving a case, courts must consider the following four nonexclusive factors: (1) class members' interest in maintaining individual actions; (2) "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the difficulties likely to be encountered in the management of a class action."[70]

### 3.    Rule 23(g)

---

[68]    *Id.* at 227.  Rule 23(c)(4)(A) provides that "[w]hen appropriate . . . an action may be brought or maintained as a class action with respect to particular issues . . . ."

[69]    Fed. R. Civ. P. 23(b)(3).

[70]    *In re Nassau County*, 461 F.3d at 230 (citing Fed. R. Civ. P. 23(b)(3)) (quotation marks omitted).

"[A] court that certifies a class must appoint class counsel."[71]  In doing so, a court must consider the following: (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class."[72]  "The court may also consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."[73]

### 4.    Standard of Review

Plaintiffs bear the burden of demonstrating – by a preponderance of the evidence – that the proposed class meets the requirements for class certification.[74]  A court must "'assess all of the relevant evidence admitted at the class certification stage' when determining whether to grant a Rule 23 motion."[75]  "[T]he obligation to make such determinations is not lessened by overlap between

---

[71]    Fed. R. Civ. P. 23(g)(1).

[72]    Fed. R. Civ. P. 23(g)(1)(A).

[73]    Fed. R. Civ. P. 23(g)(1)(B).

[74]    *See Teamsters*, 546 F.3d at 202; *In re Flag Telecom*, 574 F.3d at 34-35.

[75]    *Teamsters*, 546 F.3d at 202 (quoting *Miles I*, 471 F.3d at 42).

a Rule 23 requirement and a merits issue, even a merits issue that is identical with a

Rule 23 requirement."[76]  However, "in making such determinations, a district judge

should not assess any aspect of the merits unrelated to a Rule 23 requirement."[77]

"The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23

in order to maximize the benefit to private parties and, in cases . . . involving

alleged manipulation of public markets, to maximize the benefits to the public

provided by class actions."[78]  "'[I]f there is an error to be made, let it be in favor

and not against the maintenance of the class action, for it is always subject to

modification should later developments during the course of the trial so require.'"[79]

### 5.    Expert Testimony

In *Visa Check*, the Second Circuit held that "a district court may not

weigh conflicting expert evidence or engage in 'statistical dueling' of experts."[80]  A

court's role was merely to "ensure that the basis of the expert opinion is not so

---

[76]    *Miles I*, 471 F.3d at 41.

[77]    *Id.*

[78]    *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 274-75 (S.D.N.Y. 2008) (citing *Sumitomo I*, 182 F.R.D. at 89).

[79]    *Id.* at 275 (quoting *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968), *cert. denied sub nom.*, *Troster, Singer & Co. v. Green*, 395 U.S. 977 (1969)).

[80]    *Visa Check*, 280 F.3d at 135 (quoting *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292-93 (2d Cir. 1999)).

flawed that it would be inadmissible as a matter of law."[81]   However, in *Miles I*, the

Second Circuit explained that "[a] district judge is to assess all of the relevant

evidence admitted at the class certification stage and determine whether each Rule

23 requirement has been met, just as the judge would resolve a dispute about any

other threshold prerequisite for continuing a lawsuit."[82]

### C.   CEA Market Manipulation

"The elements of a market manipulation claim under section 9(a) of

the CEA are as follows: (1) the defendant possessed an ability to influence market

prices; (2) an artificial price existed; (3) the defendant caused the artificial price;

and (4) the defendant specifically intended to cause the artificial price."[83]  "Section

22(a) of the CEA provides plaintiffs with a private cause of action to pursue claims

of market manipulation."[84]  To have standing under the CEA, a private plaintiff

must have purchased or sold a futures contract and suffered "actual damages

resulting from" the alleged manipulation of such futures contract.[85]

---

[81]   *Id.*

[82]   *Miles I*, 471 F.3d at 41.

[83]   *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *3 (S.D.N.Y. June 28, 2007).

[84]   *Id.* (citing 7 U.S.C. § 25(a)).

[85]   7 U.S.C. § 25(a)(1)(D).

## IV.   DISCUSSION

### A.   Numerosity Under Rule 23(a)

Plaintiffs have met the requirement of numerosity requirement by a preponderance of the evidence.[86]  Plaintiffs submit evidence of the CFTC "commitment of traders" reports and NYMEX floor traders.  Together, this evidence indicates that there were approximately one thousand large and floor traders during the Class Period.[87]  Large traders are defined as holders of two hundred or more natural gas futures contracts and are required to make periodic reports of their positions to the CFTC.[88]  Floor traders are professionals who transact their business from the NYMEX trading floor.[89]  Moreover, large and floor traders comprise only "a small number" of the total traders in a given market.[90]  Accordingly, even if the subset of traders holding the long and/or short positions required to qualify for class membership under the proposed definition is a relatively small subset of the total number of NYMEX traders, it is highly likely

---

[86]   Defendants do not dispute that plaintiffs have satisfied the numerosity requirement.  *See* Def. Opp. at 11 n.10.

[87]   *See* Declaration of Ian Stoll, plaintiffs' counsel ("Stoll Decl."), ¶¶ 4-6.

[88]   *See id.* ¶ 4.

[89]   *See* Satterfield Decl. ¶ 10.

