UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x

IN RE: AMARANTH NATURAL GAS COMMODITIES
LITIGATION

MASTER FILE
NO. 07-CV-6377 (SAS)

This Document Relates to:     ALL ACTIONS
--------------------------------------------------------------------------x

**MEMORANDUM IN SUPPORT OF LEAD COUNSEL'S MOTION
FOR AN AWARD OF ATTORNEYS' FEES
<u>AND REIMBURSEMENT OF EXPENSES</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

I.     CLASS COUNSEL'S EFFORTS RESULTED IN THE CREATION OF A
       $77,100,000 COMMON FUND FOR THE BENEFIT OF THE CLASS ..........................4

       A.     In Order To Determine The Amount Of The Fee, Supreme Court And Other
              Precedent Favor The Percentage Of The Common Fund Method..........................4

       B.     The Requested Fee Is Fair and Reasonable Based On All Six "Goldberger"
              Factors..................................................................................................6

              1.     "The Time And Labor Expended By Counsel" ...........................................6

              2.     "The Magnitude And Complexities Of The Litigation"..............................9

              3.     "The Risk Of The Litigation" ...............................................................11

                     a.     Risk of Non-Payment....................................................................11

                     b.     Risks of Establishing Liability.......................................................12

              4.     "The Quality Of Representation"..............................................................14

              5.     "The Requested Fee In Relation To The Settlement"..............................16

                     a.     The Requested One-Third Fee Is Consistent With Prior CEA
                            Fee Awards ...................................................................................16

                     b.     One-Third Fees Have Been Repeatedly Awarded In Less Risky
                            Cases ...........................................................................................16

              6.     "Public Policy Considerations"...............................................................17

       C.     The Requested Fee Is Fair and Reasonable Under A Percentage of the Fund
              Analysis..................................................................................................18

       D.     The Requested Fee is Fair and Reasonable Under The Lodestar "Cross Check"
              And The Lodestar Method Generally ................................................................19

              1.     The Requested Fee is Also Reasonable Under the Lodestar
                     "Cross Check".........................................................................................19

              2.     The Requested Fee Is Reasonable Under The Lodestar Method..............19

i

a. Class Counsel's Hours Are Reasonable..........................................20

b. Class Counsel's Hourly Rates are Reasonable .............................20

II. THE REQUESTED REIMBURSEMENT OF EXPENSES IS REASONABLE AND SHOULD BE APPROVED .............................................................................................21

CONCLUSION.............................................................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Amaranth Advisors L.L.C., et al.*, 128 F.E.R.C. (2009) ................................................................ 11

*Arakis Energy Corp. Sec. Litig.*,
   No. 95-cv-3431 (ARR) 2001 WL 1590512 (E.D.N.Y. Oct. 31 2001) ..................................... 21

*Becher v. Long Island Lighting Co.,* 64 F.Supp.2d 174 (E.D.N.Y.1999)..................................... 17

*Blum v. Stenson*, 465 U.S. 886 (1984) ..................................................................................... 4, 20

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980).............................................................................. 4

*Calle Gracey, et al v. Maounis, et al.*, 11-cv-4001 (S.D.N.Y. June 11, 2011) ............................ 12

*Cange v. Stotler & Co.,* 826 F.2d 581 (7th Cir. 1987).................................................................... 17

*Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885)............................................................ 5

*Commodity Futures Trading Commission v. Amaranth Advisors, LLC., et al.,* 07-cv-6682,
   Docket No. 73 (S.D.N.Y. Aug. 12, 2009) ......................................................................... 11

*Fogarazzo v. Lehman Bros., Inc.*, 03-cv-5194,
   2011 WL 671745 (S.D.N.Y. Feb. 23, 2011) ................................................................... *passim*

*Frank v. Eastman Kodak*, 228 F.R.D. 174 (W.D.N.Y. 2005)......................................................... 17

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 46 (2nd Cir. 2000).............................. *passim*

*Greene v. Emersons, Ltd.,* No. 76 Civ. 2178, 1987 WL 11558 (S.D.N.Y. May 20, 1987) .......... 17

*In re BP Propane Direct Purchaser Antitrust Litig.*,
   06-CV-3621 (JZ) (N.D. Ill.) ........................................................................................ 12, 16

*In re Buspirone Patent Litigation*,
   No. 01-MD-1410 (S.D.N.Y. Apr. 17, 2003) ........................................................................ 18

*In re Crazy Eddie Sec. Litig.,* 824 F. Supp. 320 (E.D.N.Y. 1993)................................................. 17

*In re Initial Public Offering Securities Litig.*, 671 F.Supp.2d 467 (S.D.N.Y.)...................... *passim*

*In re Medical X-Ray Film Antitrust Litig.*, CF 1998 WL 661515 (E.D.N.Y. 1998)..................... 17

*In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124 (S.D.N.Y. 2008) ....................... 14

*In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) ................. 5, 19

*In re Natural Gas Commodities Litig.*, 03-CV-6186, Docket No. 445 (S.D.N.Y. 2005) ....... 12, 16

*In re Prudential Securities, Inc. Ltd. Partnerships Litig.*,
   912 F.Supp. 97 (S.D.N.Y. 1996) ....................................................................... 16, 20

*In re Reddiff.com India Ltd. Securities Litig.*,
   21 MC 92 (SAS), 01-cv-3020 (SAS) ....................................................................... 16

*In re Soybeans Futures Litigation.*, No. 89 Civ. 7009 (N.D. Ill.) ........................................... 12, 16

*In re Sumitomo Copper Litigation*, 74 F.Supp.2d 393 (S.D.N.Y. 1999) ............................. 5, 9, 12

*Kohen, et al. v. Pacific Investment Management Co., et al.*, 05-cv-0468 (RAG) (N.D. Ill.)........ 12

*Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002) ........... 15, 17, 18

*Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007) .................................... 19

*Maywalt v. Parker & Parsley Petroleum Co.*, 963 F. Supp. 310 (S.D.N.Y. 1997) ...................... 17

*Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353 (1982) ...................................... 9

*Missouri v. Jenkins*, 491 U.S. 274 (1984) ...................................................................................... 20

*New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136 (2d Cir. 1983) ........ 20

*RMED Intern., Inc. v. Sloan's Supermarket, Inc.*, No. 94-5587,
   2003 WL 21136726 (S.D.N.Y. May 15, 2003) ......................................................... 17