[90]   *See id.*;  Stoll Decl. ¶ 6.

24

that the class will be sufficiently large to meet the numerosity requirement.

### B.    Typicality Under Rule 23(a)

Plaintiffs have demonstrated by a preponderance of the evidence that the claims of the Proposed Representatives are typical of those of the class. The Proposed Representatives and the absent class members transacted in the same contracts, in the same centralized marketplace, were allegedly negatively impacted by the same common course of manipulative conduct for which the same group of defendants is alleged to be legally responsible for the damages. In addition, as discussed below,[91] all class members will make similar legal arguments regarding the elements of each claim.

Defendants assert that the Proposed Representatives are atypical because they lack standing under Article III and the CEA.[92] According to defendants, plaintiffs fail to provide "evidence" of injury and, therefore, cannot demonstrate injury-in-fact for purposes of Article III or actual damages under the CEA.[93]

With regard to Article III standing, I note that plaintiffs are not

---

[91]     *See infra* Part IV.E.

[92]     *See* Def. Opp. at 12 (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263-64 (2d Cir. 2006)); *id.* at 14-15.

[93]     *See id.* at 14-15.

required to *prove* injury-in-fact at the class certification stage.[94]  Nevertheless,

plaintiffs have provided evidence that each Proposed Representative suffered a net

loss during the class period that was caused by the alleged manipulation.[95]  Such

losses sufficiently demonstrate injury-in-fact.[96]

       Plaintiffs have also demonstrated actual injury under the CEA by a

preponderance of the evidence.  As already shown, plaintiffs provide evidence that

they suffered net losses caused by the Amaranth defendants' alleged

---

[94]    *See Denney*, 443 F.3d at 263 ("[F]or purposes of determining standing, we 'must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party' (*i.e.*, the class members).") (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

[95]    *See* Satterfield Reply Decl. ¶ 6 (demonstrating that Gracey lost $5,750, Smith lost $29,440, and Special lost $6,000).

[96]    *See In re Alstom SA*, 253 F.R.D. at 274 ("Plaintiffs, who held equity interests in Alstom, allege that Alstom lost approximately 93 percent of its market capitalization over the Proposed Class Period, which sufficiently demonstrates an injury in fact.").  Defendants do not contest that plaintiffs meet the remaining two elements required to establish Article III standing – traceability and redressability. Moreover, plaintiffs have demonstrated these standing elements.  Plaintiffs allege that defendants' manipulative conduct resulted in significant price movements in natural gas futures prices and spreads causing plaintiffs' injury.  Traceability is established by such allegations.  Because plaintiffs allege monetary injury, it is likely, and not merely speculative, that plaintiffs' alleged injury will be redressed by a favorable ruling. *See id.* (holding that traceability and redressability were met under similar facts).

manipulation.[97]  Moreover, case law suggests that because plaintiffs transacted at

artificial prices,[98] injury may be presumed.[99]  That these Proposed Representatives

have standing under Article III and the CEA establishes their standing to represent

the remaining class members because the Second Circuit does "not require that

each member of a class submit evidence of personal standing."[100]  Thus, the

Proposed Representatives are typical of the class and suitable representatives.

### C.    Adequacy Under Rule 23(a)

Plaintiffs have also met the adequacy requirement by a preponderance

of the evidence.  The Proposed Representatives' claims arise from the same events

---

[97]    *See PIMCO I*, 244 F.R.D. at 474 (holding that class representative had standing under CEA where it purchased one or more of the contracts at issue during the class period and was injured as a result of defendants' manipulative conduct).

[98]    *See infra* Part IV.E (discussing that plaintiffs have sufficiently demonstrated that they will be able to prove on a class-wide basis that natural gas futures contracts were trading at artificial prices during the class period).

[99]    *See PIMCO I*, 244 F.R.D. at 475-76 ("Plaintiffs allege that defendants' conduct manipulated the price of the June Contract upward to an artificial level, and, thus, each purchaser of a June Contract within the class period would have paid a higher price than would otherwise be the case absent the alleged manipulation.  Therefore, the Court is satisfied that all members of the class have suffered injury . . . .").

[100]    *Denney*, 443 F.3d at 264.  *Accord id.* ("'Once it is ascertained that there is a named plaintiff with the requisite standing [ ] there is no requirement that the members of the class also proffer such evidence.'") (quoting *PBA Local No. 38 v. Woodbridge Police Dep't*, 134 F.R.D. 96, 100 (D.N.J. 1991)).

or course of misconduct as the other class members and are based on the same
legal theory.  Moreover, the Proposed Representatives have litigated this case for
more than two years since it was filed in July 2007.

   Defendants claim that plaintiffs cannot demonstrate adequacy by a
preponderance of the evidence because there are conflicts of interests between the
Proposed Representatives and other putative class members.  Defendants contend
that all plaintiffs have conflicting "Optimal Start Dates" for the start of the alleged
manipulation.  "Optimal Start Date" is a phrase coined by defendants' expert,
Atanu Saha, and is defined to be "the date during the proposed class period on
which the proposed class member's subsequent cumulative losses from
transactions at allegedly artificial prices is the largest amount."[101]  For example,
Gracey's first trade occurred on July 5, 2006.  According to defendants' expert,
Gracey's Optimal Start Date for the manipulation is July 17, 2006.  By
comparison, Martin made no NYMEX trades after March 2, 2006 and Smith
received a net benefit if only his post July 17, 2006 trading is examined.
Defendants argue that Gracey's incentives conflict with Martin and Smith as to the
Optimal Start Date and that such conflicts should defeat class certification.[102]  In

---

[101]  Affidavit of Atanu Saha ("Saha Aff.") ¶ 16.