*Spann v. AOL Time Warner*, 02 Civ. 8238 (DLC),
   2005 WL 1330937 (S.D.N.Y. Jan. 7, 2005) ............................................................. 17

*Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939) ..................................................................... 5

*Trustees v. Greenough*, 105 U.S. 527 (1881) ................................................................................. 5

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396, F.3d 96 (2d. Cir. 2005) ........................... 5, 18, 19

*Willix v.Healthfirst, Inc.*, No. 07-1143, 2011 WL 754862 (E.D.N.Y. Feb. 18, 2011).................. 17

**Statutes**

7 U.S.C. § 1 *et seq*..................................................................................................... 2

**Other Authorities**

1974 U.S. Code Cong & Admin. News ...................................................................... 9

H.R. Rep. No. 565, 97th Cong., 2d Sess., pt. 1 at 56-7, *reprinted* in 1982 U.S. Code Cong. & Admin. News 3871, 3905-06................................................................. 17

H.R. Rep. No. 93-975, p. 1 (1974).......................................................................... 9

Seth Lubove and Elizabeth Stanton, *Pimco Power in Treasuries Prompts Suit*, BLOOMBERG MARKETS, February 20, 2008 (April 2008)............................................... 14

Written Testimony of Acting Chairman Walter Lukken and Commissioner Michael Dunn, Commodity Futures Trading Commission, before the Permanent Subcommittee on Investigations Committee on Homeland Security and Governmental Affairs—United States Senate, July 9, 2007 .................................................................................... 13

Pursuant to this Court's January 3, 2012 Order,[1] Lovell Stewart Halebian Jacobson LLP, Lowey Dannenberg Cohen & Hart, P.C. and Louis Burke, P.C. ("Lead Counsel") respectfully submit this memorandum and the accompanying declarations in support of their motion for (a) an award of attorneys' fees for Class Counsel's[2] professional services in creating a $77,100,000 common fund for the benefit of the Class, and (b) reimbursement of the expenses Class Counsel reasonably incurred in the successful prosecution of this action.

## PRELIMINARY STATEMENT

Class Counsel respectfully requests an award of attorneys' fees in the amount of one-third of the $77,100,000 common fund (or $25,700,000) created by the settlement with the Amaranth Defendants.[3]  The requested one-third fee is eminently reasonable, equitable and fair for numerous distinct reasons under controlling law.

*First*, although claims for commodity futures manipulation have been recognized as "esoteric" and notoriously "complex and difficult," *In re Sumitomo Copper Litigation*, 74 F.Supp.2d 393, 395 (S.D.N.Y. 1999) (Pollack, J.), the requested one-third fee does **not** provide Class Counsel with any positive risk multiplier and, on the contrary, constitutes a negative risk multiplier of 0.917 on the lodestar value of Class Counsel's professional services herein.  See I.B.1 *infra* (detailing Class Counsel's lodestar); see also I.D.1 *infra*.

*Second*, notwithstanding the fact that there were significant additional risks herein that did not exist in almost all prior successful commodity futures manipulation class actions, Class

---

[1] "Order Preliminarily Approving Proposed Settlement, Scheduling Hearing for Final Approval Thereof, and Approving The Proposed Form and Program of Notice to the Class" dated January 3, 2012.  Docket No. 376.

[2] "Class Counsel" refers to Lead Counsel, Law Offices of Christopher J. Gray, P.C., Labaton Sucharow, LLP and Robbins Geller Rudman & Dowd LLP.

[3] Plaintiffs' motion seeking final approval of the $77.1 million settlement with the Amaranth Defendants is being filed concurrently herewith.  Plaintiffs are also moving for final approval of the settlement with the Floor Broker Defendants but are **not** requesting any fees with respect to such settlement.

Counsel were able to achieve a $77,100,000 settlement which is (a) **40% of the remaining limited assets** of Amaranth LLC and (b) the **fourth largest** class action recovery in the 85-plus year history of the CEA.  See I.B.3a *infra*.

*Third*, Class Counsel were able to achieve this excellent result **only** because they successfully prevailed on every significant litigation battle in this extremely hard-fought case against **seven** nationally recognized and highly respected law firms representing Defendants. See I.B.4. *infra*.  Among other things, Plaintiffs overcame Amaranth's two motions to dismiss, successfully moved to attach $72.4 million of Amaranth LLC's limited remaining funds, successfully moved for class certification, successfully defended the Court's order granting class certification against Defendants' Rule 23(f) petition for interlocutory appeal in the Second Circuit Court of Appeals, and successfully prevailed on Plaintiffs' important motion to compel the production of critical documents.  See I.B.1 *infra*

*Fourth*, the "spread manipulation" claims[4] here were unprecedented and more complex and risky than the extremely risky claims made in prior commodity futures manipulation cases. *Compare* accompanying Memorandum of Law In Support of Final Approval of Settlements at pp. 1-2 (recounting the unique risks of the spread manipulation claims) and I.B.2 *infra with* Markham, *The Manipulation of Commodity Futures Prices The Unprosecutable Crime,* 8 Yale Journal on Regulation 281-389 (1991) (recounting the lack of success in prior prosecutions of manipulation claims).

*Fifth*, numerous prior class action settlements involving less complex manipulation

---

[4] Plaintiffs here alleged that the Amaranth Defendants engaged in **two** separate but related types of manipulation.  See I.B.2 *infra*.  Specifically, Plaintiffs alleged that the Amaranth Defendants engaged in an eight-month long "spread" manipulation of fourteen New York Mercantile Exchange ("NYMEX") natural gas futures contracts.  *Id*.  Plaintiffs further alleged that the Amaranth Defendants engaged in "slam the close" manipulations during the thirty minute settlement periods of three different expiring NYMEX natural gas futures contracts.  *Id*.

claims in violation of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq*. ("CEA") have awarded a one-third fee even in circumstances where such one-third fee resulted in a **positive** lodestar multiplier.  See I.B.5a *infra*.  The requested one-third fee here would result in a **negative** lodestar multiplier.  See I.D.1 *infra*.

*Sixth*, Courts in this District faced with much less risky claims than the complex CEA manipulation claims here have repeatedly awarded one-third fees that resulted in **positive** lodestar multipliers.  See I.B.5b *infra*.  Again, the requested one-third fee in this complex and risky CEA manipulation case would result in a **negative** lodestar multiplier.  See I.D.1 *infra*.