[102]  *See* Def. Opp. at 19 (citing Saha Aff. ¶¶ 12-29).

support, defendants cite two Northern District of Illinois cases, both of which found that similar differences in litigation strategy rendered a proposed class representative unable to meet its fiduciary obligations to the rest of the putative class and, thus, not an adequate class representative.[103]

Even assuming defendants' assertions regarding the Optimal Start Dates are correct, this position has been expressly rejected by most courts considering analogous issues.[104]  Indeed, *PIMCO II* is a Seventh Circuit decision issued after the two Illinois lower court decisions relied upon by defendants. Accordingly, I conclude that there are no conflicts of interest between the Proposed Representatives and the other putative class members warranting denial of class

---

[103]  *See id.* at 19-21 (citing *Premium Plus Partners, L.P. v. Davis*, No. 04 Civ. 1851, 2008 WL 3978340 (N.D. Ill. Aug. 22, 2008) and *Centurions v. Ferruzzi Trading Int'l, S.A.*, No. 89 Civ. 7009, 1994 WL 114860 (N.D. Ill. Jan. 7, 1993) (Mag. Rep. & Rec., *adopted*, Mar. 4, 1993 (Docket No. 141)).

[104]  *See PIMCO II*, 571 F.3d at 679-80 (affirming district court's class certification despite potential conflicts of interest among class members depending on when they covered their short positions because the existence of such conflicts was hypothetical, and if and when they became real, the district court could certify subclasses); *In re Natural Gas*, 231 F.R.D. at 183 (rejecting argument that class certification is precluded when class members, including purchasers, sellers, and speculators, have potentially conflicting interests in showing defendants' alleged misconduct caused the price to be lower or higher on particular dates); *Sumitomo I*, 182 F.R.D. at 95-96 ("As to the existence of alleged conflicts because Class members have differing interests in establishing the dates and amounts of manipulation, they do not give rise to a material conflict defeating adequacy . . . .").

certification. I also note that if true intra-class conflicts regarding dates and damages arise, the Court can always create appropriate sub-classes.[105]

## D.    Implied Requirement of Ascertainability

Plaintiffs have also met the implied requirement of ascertainability. Defendants assert that the proposed class is not ascertainable as to either plaintiffs' spread trading claims or their slam the close claims on the ground that identifying whether potential class members had *net* short or long positions, as required by the class definition, will make it impracticable for the court to determine whether a particular individual is a member.[106]

Although plaintiffs' proposed class is more complex than others

---

[105]    *See In re NYSE Specialist Sec. Litig.*, 260 F.R.D. at 74 ("To the extent that different formulas may apply to the calculation of any damages suffered . . . this Court can order certification of appropriate sub-classes at a later juncture within its broad discretion in arranging the structure of a class action litigation . . . .").

[106]    *See* Defendants' Supplemental Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification at 5 ("Def. Supp. Opp."). *See also In re Sadia, S.A. Sec. Litig.*, No. 08 Civ. 9528, 2010 WL 2884737, at *4 (S.D.N.Y. July 20, 2010); *McBean v. City of New York*, 260 F.R.D. 120, 132 (S.D.N.Y. 2009) (Lynch, J.) ("A class is ascertainable when defined by objective criteria that are administratively feasible, without a subjective determination."); *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618, 2004 WL 5719589, at *5 (S.D.N.Y. Mar. 31, 2004) (finding that a class was not ascertainable where the court would have to determine if each member of the proposed class had been injured "at the hands of officials of the Nigerian government acting 'in support of' defendants, which, in turn, would require analysis of the circumstances under which the individual suffered his or her injury").

previously certified by courts in commodities actions, it is not so complex as to

prevent certification. Courts have consistently certified classes that include both

purchasers and sellers of any contract relating to a specific underlying commodity

during the class period.[107]  Plaintiffs – recognizing that traders in commodities

markets often hold both short and long positions on identical contracts – have

limited their proposed class to those who held *net* long or short positions at certain

times and thus could potentially have been injured by Amaranth's allegedly

manipulative trading (which, at different times, is alleged to have caused prices to

increase or decrease).  Provided that the class members can still be identified by

using objective criteria, plaintiffs should not be penalized for limiting the class to

those who are most likely to have been damaged.  Although it will require some

complex math, whether a proposed class member held a net long or short position

on a particular contract can be determined objectively through mechanical

---

[107]     *See, e.g.*, *In re Natural Gas*, 231 F.R.D. at 180 ("All of these problems
are avoided, however, when the final clause of Plaintiffs' proposed class
description is removed, such that the class would be defined as follows: 'All
persons, other than defendants and their employees, affiliates and subsidiaries
(whether or not named in this complaint), who purchased and/or sold NYMEX
natural gas futures between January 1, 2000 and December 31, 2002.'  While the
revised class designation makes no explicit mention of damages, the definition is
analogous to the ones approved of by the *Sumitomo* line of cases addressing
analogous wrongdoing on commodity exchanges. Class membership based upon
this definition is readily ascertainable." (citation omitted)).

calculation.[108] Accordingly, the proposed class is not rendered unascertainable by the limitation that the class members held *net* long or short positions on specific contracts at specific times.