*Seventh*, the risks associated with Plaintiffs' spread manipulation claims were **further significantly increased** by testimony from the Chairman of the CFTC before the United States Senate to the effect that the CFTC's chief economist could **not** attribute the large increases in spread prices to Amaranth's trading.  *Id*.  Relying on the foregoing CFTC testimony, the Amaranth Defendants argued that Plaintiffs could not establish that the anomalous spread prices observed during the Class Period were caused by the Amaranth Defendants' trading.  *Id*.

*Eighth*, Class Counsel have performed the services necessary to produce the excellent result herein without any payment for more than 4 ½ years.  Class Counsel also advanced $1,662,613.08 in expenses for numerous experts, consultants, mediation and other necessary litigation expenses without any assurance that any of these substantial expenses would ever be reimbursed.  See II *infra*.

*Ninth*, given the high risks undertaken and excellent result obtained by Class Counsel, there is a strong public policy interest that the private enforcement of the CEA by class actions such as this one be encouraged by the award of a fee that rewards and compensates the professional services undertaken to produce this result.  See I.B.6 *infra*.

Class Counsel also respectfully requests the reimbursement of reasonable expenses incurred in the successful prosecution of this action in the amount of $1,662,613.08.   See II *infra*.  More than 81% of these expenses consisted of payments to numerous outside experts and consultants, primarily including the six experts who submitted merits expert reports.  *Id*.

In these circumstances, Class Counsel respectfully submits that this Court should award a one-third fee and order reimbursement of Class Counsel's requested expenses of $1,662,613.08.

Notice of the foregoing fee and expense requests was provided to the Class.  See Affidavit of Katherine Livesay (submitted in connection with Plaintiffs' motion for final approval of the Settlements).  The deadline for objections to the Settlements is March 19, 2012. See Docket No. 376 at ¶13.  As of March 9, 2012 no objections to the Settlements or the requested fees and expenses had been filed.  In the event that any purported objections are filed, Lead Counsel will respond to such objections in a reply brief prior to the April 9, 2012 fairness hearing.

## I.   CLASS COUNSEL'S EFFORTS RESULTED IN THE CREATION OF A $77,100,000 COMMON FUND FOR THE BENEFIT OF THE CLASS

The Supreme Court has recognized that "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); see also *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 46, 47 (2nd Cir. 2000) ("*Goldberger*") (the common fund doctrine "prevents unjust enrichment of those benefiting from a lawsuit without contributing to its cost").

### A.   In Order To Determine The Amount Of The Fee, Supreme Court And Other Precedent Favor The Percentage Of The Common Fund Method

In determining the amount of a common fund fee award, the United States Supreme Court consistently has held that it is appropriate for a fee to be determined as a percentage of the fund recovered.  *See Blum v. Stenson*, 465 U.S. 886, 900 n. 16 (1984) ("under the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class"); *see also Trustees v. Greenough*, 105 U.S. 527, 532 (1881); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 124-25 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-66 (1939). The percentage of the fund method is preferred, in part, because of its "ease of administration, permitting the judge to focus on 'a showing that the fund conferring a benefit on the class resulted from the lawyers' efforts' rather than collateral disputes over billing." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 485 (S.D.N.Y. 1998).

In *Walmart v. Visa U.S.A., Inc.,* 396 F. 3d 96, 122 (2d Cir. 2005), the Second Circuit Court of Appeals recognized that the trend in determining the amount of a common fund fee in this Circuit is toward the percentage-of-the-fund method.  *See also In re Sumitomo Copper Litig.*, 74 F.Supp. 2d 393, 397 (S.D.N.Y. 1999) ("[a]t least eight other circuits—the First, Third, Sixth, Seventh, Ninth, Tenth, Eleventh and District of Columbia Circuits—have affirmatively approved the percentage-of-recovery method as an appropriate method for determining attorneys' fees.").

The less favored method for determining the fairness and reasonableness of the fees requested by counsel in a common fund case is the lodestar method.  See *e.g., In re Sumitomo Copper Litig.*, 74 F.Supp. 2d at 397 ("[c]ourts increasingly have come to recognize the shortcomings of the lodestar/multiplier method…").  Under the lodestar method, the court reviews the fee petition in order to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate in order to arrive at the "lodestar." *Wal-Mart,* 396 F.3d at 121.  Additionally, the district court may, in its discretion, increase the

lodestar based on factors such as the risk of the litigation and the performance of the attorneys. *Id*.

Plaintiffs respectfully submit that the Court should, as it has done in prior cases, examine the reasonableness of the fee request herein using a percentage of the fund analysis based on the increasing dominance of that approach and its overall efficiency compared to the lodestar method.  See *e.g., In re Initial Public Offering Securities Litig.*, 671 F.Supp.2d 467, 505 (S.D.N.Y.) (Scheindlin, J.) ("*IPO*") (adopting percentage of the fund method to award fees in common fund case); *Fogarazzo v. Lehman Bros., Inc.*, 03-cv-5194, 2011 WL 671745 at *4 (S.D.N.Y. Feb. 23, 2011) ("*Fogarazzo*") (Scheindlin, J.) (same).

### B.   The Requested Fee Is Fair and Reasonable Based On All Six "*Goldberger*" Factors

No matter which method is chosen, the reasonableness of a common fund fee award is governed by the following six "*Goldberger*" factors:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 290 F.3d at 50.  As set forth below, the requested one-third in this case is fair and reasonable based on all six *Goldberger* factors.