However, the proposed class must be narrowed in one respect: the qualifier "and were damaged" must be removed. Unlike the determination of whether a proposed class member has a net short or long position on a contract, determining whether the proposed class member has been damaged requires an evaluation of the amount that a contract price was artificially inflated or deflated at the time of each sale and purchase. The finder of fact will ultimately have to estimate the amount of artificiality caused by Amaranth's conduct to award damages in this case, but it is premature to make this determination at this stage of the litigation.[109]

---

[108]     *Cf. Schleicher v. Wendt*, No. 09 Civ. 2154, — F.3d —, 2010 WL 3271964, at *1 (7th Cir. Aug. 20, 2010) (Easterbrook, J.) ("[In a securities class action], [t]here will be some person-specific issues, such as when (and how many) shares) a given investor purchased or sold. Timing of each person's transactions, in relation to the timing of the supposedly false statements, determines how much a given investor lost (or gained) as a result of the fraud. But these questions can be resolved mechanically. A computer can sort them out using a database of time and quantity information.").

[109]     *See In re Natural Gas*, 231 F.R.D. at 180 (removing the "and were damaged" qualifier from class action definition in a commodities case because "it would be nearly impossible to determine who satisfies this second condition of class membership without impermissibly inquiring into the merits," but certifying the class after removing that qualifier).

Defendants agree that the "and were damaged" modifier should be removed, but assert that without such a modifier certification is inappropriate because a large percentage of the class would not have been injured by the alleged manipulation.[110] Defendants cite only one decision, *PIMCO II*, in support of this argument. In that decision, though, the Seventh Circuit determined that the proposed class definition, which did not contain an "and were damaged" modifier, was not overly broad. In doing so, Judge Posner, writing for a unanimous panel, instructed:

> What is true is that a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown. Such a possibility or indeed inevitability does not preclude class certification, despite statements in some cases that it must be reasonably clear at the outset that all class members were injured by the defendant's conduct. *Those cases focus on the class definition; if the definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad.*[111]

Without the "and were damaged" modifier, the class will inevitably include some members who, when the merits of their claims are examined, are ultimately shown not to have suffered an injury. However, the proposed definition does not by its

---

[110]   *See* Def. Supp. Opp. at 5.

[111]   *PIMCO II*, 571 F.3d at 677 (citations omitted) (emphasis added).

terms include members who, when their claims are viewed at the outset, are certain

not to have been injured. As such, the class is not overly broad without the

proposed modifier.[112]

### E.    Commonality Under Rule 23(a) and Predominance Under Rule 23(b)(3)

Plaintiffs have also met the related requirements[113] of commonality

and predominance by a preponderance of the evidence. As explained, to succeed

on their market manipulation claims, plaintiffs will have to demonstrate that: (1)

---

[112]    Defendants make two other unavailing ascertainability arguments –
both relating to the third prong of the class definition (which encompasses
plaintiffs' slam the close claims). *First*, they argue that plaintiffs' theory that
"every single trader holding a long position, after any of the three expiry dates, in
any ***non-expiring*** contract through November 2006 somehow was impacted by
artificiality allegedly caused by Amaranth during the 30-minute expiry period on
the specific dates . . . defies basic economics." Def. Supp. Opp. at 4 (citation
omitted) (emphasis in original). This argument, however, goes strictly to the
merits of plaintiffs' claims, not to the ascertainability of the proposed class.
*Second*, defendants argue that the class definition is greatly expanded because the
third prong is not expressly limited to purchases made within the Class Period. *See
id.* at 4 n.4. While defendants are correct that the third prong is not limited to those
who *purchased* specific contracts within the Class Period, it is limited to those who
*held and sold* long positions in specific contracts during the Class Period. This
sufficiently limits the class.

[113]    *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)
("[The predominance inquiry] is a more demanding criterion than the commonality
inquiry under Rule 23(a). Class-wide issues predominate if resolution of some of
the legal or factual questions that qualify each class member's case as a genuine
controversy can be achieved through generalized proof, and if these particular
issues are more substantial than the issues subject only to individualized proof."
citations omitted)).

the defendant possessed an ability to influence market prices; (2) an artificial price

existed; (3) the defendant caused the artificial price; and (4) the defendant

specifically intended to cause the artificial price.  Plaintiffs have demonstrated that

each of these elements is susceptible to class-wide evidence and methods of proof.

### 1.   Ability and Intent

The first and fourth elements (ability and intent) present issues of law

and fact that are common to the entire class.  Proof of Amaranth's intent to

manipulate may be shown, for example, by the conduct and internal

communications of its traders.[114]  In the same vein, Amaranth's ability to influence

prices can be evaluated by determining whether Amaranth held a dominant market

position and whether such a market position would allow it to manipulate prices.[115]

Because both elements can be shown without reference to the class members

included in the action, efficiency is greatly served by answering these questions on

---

[114]   *See* Satterfield Decl. ¶ 22 ("In evaluating Amaranth's intent to manipulate, I would analyze the size of Amaranth's positions, the conduct of Amaranth traders in accumulating managing and liquidating those positions (including the individual communications via instant messaging platforms), as well as Amaranth's representations in general to the market and in particular to the market regulators, and the various price levels before, during and after the Class Period."); *id.* ¶¶ 23-40 (describing further this analysis and providing examples of such evidence).