### 1.   "The Time And Labor Expended By Counsel"

The first factor for determining whether a fee is reasonable is "the time and labor expended by counsel."  *Id*.  As reflected in the declarations submitted herewith, Lead Counsel has spent 44,333.64 hours of professional time in order to successfully prosecute this action.[5] The other firms that worked on the case devoted an additional 4,779.9 hours of services in

---

[5] Declaration of Christopher M. McGrath at ¶6 (detailing Lovell Stewart's professional time); Declaration of Geoffrey Horn at ¶6 (detailing Lowey Dannenberg's professional time); Declaration of Louis F. Burke at ¶6 (detailing the Burke firm's professional time).

prosecuting this action at the direction of Lead Counsel.[6]  This brings the total to 49,113.54

hours of professional services performed by Class Counsel.  The total lodestar value of Class

Counsel's time is $28,014,724.20.  A summary of Class Counsel's hours and lodestars is set

forth in the below table.

| FIRM | HOURS | LODESTAR |
|---|---|---|
| | | |
| Lovell Stewart Halebian Jacobson LLP | 23,527.42 | $13,809,618.25 |
| Lowey Dannenberg Cohen & Hart, P.C. | 14,792.60 | $8,577,478.50 |
| Louis F. Burke, P.C. | 6,013.62 | $3,084,831.20 |
| | | |
| Law Offices of Christopher J. Gray, P.C. | 2,562.20 | $1,320,489.00 |
| Labaton Sucharow, LLP | 1,256.70 | $739,758.50 |
| Robbins Geller Rudman & Dowd LLP | 961.00 | $482,548.75 |
| | | |
| **TOTALS** | 49,113.54 | $28,014,724.20 |

Under the high risk conditions present in this case (see I.B.3 *infra*), Lead Counsel had to

do an extraordinary amount of work to obtain the result herein.  For example, Lead Counsel:

(a)        took or defended forty-one days of fact and expert depositions;

(b)        used Lovell Stewart's proprietary document review software to process—and

Class Counsel's attorneys and paralegals to analyze—the equivalent of more than two million

pages of documents produced by the Defendants, including hundreds of thousands of instant

messages with complex natural gas trading jargon.  Class Counsel also reviewed documents

produced by multiple non-parties who were subpoenaed in the action.  Such documents

included voluminous data and other information produced by NYMEX and materials produced

by the United States Senate pursuant to Class Counsel's request pursuant to the Freedom of

Information Act, 5 U.S.C. §522 ("FOIA");

---

[6] Declaration of Christopher J. Gray at ¶6 (detailing the Gray firm's professional time); Declaration of Bernard Persky at ¶6 (detailing Labaton Sucharow's professional time); Declaration of Robert Rothman at ¶5 (detailing Robbins Geller's professional time).

(c)       retained and worked with sixteen separate economists, natural gas trading experts and other consultants and helped them prepare twenty expert reports which were served on Defendants;

(d)       prepared the initial and final drafts of all pleadings and briefs in the action. These included, but were not limited to, the Consolidated Amended Complaint, oppositions to the ten  initial motions to dismiss, the First Amended Consolidated Class Action Complaint, the oppositions to the six subsequent motions to dismiss, the order to show cause restraining the Amaranth Defendants from distributing any remaining assets without providing prior notice, all papers in support of class certification, including ten expert reports and four memoranda of law in support of certification, the successful opposition to Defendants' Rule 23(f) petition to the Second Circuit Court of Appeals, the motion for attachment pursuant to Fed. R. Civ. P. 64 and N.Y.C.P.L.R. 6201(1) against Amaranth L.L.C., a motion to amend the complaint to add fraudulent conveyance claims against certain Defendants and their investors, and numerous significant additional briefs concerning the need to compel Defendants' witnesses to appear at deposition or produce certain documents;

(e)       prepared and responded to voluminous discovery requests including document requests, interrogatories, requests for admission, third party subpoenas to NYMEX, FERC, CFTC and other third parties, and FOIA requests to the CFTC and FERC;

(f)       conducted all settlement negotiations with the Defendants;

(g)       engaged in mediation before the Honorable Daniel Weinstein (Ret.) which included mediation briefs, settlement discussions and communications, presentations of evidence and critiques of the Defendants' evidence before the mediator, as well as informal meetings with the mediator alone or the Mediator and counsel for the Defendants;

(h)      negotiated all settlement documentation and briefing associated with the Amaranth Settlement Agreement and Floor Broker Settlement Agreement, including two preliminary approval motions, the Plan of Allocation, Class Notice, Proof of Claim, and related documents; and

(i)      worked with the Court-appointed Settlement Administrator to provide notice to the Class and fielded calls from Class members in response to the Class Notice.

Lead Counsel respectfully submits that the quality of their extensive foregoing professional services is best indicated by the excellent result achieved for the Class.  Each Class Counsel firm has submitted a declaration in support of this motion detailing their contributions to the successful prosecution of this action.[7]

### 2.      "The Magnitude And Complexities Of The Litigation"

The second *Goldberger* factor—the magnitude and complexity of the case—also heavily supports the requested fee award in this case.  *Goldberger*, 209 F.3d at 50.

**Complexity**.  Claims for commodity futures manipulation are "esoteric" and notoriously "complex and difficult."  *Compare Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 356 (1982) quoting H.R. Rep. No. 93-975, p. 1 (1974), 1974 U.S. Code Cong & Admin. News at 5843 *with In re Sumitomo Copper Litigation*, 74 F.Supp.2d 393, 395 (S.D.N.Y. 1999) (Pollack, J.) (CEA manipulation cases are "complex and difficult").

The undersigned respectfully submit that, in their experience, this case was even more complex than the average commodity futures manipulation case because Plaintiffs alleged that

---

[7] See Declaration of Christopher M. McGrath at ¶5 (detailing Lovell Stewart's contributions); Declaration of Geoffrey Horn at ¶5 (detailing Lowey Dannenberg's contributions); Declaration of Louis F. Burke at ¶5 (detailing the Burke firm's contributions); Declaration of Christopher J. Gray at ¶4 (detailing the Gray firm's contributions); Declaration of Bernard Persky at ¶5 (detailing Labaton Sucharow's contributions); Declaration of Robert Rothman at ¶6 (detailing Robbins Geller's contributions).

the Amaranth Defendants engaged in **two** separate but related manipulations of NYMEX natural gas futures prices—an eight-month long "spread" manipulation and three "slam the close" manipulations.

**Eight-Month Long Spread Manipulation**. First, Plaintiffs alleged that Defendants held dominant positions in March 2006 through April 2007 NYMEX natural gas contracts ("Class Contracts") during certain parts of the Class Period and used these dominant positions to artificially inflate the "spread" prices between summer 2006 contracts and winter 2006-2007 contracts. Specifically, Plaintiffs alleged that Defendants' "spread" manipulation was designed to push down summer 2006 contract prices and push up winter 2006-2007 contract prices in order to widen the "spread" (or price differential) of these two categories of contracts.

**Three Slam the Close Manipulations**. Second, Plaintiffs alleged that Defendants manipulated NYMEX natural gas futures prices by engaging in so-called "slam the close" trades during the last thirty minutes of trading in the March, April and May 2006 NYMEX natural gas futures contracts for the purpose of driving the price of those contracts lower in order to benefit Defendants' non-NYMEX natural gas positions and further inflate spread prices.