[115]   *See* Gilbert Supp. Aff. ¶¶ 11-15.

a class-wide basis.[116]

## 2.   Artificiality and Causation

The remaining liability elements – artificiality and causation – also present common issues of law and fact.[117] However, because these elements can only be efficiently proven on a class-wide basis by applying various econometric and statistical models, plaintiffs are required to propose a workable *methodology* for proving these elements before a class action may be certified.[118]

---

[116]   *See In re Natural Gas*, 231 F.R.D. at 180 (holding that common questions predominated in a commodities manipulation claim under the CEA because, *inter alia*, the "claims of all class members ar[ose] from a common course of conduct by the Defendants" (citing *Green*, 406 F.2d at 299-301 and *Sumitomo I*, 182 F.R.D. at 92)).

[117]   *See id.* at 181 ("To establish liability, all class members must demonstrate price artificiality of NYMEX futures contracts prices during the class period and must demonstrate that Defendants' conduct caused the artificiality.").

[118]   *See Miles I*, 471 F.3d at 42-43 (requiring plaintiffs to prove that a relevant market was efficient because in the absence of such efficiency plaintiffs would be unable to invoke the *Basic* [*v. Levinson*] presumption to prove reliance on a class-wide basis (citation omitted)); *Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742, 2010 WL 3119452, at *6 (S.D.N.Y. Aug. 5, 2010) (plaintiffs must propose a "suitable methodology for establishing the critical elements of causation and injury on a class-wide basis"); *In re Ethylene Propylene Diene Monomer ("EPDM") Antitrust Litig.*, 256 F.R.D. 82, 100 (D. Conn. 2009) ("The real question before this court is whether the plaintiffs have established a workable multiple regression equation, *not whether plaintiffs' model actually works*, because the issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a class-wide measure of damages through generalized proof." (emphasis added)).

Plaintiffs' expert, Gilbert, has proposed several models intended to show whether Amaranth had an artificial impact on natural gas futures prices during the Class Period and to measure the amount of that artificial impact.[119] According to Gilbert, he will be able to demonstrate whether Amaranth's trading artificially increased the spread between winter and summer natural gas futures contracts by comparing the 2006/2007 NYMEX spreads with spreads in prior years (the "Before-During Method") as well as by comparing the 2006/2007 NYMEX spreads with contemporaneous spreads in other energy futures contracts (the

---

[119]     *See generally* Gilbert Supp. Aff. Following oral argument, plaintiffs, at the Court's direction, submitted a renewed motion for class certification expanding on the models developed by Gilbert when plaintiffs initially moved for class certification. On July 29, 2010, a month after plaintiffs filed their renewed motion, plaintiffs revised Gibert's affirmation. Because allowing plaintiffs "yet another bite at the apple [would be] unfair to the Court and defendants," I excluded Gilbert's amended affirmation – noting that "plaintiffs will be permitted to amend Gilbert's model and the class definition, if necessary, in preparation for summary judgment and/or trial" if class certification is granted. *See* 7/30/09 Order. The Amaranth Defendants subsequently submitted a letter, joined by the other remaining defendants, asserting that Gilbert "has once again proposed new models in connection with Plaintiffs' pending motion for class certification, this time in his [supplemental] reply affirmation . . . ." 9/7/10 Letter from Steven M. Schwartz, Counsel for Amaranth Defendants, to the Court. Plaintiffs responded that the inclusion of these new models were "strictly limited to replying" to the causation analysis performed by defendants' expert in his supplemental opposition affirmation and were not intended to act as a new basis for granting class certification. 9/8/10 Letter from Christopher Lovell, Counsel for Plaintiffs, to the Court. Accordingly, I have only considered these "new" models to this extent. Regardless, I find that Gilbert's proposed methodology, outlined in his supplemental affirmation, provides a sufficient basis for granting class certification.

"Contemporaneous Cross-Market Method").[120] These models will include an

analysis of whether other potential factors (*e.g.*, supply-demand fundamentals) may

have caused any variations detected by the Before-During and Contemporaneous

Cross-Market Methods.[121] The results of these methods may also be augmented by

application of a "Granger Causality Test" –[122] which asks the question, "Does the

History of a series x assist in forecasting a series y when one also knows the

history of y."[123] In addition, Gilbert has outlined several more complex regression

models for estimating the amount of artificial impact caused by Amaranth's

conduct, and thus, class-wide damages.[124] Finally, Gilbert has proposed two

separate event studies to evaluate the impact of Amaranth's spread trading on

natural gas futures prices and the impact of Amaranth's slam the close trades on

---

[120]   *See* Gilbert Supp. Aff. ¶¶ 17, 20-22.

[121]   *See id.* ¶ 19.

[122]   The Engle-Granger regression form was created by Robert F. Engle and Clive W.J. Granger – who shared the Nobel Prize for Economics in 2003 on the basis of their development of this methodology. *See* Gilbert Supp. Aff. ¶ 35. Plaintiffs refer to this method as the "Granger Causality Test." Plaintiffs' Supplemental Memorandum of Law in Further Support of Their Motion for Class Certification at 4.