The complexities of this case are further indicated by the volume of expert work required to successfully prosecute the case. Plaintiffs submitted ten class certification expert reports totaling 265 pages, six merits expert reports including hundreds of regression analyses and totaling more than 500 pages, and four expert reports relating to Plaintiffs' successful attachment motion. Plaintiffs were prepared to submit numerous additional rebuttal expert reports had a settlement not been reached. In total, Plaintiffs retained sixteen experts and consultants to aid them in the successful prosecution of this action. Similarly, Defendants submitted numerous expert reports in response to Plaintiffs' expert reports.

**Magnitude**.  In terms of magnitude, over the course of the 4 ½ years of litigation that produced 378 docket entries herein, Class Counsel, among other things:  (1) reviewed more than two million pages of documents and data produced by the nineteen Defendants in this action; (2) took or defended twenty-five fact and four expert depositions amounting to forty-one days of testimony; (3) issued fourteen third party subpoenas; (4) filed multiple complaints, including a 165-page amended complaint; (5) defended against sixteen motions to dismiss; (5) successfully briefed and argued the class certification motion; (6) successfully briefed and argued for an attachment of $72.4 million of Amaranth LLC's funds; and (7) filed a separate but related action alleging that certain of the Defendants violated New York statutory fraudulent conveyance provisions.

The Court issued numerous opinions and orders herein, including two lengthy opinions and orders relating to Defendants' motions to dismiss, an opinion and order certifying this action as a class action, and an opinion and order attaching $72.4 million of Amaranth LLC's remaining assets.  See Docket Nos. 147, 201, 262, 321.

### 3.    "The Risk Of The Litigation…"

The Second Circuit has identified "the risk of success as 'perhaps the foremost' factor to be considered in determining" a reasonable fee award.  *Goldberger*, 209 F.3d at 54.

### a.    Risk of Non-Payment

The Amaranth entities went out of business when they collapsed in September 2006 after losing in excess of $6 billion on natural gas futures contracts.  See Docket No. 155 at ¶¶171-177. After the collapse, Amaranth LLC, the "master fund" that held the allegedly manipulative

positions and other investments on behalf of the Amaranth entities, began distributing its remaining funds to investors.[8]

The risk of non-payment was real enough that the FERC[9] and the CFTC[10] jointly settled their respective regulatory actions with Amaranth (excluding Defendant Hunter) for only $7.5 million and specifically noted that the low settlement was due in large part to their perceived inability to secure a substantial recoverable judgment. See Joint Explanatory Statement, F.E.R.C. Docket No. IN07-26-000, at 12 (July 23, 2009).

Although the risk of non-payment was extremely high in this case, Lead Counsel proactively minimized this risk as much as possible. In or around March 2010, Amaranth LLC announced that it would distribute approximately $75 million of its remaining $195 million in assets as it continued to wind-up the firm. In response, Plaintiffs sought and successfully obtained an attachment of $72.4 million of Amaranth LLC's limited remaining assets. See Docket No 265 (order attaching $72.4 million of Amaranth's LLCs assets). Also, in June 2011, Plaintiffs filed a separate but related action against more than one hundred defendants alleging that they authorized or were the recipients of transfers made by Amaranth in violation of New York statutory fraudulent conveyance provisions. See *Calle Gracey, et al v. Maounis*, *et al*., 11-cv-4001, (S.D.N.Y. June 11, 2011). Plaintiffs' "fraudulent conveyance complaint" sought to claw-back prior distributions made by Amaranth to its investors and employees after it collapsed in September 2006. *Id.*

> **b.**   **Risks of Establishing Liability**

This is the rare CEA manipulation class action where there was no governmental or

---

[8] Plaintiffs believe that Amaranth LLC, as the master fund, is the most solvent remaining defendant in this case from which a judgment of any significant magnitude could be satisfied.
[9] *Amaranth Advisors L.L.C., et al*., 128 F.E.R.C. ¶ 61,154 (2009).
[10] *Commodity Futures Trading Commission v. Amaranth Advisors*, *LLC., et al.,* 07-cv-6682, Docket No. 73 (S.D.N.Y. Aug. 12, 2009).

exchange complaint relating to a substantial portion of Plaintiffs' manipulation allegations.[11] Plaintiffs' experts estimated that the damages associated with the spread manipulation claims were **more than four times greater** than the damages associated with the three slam the close manipulations.  Although the FERC and CFTC brought charges against Amaranth relating to the three so-called "slam the close" manipulations, no governmental entity ever brought charges against Amaranth for manipulation of spread prices.  In fact, Defendants argued that Plaintiffs' spread manipulation claims lacked merit because the CFTC and FERC did not bring such claims and instead only focused on the three slam the close manipulations. See *e.g.,* Docket No. 179 at p. 2.

However, there was not just an absence of governmental action relating to Plaintiffs' spread manipulation allegations.  On the contrary, the CFTC's Chairman actually testified before the U.S. Senate that the CFTC's chief economist could **not** attribute the large increases in spread prices to Amaranth's trading.[12]  Relying on the foregoing testimony, the Amaranth Defendants argued that Plaintiffs could not establish that the Amaranth Defendants' trading caused the anomalous spread prices observed during the Class Period.  See *e.g.*, Docket No. 303 at pp. 11-12.  While Class Counsel believes that they would have been able to establish that the Amaranth Defendants' trading did in fact cause the anomalous spread prices, a

---

[11] See *In re Natural Gas Commodities Litig.*, 03-CV-6186, Docket No. 445 (S.D.N.Y. 2005) (settlement of CEA manipulation claims where there was a related governmental complaint); *In re BP Propane Direct Purchaser Antitrust Litig.*, 06-CV-3621 Docket No. 209 (JZ) (N.D. Ill.) (same); *In re Sumitomo Copper Litigation*, 74 F.Supp.2d 393 (S.D.N.Y. 1999) (same); *In re Soybeans Futures Litigation.*, No. 89 Civ. 7009 (N.D. Ill.) (settlement of CEA manipulation claims were there was a related exchange proceeding).