[123]   Gilbert Supp. Aff. ¶ 35 (quotation marks omitted).

[124]   *See id.* ¶¶ 49-78.

natural gas futures prices.[125]

Defendants object to several aspects of these models. These objections – which fall into three categories – are insufficient to prevent plaintiffs from demonstrating that they will be able to show liability on a class-wide basis. *First*, defendants assert that some of Gilbert's preliminary calculations contain errors and that when those errors are removed from his calculations the proposed models fail to demonstrate that Amaranth caused artificial prices during the Class Period.[126] Evaluating these assertions would require this Court to judge prematurely the merits of plaintiffs' action. At the class certification stage, district courts are only permitted to resolve merits-based factual disputes that overlap with certification-based factual disputes. In *Miles I*, for example, the Second Circuit held that plaintiffs in a securities class action could only demonstrate reliance (an essential element of the securities cause of action at issue in that case) on a class-wide basis by employing the presumption, established by the Supreme Court in

---

[125]    *See id.* ¶¶ 79-98.

[126]    *See* Def. Supp. Opp. at 8 ("First, the proposed model for determining the October 2006 contract price contains a significant error. . . . Making no other changes to Gilbert's calculation except correcting this admitted date error, however, results in there being no statistically significant impact on the price of the October 2005 contract as a result of Amaranth's positions and trades."); *id.* at 11 ("In contrast, Defendants' expert correctly performed the Granger causality test on each of the 14 individual contracts at issue and found no statistically significant impact of Amaranth's positions on the prices of any of these contracts.").

*Basic Inc. v. Levinson*,[127] that purchasers of a security are presumed to rely on the total mix of information incorporated into that security's price.[128] Accordingly, because that presumption may only be applied in an efficient market, plaintiffs were required to prove market efficiency at the class certification stage even though this overlapped with the merits of the case.[129]

Here, by contrast, defendants do not assert that plaintiffs have failed to prove some factual predicate necessary for demonstrating causation and artificiality on a class-wide basis. Instead, defendants' objections go *solely* to whether plaintiffs' models will *in fact* demonstrate causation and artificiality, and hence, are unrelated to the requirements of class certification. Indeed, by arguing that plaintiffs' models, as corrected by defendants' expert, show that Amaranth did not cause any artificiality during the Class Period, defendants impliedly concede that causation can be evaluated on a class-wide basis.

*Second*, defendants argue that many of Gilbert's models are not yet in final form and have not yet been successfully applied.[130] Plaintiffs, however, are

---

[127]   485 U.S. 224 (1988).

[128]   *See Miles I*, 471 F.3d at 42.

[129]   *See id.*

[130]   *See* Def. Supp. Opp. at 8 (arguing that Gilbert has not provided a method for estimating *the precise amount* of artificiality caused by Amaranth); *id.*

not required to successfully employ their proposed methods at the class

certification stage.[131]  Gilbert's methods will undoubtedly need refinement before

they are effectively applied at trial.  Regardless, at this stage of the litigation, the

proposed methods are sufficiently developed to permit the conclusion that they can

be used to demonstrate liability on a class-wide basis.

       *Third*, and finally, defendants argue that determining whether *each*

class member was economically injured, and thus, the amount of damages (if any)

due to *each* individual will require an inquiry into a series of individualized

issues.[132]  Unlike some of defendants' other objections, this argument does relate to

whether common issues predominate over individual issues.  As I (and others)

have repeatedly stated, "'the fact that damages must be calculated on an individual

---

at 10 (arguing that Gilbert has not yet controlled for other variables that might have
impacted prices); *id.* at 10-11 (arguing that Gilbert used the wrong independent
variable when applying his Granger analysis).

[131]    *See, e.g.*, *In re EPDM*, 256 F.R.D. at 100 ("Even [*Miles I*], however,
does not require plaintiffs to prove the merits of their case-in-chief at the class
certification stage.  They need not demonstrate that their multiple regression
analysis *captures all the proper variables* and thus reaches the 'right' answer, as
the defendants would require them to do." (emphasis added)); *Lapin v. Goldman
Sachs & Co.*, 254 F.R.D. 168, 186 (S.D.N.Y. 2008) (noting that "the relevant
question is only whether Plaintiff's expert's methodology will apply to the entire
class"); *In re Alstom SA Secs. Litig.*, 253 F.R.D. 266, 281 (S.D.N.Y. 2008) ("At the
class certification stage, plaintiffs need only establish that they may be able to [ ]
prove loss causation at trial.").

[132]    *See* Def. Supp. Opp. at 12-13.

basis is no impediment to class certification.'"[133]  Calculating damages will raise

some questions of an individual nature, but this fact is insufficient to prevent class

certification where questions of liability are common to all members of the

proposed class.[134]

### 3.   Conclusion

---

[133]   *In re Fogarazzo v. Lehman Bros, Inc.*, 263 F.R.D. 90, 109 (S.D.N.Y. 2009) (quoting *Klay v. Humana*, 382 F.3d 1241, 1260-61 (11th Cir. 2004)) (citing *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003) ("The possibility that individualized inquiry into Plaintiffs' damages claims will be required does not defeat the class action because common issues nevertheless predominate.")). *Accord In re Natural Gas*, 231 F.R.D. at 180-81 ("The requirement of predominance is met where, as here, there is a showing of predominance of common questions at the liability stage of the litigation, rather than at the damages stage." (citation omitted)); *Sumitomo I*, 182 F.R.D. at 92 ("It is settled in this Circuit that factual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class." (citing *Green*, 406 F.2d at 299-301).