[12] Written Testimony of Acting Chairman Walter Lukken and Commissioner Michael Dunn, Commodity Futures Trading Commission, before the Permanent Subcommittee on Investigations Committee on Homeland Security and Governmental Affairs—United States Senate, July 9, 2007 at p. 14 ("Trading on this day was affected by a number of news stories about natural gas storage numbers (news released the previous day) and revised weather forecasts. Because of multiple events on this day it is difficult to attribute the spread increase to any one factor, including Amaranth's trading activity.").

reasonable jury could find the CFTC testimony to the contrary persuasive.

The foregoing two factors substantially increased the risks that Plaintiffs would not be able to establish liability and damages for their "spread manipulation" claims. Plaintiffs also faced several other significant risks including *Daubert* motions seeking to exclude Plaintiffs' experts' testimony, summary judgment, trial, and, even if successful at trial, post-trial motions and appeals.

Despite the foregoing unique and substantial risks present in this case, Class Counsel zealously represented the Class and secured a substantial recovery for their benefit. The foregoing risks speak to the fairness and reasonableness of the requested fee.

### 4.    "The Quality Of Representation"

The fourth factor cited by the Second Circuit is the "quality of representation" delivered by the litigation. *Goldberge*r, 209 F.3d at 50. To evaluate this factor, courts in the Second Circuit have "review[ed] the recovery obtained and the background of the lawyers involved in the lawsuit." *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008).

**Lovell Stewart**. Lovell Stewart Halebian Jacobson LLP has over thirty years of experience litigating commodity futures manipulation cases and, as sole lead or co-lead counsel, has obtained the ***first, second and third*** largest settlements in the history of the CEA. See McGrath Decl. ¶4. Lovell Stewart has also previously obtained the largest class action recovery under **two additional** federal statutes. *Id*. Bloomberg Markets magazine reported that Lovell Stewart's senior partner, Christopher Lovell, is to commodities manipulation lawsuits what Bill Gross (founder and CEO of the world's largest bond fund) is to the world of bonds. Seth Lubove and Elizabeth Stanton, *Pimco Power in Treasuries Prompts Suit*, BLOOMBERG MARKETS,

February 20, 2008 (April 2008).

**Lowey Dannenberg**.  Lowey Dannenberg has extensive experience and success prosecuting some of the most important commodity manipulation actions since the enactment of the CEA.  As co-lead counsel or one of three executive committee members, Lowey Dannenberg has helped obtain two of the largest settlements in the CEA's history, and is currently acting as co-lead counsel in two other futures manipulation cases.   In addition to its extensive commodity manipulation experience, Lowey Dannenberg has represented sophisticated clients in complex litigation for the past 40 years, recently achieving a settlement in the amount of $169.5 million, one of the largest settlements in an options backdating case.

**Louis F. Burke, P.C**.  Mr. Burke has specialized in futures litigation for the past thirty years and has many years of experience representing clients in futures market manipulation cases arising under the Commodity Exchange Act.  In addition to being appointed Co-Lead Counsel in the *Amaranth* case, Mr. Burke's firm has represented lead plaintiffs in (i) *In Re Natural Gas Commodity Litigation* involving the manipulation of the natural gas market; and (ii) *Kohen v. PIMCO* involving the manipulation of the June 2005 10 Year Treasury Note futures contract traded on the Chicago Board of Trade.  Mr. Burke's firm has filed numerous complaints alleging manipulation of (i) silver futures and option contracts traded on the Commodity Exchange, Inc. (*In Re: Commodity Exchange, Inc. Silver Futures and Options Trading Litigation*); (ii) physical oil, crude futures and options markets (*In Re: Crude Oil Commodity Futures Litigation*); (iii) platinum futures and options markets (*In Re: Platinum and Palladium Commodities Litig*.); and (iv) most recently filed the first complaint on behalf of futures customers in the *MF Global Holdings, Ltd. Investment Litigation*.

Each Class Counsel firm has submitted a firm resume detailing their background,

experience and success with CEA and other complex class action litigation.[13]

Another consideration for assessing the quality of the services rendered is the quality of the opposing counsel in the case. See *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 358, 373 (S.D.N.Y. 2002). In this action, Defendants were represented by seven highly respected and nationally recognized law firms, many of which have considerable experience with manipulation claims. The fact that Lead Counsel was able to successfully prosecute this action for 4 ½ years against such formidable opponents further reflects the quality of representation provided by Lead Counsel.

### 5. "The Requested Fee In Relation To The Settlement"

Counsel here request a fee equal to one-third of the common fund, which, if awarded, will result in a negative risk multiplier. See I.D.1 *infra*.

#### a. The Requested One-Third Fee Is Consistent With Prior CEA Fee Awards

The requested fee award is in line with prior fee awards in CEA manipulation class actions that have awarded one-third fees even in circumstances where—**unlike here**—awarding a one-third fee resulted in a **positive** lodestar multiplier. See *In re Natural Gas Commodity Litig.*, 03-CV-6186, Docket No. 445 (VM) (S.D.N.Y.) (33 1/3% fee award that resulted in a 1.86 lodestar multiplier); *In re Soybeans Futures Litig.*, No. 89 Civ. 7009 Docket Nos. 470-471 (N.D. Ill.) (33 1/3% fee award that resulted in a 1.1 lodestar multiplier); *In re BP Propane Direct Purchaser Antitrust Litig.*, 06-CV-3621, Docket No. 1872 (JBZ) (N.D. Ill.) (JBZ) (33.0% fee award that resulted in a 2.7 lodestar multiplier).

---

[13] Declaration of Christopher M. McGrath at Ex.1 (Lovell Stewart' firm resume); Declaration of Geoffrey Horn at Ex. 1 (Lowey Dannenberg's firm resume); Declaration of Louis F. Burke at Ex. 1 (Burke firm resume); Declaration of Christopher J. Gray at Ex. 1 (Gray firm resume); Declaration of Bernard Persky at Ex. 1 (Labaton Sucharow's firm resume); Declaration of Robert Rothman at Ex. A (Robbins Geller firm resume).