[134]   Defendants also object to the event study proposed by Gilbert relating to plaintiffs' slam the close claims.  According to defendants, "Gilbert admitted in his deposition that the methodology for the slam the close event studies proposed in his affirmation was not 'reliable'" and that a proposed "new methodology has neither been explained to the Court nor to Defendants."  Def. Supp. Opp. at 14 (citing 7/22/10 Gilbert Dep. at 642:16-643:6).  Defendants have overstated the matter.  In his deposition, Gilbert suggested that one aspect of his event study – the method for determining the sequence of trades – might be unreliable, *see* 7/22/10 Gilbert Dep. at 646:5-12, and then went on to describe how that problem could be overcome, *see id.* at 646:13-20.  This remaining problem, which Gilbert says he can solve, does not prevent plaintiffs from employing a reliable event study to analyze the impact of the alleged slam the close trades.

Plaintiffs have demonstrated that their claims raise numerous issues of law and fact that are common to all class members.  Moreover, they have shown that these common issues predominate over individual ones.  Specifically, although the statistical and econometric models proposed by plaintiffs are in some respects incomplete, plaintiffs have demonstrated that they will allow the finder of fact to evaluate these issues on a class-wide basis.

### F.     Superiority Under Rule 23(b)(3)

Plaintiffs have also met the superiority requirement by a preponderance of the evidence.  This case is best suited to proceed as a class action.  It involves more than one thousand potential claimants who are asserting claims based on common issues.  Claimants likely have no interest in pursuing their own claims, which may be prohibitively small.  Adjudicating individual claims would also be a significant waste of judicial resources.  In addition, this litigation has been ongoing since 2007 and class counsel and representatives have already spent a significant amount of time litigating this case.  This Court has also become familiar with the claims in this case, further making it desirable to continue this litigation here.  Finally, managing this litigation as a class action will not pose any substantial difficulties for the Court.[135]

---

[135]    *See PIMCO I*, 244 F.R.D. at 480-81 (finding superiority where the potential class was estimated at over one thousand, the claims would otherwise be

### G.    Appointment of Class Counsel Under Rule 23(g)

I similarly find plaintiffs' counsel to be "qualified, experienced and able to conduct the litigation."[136]  Lovell Stewart Halebian LLP ("Lovell") has nearly thirty years of experience in complex class actions and commodities futures contracts litigation.[137]  Christopher Lovell, the firm's senior attorney and one of the lead attorneys on this case, has tried more than sixty cases and has argued numerous appeals, including one argument before the Supreme Court of the United States.[138]  Lowey Dannenberg Cohen & Hart, P.C. ("Lowey Dannenberg") and Louis F. Burke P.C. ("Burke") have similarly impressive resumes.[139]  Moreover, plaintiffs' counsel has vigorously represented the interests of the class throughout

---

uneconomical to litigate, and judicial resources would be used most efficiently by certifying the class to resolve the common issues presented by the case); *In re Natural Gas Commodities Litig.*, 231 F.R.D at 184-85 (finding superiority where the class was likely to include thousands of members and the high cost of discovery and the application of expert methodologies would be prohibitively expensive "for individual plaintiffs to shoulder alone"); *Sumitomo I*, 182 F.R.D. at 97 (finding superiority where the class was likely to include at least 1500 individuals, but many of whom may not have been damaged to a degree worthy of instituting an individual claim).

[136]    *Baffa*, 222 F.3d at 60 (citing *In re Drexel*, 960 F.2d at 291).

[137]    *See* Resume of Lovell Stewart Halebian LLP, Ex. A-1 to Stoll Decl.

[138]    *See id.*

[139]    *See* Resume of Lowey Dannenberg Cohen & Hart, P.C., Ex. A-2 to Stoll Decl.; Resume of Louis F. Burke P.C., Ex. A-3 to Stoll Decl.

this litigation. Accordingly, I find that Lovell, Lowey Dannenberg, and Burke

satisfy the requirements of Rule 23(g) and appoint the firms as co-class counsel.

## V.    CONCLUSION

For the reasons stated above, plaintiffs' motion for class certification

is granted. The certified class includes the following members: All persons[140]

(other than Defendants, their employees, affiliates and co-conspirators) who satisfy

any one of the following conditions:

(1)    purchased, between February 16, 2006 and September 28, 2006 ("Class Period"), New York Mercantile Exchange ("NYMEX") natural gas futures contracts[141] expiring in December 2006, January 2007, February 2007, or March 2007 either (i) to liquidate prior to September 1, 2006, a short[142] position in such contract, or (ii) as a long[143] position in such contract which was not liquidated until after

---

[140]    "Persons" includes natural persons, corporations and other legal entities.

[141]    In this class definition, the terms "NYMEX natural gas futures contracts" or "natural gas futures contracts" include the miNY Henry Hub natural gas futures contracts.