   **b.**  **One-Third Fees Have Been Repeatedly Awarded In Less Risky Cases**

  Courts in this Circuit have frequently awarded attorneys' fees constituting one-third of a common fund in cases involving less risky claims than the CEA manipulation claims here.  *IPO*, 671 F.Supp.2d at 516 (awarding one-third fee in a securities fraud case); *Fogarazzo*, 2011 WL 671745 at *4 (same); *In re Reddiff.com India Ltd. Securities Litig.*, 21 MC 92 (SAS), 01-cv-3020 (SAS) July 12, 2007 Final Order and Judgment at ¶16 (awarding Lovell Stewart a one-third fee in a securities fraud case); see also *In re Prudential Securities, Inc. Ltd. Partnerships Litig.*, 912 F.Supp. 97, 103 (S.D.N.Y. 1996) ("[m]any courts have approved and awarded fees in class actions of one-third of the settlement fund in recognition of the substantial services performed by counsel and the risks undertaken.").[14]

  In light of the foregoing authority and the substantial benefits that Class Counsel's work has bestowed upon the Class, this *Goldberger* factor supports the requested fee.

   **6.**  **"Public Policy Considerations"**

  Congress viewed private lawsuits as "critical to protecting the public and fundamental to maintaining the credibility of the futures market."  *Cange v. Stotler & Co.,* 826 F.2d 581, 594-

---

[14] *See also*, *e.g., Frank v. Eastman Kodak*, 228 F.R.D. 174, 189 (W.D.N.Y. 2005) (awarding 40% of common fund); *In re Crazy Eddie Sec. Litig.,* 824 F. Supp. 320, 326 (E.D.N.Y. 1993) (awarding 33.8% of common fund); *Maywalt v. Parker & Parsley Petroleum Co.*, 963 F. Supp. 310, 313 (S.D.N.Y. 1997) (awarding 33.4% of common fund), *aff'd*, 145 F.3d 513 (2d Cir. 1998); *Willix v.Healthfirst, Inc.*, No. 07-1143, 2011 WL 754862, at *6 (E.D.N.Y. Feb. 18, 2011) (awarding 33 1/3% of common fund); *Becher v. Long Island Lighting Co.,* 64 F.Supp.2d 174, 182 (E.D.N.Y.1999) (awarding 33 1/3% of common fund); *RMED Intern., Inc. v. Sloan's Supermarket, Inc.*, No. 94-5587, 2003 WL 21136726, at *2 (S.D.N.Y. May 15, 2003) (awarding 33 1/3% of common fund); *Spann v. AOL Time Warner*, 02 Civ. 8238 (DLC), 2005 WL 1330937, at *3, *9 (S.D.N.Y. Jan. 7, 2005) (awarding 33.3% of common fund); *Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (awarding 33.3% of common fund); *In re Medical X-Ray Film Antitrust Litig.*, CF 1998 WL 661515, at *8 (E.D.N.Y. 1998) (awarding 33 1/3% of common fund); *Greene v. Emersons, Ltd.,* No. 76 Civ. 2178, 1987 WL 11558, at *1, *3 (S.D.N.Y. May 20, 1987) (awarding 33 1/3% of common fund).

595 (7th Cir. 1987) *citing* to H.R. Rep. No. 565, 97th Cong., 2d Sess., pt. 1 at 56-7, *reprinted* in

1982 U.S. Code Cong. & Admin. News 3871, 3905-06.

      This Court has also recognized the importance of private enforcement actions such as the

instant action and the corresponding need to incentivize attorneys to pursue such actions on a

contingency fee basis:

> [C]lass actions serve as private enforcement tools when…regulatory entities fail
> to adequately protect investors…plaintiffs' attorneys need to be sufficiently
> incentivized to commence such actions in order to ensure that defendants who
> engage in misconduct will suffer serious financial consequences…awarding
> counsel a fee that is too low would therefore be detrimental to this system of
> private enforcement.

*IPO*, 671 F.Supp.2d at 515-16; see also *Maley v. Del Global Technologies Corp.,* 186 F. Supp.

2d 358, 374 (S.D.N.Y. 2002) ("[p]rivate attorneys should be encouraged to take the risks

required to represent those who would not otherwise be protected from socially undesirable

activities...").

      Accordingly, public policy considerations strongly support the requested one-third fee so

that qualified counsel are sufficiently incentivized to pursue complex and risky CEA

manipulation claims like those here that Congress found to be "critical" to the enforcement of the

CEA.

*****

      In sum, all six *Goldberger* factors establish the fairness and reasonableness of the

requested fee.

    **C.**    **The Requested Fee Is Fair and Reasonable Under A Percentage of the Fund
Analysis**

      Under the preferred percentage of the fund method, courts award a fee based on a

percentage of the common fund.  See I.A. *supra.*  As set forth above, there is ample support in

18

this Circuit for an award of attorneys' fees constituting one-third of a common fund in CEA

manipulation and other less risky actions.  See I.B.5 *supra* and fn. 10 collecting cases.

In fact, courts in this Circuit have found one-third fees to be fair and reasonable even

where, **unlike here**, the one-third fee resulted in a significant positive lodestar multiplier.  See

*e.g.*, *In re Buspirone Patent Litigation*, No. 01-MD-1410, slip op. at 41-43 (S.D.N.Y. Apr. 17,

2003) (approving a fee request of 33.3% of the $220,000,000 common fund that resulted in a

lodestar multiplier of 8.46).  Indeed, the Second Circuit has previously found that lodestar

multipliers as high as 3.5 are fair and reasonable.  See *e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A.,*

*Inc.*, 396, F.3d 96, 123 (2d. Cir. 2005) (affirming lodestar multiplier or of 3.5); see also *In re*

*NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) ("multipliers of

between 3 and 4.5 have become common" in the Second Circuit).

In sum, the requested one-third fee is consistent with what has previously been found to

be fair and reasonable in numerous other CEA manipulation cases and other less risky cases even

in instances where such an award resulted in a **positive** lodestar multiplier.

### D.     The Requested Fee is Fair and Reasonable Under The Lodestar "Cross Check" And The Lodestar Method Generally

#### 1.     The Requested Fee is Also Reasonable Under the Lodestar "Cross Check"

Some courts using the percentage of the fund method still use the lodestar method "as a

'cross check' on the reasonableness of the requested percentage."  *Masters v. Wilhelmina Model*

*Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007).  Application of the lodestar cross-check here

results in a **negative** risk multiplier of **0.917** (*i.e.*, $25,700,000 / $28,014,724.20 = 0.917).  This

**negative** multiplier is well **below** the range of **positive** lodestar multipliers awarded in prior

CEA manipulation cases and other cases in the Second Circuit.  See I.B.5 *supra*.  The negative

risk multiplier here is a further indication of the reasonableness of the requested one-third fee. *Fogarazzo*, 2011 WL 671745 at *4 (finding that a one-third fee was fair and reasonable in part because it resulted in a negative risk multiplier).