[142]    As used in this class definition, a short position in a given contract expiration (*e.g.*, March 2006) means a position in which the class member's open sales of that expiration exceed the class member's open purchases of that expiration. This is so regardless of whether the short position is a standalone position or is part of a spread with a long position in a different contract expiration.

[143]    As used in this class definition, a long position in a given expiration (e.g., April 2006) means a position in which the class member's open purchases of that expiration exceed the class member's open sales of that contract expiration. This is so regardless of whether the long position is a standalone position or is part

May 10, 2006;

(2)      purchased, during the Class Period, a NYMEX natural gas futures contract expiring in March 2006, April 2006, May 2006, June 2006, July 2006, August 2006, September 2006, October 2006 or November 2006 or in April 2007 as a long position in such contract, and liquidated such position after May 10, 2006;

(3)      purchased a 2006 Contract as a long position in such contract, held such contract as of the start of any of the following time periods, and sold such contract after the end of such time period and on or prior to September 28, 2006. Time Periods: (i) 2:00 p.m. - 2:30 p.m. on February 24; (ii) 2:00 p.m. - 2:30 p.m. on March 29; or (iii) 2:00 p.m. - 2:30 p.m. on April 26, 2006 PROVIDED that no person shall satisfy this provision if they held a net short position in March 2006 Contracts at the start of Time Period (i), a net short position in April 2006 Contracts at the start of Time Period (ii), or a net short position in May 2006 Contracts at the start of Time Period (iii).

Roberto Calle Gracey, Alan Martin, Gregory H. Smith, and John F. Special are appointed as class representatives. Lovell, Lowey Dannenberg, and Burke are appointed as class counsel. The Clerk of the Court is directed to close this motion (Document No. 272). A conference is scheduled for October 20, 2010 at 4:30 p.m. in Courtroom 15C.

---

of a spread with a short position in a different contract expiration (*e.g.*, March 2006).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             September 30, 2010

47

## - Appearances -

**For Plaintiffs:**

Bernard Persky, Esq.
Gregory Scott Asciolla, Esq.
Labaton Sucharow, LLP
140 Broadway
New York, NY 10005
(212) 907-0868

Christopher Lovell, Esq.
Ian Trevor Stoll, Esq.
Lovell Stewart Halebian LLP
500 Fifth Avenue
New York, NY 10110
(212) 608-1900

Vincent Briganti, Esq.
Geoffrey Milbank Horn, Esq.
Lowey Dannenberg Cohen & Hart, P.C.
White Plains Plaza
One North Broadway, Suite 509
White Plains, NY 10601
(914) 997-0500

Robert M. Rothman, Esq.
Samuel Howard Rudman, Esq.
Fainna Kagan, Esq.
Coughlin, Stoia, Geller, Rudman &
Robbins, LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Louis Fox Burke, Esq.
Leslie Wybiral, Esq.
Louis F. Burke, P.C.
460 Park Avenue, 21st Floor
New York, NY 10022
(212) 682-1700

Christopher J. Gray, Esq.
Christopher J. Gray PC
460 Park Avenue, 21st Floor
New York, NY 10022
(212) 838-3221

48

**For Defendants Amaranth Advisors L.L.C., Amaranth Advisors (Calgary) ULC, Amaranth Group Inc., Amaranth Management Limited Partnership, Amaranth International Advisors, L.L.C.:**

Steven Michael Schwartz, Esq.
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
(212) 294-4748

Kristen Victoria Grisius, Esq.
Stephen J. Senderowitz, Esq.
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-6062

**For Defendant Nicholas M. Maounis:**

Geoffrey Aronow, Esq.
Catherine Risdon Murphy, Esq.
Bingham McCutchen LLP
2020 K Street, NW
Washington, DC 20006-1806
(202) 912-2000

Peter Curtis Neger, Esq.
Theo J. Robins, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022
(212) 705-7961

**For Defendant ALX Energy, Inc.:**

Steven R. Goldberg, Esq.
One North End Avenue, Suite 1107
New York, NY 10282
(212) 845-5100

**For Defendant Brian Hunter:**

Michael Sangyun Kim, Esq.
Zaharah Rachel Markoe, Esq.
Kobre & Kim LLP
800 Third Avenue
New York, NY 10022
(212) 586-9151

**For Defendant Amaranth LLC:**

Amelia Temple Redwood Starr, Esq.
Sheldon Leo Pollock, III, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
(212) 450-4516

**For Defendant Amaranth International Ltd.:**

Adam Selim Hakki, Esq.
Herbert S. Washer, Esq.
Kirsten N. Cunha, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-4924

**For Defendant TFS Energy Futures LLC:**

Karl Geercken, Esq.
Alan Mark Kanzer, Esq.
Amber C. Wessels, Esq.
Craig Carpenito, Esq.
Alston & Bird, LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

**For Defendant Matthew Donohoe:**

Brijesh Pradyuman Dave, Esq.
Joshua Adam Levine, Esq.
Mark J. Stein, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-3315

50

**For the J.P. Morgan Defendants:**

Daniel John Toal, Esq.
Eric S. Goldstein, Esq.
Marguerite Sophia Dougherty, Esq.
Mark Floyd Pomerantz, Esq.
Jason Harold Wilson, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3869