>**2.**     **The Requested Fee Is Reasonable Under The Lodestar Method**

Under the lodestar method, courts review the fee petition in order to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate. *Masters,* 473 F.3d at 436.  Courts applying the lodestar method will generally apply a multiplier to the lodestar to take account of the contingent nature of the fee, the risks of non-payment, the quality of the representation and the result achieved. *Wal-Mart,* 396 F.3d at 121.

As set forth in "a" and "b" below, the number of hours billed by Class Counsel and their billing rates are reasonable.

>**a.**     **Class Counsel's Hours Are Reasonable**

The first step under the lodestar method is to determine whether the number of hours devoted by counsel is reasonable. *In re Prudential,* 985 F.Supp. at 416.

Here, Class Counsel spent a total 49,113.54 hours prosecuting this action for the benefit of the Class.  See I.B.1 *supra*.  Given the magnitude and complexities of the case (see I.B.2 *supra*) and its 4 ½ year duration, the time Class Counsel spent prosecuting this action on behalf of the Class is more than reasonable.

>**b.**     **Class Counsel's Hourly Rates are Reasonable**

The second step of the lodestar analysis is the hourly rate. *In re Prudential,* 985 F.Supp. at 416.  The hourly billing rate to be applied is the hourly rate that is normally charged in the community where the counsel practices, *i.e.*, the "market rate." *See Blum v. Stenson*, 465 U.S. 886, 895 (1984).  In addition, the Supreme Court and the Second Circuit have held that the use of

*current* rates is proper since such rates more adequately compensate for inflation and loss of use

of funds.  *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1984); *New York State Ass'n for Retarded*

*Children, Inc. v. Carey*, 711 F.2d 1136, 1153 (2d Cir. 1983).

 The current hourly rates of Class Counsel are reflected in the declarations submitted

herewith.  Class Counsel's hourly rates are the competitive market hourly rates in their

respective legal communities for cases of this sort and are the same regular current rates charged

for their services in non-contingent matters.  Class Counsel's hourly rates necessarily reflect the

reputation, experience, care, and success records of Class Counsel.  No time spent by Class

Counsel in the preparation of this fee petition is included herein.

## II. THE REQUESTED REIMBURSEMENT OF EXPENSES IS REASONABLE AND SHOULD BE APPROVED

 Reimbursement of expenses to counsel whose efforts created a common fund are

generally granted "as a matter of course."  *Arakis Energy Corp. Sec. Litig.*, No. 95-cv-3431

(ARR) 2001 WL 1590512 at *17 (E.D.N.Y. Oct. 31 2001) ("[c]ourts in the Second Circuit

normally grant expense requests in common fund cases as a matter of course").

 From the beginning of the case, Class Counsel was aware that they might not recover any

expenses and, at the very least, would not recover anything until the action was successfully

resolved.  Thus, Class Counsel was motivated to, and did, take significant steps to mitigate

expenses wherever practical without jeopardizing the vigorous and efficient prosecution of the

case.

 Class Counsel respectfully requests reimbursement of $1,662,613.08 in expenses

reasonably incurred in the successful prosecution this action.[15]  The overwhelming majority of

---

[15]  Declaration of Christopher M. McGrath at ¶10 (detailing Lovell Stewart's expenses);
Declaration of Geoffrey Horn at ¶10 (detailing Lowey Dannenberg's expenses); Declaration of
Louis F. Burke at ¶10 (detailing the Burke firm's expenses); Declaration of Christopher J. Gray

Class Counsel's expenses (81%) are payments to numerous experts and consultants.  The remaining expenses were also reasonably incurred and are detailed and categorized in the declarations submitted herewith.  A summary of Class Counsel's expenses is set forth in the table below.

| FIRM | EXPENSES |
|------|----------|
|  |  |
| Lovell Stewart Halebian Jacobson LLP | $766,108.09 |
| Lowey Dannenberg Cohen & Hart, P.C. | $431,497.91 |
| Louis F. Burke, P.C. | $221,194.25 |
|  |  |
| Law Offices of Christopher J. Gray, P.C. | $136,461.12 |
| Labaton Sucharow, LLP | $41,113.70 |
| Robbins Geller Rudman & Dowd LLP | $66,218.01 |
|  |  |
| **TOTAL** | $1,662,613.08 |

Normally, a very expensive part of commodity manipulation class actions is the software and vendor costs required in order to review the millions of pages of electronic document productions.  However, Lovell Stewart made its own proprietary document review software available for use in the case without charge.  This resulted in substantial savings to the Class.

The requested reimbursement of expenses represents less than 2.2% of the $77.1 million Settlement Fund.  This ratio is extremely reasonable and is well below what has previously been found by this Court to be fair and reasonable.  See *e.g., Fogarazzo,* 2011 WL 671745 at *4 (approving as fair and reasonable expenses that constituted 9.4% of the settlement fund); *IPO*, 671 F.Supp.2d at 505 (approving as fair and reasonable expenses that constituted 8% of the settlement fund).

## <u>CONCLUSION</u>

at ¶10 (detailing the Gray firm's expenses); Declaration of Bernard Persky at ¶5 (detailing Labaton Sucharow's expenses); Declaration of Robert Rothman at ¶10 (detailing Robbins Geller's expenses).

For all the foregoing reasons, Lead Counsel's requests for (1) an award of attorneys' fees in the amount of one-third of the common fund and (2) reimbursement of $1,662,613.08 in expenses reasonably incurred in the successful prosecution of this action are fair and reasonable to the Class and should be granted.

Dated: New York, New York
  March 12, 2011

Respectfully submitted,

*/s/ Christopher Lovell*
Christopher Lovell
Christopher M. McGrath
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501
New York, New York 10006
Telephone:   (212) 608-1900
Facsimile:   (212) 719-4775

Vincent Briganti
Geoffrey Horn
**LOWEY DANNENBERG COHEN
& HART, P.C.**
White Plains Plaza
1 North Broadway, 5th Floor
White Plains, New York 10601
Telephone:   (914) 733-7221

Louis F. Burke
**LOUIS F. BURKE P.C.**
460 Park Avenue, 21st Floor
New York, New York 10022
Telephone:   (212) 682-1700

***Counsel for Plaintiffs and the Class***